ORAL ARGUMENT NOT YET SCHEDULED
**No. 25-5289**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

COALITION FOR HUMANE IMMIGRANT RIGHTS, *et al*.,
*Plaintiffs-Appellees*,

v.

KRISTI NOEM, Secretary of Homeland Security, *et al*.,
*Defendants-Appellants*.

_____

On Appeal from the United States District Court
for the District of Columbia
No. 1:25-cv-00872-JMC (Hon. Jia M. Cobb)

_____

**BRIEF OF PLAINTIFFS-APPELLEES**

_____

Esther H. Sung
Hillary Li
Karen C. Tumlin
Brandon Galli-Graves
JUSTICE ACTION CENTER
P.O. Box 27280
Los Angeles, CA 90027
(323) 450-7272
esther.sung@justiceactioncenter.org
hillary.li@justiceactioncenter.org
karen.tumlin@justiceactioncenter.org
brandon.galli-graves@justiceactioncenter.org

*Counsel for Plaintiffs-Appellees*

# CERTIFICATES AS TO PARTIES, RULINGS, AND RELATED CASES

### A.     Parties and Amici

All parties, intervenors, and amici appearing in this Court are listed in the Defendants-Appellants' Brief.

I certify under Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1 as follows:

Plaintiff-Appellee Coalition for Humane Immigrant Rights ("CHIRLA") is a membership-based nonprofit organization incorporated in California. CHIRLA has no parent corporation, and no publicly held company owns 10% or more of the organization.

Plaintiff-Appellee CASA, Inc. ("CASA") is a membership-based nonprofit organization headquartered in Maryland. CASA has no parent corporation, and no publicly held company owns 10% or more of the organization.

Plaintiff-Appellee UndocuBlack Network ("UndocuBlack") is a membership-based nonprofit organization and multigenerational network of Black immigrants. UndocuBlack has no parent corporation, and no publicly held company owns 10% or more of the organization.

### B.     Rulings Under Review

References to the rulings at issue appear in Defendants-Appellants' Brief, and the rulings are reproduced in the Joint Appendix.

### C.     Related Cases

This case has not previously been before this Court. The district court case is related to *Make the Road New York v. Noem*, No. 1:25-cv-00190 (D.D.C.), *appeal filed*, No. 25-5320 (D.C. Cir.).

/s/*Hillary Li*

# **TABLE OF CONTENTS**

CERTIFICATES AS TO PARTIES, RULINGS, AND RELATED CASES ............i

TABLE OF CONTENTS ........................................................................ ii

TABLE OF AUTHORITIES ................................................................ iv

GLOSSARY OF ABBREVIATIONS .......................................................x

STATUTES AND REGULATIONS .........................................................x

INTRODUCTION ...................................................................................1

STATEMENT OF THE ISSUES .............................................................3

STATEMENT OF THE CASE ................................................................4

    A.   Statutory Background ............................................................4

    B.   Parole Authority ...................................................................6

    C.   Defendants' Actions .............................................................7

    D.   Procedural History ...............................................................9

SUMMARY OF THE ARGUMENT .......................................................9

STANDARD OF REVIEW ..................................................................15

ARGUMENT .......................................................................................16

I.    The District Court Did Not Abuse Its Discretion in Holding that
Plaintiffs Are Likely to Succeed on the Merits ..............................16

    A.   Plaintiffs' Injuries Are Redressable......................................16

    B.   The District Court Correctly Held 8 U.S.C. §1252(f)(1) Inapplicable ...20

    C.   The District Court Did Not Abuse Its Discretion in Holding Plaintiffs
Are Likely to Succeed in Establishing that the INA Does Not
Authorize Expedited Removal of Noncitizens Paroled at a Port of
Entry. ................................................................................24

        1. Designation Provision.......................................................25

      a. Statutory Text ..................................................................25

      b. Statutory Context ............................................................28

      c. Regulatory Context and Agency Interpretation ...........................33

    2. "Arriving in" Provision ..........................................................35

      a. Statutory Text ..................................................................35

      b. Statutory Structure ..........................................................38

      c. Statutory and Regulatory Context .................................38

      d. Statutory Purpose..............................................................42

    3. AEDPA Confirms the Meaning of IIRIRA ......................................45

  D. The District Court Did Not Abuse Its Discretion in Holding that Plaintiffs Are Likely to Succeed in Proving that the Challenged Actions Are Arbitrary and Capricious. ...................................................47

II. The District Court Did Not Abuse Its Discretion in Holding that the Equitable Factors Support a Stay.....................................................49

III. The District Court Did Not Abuse Its Discretion in Staying the Challenged Actions. .......................................................................52

CONCLUSION ...........................................................................55

CERTIFICATE OF COMPLIANCE ....................................................57

CERTIFICATE OF SERVICE.............................................................58

# <u>TABLE OF AUTHORITIES</u>

**<u>Page(s)</u>**

## <u>Cases</u>

*All. for Hippocratic Med. v. FDA*, 78 F.4th 210 (5th Cir. 2023) ......................21, 53

*Awad v. Obama*, 608 F.3d 1 (D.C. Cir. 2010).........................................................15

*Burlington Truck Lines, Inc. v. United States*, 317 U.S. 156 (1962) .....................48

*Career Colls. & Schs. of Tex. v. Dep't of Educ.*, 98 F.4th 220 (5th Cir.
    2024) ................................................................................................................55

*Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837
    (1984) ..............................................................................................................41

*Coal. for Humane Immigrant Rts. v. Noem*, No. 25-5289, 2025 WL
    2649100 (D.C. Cir. Sept. 12, 2025) ...................................................................9

*Corner Post, Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 603 U.S.
    799 (2024) .......................................................................................................53

*Cuomo v. NRC*, 772 F.2d 972 (D.C. Cir. 1985) .....................................................15

*Defs. of Wildlife v. Gutierrez*, 532 F.3d 913 (D.C. Cir. 2008) ..........................16,18

*DHS v. Regents of the Univ. of Calif.*, 591 U.S. 1 (2020) ......................................48

*DHS v. Thuraissigiam*, 591 U.S. 103 (2020) .....................................................43, 44

*Direct Mktg. Ass'n v. Brohl*, 575 U.S. 1 (2015) ....................................................23

*Doe v. Noem*, 152 F.4th 272 (1st Cir. 2025) ..........................................................33

*E.V. v. Raycraft*, No. 4:25-cv-2069, 2025 WL 2938594 (N.D. Ohio
    Oct. 16, 2025*)*................................................................................................33

*Encino Motorcars, LLC v. Navarro*, 579 U.S. 211 (2016) ....................................49

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009)...................................49

*Garland v. Aleman Gonzalez*, 596 U.S. 543 (2022)...............................................23

*Grace v. Barr*, 965 F.3d 883 (D.C. Cir. 2020) ........................................22

*Griffin v. HM Florida-ORL, LLC*, 144 S. Ct. 1 (2023) ...........................53

*Harmon v. Thornburgh*, 878 F.2d 484 (D.C. Cir. 1989) ...................53, 55

*Hewitt v. United States*, 606 U.S. 419 (2025) .....................25, 26, 27, 28

*Immigr. Defs. L. Ctr. v. Noem*, 145 F.4th 972 (9th Cir. 2025) ...............20

*In re Navy Chaplaincy*, 697 F.3d 1171 (D.C. Cir. 2012) .......................15

*Larson v. Valente*, 456 U.S. 228 (1982) ................................................16

*Jazz Pharms., Inc. v. Kennedy*, 141 F.4th 254 (D.C. Cir. 2025) .............42

*Khogiani v. Raycraft*, No. 25-cv-13744, 2025 WL 3753532 (E.D. Mich. Dec. 29, 2025).............................................................33

*Kirboga v. LaRose*, No. 25-cv-3706-GPC-DDL, 2025 WL 3779426 (S.D. Cal. Dec. 31, 2025) ...................................................33

*Kucana v. Holder*, 558 U.S. 233 (2010)................................................31

*Larson v. Valente*, 456 U.S. 228 (1982)................................................16

*League of Women Voters of U.S. v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) .........................................................................51

*Leng May Ma v. Barber*, 357 U.S. 185 (1958)......................................39

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024)..................41, 42

*Make the Rd. New York v. Noem*, No. 25-5320, 2025 WL 3563313 (D.C. Cir. Nov. 22, 2025).........................................................20, 55

*Make the Rd. New York v. Wolf*, 962 F.3d 612 (D.C. Cir. 2020) ...........22

*Matter of G-*, 20 I&N Dec. 764 (BIA 1993) .........................................40

*Matter of O-*, 16 I&N Dec. 344 (BIA 1977) .........................................39

*Matter of Z-*, 20 I&N Dec. 707 (BIA 1993) .........................................40

*McNeill v. United States*, 563 U.S. 816 (2011) ......................................44

*Moskal v. United States*, 498 U.S. 103 (1990) ......................................23

*Munoz Materano v. Arteta*, No. 25 Civ. 6137 (ER), 2025 WL 2630826
(S.D.N.Y. Sept. 12, 2025) ...................................................................33

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399
(D.C. Cir. 1998) ..................................................................................55

*Nat'l Postal Pol'y Council v. Postal Regul. Comm'n*, 17 F.4th 1184
(D.C. Cir. 2021) ..................................................................................37

*Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930 (D.C.
Cir. 2004) ............................................................................................19

*Nken v. Holder*, 556 U.S. 418 (2009) ..............................................21, 51

*Nuclear Info. & Res. Serv. v. NRC*, 457 F.3d 941 (9th Cir. 2006) .........20

*Renal Physicians Ass'n v. HHS*, 489 F.3d 1267 (D.C. Cir. 2007) ..........19

*Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471
(1999) ..................................................................................................21

*Sanchez v. Mayorkas*, 593 U.S. 409 (2021) ...........................................26

*Scenic Am., Inc. v. DOT*, 836 F.3d 42 (D.C. Cir. 2016).........................19

*Shawnee Tribe v. Mnuchin*, 984 F.3d 94 (D.C. Cir. 2021) .....................51

*Trump v. CASA, Inc.*, 606 U.S. 831 (2025) ..........................51, 52, 53, 54

*United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954)......41

*United States v. Alford*, 89 F.4th 943 (D.C. Cir.), *cert. denied*, 145 S.
Ct. 180 (2024) ....................................................................................35

*United States v. Bronstein*, 849 F.3d 1101 (D.C. Cir. 2017*)*..................23

*United States v. Fischer*, 64 F.4th 329 (D.C. Cir. 2023)........................23

*Walizada v. Trump*, No. 2:25-cv-00768, 2025 WL 3551972 (D. Vt.
Dec. 11, 2025*)* ....................................................................................37

## Statutes

5 U.S.C.
  § 705 ..................................................................................*passim*
  § 706 ................................................................................15, 21, 55

6 U.S.C.
  § 202(4) ...............................................................................6, 27

8 U.S.C.
  § 1101(a)(13)(A) .................................................................26, 27
  § 1158(a) ....................................................................................36
  § 1158(a)(2)(B) .........................................................................29
  § 1182(a)(6)(C) ...........................................................................5
  § 1182(a)(9)(B)(ii) ....................................................................29
  § 1182(d)(5)(A) .................................................................6, 30, 40
  § 1225 .................................................................................*passim*
  § 1225(a) ...............................................................................30, 40
  § 1225(b) .............................................................................*passim*
  § 1225(d)(2) ...............................................................................37
  § 1229a ......................................................................................1, 4
  § 1252(e)(3) ....................................................................11, 21, 52
  § 1252(f)(1) .........................................................................*passim*
  § 1255(a) ...............................................................................29, 31

Act of Nov. 2, 1966, Pub. L. No. 89-732 ..............................32, 40
Act of Nov. 6, 2000, Pub. L. No. 106-429 ..................................32
Act of Nov. 21, 1989, Pub. L. No. 101-167 ...............................32
Act of Oct. 28, 1977, Pub. L. No. 95-145 ..................................39
Antiterrorism and Effective Death Penalty Act, Pub. L. No. 104-132, §§ 414, 422 (Apr. 24, 1996) ..........................................*passim*
Haitian Refugee Immigration Fairness Act, Pub. L. No. 105-277.........................32
Help Haitian Adoptees Immediately to Integrate Act of 2010, Pub. L. No. 111-293 ............................................................................32
Illegal Immigration Reform and Immigrant Responsibility Act, Pub. L. No. 104-208, § 302 (Sept. 30, 1996) .........................................*passim*
Pub. L. No. 85-559 (1958) ..................................................39, 40

## Regulations

8 C.F.R.
  § 1.2 ........................................................................................*passim*
  § 208.4(a)(5)(iv) ....................................................................29
  § 235.3(b)(1)(i) ................................................................10, 17
  § 235.3(b)(1)(ii) ....................................................................34
  § 235.3(b)(6) ...................................................................33, 34
  § 245.1(b)(3) ..........................................................................29
  § 245.1(d)(1)(v) .....................................................................27

Designating Aliens for Expedited Removal, 69 Fed. Reg. 48877 (Aug. 11, 2004) .............................................................................35

Designating Aliens for Expedited Removal, 84 Fed. Reg. 35409 (July 23, 2019) .................................................................................35

Designating Aliens for Expedited Removal, 90 Fed. Reg. 8139 (Jan. 24, 2025) .................................................................................35

Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans, 90 Fed. Reg. 13611 (Mar. 25, 2025) ......................................8

## Rules

Fed. R. Civ. P. 65(c) ...................................................................22

## Legislative Materials

H.R. Conf. Rep. No. 104-518 (1996) .................................................46

H.R. Conf. Rep. No. 104-828 (1996) .................................................42

H.R. Rep. No. 104-383 (1996) .............................................45, 46, 47

H.R. Rep. No. 104-469 (1996) ...................................................42, 43

S. Rep. No. 86-1651 (1960), *as reprinted in* 1960 U.S.C.C.A.N. 3124 .................31

## Other Authorities

Brief for the Petitioners, *Noem v. Al Otro Lado*, No. 25-5 (U.S. Jan. 6, 2026) ........................................................................................36

The Chicago Manual of Style § 5.132 (17th ed. 2017) ...........................................26

Merriam-Webster's Collegiate Dictionary (1996) .................................................36

Oxford English Reference Dictionary (2016) ........................................................36

Tr. of Oral Arg., *DHS v. Thuraissigiam*, 591 U.S. 103 (No. 19-161)
    (Mar. 2, 2020) .................................................................................................46

USCIS, Instructions for Application to Register Permanent Residence
    or Adjust Status (Form I-485) ...................................................................28, 32

## GLOSSARY OF ABBREVIATIONS

AEDPA              Antiterrorism and Effective Death Penalty Act

BIA                Board of Immigration Appeals

CAA                Cuban Adjustment Act

CFI                Credible Fear Interview

CHNV               Cuba, Haiti, Nicaragua, and Venezuela

IIRIRA             Illegal Immigration Reform and Immigrant Responsibility Act


## STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the addendum to this brief.

Except for those included in the addendum, all applicable statutes, etc., are contained

in the Addendum to Defendants-Appellants' Brief.

## INTRODUCTION

Plaintiffs are three organizations whose members are among the hundreds of thousands of individuals who arrived at ports of entry, were inspected by immigration officers, and were paroled into the country, where most have now lived for years. Many came through humanitarian parole processes for (among others) certain nationals of Cuba, Haiti, Nicaragua, Ukraine, and Venezuela who had relatives or others here sponsoring them; DHS granted them travel authorization to come and be considered individually for parole. DHS paroled in others after they made an appointment using Defendants' mobile application, CBP One, to come to a land port of entry for inspection. Still others are Afghan allies paroled in after being evacuated from Afghanistan during the Taliban takeover.

Early last year, Defendants issued three written directives that, *inter alia*, subjected these individuals to expedited removal. Defendants began aggressively enforcing these directives in May 2025, including through surprise courthouse arrests of noncitizens attending routine immigration court proceedings. In those proceedings, noncitizens had the right to retain counsel, present and examine evidence, cross-examine witnesses, pursue forms of relief from removal, and seek judicial review. 8 U.S.C. §1229a. In contrast, expedited removal authorizes immigration officers to deport eligible noncitizens "without further hearing or review." 8 U.S.C. §1225(b)(1)(A)(i).

This use of expedited removal against parolees was unprecedented and illegal. By statute, expedited removal cannot be applied to paroled individuals, because it may only be applied to individuals in two distinct groups: (1) noncitizens who are "arriving in the United States" (i.e., are in the process of entering the country at a port of entry), 8 U.S.C. §1225(b)(1)(A)(i), and (2) "certain other" noncitizens, subject to designation by the Secretary of Homeland Security, who "[have] not been admitted or paroled" (i.e., entered without inspection) and cannot establish two years of continuous physical presence, *id.* §1225(b)(1)(A)(iii).

The district court issued a well-reasoned, 84-page opinion explaining that Plaintiffs are likely to succeed in proving that paroled individuals cannot be subjected to expedited removal because they (1) are no longer "arriving" in the country, and (2) have been paroled into the country; and that Plaintiffs are likely to succeed on their arbitrary and capricious claim because of irreconcilable and unexplained inconsistencies between the three directives. Based on the uncontested factual finding that, apart from a few individuals paroled for criminal prosecution, DHS never subjected parolees to expedited removal before these directives, the district court rejected Defendants' contention that a preexisting regulation, which purportedly subjects parolees to expedited removal as "arriving aliens," renders

Plaintiffs' injuries nonredressable.[1] The district court then preliminarily stayed the policies under 5 U.S.C. §705.

The district court identified the correct law, applied it faithfully to the record developed by the parties, detailed its conclusions, and granted statutorily authorized relief to prevent irreparable harm and preserve the status quo. On appeal, Defendants have waived any argument as to the district court's factual findings and can identify neither error in its legal conclusions nor abuse of its discretion. This Court should affirm.

## STATEMENT OF THE ISSUES

1.    Whether the district court abused its discretion in holding that Plaintiffs are likely to succeed in proving that their injuries are redressable.

2.    Whether the district court erred in holding that 8 U.S.C. §1252(f)(1) does not limit its jurisdiction to provide meaningful relief to Plaintiffs' members harmed by Defendants' unlawful actions.

3.    Whether the district court abused its discretion in holding that Plaintiffs are likely to succeed in proving that Defendants' actions subjecting individuals paroled into the country at a port of entry to expedited removal are not authorized by 8 U.S.C. §1225(b)(1)(A), which permits the application of expedited removal

---

[1] Plaintiffs have challenged the inclusion of paroled individuals in the regulatory definition of "arriving alien," JA171-174, and have notified the district court that they will promptly move for partial summary judgment on that claim.

only to certain noncitizens who (1) are "arriving in the United States" or (2) "ha[ve] not been admitted or paroled" and cannot establish two years of physical presence.

4.      Whether the district court abused its discretion in holding that Plaintiffs are likely to succeed in proving that Defendants' actions subjecting individuals paroled into the country at a port of entry to expedited removal are arbitrary and capricious due to the lack of rational explanation of the agency's actions, including inconsistent positions taken over mere months.

5.      Whether the district court abused its discretion in staying Defendants' unlawful actions to prevent irreparable harm to Plaintiffs' members, where the likelihood of success and the balance of equities weigh in favor of a stay.

6.      Whether the district court abused its discretion in staying the Challenged Actions as to all noncitizens paroled into the United States.

## STATEMENT OF THE CASE

### A.      Statutory Background

Removal proceedings in immigration court are generally the "sole and exclusive procedure" for determining whether a person can be admitted to or removed from the country. 8 U.S.C. §1229a(a)(3). Such proceedings—commonly referred to as "240 proceedings" based on the Immigration and Nationality Act ("INA") section—include various procedural rights and protections, including the right to retain counsel, present evidence, and seek judicial review.

One exception to 240 proceedings is "expedited removal," whereby certain noncitizens determined by an immigration officer to be inadmissible because they lack valid entry documents may be ordered removed "without further hearing or review."[2] 8 U.S.C. §1225(b)(1)(A)(i). In such proceedings, noncitizens do not receive a hearing before an immigration judge, have no right to counsel, and frequently have no opportunity to prepare evidence to challenge their removal. Most defenses available in 240 proceedings, including forms of immigration relief, are unavailable. Expedited removal was created in the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), Pub. L. No. 104-208, §302 (Sept. 30, 1996), which rescinded and replaced the first ever "expedited" procedure enacted five months earlier in the Antiterrorism and Effective Death Penalty Act ("AEDPA") that never took effect. Pub. L. No. 104-132, §§414, 422 (Apr. 24, 1996).

In IIRIRA, Congress authorized expedited removal only for two distinct categories of noncitizens:

(1) those who are "arriving in the United States," 8 U.S.C. §1225(b)(1)(A)(i) (hereinafter, the "'Arriving In' Provision"); and

---

[2] Expedited removal may only be used against noncitizens inadmissible under 8 U.S.C. §1182(a)(6)(C) (relating to misrepresentations to procure, *inter alia*, admission) or (a)(7) (relating to the lack of a valid travel or entry document).

(2) subject to designation by the Secretary of Homeland Security, "certain other" noncitizens who have "not been admitted or paroled" and cannot establish two years of continuous physical presence, 8 U.S.C. §1225(b)(1)(A)(iii) (hereinafter, the "Designation Provision").

## B.    Parole Authority

"Parole" is a "form[] of permission ... to enter the United States," 6 U.S.C. §202(4), that may be granted for humanitarian or significant public benefit reasons, 8 U.S.C. §1182(d)(5)(A). Since its codification over 70 years ago, administrations of both parties have used parole as a flexible tool to promote humanitarian, foreign policy, regional security, and migration management objectives when other authorities are inadequate or unavailable. From 2021 to 2024, for example, 75,000 Afghans fleeing the Taliban, 200,000 Ukrainians displaced by Russia's invasion, and 500,000 Cubans, Haitians, Nicaraguans, and Venezuelans escaping civil unrest and natural disasters were inspected and paroled into the country. The government identified for the district court only two parolees (paroled for criminal prosecution) ever subjected to expedited removal before 2025. *See* JA631-632, JA640-641.[3]

---

[3] Such uses of expedited removal suffer from the same fatal statutory defects that apply to its use against other parolees. *See* JA641.

## C.     Defendants' Actions

This appeal concerns the district court's §705 stay of three policies issued in early 2025 to subject noncitizens previously paroled into the country at a port of entry[4] to expedited removal (together, the "Challenged Actions"):

1.     The January 23 Memorandum directed immigration officers to consider for expedited removal "any alien … amenable to expedited removal, including by terminating ongoing removal proceedings and active parole grants."[5]

2.     The February 18 Directive ordered ICE officers to consider for expedited removal any "paroled arriving aliens" who had not yet affirmatively applied for asylum, claiming "[t]here is no time limit on the ability to process such [individuals] for ER."[6]

---

[4] Such noncitizens are referred to herein as "paroled individuals" or "parolees."

[5] DHS, Memorandum from Acting Secretary Benjamine C. Huffman on Guidance Regarding How to Exercise Enforcement Discretion (Jan. 23, 2025), https://www.dhs.gov/sites/default/files/2025-01/25_0123_er-and-paroleguidance.pdf.

[6] Ted Hesson & Kristina Cooke, *Trump weighs revoking legal status of Ukrainians as US steps up deportations*, Reuters (Mar. 6, 2025), https://www.reuters.com/world/us/trump-plans-revoke-legal-status-ukrainians-who-fled-us-sources-say-2025-03-06/ (citing "internal ICE email" available at https://fingfx.thomsonreuters.com/gfx/legaldocs/gkpljxxoqpb/ICE_email_Reuters.pdf).

3.    The March 25 Federal Register Notice terminated *en masse* all existing grants of parole under the Cuban, Haitian, Nicaraguan, and Venezuelan ("CHNV") parole processes. DHS stated it was terminating parole grants early so it could "initiate expedited removal proceedings to the maximum extent possible."[7]

Enforcement efforts under the Challenged Actions ramped up in May 2025, after White House deputy chief of staff Stephen Miller pressured ICE to arrest and deport more people, setting a quota of 3,000 arrests a day (triple the number of daily arrests being made). JA026. Defendants initiated a nationwide blitz involving surprise courthouse arrests of noncitizens appearing for routine immigration court hearings. During these hearings, ICE attorneys moved to dismiss the noncitizens' cases, typically with no written motion or explanation; noncitizens (and their attorneys, for those represented) often thought this would allow them to pursue their affirmative applications for relief outside of removal proceedings. After immigration judges granted dismissal—and often even if they did not—immigration officers waiting in the wings arrested the noncitizens to process them for expedited removal. JA206-212, JA221-312.

---

[7] Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans, 90 Fed. Reg. 13611, at 13619, 13620 (Mar. 25, 2025).

Noncitizens paroled into the United States, including Plaintiffs' members, are among those harmed by Defendants' actions. JA180-205, JA221-312. They have been detained and often quickly transferred to far-flung detention centers, denied access to counsel, and deprived of the opportunity to pursue immigration relief for which they are eligible. *See, e.g.*, JA206-212, JA221-312.

### D.     Procedural History

Plaintiffs timely brought suit and subsequently amended their complaint and moved to stay the Challenged Actions under 5 U.S.C. §705 "insofar as they subject individuals who have been previously granted parole at ports of entry to expedited removal." JA121-175. The district court granted Plaintiffs' motion, holding that: (1) Plaintiffs had standing and their claims were redressable, JA042-045; (2) the Challenged Actions exceeded DHS's statutory authority under the INA, JA045-066, and were arbitrary and capricious, JA066-074; and (3) Plaintiffs had established imminent, irreparable injury, and the equitable factors favored a stay, JA075-085.

The district court denied Defendants' request to stay the §705 stay pending appeal, JA655, as did this Court, *Coal. for Humane Immigrant Rts. v. Noem*, No. 25-5289, 2025 WL 2649100 (D.C. Cir. Sept. 12, 2025).

### SUMMARY OF ARGUMENT

This Court should affirm the district court's stay of the Challenged Actions, which was properly issued pursuant to the court's jurisdiction, consistent with the

text, context, structure, history and purpose of the expedited removal statute, and is preventing further irreparable injury that was ongoing when the order was issued.

1.    The district court did not abuse its discretion in holding that the injuries to Plaintiffs' members are redressable by a stay of the Challenged Actions, regardless of the existence of regulations promulgated in 1997 that define paroled individuals as "arriving aliens" and, separately, purport to authorize the application of expedited removal to "arriving aliens." 8 C.F.R. §§1.2; 235.3(b)(1)(i). Redressability requires only that a court's order redress at least a part of a plaintiff's injuries. Here, the district court found, based on the factual record developed by both parties, that it was the Challenged Actions, and not the regulations, that prompted Defendants to newly pursue expedited removal for parolees. Defendants identify no clear error in the district court's finding that the Challenged Actions drove the Defendants' unprecedented and widespread campaign targeting paroled individuals for expedited removal, and that the harm to Plaintiffs' members stemmed directly from those actions.

2.    The district court correctly rejected Defendants' argument that 8 U.S.C. §1252(f)(1) prohibits an APA §705 stay. The Supreme Court has held that §1252(f)(1) is "nothing more or less than a limit on *injunctive* relief," JA028-031 (emphasis added), and Defendants have no rejoinder to the multiple federal courts holding it inapplicable to APA vacatur relief. Like vacatur, a §705 stay does

not order DHS to take or refrain from taking any actions, but re-establishes the *status quo ante* by staying DHS's actions while this case proceeds to final judgment. Defendants cite no authority for equating statutory stays to injunctions for purposes of §1252(f)(1). Moreover, Defendants' interpretation would leave Plaintiffs and others similarly situated with no remedy at all in cases brought under 8 U.S.C. §1252(e)(3), even though they are authorized by statute.

3.     The district court did not abuse its discretion in holding Plaintiffs were likely to succeed in showing the Challenged Actions are not authorized by 8 U.S.C. §1225(b)(1)(A), which permits expedited removal for two distinct groups of noncitizens lacking valid entry documents, neither of which includes individuals paroled into the country at a port of entry.

The Designation Provision permits the application of expedited removal only to certain noncitizens physically present in the United States for less than two years who "ha[ve] not been admitted or paroled." The statute's text makes plain that someone who came into the country through parole is not part of this group. Defendants concede that a noncitizen with "active" parole is not subject to expedited removal under this provision, but argue that once someone's parole has been terminated, the person becomes someone who "has not been … paroled." This argument relies on a misreading of Supreme Court precedent. Defendants also

identify nothing on appeal to disturb the district court's finding that Defendants' own regulations and past practice favor Plaintiffs' interpretation.

The "Arriving In" Provision allows the application of expedited removal only to certain noncitizens who are "arriving in the United States." The statutory language and ordinary meaning of "is arriving," which is defined as being "in the process of reaching [a] destination," JA060, make clear that someone who came to a port of entry, was inspected by an immigration officer, was paroled into the country, and has been residing here for years is not "arriving in the United States," and therefore is not amenable to expedited removal. Defendants advance an interpretation of "arriving" that treats paroled individuals as always "arriving," in perpetuity. This interpretation runs contrary to the ordinary meaning of the words that Congress chose, the use of "arrive" and other forms of the term elsewhere in §1225, and the government's own arguments to the Supreme Court in a pending case. Similarly unavailing is Defendants' claim that 8 C.F.R. §1.2, which includes paroled individuals as "arriving aliens," resolves this statutory analysis; the regulation cannot grant authority beyond the statute. Defendants also assert that the parole statute reflects the "legal fiction" that parolees are "legally in the same position as [noncitizens] standing at the border." But they provide no basis to conclude that Congress incorporated this fiction into the concept of "arriving" in the expedited removal statute. Quite the opposite is true: when creating the "Arriving

In" expedited removal authority, Congress was primarily concerned with noncitizens in the process of arriving at airports without valid documents, which did not include paroled individuals. Finally, the legislative history of AEDPA and the evolution of expedited exclusion in that law to expedited removal in IIRIRA, five months later, confirms that Congress did not intend to subject paroled individuals to expedited removal.

4.    The district court did not abuse its discretion in holding Plaintiffs are likely to succeed in proving that Defendants failed to engage in reasoned decisionmaking in issuing the Challenged Actions. Defendants provide scant explanation for their decisions to subject paroled individuals to expedited removal, and the explanations they do provide are inconsistent. The January 23 Huffman Memorandum and the March 25 CHNV Termination Notice, which appear to be based on the Designation Provision, indicate that parole status must be terminated before an individual can be subjected to expedited removal, and that termination must be done *before* the parolee has been here for two years. On the other hand, the February 18 ICE Directive was issued between the other two Challenged Actions, cites no legal authorities, and states that there is "no time limit" on subjecting paroled individuals to expedited removal, even those with active grants of parole. Defendants provide only impermissible *post hoc* rationalizations for the flip-flop in positions taken in the three Challenged Actions. The district court

correctly held that this kind of inconsistency, over the span of mere months, "is the hallmark of arbitrary and capricious decision-making." JA066-074.

5.     The district court did not abuse its discretion in concluding that the Challenged Actions inflicted imminent, irreparable injury on Plaintiffs' members and noncitizens like them. The district court did not err in finding that credible fear interviews in expedited removal proceedings lack the kind of process provided in 240 proceedings and that parolees targeted for expedited removal, like Plaintiffs' members, were detained far from family; lost opportunities to seek immigration relief; and faced deportation to countries where they could be persecuted or killed because of Defendants' wrongful actions.

The district court's conclusion that the balance of equities and the public interest weigh in favor of a stay was likewise not an abuse of discretion. Defendants' unlawful policies exposed hundreds of thousands of paroled individuals currently here in the United States—who did everything the government asked of them to come to this country via a lawful pathway—to expedited removal and the risk of separation from the lives they have built here with their families. While Defendants may have an interest in carrying out the President's immigration policies, the public has a stronger interest in the Executive adhering to the laws enacted by Congress, including those that prevent individuals from being erroneously removed to places where they would face persecution or death.

- 14 -

6.    The scope of the district court's stay of the Challenged Actions was also not an abuse of discretion. This Court and others around the country have held that a full stay or vacatur of an unlawful agency action is the standard remedy under APA §§705 and 706. Defendants point to nothing in the statute or case law indicating that a §705 stay should be granted only as to the plaintiffs. The district court identified the significant practical challenges in implementing a stay limited to Plaintiffs' members, which highlight the likelihood that a limited stay would result in incomplete relief to Plaintiffs; Defendants did not address that factor and thus waived any appeal of it. The district court did not abuse its discretion in holding that staying the Challenged Actions in full was necessary to prevent irreparable harm to Plaintiffs.

## STANDARD OF REVIEW

An APA §705 stay of agency action turns on likelihood of success on the merits; likelihood of irreparable injury absent relief; and the public interest. *Cuomo v. NRC*, 772 F.2d 972, 974 (D.C. Cir. 1985). This Court reviews the district court's weighing of the equitable relief factors for abuse of discretion, legal holdings de novo, and factual findings for clear error. *In re Navy Chaplaincy*, 697 F.3d 1171, 1178 (D.C. Cir. 2012). "[I]f the district court's account of the evidence is plausible in light of the record viewed in its entirety," this Court "may not reverse it." *Awad v. Obama*, 608 F.3d 1, 7, 10 (D.C. Cir. 2010).

## ARGUMENT

**I.    The District Court Did Not Abuse Its Discretion in Holding that Plaintiffs are Likely to Succeed on the Merits.**

**A.    Plaintiffs' Injuries are Redressable.**

The district court did not abuse its discretion in holding that Plaintiffs' injuries are redressable and that a stay of the Challenged Actions would provide relief.

The district court properly examined the record before it in holding that Plaintiffs' asserted injuries are likely to be redressed by a favorable decision. JA038. Plaintiffs "need not show that a favorable decision will relieve [their] *every* injury," *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982) (emphasis in original), but only that "an order from the district court could redress [plaintiff's] injury, at least in part," *Defs. of Wildlife v. Gutierrez,* 532 F.3d 913, 925 (D.C. Cir. 2008).

The district court did not clearly err in finding that "[w]hile DHS has long asserted the authority to apply expedited removal to parolees … *the agency has only begun doing so* en masse *since the Challenged Actions*." JA035 (emphasis added). *See* JA222-223, JA259, JA355, JA370. Indeed, when pressed below, Defendants identified only *two* examples of the agency subjecting paroled individuals to expedited removal before 2025. Both times, the noncitizens were paroled into the country for criminal prosecution. JA036.[8] The district court thus did not abuse its

---

[8] Defendants also submitted a 2011 ICE guidance advising officers to use expedited removal for parolees "for reasons other than prosecution only if the parole has

discretion in holding that staying the three Challenged Actions would at least partially redress Plaintiffs' injuries; the "unrebutted" record is devoid of evidence that the same injuries would have occurred "had none of the three Challenged Actions been issued." JA034-039. Defendants do not contest this finding—and indeed, the district court noted this finding was consistent with Defendants' own briefing, in which Defendants themselves represented that "[t]he relief Plaintiffs request would prevent DHS from applying expedited removal to potentially hundreds of thousands of paroled aliens." JA037, JA480.

On appeal, Defendants primarily rehash an argument the district court considered and rejected—that the redressability of Plaintiffs' injuries is "speculative" because two pre-existing regulations purport to authorize expedited removal under the "Arriving In" Provision for paroled individuals.[9] Defs.' Br. 22-30. This argument remains wrong for at least two reasons.

---

expired or been terminated <u>and</u> the [individual] has been continuously present in the United States for less than one year." JA635-636. But the district court found no evidence "of how often or how pervasively ICE officials actually used [the expedited removal authority]" on humanitarian parolees, JA036, and noted that the guidance imposed separate, and significantly greater, restrictions on expedited removal for individuals paroled for reasons other than prosecution, *id.*

[9] First promulgated in 1997 via an "interim" final rule, 8 C.F.R. §1.2 defines a noncitizen paroled into the country at a port of entry as an "arriving alien." 8 C.F.R. §235.3(b)(1)(i) references this definition in authorizing expedited removal for "arriving aliens," purportedly per the "Arriving In" Provision.

First, although these regulations existed for nearly 30 years before the issuance of the Challenged Actions, the district court did not clearly err in finding that Defendants never attempted to rely upon them except in a vanishingly small number of cases.[10] *See* JA036. The district court found that Defendants failed to demonstrate, "as a factual matter, that 8 C.F.R. §1.2 would have the same result had none of the three Challenged Actions been issued." JA038. Defendants identify no error in this finding, much less the clear error necessary to reverse. Nor do Defendants identify any legal error in the holding that "relief need only be likely to relieve the asserted injury 'in part,' not even the entirety of the injury." *Id.* (citing *Defs. of Wildlife,* 532 F.3d at 925).

Second, although the 8 C.F.R. §1.2 definition of "arriving alien" is not subject to the stay, the district court held it "to be *ultra vires* to the extent it subjects parolees to expedited removal," further undermining Defendants' suggestion that it precludes redress. JA054. Perhaps for that reason, although Defendants say they recently "have applied expedited removal pursuant to [the regulations] to paroled [individuals]," Defs.' Br. 17, they do not assert to be doing so to the extent they did pursuant to the Challenged Actions.

---

[10] Defendants argue a claim related to 8 C.F.R. §1.2 would be untimely. Defs.' Br. 23-24, 24 n.2. That dispute is not before this Court, *see supra* n.1, and so is not addressed here.

The cases Defendants cite on pages 28-29 of their brief do not illuminate any clear error in the factual findings underlying the district court's holding. Moreover, they are entirely distinguishable because the obstacles to redressability in those cases involved regulated third parties whose actions severed any causal chain between the government policy challenged by the plaintiffs and their alleged harm.[11]

Here, Defendants do not and cannot claim a third party's action breaks redressability, because the applicable agency actions and regulations concern the conduct of Defendants themselves and how Defendants' actions changed after the Challenged Actions. As the district court found (and Defendants do not contest), there is "no evidence that DHS applied expedited removal to the many parolees ... who were paroled into the United States for a purpose other than criminal prosecution" prior to the Challenged Actions.   JA036. The fact that certain regulations purport to permit, but do not *require*, Defendants to subject humanitarian parolees to expedited removal—and in fact did *not* prompt Defendants to do so

---

[11] *See* Defs.' Br. 28-29, discussing *Scenic Am., Inc. v. DOT*, 836 F.3d 42, 50-53 (D.C. Cir. 2016) (no causation because, even before the challenged guidance issued, states routinely sought and received permission for digital billboards under existing regulatory scheme); *Renal Physicians Ass'n v. HHS*, 489 F.3d 1267, 1277-78 (D.C. Cir. 2007) (Plaintiffs failed to show vacatur would raise wages, since the market had adjusted to the lower wage and a statute capped pay at "fair market value"); *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 939-40 (D.C. Cir. 2004) (no redressability because Title IX and its implementing regulations "would still be in place," and schools could still eliminate or cap men's wrestling teams to comply).

- 19 -

before—distinguishes this case from *Scenic America*, *Renal Physicians*, and *National Wrestling Coaches*, in which unchallenged laws and regulations required certain conduct from third parties, and the plaintiffs failed to show that the third-party conduct would change notwithstanding those unchallenged regulations.[12]

Defendants' cases are inapposite, and they have failed to identify any error in the court's factual findings. The district court correctly held that the plaintiffs' injuries are redressable.

### B.    The District Court Correctly Held 8 U.S.C. §1252(f)(1) Inapplicable.

The district court properly rejected Defendants' contention that 8 U.S.C. §1252(f)(1) bars temporary stay relief. As the district court correctly concluded, §1252(f)(1) does not prohibit stays under 5 U.S.C. §705 because a stay is not injunctive relief, and §1252(f)(1) therefore does not apply. JA028 n.16 (collecting cases); *see also Make the Rd. New York v. Noem*, No. 25-5320, 2025 WL 3563313, at *17 (D.C. Cir. Nov. 22, 2025); *Immigr. Defs. L. Ctr. v. Noem*, 145 F.4th 972, 989 (9th Cir. 2025). Defendants spill much ink on the purported equivalence between a stay and an injunction, contending that the district court's stay merely "accomplished the same ends under a different label." Defs.' Br. 56, 58. But as the Supreme Court

---

[12] Defendants' sole case not involving third-party regulations, *Nuclear Info. & Res. Serv. v. NRC*, 457 F.3d 941 (9th Cir. 2006), is unpersuasive because the unchallenged regulations there *required* agency action.

has recognized, stays are not injunctions, and §1252(f)(1) bars only the latter and not the former. *Nken v. Holder*, 556 U.S. 418, 428–29 (2009) ("An injunction and a stay have typically been understood to serve different purposes;" "a stay … temporarily suspend[s] the source of authority to act," but does not "direct[] an actor's conduct"); *see also All. for Hippocratic Med. v. FDA*, 78 F.4th 210, 254 (5th Cir. 2023) (contrasting the two and explaining that a stay is a "temporary form of vacatur"). A stay, like vacatur, nullifies agency action and thereby re-establishes the *status quo ante*. *Id.*; *accord* JA028-029.

Defendants argue §1252(f)(1) bars *any* order that "restrains" the government in carrying out expedited removal. Defs.' Br. 20. This argument ignores clear Supreme Court precedent that §1252(f)(1) is "nothing more or less than a limit on *injunctive relief*," *Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 481 (1999) (emphasis added), and relies on an excessively broad interpretation of "restrain" encompassing any order that might affect government operations. But such an expansive reading of "restrain" would include §706 vacatur, and Defendants provide no principled explanation for why §1252(f)(1) should apply only to temporary §705 stays but not also to permanent §706 vacatur.

The INA explicitly provides for the review in this Circuit of "[c]hallenges [to the] validity of the [expedited removal] system" like this case, 8 U.S.C. §1252(e)(3), and this Circuit has confirmed that such suits can be brought by associations like

Plaintiffs on behalf of directly impacted individuals. *Make the Road New York v. Wolf*, 962 F.3d 612, 627-28 (D.C. Cir. 2020). But if, as Defendants contend, §1252(f)(1) bars all relief that "looks anything like an injunction, stay, or vacatur" for anyone except an "individual alien" (addressed in other parts of §1252), then Plaintiffs would have no remedy at all. JA030. Absurdly, "Congress would have expressly authorized the district court to review expedited-removal policies yet simultaneously prohibited it from issuing any remedies." *Grace v. Barr*, 965 F.3d 883, 907 (D.C. Cir. 2020) (rejecting interpretation of a jurisdictional provision that would prevent orders enjoining unlawful expedited removal policies). At the district court, Defendants defended this argument, JA030-031, but on appeal, their brief is silent on this fatal "structural problem," JA030.

Principles of statutory interpretation support reading "restrain" as a synonym of "enjoin"; properly understood, §1252(f)(1)'s prohibition of orders to "enjoin or restrain" references the two kinds of equitable injunctive relief under Rule 65: injunctions and temporary restraining orders.[13] If, as Defendants contend, "restrain"

---

[13] *See generally* Fed. R. Civ. P. 65(c) (contemplating that issuance of a "preliminary injunction or a temporary restraining order" may result in "costs and damages sustained by [the] party found to have been wrongfully *enjoined or restrained*" (emphasis added)); *United States v. Bronstein*, 849 F.3d 1101, 1110 (D.C. Cir. 2017); *United States v. Fischer*, 64 F.4th 329, 336 (D.C. Cir. 2023); see also *Moskal v. United States*, 498 U.S. 103, 120–21 (1990) (Scalia, J., dissenting) (a statute's listing of synonyms or near-synonyms should be read as "not a listing of differing

were to encompass any order that has a "negative impact" on "any phase" of expedited removal, there would be no need for §1252(f)(1) to prohibit orders that "enjoin" expedited removal operations. *Direct Marketing Ass'n v. Brohl*, 575 U.S. 1, 13 (2015) (rejecting a broad interpretation of "restrain" and instead applying "its meaning in equity" where it appeared in a statute with "enjoin" and "suspend"). Indeed, §1252(f)(1)'s title of "Limit on Injunctive Relief" supports construing "restrain" to be synonymous with "enjoin." In *Aleman Gonzalez*, "[p]utting [all] these terms together," the Supreme Court interpreted §1252(f)(1), including "enjoin" and "restrain," to "generally prohibit[] lower courts from entering *injunctions* that order federal officials to take or to refrain from taking actions." *Garland v. Aleman Gonzalez*, 596 U.S. 543, 550 (2022) (emphasis added).

Defendants provide no authority supporting their claim that 8 U.S.C. §1252(f)(1) bars temporary stay relief. They also fail to grapple with the overwhelming weight of case law holding that injunctions and stays are not equivalent remedies and that §1252(f)(1), as its very title suggests, applies only to the former. The district court's stay was not an abuse of discretion.

---

and precisely calibrated terms, but a collection of near synonyms" representing a category of conduct).

**C.    The District Court Did Not Abuse Its Discretion in Holding Plaintiffs are Likely to Succeed in Establishing that the INA Does Not Authorize Expedited Removal of Noncitizens Paroled at a Port of Entry.**

The district court did not abuse its discretion in holding that Plaintiffs are likely to succeed in proving that neither provision of the expedited removal statute permits the expedited removal of parolees. JA065-066. Congress only authorized expedited removal as to two groups of noncitizens lacking valid entry documents: (1) those who "[are] arriving in the United States" and (2) subject to designation by the Secretary, those who "ha[ve] not been admitted or paroled" and cannot establish two years of continuous physical presence. 8 U.S.C. §1225(b)(1). These are two distinct, not overlapping groups, as made clear by the title of 8 U.S.C. §1225(b)(1) ("Inspection of aliens arriving in the United States and certain *other* aliens who have not been admitted or paroled") (emphasis added). Defendants argue that noncitizens who arrive at a port of entry, are inspected, and are paroled into the country may be subjected to expedited removal under both of these provisions—under the Designation Provision, after their parole is terminated and so long as they have not been here for two years; and under the "Arriving In" Provision, in perpetuity, and even before their parole is terminated.

The expedited removal statute's text, context, structure, history, and purpose make clear that the district court correctly rejected Defendants' interpretation.

- 24 -

### 1.    Designation Provision

The Designation Provision provides that a noncitizen who, subject to other requirements, "has not been admitted or paroled into the United States," can be subjected to expedited removal. 8 U.S.C. §1225(b)(1)(A)(iii); *see* JA046. Defendants concede that someone with active parole status "has been … paroled into the United States," but argue that upon termination, that person becomes someone who "has not been … paroled into the United States." Defs.' Br. 38. The district court correctly rejected Defendants' arguments, concluding: "the Designation Provision does not authorize designation for expedited removal of any noncitizen who has, at any point in time, been paroled into the United States." JA058. Defendants identify no error in the district court's careful analysis.

***Statutory Text.*** Defendants' argument begins with a fundamental misreading of *Hewitt v. United States*, 606 U.S. 419 (2025). That case addressed a section of the First Step Act, a criminal justice reform bill, that applied to an offense only "if a sentence for the offense *has not been imposed* [by the Act's] date of enactment." Defs.' Br. 38 (citation omitted). Defendants claim that the present-perfect tense ("has not been") *always* "conveys to a listener that the event in question continues to be true or valid." *Id*. (quoting *Hewitt*, 606 U.S. at 429). Accordingly, they say, if a noncitizen paroled into the country has their parole terminated, it is no longer true the noncitizen "has been paroled" into the country. *Id*.

- 25 -

That conclusion is neither linguistically correct nor what *Hewitt* held. Rather, in *Hewitt*, Justice Jackson explained that the present-perfect tense ("has not been") can refer to *either* (1) "an act, state, or condition that is *now* completed" or (2) "a past action that comes up to and touches the *present*." *Hewitt*, 606 U.S. at 427-28 (quoting *The Chicago Manual of Style* §5.132 (17th ed. 2017)); *accord* JA048 ("the present-perfect tense can refer to two different things (either a time in the indefinite past or … a past action or state that continues into the present)" (cleaned up, citation omitted)). Determining which meaning applies turns on context. *Hewitt*, 606 U.S. at 427, 429. A court must—as the district court did—look to the statutory context, including provisions adjacent to the language at issue, to "determine whether its grammatical holding made sense in the context of the statute as a whole." JA048.

Here, one important context clue is Congress's decision to pair "paroled" with "admitted." JA048-049. The term "admitted" is defined in immigration law to refer to the "lawful entry of the alien into the United States after inspection and authorization by an immigration officer," 8 U.S.C. §1101(a)(13)(A). "Admitted" refers to an event now completed (i.e., the entry), but not a continuing status: an admitted noncitizen who loses immigration status still has been admitted. *See Sanchez v. Mayorkas*, 593 U.S. 409, 415 (2021) ("Lawful status and admission ... are distinct concepts in immigration law .... [A] foreign national can be *admitted* but not in lawful status—think of someone who legally entered the United States on a

student visa, but stayed in the country long past graduation.") (emphasis added). By contrast, "parole" can refer to both a manner of physically entering the country, *see* 6 U.S.C. §202(4) (describing parole and visas as "forms of permission ... to enter the United States"), and a status that one can lose, *see, e.g.*, January 23 Memorandum (discussing terminating "active parole status"); 8 C.F.R. §245.1(d)(1)(v) (defining "lawful immigration status" for specified purposes to include "parole status which has not expired, been revoked or terminated."). The district court astutely observed that "paroled" paired with "admitted" makes clear that Congress referred to the manner of entry—an historical fact—and not a continuing status. JA048-049 (applying *noscitur a sociis* canon).[14]

Defendants next argue that "has been admitted or paroled" must refer to whether the noncitizen currently maintains a lawful admitted or paroled status to avoid an allegedly absurd result: if the phrase referred only to manner of entry, they say, a noncitizen who was admitted into the country, departed, and then returned illegally would be exempt from expedited removal as someone who "has been admitted." Defs.' Br. 41. Defendants confuse the present-perfect ("has been") with the past-perfect ("had been"). The use of the present-perfect tense *itself* directs

---

[14] Defendants' assertion that "admission" is a noun that "might refer to a specific act" that happens at a defined time, while "'admitted' ... refers to a status," Defs.' Br. 41, ignores that *both* "admitted" and "admission" are defined as "a lawful entry ... after inspection," 8 U.S.C. §1101(a)(13)(A).

attention to the present moment and the current period of stay, whereas the past-perfect is used where an "event is merely a relic of history because it was voided by a subsequent action." *Hewitt*, 606 U.S. at 428-30. Plaintiffs agree with Defendants that as to "has been admitted," the expedited removal statute is "concerned with whether the alien's *current* presence is pursuant to a lawful admission," Defs.' Br. 41-42, but that just means the statute is focused on whether the noncitizen's current physical presence is pursuant to a lawful entry that occurred after inspection. Similarly, "has been ... paroled" refers to whether the current presence is pursuant to a parole granted after inspection. A person who was admitted or paroled into the country, left, and returned illegally would be someone who "*had* been admitted or paroled," not someone who "has been admitted or paroled."[15] Defendants' argument only illustrates the clarity of Congress's construction.

**Statutory Context.** Defendants further misread *Hewitt* by glossing over the importance of vacatur to the particular result there. The *Hewitt* Court held that vacatur of a criminal sentence means the sentence "has not been imposed" within the meaning of the First Step Act because upon vacatur, "the law acts as though the

---

[15] USCIS agrees such a person also would not be someone who "was inspected and admitted or paroled." USCIS, Instructions for Application to Register Permanent Residence or Adjust Status, at 11, https://www.uscis.gov/sites/default/files/document/forms/i-485instr.pdf (requiring evidence of "inspection and admission or inspection and parole" related to "the most recent arrival.")

vacated order never occurred" and the criminal defendant is "treated going forward as though he were never convicted." *Hewitt*, 606 U.S. at 431. Therefore, it makes sense that if a sentence has been vacated, it "has not been imposed" for purposes of that statute. *Id*. at 433. In contrast, a grant of parole has certain ongoing legal effects after termination. For example, parolees may adjust status even after their parole has ended. 8 U.S.C. §1255(a) (authorizing adjustment of status of a noncitizen "who was inspected and admitted or paroled into the United States"); 8 C.F.R. §245.1(b)(3); JA050. Similarly, time on active parole status does not count as unlawful presence for inadmissibility purposes even if parole ends. 8 U.S.C. §1182(a)(9)(B)(ii).[16] The district court correctly applied the analysis of *Hewitt* to the language and statutory context of the Designation Provision to hold that it "make[s] sense for the [provision] to treat noncitizens who were paroled into the United States differently, even once their parole ends, than noncitizens who entered the country without parole." JA050. Defendants neither address nor identify any error in this analysis.

Defendants suggest other background principles and cases support their interpretation of the Designation Provision, but the district court properly rejected them as well. For example, Defendants argue the statutory parole authority requires

---

[16] A parolee may also be excused from the statutory requirement to apply for asylum within one year of entry, so long as they apply within a reasonable period after their parole ends. *See* 8 U.S.C. §1158(a)(2)(B); 8 C.F.R. §208.4(a)(5)(iv).

that "has not been ... paroled" refer to a continuing status, because the statute provides that once parole ends, the noncitizen's case shall "be dealt with in the same manner as that of any other applicant for admission." Defs.' Br. 38-39; 8 U.S.C. §1182(d)(5)(A). Such language, however, does not render an individual subject to expedited removal if their parole is revoked, as Defendants suggest. Defendants' argument ignores that "applicant for admission" is a term broadly defined in the expedited removal statute itself as a noncitizen "present in the United States who has not been admitted *or* who arrives in the United States." 8 U.S.C. §1225(a)(1) (emphasis added). In the same statutory provision, Congress chose *not* to subject all applicants for admission to expedited removal and defined eligibility for expedited removal without reference to "applicant[s] for admission" at all. Had Congress intended to subject all "applicants for admission" to expedited removal, "Congress could easily have said so," *Kucana v. Holder*, 558 U.S. 233, 248 (2010), particularly given that it defined that term in the expedited removal statute itself.

What is more, even while relying on the parole statute, Defendants ignore crucial language therefrom: when parole ends, a noncitizen's case shall "*continue to be dealt with in the same manner as that of any other applicant for admission.*" 8 U.S.C. §1182(d)(5)(A) (emphasis added). As the district court noted, a paroled individual is *always* an "applicant for admission," including when they have active parole status, as they are present in the United States without having been admitted

- 30 -

(the definition). So, it makes sense that their case would simply "continue to" be addressed like that of other applicants for admission—but that says nothing about their eligibility for expedited removal. *See* JA051-052.

Defendants also argue that if Congress meant to exclude paroled individuals from expedited removal regardless of whether their parole status remains active, it could have used the simple past tense, "was paroled." Defs.' Br. 42-43 (citing 8 U.S.C. §1255(a) (INA §245(a)), regarding adjustment of status). But the distinction Defendants are trying to draw between "has been paroled" and "was paroled" is illusory at best. When Congress in 1960 amended INA §245(a) to allow a noncitizen who "was" paroled into the country to adjust status, the Senate Report accompanying the measure explained that it would broaden the law "so as to include all aliens ... who *have been paroled* into the United States." S. Rep. No. 86-1651 (1960), *as reprinted in* 1960 U.S.C.C.A.N. 3124, 3125, 3142 (emphasis added). The Department of Justice had the same interpretation. *See id.* at 3142. Where Congress and the Executive Branch understood that "was paroled" in INA §245(a) meant the same thing as "has been paroled," it makes no sense to now ascribe a distinct meaning to the use of "has been paroled" in 8 U.S.C. §1225(b)(1)(A)(iii)(II) by comparing it to the use of "was paroled" in INA §245(a).

Similarly, Congress used "was" paroled in various acts providing special authorization for certain paroled noncitizens to adjust status, yet in the comparable

Cuban Adjustment Act ("CAA"), used "has been" paroled.[17] There is no basis to believe Congress meant to treat Cuban parolees more harshly than parolees from these other countries.[18] Defendants' entire argument is a distinction without a difference.

Grasping at straws, Defendants cite the First Circuit's *Doe v. Noem* decision as bolstering their interpretation of the Designation Provision. Defs.' Br. 40-41. However, the First Circuit expressly declined to construe the statute, holding only that the parties each proffered "plausible" interpretations. *Doe v. Noem*, 152 F.4th 272, 288 (1st Cir. 2025). *Doe* is also an outlier: numerous courts have subsequently concurred with the district courts in that and this case, holding that noncitizens who have been paroled into the country are not amenable to expedited removal under the

---

[17] *Compare* Help Haitian Adoptees Immediately to Integrate Act of 2010, Pub. L. No. 111-293 (authorizing adjustment of status for certain Haitian orphans who "[were] inspected and granted parole into the United States"); Act of Nov. 6, 2000, Pub. L. No. 106-429 (authorizing adjustment of status for certain Indochinese nationals who "[were] paroled into the United States"); HRIFA, Pub. L. No. 105-277 (authorizing adjustment of status for certain Haitian nationals who "[were] paroled into the United States"); Act of Nov. 21, 1989, Pub. L. No. 101-167 (authorizing adjustment of status for certain Soviet and Indochinese nationals who "[were] inspected and granted parole into the United States") *with* Act of Nov. 2, 1966, Pub. L. No. 89-732 (authorizing adjustment of status for certain Cuban nationals who "ha[ve] been inspected and admitted or paroled into the United States").

[18] DHS agrees. *See* Form I-485 Instructions ("You may apply for adjustment of status [under the CAA] if you are a native or citizen of Cuba who *was* inspected and admitted or paroled into the United States after January 1, 1959.").

Designation Provision. *See, e.g.*, *Kirboga v. LaRose*, No. 25-cv-3706-GPC-DDL, 2025 WL 3779426 (S.D. Cal. Dec. 31, 2025); *Khogiani v. Raycraft*, No. 25-cv-13744, 2025 WL 3753532 (E.D. Mich. Dec. 29, 2025); *E.V. v. Raycraft*, No. 4:25-cv-2069, 2025 WL 2938594 (N.D. Ohio Oct. 16, 2025); *Munoz Materano v. Arteta*, No. 25 Civ. 6137 (ER), 2025 WL 2630826 (S.D.N.Y. Sept. 12, 2025). Defendants, on the other hand, cannot cite a single case adopting their novel and expansive interpretation of the provision.[19]

**Regulatory Context and Agency Interpretation.** The district court did not err in finding further support for its interpretation of the statute in DHS's own regulations and past practice. JA053-057.

The regulation specifically implementing the Designation Provision guarantees a noncitizen subjected to expedited removal under that provision a reasonable opportunity to establish he or she "*was* admitted or paroled into the United States following inspection at a port-of-entry." 8 C.F.R. §235.3(b)(6) (emphasis added). An immigration officer must then "verify the alien's status," (i.e., verify the noncitizen's "status" as someone who "was admitted or paroled into the United States following inspection at a port-of-entry," as opposed to someone who

---

[19] Defendants themselves conceded in recent litigation that parolees cannot be subject to expedited removal under the Designation Provision even after their parole status has been terminated. JA054 n.23; JA513 n.15.

entered without inspection). *See* 8 C.F.R. §235.3(b)(1)(ii) (describing the Designation Provision as applying to "aliens who enter without inspection"). If the noncitizen establishes he or she "was" paroled, an immigration officer will determine whether parole "has been, or should be, terminated, and whether the alien is inadmissible," 8 C.F.R. §235.3(b)(6), but the regulation does not say such a person is amenable to expedited removal, as Defendants seem to suggest, Defs.' Br. 43. Rather, as the district court noted, it says only that the noncitizen will be subjected to expedited removal if the noncitizen "*cannot* satisfy the examining officer that he or she was lawfully admitted or paroled." 8 C.F.R. §235.3(b)(6) (emphasis added); *see* JA056; JA514.[20]

Moreover, Defendants cannot contest that their past designations evidence their own understanding that "has not been admitted or paroled" refers to noncitizens present without inspection. JA054. For instance, the 2019 designation, which asserts six times that it expands DHS's authority to use the Designation Provision to the maximum extent authorized by statute, says it will apply to certain noncitizens who "*entered* the United States without admission or parole," and that full expansion "is

---

[20] Defendants point to two regulations regarding asylum and parole termination as bolstering their position, Defs.' Br. 44-45, but they do nothing to disturb the district court's conclusions that the regulations either provide little support or insight into the meaning of the statute, or that they even illustrate inconsistencies in Defendants' regulations. JA055-057.

necessary to remove from the United States inadmissible aliens … who are encountered less than two years *after entering the United States without admission or parole*." 84 Fed. Reg. 35409, 35410-14 (July 23, 2019) (emphases added).[21] Additionally, the January 2025 designation published by the current administration specifically states that it "does not apply to aliens who arrive at U.S. ports of entry, because those aliens are already subject to expedited removal." 90 Fed. Reg. 8139, 8140 (Jan. 24, 2025). Given Defendants' position that noncitizens who have been paroled into the country at ports of entry remain indefinitely "arriving in" the country, including after their parole is terminated or expired, *but see infra* Section I.C.2, the current designation itself evidences Defendants' belief that such paroled individuals are *not* covered by the Designation Provision because they are addressed in the "Arriving In" Provision. JA054.

### 2.  "Arriving in" Provision

*Statutory Text.* The district court correctly held that the "Arriving In" Provision of the expedited removal statute also does not include paroled individuals, because they are not "arriving in" the United States. JA058. As the statute does not define the term "arriving," the court looked to the term's ordinary meaning, JA059-060 (citing *United States v. Alford,* 89 F.4th 943, 949 (D.C. Cir.), *cert. denied*, 145

---

[21] The 2004 designation reflects the same understanding. 69 Fed. Reg. 48877, 48880 (Aug. 11, 2004).

S. Ct. 180 (2024)), and concluded that a noncitizen who "is arriving" in the United States is "in the process of reaching his or her destination … and making an appearance there." JA059-060 (citing *Merriam-Webster's Collegiate Dictionary* (1996) and *Oxford English Reference Dictionary* (2016)). It does not "refer to someone who previously reached the United States via a port of entry, underwent inspection at that port of entry, and then was paroled into the United States." JA060.

The present-progressive tense signals an action that is continuing, so the phrase "is arriving in the United States" focuses on people currently in the process of arriving, who will no longer be arriving once they have arrived (i.e., reached their destination). Defendants' interpretation treats paroled individuals as *forever* "arriving," even after they have reached their destination and established physical presence here; Defendants make no effort to square this with the plain and ordinary meaning of the words or verb tense Congress chose. Moreover, Defendants are now making a contrary argument before the Supreme Court, where they define the term "arrives in the United States" in 8 U.S.C. §1158(a) (on authority to apply for asylum) as referring to when a person "comes within the limits or bounds of the United States." Brief for the Petitioners at 14-15, *Noem v. Al Otro Lado,* No. 25-5 (Jan. 6, 2026)[22] (defining the verb "arrive" per the Oxford English Dictionary to mean "[t]o

---

[22]    Brief    available    at    https://www.supremecourt.gov/DocketPDF/25/25-5/390940/20260106152523401_25-5AlOtroLadoPetBr.pdf.

come to the end of a journey, to a destination, or to some definite place" and "in" to mean "[w]ithin the limits or bounds of.").[23] The government there emphasizes that "[c]ommon usage confirms that English speakers use 'arrive in' to mean entering a specified location." *Id.* at 15.[24]

Additionally, multiple other provisions in §1225 use "arrive" or a form thereof to refer to physical entry into the country from elsewhere. JA060 (citing 8 U.S.C. §§1225(d)(2), 1225(b)(2)(C), 1225(b)(1)(F)). Defendants only address these uses by dismissing them as irrelevant and not "inconsistent with treating paroled aliens as still 'arriving in' the United States." Defs.' Br. 34-35. But the uses inform how "arriving" should be interpreted in the absence of a statutory definition. *See* JA060. The use of an identical or nearly identical term in a statute should be read to have the same or similar meaning, and it is clear here that the multiple other uses of forms of "arriving" in 8 U.S.C. §1225 focus on the process of physically entering into the country. *Id.*; *Nat'l Postal Pol'y Council v. Postal Regul. Comm'n,* 17 F.4th 1184,

---

[23] Defendants also recently conceded that an Afghan national paroled into the country as part of Operation Allies Welcome and later placed in 240 proceedings was not "arriving in the United States" for purposes of the expedited removal statute at the time of his arrest within the United States. *Walizada v. Trump*, No. 2:25-cv-00768, 2025 WL 3551972, at *11 (D. Vt. Dec. 11, 2025).

[24] Plaintiffs take no position regarding whether a noncitizen on the threshold of entering the country "arrives in" the country, but do agree with the government's position in *Al Otro Lado* that once the noncitizen has come within the limits or bounds of the United States, arrival is complete.

1191 (D.C. Cir. 2021) ("[a] standard principle of statutory construction provides that identical words and phrases within the same statute should normally be given the same meaning.") (citation omitted). Defendants' arguments fail to grapple with the statutory text.

  ***Statutory Structure.*** The structure of 8 U.S.C. §1225(b)(1) reinforces that paroled individuals are not perpetually "arriving in" the country. The provision's title contemplates two distinct and separate categories of individuals who can be subject to expedited removal: noncitizens "arriving in the United States" and "certain other" noncitizens present in the country "who have not been admitted or paroled." Noncitizens paroled into the country would be included in the latter category—and thereby subject to expedited removal under the Designation Provision—*but for* the language explicitly shielding them from such threat. *See supra* Section I.C.1. The very fact that parolees would be included in that group demonstrates they cannot also be "arriving in" the country and subject to expedited removal under the "Arriving In" Provision.

  ***Statutory and Regulatory Context.*** Unable to defend their interpretation as consistent with the statute's text and structure, Defendants argue that "arriving" must be understood as incorporating a "legal fiction" treating parolees as "legally in the same position as [noncitizens] standing at the border." Defs.' Br. 32. The district

court correctly dismissed this argument as lacking evidentiary or legal support and inconsistent with the statute's history and purpose. JA061-065.

It is true that under this fiction, parolees were considered not to have effected an "entry" into the country, which meant, *inter alia*, that they were removed through exclusion proceedings rather than deportation proceedings. But that does not mean they were considered to be forever "arriving" in the country or merely had "'arrived' *at* a port of entry in terms of a historical event." Defs.' Br. 33-34 (emphasis added). Rather, even before the enactment of IIRIRA, parolees were understood to have arrived *in* the country even though they had not effected "entry." *See, e.g.*, *Leng May Ma v. Barber*, 357 U.S. 185, 186 (1958) (describing a noncitizen paroled at a port of entry as having "arrived in this country"); *Matter of O-*, 16 I&N Dec. 344, 351-52 (BIA 1977) (describing persons evacuated from Vietnam to Guam as having made an "arrival" and having been "paroled into the United States").[25]

Congress, too, frequently referred to parolees as having "arrived in the United States" or as having a "date of arrival in the United States." *See* Act of Oct. 28, 1977, Pub. L. No. 95-145 (establishing a record of permanent residence for Indochinese parolees based upon "the date of the alien's arrival in the United States"); Pub. L.

---

[25] The circumstances of the evacuees in this case, many of whom worked with U.S. government contractors in Vietnam, closely resemble those of Afghan Allies paroled into the United States in recent years.

- 39 -

No. 85-559 (1958) (authorizing Hungarian parolees to adjust status and referring to their date and time of "arrival" in the United States); Pub. L. No. 89-732 (1966) (authorizing Cuban parolees to adjust status and referring to their date of "arrival" and the "date the alien originally arrived in the United States as a nonimmigrant or as a parolee").[26]

Defendants argue the parole statute supports subjecting paroled individuals to expedited removal. Defs.' Br. 31-32. This is wrong: the statute says nothing about expedited removal and does not say that when parole ends the noncitizen shall be deemed to be "arriving in the United States." Rather, it only provides that when a noncitizen's parole ends, they "*shall continue to be dealt with* in the same manner as that of any other applicant for admission to the United States." 8 U.S.C. §1182(d)(5)(A) (emphasis added). As discussed above, an "applicant for admission" is, by definition, far broader than an "arriving" individual, 8 U.S.C. §1225(a)(1), and paroled individuals are *always* applicants for admission, which explains why they

---

[26] Defendants' erroneous conflation of "entry" and "arrival" is evident outside of the parole context as well. Shortly before IIRIRA's enactment, the Board of Immigration Appeals ("BIA") considered whether noncitizens effected an *entry* into the country when their ship, the *Golden Venture*, ran aground off the New York coast. *Matter of G-*, 20 I&N Dec. 764, 768-69 (BIA 1993). While the BIA spent pages deciding that question, scrutinizing different groups of noncitizens based upon when, where, and whether they were apprehended, it acknowledged all of them had "arrived in the United States." *Id.* at 766, 769. *Accord Matter of Z-*, 20 I&N Dec. 707, 708 (BIA 1993).

"shall continue to be dealt with" as such after their parole ends. *See supra* pp. 29-31.
Defendants omit this key language, JA051-052, 059, and baselessly assert that a parolee "is subject to expedited removal because he retains his status as an 'arriving alien' under the INA." Defs.' Br. 32.[27] But an "arriving alien" is neither a status under the INA, nor the same thing as an "applicant for admission," and the parole statute refers only to the latter.

Defendants also argue that the "arriving alien" definition in 8 C.F.R. §1.2 "resolves the merits" of the statutory analysis because the district court was "obliged to treat [the regulation] as valid and controlling for present purposes," Defs.' Br. 31, relying on *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954). But *Accardi* says only that an *agency* cannot violate its own regulations, not that a *court* reviewing a statute must treat the regulation as "valid and controlling" upon itself. *See id*. at 267. Even under *Chevron* deference, regulations were only given controlling interpretative weight if they were not "arbitrary, capricious, or manifestly contrary to [an ambiguous] statute." *Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,* 467 U.S. 837, 843-44 (1984). Post-*Chevron*, courts "need not *and under the*

---

[27] Defendants note that during the 1997 rulemaking, they responded to a comment objecting to the treatment of paroled individuals as "arriving aliens" by asserting that the parole statute provides "solid statutory basis" for doing so. Defs.' Br. 9, 36 n.4. Simply declaring that to be true does not make it so. *See Loper Bright Enters. v. Raimondo,* 603 U.S. 369, 413 (2024).

*APA may not* defer to an agency interpretation of the law." *Loper Bright Enters. v. Raimondo,* 603 U.S. 369, 413 (2024) (emphasis added). While a court can consider an agency's interpretation as evidence of what a law means, Defs.' Br. 35-36, even a "longstanding view" of the agency is "at most, only persuasive authority and [courts] must still independently interpret the statute." *Jazz Pharms., Inc. v. Kennedy*, 141 F.4th 254, 266 (D.C. Cir. 2025). The district court did exactly this, properly reviewing 8 C.F.R. §1.2 along with other arguments and evidence to make an independent interpretation of the statute, and held the Challenged Actions—and the regulation itself—*ultra vires*. JA058-066.

**Statutory Purpose.** IIRIRA's legislative history illuminates Congress's intent in adopting the expedited removal authority and shows that Defendants' argument—that parolees are forever "arriving in" the country—runs counter to the statute's purpose. Citing a House Judiciary Committee Report, for example, the district court found that the focus of the "Arriving In" Provision was noncitizens actually in the process of arriving at ports of entry (frequently airports) without valid documents. JA064-065; H.R. Rep. No. 104-469, at 157-58, 225 (1996).

Another congressional priority in IIRIRA was "improving deterrence of illegal immigration," H.R. Conf. Rep. No. 104-828, at 1 (1996), which the legislation did by removing certain advantages in immigration proceedings that noncitizens who successfully entered the country without inspection previously had

over those who presented themselves for inspection at a port of entry, including those then paroled into the country. *See* H.R. Rep. No. 104-469, at 225 (1996). In this regard, Defendants' interpretation of "arriving" creates an "oddity" they cannot explain. JA064-065. According to Defendants, a noncitizen who entered without inspection cannot be subjected to expedited removal after two years of physical presence, but a noncitizen paroled after inspection "can face expedited removal forever, regardless of how long they have been physically present." JA064. Defendants respond that "Congress can choose to balance the burdens and benefits of immigration law as it sees fit," but that platitude does nothing to reconcile Defendants' idiosyncratic interpretation of the statute with Congress's stated objectives and explicit language shielding paroled individuals from expedited removal. There is no reason to think Congress intended the exceptional tool of expedited removal to be used against people who came to a port of entry—frequently with DHS-provided travel authorization, an invitation from the government, or an appointment issued by Defendants—to be inspected and lawfully paroled into the country. There is even less reason to think Congress in IIRIRA intended to do so on terms *harsher* than those imposed on people who entered unlawfully. *See DHS v. Thuraissigiam*, 591 U.S. 103, 140 (2020) (rejecting an interpretation of the statute that would "create a perverse incentive to enter at an unlawful rather than a lawful

location."). *Cf. McNeill v. United States*, 563 U.S. 816, 822 (2011) ("Absurd results are to be avoided.").

Unable to defend the logic of their stated position, Defendants puzzlingly claim the "oddity" disappears if the Court were to hold that, "consistent with" the Designation Provision, upon termination of parole a noncitizen can be subjected to expedited removal if they have not been here two years. Defs.' Br. 37. Perhaps Defendants are suggesting openness to abandoning their argument that parolees can forever be subjected to expedited removal under the "Arriving In" Provision. But if Defendants merely mean the oddity disappears if the Court accepts their argument regarding the Designation Provision, that simply isn't true. Even then, Defendants' position would be that terminated parolees can be subjected to expedited removal forever under the "Arriving In" Provision, even if expedited removal under the Designation Provision becomes unavailable after two years.

As the district court put it, "Defendants rest their argument under both [prongs of the expedited removal statute] on a purported background legal principle that they cannot even pin down," and "[i]n the face of all the evidence to the contrary." JA065-066. The district court did not abuse its discretion in holding that Plaintiffs are likely to succeed in proving the Challenged Actions are *ultra vires.*

### 3.    AEDPA Confirms the Meaning of IIRIRA

The text and legislative history of a contemporaneously enacted statute, AEDPA, further supports the district court's interpretation of the expedited removal provision enacted in IIRIRA. In the 104th Congress, these two major bills proceeded simultaneously and on separate tracks, but AEDPA was signed into law first. AEDPA created a novel "expedited exclusion" authority permitting immigration officers to "exclude[] from the United States without further hearing or review" any noncitizen "seeking entry" who lacked valid entry documents. AEDPA, Pub. L. No. 104-132, §422. Further, AEDPA deemed any noncitizen "found in the United States who has not been admitted to the United States after inspection" to be "seeking entry and admission," thereby also exposing them to the new expedited procedure. *Id.* §414.

Congress was clear that the "seeking entry" provision specifically and only concerned individuals arriving and being inspected at ports of entry. *See* H.R. Conf. Rep. 104-518, at 117 (1996), 1996 WL 183509 (the provision addressed "the inspection and exclusion of aliens arriving at a port of entry."); H.R. Rep. No. 104-383, at 99 (1996), 1996 WL 731698 (same); *id.* at 181-82 (The provision "grant[ed] low level immigration officers at airports and other ports of entry non-reviewable authority to exclude and deport aliens seeking entry without proper documents." (dissenting views)). The provision applying to noncitizens found in the country

- 45 -

without inspection and admission concerned "those whose initial entry was wholly illegal," who "successfully evaded requirements for lawful entry." H.R. Rep. No. 104-383, at 40, 101; H.R. Conf. Rep. 104-518, at 117 (The provision applied to "any alien who has entered the United States unlawfully.").

Although legislative history confirms Congress had no intention of exposing paroled individuals to expedited exclusion, they were vulnerable based on AEDPA's text. Because parolees had long been understood not to have effected an "entry" into the country, they might have been considered "seeking entry." And since parole did not constitute an admission, parolees "found in the United States" certainly would not have been considered "admitted" despite having been inspected.

Just five months after AEDPA's enactment, Congress enacted IIRIRA and the expedited removal provision that remains current law. IIRIRA repealed AEDPA's two expedited exclusion provisions before they ever took effect and replaced them with an expedited removal authority that maintained focus on the same two intended categories of noncitizens: those arriving at ports of entry and those present in the country who entered without inspection.[28] But whereas AEDPA targeted "arriving"

---

[28] During President Trump's first term, the Solicitor General began argument to the Supreme Court with the statement: "Congress established the expedited removal system in 1996 for aliens who arrive at our borders or enter illegally and have no entry documents." Tr. of Oral Arg. at 3, *DHS v. Thuraissigiam*, 591 U.S. 103 (No. 19-161) (Mar. 2, 2020).

noncitizens using the term "seeking entry," IIRIRA moved away from the concept

of "entry" (and any accompanying legal fiction) and spoke plainly of a noncitizen

"who is arriving in the United States." And whereas AEDPA applied to noncitizens

present "who ha[ve] not been admitted," IIRIRA better homed in on the intended

target of "illegal entrant[s]," H.R. Rep. No. 104-383, at 40, by also shielding from

expedited removal those who "have ... been ... paroled." In other words, the change

in language from AEDPA to IIRIRA—over a matter of mere months—shows

unmistakable congressional intent to protect parolees from the novel summary

procedures created therein.

### D.  The District Court Did Not Abuse its Discretion in Holding that Plaintiffs Are Likely to Succeed in Proving that the Challenged Actions are Arbitrary and Capricious.

The district court did not abuse its discretion in holding that Plaintiffs are

likely to prove that the challenged agency actions are arbitrary and capricious

because they rely upon a "Schrödinger's legal justification." JA072. Somehow, DHS

both "must (and should) subject former parolees to expedited removal within two

years of" arrival under the January 23 Huffman Memorandum and the March 25

CHNV Termination Notice; *and* simultaneously claims parolees are amenable to

expedited removal in perpetuity under the February 18 ICE Directive. None of the

Challenged Actions acknowledge or explain these inconsistent positions. The

district court did not abuse its discretion in holding that such inconsistency in agency

- 47 -

action "is the hallmark of arbitrary and capricious decision-making," JA072-073, rejecting Defendants' subsequently proffered explanations as "impermissible *post hoc* rationalization." JA073 (citing *DHS v. Regents of the Univ. of Calif.*, 591 U.S. 1, 22 (2020)).

Defendants offer nothing that supports reversing the district court's decision, but only *post hoc* justifications, highlighting specific words or phrases in the January 23 Huffman Memorandum and the March 25 CHNV Termination Notice to suggest those documents are permissive and can be interpreted broadly so as not to conflict with the February 18 ICE Directive. Defs.' Br. 45-47.

But "judicial review of agency action is limited to the grounds that the agency invoked when it took the action." *Regents,* 591 U.S. at 20 (citation and internal quotation marks omitted); *see also Burlington Truck Lines, Inc. v. United States*, 317 U.S. 156, 168-69 (1962). Defendants cannot escape the plain language of the challenged agency actions staking out two diametrically opposed positions: on the one hand, that "[e]xpedited removal is available only when [a parolee] has not been continuously present in the United States for at least [two years]," March 25 CHNV Termination; and on the other hand, that there is no "time limit" to apply expedited removal to "paroled arriving aliens," Feb. 18 ICE Directive. Defendants' *post hoc* arguments do nothing to resolve this inconsistency. The district court did not err in

finding that the challenged agency actions lack rational explanation and are therefore arbitrary and capricious.

Nor did the district court err in considering the February 18 ICE Directive's complete lack of statutory or regulatory justification. While Defendants claim such a directive need not contain citations to authority as if it were published in the Federal Register, the February 18 ICE Directive did not simply lack citations. It lacked *any* stated basis for its legal conclusion that "no time limit" exists for the agency's ability to process parolees for expedited removal, and for why the agency changed its position from the January 23 Huffman Memorandum. The APA does not necessarily require an agency to provide citations for every assertion, but it does require the agency to "give adequate reasons for its decisions," *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016), especially when the agency is changing position, *see FCC v. Fox Television Stations, Inc*., 556 U.S. 502, 515 (2009). The district court correctly held that Plaintiffs are likely to succeed in proving the agency failed to engage in reasoned decisionmaking. JA074.

## II. The District Court Did Not Abuse Its Discretion In Holding that the Equitable Factors Support a Stay.

The district court did not abuse its discretion in concluding that, absent a stay of the Challenged Actions, Plaintiffs' members and others like them would continue to face imminent, irreparable injury, and that other equitable factors weigh in favor

of a stay. JA075-081. Defendants raise no new arguments on appeal to disturb this holding.

1. The district court did not clearly err in finding that the Challenged Actions were inflicting irreparable injuries on Plaintiffs' paroled members who were paroled into the country, including the deprivation of the opportunity to apply for immigration relief; deprivation of meaningful process, including the lack of judicial review, limited access to counsel, and limited ability to defend against their removal; risks of persecution and death if removed to their home country; and detention and family separation.[29] JA074. Defendants did not rebut this evidence below and continue to "vastly understate [the] evidence of irreparable injury" now. JA075.

Defendants assert that the availability of credible fear interviews ("CFIs") during expedited removal reduces the risk of erroneous removals, and that Plaintiffs' members would be detained regardless of whether they were in expedited removal. Defs.' Br. 48-51. These arguments continue to ignore that (1) CFIs offer significantly fewer protections and opportunities for relief than 240 proceedings, JA074-076, JA213-220; and (2) many paroled individuals put in expedited removal were *previously in 240 proceedings* and were *not* detained. They were with their

---

[29] Defendants rehash their arguments concerning redressability, but have identified no factual error in the district court's findings, nor any legal error in the district court's holding, that a stay would redress at least part of Plaintiffs' alleged injuries, *see supra* Section I.A.

families, could access an attorney at their own expense, and were pursuing immigration relief. JA078; JA206-419. In expedited removal, they lost all of that. The district court did not abuse its discretion in finding that this ongoing and imminent irreparable injury warranted a stay. JA081.

2. As the district court properly determined, the balance of equities and the public interest, which merge here, favor a stay. The stay will "not substantially injure other interested parties," *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016), but it will benefit individuals around the country who followed the law to come here via a lawful pathway and are harmed by the government's unlawful actions.

Defendants recycle arguments that the government suffers irreparable injury whenever a court blocks it from enforcing its policies, Defs.' Br. 52-53, but the district court did not abuse its discretion in giving more weight to other factors. *See, e.g.*, *Nken*, 556 U.S. at 436 (recognizing "public interest in preventing [individuals] from being wrongfully removed"). There is no public interest in unlawful agency action. JA079; *Shawnee Tribe v. Mnuchin,* 984 F.3d 94, 102 (D.C. Cir. 2021). Defendants identify no cases endorsing the "radical proposition that the President is harmed, irreparably, whenever he cannot do something he wants to do, even if what he wants to do is break the law." JA081 (quoting *Trump v. CASA, Inc.*, 606 U.S. 831, 893 (2025) (Sotomayor, J., dissenting)).

### III.   The District Court Did Not Abuse Its Discretion In Staying the Challenged Actions.

The district court's stay of the Challenged Actions as to all noncitizens who have previously been granted parole at ports of entry was not an abuse of discretion. Defendants raise no arguments, and certainly point to no case law, supporting their contention that relief should be limited to Plaintiffs' members.

The scope of the preliminary stay is not an abuse of discretion. On appeal, Defendants present no practical solutions to the challenges the district court identified in effectuating a stay limited to Plaintiffs' members. The effort to identify Plaintiffs' members among the hundreds of thousands of paroled individuals who could be placed in expedited removal would perversely be "more burdensome to the defendant than necessary." *CASA*, 606 U.S. at 852. A limited stay is also likely to provide incomplete relief even to Plaintiffs' members, given the likelihood that Defendants will not identify a member before irreparably injuring them, *see supra* Section II. To prevent irreparable harm to Plaintiffs' members, complete relief requires a full stay of the Challenged Actions. And Defendants do not dispute the district court's observation that a "nationwide" stay is a particularly apt remedy in this §1252(e)(3)(A) case because all actions like this one challenging expedited removal policies must be brought in this Circuit. JA083.

Defendants argue that §705 incorporates traditional equitable principles warranting a limited stay, including the "complete-relief principle" that relief

- 52 -

"should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," Defs.' Br. 59-60 (quoting *CASA*, 606 U.S. at 852), and the principle that "a court cannot adjudicate directly upon" non-parties, Defs.' Br. 62 (quoting *CASA*, 606 U.S. at 844). These arguments are flawed for at least two reasons.

First, even assuming the APA incorporates the complete-relief principle, APA relief consists of the challenged agency action being vacated (or postponed), not the challenged agency action's "application to the individual petitioners [being] proscribed." *Corner Post, Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 603 U.S. 799, 838 (2024) (Kavanaugh, J., concurring) (quoting *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989)). The court "act[s] directly against the challenged agency action." *Corner Post*, 603 U.S. at 838 (Kavanaugh, J., concurring); *see also All. for Hippocratic Med.*, 78 F.4th at 254. After all, an "invalid rule may not be applied to anyone." *Griffin v. HM Florida-ORL, LLC*, 144 S. Ct. 1, 2 n.1 (2023) (Kavanaugh, J., concurring in denial of application for stay) (citation omitted). "Complete relief" at this time under §705 consists of postponement of the Challenged Actions themselves.

Second, Defendants' "equitable" interpretation of §705 would result in impermissibly adding language to the statute. Under Defendants' reading, §705's provision of relief "to the extent necessary to prevent irreparable injury" must refer

to "irreparable injury *to the plaintiff*." Defs.' Br. 61 (emphasis added). But Defendants cite no authority to support adding words to the APA found nowhere therein.[30] Defendants do point to §705's text stating courts "may issue" "only 'all necessary and appropriate process,'" but they cannot explain how this statutory language creates a mandatory command that a court must equitably limit stay relief to the parties (or, as Defendants suggest, to only pre-identified members of Plaintiffs). Defs.' Br. 61-62. Defendants certainly do not explain why such language or any equitable principles require limited relief here, where all actions like this one must be brought in the United States District Court for the District of Columbia, and where the district court has identified practical challenges that, in its discretion, warrant a temporary stay of the agency actions in full.[31]

Defendants' emphasis on equitable principles not reflected in the statute "do[es] not hold water" against the backdrop "of specific statutory text and longstanding administrative law principles" establishing that "the scope of preliminary relief under Section 705 aligns with the scope of ultimate relief under

---

[30] For all their reliance on *CASA* and other Supreme Court decisions discussing equitable remedies, Defendants conveniently ignore that these cases concern only *injunctive* relief and do not discuss APA stay or vacatur relief. *See* Defs.' Br. 59-62.

[31] To the extent §702 creates a "duty" on the court to "deny" relief on any "appropriate legal or equitable ground," Defs.' Br. 63, Defendants do not identify any such ground requiring a limited stay here, especially given their reliance on cases concerning *injunctive* relief, and not APA stay relief.

Section 706, which is not party-restricted and allows a court to 'set aside' an unlawful agency action."[32] *Career Colls. & Schs. of Tex. v. Dep't of Educ.*, 98 F.4th 220, 255-56 (5th Cir. 2024). The district court's stay is consistent with this Court's guidance that "[t]raditional administrative law principles" contemplate vacatur of unlawful agency actions, including in the context of preliminary relief, and was not an abuse of discretion. *Harmon*, 878 F.2d at 494-95 & n.21; *cf. Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998).

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court's order.

---

[32] Defendants never explain how "background equitable principles … translate to the APA." *Make the Rd.*, 2025 WL 3563313, at *35. As two judges of this Court recently found, there is good reason to think the APA was not intended to incorporate traditional equitable principles—not least because the APA specifically "empower[s] the judiciary to act directly against the challenged agency action." *Id.* (citation omitted).

Dated: January 16, 2026          Respectfully submitted,

*/s/ Hillary Li*
Hillary Li
Esther H. Sung
Karen C. Tumlin
Brandon Galli-Graves
JUSTICE ACTION CENTER
P.O. Box 27280
Los Angeles, CA 90027
(323) 450-7272
hillary.li@justiceactioncenter.org
esther.sung@justiceactioncenter.org
karen.tumlin@justiceactioncenter.org
brandon.galli-graves@justiceactioncenter.org

*Counsel for Plaintiffs-Appellees*

**CERTIFICATE OF COMPLIANCE**

I certify, pursuant to Federal Rule of Appellate Procedure 32(a)(7)(B) that the foregoing brief contains 12,964 words, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f).  I further certify that the document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365, in 14-point Times New Roman font.

Dated: January 16, 2026                    Respectfully submitted,

                                           */s/ Hillary Li*                    
                                           Hillary Li

                                           *Counsel for Plaintiffs-Appellees*

# CERTIFICATE OF SERVICE

I hereby certify that on January 16, 2026, I caused the foregoing document to be electronically filed using the appellate CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Respectfully submitted,

*/s/ Hillary Li*
Hillary Li

*Counsel for Plaintiffs-Appellees*