[ORAL ARGUMENT NOT YET SCHEDULED]
**Case No. 25-5289**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

COALITION FOR HUMANE IMMIGRANT RIGHTS, *et al.*,

*Plaintiffs-Appellees,*

*- v. -*

KRISTI NOEM, Secretary of Homeland Security, *et al.*,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Columbia
No. 1:25-cv-00872-JMC (Hon. Jia M. Cobb)

## BRIEF FOR *AMICI CURIAE* FORMER IMMIGRATION JUDGES AND FORMER MEMBERS OF THE BOARD OF IMMIGRATION APPEALS IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE

John R. Jacob
AKIN GUMP STRAUSS HAUER
 & FELD LLP
2001 K Street NW
Washington, D.C. 20006
Tel.: (202) 887-4000
Fax: (202) 887-4288
Email: jjacob@akingump.com

*Counsel for Amici Former Immigration Judges and Former Members of the Board of Immigration Appeals*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), *amici* Former Immigration Judges and Former Members of the Board of Immigration Appeals certify as follows:

**A.**   **Parties and Amici**

Except for the following, all parties, intervenors, and *amici* appearing in this Court are listed in the Brief for Appellants, except *amici* Former Immigration Judges and Former Members of the Board of Immigration Appeals.  A full listing of *amici* is attached hereto in the Appendix A.

**B.**   **Rulings Under Review**

References to the rulings at issue appear in the Brief for Appellants.

**C.**   **Related Cases**

Related cases are listed in the Brief for Appellants.

*/s/ John R. Jacob*
John R. Jacob

## TABLE OF CONTENTS

IDENTITY AND INTEREST OF *AMICI CURIAE* ................................... 1

INTRODUCTION ..................................................................... 2

ARGUMENT ........................................................................... 4

    I.    THE DISTRICT COURT CORRECTLY
        CHARACTERIZED EXPEDITED REMOVAL AS
        "LIKELY" TO "RESULT IN MORE WRONGFUL
        REMOVALS" ................................................................. 4

        A.    Safeguards Under Section 240 Removal
            Proceedings Are Essential to Preventing
            Wrongful Removals .............................................. 5

        B.    Lacking Safeguards, Expedited Removal
            Proceedings Are Highly Susceptible to Wrongful
            Removal ............................................................ 9

        C.    Credible Fear Proceedings Increase the Risk of
            Wrongful Removal ............................................... 13

CONCLUSION ...................................................................... 21

CERTIFICATE OF COMPLIANCE ......................................... 22

CERTIFICATE OF SERVICE ................................................. 23

APPENDIX A ................................................................. Appx. 1

# TABLE OF AUTHORITIES

CASES:

*Dep't of Homeland Sec. v. Thuraissigiam,*
 591 U.S. 103 (2020) .................................................................. 16

STATUTES:

8 U.S.C.
 § 1225 .................................................................... 2, 3, 4, 5, 9, 10, 14
 § 1225(b) ...................................................................................... 9, 10
 § 1229a ...................................... 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 13, 14, 16
 § 1229a(b) .......................................................................................... 3
 § 1229a(b)(1) ..................................................................................... 6
 § 1229a(b)(4) ..................................................................................... 6
 § 1229a(c) .......................................................................................... 3
 § 1229a(c)(3)(A) ............................................................................... 7
 § 1252 ................................................................................................ 7

OTHER AUTHORITIES:

8 CFR
 § 235.3(b)(4) ............................................................................. 10, 14
 § 1003.1 ............................................................................................. 7
 § 1003.10 ........................................................................................... 6
 § 1003.42(e) .................................................................................... 11

64 Fed. Reg. 8478 (Feb. 19, 1999) ........................................................ 15

Fed. R. App. P. 29(a)(4)(E) ..................................................................... 1

Immigration Court Practice Manual, Chapter 7.4(d)(4)
 (2025) ............................................................................................. 13

## IDENTITY AND INTEREST OF *AMICI CURIAE*[1]

*Amici curiae* are former immigration judges ("IJs") and former members of the Board of Immigration Appeals ("BIA" or the "Board"), listed in Appendix A, with substantial, combined years of service and intimate knowledge of the U.S. immigration system. *Amici* seek to illuminate for this Court the procedures involved in removal proceedings under the Immigration and Nationality Act ("INA"), the role of IJs, and how expedited removal poses a significant risk of wrongful removal for noncitizens.

*Amici* are invested in the issues presented by Plaintiffs-Appellees because they have dedicated their careers to improving the fairness and efficiency of the U.S. immigration system, even after departing from the bench. Given *amici's* familiarity with the procedures and realities of the immigration adjudication system, *amici* respectfully submit that this Court should affirm the stay granted by the district court, which correctly

---

[1] All parties have consented to the filing of this brief. Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *amici* state that no party's counsel has authored this brief in whole or in part, and that no party, party's counsel, or person (other than *amici*, its members, and its counsel) have contributed money to fund the preparation or submission of this brief.

reasoned that subjecting the Plaintiffs-Appellees to expedited removal poses a significant risk of wrongful removal and therefore imminent irreparable harm.

## INTRODUCTION

As former immigration judges and former members of the BIA, *amici* have centuries of collective experience impartially administering justice in removal hearings and in conducting immigration court level reviews for individuals subject to expedited removal who have received negative credible fear findings. Drawing on our expertise and experience, *amici* understand how expedited removal, despite the credible fear interview process, creates a significant risk for wrongful removal and resulting irreparable harm.

We thus submit this amicus brief to ask this Court to affirm the district court's stay. The stay is essential to upholding the INA, which provides that noncitizens who have been paroled are not subject to expedited removal under section 235 of the INA (codified at 8 U.S.C. § 1225) ("expedited removal" or "Section 235 proceedings"). Their cases should instead, as has been longstanding practice, be handled through standard proceedings under section 240 of the INA ("Section 240

proceedings") (codified at 8 U.S.C. § 1229a). This distinction is essential because, as former immigration judges, we have keenly observed how, compared with Section 240 proceedings, the lack of procedural safeguards under expedited removal creates a significant risk of wrongful removal. *Compare* § 1229a(b)-(c), *with* 8 U.S.C. § 1225. The stay is therefore essential to upholding the INA and the procedural protections it affords to Plaintiffs-Appellees; this ensures their cases are handled in accordance with law and that, as applicable, they may exercise their right to remain in the United States lawfully—often because they face extreme harm, torture or death in their home countries.

The use of Section 235 proceedings in these circumstances is, in our view, intended by Defendant-Appellees to take advantage of a process that offers only limited—and in some cases non-existent—review by immigration judges. As this Administration limits the independence of immigration judges through firings, re-assignments, and top-down directives, it also seeks to circumvent their involvement in the removal process altogether. Section 235 expedited removal allows Defendant-Appellants to act as gatekeepers in the first instance to credible fear interviews ("CFI"), then to limit positive CFI determinations, thereby

3

leaving asylum-seekers with, at most, a truncated IJ review. The district court was correct to find that the use of Section 235 in lieu of Section 240 proceedings qualifies as irreparable harm.

## ARGUMENT

### I. THE DISTRICT COURT CORRECTLY CHARACTERIZED EXPEDITED REMOVAL AS "LIKELY" TO "RESULT IN MORE WRONGFUL REMOVALS"

Our experience confirms the district court's finding that Defendants-Appellants "vastly understate", JA75, how expedited removal significantly raises the risk of wrongful removal and resulting irreparable injury. While serving as immigration judges, our members presided over proceedings under both Section 235 and Section 240. In the former, we reviewed negative determinations made only after a noncitizen had been given a credible fear interview. As explained below, immigration judges review negative CFI determinations only in certain circumstances; they do not have authority to review the decision whether to grant a credible fear interview in the first instance. Even with a limited record, and often unprepared and unrepresented noncitizens, it was not uncommon to identify mistakes or missed eligibilities from the CFI process.

4

Section 235 proceedings stand in stark contrast to Section 240 proceedings. As the district court correctly outlined, Section 240 proceedings provide an array of safeguards unavailable in expedited removal, including time to gather evidence, right to counsel, adversarial proceedings, robust proceeding records, and appellate reviewability. JA6-7.

Below we first explain Section 240 proceedings, in which most Plaintiff-Appellees had been placed after being paroled into the United States. We then contrast immigration judges' role in Section 235 proceedings.

### A. Safeguards Under Section 240 Removal Proceedings Are Essential to Preventing Wrongful Removals

Section 240 removal proceedings are the "standard mechanism" by which we would expect to adjudicate the removal of people who had been paroled or had their parole terminated. JA6. The safeguards afforded to noncitizens in Section 240 proceedings are appropriately rigorous considering the life-and-death risks from removal. Section 240 proceedings are presided over by immigration judges, licensed attorneys with a duty to develop the record for their cases, including by issuing "subpoenas for the attendance of witnesses and presentation of evidence."

8 U.S.C. § 1229a(b)(1); 8 CFR § 1003.10. Immigration judges must also conduct themselves "in a timely and impartial manner." 8 C.F.R. § 1003.10.

Section 240 proceedings are adversarial, with the noncitizen party having a right to be represented by counsel, to examine adverse evidence, to present one's own evidence, and to cross-examine government witnesses. 8 U.S.C. § 1229a(b)(4). While Section 240 proceedings do not follow the same rules or patterns of federal or state trial courts, there are similarities. As the district court correctly found, the procedures and rights inherent in Section 240 proceedings often require multiple hearings. JA7. Section 240 removal starts with a "Notice to Appear" ("NTA"), alleging the facts underlying the charged legal grounds for removal. The immigration court's first step is to obtain pleadings to these allegations and charges, typically at an initial hearing called a "master calendar." The timing of the master calendar can be set weeks or months from the service of the NTA, giving noncitizens the opportunity to obtain legal counsel or at least legal guidance as to their rights and obligations. As the district court accurately explained, this timing also enables noncitizens to fully explore all paths to lawfully remain in the United

States, such as through petitions for relief (*e.g.*, asylum) or collateral relief for other reasons (*e.g.*, adjustment of status due to marriage). JA7.

In Section 240 proceedings, the government must establish, "by clear and convincing evidence," that a noncitizen is deportable, and a decision on deportability is not "valid unless it is based on reasonable, substantial, and probative evidence." 8 U.S.C. § 1229a(c)(3)(A). These standards help avoid arbitrary outcomes and promote uniformity in decision making, which is essential to upholding the INA and preventing wrongful removals.

If an immigration judge renders an adverse decision, it is appealable to the Board of Immigration Appeals, and then the U.S. court of appeals. 8 U.S.C. § 1252; 8 CFR § 1003.1; JA7. Because immigration judges have a duty to develop the record in a case, and because evidence and testimony is recorded, there is substantial material to facilitate appeals.

The bottom line is that Section 240 proceedings take time; but this is a feature, not a bug—a feature that Defendants-Appellees seek to avoid in a push to deport as many noncitizens as possible, as quickly as possible, without regard for their eligibility for protection or other relief.

The quintessential procedural safeguards accompanying Section 240 proceedings—including thorough oversight of an impartial immigration judge—force a careful and deliberate evaluation designed to vindicate the rights of noncitizens and prevent wrongful removals.

Indeed, as immigration judges, we adjudicated numerous cases that hinged on evidence and testimony that came to light only because of the probing nature of Section 240 proceedings—the very purpose of these safeguards. It is no exaggeration to say that additional evidence and testimony altered almost every case over which we presided. Frequently we encountered claims that became viable only after evidence arose during a proceeding; these claims otherwise may have been abandoned or denied if the proceeding were limited to the evidence available at the outset of the case, resulting in an erroneous or wrongful removal. It was exceedingly rare to encounter a case where an applicant from the beginning supplied all the necessary evidence with a clear-cut case not requiring further development to reach the correct legal outcome, particularly when not represented by counsel.

Our experience shows that the safeguards exclusive to Section 240 proceedings are essential to vindicating people's rights, preventing

wrongful removal, and avoiding the irreparable harm facing Plaintiffs-Appellees. As described below, the opposite is true of expedited removal proceedings.

### B. Lacking Safeguards, Expedited Removal Proceedings Are Highly Susceptible to Wrongful Removal

The district court's description of how expedited removal proceedings are carried out, JA6-11, is consistent with our experience. Our view was from the perspective of the final stage of expedited removal, where an immigration judge may review a negative CFI determination, which can happen only after the agency grants the credible fear interview following an initial review.

Unlike Section 240 proceedings, expedited removal is by and large not an adjudicatory process. Rather, it is a set of determinations made by agency officials after interviewing the noncitizen, in detention. The immigration judge is involved only as a potential final step—the difference between a right to pursue relief and removal from the United States.

Section 235 removal proceedings are initiated by DHS enforcement officers, who are not lawyers or adjudicators. 8 U.S.C. § 1225(b); JA217 ¶ 13. The enforcement officer first chooses whether to apply expedited

9

removal to the noncitizen. (The officer may otherwise parole the noncitizen and/or place the noncitizen into Section 240 proceedings.) Once the officer has chosen to proceed according to Section 235, the officer determines whether the noncitizen has expressed a "fear of persecution or torture, or a fear of return to his or her country." If, in that unreviewable determination, the officer decides that the noncitizen did not express such a fear, the noncitizen is removed after supervisor approval, without further process. 8 U.S.C. § 1225(b); 8 CFR § 235.3(b)(4). The noncitizen is not "entitled to seek or be represented by counsel" during this initial screening. JA216 ¶ 11. This decision is not reviewable or appealable. JA8.

If the officer instead determines that the noncitizen has expressed such a fear, an asylum officer will conduct a credible fear interview. 8 CFR § 235.3(b)(4); JA8; JA216 ¶ 12. CFIs may occur with little or no time to prepare or secure any form of legal support (*e.g.,* 24-48 hours), and there is no right to counsel. The Administration last year de-funded long-standing independent legal orientation programs (LOPs) in detention centers, through which non-profit legal aid organizations provided guidance to noncitizens preparing for CFIs. Now, very few if any

10

noncitizens receive assistance preparing for a CFI, even to understand the basic purpose of the process. The CFI itself is a truncated, scripted interview, often conducted over the phone or by video. While a noncitizen may have an attorney participate in the process, this is not the norm. (Indeed, the LOPs that helped identify available counsel no longer exist.) After this brief interview, the asylum officer determines whether the noncitizen has presented a "credible fear" and has no bars to relief. If the determination is positive, the noncitizen is placed in Section 240 proceedings. If the determination is negative, the noncitizen may elect (by checking a box) to have an immigration judge review the asylum officer's determination. (A refusal or failure to decline an immigration judge review will also result in an immigration judge review.)

Only now does the immigration judge come into play. (As noted, the immigration judge has no role after an officer declines to grant a noncitizen a credible fear interview in the first instance.) An IJ review occurs quickly—by regulation within 24 hours, but not more than 7 days after, a supervisor concurs with the negative determination, 8 CFR § 1003.42(e), and the noncitizen remains detained during this period.

11

The officer is not obliged to explain how interviewees might pursue relief—even when the law provides an avenue for the person to remain. JA217 ¶ 13.

If the officer conducting the CFI finds no credible fear, the interviewee may request a review of that determination before an immigration judge. JA8. The immigration judge conducts a *de novo* review of the noncitizen's credible fear of persecution or torture and any bars to relief. Many of our members conducted these reviews, often reversing the negative credible fear determination. No doubt immigration judges are an important backstop at this final stage separating a noncitizen from the ability to seek relief and immediate removal, but this is at best a triage process. These detained noncitizens are often ill-prepared for the review, and they typically appear without counsel who could help explain their eligibility for relief, as the CFI review does not confer a right to counsel. *Id.* The Immigration Court Procedures Manual emphasizes that even if the noncitizen is able to consult with someone about the IJ review, the noncitizen "is not represented at the credible fear review" and nobody acting on that person's behalf is entitled to "make opening statements, call and question

witnesses, conduct cross examinations, object to evidence, or make closing arguments." Immigration Court Practice Manual, Chapter 7.4(d)(4) (2025). Simply put, even when reviewed by an IJ, the CFI process is not designed to facilitate meaningful, detailed review of the noncitizen's circumstances and eligibility to remain in the United States. Moreover, the noncitizen faces the natural inclination by immigration judges to treat the negative determination as a baseline, even if the review is *de novo* as a matter of law.

Even if the asylum officer or immigration judge makes a credible fear finding, and the noncitizen is placed in full Section 240 removal proceedings, they remain detained, typically far from home, family, or any resources to help vindicate their rights

## C.    Credible Fear Proceedings Increase the Risk of Wrongful Removal

The fundamental virtue of Section 240 proceedings is that they are governed by safeguards that compensate for the inevitable faults of imperfect humans and bureaucracies—which is essential to preventing irreparable harm from wrongful removal. The fundamental flaw with expedited removal is the absence of these safeguards. Defendants-Appellants argue that the CFI process compensates for this defect by

13

protecting noncitizens who "could suffer persecution or death if removed through the expedited removal process." JA475-76. But as with expedited removal itself, the design and implementation of the CFI process renders it unable to adequately prevent such harm, even assuming the best intentions and capabilities of the officers and judges involved. As immigration judges that reviewed adverse CFI determinations, we believe there are many reasons why Plaintiffs-Appellees face irreparable harm despite the availability of CFIs and limited IJ review of them.

First, a CFI is granted only if the enforcement officer conducting a screening perceives and credits a noncitizen expressing "an intention to apply for asylum" or "a fear of persecution or torture" or "return to his or her country." 8 CFR § 235.3(b)(4). Understanding that enforcement officers are acting in good faith, the rushed Section 235 process invites error. As immigration judges, it was obvious to us during full Section 240 removal proceedings how a noncitizen could easily fail to reveal the requisite intent or fear during an expedited removal screening while being detained, unprepared, and unrepresented, and also experiencing fear and confusion, potential language barriers, and an unfamiliarity with the relevant legal issues.

14

Second, even if a noncitizen is referred to a CFI, for all the same reasons, the noncitizen may be unlikely to indicate credible fear to the officer conducting the CFI. In our experience, this was especially likely when self-represented applicants were uncomfortable discussing material issues because they feared that revelations about their identity might cause them harm in custody, such as for having a minority religious faith or being gay or gender non-conforming.

Additionally, as immigration law has become far more complex over the years, without the assistance of counsel, noncitizens may be increasingly unable to identify or explain—to the officer conducting the CFI or to an immigration judge on review—a credible fear related to their eligibility to remain. When the expedited removal statute was enacted in 1996, JA6, asylum claims generally were far less nuanced and did not require, for example, to prove particularity and social distinction in order to establish the validity of a particular social group. Moreover, immigration judges at the time were not yet responsible for grappling with complicated determinations under the Convention Against Torture, such as for government acquiescence—an additional complexity assigned to them by regulation in 1999. *See* 64 Fed. Reg. 8478 (Feb. 19, 1999).

15

Today, unrepresented asylum seekers cannot be expected to marshal sophisticated legal standards to establish, for example, the cognizability of a claimed particular social group or the existence of an imputed political opinion.[2]

Third, the CFI process is not robust enough to systematically identify facts that establish credible fear. It depends entirely on how asylum officers conduct the interview, and whether they extract the relevant information from an applicant. And enforcement officers may lack the knowledge, skill, experience, or motivation to identify qualifying grounds for interviewees that would spare them from expedited removal. In our experience, officers generally asked interviewees about what

---

[2] Without challenging the holding in *Thuraissigiam*, we note the facts in that case exemplify why compared to Section 240 proceedings, CFIs may fail to identify (even when reviewed by an immigration judge) when a noncitizen has credible fear, particularly when the relevant eligibility criteria for relief are complex—a point on which the majority did not rule. *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103 (2020) (describing how a CFI affirmed by an immigration judge failed to identify a nexus to a protected ground when a Tamil male credibly testified to being kidnapped and brutally beaten by a gang of men, because only later did the context come to light linking this experience with Tamils being a long-persecuted ethnic minority in Sri Lanka subject to widespread and well-documented patterns of similar abduction and torture by the government).

16

immediate issues prompted them to leave their home country or broad questions about whether they had ever been harmed due to their race, religion, or affiliations. But the officers rarely asked general questions about physical harm or threats or clarified what harms were relevant. As a result, officers often missed cases where harm occurred before someone made the immediate decision to leave, or where interviewees internalized harm as culturally typical, so they did not think to mention it. For example, many applicants had viable family or gender-based claims that were not evaluated because those events had occurred years prior or because they did not understand domestic violence to be the type of harm an officer was asking about.

Even as immigration judges—trained attorneys with years of experience with engaging adversarial proceedings, overseeing countless nuanced immigration proceedings, and learning extensively about in-country dynamics—it was difficult to ascertain the relevant facts in these complex cases. In one CFR review, for instance, an applicant positively described being able to practice his religion freely in various countries where he had spent time. Knowledge of religious discrimination in his home country, however, enabled an immigration judge to specifically

17

inquire about the applicant's religious experience there. This revealed that the applicant suffered severe discrimination and a death threat in his home country—facts that supported an asylum claim but that had been entirely missed earlier in his removal proceeding. It is unsurprising then that officers without the benefit of immigration judges' experience would have an even harder time identifying interviewees' credible fear during CFIs—especially when facing pressure to boost deportations. *See* JA26 (describing a ramp up of expedited removals amid policy changes instituted by DHS).

Fourth, an adverse CFI determination is subject to IJ review only in limited circumstances (if the noncitizen elects review by checking a box or the noncitizen refuses or declines an IJ review, which leads to an automatic review). But even with IJ review, for many of the same reasons described above, IJ review under the constraints of expedited removal may be unlikely to identify when an interviewee is entitled to remain in the United States for further evaluation.

Although immigration judges do their best to uncover evidence possibly supporting a credible fear, this can be an impossible task without a transcript of the CFI, counsel to guide interviewees, and time

to develop evidence that may be needed to overturn an adverse CFI determination. For example, the outcome of an IJ review may turn on country conditions evidence, a theory of how to present the claim (*e.g.*, a particular social group relevant to grounds for asylum), or what particular statute to apply (*e.g.*, for asylum, withholding of removal, or the Convention Against Torture)—among other complex factors that take time and evidence to properly develop.

Additionally, sometimes an adverse CFI determination is based on a bar to relief, such as a criminal conviction. This can be challenging if not impossible to evaluate with the little information and time provided for IJ review. For example, we have dealt with cases where expedited removal was ordered and a credible fear determination denied on the basis of the person having aggravated felony convictions—only to discover that these were not legally aggravated felonies. The lack of time, evidence, and counsel makes expedited removal and CFI reviews highly susceptible to missing these errors and preventing wrongful removals.

Fifth, one member of the *amici* recounted being allotted only a short period of time to process enormous volumes of cases, inevitably heightening the risk of making errors or missing key details. This former

19

immigration judge described how sometimes the files from CFIs under review would not be available until the night before a hearing. The judge recalled that some immigration judges often had 18-24 CFI review hearings every day, with only 10 hours to conduct them all, mere minutes to review negative CFI determinations and evaluate all the complexity related to credible fear. Defendants-Appellants claim, JA475-76, that the availability of IJ review makes CFIs sufficient to spare Plaintiffs-Appellees from irreparable harm in expedited removal proceedings. Having conducted CFI reviews under the impossible circumstances in which they occur, our experience as immigration judges proves otherwise.

The lack of safeguards with expedited removal proceedings introduces numerous opportunities for error while inhibiting noncitizens from being able to invoke their legitimate right to remain for reasons such as asylum. The result is a high propensity for wrongful removal that is not corrected by the availability of CFIs. CFIs suffer from the same defective procedures as expedited removal itself, making CFIs susceptible to error and unlikely to reveal legitimate instances of credible fear. Even when immigration judges review adverse CFI determinations made by enforcement officers, the constraints on the review process make

20

it impossible to sufficiently overcome these fatal flaws. That is why as immigration judges who have been intimately involved in removal proceedings over many years across the country, we conclude that expedited removal presents a high risk of wrongful removal for Plaintiffs-Appellees and the irreparable harm that follows.

## CONCLUSION

For the foregoing reasons, *amici* respectfully urge the Court to affirm the district court's stay.


Dated:  January 23, 2026          Respectfully submitted,

                                             /s/ *John R. Jacob*
                                             John R. Jacob
                                             AKIN GUMP STRAUSS HAUER & FELD LLP
                                             2001 K Street NW
                                             Washington, D.C. 20006
                                             (202) 887-4000
                                             jjacob@akingump.com

*Counsel for Amici Former Immigration Judges & Former Members of the Board of Immigration Appeals*

21

## CERTIFICATE OF COMPLIANCE

**1.**   This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), this brief contains 3,959 words.

**2.**   This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because: this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365, 14 point Century Schoolbook.

*/s/ John R. Jacob*
John R. Jacob

Dated: January 23, 2026

22

## CERTIFICATE OF SERVICE

I hereby certify that on January 23, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ John R. Jacob*
John R. Jacob

23

## APPENDIX A

### Former Immigration Judges and
### Members of the Board of Immigration Appeals

- Hon. Steven Abrams, Immigration Judge, New York, Varick St., and Queens Wackenhut, 1997-2013

- Hon. Terry A. Bain, Immigration Judge, New York, 1994-2019

- Hon. Sarah M. Burr, Assistant Chief Immigration Judge and Immigration Judge, New York, 1994-2012

- Hon. Sarah Cade, Immigration Judge, Boston, 2021-2025

- Hon. Daniel Caudillo, Immigration Judge, Laredo, TX 2021-2025

- Hon. Florence Chamberlin, Immigration Judge, San Francisco, 2023-2025

- Hon. Jeffrey S. Chase, Immigration Judge, New York, 1995-2007

- Hon. Joan V. Churchill, Immigration Judge, Washington, D.C./ Arlington, VA - 1980 - 2005

- Hon. Bruce J. Einhorn, Immigration Judge, Los Angeles, 1990-2007

- Hon. Cecelia M. Espenoza, Appellate Immigration Judge, Board of Immigration Appeals, 2000-2003

- Hon. James R. Fujimoto, Immigration Judge, Chicago, 1990-2019

- Hon. Jennie Giambastiani, Immigration Judge, Chicago, 2002-2019

- Hon. Alberto E. Gonzalez, Immigration Judge, San Francisco, 1995 - 2005

- Hon. John F. Gossart, Jr., Immigration Judge, Baltimore, 1982-2013

- Hon. Paul Grussendorf, Immigration Judge, Philadelphia and San Francisco, 1997-2004

- Hon. Rebecca Holt, Immigration Judge, Memphis, 2010-2025

- Hon Sandy Hom, Immigration Judge, New York, 1993-2018

- Hon. Charles M. Honeyman, Immigration Judge, New York and Philadelphia, 1995-2020

- Hon. Denise Hunter, Immigration Judge, Sacramento, 2022-2025

- Hon. William P. Joyce, Immigration Judge, Boston, 1996-2002

- Hon. Carol King, Immigration Judge, San Francisco, 1995-2017

- Hon. David Koelsch, Immigration Judge, Baltimore, Hyattsville, MD, 2018-2025

- Hon. Christopher M. Kozoll, Immigration Judge, Memphis, 2022-2023

- Hon. Elizabeth A. Lamb, Immigration Judge, New York, 1995 - 2018

- Hon. Dana Leigh Marks, Immigration Judge, San Francisco, 1987-2021

- Hon. Margaret McManus, Immigration Judge, New York, 1991-2018

- Hon. Steven Morley, Immigration Judge, Philadelphia, 2010-2022

- Hon. Maria E. Navarro, Immigration Judge, New York, 2017-2025

Appx. 2

- Hon. Anam Rahman Petit, Immigration Judge, Annandale, VA, 2023-2025

- Hon. George Proctor, Immigration Judge, Los Angeles, San Francisco, 2003-2008

- Hon. Patricia A. Rohan, Immigration Judge, New York, 1982 - 2017

- Hon. Lory D. Rosenberg, Appellate Immigration Judge, Board of Immigration Appeals, 1995-2002

- Hon. Susan G. Roy, Immigration Judge, Newark, 2008-2010

- Hon. Andrea Saenz, Appellate Immigration Judge, Board of Immigration Appeals, 2021-2025

- Hon. Paul W. Schmidt, Chairperson and Appellate Immigration Judge, Board of Immigration Appeals, 1995-2003; Immigration Judge, Arlington, VA, 2003-2016

- Hon. Douglas B. Schoppert, Immigration Judge, New York, 1997-2024

- Hon. Noelle Sharp, Assistant Chief Immigration Judge, Houston, 2021-2025

- Hon. Patricia M. B. Sheppard, Immigration Judge, Boston, 1993-2006

- Hon. Ilyce S. Shugall, Immigration Judge, San Francisco, 2017-2019

- Hon. Helen Sichel, Immigration Judge, New York, 1997-2020

- Hon. Gabriel C. Videla, Immigration Judge, New York and Miami, 1994-2022

- Hon. Polly A. Webber, Immigration Judge, San Francisco, 1995-2016

- Hon. Carmen Maria Rey Caldas, Immigration Judge, Stewart (Lumpkin, GA) and New York, 2022-2025