**ORAL ARGUMENT SCHEDULED FOR MARCH 16, 2026**
**No. 25-5289**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

COALITION FOR HUMANE IMMIGRANT RIGHTS, *et al.*,
*Appellees*,

v.

KRISTI NOEM, in her official capacity as
Secretary of Homeland Security, *et al.*,
*Appellants*.

---

On Appeal from the U.S. District Court
for the District of Columbia
No. 1:25-cv-00872 (Cobb, J.)

---

### REPLY BRIEF FOR APPELLANTS

---

PAPU SANDHU
*Assistant Director*
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
P.O. Box 878, Ben Franklin
Station
Washington, DC 20044

BRETT A. SHUMATE
*Assistant Attorney General*
DREW C. ENSIGN
*Deputy Assistant Attorney General*
TYLER J. BECKER
*Counsel to the Assistant Attorney
General*
U.S. Department of Justice,
Civil Division
950 Pennsylvania Avenue, NW
Washington, DC 20530
(202) 514-2000

## **TABLE OF CONTENTS**

INTRODUCTION.................................................................1

ARGUMENT ....................................................................3

    I.    The Government Is Likely To Succeed on the Merits............3

        A.    Plaintiffs' Alleged Harms are not Redressable. ............3

        B.    The "Arriving in" Provision Applies to Aliens Paroled at Ports of Entry. ...............................8

        C.    The "Designation" Provision Applies to Aliens Whose Parole has been Revoked. ................................22

        D.    The Agency's Actions are not Arbitrary and Capricious....................................................25

    II.    The Remaining Equitable Factors Weigh Strongly in the Government's Favor...........................................26

        A.    Irreparable Harm.........................................26

        B.    Harm to the Government and Public Interest. ...........28

    III.    The District Court's Stay Violates 8 U.S.C. §1252(f)(1).......28

    IV.    The District Court's Universal Relief Exceeded Its Authority .................................................31

CONCLUSION .................................................................34

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

i

# TABLE OF AUTHORITIES

## CASES

*Adams v. Holder*,
692 F.3d 91 (2d Cir. 2012) ................................................................. 21

*Akhtar v. Gonzales*,
450 F.3d 587 (5th Cir. 2006) ............................................................. 14

*Barney v. Rogers*,
83 F.3d 318 (9th Cir. 1996) ............................................................... 13

*Career Coll. & Schools of Texas v. DOE*,
98 F.4th 220 (5th Cir. 2024) ............................................................. 32

*Conroy v. Aniskoff*,
507 U.S. 511 (1993) ........................................................................... 15

*Doc Society v. Rubio*,
141 F.4th 1273 (D.C. Cir. 2025) ................................................ 3, 6, 8

*Duarte v. Mayorkas*,
27 F.4th 1044 (5th Cir. 2022) ........................................................... 10

*E.V. v. Raycraft*,
2025 WL 3122837 (N.D. Ohio Nov. 7, 2025) ..................................... 7

*FAA v. Cooper*,
566 U.S. 284 (2012) ............................................................................. 9

*Garland v. Aleman Gonzalez*,
596 U.S. 543 (2022) ........................................................................... 29

*Gisbert v. U.S. Atty. Gen.*,
988 F.2d 1437 (5th Cir.) .................................................................... 17

*Haaland v. Brackeen,*
   599 U.S. 255 (2023).................................................................5

*Hecht Co. v. Bowles,*
   321 U.S. 321 (1944).................................................................33

*Hewitt v. United States,*
   606 U.S. 419 (2025).................................................................22

*Jazz Pharms., Inc. v. Kennedy,*
   141 F.4th 254 (D.C. Cir. 2025)...........................................14

*Kaplan v. Tod,*
   267 U.S. 228 (1925).................................................................1

*Karmamoldoyeva v. Warden,*
   2026 WL 266459 (S.D. Cal. Feb. 2, 2026)..........................7

*Landon v. Plasencia,*
   459 U.S. 21 (1982).................................................................13

*Leng May Ma v. Barber,*
   357 U.S. 185 (1958).........................................................12, 13

*Loper Bright Enters. v. Raimondo,*
   603 U.S. 369 (2024).........................................................18, 19

*Loughrin v. United States,*
   573 U.S. 351 (2014).................................................................29

*Lujan v. Defs. of Wildlife,*
   504 U.S. 555 (1992)...........................................................4, 5, 6

*Make the Rd. N.Y. v. Noem (MRNY),*
   2025 WL 3563313 (D.C. Cir. Nov. 22, 2025) ...............19, 20, 29, 33

*Montiel v. Raycraft,*
   2026 WL 32076 (W.D. Mich. Jan. 6, 2026)..........................7

*Nat'l Wrestling Coaches Ass'n v. DOE*,
    366 F.3d 930 (D.C. Cir. 2004) ............................................................3

*Nken v. Holder*,
    556 U.S. 418 (2009)................................................................29, 30

*Nuclear Info. & Res. Serv. v. NRC*,
    457 F.3d 941 (9th Cir. 2006)..............................................................8

*Rodriguez-Acurio v. Almodovar*,
    2025 WL 3314420 (E.D.N.Y. Nov. 28, 2025) .......................................7

*S.W. v. Noem*,
    2025 WL 3754067 (S.D.N.Y Dec. 29, 2025) .........................................7

*Scenic Am., Inc. v. DOT*,
    836 F.3d 42 (D.C. Cir. 2016) ..............................................................7

*Starbucks Corp. v. McKinney*,
    602 U.S. 339 (2024)...........................................................................33

*Thuraissigiam v. DHS*,
    591 U.S. 103 (2020)..............................................................9, 20, 27

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021)............................................................................3

*Trump v. CASA, Inc.*,
    606 U.S. 831 (2025).....................................................2, 28, 31, 32, 33

*United States v. Argueta-Rosales*,
    819 F.3d 1149 (9th Cir. 2016)...........................................................16

*United States v. Balint*,
    201 F.3d 928 (7th Cir. 2000)..............................................................9

*United States v. Bronstein*,
    849 F.3d 1101 (D.C. Cir. 2017) .........................................................30

iv

*United States v. Wilson*,
   503 U.S. 329 (1992) ..................................................................24

*Zheng v. Gonzales*,
   422 F.3d 98 (3d Cir. 2005) .......................................................24

## STATUTES

5 U.S.C. §705 ...................................1, 2, 3, 4, 5, 8, 28, 29, 31, 32, 33, 34

8 U.S.C. §1101(a)(13)(A) .........................................................23

8 U.S.C. §1101(a)(13)(B) .........................................................16

8 U.S.C. §1182(d)(5) ...............................................................16

8 U.S.C. §1182(d)(5)(A) .................................................10, 12, 22

8 U.S.C. §1225 .......................................................................10

8 U.S.C. §1225(a)(1) ...............................................................10

8 U.S.C. §1225(a)(2) ...............................................................11

8 U.S.C. §1225(b)(1) ..........................................................11, 19

8 U.S.C. §1225(b)(1)(A)(i) ............................... 10, 11, 14, 18, 21

8 U.S.C. §1225(b)(1)(A)(ii) ......................................................21

8 U.S.C. §1225(b)(1)(A)(iii) ..........................................17, 22, 23

8 U.S.C. §1225(b)(1)(B) ...........................................................21

8 U.S.C. §1225(b)(1)(E) .......................................................27, 28

8 U.S.C. §1225(c)(1) ...............................................................10

8 U.S.C. §1226(a) ................................................................. 13

8 U.S.C. §1229a ................................................ 14, 18, 21, 27

8 U.S.C. §1229b(b)(1) ......................................................... 21

8 U.S.C. §1252(f)(1) ...................................... 2, 28, 29, 30, 31

8 U.S.C. §1255(a) .......................................................... 21, 24

## OTHER STATUTES

Antiterrorism and Effective Death Penalty Act,
  Pub. L. No. 104-132 (1996) .............................................. 15

Illegal Immigration Reform and Immigrant Responsibility Act of 1996,
  Pub. L. No. 104–208 ........................................................... 8

## REGULATIONS

8 C.F.R. §1.2 .................................... 1, 3, 4, 5, 6, 7, 15, 18, 26

8 C.F.R. §208.1(b) ............................................................. 28

8 C.F.R. §235.3 ............................................... 1, 3, 4, 5, 6, 7

## LEGISLATIVE MATERIALS

104 Cong. Rec. S3427 (daily ed. April 17, 1996) .............................. 15, 16

H.R. Rep. No. 104-383 (1996) ................................................... 12

H.R. Rep. No. 104–469 (1996) .................................................. 16

## OTHER AUTHORITIES

62 Fed. Reg. 10,312 (Mar. 6, 1997) .......................................................... 15

90 Fed. Reg. 13,611 (Mar. 25, 2025) ........................................................ 20

## INTRODUCTION

Plaintiffs' brief confirms their insurmountable Article III redressability problem.  Plaintiffs do not challenge the Government's position that the Department of Homeland Security (DHS) may continue to apply expedited removal to paroled arriving aliens under 8 C.F.R. §§1.2 and 235.3—which they did not challenge in their request for a stay pursuant to 5 U.S.C. §705.  Thus, they cannot establish that their members' harms would be redressed by the district court's §705 stay. They have had such a stay for months and it has not provided them with any apparent relief.  The Court should reverse on this threshold ground alone.

On the merits, the application of expedited removal to paroled arriving aliens is consistent with decades of case law and duly-enacted statutes.  Plaintiffs do not dispute that under bedrock principles of immigration law, an alien paroled at a port of entry is legally considered to be at the border "and ha[s] gained no foothold" in the United States, *Kaplan v. Tod*, 267 U.S. 228, 230 (1925).  Congress undoubtedly had this in mind when it enacted expedited removal for aliens "arriving in" the United States.  Congress also is presumed to have been aware of

established precedent prior to the enactment of expedited removal holding that a paroled "arriving alien" was not deemed to have made an "entry," and was therefore subject to the less favorable former "exclusion" proceedings.

Furthermore, the district court lacked authority to enter the universal stay because its stay order "restrain[s]" the Government from expeditiously removing an entire class of aliens. 8 U.S.C. §1252(f)(1). Plaintiffs essentially read "restrain" out of the statute.

Finally, the district court's universal stay is overbroad. A stay under 5 U.S.C. §705 stay is a form of "interim equitable relief" and must operate within traditional equitable limits. A §705 stay, like other equitable remedies, cannot go beyond awarding a *party* complete relief. *Trump v. CASA, Inc.*, 606 U.S. 831, 852-53 (2025). The district court's universal §705 stay does just that, however, and thus cannot survive appellate scrutiny.

This Court should reverse.

## ARGUMENT

## I.    The Government Is Likely To Succeed on the Merits.

### A.    Plaintiffs' Alleged Harms are not Redressable.

"[P]laintiffs must demonstrate standing … for each form of relief that they seek," including preliminary relief like a §705 stay. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).  Redressability— a required element of Article III standing—is absent where "independent" legal authority would permit the challenged conduct to continue notwithstanding the requested relief.  *Nat'l Wrestling Coaches Ass'n v. DOE*, 366 F.3d 930, 941 (D.C. Cir. 2004).  Plaintiffs' failure to establish redressability to seek this §705 stay requires reversal.[1]

Critically, Plaintiffs' brief does not contest the following facts:

- DHS's "arriving alien" regulations (8 C.F.R. §§1.2 and 235.3) authorize DHS to apply expedited removal to aliens, like Plaintiffs' members, who were paroled at ports of entry.  Joint Appendix (JA) at 172, ¶178.

- Plaintiffs did not ask the court below to stay these regulations in their §705 stay motion.  JA-509 n.12.

- At a hearing on the stay motion, Plaintiffs conceded that even if the district court were to grant their requested §705 stay, DHS

---

[1] Contrary to Plaintiffs' suggestions otherwise, the district court's "standing determinations are reviewed de novo." *Doc Society v. Rubio*, 141 F.4th 1273, 1276 (D.C. Cir. 2025) (quotation omitted).

would be able to apply expedited removal to aliens paroled at ports of entry under the arriving alien regulations. JA-538-39.

- In its stay order, the district court did not enjoin the Government from applying expedited removal to paroled arriving aliens pursuant to the arriving alien regulations, or stay said regulations.

- Defendants are currently applying the arriving alien regulations to aliens paroled at ports of entry. Indeed they have been doing so for months without Plaintiffs filing any motion contending that Defendants' continued reliance on 8 C.F.R. §§1.2 and 235.3 (which are not stayed) somehow violates the district court's §705 stay.

Given these concessions, Plaintiffs cannot show it is "likely" that their members' alleged injury—being subject to expedited removal—will be "redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (quotation omitted). Thus, the district court's §705 stay must be vacated. Appellants' Brief ("Govt.Br.") at 22-25.

Plaintiffs' contrary arguments fail. Plaintiffs (at 18) contend that the district court correctly found redressability met because Defendants purportedly relied on 8 C.F.R. §§1.2 and 235.3 to apply expedited removal to paroled arriving aliens "in a vanishingly small number of cases" before the Challenged Actions. That characterization is dubious. Govt.Br.27 n.3. And irrelevant too: the question here is not whether Plaintiffs' injury would be redressed based on DHS's past conduct. Plaintiffs are seeking

4

*prospective* relief—not damages for past actions.  The operative question under Article III is thus whether Plaintiffs' injury would "likely" be redressed *going forward* in the event of a favorable court ruling.  *See Lujan*, 504 U.S. at 561 (quotation omitted).  Because DHS can, and is, applying 8 C.F.R. §§1.2 and 235.3 to the same group of aliens after the Challenged Actions were stayed, Plaintiffs cannot establish their members' injury will likely be redressed by the §705 stay they sought (and obtained).

Plaintiffs (at 18) assert that because the district court concluded that 8 C.F.R. §1.2 was *ultra vires*, their members' injuries are redressable by the district court's §705 stay.  But "[i]t is a federal court's judgment, not its opinion, that remedies an injury; thus it is the judgment, not the opinion, that demonstrates redressability."  *Haaland v. Brackeen*, 599 U.S. 255, 294 (2023).  Given Plaintiffs' failure to challenge the arriving-alien regulations in their §705 stay motion, they could "hope for nothing more than an opinion" stating those regulations were *ultra vires*—not a judgment barring DHS's use of those regulations.  *See id.*  The district court's naked legal reasoning—which is wholly untethered from any actual relief granted in its §705 stay—thus does not actually redress

5

Plaintiffs' injuries. Plaintiffs (at 18) concede as much: "the 8 C.F.R. §1.2 definition of 'arriving alien' is not subject to the stay." The district court's analysis of that provision's legality is thus a quintessential advisory opinion.

Plaintiffs (at 18) argue that because *Defendants* have not proven they are applying expedited removal using 8 C.F.R. §1.2 "to the extent" they were applying expedited removal before the stay of the Challenged Actions, Plaintiffs' injury can still be redressed "in part." But it is *Plaintiffs'* burden to establish standing, not Defendants'. *Lujan*, 504 U.S. at 561. And Plaintiffs have still failed to demonstrate which "part" of their members' injury can be redressed given that DHS can still apply 8 C.F.R. §§1.2 and 235.3 to remove the same previously paroled aliens whom Plaintiffs represent. Govt.Br.27.

In another recent case, this Court determined plaintiffs' claims were not likely redressable where, even if a mandatory policy for visa applicants to provide social-media accounts with applications were vacated, regulations still permitted consular officers to consider a visa applicant's social-media history on a case-by-case basis. *Doc Soc'y v. Rubio*, 141 F.4th 1273, 1278 (D.C. Cir. 2025). So too here. Plaintiffs'

6

members' injuries are not likely redressable where DHS can still subject those members to expedited removal under the unchallenged regulations. In any event, as the many cases about the issue in federal courts demonstrate, DHS has used 8 C.F.R. §§1.2 and 235.3 to apply expedited removal to previously paroled aliens.[2]

Plaintiffs (at 19-20 & n.11) contest Defendants' reliance on case law finding a lack of redressability where the response of third parties to a court's ruling would impact whether Plaintiffs' injury would actually be redressed. It is unclear why that distinction matters; it is, at best for Plaintiffs, merely speculative whether Defendants would "behave any differently" if the Challenged Actions were stayed, yet the arriving-alien regulations were not. *See Scenic Am., Inc. v. DOT*, 836 F.3d 42, 50-53 (D.C. Cir. 2016).

Plaintiffs acknowledge that one case Defendants cited "does not involve third-party regulations" but is "unpersuasive" nonetheless

---

[2] *E.g.*, *Karmamoldoyeva v. Warden*, 2026 WL 266459, at *6 (S.D. Cal. Feb. 2, 2026); *Montiel v. Raycraft*, 2026 WL 32076, at *3 (W.D. Mich. Jan. 6, 2026); *S.W. v. Noem*, 2025 WL 3754067, at *2,*5 & n.7 (S.D.N.Y. Dec. 29, 2025); *Rodriguez-Acurio v. Almodovar*, 2025 WL 3314420, at *19-*21 (E.D.N.Y. Nov. 28, 2025); *E.V. v. Raycraft*, 2025 WL 3122837, at *7 (N.D. Ohio Nov. 7, 2025).

because the "unchallenged regulations *required* agency action." Appellees' Br.20 n.12 (citing *Nuclear Info. & Res. Serv. v. NRC*, 457 F.3d 941, 955 (9th Cir. 2006)).  Yet this Court has found a lack of redressability even where the unchallenged regulations permitted discretion. Specifically, this Court held that because "a consular officer may still scrutinize a visa applicant's social media activities even if" a policy requiring visa applicants to provide their social-media accounts was vacated, Plaintiffs' alleged speech harms may not be redressed by a decision vacating the mandatory policy.  *Doc Soc'y*, 141 F.4th at 1278.

Because Plaintiffs failed to establish redressability as to the particular §705 stay they sought, the district court's stay must be reversed.

### B.   The "Arriving in" Provision Applies to Aliens Paroled at Ports of Entry.

Plaintiffs (at 39) do not dispute that an alien paroled at a port of entry stands in the same legal position as one stopped at the border, and prior to 1997 was subject to former "exclusion" proceedings as an "arriving alien" who was not considered to have made an "entry."  Yet they contend that in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104–208, Congress

prohibited DHS from applying expedited removal to paroled arriving aliens, even though it reiterated the statutory language that parole is not an admission—language which has served as the basis of the "century-old" legal fiction. *DHS v. Thuraissigiam*, 591 U.S. 103, 139 (2020). The statutory text, context, and history are to the contrary.

1. Plaintiffs (at 36) make the same textual error as the district court by isolating the word "arriving" and insisting it cannot be applied to paroled aliens because they have already "reached" the United States and been paroled. But dictionary definitions are not dispositive when interpreting a term that has a specialized meaning in the law. *FAA v. Cooper*, 566 U.S. 284, 291-92 (2012).

Plaintiffs' reading ignores the immigration and statutory context of the term "arriving"—context that strongly suggests Congress was referring to a *status* and not just a historical event (the alien's physical arrival). The use of the present-progressive tense, "arriving," signals a status that continues to be true; an alien "arriving in" the United States without valid documentation has not been admitted and continues to not be admitted. *See United States v. Balint*, 201 F.3d 928, 933 (7th Cir. 2000) ("[T]he present progressive tense … generally indicates continuing

action[.]").  For a paroled arriving alien, the parole statute makes clear that parole "shall not be regarded as an admission" and "when the purposes of such parole … have been served" the alien "shall forthwith" be returned to custody and "shall continue to be dealt with in the same manner as that of any other applicant for admission."   8 U.S.C. §1182(d)(5)(A).

Thus, an alien granted parole at a port of entry remains unadmitted and hence, in the *status* of an alien "arriving in" the United States.  *See Duarte v. Mayorkas*, 27 F.4th 1044, 1058 (5th Cir. 2022) ("[A]lthough a paroled alien is physically allowed to enter the country, the legal status of the alien is the same as if he or she were still being held at the border waiting for his or her application for admission to be granted or denied."). Congress surely meant to include such aliens under §1225(b)(1)(A)(i).

This interpretation of "arriving" is supported by the statutory context because Congress has used that term in other provisions to denote status.  The general title of 8 U.S.C. §1225 includes the term "expedited removal of inadmissible *arriving* aliens," a reference to 8 U.S.C. §1225(c)(1) (emphasis added), which provides for a removal procedure for arriving aliens who are inadmissible on security-related

10

grounds, which refers to a status.  *See also* 8 U.S.C. §1225(a)(2) ("An arriving alien who is a stowaway is not eligible to apply for admission…."). Additionally, the inadmissibility ground at 8 U.S.C. §1182(a)(9)(A)(i) for aliens previously removed is entitled: "Arriving Aliens."  Notably, the section under that heading references an "alien who has been ordered removed under *section 1225(b)(1)*…." suggesting Congress viewed aliens under §1225(b)(1)(A)(i) as having the *status* of "arriving aliens" and thus within the class of aliens "arriving in" the United States.  (Emphasis added).

Plaintiffs (at 37-40) cite other provisions in §1225(b)(1) and statutes outside the INA that use some form of the term "arrive."  But no one disputes paroled arriving aliens have physically reached a port of entry and been paroled.  That says nothing, however about the interpretation of "arriving in" for purposes of *expedited removal of parolees*, who have not been admitted, and whose release is temporary and subject to the broad discretion of the Secretary.[3]  8 U.S.C. §1182(d)(5)(A).  As discussed

---

[3] For similar reasons, Plaintiffs (at 36-37) are wrong in asserting that the Government made a "contrary argument" in *Noem v. Al Otro Lado*, No. 25-5 (Jan. 6, 2026).  There the Government made the unremarkable argument that "an alien who is stopped in Mexico does not 'arrive in' the (continued . . .)

above, because parole does not change an alien's immigration status, a paroled alien continues to have the status of an alien "arriving in" the United States.

2. Plaintiffs' attempt (at 40-41) to minimize the parole statute, 8 U.S.C. §1182(d)(5)(A), by arguing that an "'applicant for admission' is not the same as someone eligible for expedited removal" misses the point. The statute's language that parole is not an admission is based on the long-established entry-fiction doctrine. *Leng May Ma v. Barber*, 357 U.S. 185, 188-89 (1958); *see also* H.R. Rep. No. 104-383 (1996), at 182 n.29, 1995 WL 731698 (referencing the "entry doctrine") (dissenting views). This background principle clearly informs the interpretation of "arriving in" for parolees and distinguishes them from other applicants for admission who are not "arriving in" the United States.

3. The statutory history and case law demonstrate Congress's awareness of the term "arriving" as used in the analogous context of "exclusion" proceedings. Prior to the enactment of expedited removal in

United States" for purposes of asylum eligibility because "arrives in" "refers to entering a specified place, not just coming close to it." *Al Otro Lado*, No. 25-5, Brief for Petitioners at 11. There is nothing contradictory in the Government's position.

IIRIRA, aliens arriving at a port of entry without valid documentation were placed in exclusion proceedings as "excludable," while those who entered the country and were "deportable," were placed in "deportation" proceedings. 8 U.S.C. §§1226(a), 1251(a), 1252(b) (1994); *Leng May Ma*, 357 U.S. at 187. In exclusion proceedings an immigration officer had authority to determine whether an "*arriving alien*" detained for further inquiry "shall be allowed to enter or shall be excluded and deported." 8 U.S.C. §1226(a) (1994) (emphasis added). Aliens in exclusion proceedings had significantly fewer "procedural protections and [] substantive rights." *Landon v. Plasencia*, 459 U.S. 21, 25-27 (1982) (detailing differences); *see also Leng May Ma*, 357 U.S. at 187.

Importantly, the Supreme Court held that parole at the border did not entitle an "arriving alien" to be placed in deportation proceedings because such parole does not constitute an "entry." *Leng May Ma*, 357 U.S. at 186-88. This was true even when parole was granted for humanitarian reasons and immigration authorities did not initiate exclusion proceedings until later. *E.g.*, *Barney v. Rogers*, 83 F.3d 318, 320 (9th Cir. 1996) (alien properly placed in exclusion proceedings after

13

paroled into United States pursuant to a prior grant of advance parole) (relying on *Leng May Ma*).

Thus, prior to IIRIRA, "[p]aroled aliens were considered arriving aliens" because parole was not considered an entry. *Akhtar v. Gonzales*, 450 F.3d 587, 590 (5th Cir. 2006). In IIRIRA, Congress eliminated exclusion and deportation proceedings and replaced them with "removal proceedings." *See* 8 U.S.C. §1229a. But critically, Congress also created expedited removal for aliens "arriving in the United States," like those "arriving aliens" previously placed in exclusion proceedings. 8 U.S.C. §1225(b)(1)(A)(i).

Although the pre-IIRIRA exclusion cases primarily focused on the term "entry" rather than "arriving," they support Defendants' interpretation of "arriving in." Congress is presumed to have legislated with awareness of the prior case law holding that an alien's parole at a port of entry does not exempt the alien from exclusion proceedings. *See Jazz Pharms., Inc. v. Kennedy*, 141 F.4th 254, 263 (D.C. Cir. 2025). Analogously, under the current scheme, parole of an alien "arriving" at a port of entry should not exempt the alien from expedited removal proceedings. It was against this backdrop that then-Attorney General

14

Reno issued a regulation in 1997 defining "arriving alien" to include paroled arriving aliens. *See* 62 Fed. Reg. 10,312, 10,330 (Mar. 6, 1997); *see also* 8 C.F.R. §1.2.

Plaintiffs' reliance on the Antiterrorism and Effective Death Penalty Act, Pub. L. No. 104-132 (Apr. 24, 1996) (AEDPA), is puzzling because that statute fits seamlessly with the pre-1996 statutory history discussed above. As Plaintiffs themselves suggest, AEDPA provided that aliens not admitted—including paroled arriving aliens—are "seeking entry and admission" and therefore would have been subject to AEDPA's "expedited exclusion" provision had it become effective. Appellees' Br.45-46 (AEDPA's text made parolees "vulnerable" to "expedited exclusion"); AEDPA, §§414, 422.

Nevertheless, Plaintiffs (at 46) contend—seizing upon on fragments from AEDPA's legislative history—that "Congress had no intention of exposing paroled individuals to expedited exclusion." But legislative history cannot trump a statute's plain text. *See Conroy v. Aniskoff*, 507 U.S. 511, 519 (1993) (Scalia, J. concurring). In any event, nothing in AEDPA's legislative history reveals a Congressional intent to preclude application of the exclusion provisions to paroled arriving aliens. *See* 104

15

Cong. Rec. S3427 (daily ed. Apr. 17, 1996) (statement of Sen. Leahy) (focusing on protecting asylum applicants). If anything, the legislative history supports Defendants' position by showing Congress's awareness of the entry fiction, which even the dissenting House Judiciary Committee Members acknowledged. *See* H.R. 104-383, at 182 n.29.

Plaintiffs (at 47) further contend that in IIRIRA Congress abruptly pivoted and sought to "protect parolees" from expedited removal by using the term "arriving" and omitting the term "entry." *See also* Scholars Br.9-10, 21-23. That is mere speculation, especially given that paroled arriving aliens were long treated as "excludable." Moreover, this argument ignores the fact that in IIRIRA Congress "replaced 'entry' with the new concept of 'admission,'" *United States v. Argueta-Rosales*, 819 F.3d 1149, 1166 (9th Cir. 2016), with full awareness that parole is *not* an admission, 8 U.S.C. §1182(d)(5).

Congress doubled down on this principle by inserting the same language in another provision of the INA. 8 U.S.C. §1101(a)(13)(B) ("An alien who is paroled under section 1182(d)(5) of this title … shall not be considered to have been admitted."); *see also* H.R. Rep. No. 104–469 (1996), at 225, 1996 WL 168955 (1996), ("Parolees under INA section

16

212(d)(5), who are not considered to have made an 'entry' under current law, will likewise not be considered to have been admitted under this new definition."). Thus, there is no indication Congress intended to change course and exclude parolees from expedited removal. Moreover, Plaintiffs' theory makes little sense: if Congress intended such a result, it could have explicitly excluded parolees from the "arriving in" authority *as it did* in the Designation Provision for parolees in an active parole period. 8 U.S.C. §1225(b)(1)(A)(iii).

Likewise, Amici's assertion that in the 15 years prior to IIRIRA, Congress was not concerned with addressing the problem of parolees, but focused on those physically at the border, is unpersuasive. *See* Scholars Br.11-12. For example, Amici cites the "Mariel Boatlift" crisis in the 1980's involving fleeing Cuban migrants as evidence of "Congress's motivations" in considering summary exclusion procedures. *Id.* at 12. But many, if not most, of the 125,000 arriving Cubans were paroled into the United States pending their exclusion proceedings given their large numbers and Cuba's refusal to accept their return. *Gisbert v. U.S. Att'y Gen.*, 988 F.2d 1437, 1439 (5th Cir.), *amended*, 997 F.2d 1122 (5th Cir.

17

1993).  Removing these parolees quickly and efficiently is consistent with

"Congress's core purpose."  *See* Scholars Br.22.

A different interpretation would hamstring the Executive's ability

to manage such crises.  Consider if thousands of undocumented aliens

arrived at U.S. ports of entry and DHS had to parole many of them

because it lacked the resources to process all of them for expedited

removal at that moment or because a foreign dictator refused to take

them back.  Under Plaintiffs' and Amici's reading, DHS would be forced

to place such aliens—even those who had committed serious crimes—into

removal proceedings under §1229a, which could take months or even

years to complete.[4]  There is no reason to believe that Congress intended

anything of the sort.

4.  The district court also failed to give "due respect" to the agency's

interpretation of §1225(a)(1)(A)(i) as set forth in the arriving alien

regulation at 8 C.F.R. §1.2.  *Loper Bright Enters. v. Raimondo*, 603 U.S.

369, 403 (2024).  The agency's almost 29-year-old interpretation is not

---

[4] Plaintiffs (at 6 n.3) appear to take the position that the Government
could not use expedited removal even for aliens who were paroled into
the United States for criminal prosecution.  That result makes little
sense.

only consistent with the statutory history discussed above but "was issued roughly contemporaneously with enactment of the statute and [has] remained consistent over time." *Id.* at 386. Thus, it "can inform [a court's] determination of what the law is." *Id.* (cleaned up).

Plaintiffs remaining arguments are also unpersuasive. Contrary to their assertions (at 38), the dual-authority structure of §1225(b)(1) supports the Government's position. The designation and "arriving in" provisions are separate sources of authority. Congress excluded *currently* paroled aliens from the designation provision, and the absence of an equivalent exclusion from the "arriving in" provision does not support Plaintiffs' position or the district court's analysis. To the contrary: Congress demonstrated it knew how to exclude paroled aliens—and chose not to do so for paroled aliens in the arriving alien provision. The exclusion in the designated alien provision has a very specific purpose, which is to preclude the designation of an alien for expedited removal *for the duration of the alien's parole. See Make the Rd. N.Y. v. Noem* (*MRNY*), 2025 WL 3563313, at *23 (D.C. Cir. Nov. 22, 2025) (statement of Millett and Childs, JJ.).

19

Next, Plaintiffs (at 43-44) contend it would be odd to treat parolees worse than illegal entrants, but ignore Defendants' arguments delineating ways in which Congress treats parolees *more* leniently than illegal entrants.  *See* Govt.Br.36-37.  Moreover, two judges of this Court recently rejected a similar argument and explained that "[p]arolees enter on the condition and with the understanding that they remain legally at the border."[5]  *MRNY*, 2025 WL 3563313, at *23.  "Any connections they make within the United States are with the knowledge of their un-entered status, and so they develop no reasonable expectations or reliance interests based on their continued presence."  *Id.*

Furthermore, "parole alone is not an underlying basis for obtaining any immigration status."  90 Fed. Reg. 13,611, 13,612 (Mar. 25, 2025).  Thus, contrary to AILA's suggestions, parolees have no inherent pathway to obtain lawful status.  *Contra* AILA Br.7, 11, 12-13.  While parolees may affirmatively apply for and be granted asylum while physically present in the United States, they may also pursue this relief in

---

[5]  Thus, it is undisputed that "aliens who arrive at ports of entry—even those paroled elsewhere in the country for years pending removal—are treated for due process purposes as if stopped at the border."  *DHS v. Thuraissigiam*, 591 U.S. 103, 139 (2020) (cleaned up).

20

expedited removal proceedings through the credible fear screening process.  8 U.S.C. §1225(b)(1)(A)(ii), (B).  AILA suggests parolees could also seek the relief of cancellation of removal if placed in §1229a removal proceedings. *Id*. at 13.  However, that relief requires, *inter alia*, ten years continuous physical presence in the United States and a showing of exceptional and extremely unusual hardship to a qualifying relative.  8 U.S.C. §1229b(b)(1); *see also id.* §1229b(d)(1)(A) (termination of continuous physical presence period upon service of Notice to Appear).  Few—*if any*—paroled arriving aliens would satisfy these requirements, and Plaintiffs have not pointed to a single member who does.[6]

For all these reasons, a paroled arriving alien is subject to expedited removal under §1225(a)(1)(A)(i).

---

[6] It is true that a parolee may be eligible to adjust status in certain situations (*i.e.*, marriage to a U.S. citizen).  But adjustment of status is within the broad discretion of the Secretary and the Attorney General.  8 U.S.C. §1255(a).  Moreover, aliens have an alternative to adjustment, which is to leave the country and seek consular processing from the U.S. embassy or consulate in their home country.  *Adams v. Holder*, 692 F.3d 91, 98-99 (2d Cir. 2012).

## C.   The "Designation" Provision Applies to Aliens Whose Parole has been Terminated.

Separate from the "arriving in" provision, §1225(b)(1)(A)(iii) authorizes expedited removal for former parolees with less than two years of continuous presence in the United States before the date of determination of inadmissibility.  Plaintiffs interpret the "has not been admitted or paroled" language to categorically immunize any alien who has ever been paroled, for any length of time, from expedited removal; but they provide no reason to conclude why Congress would intend this result.  As Plaintiffs themselves (at 26) recognize, this language may be used to indicate a continuing state, not just a past event.  That is the best reading of the statute here.  *See Hewitt v. United States*, 606 U.S. 419, 428-30 (2025).

Plaintiffs (at 29-30) have little to offer in response to the language of the parole statute, which illuminates how the Court should interpret the Designation Provision.  The parole statute provides that an alien whose parole is terminated is to be "dealt with in the *same* manner as that of *any other* applicant for admission"— including other applicants for admission subject to expedited removal.  8 U.S.C. §1182(d)(5)(A) (emphases added).  Confusingly, Plaintiffs (at 30) respond by stating that

22

Congress did not subject all applicants for admission to expedited removal. But the Designation Provision *does* authorize expedited removal for any "other" applicant for admission who was never paroled (like an illegal entrant) and who lacks two years of continuous presence. Therefore, to be consistent with the language of the parole statute, the Designation Provision should be read to also authorize expedited removal of aliens whose parole has been terminated and who lack two years of continuous physical presence.

Plaintiffs' argument (at 26) that "has not been … paroled" must refer to the past because Congress "pair[ed] 'paroled' with 'admitted'" is also wrong because both those terms focus on the alien's *current status* rather than a completed act. To be sure, "admitted" may refer to a completed act, but it may also refer to a status, and nothing in the INA's definition of that term, 8 U.S.C. §1101(a)(13)(A), precludes such application. The critical point is that the context here focuses on whether the alien is currently in the United States pursuant to an admission or in a valid period of parole. If so, they are ineligible for expedited removal under 8 U.S.C. §1225(b)(1)(A)(iii). Furthermore, although Plaintiffs (at 27-28) dispute this point, their interpretation of "admitted" as a past

23

event could reasonably be interpreted to preclude expedited removal of an illegally entering alien simply because the alien may have been admitted (and then removed) at some time in the past; that result would clearly frustrate Congress's intent.

If Congress meant for "has not been admitted or paroled" to refer to a past event, it could have easily used past tense language as it did in the adjustment of status statute at 8 U.S.C. §1255(a) ("was inspected and … paroled").  Govt.Br.42-43; *see Zheng v. Gonzales*, 422 F.3d 98, 121 (3d Cir. 2005) (noting use of past tense in §1255(a) "does suggest that DHS might be unable to terminate adjustment eligibility simply by revoking parole").  Plaintiffs' only rejoinder (at 31-32) is to cite legislative history and statutory provisions outside the INA to claim that Congress meant for the terms "has been" and "was" to mean the same thing in the context of adjustment of status.   But that theory violates the principle that "Congress' use of a verb tense is significant in construing statutes." *United States v. Wilson*, 503 U.S. 329, 333 (1992).

Finally, the Government's position is also consistent with the regulations which contemplate expedited removal of paroled aliens under

the Designation Provision.  Govt.Br.43-45.  Plaintiffs (at 34 n.20) fail to engage substantively with the Government's arguments in this regard.

### D.    The Agency's Actions are not Arbitrary and Capricious

There is no inconsistency among the Challenged Documents as to the legal justification for expedited removal.  In their brief, Plaintiffs fail to explain what language in the Huffman Memo is inconsistent with the February 18 ICE Directive in response to Defendants' argument.  *See* Govt.Br.46-47.  Additionally, the CHNV Termination Notice cannot be the basis of an inconsistency given it does not purport to create a rule for the application of expedited removal.  Regardless, DHS's statements in the Notice about being limited to a two-year time-period simply do not constitute a renunciation of using expedited removal under its "arriving in" authority.  These conclusions are not "*post-hoc* justifications," *contra* Appellees' Br.48, but are based on a fair reading of the Challenged Documents.

Plaintiffs (at 49) are also incorrect that the February 18, 2025 ICE Directive lacked any legal justification in concluding there is "no time limit" to apply expedited removal to parolees.  By using the term "paroled arriving aliens," that Directive was invoking the "arriving alien"

25

authority under 8 C.F.R. §1.2, which contains no time limit for applying expedited removal. Even the district court suggested this language might "suffice[] to indicate th[e] Directive's legal authority." JA-71.

## II. The Remaining Equitable Factors Weigh Strongly in the Government's Favor.

### A. Irreparable Harm

As an initial matter, Plaintiffs fail to explain how their members could be suffering irreparable harm from the Challenged Actions given they do not dispute DHS can still apply expedited removal to the same individuals under the arriving alien regulations (and is currently doing so). *Supra* at 3-9.

In any event, Plaintiffs' arguments fail on the merits. The district court relied on, and Plaintiffs cite, two "buckets" of harms—lack of meaningful process, especially for credible fear claims, and detention/family separation. JA-75-78; Appellees' Br.50-51. As to the first, the record demonstrates aliens obtained meaningful review of their fear claims. Plaintiffs' own declarations show that at least three aliens were found to have a credible fear. *See* JA-316, ¶14, JA-357, ¶18, JA-401, ¶9. And as to the detention harms, Plaintiffs (at 50-51) do not dispute the Secretary's broad discretion to terminate parole and detain

an alien, regardless of whether she chooses to pursue §1229a removal proceedings or expedited removal. *See also* Govt.Br.50-51.

Nor does the brief for Amici Former IJs and Board Members establish irreparable harm. Amici fail to discuss the record in this case, which supports the Defendants' position as noted above. And Amici's claim that the credible fear process is "not robust enough," *see* IJs/BIA Br.16, cannot be squared with the fact that the majority of credible-fear screenings in the past have resulted in an affirmative credible-fear finding. Govt.Br.49; *see also* https://www.congress.gov/crs-product/R48078 at 17 (last visited Feb. 9, 2026). In this regard, Amici fail to explain that the credible fear standard is a low "screening" standard requiring the alien to show only a "significant possibility" of eligibility. *See Thuraissigiam*, 591 U.S. at 109-10. Nor do they mention—while casting doubt on DHS asylum officers' qualifications, *see* IJs/BIA Br.16-17—that Congress requires these officers to have "professional training in country conditions, asylum law, and interview techniques comparable to that provided to full-time adjudicators of [asylum] applications," and be supervised by an officer who "has had substantial experience adjudicating asylum applications," 8 U.S.C.

§1225(b)(1)(E); *see also* 8 C.F.R. §208.1(b) (setting forth training requirements).

### B.  Harm to the Government and Public Interest.

Plaintiffs (at 51) seek to deflect Supreme Court decisions stating that the Government "suffers a form of irreparable injury" "[a]ny time [it] is enjoined by a court from effectuating statutes enacted by representatives of its people," *CASA*, 606 U.S. at 861 (quotations omitted), by arguing "[t]here is no public interest in unlawful agency action."  But, as explained, Defendants are likely to prevail on the merits of the statutory-authority question.  In any event, Plaintiffs' reasoning improperly collapses the merits and the harm factors.

## III.  The District Court's Stay Violates 8 U.S.C. §1252(f)(1).

Section 1252(f)(1) precludes the district court's §705 stay because the stay "enjoin[s] or restrain[s] the operation of" the INA provisions governing expedited removal and applies "beyond an individual alien against whom proceedings … have been initiated."  8 U.S.C. §1252(f)(1); *see* Govt.Br.54-59.

Plaintiffs (at 20) insist §1252(f)(1) does not apply because that provision is confined to "injunctive relief."  But Plaintiffs ignore the

provision's text, which goes beyond orders that "enjoin," to include those that "restrain" a covered statute's operation. Section 1252(f)(1) thus broadly reaches all relief that prohibits the Government from "carry[ing] out" any covered provisions. *Garland v. Aleman Gonzalez*, 596 U.S. 543, 549-50 (2022). Regardless of whether the district court's §705 stay "enjoin[s]" expedited removals, there is simply no persuasive argument that the stay does not "restrain" them. Just as in *Aleman Gonzalez*, the court's order "require[s] officials to … refrain from actions that," "in the Government's view," "are allowed by" §1225(b)(1)(A). *Id.* at 551; *but see MRNY*, 2025 WL 3563313, at *16.

Plaintiffs (at 20-21) rely on *Nken v. Holder*, 556 U.S. 418 (2009), to juxtapose the effect of injunctive relief with that of a temporary §705 stay. But *Nken* focused on whether an alien's request to stay removal proceedings was barred by a separate provision, §1252(f)(2) ("Particular Cases"). In §1252(f)(2), Congress used only the word "enjoin"—*not* "restrain." Section 1252(f)(1) does include the word "restrain," and that deliberate addition must be given effect. *See Loughrin v. United States*, 573 U.S. 351, 358 (2014) ("When Congress includes particular language in one section of a statute but omits it in another, this Court presumes

29

that Congress intended a difference in meaning." (cleaned up)). Moreover, the *Nken* Court's express refusal to distinguish between preliminary or final injunctions in interpreting the meaning of "enjoin" dispels Plaintiffs' irrelevant contention that §1252(f)(1) covers only injunctions and temporary restraining orders. *Compare* Appellees' Br.22-23, *with Nken*, 556 U.S. at 428 ("[A] court [order] which commands or forbids is an injunction[,]" "whether the injunction is preliminary or final.").

Plaintiffs (at 22-23) argue that "restrain" has no independent effect and is merely a "synonym" for "enjoin." But the "surplusage canon of statutory interpretation must be applied with the statutory context in mind." *United States v. Bronstein*, 849 F.3d 1101, 1110 (D.C. Cir. 2017). And here, *the very next provision* (§1252(f)(2)) undermines Plaintiffs' position, demonstrating that Congress meant for "restrain" to have independent meaning.

Finally, Plaintiffs' contention (at 22) that reading "restrain" independently of "enjoin" presents a "structural" problem with §1252(e)(3)(B) is a mirage. As the Government explained below, the district court could, consistent with §1252(f)(1), provide party-specific

30

relief to an individual alien who was subject to expedited removal.  JA-575-80.  And the Supreme Court always retains authority to "enjoin or restrain" actions under §1252(f)(1).

## IV.   The District Court's Universal Relief Exceeded Its Authority

The district court's §705 stay is governed by traditional equitable principles, which require that the court's order "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs."  *CASA*, 606 U.S. at 852 (cleaned up).  Here, complete relief is provided by a remedy that applies to those members Plaintiff organizations can identify as affected by the challenged agency actions.

Plaintiffs (at 53) incorrectly assert that, in the APA context, the complete-relief principle is satisfied by "vacating (postponing)" the agency action, even if that relief is applied to non-parties.  But Plaintiffs are wrong that traditional equitable principles do not apply to §705 stays because they are a temporary form of vacatur.  The question §706 presents regarding universal vacatur is different from the question whether §705 permits courts to grant universal, interim relief while a case proceeds.  Congress notably used mandatory language in §706 ("shall" "set aside") for *final* relief but used discretionary language in

31

§705 ("may" issue "necessary and appropriate process") for *preliminary* relief.  Govt.Br.64.

Plaintiffs fail to address these differences meaningfully.  Rather, Plaintiffs cite an out-of-circuit, pre-*CASA* case concluding that §705's "necessary and appropriate process" language means that relief should be limited to only the parts of the rule Plaintiffs challenge, not that relief cannot be provided to third parties, Appellees' Br.55 (citing *Career Coll. & Schools of Texas v. DOE*, 98 F.4th 220, 255-56 (5th Cir. 2024)).  Even if that were correct, neither Plaintiffs nor the Fifth Circuit addressed §705's equally discretionary "may issue" language.

Plaintiffs fail to show that Congress desired to depart from traditional equitable practice in §705.  Limiting §705 relief to the parties before the court does not, as Plaintiff claims (at 54), "add[] words to the APA found nowhere therein."  Indeed, Plaintiffs' position turns the rule that statutes incorporate longstanding equitable principles "absent a clear command" upside down.  *Starbucks Corp. v. McKinney*, 602 U.S. 339, 346 (2024).  Limiting relief to the parties merely gives effect to the discretionary language that §705 does use, which *confirms* rather than displaces traditional equitable principles, *id.* at 347-48.  Plaintiffs fail to

grapple with *Starbucks*, *Hecht Co. v. Bowles*, 321 U.S. 321 (1944), and other like cases. Even though those cases involved injunctions, they apply with equal force here because Congress did not plainly depart from traditional equitable principles in §705. *But see MRNY*, 2025 WL 3563313, at \*36.

Finally, Plaintiffs' contention (at 52) that the application of the complete-relief principle raises "practical" concerns, fails to justify the district court's extraordinary relief which extended to non-party aliens nationwide. *CASA* rejected a similar appeal concluding that "the policy pros and cons are beside the point." 606 U.S. at 856 (citation omitted). In any event, Plaintiffs (at 52) offer nothing more than speculation that "Defendants will not identify a member before irreparably injuring them,"—an argument that would permit organizations to flout *CASA* and obtain universal relief in virtually every case. Nor is *CASA* distinguishable because systematic challenges to expedited removal may be brought only in the District Court for the District of Columbia. *See id.* That fact only supports application of the party-specific relief principle because once the D.C. Circuit decides an issue, its holding can be invoked

by all non-parties as controlling precedent; until then individual non-parties may file their own suits in the D.C. District Court.

## CONCLUSION

This Court should reverse the district court's grant of a §705 stay.

Respectfully submitted,

PAPU SANDHU
*Assistant Director*
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 868 Ben Franklin Station
Washington, DC 20044
(202) 616-9357

BRETT A. SHUMATE
*Assistant Attorney General*

/s/ *Drew C. Ensign*
DREW C. ENSIGN
*Deputy Assistant Attorney General*
*Drew.C.Ensign@usdoj.gov*
(202) 514-2000

TYLER BECKER
*Counsel to the Assistant Attorney General*
U.S. Department of Justice, Civil Division

Dated:  February 17, 2026

950 Pennsylvania Avenue, NW
Washington, DC 20530

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because:

1. This brief contains 6,453 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(ii) and D.C. Circuit Rule 32(e)(1).

2. The brief complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Century Schoolbook font.

/s/ *Tyler J. Becker*
Tyler J. Becker

Dated:  February 17, 2026          Attorney for Appellants

## CERTIFICATE OF SERVICE

I hereby certify that on February 17, 2026, I electronically filed the foregoing reply brief with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

/s/ *Tyler J. Becker*
Tyler J. Becker

Dated:  February 17, 2026          Attorney for Appellants