# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued March 16, 2026          Decided August 11, 2026

No. 25-5289

COALITION FOR HUMANE IMMIGRANT RIGHTS, ET AL.,
APPELLEES

v.

MARKWAYNE MULLIN, IN HIS OFFICIAL CAPACITY AS
SECRETARY OF HOMELAND SECURITY, ET AL.,
APPELLANTS

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:25-cv-00872)

———

*Tyler J. Becker*, Counsel to the Assistant Attorney General, U.S. Department of Justice, argued the cause for appellants. With him on the briefs were *Brett A. Shumate*, Assistant Attorney General, *Drew C. Ensign*, Deputy Assistant Attorney General, and *Papu Sandhu*, Assistant Director.

*Matt A. Crapo* was on the brief for *amicus curiae* Federation for American Immigration Reform in support of appellants.

*Esther H. Sung* argued the cause for appellees. With her on the brief were *Hillary Li*, *Karen C. Tumlin*, and *Brandon Galli-Graves*. *Tom-Tsvi M. Jawetz* entered an appearance.

2

*Jessica A. Dawgert* was on the brief for *amici curiae* Immigration and Constitutional Scholars in support of appellees.

*Addison B. Thompson, Jr.* was on the brief for *amicus curiae* American Immigration Lawyers Association in support of appellees.

*John R. Jacob* was on the brief for *amici curiae* Former Immigration Judges and Former Members of the Board of Immigration Appeals in support of appellees.

Before: SRINIVASAN, *Chief Judge*, RAO and WALKER, *Circuit Judges*.

Opinion for the Court filed PER CURIAM.

PER CURIAM: Leaders in the Department of Homeland Security issued a memorandum and sent an email suggesting that officials should consider subjecting parolees to expedited removal. Several parolees challenged the legality of the memorandum and the email. But the parolees did not challenge the authorities that permit the government to subject them to expedited removal.

The question presented is whether the organizations have standing to challenge governmental action in order to avoid expedited removal of their members without showing that the requested relief would likely leave their members less liable to expedited removal.

They do not.

3

**I**

**A**

Each year, the Secretary of Homeland Security reviews thousands of applications by immigrants for parole.  "Parole," in the immigration context, is a "form[ ] of permission . . . to enter the United States."  6 U.S.C. § 202(4).  Although parole permits temporary entry, it is "not [to] be regarded as an admission of the alien."  8 U.S.C. § 1182(d)(5)(A).

Like other aliens who have not been admitted, parolees may be removed from the United States, although the procedures used for removing them are not always the same. Some parolees may be subject to formal removal proceedings, which generally take longer and provide more procedural protections.  *See* 8 U.S.C. §§ 1101(a)(13)(B), 1229a(b)(5)(A), (e)(2).  Others may be subject to expedited removal proceedings, which (as the name suggests) move more expeditiously and provide fewer procedural protections.  *E.g.*, *United States v. Arredondo-Martinez*, 2011 WL 13196331, at *1, *4 (C.D. Cal. Oct. 3, 2011) (defendant paroled into country for criminal prosecution and placed into expedited removal proceedings), *aff'd*, 492 F. App'x 823 (9th Cir. 2012); *Cordón-Linarez v. Garland*, 2024 WL 4652824 (M.D. Pa. Nov. 1, 2024) (same), appeal pending, No. 24-3068 (3d Cir.); *Corrales-Gonzalez v. Emmerich*, 2025 WL 1638423 (W.D. Wis. June 9, 2025) (same); *Obregon-Calcedo v. Thompson*, 2025 WL 1805464 (D.N.J. June 30, 2025) (same).

One authority that may permit expedited removal of parolees is especially important in this case.  That is 8 U.S.C. § 1225(b)(1)(A)(i), which we call the "arriving in" authority. The arriving in authority allows DHS to use expedited removal procedures for aliens who are "arriving in" the United States. *Id.*; *see also* 8 C.F.R. § 235.3(b)(1)(i).

4

Under implementing regulations first promulgated in 1997 — less than six months after passage of the statutory arriving in authority — "[a]n arriving alien remains" one "even if paroled." 8 C.F.R. § 1.2; *see also* Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 Fed. Reg. 10312, 10312–13 (Mar. 6, 1997); Illegal Immigration Reform and Immigrant Responsibility Act of 1996, § 302, 110 Stat. 3009-546, 3009-579–3009-580 (Sept. 30, 1996).[1]

---

[1] Another authority, the designation authority, may permit expedited removal of some ex-parolees. *See* 8 U.S.C. § 1225(b)(1)(A)(iii). But at least under long-standing regulations, ex-parolees are also subject to expedited removal under the arriving in authority without certain limitations constraining the designation authority. *See* 8 C.F.R. § 1.2 ("An arriving alien remains an arriving alien even if paroled . . . and even after any such parole is terminated or revoked."); *see also* 8 U.S.C. §1225(b)(1)(A)(iii)(II) (excepting from the scope of the designation authority certain aliens who, *inter alia*, can show that they have "been physically present in the United States continuously for" a "2-year" statutory "period").

We need not tarry on these matters. Parole termination is ultimately irrelevant to our analysis here. The plaintiffs do not challenge the regulation rendering ex-parolees liable to expedited removal under the arriving in authority. So whether or not parole termination has taken place, and whether or not ex-parolees are subject to expedited removal under the designation authority, the organizational plaintiffs' members would remain equally subject to expedited removal under the arriving in authority. Since expedited removal would impose the harm upon the organizational plaintiffs' members, the standing issue our decision focuses on does not turn on parole termination or whether the designation authority permits the Government to remove ex-parolees.

5

**B**

When President Trump took office a second time, his administration sought to subject parolees to expedited removal. Two particular measures matter for understanding our decision today.[2]

The first is the "Huffman Memorandum." On January 23, 2025, then-Acting Secretary of the Department of Homeland Security Benjamine C. Huffman directed immigration officers to consider whether expedited removal should be applied to anyone who is "amenable," including those who have "active parole status." Memorandum from Benjamine C. Huffman, Acting Secretary (Jan. 23, 2025), https://perma.cc/X7EG-WKZ7.

The second is the "ICE Email." On February 18, 2025, the Immigration and Customs Enforcement agency circulated an email indicating that officers "may process for [expedited removal] any arriving alien," including "paroled arriving aliens." JA 138; *see* https://tinyurl.com/y3ejk2ds.

The Coalition for Humane Immigrant Rights and two other membership organizations brought suit challenging these actions under the APA and the Fifth Amendment's Due Process Clause.[3] They also moved to stay the challenged

---

[2] The plaintiffs have also challenged, and the district court purported to partially stay, a notice terminating parole for aliens from certain countries. But as noted above, the standing issue our decision focuses on does not turn on the merits of the plaintiffs' claims concerning termination. *See supra*, n.1.

[3] Because the organizational plaintiffs advance theories of associational standing, sometimes when we talk about "the plaintiffs," we refer in reality to the members of the plaintiff organizations.

6

actions under 5 U.S.C. § 705.  JA 86–175, 176–79.  They did not move to stay 8 C.F.R. § 1.2, the regulation subjecting parolees to expedited removal under the arriving in authority. The district court granted a stay "to the extent the Challenged Actions subject to expedited removal individuals who have been, at any time, paroled into the United States at a point of entry."  JA 85.

We hold that the district court lacked jurisdiction. Therefore, we vacate the district court's stay.

## II

The only questions we address today concern jurisdiction: both our own and the district court's.  Although we have jurisdiction over this appeal, the district court lacked jurisdiction.

## A

We begin with two challenges to our appellate jurisdiction. *See Process & Indus. Devs. Ltd. v. Fed. Republic of Nigeria*, 962 F.3d 576, 580 (D.C. Cir. 2020) (holding that appellate courts must address their appellate jurisdiction before addressing the jurisdiction of the court below).

## 1

The first involves our statutory appellate jurisdiction over § 705 stays of executive action.  *See* 5 U.S.C. § 705.  Section 705 stays, like other interlocutory orders, generally do not fall within our appellate jurisdiction under 28 U.S.C. § 1291 over "final decisions" of the district courts.  Section 1292(a)(1), though, provides appellate jurisdiction over "[i]nterlocutory orders of the district courts . . . granting, continuing, modifying, refusing or dissolving injunctions, or refusing to

7

dissolve or modify injunctions."   28 U.S.C. § 1292(a)(1).   In this case, § 1292(a)(1) grants appellate jurisdiction.

It is unnecessary to decide whether a stay of executive action categorically qualifies as an "injunction" for purposes of § 1292(a)(1).   "Even if an order does not by its terms grant or deny a specific request for an injunction," it "may still be appealable if it has the 'practical effect' of doing so."   *Salazar ex rel. Salazar v. District of Columbia*, 671 F.3d 1258, 1261–62 (D.C. Cir. 2012) (quoting *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 83 (1981)).   According to our precedents, the practical effects test is satisfied if either (a) the order "affect[s] predominantly all of the merits," or (b) it "might have a serious, perhaps irreparable, consequence," and can "be effectually challenged only by immediate appeal."   *Id.* (quotation omitted).   Under that test, this stay had the practical effect of granting an injunction.

As a prior panel of our court suggested when analyzing some of the very actions at issue here, the stay is immediately appealable because it "might have a serious, perhaps irreparable, consequence" and can "be effectually challenged only by immediate appeal."   *Id.* (quotation omitted); *see also Make the Road New York v. Noem*, 2025 WL 3563313, at *7 (D.C. Cir. Nov. 22, 2025) (per curiam) (explaining that the district court had stayed parts of the Huffman Memorandum, among other executive actions); *id.* at *9–11 (holding the stay was likely appealable under § 1292(a)(1)).

Start with irreparable injury.   As we explain below, the Government was injured by the order.   *See infra*, Part II.A.2. And that injury was irreparable because the Government alleges the district court wrongly issued "universal" relief, thereby "exercis[ing] general oversight of the Executive Branch" and "improper[ly] intru[ding]" upon its prerogatives.

8

*Trump v. CASA, Inc.*, 606 U.S. 831, 859–61 (2025); *see also Make the Road*, 2025 WL 3563313, at *10 (noting that, "[i]n assessing jurisdiction," we "assume[ ] that the party invoking the court's jurisdiction will succeed on the merits"). *Compare Kingdom v. Trump*, 2026 WL 1905418, at *2 (D.C. Cir. June 17, 2026) (per curiam) (adopting a broader reading of *CASA*'s holding concerning irreparable injury), *with id.* at *2–3 (Pillard, J., dissenting) (adopting a narrower reading in which *CASA*'s holding is tied to the unique context of universal relief). Moreover, even if universal relief were not involved, the injury inflicted by the stay would be irreparable because the "Executive Branch policy" at issue has "foreign affairs implications." *Trump v. Orr*, 146 S. Ct. 44, 46 (2025); *see also Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952) ("any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations" and "the war power").

That also explains why the stay order can "be effectually challenged only by immediate appeal." *Salazar*, 671 F.3d at 1262 (quotation omitted). When it comes to the irreparable injury inquiry in interim relief, the very question is whether relief is needed now to preserve the court's ability to grant effectual relief later. *See Georgia v. Brailsford*, 2 U.S. (2 Dall.) 402, 407 (1792) (opinion of Blair, J.) ("[T]hat an injury may not be done, which it may be out of our power to repair, the injunction ought, I think, to issue, till we are enabled, by a full enquiry, to decide upon the whole merits of the case."); *see also Starbucks Corp. v. McKinney*, 602 U.S. 339, 346 (2024); *Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 200 (3d Cir. 2024); Samuel L. Bray, *The Purpose of the Preliminary Injunction*, 78 Vand. L. Rev. 809, 823–26 (2025). Thus, it is unsurprising that in the Supreme Court's most recent foray into the *Carson* test in a case involving interim relief, the Court collapsed the

9

irreparable injury prong and this prong. *See A.A.R.P. v. Trump*, 605 U.S. 91, 94 (2025); *see also Make the Road*, 2025 WL 3563313, at *11.

Our decision today accords with decisions of our sister circuits. Other circuits have held that particular § 705 stays are immediately appealable. *See Immigrant Defs. Law Ctr. v. Noem*, 145 F.4th 972, 984 n.6 (9th Cir. 2025) (collecting cases). Indeed, a few months ago, a panel said it was "aware of no court of appeals holding that Section 705 stays are not appealable under 28 U.S.C. § 1292(a)(1)." *Make the Road v. Noem*, 2025 WL 3563313, at *11 (D.C. Cir. Nov. 22, 2025) (per curiam).

This should not be surprising. The "practical effects" test is concerned with, well, practical effects. And as the Supreme Court has explained, "[b]oth" stays and preliminary injunctions often "have the" same "practical effect[s]." *Nken v. Holder*, 556 U.S. 418, 428 (2009).

**2**

The second challenge involves the Government's standing to appeal. The challenge to the Government's standing to appeal arises ironically from the Government's argument that the plaintiffs lacked standing. To oversimplify a bit,[4] the Government's challenge to the plaintiffs' theory of standing is that the plaintiffs sought to stay only the Huffman Memorandum and the ICE Email. But staying those two actions could not redress the plaintiffs' injuries because the

---

[4] We offer a more precise analysis of the plaintiffs' standing in the next part of our opinion. *See infra*, Part II.B.

10

Government could take the same exact actions against the plaintiffs under the arriving in authorities.[5]

At oral argument, we asked whether that meant the Government lacked standing to appeal. After all, how could the district court's stay harm the Government if the Government remains free to keep doing what it wants notwithstanding the stay? Despite our questioning at oral argument, we conclude here that the Government has standing to appeal.

For the Government to establish standing to appeal, it must show that it was harmed by the order *entered*. *See West Virginia v. EPA*, 597 U.S. 697, 718 (2022) ("In considering a litigant's standing to appeal, the [first] question is whether it has experienced an injury 'fairly traceable to the *judgment below*.'" (quoting *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 433 (2019)). But for the plaintiffs to establish standing, they must show that their injuries would likely be redressed by the order *requested*. *See Babb v. Wilkie*, 589 U.S. 399, 413 (2020) ("It is bedrock law that requested relief must redress the alleged injury." (quotation omitted)); *Gutierrez v. Saenz*, 606 U.S. 305, 316–17 (2025). That makes a difference here, because the order requested and the order entered may well differ.

The order entered is plausibly read to block the Government from relying on the regulation authorizing the Government to subject parolees to expedited removal under the

---

[5] No one contests that the requirement that plaintiffs must demonstrate standing for each form of relief means that plaintiffs must also demonstrate standing to seek interim relief. *See* Tr. of Oral Arg. 3; Appellee Br. 16–20; *accord* Tr. of Oral Arg. 5–6 (Srinivasan, C.J.) (asking about this very issue). So we assume for purposes of this appeal that the plaintiffs must do so.

11

arriving in authority. If that reading of the order is right, the Government has suffered harm. The authority on which the Government would rely to subject the plaintiffs — and any other parolees — to expedited removal would have been "temporarily divest[ed]" of legal force, *Nken*, 556 U.S. at 428, thus causing an interference with the Government's ability to enforce the immigration laws as it understands them. And the fact that the scope of the order is unclear does not cure the harm, especially not when the order operates nationwide.

The order requested is different. The plaintiffs did not request a stay of 8 C.F.R. § 1.2. Thus, the order they requested would permit the Government to continue subjecting them to expedited removal. And as we explain later, that dooms the plaintiffs' theory of standing.

**B**

**1**

Although we have jurisdiction over this appeal, the plaintiffs failed to meet their burden to demonstrate standing to seek the stay they requested below.

Start with the plaintiffs' theory of standing. As for injury-in-fact, the plaintiffs assert that being subjected to expedited removal, rather than formal removal, is an injury. As for causation, they claim the Huffman Memorandum and ICE Email will cause that injury because parolees have been subjected to expedited removal proceedings at higher rates following issuance of the Memorandum and Email. Finally, as for redressability, they claim redressability follows from causation: Just as the Huffman Memorandum and ICE Email led to a rise in expedited removal rates, staying the Memorandum and Email would lead to a drop in expedited removal rates.

12

Leaving aside other potential problems with the plaintiffs' theory, we note a fatal redressability problem: Even if the number of expedited removals increased because of the Huffman Memorandum and ICE Email, that does not mean getting rid of the Memorandum and Email will reverse that trend. *See Renal Physicians Ass'n v. HHS*, 489 F.3d 1267, 1278 (D.C. Cir. 2007) ("There might be some circumstances in which governmental action is a substantial contributing factor in bringing about a specific harm, but the undoing of the governmental action will not undo the harm.").

As all acknowledge, the stay the plaintiffs requested would not affect the Government's authority to continue subjecting the plaintiffs to expedited removal under 8 C.F.R. § 1.2, the regulation permitting the Government to subject parolees to expedited removal. And the Government may well decide to exercise that authority given its enforcement priorities, which even the plaintiffs recognize. *See* Appellees' Br. 8 (noting that expedited removals of parolees increased following the daily arrest quota established by White House deputy chief of staff Stephen Miller). Thus, absent "more specific allegations," we cannot conclude the plaintiffs have established redressability. *Doc Soc'y v. Rubio*, 141 F.4th 1273, 1278 (D.C. Cir. 2025); *see also Renal Physicians*, 489 F.3d at 1278 ("the undoing of the governmental action will not undo the harm, because the new status quo is held in place by other forces"); *Murthy v. Missouri*, 603 U.S. 43, 73–74, 74 n.11 (2024) (holding that even if the plaintiff established causation on the basis that the challenged policies were "tainted by initial governmental" illegality, the plaintiff failed to establish redressability because the critical actor "remain[ed] free to enforce, or not to enforce" the precise same harmful "policies").

13

It is, perhaps, possible that the district court's stay of the Huffman Memo and the ICE Email will redress the plaintiffs' injuries.  But it is the plaintiffs' burden to show that redressability is "likely" — not just possible.  *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998) ("there must be redressability — a *likelihood* that the requested relief will redress the alleged injury") (emphasis added)); *Marino v. Nat'l Oceanic & Atmospheric Admin.*, 33 F.4th 593, 596 (D.C. Cir. 2022) (to show standing, a plaintiff must show "that the injury is likely to be redressed by a favorable decision") (cleaned up).  And the plaintiffs give no basis for thinking that their susceptibility to expedited removal would be reduced in any cognizable way by the stay given the continuing availability of the unstayed 8 C.F.R. § 1.2.  That is especially so given that, after the district court's stay of the memo and email, the Government has continued to subject parolees to expedited removal by relying on 8 C.F.R. § 1.2.  *See* Gov't Opening Br. 17, Reply Br. 5, 7; Appellees' Br. 17–18; Oral Arg. Tr. 8–9, 19, 83, 85, 91.

The plaintiffs offer two counterarguments.  Both fail.

First, the plaintiffs assert that even if some expedited removals will continue, the district court's stay will decrease the rate of expedited removals because parolees were subjected to expedited removal proceedings at higher rates after the Huffman Memorandum and ICE Email.  But given the continued availability of expedited removal under 8 C.F.R. § 1.2 — the regulation permitting the Government to subject parolees to expedited removal — the plaintiffs have not shown that the district court's stay will decrease the rate of expedited removal.  Instead, they have argued that Government rarely relied on § 1.2 in the past.  *See* Appellees' Br. 18.  But regardless of the past, it is undisputed that since last year, the Government has indeed been relying on § 1.2.  Given that

14

recent history and the Government's new enforcement priority for the expedited removal of parolees, the plaintiffs have failed to show that the Government could not (or would not) continue to rely on § 1.2 to maintain an increased rate of expedited removals.

Second, the plaintiffs argue that the Government cannot rely on 8 C.F.R. § 1.2 because it is unlawful.  That too fails. The plaintiffs did not seek a stay of § 1.2.  So the requested relief would change nothing.  The only thing that might change something is the district court's opinion accompanying its order, which might persuade the Government that § 1.2 is unlawful.  "But '[r]edressability requires that the court be able to afford relief *through the exercise of its power*, not through the persuasive or even awe-inspiring effect of the opinion *explaining* the exercise of its power.'"  *Haaland v. Brackeen*, 599 U.S. 255, 294 (2023) (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 825 (1992) (Scalia, J., concurring in part and concurring in judgment)).

\*   \*   \*

Plaintiffs cannot seek relief that changes nothing for them. The plaintiffs here tried to do just that.   So we vacate the stay issued by the district court.

*So ordered.*