# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COALITION FOR HUMANE IMMIGRANT RIGHTS, *et al.*,<br><br>　　*Plaintiffs,*<br><br>　　*v.*<br><br>KRISTI NOEM, in her official capacity as Secretary of Homeland Security, *et al.*,<br><br>　　*Defendants.* | Case No.: 1:25-cv-0872 |

## DECLARATION OF MELISSA LIM CHUA

I, Melissa Lim Chua, upon my personal knowledge, hereby declare as follows:

1. I am over the age of 18 and competent to testify to the facts and matters set forth herein.

2. I am Co-Director of the Immigrant Protection Unit at the New York Legal Assistance Group (NYLAG), and I am an attorney in good standing of the State Bar of New York. NYLAG represents one client, D.L.C., who was paroled into the United States after an appointment properly made through the CBP One application and was subsequently processed for expedited removal. D.L.C. and his mother are both members of CASA.

### D.L.C.

3. D.L.C. is a national of Venezuela who was granted parole on or about May 1, 2024, after securing an appointment using the CBP One application to appear at an official port of entry. He was 19 years old at the time of entry. That same day, D.L.C. was issued a Notice to Appear (NTA), which was docketed with EOIR on May 2, 2024. D.L.C. was

subsequently granted an employment authorization document (EAD) pursuant to this parole, valid for one year.

4. Upon arriving in the United States, D.L.C. was living with his mother and attending a public school focused on supporting English Language Learners. On May 28, 2024, D.L.C. filed a timely *pro se* application for asylum with the immigration court detailing his fear of his removal to Venezuela. On October 2, 2024, D.L.C. attended his first master calendar hearing with the immigration court. The Immigration Judge scheduled a second master calendar hearing for May 21, 2025.

5. On April 11, 2025, D.L.C. received an email informing him that his parole was being terminated effective April 18, 2025; on April 18, 2025, D.L.C.'s parole was terminated.

6. Prior to his second hearing with the immigration court, D.L.C. began the process of seeking Special Immigrant Juvenile Status ("SIJS") with the assistance of a *pro se* clinic at the NYC Asylum Seeker Navigation Center, set up by the City of New York to provide *pro se* services to newly arrived New York residents. SIJS is a pathway to lawful permanent resident status (LPR) or a "green card" for children who are under 21 years of age and have been "abused, neglected or abandoned" by one or more parents. There are two general stages in obtaining SIJS: the first is a proceeding in the Family or Surrogates Court where the child resides, and the second is an application with the Department of Homeland Security (DHS). Upon information and belief, D.L.C. is *prima facie* eligible for SIJS relief because he is: under 21 years old; unmarried; unable to be reunified with his father because his father abandoned and neglected him, and his father is deceased, a similar basis under New York State law; and it is not in his best interest to return to his home country.

JA351

7.  On May 21, 2025, D.L.C. and his mother attended his second master calendar hearing *pro se* at the 290 Broadway Immigration Court in New York. D.L.C.'s mother informed me that at that hearing, counsel for DHS moved the Court to dismiss D.L.C.'s proceedings, despite D.L.C.'s timely-submitted and pending application for asylum. Upon information and belief, the Court asked D.L.C.'s mother several questions regarding dismissal, a complicated legal procedure that neither D.L.C nor his mother fully understood. Neither D.L.C. nor his mother speak English fluently, nor does either have any background in the American legal system. At the time of the hearing, D.L.C. and his mother believed dismissal would allow D.L.C. to move forward more easily on his SIJS case and that he could continue to pursue his application for asylum outside of the court. D.L.C.'s mother stated that neither she nor D.L.C. were clearly advised that DHS intended to arrest and detain him or that DHS would later attempt to remove him through expedited removal procedures upon dismissal of D.L.C.'s immigration court proceedings, nor were they advised that dismissal would mean that D.L.C. could no longer pursue his asylum application before the immigration court.

8.  After D.L.C.'s case was dismissed, D.L.C. and his mother left court, where they were followed into the elevator by two men in plain clothes. After leaving the elevator at the lobby on the first floor, the two men, who were ICE officers, ordered D.L.C. and his mother up against a wall. The officers spoke English, which neither D.L.C. nor his mother speak fluently. D.L.C.'s mother believes that the ICE officers said that they had an arrest warrant for them, but when she asked to see the warrant, they did not provide anything to her. The ICE officers then asked D.L.C. and his mother to present their "papers" and D.L.C.'s mother complied. Immediately after she presented their

JA352

documents, the ICE officers handcuffed D.L.C. Although his mother tried to explain that

D.L.C. was young and was very ill, the ICE officers detained D.L.C. and put him in a

vehicle. Although D.L.C.'s mother took video of the arrest, she stopped recording when

the ICE officers told her that if she continued to resist, she would also be detained. Upon

information and belief, aside from this May 21, 2025, apprehension by ICE, D.L.C. has

not had any contact with law enforcement since entering the United States.

9. On May 21, 2025, the same day that D.L.C. was detained, another NYLAG attorney

observed a number of ICE officers throughout the immigration courts at 26 Federal Plaza

and 290 Broadway in New York, including in courtrooms. While many of the officers

were undercover, there were also at least two armed DHS law enforcement officers in

uniform outside of the buildings. In front of the immigration courts, the NYLAG attorney

also observed and photographed multiple vehicles marked "DHS police," as well as a

number of unmarked vehicles that, upon information and belief, were in use by ICE. At

290 Broadway, the NYLAG attorney observed the apprehension of a noncitizen, who was

arrested by plainclothes ICE officers and placed into an unmarked vehicle.

10. Shortly after D.L.C was detained, D.L.C.'s mother was connected with NYLAG's rapid

response team, which generally focuses on providing representation to noncitizens who

have been detained and/or ordered removed following proceedings that do not comport

with due process. We reached out to ICE Enforcement and Removal Operations (ERO)

on D.L.C.'s behalf and were informed that D.L.C. would be transferred to an Asylum Pre-

Screening Officer (APSO) for a CFI on May 22, which we understood to mean that

D.L.C. had been placed into expedited proceedings. At that time we informed ICE them

that D.L.C. was not properly subject to expedited removal as he entered on parole and

JA353

that he had an upcoming hearing in family court for his SIJS application. We did confirm

that he would receive a credible fear interview (CFI) should they subject him to expedited

proceedings, as he feared removal to Venezuela. We additionally asked that D.L.C.

receive a fear screening with respect to El Salvador should the government try to remove

him to that country instead of to Venezuela.

11. We additionally informed ICE that D.L.C. suffered from a chronic medical condition that

required treatment. A few months after arriving in the United States, D.L.C. began

experiencing serious health issues. Specifically, D.L.C. suffers from persistent fevers and

gastrointestinal issues, leading him to seek medical treatment repeatedly from the Sun

River Health Center. Unable to determine the cause of his symptoms, the health center

referred him to New York Blood and Cancer Specialists for follow-up visits with an

oncologist and hematologist. At the time of his detention by U.S. Immigration and

Customs Enforcement, D.L.C. was being assessed for the cause of his ongoing

symptoms. Since being detained, D.L.C. received a diagnosis from these outside

specialists that may be life threatening or lead to significant morbidity if not treated

properly.

12. Had D.L.C. or his mother been aware of the ramifications of dismissal, they would have

vigorously opposed dismissal of proceedings. D.L.C.'s mother reported that she and

D.L.C. did try to change their pleading regarding dismissal, because they became

concerned about their decision towards the end of the hearing, but D.L.C.'s mother is

unsure if that was translated from Spanish to English for the Court. D.L.C.'s mother

informed me that there was a man in the courtroom observing their proceedings whom

she did not recognize. On May 29, 2025, we requested a copy of the "Digital Audio

JA354

Recording" (DAR) via a Freedom of Information Act Request (FOIA) and on May 30, 2025, we requested a copy of the DAR via the court's system to retrieve the Record of Proceedings (ROP). We were first provided with a copy of the DAR today, June 10, 2025.

13. NYLAG's immigration unit handles hundreds of removal cases a year and we have not previously seen DHS move to dismiss removal proceedings to pursue expedited removal, let alone processing a person paroled into the country for removal through expedited removal.

14. Although NYLAG began the process of reaching out to D.L.C. on May 21, 2025, because of D.L.C.'s movement between facilities, we were unable to make contact with him until the morning of May 28, 2025. Initially, upon information and belief, D.L.C. believed that he would be sent to a detention center in New Jersey. When D.L.C. appeared in the ICE detainee locator on May 22, 2025, the locator indicated that D.L.C. had been detained at the Elizabeth Contract Detention Center in Elizabeth, New Jersey. That same day, NYLAG attorneys were informed by ERO that D.L.C. was not at Elizabeth, but at the Orange County Jail (OCJ), in Goshen, New York. When NYLAG attorneys called OCJ, they were informed by OCJ staff that D.L.C. was not in fact detained there. The evening of May 22, 2025, D.L.C. was then moved to the Port Isabel Detention Center (Port Isabel) in Los Fresnos, Texas. That same day, NYLAG attorneys set up a call for Tuesday, May 27, 2025, the first available attorney visit that was available. However, on the evening of May 24, 2025, D.L.C. called his mother, indicating that he had been moved to the Alexandria Staging Facility in Alexandria, Louisiana. On the morning of May 25, 2025, a NYLAG attorney reached out to ERO to confirm D.L.C.'s whereabouts, as the detainee locator on the morning of May 25, 2025, still indicated that D.L.C. was at

JA355

Port Isabel. That same day, ERO sent an email to the NYLAG attorney indicating that

D.L.C. was at the Moshannon Valley Correctional Center (Moshannon) in Pennsylvania.

However, soon after the email from ERO, D.L.C. called his mother and informed her that

he was, in fact, still in Alexandria. The NYLAG attorney wrote another email to ERO,

again asking them to clarify his location, and was informed that D.L.C. was not actually

in Moshannon yet but would be transferred from Alexandria to Moshannon via airplane

later in the day on May 25, 2025. ERO then informed the NYLAG attorney that they

would have to contact Moshannon in order to set up an attorney visit with D.L.C. As of

7:00 am on May 26, 2025, the ICE detainee locator listed D.L.C. as being held in

Alexandria. Around that time, D.L.C.'s mother called a NYLAG attorney to relay that

D.L.C. had called from Moshannon. Following that phone call, a NYLAG attorney

emailed ERO in Moshannon to confirm his location. ERO emailed saying that D.L.C. had

never been detained at Moshannon. Having received the message from D.L.C.'s mother

relaying that D.L.C. had called from Moshannon, the NYLAG attorney emailed ERO

again to ask again where D.L.C. was being held. As of 11:00 am on May 26, 2025,

D.L.C. was still listed as being at Alexandria, notwithstanding having called his mother

from Moshannon. It was not until May 27, 2025, at approximately 10:27am that we

confirmed by contacting Moshannon directly that D.L.C. was, in fact, at that facility.

Because of transit, NYLAG was not able to make contact with D.L.C. until the morning

of Tuesday, May 28, 2025, the earliest available appointment.

15. Upon information and belief, prior to NYLAG's first contact with D.L.C. on May 28,

2025, D.L.C. had asked officials for an attorney to be present at his CFI but was told that

he would have to proceed with his CFI on whatever date they provided him, with or

JA356

without an attorney. It can take many days to schedule a legal call when a non-citizen is

transferred to a new detention facility, and D.L.C.'s constant transfers between facilities

have made it impossible to date to make contact with him to represent or even prepare

him for his CFI.

16. On May 29, 2025, D.L.C. had his CFI. NYLAG was only made aware of the CFI through

D.L.C.'s mother one hour before the interview. Upon learning about the imminent

interview, we contacted APSO with a Form G-28 indicating that we were representing

D.L.C. and asked to be called into the interview. At approximately 8:30 am, counsel was

contacted by APSO and allowed to represent D.L.C. during the interview.

17. On May 30, 2025, NYLAG attorneys and D.L.C.'s mother appeared at a scheduled Bronx

Family Court hearing in connection with his request for SIJC. Although the Department

of Homeland Security (DHS) did not make him available for this previously scheduled

court hearing, even virtually, the Bronx Family Court referee granted the guardianship

and special findings orders necessary for D.L.C. to qualify for SIJS. NYLAG filed

D.L.C.'s application for SIJS on Form I-360 with U.S. Citizenship and Immigration

Services on Tuesday, June 3, 2025.

18. On June 1, 2025, D.L.C. was served with a new Notice to Appear (NTA), indicating that

he had passed his CFI. Attached to the NTA was the Notice and Order of Expedited

Removal on Form I-860, signed on May 21, 2025, the day of the dismissal of D.L.C.'s

hearing. Attached as Exhibits A and B to this declaration are, respectively, true and

correct copies of D.L.C.'s second Notice to Appear and Form I-860, with all personally

identifiable information redacted. Prior to that date, we had not received copies of the

Form I-860, despite having asked ERO for them.

JA357

19. D.L.C. has suffered serious harm from being subjected to expedited removal proceedings. First, as a result of DHS's decision to end D.L.C.'s immigration court proceedings and to instead process him through expedited removal, D.L.C. was placed great at risk of losing his ability to pursue SIJS, an important form of relief from removal. D.L.C. would have been unable to seek this relief had he been expeditiously removed to Venezuela and the only want he was able to avoid such a removal was by separately establishing that he has a credible fear of persecution in Venezuela; had he not had a strong claim for asylum, he would not have been returned to ordinary immigration court proceedings and his eligibility for SIJS relief would have provided no opportunity to slow down the removal process for him to pursue that relief.

20. Additionally, D.L.C.'s detention resulting from DHS's decision to process him for expedited removal means he will not be able to obtain the medical intervention necessary to treat his newly diagnosed condition. As a result, his health is likely to deteriorate, making it extremely difficult to pursue an asylum case, and potentially exposing him to significant morbidity and/or death.

21. Finally, D.L.C. is young—only 20 years old—and he is already feeling extremely scared and hopeless at the fact that he has been jailed and moved far from family, school, and support. He has had ongoing headaches and is unlikely to be able to receive the treatment necessary for his medical condition. Moreover, as evidenced by the difficulty NYLAG attorneys have had communicating with D.L.C., continuing to subject him to detention as a result of the decision to dismiss his first removal proceedings and pursue expedited removal will make it extremely difficult for him to access counsel and properly present

JA358

his claims, increasing the risk that he will be removed to a country where he faces the

threat of persecution without the meaningful opportunity to have his cases adjudicated.

22. It is not feasible for D.L.C. to prepare his own signed declaration, because he is in

immigration detention and we are only able to speak with him occasionally by phone.


I declare under penalty of perjury and under the laws of the United States that the foregoing
is true and correct to the best of my knowledge.


Executed in New York, New York on June 11, 2025.

Melissa Lim Chua

JA359

# EXHIBIT A

DEPARTMENT OF HOMELAND SECURITY
**NOTICE TO APPEAR**

---

**In removal proceedings under section 240 of the Immigration and Nationality Act:**

File No: ▮▮▮▮▮▮▮

In the Matter of:

Respondent: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ currently residing at:

MOSHANNON VALLEY PROCESSING CENTER, 555 GEO DRIVE, PHILIPSBURG, PA 16866     929-759-8099
(Number, street, city, state and ZIP code)     (Area code and phone number)

[ ] You are an arriving alien.

[x] You are an alien present in the United States who has not been admitted or paroled.

[ ] You have been admitted to the United States, but are removable for the reasons stated below.

The Department of Homeland Security alleges that you:

1. You are not a citizen or national of the United States;
2. You are a native of Venezuela and a citizen of VENEZUELA;
3. You entered the United States at an unknown location on or about 2024-05-01;
4. You did not then possess or present a valid immigrant visa, reentry permit, border crossing identification card, or other valid entry document;
5. You were not then admitted or paroled after inspection by an Immigration Officer.

On the basis of the foregoing, it is charged that you are subject to removal from the United States pursuant to the following provision(s) of law:

Section 212(a)(7)(A)(i)(I) of the Immigration and Nationality Act (Act), as amended, as an immigrant who, at the time of application for admission, is not in possession of a valid unexpired immigrant visa, reentry permit, border crossing card, or other valid entry document required by the Act, and a valid unexpired passport, or other suitable travel document, or document of identity and nationality as required under the regulations issued by the Attorney General under section 211(a) of the Act.

Section 212(a)(6)(A)(i) of the Act, as amended, as an alien present in the United States without being admitted or paroled, or who has arrived in the United States at any time or place other than as designated by the Attorney General.

[x] This notice is being issued after an asylum officer has found that the respondent has demonstrated a credible fear of persecution or torture.

[x] Section 235(b)(1) order was vacated pursuant to:     [x] 8CFR 208.30     [ ] 8CFR 235.3(b)(5)(iv)

YOU ARE ORDERED to appear before an immigration judge of the United States Department of Justice at:

625 EVANS STREET, ROOM 148A, ELIZABETH, NJ 07201
(Complete Address of Immigration Court, including Room Number, if any)

on ___06/12/2025___ at ___9:00 AM___ to show why you should not be removed from the United States based on the
         (Date)              (Time)

charge(s) set forth above.     _____ Supervisory Asylum Officer
                                (Signature and Title of Issuing Officer)

Date: ___06/01/2025___                    Philipsburg, PA
                                          (City and State)

---

DHS Form I-862 (6/22)

**Notice to Respondent**

**Warning:** Any statement you make may be used against you in removal proceedings.

**Alien Registration:** This copy of the Notice to Appear served upon you is evidence of your alien registration while you are in removal proceedings. You are required to carry it with you at all times.

**Representation:** If you so choose, you may be represented in this proceeding, at no expense to the Government, by an attorney or other individual authorized and qualified to represent persons before the Executive Office for Immigration Review, pursuant to 8 CFR 1003.16. Unless you so request, no hearing will be scheduled earlier than ten days from the date of this notice, to allow you sufficient time to secure counsel. A list of qualified attorneys and organizations who may be available to represent you at no cost will be provided with this notice.

**Conduct of the hearing:** At the time of your hearing, you should bring with you any affidavits or other documents that you desire to have considered in connection with your case. If you wish to have the testimony of any witnesses considered, you should arrange to have such witnesses present at the hearing. At your hearing you will be given the opportunity to admit or deny any or all of the allegations in the Notice to Appear, including that you are inadmissible or removable. You will have an opportunity to present evidence on your own behalf, to examine any evidence presented by the Government, to object, on proper legal grounds, to the receipt of evidence and to cross examine any witnesses presented by the Government. At the conclusion of your hearing, you have a right to appeal an adverse decision by the immigration judge. You will be advised by the immigration judge before whom you appear of any relief from removal for which you may appear eligible including the privilege of voluntary departure. You will be given a reasonable opportunity to make any such application to the immigration judge.

**One-Year Asylum Application Deadline:** If you believe you may be eligible for asylum, you must file a Form I-589, Application for Asylum and for Withholding of Removal. The Form I-589, Instructions, and information on where to file the Form can be found at **www.uscis.gov/i-589**. Failure to file the Form I-589 within one year of arrival may bar you from eligibility to apply for asylum under section 208(a)(2)(B) of the Immigration and Nationality Act.

**Failure to appear:** You are required to provide the Department of Homeland Security (DHS), in writing, with your full mailing address and telephone number. You must notify the Immigration Court and the DHS immediately by using Form EOIR-33 whenever you change your address or telephone number during the course of this proceeding. You will be provided with a copy of this form. Notices of hearing will be mailed to this address. If you do not submit Form EOIR-33 and do not otherwise provide an address at which you may be reached during proceedings, then the Government shall not be required to provide you with written notice of your hearing. If you fail to attend the hearing at the time and place designated on this notice, or any date and time later directed by the Immigration Court, a removal order may be made by the immigration judge in your absence, and you may be arrested and detained by the DHS.

**Mandatory Duty to Surrender for Removal:** If you become subject to a final order of removal, you must surrender for removal to your local DHS office, listed on the internet at **http://www.ice.gov/contact/ero**, as directed by the DHS and required by statute and regulation. Immigration regulations at 8 CFR 1241.1 define when the removal order becomes administratively final. If you are granted voluntary departure and fail to depart the United States as required, fail to post a bond in connection with voluntary departure, or fail to comply with any other condition or term in connection with voluntary departure, you must surrender for removal on the next business day thereafter. If you do not surrender for removal as required, you will be ineligible for all forms of discretionary relief for as long as you remain in the United States and for ten years after your departure or removal. This means you will be ineligible for asylum, cancellation of removal, voluntary departure, adjustment of status, change of nonimmigrant status, registry, and related waivers for this period. If you do not surrender for removal as required, you may also be criminally prosecuted under section 243 of the Immigration and Nationality Act.

**U.S. Citizenship Claims:** If you believe you are a United States citizen, please advise the DHS by calling the ICE Law Enforcement Support Center toll free at (855) 448-6903.

**Sensitive locations:** To the extent that an enforcement action leading to a removal proceeding was taken against Respondent at a location described in 8 U.S.C. § 1229(e)(1), such action complied with 8 U.S.C. § 1367.

Upon information and belief, the language that the alien understands is                    SPANISH

---

## Request for Prompt Hearing

To expedite a determination in my case, I request this Notice to Appear be filed with the Executive Office for Immigration Review as soon as possible. I waive my right to a 10-day period prior to appearing before an immigration judge and request my hearing be scheduled.

Before: _____                    _____
                                                                    *(Signature of Respondent)*

                                                                    Date: _____
_____
        *(Signature and Title of Immigration Officer)*

---

## Certificate of Service

This Notice To Appear was served on the respondent by me on _____, in the following manner and in compliance with section 239(a)(1) of the Act.

☐ in person     ☐ by certified mail, returned receipt # _____ requested     ☐ by regular mail

☐ Attached is a credible fear worksheet.

☐ Attached is a list of organization and attorneys which provide free legal services.

The alien was provided oral notice in the _____ language of the time and place of his or her hearing and of the consequences of failure to appear as provided in section 240(b)(7) of the Act.

_____                    _____
    *(Signature of Respondent if Personally Served)*                    *(Signature and Title of officer)*

---

Privacy Act Statement

**Authority:**
The Department of Homeland Security through U.S. Immigration and Customs Enforcement (ICE), U.S Customs and Border Protection (CBP), and U.S. Citizenship and Immigration Services (USCIS) are authorized to collect the information requested on this form pursuant to Sections 103, 237, 239, 240, and 290 of the Immigration and Nationality Act (INA), as amended (8 U.S.C. 1103, 1229, 1229a, and 1360), and the regulations issued pursuant thereto.

**Purpose:**
You are being asked to sign and date this Notice to Appear (NTA) as an acknowledgement of personal receipt of this notice. This notice, when filed with the U.S. Department of Justice's (DOJ) Executive Office for Immigration Review (EOIR), initiates removal proceedings. The NTA contains information regarding the nature of the proceedings against you, the legal authority under which proceedings are conducted, the acts or conduct alleged against you to be in violation of law, the charges against you, and the statutory provisions alleged to have been violated. The NTA also includes information about the conduct of the removal hearing, your right to representation at no expense to the government, the requirement to inform EOIR of any change in address, the consequences for failing to appear, and that generally, if you wish to apply for asylum, you must do so within one year of your arrival in the United States. If you choose to sign and date the NTA, that information will be used to confirm that you received it, and for recordkeeping.

**Routine Uses:**
For United States Citizens, Lawful Permanent Residents, or individuals whose records are covered by the Judicial Redress Act of 2015 (5 U.S.C. § 552a note), your information may be disclosed in accordance with the Privacy Act of 1974, 5 U.S.C. § 552a(b), including pursuant to the routine uses published in the following DHS systems of records notices (SORN): DHS/USCIS/ICE/CBP-001 Alien File, Index, and National File Tracking System of Records, DHS/USCIS-007 Benefit Information System, DHS/ICE-011 Criminal Arrest Records and Immigration Enforcement Records (CARIER), and DHS/ICE-003 General Counsel Electronic Management System (GEMS), and DHS/CBP-023 Border Patrol Enforcement Records (BPER). These SORNs can be viewed at https://www.dhs.gov/system-records-notices-sorns. When disclosed to the DOJ's EOIR for immigration or proceedings, this information that is maintained and used by DOJ is covered by the following DOJ SORN: EOIR-001, Records and Management Information System, or any updated or successor SORN, which can be viewed at https://www.justice.gov/opcl/doj-systems-records. Further, your information may be disclosed pursuant to routine uses described in the abovementioned DHS SORNs or DOJ EOIR SORN to federal, state, local, tribal, territorial, and foreign law enforcement agencies for enforcement, investigatory, litigation, or other similar purposes.

For all others, as appropriate under United States law and DHS policy, the information you provide may be shared internally within DHS, as well as with federal, state, local, tribal, territorial, and foreign law enforcement; other government agencies; and other parties for enforcement, investigatory, litigation, or other similar purposes.

**Disclosure:**
Providing your signature and the date of your signature is voluntary. There are no effects on you for not providing your signature and date; however, removal proceedings may continue notwithstanding the failure or refusal to provide this information.

# EXHIBIT B

JA364

DEPARTMENT OF HOMELAND SECURITY
U.S. Immigration and Customs Enforcement

## NOTICE AND ORDER OF EXPEDITED REMOVAL

DETERMINATION OF INADMISSIBILITY     Event Number: ███████

File No: ███████

Date: **May 21, 2025**

In the Matter of: ███████████

Pursuant to section 235(b)(1) of the Immigration and Nationality Act (Act), (8 U.S.C. 1225(b)(1)), the Department of Homeland Security has determined that you are inadmissible to the United States under section(s) 212(a) ☐ (6)(C)(i); ☐ (6)(C)(ii); ☒ (7)(A)(i)(I); ☐ (7)(A)(i)(II); ☐ (7)(B)(i)(I); and/or ☐ (7)(B)(i)(II); of the Act, as amended, and therefore are subject to removal, in that:

1. You are not a citizen or national of the United States;

2. You are a native of VENEZUELA and a citizen of VENEZUELA;

3. You are an immigrant not in possession of a valid unexpired immigrant visa, reentry permit, border crossing card, or other valid entry document required by the Immigration and Nationality Act; and/or

4. You are an immigrant in possession of a valid unexpired passport, or other suitable travel document, or document of identity and nationality.

FAHAD ASLAM
DO
_____
Name and title of immigration officer (Print)

_____
Signature of immigration officer (Sign in ink)

## ORDER OF REMOVAL
## UNDER SECTION 235(b)(1) OF THE ACT

Based upon the determination set forth above and evidence presented during inspection or examination pursuant to section 235 of the Act, and by the authority contained in section 235(b)(1) of the Act, you are found to be inadmissible as charged and ordered removed from the United States.

FAHAD ASLAM
DO
_____
Name and title of immigration officer (Print)

_____
Signature of immigration officer (Sign in ink)

V. COLLADO COLLADO
Supervisory Detention and Deportati
_____
Name and title of supervisor (Print)

_____
Signature of supervisor, if available (Sign in ink)

☐ Check here if supervisory concurrence was obtained by telephone or other means (no supervisor on duty).

### CERTIFICATE OF SERVICE

I personally served the original of this notice upon the above-named person on 05/21/25
_____     (Date)
Signature of immigration officer (Sign in ink)

Refused to sign     05/21/25
_____     (Date)
Signature of alien (Sign in ink)

ICE Form I-860 (5/11)     Page 1 of 1

JA365

**U.S. Department of Homeland Security**                    Continuation Page for Form ___I-860___

| Alien's Name | File Number | Date |
|---|---|---|
| ██████████ | ██████ | 05/21/2025 |
| | Event No: ██████ | |

NARRATIVE
---------
5. ON THE BASIS OF THE FOREGOING, IT IS CHARGED THAT YOU ARE SUBJECT TO REMOVAL FROM THE
UNITED STATES PURSUANT TO THE FOLLOWING PROVISION OF
LAW:=====================================================================================
====212(a)(7)(A)(i)(I) of the Immigration and Nationality Act (Act), as amended, as an
immigrant who, at the time of application for admission, is not in possession of a valid
unexpired immigrant visa, reentry permit, border crossing card, or other valid entry
document required by the Act, and a valid unexpired passport, or other suitable travel
document, or document of identity and nationality as required under the regulations issued
by the Attorney General under section 211(a) of the Act.

| Signature | Title |
|---|---|
| FAHAD ASLAM | DO |

_____2_____ of _____2_____ Pages

Form I-831 Continuation Page (Rev. 08/01/07)

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COALITION FOR HUMANE IMMIGRANT RIGHTS, *et al.*,<br><br>    *Plaintiffs,*<br><br>    *v.*<br><br>KRISTI NOEM, in her official capacity as Secretary of Homeland Security, *et al.*,<br><br>    *Defendants.* | Case No.: 1:25-cv-0872 |

## DECLARATION OF MICHAEL R. HIRMAN, ESQ.

I, Michael R. Hirman, upon my personal knowledge, hereby declare as follows:

1. I am over the age of 18 and competent to testify to the facts and matters set forth herein.

2. I am an attorney in good standing of the State Bars of California and Minnesota. I have practiced immigration law, including removal defense, for more than 20 years, and I am the president of the East County San Diego Bar Association. I represent a client, R.J.L.B., who was paroled into the United States and was later processed for expedited removal.

3. R.J.L.B. is a national of Venezuela and an officer in the Venezuelan military who is in the process of defecting to the United States. As part of his military service in Venezuela, R.J.L.B. was trained in Cuba. He therefore possesses highly classified intelligence on both Cuba and Venezuela. Since R.J.L.B. was detained by U.S. Immigration and Customs Enforcement (ICE) in connection with their efforts to subject him to expedited removal, information has gotten to the Venezuelan government. His home in Venezuela is now under surveillance and agents of the Venezuelan government have begun to follow his family members around. R.J.L.B. is certain that if he is forced to return to Venezuela, he

JA367

will be killed at the very least for deserting the Venezuelan Army, and because he opposed and refused to obey orders of a superior officer.

4. On January 17, 2025, R.J.L.B. presented at the San Ysidro port of entry for inspection at a scheduled CBP One appointment. After inspection, he was granted parole into the United States. At the same time, he was issued a Notice to Appear that required him to present to the San Diego Immigration Court on February 24, 2025.

5. After R.J.L.B. was paroled into the United States, he resided in California, staying with extended family in San Diego.

6. When R.J.L.B. first appeared in Immigration Court on February 24, 2025, he was given a continuance to obtain an attorney. His next hearing was set for May 21, 2025. R.J.L.B., submitted his I-589 application for asylum and supporting documents to the San Diego Immigration Court on February 21, 2025.

7. On Wednesday, May 21, 2025, R.J.L.B. attended his second Immigration Court hearing. As soon as I entered an appearance as R.J.L.B.'s counsel, the Trial Attorney for the Department of Homeland Security made an oral motion to terminate the case. The motion was not accompanied by any writing, declaration, or memorandum of points and authorities. I did not oppose the motion because in my usual experience, the government attorney moves to dismiss this way because they believe USCIS can handle the matter as the Respondent has a good case and is likely to be able to establish eligibility for relief in the form of asylum. At no time did the DHS attorney or the Immigration Judge state that the dismissal would result in "expedited removal." R.J.L.B., was happy that his matter was over and could proceed with his asylum application before USCIS.

JA368

8. However, as soon as he got into the hallway outside of the courtroom, ICE enforcement officers surrounded him and arrested him. When we told them there was no Notice to Appear anymore because it was dismissed by the court, ICE stated they were removing R.J.L.B. through expedited removal. Both R.J.L.B. and I were blindsided by this.

9. We informed ICE that R.J.L.B. is an officer in the Venezuelan military and was in the process of defecting to the United States, and that he was willing, able and ready to join the United States military or to work as a clandestine agent for the Central Intelligence Agency or the Defense Intelligence Agency. ICE agents were not aware of this information and openly scoffed at the idea that R.J.L.B. would be willing to assist the U.S. government.

10. Since his detention, we believe that ICE and the CIA have interviewed R.J.L.B., but I do not know if ICE has referred him to U.S. Citizenship and Immigration Services for a Credible Fear Interview (CFI) or, if he has been referred, whether a CFI has taken place. On May 24, 2025, R.J.L.B. applied for a bond hearing with the San Diego Immigration court. The results of this are unknown.

11. During the questioning at the detention facility R.J.L.B, has been asked about his training in Cuba and the weapons that he has been trained to operate. This might be the one conversation that impressed the ICE inspectors as they were fascinated at his weapons training.

12. Processing R.J.L.B. for expedited removal is sending him back to a country where he will all but certainly be killed. His home in Venezuela is already under surveillance and given his role with the military and the classified information he possesses; he is very afraid to go back.

JA369

13. R.J.L.B. will not be able to meaningfully fight for his asylum claim or any other claims for relief if he is forced to do so through the expedited removal process and while detained. He will lack consistent access to counsel and other resources that will allow him to strengthen his case, which means that the merits of his legitimate claims of fear will not be assessed fully.

14. In my more than two decades of practice as an immigration attorney and my regular contact with other immigration attorneys in the San Diego area, I have never seen the government move to dismiss an immigration case in the immigration courts so that the individual could instead be arrested and processed for expedited removal. I have also never seen the government place an individual paroled into the country in expedited removal.

I declare under penalty of perjury and under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Executed in La Mesa, California on June 3, 2025.

*s/Michael R. Hirman*

Michael R. Hirman, Esq.
Attorney for R.J.L.B.

JA370

ITE   TATE   I T I T   T
THE   I T I T   BIA

|  |  |
|---|---|
| COALITION FOR HUMANE IMMIGRANT RIGHTS, *et al.*,<br><br>    *Plaintiffs,*<br><br>    *v.*<br><br>KRISTI NOEM, in her official capacity as Secretary of Homeland Security, *et al.*,<br><br>    *Defendants.* | Case No.: 1:25-cv-0872 |

E   A ATI   I   TA I A A A

I, Ming Tanigawa-Lau, upon my personal knowledge, hereby declare as follows:

1. I am over the age of 18 and competent to testify to the facts and matters set forth herein.

2. I am a staff attorney at Immigrant Defenders Law Center ("ImmDef"), and I am an attorney in good standing of the State Bar of California. I have been practicing law for three and a half years, focusing on issues in immigration law and federal litigation. For the last year, I have solely focused on immigration deportation defense for minors and adults in Southern California.

3. On May 27, 2025, I was assigned to provide pro bono assistance to R.A.U.P., an individual who was paroled into the United States at a port of entry in 2024 and has now been placed in expedited removal proceedings. My supervisor at ImmDef told me that R.A.U.P. had been detained at his court hearing on May 23, 2025, and transferred to the Northwest Detention Center in Tacoma, Washington.

JA371

4.  That same day, on May 27, 2025, I called the Northwest Detention Center to inquire

about speaking with R.A.U.P. I was told that I could leave a message for him with my

phone number, and that he could choose to call me back at any time of the day or night. I

left my phone number with the agent. In my experience, this was a highly unusual system

for setting up attorney calls, which normally involves emailing a dedicated email address

to coordinate a specific meeting time with a client.

5.  Later that day, I received a call from R.A.U.P. He told me that he was paying for the call

and that he only had ten minutes to speak with me. There were voices in the background,

and he said it was noisy where he was calling from. I was surprised by this because I

know that ICE standards require detainees to be provided with private consultation rooms

for their attorney calls. I also know that ICE standards require that facilities permit

detainees to make free calls to engage in legal consultation. In my experience, a client has

never had to call me from a public phone using their own phone credits.

6.  I was able to schedule a private attorney call with R.A.U.P. on June 4, 2025. R.A.U.P.

told me that he entered the United States in September 2024 through the San Ysidro Port

of Entry, with an appointment made through the CBP One application. He was inspected

and granted parole into the country until September 2026, and he was also given a Notice

to Appear with an immigration court hearing date. Attached as Exhibit A to this

declaration is a true and correct copy of the Notice of Appear ("NTA"), dated September

6, 2024, that R.A.U.P. received with all personally identifiable information redacted. The

September 6 NTA ordered R.A.U.P. to appear at a Master Calendar Hearing on March 21,

2025. Unfortunately, R.A.U.P. told me that he contracted COVID three days prior to his

hearing and was unable to appear. At the March 21 hearing, the immigration judge issued

him an in absentia removal order, but after submitting evidence of his doctor's visit and a

Motion to Reopen, R.A.U.P. was able to have his case reopened. R.A.U.P. received a new

hearing notice, scheduling his first Master Calendar Hearing for May 23, 2025. Attached

as Exhibit B to this declaration is a true and correct copy of the Notice of In-Person

Hearing, dated April 16, 2025, that R.A.U.P. received with all personally identifiable

information redacted. As instructed, R.A.U.P. attended his first Master Calendar Hearing

on May 23, 2025, but that day his case was dismissed on motion by the Department of

Homeland Security attorney and he was detained shortly after and placed in expedited

removal proceedings.

7.   R.A.U.P. told me that after his arrest by ICE, he was taken to the ICE processing center in

Los Angeles, where they asked him about whether he had any links to gangs in Venezuela

or elsewhere. R.A.U.P. said he refused to answer any questions without an attorney. They

then sent him to a prison in Glendale, where he spent the night. Per R.A.U.P., the next

day, they told him that they were going to take him to a detention center in Washington,

where he would stay for three or four days, before being deported to Venezuela. R.A.U.P.

told me that on May 24, 2025, they took him to the Northwest Detention Center. He said

that since then, no one has told him anything about his case or what would happen to

him.

8.   On our call, R.A.U.P. sounded angry, confused, and desperate. He told me that while he

had previously planned on submitting a claim for asylum, he now feared that the system

would not protect him even if he did have a legitimate asylum case. He expressed that not

being given any information about what was going to happen to him or when he might be

deported or transferred was enormously difficult and frustrating.

JA373

9.  R.A.U.P. was preparing to file an application for asylum when he went to his Master Calendar Hearing on May 23. He should have a meaningful opportunity to present his claim for asylum before an immigration judge, but because he has now been placed in expedited removal, he will not be able to present his asylum claim unless immigration officials refer him for a Credible Fear Interview and at that interview determine that he has established a credible fear of persecution.

10. Because he is in detention, R.A.U.P.'s ability to communicate with counsel is significantly diminished. It took me a week of emailing and calling the Northwest Detention Center to finally schedule an ordinary attorney call with R.A.U.P. for June 4, 2025. The delay in being able to have an extended consultation with R.A.U.P. meant I could not gather crucial information from R.A.U.P. or meaningfully assess his immigration options.

11. Furthermore, placing R.A.U.P. in expedited removal proceedings makes it significantly more difficult for him to gather evidence and prepare his asylum application, which he must submit by September 2025 in order to comply with his statutory One Year Filing Deadline. Instead of allowing him time to prepare his application, as he expected, DHS has forced R.A.U.P. to essentially re-initiate his claim for asylum by asserting his fear of return, proceeding with a Credible Fear Interview, and hopefully being placed once again in removal proceedings, all while in detention. This is deeply troubling to me, given that R.A.U.P. applied for and received a CBP One appointment to come to a port of entry, was inspected and paroled into the U.S., complied with his obligations to appear at court, and was preparing his legitimate application for asylum.

JA374

12. Because R.A.U.P. is detained in Washington and I am only able to reach him by phone

    occasionally, it is not reasonably feasible to obtain a signed declaration directly from him.

    I reviewed the contents of this declaration over the phone with him and he confirmed that

    the statements about his immigration history, status, and case are all true and correct to

    the best of his knowledge.


    I declare under penalty of perjury and under the laws of the United States that the foregoing

is true and correct to the best of my knowledge.


                                        Executed in Los Angeles, California on June 4, 2025.

                                        _____
                                                Ming Tanigawa-Lau

JA375

# EXHIBIT

**DEPARTMENT OF HOMELAND SECURITY**
## NOTICE TO APPEAR

In removal proceedings under section 240 of the Immigration and Nationality Act:

Event No: ▮

Subject ID : ▮    FIN #: ▮
SIGMA Event: ▮    DOB: ▮
In the Matter of:

File No: ▮

Respondent: ▮    currently residing at:

Los Angeles, CALIFORNIA 91605, UNITED STATES OF AMERICA    ▮

(Number, street, city, state and ZIP code)    (Area code and phone number)

[x] You are an arriving alien.

[ ] You are an alien present in the United States who has not been admitted or paroled.

[ ] You have been admitted to the United States, but are removable for the reasons stated below.

The Department of Homeland Security alleges that you:
1. You are not a citizen or national of the United States;
2. You are a native of VENEZUELA and a citizen of VENEZUELA;
3. You applied for admission on 09/06/2024 at SAN YSIDRO, CA, USA;
4. You are an immigrant not in possession of a valid unexpired immigrant visa, reentry permit, border crossing card, or other valid entry document required by the Immigration and Nationality Act;

On the basis of the foregoing, it is charged that you are subject to removal from the United States pursuant to the following provision(s) of law:
See Continuation Page Made a Part Hereof

[ ] This notice is being issued after an asylum officer has found that the respondent has demonstrated a credible fear of persecution or torture.

[ ] Section 235(b)(1) order was vacated pursuant to:    [ ] 8CFR 208.30    [ ] 8CFR 235.3(b)(5)(iv)

YOU ARE ORDERED to appear before an immigration judge of the United States Department of Justice at:
300 N LOS ANGELES ST RM 4330,
LOS ANGELES, CA, US 90012

(Complete Address of Immigration Court, including Room Number, if any)

on March 21, 2025    at 01:00 PM    to show why you should not be removed from the United States based on the
    (Date)    (Time) CUEN, Jose

charge(s) set forth above.    CBP OFFICER

(Signature and Title of Issuing Officer)    Digitally Acquired Signature

Date: September 6, 2024    SAN YSIDRO, CALIFORNIA

(City and State)

DHS Form I-862 (6/23)

JA377



JA378

# EXHIBIT B

JA379



UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
LOS ANGELES IMMIGRATION COURT

**Notice of In-Person Hearing**

Your case has been scheduled for a MASTER hearing before the immigration court on:

Date:          May 23, 2025
Time:          1:00 P.M. PT
Court Address: 300 N. LOS ANGELES ST.
               4TH FLOOR, COURTROOM 3, LOS ANGELES, CA 90012

**Representation:** You may be represented in these proceedings, at no expense to the government, by an attorney or other representative of your choice who is authorized and qualified to represent persons before an immigration court. If you are represented, your attorney or representative must also appear at your hearing and be ready to proceed with your case. Enclosed and online at https://www.justice.gov/eoir/list-pro-bono-legal-service-providers is a list of free legal service providers who may be able to assist you.

**Failure to Appear:** If you fail to appear at your hearing and the Department of Homeland Security establishes by clear, unequivocal, and convincing evidence that written notice of your hearing was provided and that you are removable, you will be ordered removed from the United States. Exceptions to these rules are only for exceptional circumstances.

**Change of Address:** The court will send all correspondence, including hearing notices, to you based on the most recent contact information you have provided, and your immigration proceedings can go forward in your absence if you do not appear before the court. If your contact information is missing or is incorrect on the Notice to Appear, you must provide the immigration court with your updated contact information within five days of receipt of that notice so you do not miss important information. Each time your address, telephone number, or email address changes, you must inform the immigration court within five days. To update your contact information with the immigration court, you must complete a Form EOIR-33 either online at https://respondentaccess.eoir.justice.gov/en/ or by completing the enclosed paper form and mailing it to the immigration court listed above.

**Internet-Based Hearings:** If you are scheduled to have an internet-based

JA380



JA381

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

COALITION FOR HUMANE IMMIGRANT RIGHTS,
*et al.*,

    *Plaintiffs,*

*v.*

KRISTI NOEM, in her official capacity as Secretary of
Homeland Security, *et al.*,

    *Defendants.*

Case No.: 1:25-cv-0872

### DECLARATION OF ATTORNEY SABRINA PEREZ-ARLEO

I, Sabrina Perez-Arleo, upon my personal knowledge, hereby declare as follows:

1. I am over the age of 18 and competent to testify to the facts and matters set forth herein.

2. I am an attorney at Perez Law Office, PLLC, and I am an attorney in good standing of the State Bar of Arizona. I represent 1 client, G.C.M., who was paroled into the United States at a port of entry and has been targeted with and processed for expedited removal.

3. G.C.M. is a national of Peru who presented at the Brownsville, Texas port of entry for a CBP One appointment on December 11, 2024, for inspection. After inspection, G.C.M. was paroled into the country and granted parole status until 2026. At the same time, he was issued a Notice to Appear with an immigration court hearing date. Attached as Exhibit A to this declaration is a true and correct copy of G.C.M.'s Notice to Appear with all personally identifiable information redacted.

4. After G.C.M. was paroled into the United States, G.C.M. resided in Arizona with family.

JA382

5. G.C.M. was scheduled to appear for a first master calendar hearing on June 17, 2026, after the anticipated expiration of G.C.M.'s parole status. G.C.M. was preparing to file his affirmative asylum application with the assistance of counsel.

6. On March 21, 2025, G.C.M. was detained by Immigration and Customs Enforcement ("ICE") after a traffic stop. G.C.M. was processed into the Eloy Detention Center in Eloy, Arizona, and he remains detained there to this day. G.C.M. had valid parole status at the time of detention. Based upon my review of the record of proceedings, it appears that, on March 28, 2025, ICE filed a form I-830 Notice with the Court, which informs the Court of an individual's address and whether he is detained. Although the Form I-830 indicated that a motion was attached, there is no motion in the record of proceedings, and one does not appear to have been filed.

7. On April 3, 2025, when G.C.M. was still detained and unrepresented by counsel, the attorney representing the Department of Homeland Security ("DHS") filed a motion to dismiss proceedings without prejudice. The motion stated as its basis that the Notice to Appear had been "improvidently" issued. Attached as Exhibit B to this declaration is a true and correct copy of DHS's motion with all personally identifiable information redacted. That same day, the Immigration Judge granted the DHS motion to dismiss. Attached as Exhibit C to this declaration is a true and correct copy of the Immigration Judge's order, dated the same day, granting the DHS motion to dismiss. DHS did not seek out or include G.C.M.'s position on the motion. G.C.M. was not provided with an opportunity to respond to the motion filed by DHS.

8. On April 6, 2025, three days after the Court granted the DHS motion to dismiss, G.C.M.'s parole status was revoked.

2

JA383

9. On April 7, 2025, G.C.M. retained me to represent him. G.C.M. was not previously represented by counsel. I filed my G-28 Notice of Representation with ICE, and ICE was aware that G.C.M. was represented by counsel.

10. On April 23, 2025, G.C.M. was interviewed by a U.S. Citizenship and Immigration Services officer for a Credible Fear Interview ("CFI"). On April 20, 2025, Friday morning at about 7:00am MST, I was contacted by an asylum officer. The officer informed me that G.C.M. was about to have a CFI and asked if I wanted to be on the call. I was not able to be on the call because I had an appointment to get to, and I asked the officer to reschedule the call. After much pushback from the asylum officer, the officer obtained authorization from his supervisor to continue the interview, because I insisted that I wanted to be present. On Monday, April 23, 2025, I received another phone call from USCIS. This time, it was a different officer. It was early morning, and I did not receive any notification about this interview and was not available to participate in the call at that time as I was out of my office. The officer told me that she would conduct another CFI before G.C.M.'s CFI, and she would call me back after that interview. I was told that the interviews are not rescheduled unless there were "special circumstances" to warrant rescheduling the interview. I had not received the evidence, and I did not have sufficient time to properly prepare for G.C.M.'s CFI. About two hours later, I was in my office, and I received a call back from the asylum officer to conduct the CFI with G.C.M. I could hear that G.C.M. was very nervous during his CFI—he could not remember dates or details well. G.C.M. received a negative CFI determination. I did not receive the negative CFI determination myself, and I have not seen the determination myself, but my client told me that he was told that his CFI was denied. G.C.M. informed me that a judge

3

reviewed his CFI determination and upheld the negative CFI. I did not receive any hearing notification of that hearing and was not present. Communication with G.C.M. has been difficult, because he does not have funds to make calls, the detention center is very far from my office, and it takes me over an hour to get to Eloy Detention Center.

11. On May 5, 2025, I filed G.C.M.'s appeal with the Board of Immigration Appeals appealing the Court's dismissal of his removal proceedings. G.C.M.'s brief was filed by me on June 2, 2025, and the appeal remains pending.

12. G.C.M. is afraid to return to Peru, but because he has been processed for expedited removal and he was issued a negative CFI finding, he is now unable to present his asylum claim for which he is eligible unless his appeal is successful. G.C.M. is not eligible for other forms of relief. Before, when he was in regular removal proceedings, he would have been able to request asylum as a form of relief from removal, and he would have been able to present that claim to an immigration judge for adjudication on the merits. In removal proceedings, G.C.M. could present expert testimony, and he would have time to obtain evidence. He also would have been able to prepare his claim with his family and counsel, instead of being detained, which creates significant challenges for communication, access to counsel and other resources. G.C.M. did not expect to have a hearing in his case until June 17, 2026, and he was not prepared for the expedited removal proceedings initiated against him. Also, I am unable to have much contact with G.C.M., and it is difficult to work with him while he is in detention. For example, the last time I visited him, he did not have any of his documentation with him, because he said he had been brought in from outside and did not have access to those documents. Relying on G.C.M.'s account without reviewing his documentation makes it challenging,

4

JA385

because he does not understand English, and he does not have any experience with the legal process.

13. I have reviewed the contents of this declaration with G.C.M. by phone, and he has confirmed that all statements about his immigration history, immigration status, and immigration case are true and correct to the best of his knowledge. It is not feasible for G.C.M. to prepare his own signed declaration, because he is in immigration detention and I have only been able to review the documents filed with the Court, he does not call me often, and I am not able to visit him often at the detention center.

I declare under penalty of perjury and under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Executed in Chandler, AZ on 06/04/2025



JOHN ESPARZA
NOTARY PUBLIC - ARIZONA
Maricopa County
Commission # 685954
My Commission Expires
April 27, 2028

Sabrina Perez-Arleo, Esq.

Subscribed and sworn before me this _____5_____ day of _____June, 2025_____.

_____
Notary Public

5

JA386

# EXHIBIT

DEPARTMENT OF HOMELAND SECURITY
## NOTICE TO APPEAR

| | |
|---|---|
| **In removal proceedings under section 240 of the Immigration and Nationality Act:** | Event No: ▮▮▮▮▮ |
| Subject ID : ▮▮▮▮▮   FIN #: ▮▮▮▮▮ | |
| SIGMA Event: ▮▮▮▮▮   DOB: ▮▮▮▮▮ | File No: ▮▮▮▮▮ |
| In the Matter of: ▮▮▮▮▮ | |

Respondent: ▮▮▮▮▮ _____ currently residing at:

▮▮▮▮▮ Cottonwood, ARIZONA 86326, UNITED STATES OF AMERICA ▮▮▮▮▮

(Number, street, city, state and ZIP code)          (Area code and phone number)

[x] You are an arriving alien.

[ ] You are an alien present in the United States who has not been admitted or paroled.

[ ] You have been admitted to the United States, but are removable for the reasons stated below.

The Department of Homeland Security alleges that you:
1. You are not a citizen or national of the United States;
2. You are a native of PERU and a citizen of PERU;
3. On or about December 11, 2024, you applied for admission to the United States at the Brownsville, Texas Port of Entry;
4. You are an immigrant not in possession of a valid unexpired immigrant visa, reentry permit, border crossing card, or other valid entry document required by the Immigration and Nationality Act.

On the basis of the foregoing, it is charged that you are subject to removal from the United States pursuant to the following provision(s) of law:
See Continuation Page Made a Part Hereof

[ ] This notice is being issued after an asylum officer has found that the respondent has demonstrated a credible fear of persecution or torture.

[ ] Section 235(b)(1) order was vacated pursuant to:    [ ] 8CFR 208.30    [ ] 8CFR 235.3(b)(5)(iv)

YOU ARE ORDERED to appear before an immigration judge of the United States Department of Justice at:
250 N 7TH AVE STE 300,
PHOENIX, AZ, US 85007

*(Complete Address of Immigration Court, including Room Number, if any)*

on June 17, 2026 ___ at 08:30 AM ___ to show why you should not be removed from the United States based on the
   *(Date)*          *(Time)* VICENCIO, Marisol

charge(s) set forth above.    CBP OFFICER    *M Vicencio*

   *(Signature and Title of Issuing Officer)*    *Digitally Acquired Signature*

Date: December 11, 2024    BROWNSVILLE , TEXAS

   *(City and State)*

Uploaded on: 12/11/2021 at 01:00:57 PM (Mountain Standard Time) Reserved BLIO
USCA Case #25-5289    Document #2143852    Filed: 11/17/2025    Page 40 of 309
Case 1:25-cv-00072-JMC    Document 22-16    Filed 06/11/25    Page 8 of 17
Notice to Respondent

**Warning:** Any statement you make may be used against you in removal proceedings.

**Alien Registration:** This copy of the Notice to Appear served upon you is evidence of your alien registration while you are in removal proceedings. You are required to carry it with you at all times.

**Representation:** If you so choose, you may be represented in this proceeding, at no expense to the Government, by an attorney or other individual authorized and qualified to represent persons before the Executive Office for Immigration Review, pursuant to 8 CFR 1003.16. Unless you so request, no hearing will be scheduled earlier than ten days from the date of this notice, to allow you sufficient time to secure counsel. A list of qualified attorneys and organizations who may be available to represent you at no cost will be provided with this notice.

**Conduct of the hearing:** At the time of your hearing, you should bring with you any affidavits or other documents that you desire to have considered in connection with your case. If you wish to have the testimony of any witnesses considered, you should arrange to have such witnesses present at the hearing. At your hearing you will be given the opportunity to admit or deny any or all of the allegations in the Notice to Appear, including that you are inadmissible or removable. You will have an opportunity to present evidence on your own behalf, to examine any evidence presented by the Government, to object, on proper legal grounds, to the receipt of evidence and to cross examine any witnesses presented by the Government. At the conclusion of your hearing, you have a right to appeal an adverse decision by the immigration judge. You will be advised by the immigration judge before whom you appear of any relief from removal for which you may appear eligible including the privilege of voluntary departure. You will be given a reasonable opportunity to make any such application to the immigration judge.

**One-Year Asylum Application Deadline:** If you believe you may be eligible for asylum, you must file a Form 1-589, Application for Asylum and for Withholding of Removal. The Form 1-589, Instructions, and information on where to file the Form can be found at www.uscis.gov/I-589. Failure to file the Form 1-589 within one year of arrival may bar you from eligibility to apply for asylum pursuant to section 208(a)(2)(B) of the Immigration and Nationality Act.

**Failure to appear:** You are required to provide the Department of Homeland Security (DHS), in writing, with your full mailing address and telephone number. You must notify the Immigration Court and the DHS immediately by using Form EOIR-33 whenever you change your address or telephone number during the course of this proceeding. You will be provided with a copy of this form. Notices of hearing will be mailed to this address. If you do not submit Form EOIR-33 and do not otherwise provide an address at which you may be reached during proceedings, then the Government shall not be required to provide you with written notice of your hearing. If you fail to attend the hearing at the time and place designated on this notice, or any date and time later directed by the Immigration Court, a removal order may be made by the immigration judge in your absence, and you may be arrested and detained by the DHS.

**Mandatory Duty to Surrender for Removal:** If you become subject to a final order of removal, you must surrender for removal to your local DHS office, listed on the internet at http://www.ice.gov/contact/ero, as directed by the DHS and required by statute and regulation. Immigration regulations at 8 CFR 1241.1 define when the removal order becomes administratively final. If you are granted voluntary departure and fail to depart the United States as required, fail to post a bond in connection with voluntary departure, or fail to comply with any other condition or term in connection with voluntary departure, you must surrender for removal on the next business day thereafter. If you do not surrender for removal as required, you will be ineligible for all forms of discretionary relief for as long as you remain in the United States and for ten years after your departure or removal. This means you will be ineligible for asylum, cancellation of removal, voluntary departure, adjustment of status, change of nonimmigrant status, registry, and related waivers for this period. If you do not surrender for removal as required, you may also be criminally prosecuted under section 243 of the Immigration and Nationality Act.

U.S. Citizenship Claims: If you believe you are a United States citizen, please advise the DHS by calling the ICE Law Enforcement Support Center toll free at (855) 448-6903.

**Sensitive locations:** To the extent that an enforcement action leading to a removal proceeding was taken against Respondent at a location described in 8 U.S.C. § 1229(e)(1), such action complied with 8 U.S.C. § 1367.

Upon information and belief, the language that the alien understands is **SPANISH**

---

## Request for Prompt Hearing

To expedite a determination in my case, I request this Notice to Appear be filed with the Executive Office for Immigration Review as soon as possible. I waive my right to a 10-day period prior to appearing before an immigration judge and request my hearing be scheduled.

Before: _____

_____
*(Signature of Respondent)*

Date: _____

_____
*(Signature and Title of Immigration Officer)*

---

### Certificate of Service

This Notice To Appear was served on the respondent by me on <u>December 11, 2024</u>, in the following manner and in compliance with section 239(a)(1) of the Act.

☒ in person ☐ by certified mail, returned receipt # _____ requested ☐ by regular mail
☐ Attached is a credible fear worksheet.
☒ Attached is a list of organization and attorneys which provide free legal services.

The alien was provided oral notice in the <u>SPANISH</u> language of the time and place of his or her hearing and of the consequences of failure to appear as provided in section 240(b)(7) of the Act.

VICENCIO, Marisol             M Vicencio
_____    CBP OFFICER              _____
*Digitally Acquired Signature*                              *Digitally Acquired Signature*
*(Signature of Respondent if Personally Served)*    *(Signature and Title of officer)*

EOIR — 2 of 4

Uploaded on: 12/11/2021 at 01:00:52 PM (Mountain Standard Time) Baser City PHO
Case 1:25-cv-00872-JMC Document #21-5882 Filed 06/11/25 Page 9 of 17
USCA Case #25-5289 Document #2145882 Filed: 11/17/2025 Page 41 of 309
Privacy Act Statement

**Authority:**

The Department of Homeland Security through U.S. Immigration and Customs Enforcement (ICE), U.S. Customs and Border Protection (CBP), and U.S. Citizenship and Immigration Services (USCIS) are authorized to collect the information requested on this form pursuant to Sections 103, 237, 239, 240, and 290 of the Immigration and Nationality Act (INA), as amended (8 U.S.C. 1103, 1229, 1229a, and 1360), and the regulations issued pursuant thereto.

**Purpose:**

You are being asked to sign and date this Notice to Appear (NTA) as an acknowledgement of personal receipt of this notice. This notice, when filed with the U.S. Department of Justice's (DOJ) Executive Office for Immigration Review (EOIR), initiates removal proceedings. The NTA contains information regarding the nature of the proceedings against you, the legal authority under which proceedings are conducted, the acts or conduct alleged against you to be in violation of law, the charges against you, and the statutory provisions alleged to have been violated. The NTA also includes information about the conduct of the removal hearing, your right to representation at no expense to the government, the requirement to inform EOIR of any change in address, the consequences for failing to appear, and that generally, if you wish to apply for asylum, you must do so within one year of your arrival in the United States. If you choose to sign and date the NTA, that information will be used to confirm that you received it, and for recordkeeping.

**Routine Uses:**

For United States Citizens, Lawful Permanent Residents, or individuals whose records are covered by the Judicial Redress Act of 2015 (5 U.S.C. § 552a note), your information may be disclosed in accordance with the Privacy Act of 1974, 5 U.S.C. § 552a(b), including pursuant to the routine uses published in the following DHS systems of records notices (SORN): DHS/USCIS/ICE/CBP-001 Alien File, Index, and National File Tracking System of Records, DHS/USCIS-007 Benefit Information System, DHS/ICE-011 Criminal Arrest Records and Immigration Enforcement Records (CARIER), and DHS/ICE-003 General Counsel Electronic Management System (GEMS), and DHS/CBP-023 Border Patrol Enforcement Records (BPER). These SORNs can be viewed at https://www.dhs.gov/system-records-notices-sorns. When disclosed to the DOJ's EOIR for immigration proceedings, this information that is maintained and used by DOJ is covered by the following DOJ SORN: EOIR-001, Records and Management Information System, or any updated or successor SORN, which can be viewed at https://www.justice.gov/opcl/doj-systems-records. Further, your information may be disclosed pursuant to routine uses described in the abovementioned DHS SORNs or DOJ EOIR SORN to federal, state, local, tribal, territorial, and foreign law enforcement agencies for enforcement, investigatory, litigation, or other similar purposes.

For all others, as appropriate under United States law and DHS policy, the information you provide may be shared internally within DHS, as well as with federal, state, local, tribal, territorial, and foreign law enforcement; other government agencies; and other parties for enforcement, investigatory, litigation, or other similar purposes.

**Disclosure:**

Providing your signature and the date of your signature is voluntary. There are no effects on you for not providing your signature and date; however, removal proceedings may continue notwithstanding the failure or refusal to provide this information.

DHS Form I-862 (6/22)

JA390

EOIR – 3 of 4

**U.S. Department of Homeland Security**                 **Continuation Page for Form** I-862

| Alien's Name | File Number | Date |
|---|---|---|
| | SIGMA Event: | December 11, 2024 |
| | Event No: | |

ON THE BASIS OF THE FOREGOING, IT IS CHARGED THAT YOU ARE SUBJECT TO REMOVAL FROM THE
UNITED STATES PURSUANT TO THE FOLLOWING PROVISION(S) OF LAW:
=====================================================================================

212(a)(7)(A)(i)(I) of the Immigration and Nationality Act (Act), as amended, as an
immigrant who, at the time of application for admission, is not in possession of a valid
unexpired immigrant visa, reentry permit, border crossing card, or other valid entry
document required by the Act, and a valid unexpired passport, or other suitable travel
document, or document of identity and nationality as required under the regulations issued
by the Attorney General under section 211(a) of the Act.

| Signature | Title |
|---|---|
| *M Vicencio*  VICENCIO, Marisol | CBP OFFICER |

*Digitally Acquired Signature*

Form I-831 Continuation Page (Rev. 08/01/07)

JA391

# EXHIBIT B

Uploaded on: 04/03/2025 at 09:25:08 AM (Mountain Standard Time) Base City (PHO)
Case 2:25-cv-00971-JMC Document 22-16 Filed 06/21/25 Page 12 of 17
USCA Case #25-5289 Document #2145852 Filed: 11/17/2025 Page 44 of 309

orina lmeida
hief ounsel

**DETAINED**

Briana . Rodriguez
ssistant hief ounsel
U.S. mmigration and ustoms Enforcement
U.S. Department of omeland Security
1705 E. anna d.
Eloy Z 85131

## UNITED STATES DEPARTMENT OF JUSTICE
## EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
## IMMIGRATION COURT
## PHOENIX, ARIZONA

| | |
|---|---|
| n the Matter of: | ) |
| | ) |
| ████████████████ | ) |
| | ) |
| n removal proceedings | ) |
| | ) |

File No.: ████████████

mmigration Judge: abich Paul

Next earing: 6/17/2026

## DEPARTMENT OF HOMELAND SECURITY
## MOTION TO DISMISS WITHOUT PREJUDICE

EOIR – 1 of 3

JA393

Uploaded on: 04/03/2025 at 09:25:08 AM (Mountain Standard Time) Base City: PHO
Case 2:25-cv-00978-JMC Document 22-16 Filed 06/11/25 Page 13 of 17
USCA Case #25-5289 Document #2145852 Filed: 11/17/2025 Page 45 of 309

**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**IMMIGRATION COURT**
**PHOENIX, ARIZONA**

n the Matter of: )
)
)
▮▮▮▮▮▮▮ ) File No.: ▮▮▮▮▮▮▮
)
n removal proceedings )
)

**DEPARTMENT OF HOMELAND SECURITY**
**MOTION TO DISMISS WITHOUT PREJUDICE**

Pursuant to 8  .F.  . § 1239.2(c) and 8  .F.  . § 239.2(a)(6)  the Department of  omeland

Security (the Department) hereby moves to dismiss  without prejudice  the removal proceedings on

the Notice to Appear (NT  ) issued on or about December 11  2024  because the NTA was

improvidently issued.

espectfully submitted this 3rd day of April 2025.

BRIANA A RODRIGUEZ   Digitally signed by BRIANA A RODRIGUEZ
Date: 2025.04.03 09:23:16 -07'00'

Briana  .  odriguez
ssistant  hief  ounsel

orina  lmeida
hief  ounsel
U.S.  mmigration and  ustoms Enforcement
U.S. Department of  omeland Security

Uploaded on: 04/03/2025 at 09:25:08 AM (Mountain Standard Time) Base City (PHO)
Case 2:25-cv-00871-JMC Document 22-16 Filed: 06/21/25 Page 14 of 17
USCA Case #25-5289 Document #2145852 Filed: 11/17/2025 Page 46 of 309

## CERTIFICATE OF SERVICE

hereby certify that this Department of omeland Security Motion to Dismiss Without Prejudice and any attached documents was/were served upon the respondent (or his/her representative):

☒ by placing a true copy in a sealed envelope into the inter/intra-office mail at 1705 E. anna d. Eloy Z 85131 to the address set forth below:

EL  Z 85131



BRIANA A RODRIGUEZ
Digitally signed by BRIANA A RODRIGUEZ
Date: 2025.04.03 09:23:39 -07'00'

Date: April 3, 2025

ssistant hief ounsel

# EXHIBIT

**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**PHOENIX IMMIGRATION COURT**

Respondent Name:

████████████████████

To:

████████████████████

ELOY, AZ 85131

A-Number:

███████

Riders:
In Removal Proceedings
Initiated by the Department of Homeland Security
Date:
04/03/2025

**ORDER ON MOTION TO DISMISS**

☐ The Respondent ☑ the Department of Homeland Security ☐ the parties jointly has/have filed a motion to dismiss these proceedings under 8 CFR 1239.2(c). The moving party has given notice of the motion to the non-moving party and the court has provided the non-moving party with an opportunity to respond. The motion is ☐ opposed ☐ unopposed.

After considering the facts and circumstances, the immigration court orders that the motion to dismiss is:

☑ Granted without prejudice
☐ Denied

Further explanation:

To ensure that the proceeding is not prolonged, or that the Respondent possibly expends resources to obtain counsel, the Court grants the Department's motion prior to receiving the Respondent's position. The Court finds that the Department's motion has been filed prior to the Respondent's initial hearing and having obtained counsel. Thus, given this early stage in removal proceedings, the Court finds that the Respondent is not prejudiced by dismissal. Matter of G-N-C-, 22 I&N Dec. 281, 284-85 (BIA 1998).

IT IS SO ORDERED.

JA397

Immigration Judge: HABICH, PAUL 04/03/2025

**Certificate of Service**

This document was served:

Via: [ M ] Mail | [ P ] Personal Service | [ E ] Electronic Service | [ U ] Address Unavailable

To: [ M ] Noncitizen | [ ] Noncitizen c/o custodial officer | [ ] Noncitizen's atty/rep. | [ E ] DHS

Respondent Name : ███████████████████ A-Number : ██████████

Riders:

Date: 04/04/2025 By: STROH, BELEN, Court Staff

JA398

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COALITION FOR HUMANE IMMIGRANT RIGHTS, *et al.*,<br><br>　　*Plaintiffs,*<br><br>　　*v.*<br><br>KRISTI NOEM, in her official capacity as Secretary of Homeland Security, *et al.*,<br><br>　　*Defendants.* | Case No.: 1:25-cv-0872 |

## DECLARATION OF SARAH T. GILLMAN, ESQ.

I, Sarah T. Gillman, Esq, declare under penalty of perjury under the laws of the United States of America:

1. I am over the age of 18 and competent to testify to the facts and matters set forth herein.

2. I am an attorney and currently hold the position of Director of Strategic U.S. Litigation, U.S. Advocacy & Litigation, Robert F. Kennedy Human Rights (RFK Human Rights). I previously held the position of Legal Director of Rapid Defense Network (RDN). Prior to that, I was a Supervising Attorney with The Legal Aid Society's Immigration Law Unit, where I was responsible for the supervision of a staff of attorneys and paralegals in the Society's New York Immigrant Family Unity Project ("NYIFUP"). Prior to that, I served as a Staff Attorney with The Legal Aid Society's Immigration Law Unit. I have also held positions with the New York University School of Law (NYU), Immigrant Rights Clinic (IRC). From 2012-2014, I held the position of Adjunct Professor of Clinical Law and in the Summer of 2019 and Summer of 2021, I was a Summer Cooperating Attorney. I have been representing individuals who are detained

JA399

and facing deportation from the United States for seventeen (17) years with a specific focus on detention and removal defense.

3. RFK Human Rights currently represents a client, J.M.A., who was paroled into the United States at a port of entry and was nearly two years later processed for expedited removal. J.M.A. is a national of Cuba who used the Department of Homeland Security's CBP One mobile application in 2023 to schedule an appointment to present at a port of entry for inspection. On June 9, 2023, the day of his appointment, J.M.A. came to the Calexico port of entry along the U.S.-Mexico border, was inspected by a U.S. Customs and Border Protection officer and was paroled into the country.

4. Following his parole into the United States, the Department of Homeland Security (DHS) commenced removal proceedings against J.M.A. However, because he is a Cuban national whose parole into the United States made him eligible to apply for lawful permanent resident (LPR) status through the Cuban Adjustment Act (CAA) after one year in the country, removal proceedings were terminated without prejudice to allow for USCIS to adjudicate the CAA application. After that, J.M.A. applied for and received an employment authorization document (EAD), found a job, and became a trusted and valued employee at his company.

5. In February 2025, J.M.A. was detained by DHS after he was arrested by local police and charged with petit larceny—a charge that he has denied and has not yet led to any conviction. While J.M.A. was shopping in a store with a friend, a security guard alleged that J.M.A. and his friend were stealing items. While both denied the allegations and explained that they were shopping, the security guard called the local police and J.M.A. and his friend were arrested. Thereafter, the local police contacted immigration authorities.

JA400

6.  On or about February 9, 2025, J.M.A. was detained by immigration authorities and once

    more placed in removal proceedings. On March 25, 2025, J.M.A. appeared *pro se* for a

    master calendar hearing while in detention at the Buffalo Federal Detention Facility (BFDF).

    Prior to the March 25, 2025, hearing date, an attorney for DHS filed a written motion to

    terminate removal proceedings and that motion was granted by the Immigration Judge at the

    March 25 hearing. Attached as Exhibits A, B, and C to this declaration, respectively, are true

    and correct copies of DHS's motion to dismiss, the immigration judge's decision, and the

    transcript of the March 25 hearing with all personally identifiable information redacted.

7.  Thereafter the client was placed in expedited removal proceedings on March 26, 2025, and

    referred for a credible fear interview that took place on March 31, 2025. Although the asylum

    officer found J.M.A.'s responses credible, he issued a negative credible fear determination.

    J.M.A. requested a review of the asylum officer's negative credible fear determination before

    the Immigration Judge.

8.  On April 3, 2025, RFK Human Rights entered an appearance on behalf of J.M.A. RFK

    Human Rights filed an appeal with the Board of Immigration Appeals (BIA) of the

    Immigration Judge's decision granting the DHS's motion to terminate removal proceedings

    and prepared a submission in support of the Immigration Judge's review of the negative

    credible fear determination.

9.  On April 7, 2025, the Immigration Judge reversed the negative fear determination. As a result

    of this reversal, J.M.A. was statutorily entitled to be returned to regular removal proceedings

    before the immigration court.

JA401

10. On May 3, 2025, DHS and RFK Human Rights filed with the BIA a joint motion to remand the case to the immigration court so that J.M.A. can apply for all available and appropriate forms of relief. The BIA granted the joint motion to remand.

11. On June 5, 2025, J.M.A. and undersigned counsel appeared at the first Master Calendar hearing following the BIA remand. The Immigration Judge who is assigned to J.M.A.'s case is the same Immigration Judge who granted the DHS motion on March 25, 2025. At the June 5 hearing, I advised the Immigration Judge that J.M.A. has a pending application with USCIS to adjust status under the CAA. The Immigration Judge was surprised about this fact given that it was not disclosed by DHS at the time J.M.A. appeared pro se before the Immigration Judge on March 25, 2025. The Immigration Judge stated that if J.M.A. had a pending application to adjust status under the CAA, he should not have been put into expedited removal proceedings. The Immigration Judge asked the DHS attorney if he agreed with that analysis and the DHS attorney concurred and noted that he had not filed the motion to terminate.

12. The placement of J.M.A. in expedited removal, despite the fact that he had been paroled into the United States, nearly resulted in his quick removal from the United States. Unlike many others, J.M.A. was able to secure pro bono counsel to assist him in presenting his credible fear claim to the immigration judge reviewing the asylum officer's negative determination. If J.M.A. had been removed from the United States, he would have been removed to Cuba—a country where he fears persecution and torture. Additionally, J.M.A.'s removal from the country through expedited removal proceedings would have vitiated his right to continue pursuing his application for adjustment of status under the CAA.

JA402

I declare under penalty of perjury and under the laws of the United States that the foregoing

is true and correct to the best of my knowledge.


Executed in New York, New York on June 9, 2025


*Sarah Gillman*
Sarah T. Gillman, Esq.

JA403

# EXHIBIT

DETAINED

Carol G. Bridge
Chief Counsel
Jeffrey T. Fiut
Deputy Chief Counsel
Sydney V. Probst
Assistant Chief Counsel
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security
4250 Federal Drive
Batavia, NY 14020

## UNITED STATES DEPARTMENT OF JUSTICE
## EXECUTIVE OFFICE OF IMMIGRATION REVIEW
## IMMIGRATION COURT
## BATAVIA, NEW YORK

| IN THE MATTER OF: | IN REMOVAL PROCEEDINGS |
|---|---|
| ███████ | ███████ |
| Respondent | |

Immigration Judge: TBD                    Hearing Date: March 25, 2025

## U.S. DEPARTMENT OF HOMELAND SECURITY
## MOTION TO DISMISS WITHOUT PREJUDICE

EOIR – 1 of 4

*Revised 3/12/2025*
JA405

**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE OF IMMIGRATION REVIEW**
**IMMIGRATION COURT**
**BATAVIA, NEW YORK**

| IN THE MATTER OF: | IN REMOVAL PROCEEDINGS |
|---|---|
| ███████████ | ███████████ |
| Respondent | |

The U.S. Department of Homeland Security (Department) moves to dismiss removal proceedings, without prejudice. Specifically, the Department has reviewed the facts and circumstances of the case and determined that circumstances after issuance of the Notice to Appear have changed to such an extent that continuation is no longer in the best interest of the government. 8 C.F.R. §§ 1239.2(c), 239.2(a)(7) and (c).

Dismissal pursuant to this motion is without prejudice and does not constitute a final judgment rendered on the merits of any issue in these proceedings. *See* 8 C.F.R. § 1239.2(c) (providing that dismissal "shall be without prejudice to the alien or the Department").

**WHEREFORE**, for the reasons stated above, the Department requests this Court grant its motion to dismiss without prejudice.

Respectfully submitted on March 24, 2025

*Sydney Probst*
_____
Sydney V. Probst
Assistant Chief Counsel

EOIR – 2 of 4

*Revised 3/12/2025*
JA406

Uploaded on: 03/24/2025 at 09:31:02 AM (Eastern Daylight Time) Base City: BTV
Case 1.25-cv-00872-JMC Document 22-13 Filed 06/11/25 Page 9 of 21
USCA Case #25-5289 Document #2145852 Filed: 11/17/2025 Page 58 of 309

# UNITED STATES DEPARTMENT OF JUSTICE
## EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
## IMMIGRATION COURT
## BATAVIA, NEW YORK

| IN THE MATTER OF: | IN REMOVAL PROCEEDINGS |
|---|---|
| ▌▌▌▌▌▌▌▌ | ▌▌▌▌▌ |
| Respondent | |

## ORDER OF THE IMMIGRATION JUDGE

Upon consideration of the **U.S. Department of Homeland Security Motion to Dismiss Without Prejudice**, it is HEREBY ORDERED that the motion be:

[   ] **GRANTED.**

[   ] **DENIED** because: _____

_____

_____

_____

_____      _____
Date                                  TBD
                                       Immigration Judge

## CERTIFICATE OF SERVICE

This document was served by: [ M ] Mail; [ P ] Personal Service; [ O ] Other: _____

To: [  ] Alien; [  ] Alien c/o Custodial Officer; [  ] Alien's Atty/Rep.; [  ] DHS

Date:_____        By: Court Staff_____

EOIR – 3 of 4

*Revised 3/12/2025*
JA407

<table>
<tr><td>

**IN THE MATTER OF:**

███████████████

Respondent

</td><td>

**IN REMOVAL PROCEEDINGS**

███████████

</td></tr>
</table>

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this day, I served a copy of this **U.S. Department of Homeland Security Motion to Dismiss Without Prejudice**.

☐    an identical copy in a sealed envelope with postage thereon fully prepaid and causing the same to be deposited with the U.S. Postal Service to the person at the precise and complete address set forth below. (See Immigration Court Practice Manual, Chapter 3.2)

☒    an identical copy hand-delivered to a responsible person at the address, set forth below, of the individual being served. (*See* Immigration Court Practice Manual, Chapter 3.2)

☐    through the EOIR Courts and Appeals System (ECAS), which will automatically send service notifications to both parties that a new document has been filed.

**c/o Buffalo Federal Detention Facility**
**4250 Federal Drive**
**Batavia, NY 14020**

I declare under penalty of perjury that the foregoing is true and correct.  Executed on March 24, 2025.

   Sydney V. Probst
Sydney V. Probst
Assistant Chief Counsel

EOIR — 4 of 4

***Revised 3/12/2025***
JA408

# EXHIBIT B

**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**BATAVIA IMMIGRATION COURT**

Respondent Name:

█████████████████████

To:

███████████████████

BATAVIA, NY 14020

A-Number:

█████████████

Riders:

In Removal Proceedings
Initiated by the Department of Homeland Security
Date:
03/25/2025

**ORDER ON MOTION TO DISMISS**

☐ The Respondent ☑ the Department of Homeland Security ☐ the parties jointly has/have filed a motion to dismiss these proceedings under 8 CFR 1239.2(c). The moving party has given notice of the motion to the non-moving party and the court has provided the non-moving party with an opportunity to respond. The motion is ☐ opposed ☐ unopposed.

After considering the facts and circumstances, the immigration court orders that the motion to dismiss is:

☑ Granted without prejudice
☐ Denied

Further explanation:

IT IS SO ORDERED.

JA410

Immigration Judge: SCHULTZ, ERIC 03/25/2025

**Certificate of Service**

This document was served:

Via: [ M ] Mail | [ P ] Personal Service | [ E ] Electronic Service | [ U ] Address Unavailable

To: [ ] Noncitizen | [ P ] Noncitizen c/o custodial officer | [ ] Noncitizen's atty/rep. | [ P ] DHS

Respondent Name : ███████████████    A-Number : ██████████

Riders:

Date: 03/25/2025 By: Cavar, Sandi, Court Staff

JA411

# EXHIBIT

JA412

U.S. Department of Justice
Executive Office for Immigration Review
United States Immigration Court

In the Matter of                                                        File: ███████

███████████                    )
                               )              IN REMOVAL PROCEEDINGS
                               )
RESPONDENT                     )              Transcript of Hearing

Before Schultz, Eric, Immigration Judge

Date: March 25, 2025                          Place: BATAVIA, NEW YORK

Transcribed by Heritage Reporting Corp.

Official Interpreter:

Language: SPANISH

Appearances:

  For the RESPONDENT:

  For the DHS: PETER MARCHE

1    JUDGE FOR THE RECORD

2        Good morning everyone.  We're on the record.  This is Immigration Judge Eric

3    Schultz presiding in removal proceedings at the Batavia, New York Immigration Court

4    on March 25, 2025, in a group master calendar hearing for three Respondents.  I will

5    identify them by name and alien registration number momentarily.  The Respondents

6    are each detained in the custody of the Department of Homeland Security.  They are

7    appearing in person before the Court today.  I've familiarized myself with their record of

8    proceedings.  The Department of Homeland Security is represented by Assistant Chief

9    Counsel Peter Marche, who is appearing in person with the Court today.  The

10   Respondents are not represented.  We have the assistance of a Spanish interpreter

11   telephonically connected from Language Services Associates to assist the Court and

12   the parties today.

13   JUDGE TO INTERPRETER

14       To our interpreter, we are on the record.  Thank you for your help.  As always we

15   appreciate it.

16   INTERPRETER TO JUDGE

17       Good morning.  Thank you so much, Your Honor.  My pleasure.

18   JUDGE TO INTERPRETER

19       Do you swear or affirm to faithfully and correctly interpret the proceedings here

20   from English to Spanish and Spanish to English?

21   INTERPRETER TO JUDGE

22       Yes, I do.

23   JUDGE TO INTERPRETER

24       Thank you.

25   JUDGE TO RESPONDENTS



1    To the Respondents through our interpreter, good morning gentlemen.  When I

2    say your name, please stand and remain standing.  ████████████████████.

3    ██████████████████████████████.  And ███████████████████████

4    ████████████████.

5    JUDGE FOR THE RECORD

6    Let the record reflect all three Respondents stood when called, indicating they

7    are all present for this group master calendar hearing.

8    JUDGE TO RESPONDENTS

9    To the Respondents through our interpreter, thank you, gentlemen.  You may be

10   seated.  Please raise your hand if Spanish is your best language.  Thank you.  You may

11   lower your hands.

12   JUDGE FOR THE RECORD

13   Let the record reflect that all three Respondents raised their hand indicating

14   Spanish is their best language.

15   JUDGE TO RESPONDENTS

16   So, to the Respondents, I'm going to explain to you the legal rights that you have

17   in these proceedings.  Please listen carefully and after I've completed my explanation, I

18   will speak to each of you individually.

19   The reason why we're here is because the U.S. Government has charged that

20   you do not have a legal right to remain in the United States and has listed those

21   charges in a document called a Notice to Appear that you were given to start this case.

22   There are two purposes for these hearings.  The first is to see if the U.S. Government is

23   correct in that charge.  The second is to see if you qualify for any relief or benefit that

24   would allow you to stay in the United States or leave without being ordered removed.

25   During these proceedings, you have the right to present evidence in support of

1  your case and to examine and object to any evidence presented by the Government.  If

2  at the end of these hearings the Court determines you are not legally allowed to remain

3  in the United States, you have a right to appeal that decision to a higher court called the

4  Board of Immigration Appeals.

5      If you apply for any relief from removal, such as for example asylum, the Court

6  will set a deadline for you to file your application with the Court.  If the application is not

7  filed by the deadline set, the Court may deem the application abandoned.  You also

8  have what's called a corroboration requirement.  This means you are expected and

9  required to file reasonably available documents to support claims you make in an

10  application.  So, for example, if you apply for asylum, you're expected to file documents

11  to show why you have a fear of returning to your home country.  If you don't provide

12  those kinds of documents, the Court may deny your application for relief, based on lack

13  of corroboration.

14      You have the right to be represented during these proceedings by an attorney or

15  a qualified representative at your own expense.  The Court and the Government cannot

16  provide you with an attorney.  However, when you came into Court today, our officer

17  gave you a list of individuals and organizations that may be able to represent you at little

18  or no cost to you.  Please understand you are not limited to just the attorneys on the list.

19  If you wish, you can arrange for any attorney you want, but it is your responsibility to

20  find counsel.

21  JUDGE FOR THE RECORD

22      This concludes the group legal rights advisals.  I will now go into each individual

23  case.

24              [OFF THE RECORD]

25               [ON THE RECORD]

March 25, 2025

JA416

1  JUDGE FOR THE RECORD

2      We are back on the record.  This is Immigration Judge Eric Schultz in the matter

3  of ██████████, file number ████████.  Let the record reflect this Respondent

4  was part of a group master calendar hearing in which I explained and was part of that

5  group for legal rights he has in these proceedings.  We are now on his individual matter.

6  JUDGE TO ████████████

7      To the Respondent through our interpreter, good morning.  How are you?

8  ███████████████ TO JUDGE

9      Good morning, sir.  I'm fine.  Thanks.

10  JUDGE TO ████████████

11      Please confirm what language do you speak and understand best.

12  ███████████████ TO JUDGE

13      I speak a little bit English, but I'm so nervous right now.  It's better for me to

14  speak Spanish.  [indiscernible].

15  JUDGE TO ████████████

16      All right.  So, in English and through our interpreter, sir, if English [sic] is your

17  best language, please let's use the interpreter.  These are important proceedings for

18  you.  I want to make sure you understand everything.

19  ███████████████ TO JUDGE

20      I will use interpreter, please.

21  JUDGE TO ████████████

22      Please raise your right hand.  Do you swear or affirm that the testimony you will

23  give today will be the truth?

24  ███████████████ TO JUDGE

25      Yes.  I swear.

JA417

1    JUDGE TO ███████████

2        Thank you.  You may lower your hand, and please tell me your full name.

3    ███████████    TO JUDGE

4        ████████.

5    JUDGE TO ███████████

6        Thank you.

7    JUDGE TO INTERPRETER

8        Madam Interpreter, when I speak to Government Counsel, please continue

9    consecutive interpretations.  Okay?

10   INTERPRETER TO JUDGE

11       Okay.

12   JUDGE TO ███████████

13       So, to the Respondent, sir, yesterday the Government attorney's office filed a

14   request or a motion to dismiss your proceedings without prejudice, which means there

15   would be no longer an Immigration Court proceeding.  They have the right to do that

16   under regulation.  They get to decide who should appear in front of me and then when

17   that happens, I decide the issues, but they can decide whether to proceed or not in

18   certain cases like yours.

19   JUDGE TO MR. MARCHE

20       Attorney Marche, are you familiar with this, and did you want to add anything?

21   MR. MARCHE TO JUDGE

22       I saw the motion filed by my co-Counsel, Ms. Probst.  I have nothing further to

23   add, Your Honor.

24   JUDGE TO ███████████

25       So, to the Respondent, sir, I am going to sign that order dismissing this

████████████        5        March 25, 2025

JA418

1    Immigration Court proceeding.  You have Counsel -- you can try to find Counsel

2    yourself if you'd like and talk to your deportation officer, but we're not going to have an

3    Immigration Court case right now.  All right?  Do you understand?

4    ███████████████████ TO JUDGE

5        Yes, sir.

6    JUDGE TO ███████████████

7        Do you have any questions?

8    ███████████████████ TO JUDGE

9        No, sir.

10   JUDGE TO ███████████████

11       All right.

12   JUDGE FOR THE RECORD

13       So, this is actually going to be an adjournment code 8(a) for signing the order

14   before the hearing, and we will go off the record on the removal case and go to the

15   bond hearing next.

16                            <u>HEARING CLOSED</u>

17

18

19

20

21

22

23

24

25

BRETT A. SHUMATE
*Assistant Attorney General*
*Civil Division*
AUGUST E. FLENTJE
*Special Counsel for Immigration*
PAPU SANDHU
*Assistant Director*
U.S. Department of Justice
Office of Immigration Litigation
General Litigation and Appeals Section
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
(202) 616-9357
Papu.Sandhu@usdoj.gov
TIM RAMNITZ
*Senior Litigation Counsel*
ARIC A. ANDERSON
TARYN ARBEITER
*Trial Attorneys*

Counsel for Defendants

## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| COALITION FOR HUMANE IMMIGRANT RIGHTS, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> KRISTI NOEM, in her official capacity as Secretary of Homeland Security, *et al.*, <br><br> Defendants. | Civil Action No. 1:25-cv-00872 (JMC) <br><br> Hon. Jia M. Cobb |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A STAY OF AGENCY ACTION UNDER 5 U.S.C. § 705

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................... 1

LEGAL AND PROCEDURAL BACKGROUND ...................................................... 3

    I.    Statutory Scheme for Expedited Removal and Parole ................................... 3

    II.   DHS Documents Plaintiffs Request to Stay .................................................. 7

LEGAL STANDARD ............................................................................................... 9

ARGUMENT .......................................................................................................... 11

    I.    5 U.S.C. § 705 Does Not Provide a Basis for the Relief Plaintiff Seeks. ..................... 11

        A.   Section 1252(f)(1) Prohibits a Stay of Agency Action that Precludes DHS from Applying Expedited Removal to Paroled Aliens .................................................. 11

        B.   The Court Cannot Stay Agency Action that Has Already Gone into Effect. ........... 15

        C.   The INA's Judicial Review Provision for Expedited Removal Also Does Not Support the Request for a Stay ....................................................... 17

    II.   The Court Should Deny the Stay Motion Because It Lacks Jurisdiction Over Plaintiffs' Claims ........................................................... 18

        A.   Plaintiffs Cannot Establish Standing Because Their Alleged Harms are not Redressable. ......................................................... 18

        B.   Plaintiffs' Challenges to Expedited Removal Are Time-Barred. ........................... 20

        C.   The Relief That Plaintiffs Seek Is Also Squarely Foreclosed by 8 U.S.C. § 1252(g) ..................................................... 24

        D.   Plaintiff Organizations Cannot Show They Are Within the Zone of Interests Protected by the Expedited Removal Statute ....................................... 26

JA421

III.    Plaintiffs Fail to Establish a Likelihood of Success on the Merits
        Because Application of Expedited Removal to Plaintiffs' Members
        Is Lawful..................................................................................................30

    A.    Aliens Paroled into the U.S. at a Port of Entry are Properly Subject
          to Expedited Removal Because They Are Aliens "Arriving in the
          United States."........................................................................................30

    B.    Aliens Paroled into the U.S. at a Port of Entry are Properly Subject to Expedited
          Removal Because They Are Within the Class of Aliens Designated by the Secretary.
          34

    C.    Plaintiffs Are Not Likely to Succeed on their APA Claim Because the Documents
          They Contest Did Not Make the Changes That Plaintiffs Allege and Are Not
          Inconsistent. ..........................................................................................39

IV.    The Remaining Equitable Factors Weigh Strongly in the
       Government's Favor. ...............................................................................46

    A.    Plaintiffs have not Established Irreparable Harm...................................46

    B.    The Harm to the Government and the Public's Interest Favor Denying the Stay.....51


V.    At a Minimum, any Relief Should be Limited to Identifiable
      Plaintiff Members and Their Specific Harms.............................................53

CONCLUSION..................................................................................................55

JA422

**TABLE OF AUTHORITIES**

<u>Cases</u>

*Abbott v. Perez*,
    585 U.S. 579 (2018)...........................................................................................12

*Adams v. Holder*,
    692 F.3d 91 (2d Cir. 2012)...............................................................................48

*AILA v. Reno (AILA I)*,
    18 F. Supp. 2d 38, 47 (D.D.C. 1998).................................................................24

*Arizona v. U.S.*,
    567 U.S. 387 (2012)...........................................................................................52

*Bates v. United States*,
    522 U.S. 23 (1997)......................................................................................33, 50

*Bauer v. DeVos*,
    325 F. Supp. 3d 74 (D.D.C. 2018)......................................................................9

*Bennett v. Spear*,
    520 U.S. 154 (1997)...........................................................................................40

*Biden v. Texas*,
    597 U.S. 785 (2022)...........................................................................................11

*Brown v. Gilmore*,
    533 U.S. 1301 (2001)...................................................................................12, 14

*California v. Grace Brethren Church*,
    457 U.S. 393 (1982)...........................................................................................12

*California v. U.S. Bureau of Land Mgmt.*,
    277 F. Supp. 3d 1106 (N.D. Cal. 2017).............................................................15

*Clarke v. Security Indus. Ass'n*,
    479 U.S. 388 (1987)...........................................................................................27

*Ctr. for Biological Diversity v. Regan*,
    No. CV 21-119 (RDM), 2022 WL 971067 (D.D.C. Mar. 30, 2022)....................15

JA423

*Dep't of Homeland Sec. v. Thuraissigiam*,
    591 U.S. 103 (2020) ............................................................................... *passim*

*DHS v. New York*,
    140 S. Ct. 599 (2020) .................................................................................. 54

*Doe v. Noem*,
    No. 1:25-CV-10495-IT, 2025 WL 1099602 (D. Mass. Apr. 14, 2025) ........................ *passim*

*Duarte v. Mayorkas*,
    27 F.4th 1044 (5th Cir. 2022) ................................................................... 32, 35

*Dugdale v. Customs and Border Protection*,
    300 F. Supp. 3d 276 (D.D.C. 2018) ................................................................ 23

*Dugdale v. U.S. Customs & Border Prot.*,
    88 F. Supp. 3d 1 (D.D.C. 2015) ................................................................... 45

*E.F.L. v. Prim*,
    986 F.3d 959 (7th Cir. 2021) ................................................................... 25, 26

*F.D.A. v. Alliance for Hippocratic Medicine*,
    602 U.S. 367 (2024) ................................................................................. 20

*Garland v. Aleman Gonzalez*,
    596 U.S. 543 (2022) ............................................................................ 11, 13

*Gill v. Whitford*,
    138 S. Ct. 1916 (2018) ......................................................................... 10, 53

*Grace v. Barr*,
    965 F.3d 883 (D.C. Cir. 2020) ..................................................................... 44

*Ibragimov v. Gonzales*,
    476 F.3d 125 (2d Cir. 2007) ................................................................... 32, 35

*Immigrant Defs. L. Ctr. v. Noem*,
    ___ F.3d ____, 2025 WL 1172442 (C.D. Cal. Apr. 16, 2025) .............................. 13

*INS v. Legalization Assistance Project of L.A. Cty. Fed'n of Labor*,
    510 U.S. 1301 (1993) ........................................................................... 29, 52

*Jennings v. Rodriguez*,
    583 U.S. 281 (2018) ......................................................................... 30, 35, 48

*Kaspersky Lab, Inc. v. DHS*,
    311 F. Supp. 3d 187 (D.D.C. 2018) ................................................................ 19

*Kiakombua v. Wolf,*
    498 F. Supp. 3d 1 (D.D.C. 2020) .................................................................... 23

*Landin-Molina v. Holder*,
    580 F.3d 913 (9th Cir. 2009) .......................................................................... 49

*Lawyers Ass'n v. Reno,*
    ("AILA II"), 199 F.3d 1352 (D.C. Cir. 2000) ........................................... *passim*

*Leng May Ma v. Barber*,
    357 U.S. 185 (1958) ........................................................................... 6, 32, 35

*Log Cabin Republicans v. United States*,
    658 F.3d 1162 (9th Cir. 2011) ........................................................................ 10

*Loper Bright Enters. v. Raimondo*,
    603 U.S. 369 (2024) ........................................................................................ 31

*Lucacela v. Reno*,
    161 F.3d 1055 (7th Cir. 1998) ........................................................................ 52

*Lujan v. Def. of Wildlife*,
    504 U.S. 555 (1992) ........................................................................................ 18

*M.M.V. v. Garland*,
    1 F.4th 1100 (D.C. Cir. 2021) ........................................................................ 24

*Madsen v. Women's Health Ctr., Inc.*,
    512 U.S. 753 (1994) ................................................................................. 10, 54

*Make the Rd. New York v. Wolf*,
    962 F.3d 612 (D.C. Cir. 2020) ........................................................................ 28

*Make the Road N.Y. v. McAleenan*,
    405 F. Supp. 3d 1 (D.D.C. 2019) ........................................................ 29, 41, 42

*Maryland v. King*,
    567 U.S. 1301 (2012) ..................................................................................... 52

*Matter of E-R-M-,*
    25 I. & N. Dec. 520 (BIA 2011) ..................................................................... 26

JA425

*Monsanto Co. v. Geertson Seed Farm*s,
    561 U.S. 139 (2010)........................................................................54

*Morice v. Hosp. Serv. Dist. #3*, No.,
    CV 18-7945, 2019 WL 1517954 (E.D. La. Apr. 8, 2019) ...................53

*Munaf v. Geren*,
    553 U.S. 674 (2008)........................................................................10

*Myers v. United States*,
    272 U.S. 52 (1926)..........................................................................52

*Nat'l Pork Producers Council v. Ross*,
    598 U.S. 356 (2023)........................................................................43

*Nat'l TPS All. v. Noem*,
    ___F. Supp. 3d___, 2025 WL 957677 (N.D. Cal. Mar. 31, 2025) ......13

*Ne. Ohio Coal. for Homeless & Serv. Emps. Int'l Union, Loc. 1199 v. Blackwell*,
    467 F.3d 999 (6th Cir. 2006)...........................................................16

*Nken v. Holder*,
    556 U.S. 418 (2009).............................................................13, 14, 52

*Noem v. Doe*,
    145 S. Ct. 1524 (2025)..............................................................*passim*

*Nutrition Distrib., LLC v. Enhanced Athlete, Inc.*,
    2017 WL 5467252 (E.D. Cal. Nov. 14, 2017)...................................53
*O.A. v. Trump*,
    404 F. Supp. 3d 109, 144 (D.D.C. 2019). ..................................29, 30

*Off. of Pers. Mgmt. v. Am. Fed'n of Gov't Emps., AFL-CIO*,
    473 U.S. 1301 (1985)......................................................................17

*Reno v. Am.-Arab Anti-Discrimination Comm.*,
    525 U.S. 471 (1999).............................................................25, 26, 39

*Russello v. United States*,
    464 U.S. 16 (1983).....................................................................33, 34

*Sampson v. Murray*,
    415 U.S. 61 (1974).....................................................................10, 12

JA426

*Shaughnessy v. United States ex rel. Mezei*,
    345 U.S. 206 (1953)...................................................................................... 6, 46

*Sierra Club v. Jackson*,
    833 F. Supp. 2d 11 (D.D.C. 2012)............................................................... 13

*Sorenson v. Sec'y of Treasury*,
    475 U.S. 851 (1986)....................................................................................... 15

*Tazu v. Att'y Gen. U.S.*,
    975 F.3d 292 (3d Cir. 2020)...................................................................25, 26

*Tesfamichael v. Gonzales*,
    411 F.3d 169 (5th Cir. 2005)......................................................................... 13

*Texas v. Biden*,
    646 F. Supp. 3d 753 (N.D. Tex. 2022)......................................................... 13

*Texas v. E.P.A.*,
    726 F.3d 180 (D.C. Cir. 2013)...................................................................... 19

*Thompson v. N. Am. Stainless*,
    562 U.S. 170 (2011)....................................................................................... 27

*Turkiye Halk Bankasi A.S. v. United States*,
    598 U.S. 264 (2023)....................................................................................... 43

*Turner v. U.S. Att'y Gen.*,
    130 F.4th 1254 (11th Cir. 2025) ................................................................... 35

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008).......................................................................................... 10

*Wyoming v. U.S. Dep't of Interior*,
    2018 WL 2727031 (10th Cir. June 4, 2018)................................................. 12

**Statutes**

5 U.S.C. § 701(a)(1).......................................................................................... 25

5 U.S.C. § 702.................................................................................................... 27

5 U.S.C. § 702(1)............................................................................................... 55

JA427

5 U.S.C. § 702(a)(2) ................................................................................................ 44

5 U.S.C. § 704 ........................................................................................................ 39

5 U.S.C. § 705 ................................................................................................. *passim*

5 U.S.C. § 706(2)(A) .............................................................................................. 54

8 U.S.C. § 1101(a)(13)(B) ....................................................................................... 6

8 U.S.C. § 1182(a)(6)(C) ..................................................................................... 4, 5

8 U.S.C § 1182(a)(7) ................................................................................................ 4

8 U.S.C. § 1182(d)(5) ...................................................................................... *passim*

8 U.S.C. § 1182(d)(5)(A) ................................................................................. *passim*

8 U.S.C. § 1225 ................................................................................................. 36, 38

8 U.S.C. § 1225(b)(1)(A) ................................................................................. 11, 28

8 U.S.C. § 1225(b)(1)(B) ........................................................................................ 45

8 U.S.C. § 1226(e) .................................................................................................. 48

8 U.S.C. § 1229a ............................................................................................ 2, 3, 47

8 U.S.C. § 1229b(b)(1) ........................................................................................... 48

8 U.S.C. § 1252(a)(2)(A) .................................................................................. 20, 24

8 U.S.C. § 1252(e) ............................................................................................ 27, 28

8 U.S.C. § 1252(e)(1)(A) .................................................................................. 12, 17

8 U.S.C. § 1252(e)(1)(B) ........................................................................................ 18

8 U.S.C. § 1252(e)(3) ..................................................................................... 1, 20, 41

8 U.S.C. § 1252(e)(3)(A) ........................................................................................ 21

8 U.S.C. § 1252(e)(3)(B) ............................................................................. 22, 23, 45

JA428

8 U.S.C. § 1252(f)(1)......................................................................................... *passim*

8 U.S.C. § 1252(g)............................................................................................. *passim*

8 U.S.C. § 1255(a)(2)............................................................................................... 49

28 U.S.C. § 2401...................................................................................................... 24

**Rules**

Fed. R. Civ. Pro. 23................................................................................................. 54

**Regulations**

8 C.F.R. § 1.1(q) (1998)..................................................................................... 4, 22

8 C.F.R. § 1.2.................................................................................................... *passim*

8 C.F.R. § 208.30(e)(8)........................................................................................... 46

8 C.F.R. § 212.5(e)(2)..................................................................................... 6, 7, 35

8 C.F.R. § 212.5(e)(2)(i)................................................................................... *passim*

8 C.F.R. § 235.3....................................................................................................... 18

8 C.F.R. § 235.3(b)............................................................................................. 30, 46

8 C.F.R. § 235.3(b)(1)............................................................................................... 3

8 C.F.R. § 235.3(b)(1)(i)................................................................................... *passim*

8 C.F.R. § 235.3(b)(1)(ii)........................................................................................ 37

8 C.F.R. § 235.3(b)(4)............................................................................................. 46

8 C.F.R. § 235.3(b)(6)............................................................................................. 37

8 C.F.R. § 1003.42(c).............................................................................................. 46

8 C.F.R. § 1003.42(d).............................................................................................. 46

JA429

**Other Authorities**

*Proclamation No. 14, 159,*
    90 Fed. Reg. 8443 (Jan. 20, 2025) ....................................................................4

*Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures,*
    62 Fed. Reg. 10 (Mar. 6, 1997) .....................................................................4

*Designating Aliens for Expedited Removal,*
    90 Fed. Reg. 8139 (Jan. 24, 2025) ...................................................... *passim*

*Eligibility of Arriving Aliens in Removal Proceedings to Apply for Adjustment of Status and Jurisdiction to Adjudicate Applications for Adjustment of Status,*
    71 Fed. Reg. 27 (May 12, 2006) .....................................................................4

JA430

# INTRODUCTION

This Court should deny Plaintiffs' motion under 5 U.S.C. § 705 to stay the effective date of various agency documents that have already gone into effect.  Plaintiffs argue that the Department of Homeland Security ("DHS") lacks statutory authority to apply expedited removal to aliens paroled at ports of entry, but they concede that a 1997 regulation, 8 C.F.R. § 1.2, in combination with 8 C.F.R. § 235.3(b)(1)(i), explicitly provides DHS such authority.  Plaintiffs' stay motion, however, does not ask the Court to enjoin the application of these regulations, and therefore their motion fails for lack of redressability because, separate and apart from the challenged documents, the regulations provide a legal basis for DHS to apply expedited removal to paroled aliens.

Plaintiffs further concede that they are *not* challenging a March 2025 Federal Register Notice from Secretary of Homeland Security Kristi Noem ending certain parole programs.  ECF No. 21 ("Amended Compl."), ¶¶ 20, 51; *see Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans*, 90 Fed. Reg. 13,611 (Mar. 25, 2025) ("March 2025 FRN").  Yet they ask this Court to stay that Rule, which is already in effect, without explaining how the Court has authority to do so in light of their concession and in light of a recent Supreme Court order staying a district court's injunction enjoining that very Rule.  *Noem v. Doe*, 145 S. Ct. 1524 (2025).

The stay motion fails on other threshold grounds.  First, Plaintiffs' challenges to expedited removal are time-barred under 8 U.S.C. § 1252(e)(3) and precluded from this Court's review under 8 U.S.C. § 1252(g).  Second, Plaintiffs' request for a stay is barred by 8 U.S.C. § 1252(f)(1) because that request is in substance no different than a request for a preliminary injunction seeking

JA431

to prevent DHS from applying expedited removal to paroled aliens. Third, while 5 U.S.C. § 705 authorizes courts in some circumstances to delay the effective date of an agency action, section 705 cannot be used where, as here, the agency action has already taken effect.

As to the merits, Plaintiffs cannot show a likelihood of success. The statutory text, context, structure, and history support the view that Congress intended for 8 U.S.C. § 1225(b)(1)(A)(i) to apply to aliens paroled at ports of entry as those "arriving in" the U.S. *See* 8 U.S.C. § 1182(d)(5)(A) ("And when the purposes of parole have been served the alien shall forthwith be returned to custody and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States."). In addition, and apart from the "arriving in" provision, paroled aliens (whose parole is later terminated or revoked) can be subject to expedited removal if they have been continuously present in the United States for less than two years as designated by the Secretary of Homeland Security, as they now are. 8 U.S.C. § 1225(b)(1)(A)(iii); 90 Fed. Reg. 8139 (Jan. 24, 2025). And, contrary to Plaintiff's protestations, there is nothing inconsistent about DHS citing these different overlapping statutory authorities for expedited removal in different documents.

Finally, the stay motion should be denied because the balance of harms weighs strongly in the Defendants' favor. Plaintiffs' assertion that expedited removal will lead to their members suffering persecution or torture is simply not convincing, given aliens are entitled to "credible fear" procedures that allow them to assert a fear of return to their home country and receive three levels of administrative review. Indeed, several aliens that Plaintiffs discuss in their declarations were found to have a credible fear through this process and referred to removal proceedings under 8 U.S.C. § 1229a. Plaintiffs also allege a litany of other harms that will result from expedited

2

JA432

removal, but these allegations do not establish irreparable harm because they are the normal consequences of removal that apply to all removed aliens, whether DHS initiates expedited removal, removal following a proceeding under section 1229a, or some other removal procedure.

In contrast, if Plaintiffs' request were granted in the way they seek, DHS would be enjoined from applying expedited removal to potentially hundreds of thousands of aliens whose parole it has terminated or will terminate, thereby frustrating its ability to expeditiously remove such aliens and imposing substantial administrative burdens by requiring DHS to initiate and litigate full-blown section 1229a removal hearings if it chose to pursue removal. Thus, the balance of hardships weighs heavily in the Defendants' favor.

Lastly, if the Court grants the stay motion, the relief should be narrowly tailored. Plaintiffs' lawsuit is brought on behalf of their members, and therefore a stay should not go beyond those members who they can identify as being affected by the challenged agency actions, rather than to all aliens paroled at a port of entry (as Plaintiffs' motion appears to request).

## LEGAL AND PROCEDURAL BACKGROUND

### I.   Statutory Scheme for Expedited Removal and Parole

**A.   *Expedited Removal.*** Two groups of aliens are subject to expedited removal: (1) aliens arriving in the United States, 8 U.S.C. § 1225(b)(1)(A)(i) ("an alien … who is arriving in the United States"), and (2) aliens designated by the Secretary of Homeland Security within certain outer statutory limits, *id.* ("an alien … described in clause (iii)"). *See* 8 U.S.C. § 1225(b)(1)(A)(i), (iii); 8 C.F.R. § 235.3(b)(1). As to the first group, an alien who arrives at a port of entry and is subsequently paroled into the United States is subject to expedited removal because he retains his status as an alien "arriving in" the United States. 8 C.F.R. § 1.2. As to the second group, the statute limits designation as follows: "An alien … who has not been admitted or paroled into the United

3

JA433

States, and who has not affirmatively shown, to the satisfaction of an immigration officer, that the alien has been physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility under this subparagraph." 8 U.S.C. § 1225(b)(1)(A)(iii)(II).  Aliens in either the first group (arriving alien) or second group (designated alien) can be removed through the expedited removal procedure if they are removable on either of two grounds of inadmissibility, namely, on the basis of fraud or willful misrepresentation, 8 U.S.C. § 1182(a)(6)(C), or a lack of valid documents, 8 U.S.C § 1182(a)(7). 8 U.S.C. § 1225(b)(1)(A)(i).

In 1997, DOJ promulgated implementing regulations to apply expedited removal initially only to aliens arriving at a port of entry.  *Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures*, 62 Fed. Reg. 10,312, 10,312-13 (Mar. 6, 1997) (noting the agency's view "that the statute seemed to differentiate more clearly between aliens at ports-of-entry and those encountered elsewhere in the United States").  The Department adopted a regulation defining arriving alien to include "an alien who seeks admission to or transit through the United States, as provided in 8 CFR part 235, at a port-of-entry."  8 C.F.R. § 1.1(q) (1998) (currently at 8 C.F.R. §§ 1.2, 1001.1(q)).  Critically, it also provided:  "An arriving alien remains such *even if paroled* pursuant to section 212(d)(5) of the Act [8 U.S.C. § 1182(d)(5)]."  *Id.* (emphasis added).  That rule went into effect on April 1, 1997.  62 Fed. Reg. at 10,312.

Although the regulation has been revised since its adoption, the amendments only confirm that "arriving alien" includes aliens paroled at a port of entry, like the members described by Plaintiffs.  In 2006, the regulatory definitions were amended to specifically provide, as they do

4

now, that an arriving alien includes aliens who are paroled "even after any such parole is terminated or revoked." 8 C.F.R. §§ 1.2, 1001.1(q); *see Eligibility of Arriving Aliens in Removal Proceedings to Apply for Adjustment of Status and Jurisdiction to Adjudicate Applications for Adjustment of Status*, 71 Fed. Reg. 27,585, 27,591 (May 12, 2006).

With respect to the designation provision at 8 U.S.C. § 1225(b)(1)(A)(iii), the Secretary of Homeland Security (and Commissioner of the legacy INS in 2002) have on five occasions exercised this designation authority. The most recent designation of aliens under 8 U.S.C. § 1225(b)(1)(A)(iii) occurred on January 24, 2025, following President Trump's Executive Order 14159, *Protecting the American People from Invasion*, 90 Fed. Reg. 8443 (Jan. 20, 2025). The Acting Secretary of Homeland Security published a Federal Register notice restoring the scope of expedited removal to "the fullest extent authorized by Congress." *Designating Aliens for Expedited Removal*, 90 Fed. Reg. 8139 (Jan. 24, 2025). The notice enabled DHS "to place in expedited removal, with limited exceptions, aliens determined to be inadmissible under [8 U.S.C. § 1182(a)(6)(C) or (a)(7)] who have not been admitted or paroled into the United States and who have not affirmatively shown, to the satisfaction of an immigration officer, that they have been physically present in the United States continuously for the two-year period immediately preceding the date of the determination of inadmissibility," who were not covered by previous designations. *Id.* at 8,139-40. The notice explained that this action aimed to "enhance national security and public safety—while reducing government costs—by facilitating prompt immigration determinations" and would "enable DHS to address more effectively and efficiently the large volume of aliens who are present in the United States unlawfully … and ensure the prompt removal from the United States of those not entitled to enter, remain, or be provided relief or protection

JA435

from removal." *Id.* at 8,139.  Plaintiffs do not challenge that expansion in this case.  ECF No. 21 ("Amended Compl."), ¶¶ 20, 59.

    **B.  *Parole.***  Congress has long provided authority to immigration officials to use parole to temporarily allow aliens to proceed into the interior of the United States, emphasizing that parole is not an "admission" within the meaning of the INA.  8 U.S.C. §§ 1101(a)(13)(B), 1182(d)(5)(A). "[A]liens who arrive at ports of entry—even those paroled elsewhere in the country for years pending removal—are 'treated' for due process purposes 'as if stopped at the border.'"  *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 139 (2020) (quoting *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 215 (1953)); *see also Leng May Ma v. Barber*, 357 U.S. 185, 188-90 (1958).

    As amended in 1996, the relevant statute provides that the Secretary of Homeland Security "may ... in [her] discretion parole" an "alien applying for admission," and specifies that such a parole is done "temporarily under such conditions as [the Secretary] may prescribe [and] only on a case-by-case basis for urgent humanitarian reasons or significant public benefit."  8 U.S.C. § 1182(d)(5)(A).  The statute further states that parole may be terminated "when the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served."[1]  *Id.* Thus, the grant of parole and its termination is committed to the broad discretion of the Secretary. After parole is terminated, "the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall *continue to be dealt with in the same manner as that of any other applicant for admission* to the United States."  *Id*. (emphasis added).  In other

---

[1]  In addition, among other possibilities, parole terminates with service of a document charging the alien with being removable.  8 C.F.R. § 212.5(e)(2).

JA436

words, when parole ends, the alien "shall be restored to the status that he or she had at the time of parole." *Id.*

## II. DHS Documents Plaintiffs Request to Stay

Plaintiffs' motion seeks to stay three DHS documents. Memorandum of Law in support of Motion for a Stay of Agency Action, ECF No. 22-1 ("Memo") at 10. The first document is a memorandum issued on January 23, 2025 by then-Acting Secretary of Homeland Security Benjamine C. Huffman to senior DHS officials setting forth guidance on how to exercise enforcement discretion in light of a recent "clarifi[cation]" of DHS's policy regarding the scope of the parole statute and its expansion of expedited removal consistent with its statutory authority. *Id.* Memorandum from Benjamine C. Huffman, Acting Secretary (Jan. 23, 2025) ("Huffman Memorandum"), *available at* https://www.dhs.gov/sites/default/files/2025-01/25_0123_er-and-parole-guidance.pdf (last accessed May 27, 2025). The Huffman Memorandum instructs immigration enforcement to take "all steps necessary to review [an] alien's case and consider, in exercising [] enforcement discretion, whether to apply expedited removal," which "may include" terminating other removal proceedings or parole. *Id.* For aliens who are not subject to expedited removal and have "been granted parole under a policy that may be paused, modified, or terminated immediately under the January 20 memorandum," the Huffman Memorandum instructs DHS officials to "consider, in exercising [their] enforcement discretion, whether any such alien should be placed in removal proceedings" or whether "parole remains appropriate in light of any changed legal or factual circumstances." *Id.* Finally, the Huffman Memorandum directs that "[t]he actions contemplated by this memorandum shall be taken in a manner consistent with applicable, statutes, regulations, and court orders." *Id.*

7

JA437

The second document Plaintiffs seek to stay is, according to Plaintiffs, a "directive" sent by ICE leadership to Enforcement and Removal Operations personnel "directing such officers to consider for expedited removal 'paroled arriving aliens' who have not applied affirmatively for asylum with USCIS." Amended Compl., ¶ 63; Memo at 18-19, 25.

The third document Plaintiffs seek to stay is a March 2025 Federal Register Notice from Secretary of Homeland Security Kristi Noem ending certain parole programs. Memo at 10. *Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans*, 90 Fed. Reg. 13,611 (Mar. 25, 2025) ("March 2025 FRN"). Plaintiffs' reliance on this document requires some background.

During the Biden Administration, DHS established several parole programs, including those for individuals from Cuba, Haiti, Nicaragua, and Venezuela and their immediate family members ("CHNV" programs). Memo at 5-6 & n.5. In a notice published on March 25, 2025, DHS terminated the CHNV parole programs. 90 Fed. Reg. 13,611. Upon re-examination and based on DHS's experience, Secretary Noem determined that the CHNV programs "do not serve a significant public benefit, are not necessary to reduce levels of illegal immigration, did not sufficiently mitigate the domestic effects of illegal immigration, are not serving their intended purposes, and are inconsistent with the Administration's foreign policy goals." *Id.* at 13,612. To the extent that "urgent humanitarian reasons" supported any grants of parole under CHNV, "DHS believes that [such] reasons for granting parole [are] best addressed on a case-by-case basis consistent with the statute, and taking into consideration each alien's specific circumstances." *Id.* Thus, the Secretary determined that grants of parole under the CHNV programs that had not

8

JA438

already expired by April 24, 2025, were to terminate on that date unless the Secretary decides to the contrary in individual cases. *Id*. at 13,611.

In addressing the effect of such termination on existing parolees, the Secretary determined any reliance interests were outweighed by the fact that allowing parole to expire on its own terms would enable some aliens to accrue more than two years of presence in the United States, which, the Notice noted, would mean that DHS could not remove them by expedited removal pursuant to § 1225(b)(1)(A)(iii) but would instead have to initiate the more lengthy process of a full removal hearing under 8 U.S.C. § 1229a. *Id*. at 13,619 ("If DHS were to allow the CHNV parolee population to remain for the full duration of their two-year parole, DHS would be compelled to place a greater proportion of this population in section 240 removal proceedings to effectuate their removal, further straining the already over-burdened immigration court system") (citations and footnote omitted)); *see also id.* at 13,620 (same effect). The Notice did not discuss the use of expedited removal for the parolees as arriving aliens under 8 U.S.C. § 1225(b)(1)(A)(i) and 8 C.F.R. § 235.3(b)(1)(i).

## LEGAL STANDARD

Plaintiffs move for a stay under 5 U.S.C. § 705, which provides, in relevant part, that "[o]n such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court ... may ... postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." "[A] stay under § 705 should be imposed for one—and only one—reason: to maintain the status quo in order to allow judicial review of the underlying regulation to proceed in a 'just' manner." *Bauer v. DeVo*s, 325 F. Supp. 3d 74, 106-07 (D.D.C. 2018). Moreover, as the D.C. Circuit has explained, Section 705

JA439

is intended to "postpone the effective date of a not yet effective rule, pending judicial review." *Safety-Kleen Corp. v. EPA*, Nos. 92-1629, 92-1639, 1996 U.S. App. LEXIS 2324, at *2-3 (D.C. Cir. Jan. 19, 1996).

The standards of review for relief under 5 U.S.C. § 705 and for preliminary injunctions are the same. *See Sampson v. Murray*, 415 U.S. 61, 80 (1974). A "preliminary injunction is an extraordinary and drastic remedy." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008). A court should enter a preliminary injunction only "upon a clear showing that the [movant] is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). To obtain a preliminary injunction, the moving party must demonstrate (1) that it is likely to succeed on the merits of its claims; (2) that it is likely to suffer an irreparable injury in the absence of injunctive relief; (3) that the balance of equities tips in its favor; and (4) that the proposed injunction is in the public interest. *Id.* at 20.

Moreover, Article III demands that a remedy "be limited to the inadequacy that produced the injury in fact that the plaintiff has established." *Gill v. Whitford*, 138 S. Ct. 1916, 1931 (2018) (citation omitted); *see Log Cabin Republicans v. United States*, 658 F.3d 1162, 1168 (9th Cir. 2011) (per curiam), and bedrock principles of equity similarly require that injunctions be no broader than "necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994).

JA440

## ARGUMENT

**I.    5 U.S.C. § 705 Does Not Provide a Basis for the Relief Plaintiff Seeks.**

**A.    Section 1252(f)(1) Prohibits a Stay of Agency Action that Precludes DHS from Applying Expedited Removal to Paroled Aliens.**

While Plaintiffs have styled their request for relief as a stay rather than an injunction, the relief requested is the same in substance. Therefore, their request is precluded by 8 U.S.C. § 1252(f)(1), which provides:

> Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of Part IV of this subchapter ... other than with respect to the application of such provisions to an individual alien against whom proceedings ... have been initiated.

*See also Biden v. Texas*, 597 U.S. 785, 797 (2022) (section 1252(f)(1) "generally prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions"). "Part IV of this subchapter" refers to 8 U.S.C. §§ 1221-1232, the sections of the United States Code which govern the inspection, apprehension, examination, exclusion, and removal of aliens. *Garland v. Aleman Gonzalez*, 596 U.S. 543, 549, 558 (2022). Expedited removal under 8 U.S.C. § 1225(b)(1)(A) falls within §§ 1221-1232 and, therefore, is covered by 8 U.S.C. § 1252(f)(1). And whether Plaintiffs are ultimately correct that section 1225(b)(1)(A) cannot be applied to former parolees does not matter. "[T]he reach of § 1252(f)(1)" is not "dependent upon the merits" of Plaintiffs' claim that the government is "misapplying a covered statutory provision." *Aleman Gonzalez*, 596 U.S. at 553-54. Consequently, the Court lacks authority to grant Plaintiffs' request to categorically stay application of expedited removal to former parolees. *Texas*, 597 U.S. at 794, 797 (holding that the

11

JA441

district court's order enjoining the government to continue applying its "remain in Mexico" program under 8 U.S.C. § 1225(b)(2)(C) violated § 1252(f)(1)).

Section 705 does not provide an end-run around 8 U.S.C. § 1252(f)(1). "The relevant legislative history of [section 705] … indicates that it was primarily intended to reflect existing law under the Scripps-Howard doctrine ... and not to fashion new rules of intervention for District Courts." *Sampson*, 415 U.S. at 68 n.15. The Scripps-Howard doctrine was that courts of appeal have traditional equitable authority to grant a stay pending review of final agency action, even where a statute does not explicitly authorize a stay. *Id.* at 73. Section 705 codified this existing equitable authority. *Id.* at 68 n.15. Equitable relief, however, is not available for "any action pertaining to an order to exclude an alien in accordance with section 1225(b)(1)." 8 U.S.C. § 1252(e)(1)(A) ("Without regard to the nature of the action or claim and without regard to the identity of the part or parties bringing the action, no court may ... enter declaratory, injunctive, or other equitable relief in any action pertaining to an order to exclude an alien in accordance with section 1225(b)(1)...."). Meanwhile, Plaintiffs' stay request is, in any event, no different than a request for an injunction. *See Brown v. Gilmore*, 533 U.S. 1301, 1303 (2001) (Rehnquist, C.J., in chambers) ("[A]pplicants are seeking not merely a stay of a lower court judgment, but an injunction against the enforcement of a presumptively valid state statute"); *Abbott v. Perez*, 585 U.S. 579, 595 (2018) ("[W]e have not allowed district courts to shield their orders from appellate review by avoiding the label injunction.") (cleaned up); *California v. Grace Brethren Church*, 457 U.S. 393, 408 (1982) (statute barring court orders that "suspend or restrain" tax collection stripped jurisdiction to enter injunctions or declaratory relief); *Wyoming v. U.S. Dep't of Interior*, 2018 WL 2727031, at *1 (10th Cir. June 4, 2018) (explaining that "[t]he district court's 'stay' effectively

enjoins enforcement of the Rule" and is thus immediately appealable as an injunctive order). A court order granting Plaintiffs' stay request under § 705 would—as Plaintiffs envision it—restrain how DHS implements expedited removal. Memo at 1; *see also* Amended Compl. at 54, ¶ 5, Prayer for Relief. Section 1252(f)(1) eliminates any court's (other than the Supreme Court's) authority to issue orders enjoining or restraining implementation of the expedited removal statute, where "restrain" means to "check, hold back, or prevent (a person or thing) from some course of action," to "inhibit particular actions," or to "stop (or perhaps compel)" action. *Aleman Gonzalez*, 596 U.S. 549. Consequently, a stay under section 705 is analogous to a preliminary injunction. *See Sierra Club v. Jackson*, 833 F. Supp. 2d 11, 28 (D.D.C. 2012) (discussing how a § 705 "[s]tay is not designed to do anything other than preserve the status quo."). *But see Immigrant Defs. L. Ctr. v. Noem*, ___ F.3d ____, 2025 WL 1172442, at *14-15 (C.D. Cal. Apr. 16, 2025) (declining to extend 8 U.S.C. § 1252(f)(1) to Section 705), *appeal pending*, No. 25-2581 (9th Cir. filed Apr. 22, 2025); *Nat'l TPS All. v. Noem*, ___ F. Supp. 3d ___, 2025 WL 957677, at *11-14 (N.D. Cal. Mar. 31, 2025) (same), *appeal pending*, No. 25-2120 (9th Cir. filed Apr. 2, 2025); *Texas v. Biden*, 646 F. Supp. 3d 753, 768-69 (N.D. Tex. 2022) (same).

   *Nken v. Holder*, 556 U.S. 418, 428 (2009), is not to the contrary. The *Nken* Court addressed a different INA provision, 8 U.S.C. § 1252(f)(2)—which only prohibited "enjoin[ing] the removal of any alien"—and held it did not preclude *individual stays* of the order of removal pending review. *Id.* at 428. The stay of the removal order, the Court reasoned, "operate[d] upon the [administrative or] judicial proceeding itself." *Id.* at 428; *see Tesfamichael v. Gonzales*, 411 F.3d 169, 174 (5th Cir. 2005) (a "stay" is distinct from an "injunction" when it operates on an *adjudication* originating in a lower court or an administrative agency); *see also Black's Law Dictionary* 1413 (6th ed. 1990)

13

JA443

(defining a "stay" as: "[a] stopping; the act of arresting *a judicial proceeding* by the order of a court") (emphasis added).

Moreover, § 1252(f)(1) is far broader than § 1252(f)(2), given that it strips courts of jurisdiction to "enjoin *or restrain* the operation" of the covered provisions, rather than just prohibiting enjoining removal orders. 8 U.S.C. § 1252(f)(1). And Plaintiffs do not seek to enjoin an individual removal proceeding or some other *agency adjudication* pending judicial review of that adjudication. They ask this Court to prevent the government from implementing the expedited removal statute. Such an order, even if labeled a stay, is injunctive in effect and thus § 1252(f)(1) bars it. *See Brown*, 533 U.S. at 1303 (Rehnquist, C.J., in chambers) ("[A]pplicants are seeking not merely a stay of a lower court judgment, but an injunction against the enforcement of a presumptively valid state statute"); *see Nken*, 556 U.S. at 429 ("[a] stay 'simply suspends *judicial alteration of the status quo*, while injunctive relief *grants judicial intervention*" in the first instance) (emphasis added). Indeed, a contrary reading is at odds with Congress's clear intent that the government's chosen means of implementing the covered "procedures will remain in force while [any] lawsuits are pending" and that "single district courts or courts of appeal do not have authority to enjoin procedures established by Congress to reform the process of removing illegal aliens from the U.S." H.R. Rep. No. 104-469, pt 1, at 161 (Conference Report). A postponement under Section 705 would improperly prevent implementation of expedited removal "while [] lawsuits are pending," before final judgment affirmed by the Supreme Court. *Id*. Accordingly, § 1252(f) bars Plaintiff's request for a stay.

**B.    The Court Cannot Stay Agency Action that Has Already Gone into Effect.**

Aide from Section 1252(f)'s clear bar on relief, section 705 by its own terms does not authorize a postponement of the documents. Courts construing section 705 have concluded that

14

the phrase "postpone the effective date" of an agency action authorizes the "postpone[ment of] the effective date of a *not yet effective rule*, pending judicial review," but not suspension of a rule that is already in effect.  *See, e.g.*, *Safety-Kleen Corp. v. EPA*, Nos. 92-1629, 92-1639, 1996 U.S. App. LEXIS 2324, at *2-3 (D.C. Cir. Jan. 19, 1996) (emphasis added); *Ctr. for Biological Diversity v. Regan*, No. CV 21-119 (RDM), 2022 WL 971067, at *21 (D.D.C. Mar. 30, 2022) (same, collecting cases); *California v. U.S. Bureau of Land Mgmt.*, 277 F. Supp. 3d 1106, 1118 (N.D. Cal. 2017) (same). While these cases address an agency decision to "postpone the effective date," Section 705 uses identical language when referring to "the reviewing court ... postpon[ing] the effective date of an agency action."  The use of an identical phrase in the first and second sentences of Section 705 must be presumed to be intentional.  *See, e.g.*, *Sorenson v. Sec'y of Treasury*, 475 U.S. 851, 860 (1986) ("The normal rule of statutory construction assumes that identical words used in different parts of the same act are intended to have the same meaning.").  Given its plain meaning, the language in Section 705 allowing a court or agency to "postpone the effective date" can only be read to mean that the statute allows the court "to put off until a future time," "defer," or "delay" the "operative" date of the agency action.  *See* MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/postpone (last visited June 19, 2025); MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/effective (last visited June 19, 2025); *see also* BLACK'S LAW DICTIONARY ONLINE (2d. Ed.) (defining "postpone" as "to put off; defer; delay; continue").  One cannot "defer" or "put off" an action that has already occurred; thus, it would be unreasonable to interpret the statute as permitting the issuance of a stay after the operative date of the challenged rule has already passed.

15

JA445

Here, the agency actions Plaintiffs seek to stay are already in effect.  The Huffman Memorandum is dated January 23 without a future effective date; it is written in the present tense to provide guidance to agency officials.  Huffman Memorandum at 1 ("This memorandum provides guidance regarding how to exercise enforcement discretion in implementing these policies.").  The February 18 email "directive," as described by Plaintiffs, likewise does not provide for delayed implementation.  Amended Compl., ¶¶ 63-64.  The March 25, 2025 FRN stated it was immediately terminating the CHNV parole programs and providing 30 days' notice before existing parole grants were terminated.[2]  The fact that Section 705 is disjunctive, permitting reviewing courts to "postpone the effective date of an agency action *or* to preserve status or rights pending conclusion of the review proceedings" (emphasis added), cannot change this result.  That second clause is subject to the same temporal limitation as the first clause for the simple reason that the status quo, once a rule goes into effect, is that the rule is in effect.  An order staying a rule or policy after it goes into effect thus does not preserve, but alters, the status quo.  *See, e.g., Ne. Ohio Coal. for Homeless & Serv. Emps. Int'l Union, Loc. 1199 v. Blackwell*, 467 F.3d 999, 1006 (6th Cir. 2006) (explaining an order "preventing the implementation of new regulations" would "disturb[]" rather than preserve "the status quo"); *Off. of Pers. Mgmt. v. Am. Fed'n of Gov't Emps., AFL-CIO*, 473 U.S. 1301, 1305 (1985) (explaining that had the district court issued an order

---

[2]  Although the District Court for the District of Massachusetts, on April 14, 2025, issued preliminary relief enjoining the March 25, 2025 FRN's termination of parole grants for those previously granted parole under the CHNV programs, *Doe v. Noem*, No. 1:25-CV-10495-IT, 2025 WL 1099602, at *20 (D. Mass. Apr. 14, 2025), *appeal pending* No. 25-1384 (1st Cir.), the FRN had already gone into effect on March 25.  In any event, on May 30, 2025, the Supreme Court granted the Government's application for a stay of the district court's order pending the disposition of the Government's appeal in the First Circuit.  *Noem v. Doe*, 145 S. Ct. 1524 (2025).  Following that decision, Plaintiffs did not seek a stay of the FRN with this Court until June 11, 2025.

stopping rule from taking effect that would alter the "status quo"). The status quo presently is that all three DHS documents are operative.

### C. The INA's Judicial Review Provision for Expedited Removal Also Does Not Support the Request for a Stay.

The INA's juridical review provisions for changes to the expedited removal system also precludes the relief being sought. Section 1252(e)(1) provides that "no court may—(A) enter declaratory, injunctive, or other equitable relief in any action pertaining to an order to exclude an alien in accordance with section 1225(b)(1) of this title except as specifically authorized in a subsequent paragraph of this subsection." As to section 1252(e)(3), the sole remedy authorized is a "determination[]" on the merits of "whether [section 1225(b)], or any regulation issued to implement such section, is constitutional" or "whether such a regulation, or a written policy directive, written policy guideline, or written procedure issued by or under the authority of the Attorney General [or Secretary] to implement such section, is not consistent with applicable provisions of this subchapter or is otherwise in violation of law." Section 1252(e)(3) does not provide for any interim relief premised on such a determination. Congress authorized litigation "by, and only by, aliens against whom the new procedures had been applied." *Am. Immigr. Lawyers Ass'n v. Reno* ("*AILA II*"), 199 F.3d 1352, 1360 (D.C. Cir. 2000). And Section 1252(e) specifically bars any "declaratory, injunctive, or other equitable relief" preventing the application of such procedures to other aliens during the course of litigation. 8 U.S.C. § 1252(e)(1)(A). Congress also barred class actions in 8 U.S.C. § 1252(e)(1)(B), providing further evidence that Congress intended to limit broad relief like Plaintiffs seek in the stay motion.

17

JA447

II.    **The Court Should Deny the Stay Motion Because It Lacks Jurisdiction Over Plaintiffs' Claims.**

    A.    **Plaintiffs Cannot Establish Standing Because Their Alleged Harms are not Redressable.**

Plaintiff organizations seek to stay three DHS documents described above which guide DHS officials' exercise of enforcement discretion.  In doing so, Plaintiffs assert claims on behalf of various members of theirs who were granted parole, despite not being directly subject to DHS's documents themselves.  Plaintiffs, however, cannot establish standing because they have failed to show how granting the requested relief will prevent their members from being subject to expedited removal.  *See Lujan v. Def. of Wildlife*, 504 U.S. 555, 560--61 (1992) (discussing standing requirements including that the injury is "likely" to be redressed by a favorable decision).

The problem for Plaintiffs is that they concede in their first amended complaint that DHS's regulation at 8 C.F.R. § 1.2, in combination with 8 C.F.R. § 235.3, allows DHS to apply expedited removal to aliens paroled at ports of entry.  *See* Amended Compl., ¶ 78 ("The overbroad definition of 'arriving alien' in 8 C.F.R. § 1.2, when Defendants apply it through 8 C.F.R. § 235.3, means that any paroled individual may be subjected to expedited removal at any time.").  While Plaintiffs allege in their amended complaint that section 1.2 is inconsistent with the expedited removal statute, Amended Compl., ¶ 179, their stay motion does not ask the Court to enjoin the application of 8 C.F.R. §§ 1.2 or 235.3, as applied to paroled aliens.

Instead, they ask the Court to stay three DHS documents, none of which purports to address the issue of DHS's authority to apply expedited removal to paroled aliens, but which assume that authority.  The primary document Plaintiffs rely on, the Huffman Memorandum, directs immigration officers "to review the alien's case and consider, in exercising [] enforcement discretion, whether to apply expedited removal" in order to effectively implement DHS's new

JA448

policies regarding the termination of certain parole programs and the expansion of expedited removal.  But DHS's authority to apply expedited removal to paroled aliens pursuant to 8 C.F.R. §§ 1.2, 235.3—which were promulgated almost three decades ago—is in no way contingent on this enforcement guidance document issued five months ago.  The same reasoning applies to ICE's February 18 "directive."  That document likewise assumes DHS has authority to apply expedited removal to paroled aliens.  *See* Amended Compl., ¶ 63 (characterizing this document as "directing [DHS] officers to consider for expedited removal 'paroled arriving aliens'").

Finally, while the FRN did discuss DHS's authority under 8 U.S.C. § 1225(b)(1)(A)(iii) to designate paroled aliens for expedited removal, it did not set out to specify which individuals would be eligible for expedited removal.  90 Fed. Reg. at 13,611 (summary and background). Instead, in issuing this FRN, the Secretary decided to end certain parole programs and explained her reasons for doing so.  *Id*. at 13,612-17.  And given that Plaintiffs do not challenge this Rule, it is unclear on what basis they can seek a stay.  Thus, none of these documents are necessary for DHS to apply expedited removal to aliens paroled at a port of entry, and staying their implementation will not prevent the harms Plaintiffs allege they cause.  *See Texas v. E.P.A.*, 726 F.3d 180, 198 (D.C. Cir. 2013) (dismissing challenge to administrative rules for lack of standing because vacating those rules "would not redress the State petitioners' injury," which was separately caused by a statute); c*f. Kaspersky Lab, Inc. v. DHS,* 311 F. Supp. 3d 187, 219 (D.D.C. 2018) (finding plaintiffs failed to establish redressability where requested relief addressed "only one of two government actions that both independently produce the same alleged harm").

Plaintiff organizations further cannot establish standing because they have failed to plead an injury.  None of the Plaintiffs have attempted to assert organizational standing and have indeed

JA449

failed to identify any legally cognizable injury to themselves. *F.D.A. v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 395 (2024) (holding that the mere expenditure of resources to research and advocate against the practices at issue in a case does not confer standing); *see* Amended Compl., ¶¶ 89–143; Memo at 11.  Instead, Plaintiffs attempt to establish associational standing. Memo at 11-12.  For purposes of this opposition, Defendants do not challenge Plaintiffs' claim that they have sufficiently pled injury to their members because, as discussed, Plaintiffs lack standing on another basis—failing to establish redressability.

### B.    Plaintiffs' Challenges to Expedited Removal Are Time-Barred.

Plaintiffs claim that the Court has jurisdiction under 8 U.S.C. § 1252(e)(3).  Memo at 13. But their claims—all of which challenge expedited removal—are out of time under that statute. Section 1252(a)(2)(A), entitled "Review relating to section 1225(b)(1))," provides:

> Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, no court shall have jurisdiction to review—
>
> \*        \*        \*
>
> (ii) except as provided in subsection (e), a decision by the Attorney General to invoke the provisions of such section [section 1225(b)(1)],
>
> (iii) the application of such section to individual aliens, including the determination made under section 1225(b)(1)(B) of this title, or
>
> (iv) except as provided in subsection (e), procedures and policies adopted by the Attorney General to implement the provisions of section 1225(b)(1) of this title.

8 U.S.C. § 1252(a)(2)(A).  Therefore, the INA precludes challenges to DHS's decision to "invoke" the expedited removal procedure or to apply it to "individual aliens" "except as provided under subsection (e)" of section 1252.  In turn, subsection (e)(3)(A), entitled "Challenges on Validity of the System," provides:

20

JA450

Judicial review of determinations under section 1225(b) of this title and its implementation is available in an action instituted in the United States District Court for the District of Columbia, but shall be limited to determinations of—

(i) whether such section, or any regulation issued to implement such section, is constitutional; or

(ii) whether such a regulation, or a written policy directive, written policy guideline, or written procedure issued by or under the authority of the Attorney General to implement such section, is not consistent with applicable provisions of this subchapter or is otherwise in violation of law.

8 U.S.C. § 1252(e)(3)(A).

Critically, these types of systematic challenges shall be filed "no later than 60 days after the date the challenged section, regulation, directive, guideline, or procedure ... is first implemented." *Id.* § 1252(e)(3)(B). That deadline is jurisdictional and is not excused by a post sixty-day discovery that a particular individual will be subject to expedited removal. *AILA v. Reno (AILA I)*, 18 F. Supp. 2d 38, 47 (D.D.C. 1998) ("The Court reaches this conclusion because Congress designed the statute so that the 60 days ran from a fixed point, the initial implementation of the challenged provisions, rather than from the date of application of IIRIRA to a particular alien."), *aff'd*, *AILA II,* 199 F.3d at 1358.

In their stay motion, Plaintiffs argue that three DHS documents provide incorrect guidance because aliens paroled at a port of entry are not subject to expedited removal. Memo at 14-21. However, as explained below, DHS promulgated a regulation effective on April 1, 1997 defining an "arriving alien" as "an alien who seeks admission ... at a port-of-entry" and clarified that such an alien remains an arriving alien "even if paroled." 62 Fed. Reg. at 10,312 (codified at 8 C.F.R. § 1.2). Plaintiffs cannot challenge the conclusion that they are subject to expedited removal or the adequacy of these procedures because their complaint was not filed within sixty days of April 1, 1997.

21

JA451

In an interim final rule effective April 1, 1997, the Department of Justice defined the term "arriving alien" as including precisely the group that Plaintiffs say are not subject to expedited removal:

> The term arriving alien means *an alien who seeks admission to or transit through the United States, as provided in 8 CFR part 235, at a port-of-entry*, or an alien who is interdicted in international or United States waters and brought into the United States by any means, whether or not to a designated port-of-entry, and regardless of the means of transport. *An arriving alien remains such even if paroled pursuant to section 212(d)(5) of the Act.*

62 Fed. Reg. at 10,312; 8 C.F.R. § 1.1(q) (1998) (emphases added). "Arriving aliens" are subject to expedited removal. 8 C.F.R. § 235.3(b)(1)(i). If Plaintiffs wanted to contest the regulation's inclusion of aliens paroled at a port of entry as within the group of "arriving aliens" subject to expedited removal, they had to do so within sixty days after April 1, 1997. 8 U.S.C. § 1252(e)(3)(B); *see AILA II*, 199 F.3d at 1355. The present complaint was filed decades out of time. That is so even if Plaintiffs' members did not themselves become "arriving aliens" and subject to expedited removal until long after the deadline passed. *AILA I*, 18 F. Supp. 2d at 47. Thus, the Court lacks jurisdiction over Plaintiffs' challenges to expedited removal.

In their brief, Plaintiffs claim their challenge to the DHS documents is timely because the complaint was filed within 60 days of the date the three recent documents were issued. Memo at 12-13. Plaintiffs are incorrect. 8 U.S.C. § 1252(e)(3)(B) (60-day clock runs "after the date the challenged [document] is *first implemented*" (emphasis added)). If plaintiffs could initiate a lawsuit every time federal statutes or rules were cited or discussed in more recent agency guidance, it would nullify the deadline that Congress established. *See AILA II*, 199 F.3d at 1364 ("Congress imposed the 60-day limit on actions in order to cabin judicial review and to have the validity of the new law decided promptly."). Thus, Plaintiffs cannot challenge the long-established principle

22

JA452

that aliens paroled at a port of entry are subject to expedited removal, even if that proposition was repeated in the 60 days before the filing of their complaint. 8 U.S.C. § 1252(e)(3)(B) ("first implemented"); *cf. Kiakombua v. Wolf,* 498 F. Supp. 3d 1, 36 (D.D.C. 2020) (Jackson, J.) (finding that 60-day limit ran from the date the USCIS's "lesson plan" was implemented where certain parts of that plan provided new credible fear adjudication standards that were contrary to the INA and its regulations).

This is highlighted by the fact that the agency documents do not set out a new policy regarding the application of expedited removal to paroled aliens but simply remind DHS officers of the statutory and regulatory law and judicial precedent relating to DHS' enforcement discretion, and encourage them to exercise that discretion, including "consider[ing]" whether to apply expedited removal. *Supra*, at 7-8. Moreover, even if the agency's reiteration of a long-held position could restart the 60-day clock, that does not help Plaintiffs here because none of DHS's documents purports to address the issue of DHS's authority to apply expedited removal to paroled aliens. Rather, they assume that authority. *See supra*, at II.A; *see also Dugdale v. Customs and Border Protection*, 300 F. Supp. 3d 276, 278 n.5 (D.D.C. 2018), *aff'd*, 2019 WL 2157423 (D.C. Cir. 2019).

In their amended complaint, Plaintiffs raise three additional arguments in an attempt to avoid the time bar, each of which fails. *See* Amended Compl., ¶¶ 181-83. First, Plaintiffs' assertion that the jurisdictional bar at 8 U.S.C. § 1252(a)(2)(A) does not apply is meritless. *See* Amended Compl., ¶ 181. The challenge to the regulation is a challenge to the procedures adopted to implement the expedited removal statute and therefore its review is limited to that available under 1252(e), including its 60-day time limit. 8 U.S.C. § 1252(a)(2)(A)(iv) ("no court shall have jurisdiction to review ... except as provided in subsection (e), *procedures and policies adopted by*

JA453

*the Attorney General* to implement the provisions of section 1225(b)(1) of this title" (emphasis added)).    Second, the statute governing judicial review in this case supersedes the six-year limitations period in 28 U.S.C. § 2401.    8 U.S.C. § 1252(a)(2)(A) ("*Notwithstanding any other provision of law* (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title..." (emphasis added)).    And, finally, equitable tolling cannot assist Plaintiffs.    *M.M.V. v. Garland*, 1 F.4th 1100, 1109 (D.C. Cir. 2021). The D.C. Circuit approved the holding that the 60-day limit is jurisdictional.    *AILA I*, 18 F. Supp. at 47; *AILA II*, 199 F.3d at 1355.    And, in any event, Plaintiffs do not allege any facts that would justify equitable tolling if it were available.    *See, e.g., Robinson v. DHS OIG*, 71 F.4th4th 51, 58 (D.C. Cir. 2023).

For all of these reasons, the Court should dismiss Plaintiffs' claims as time-barred.

**C.    The Relief That Plaintiffs Seek Is Also Squarely Foreclosed by 8 U.S.C. § 1252(g).**

Plaintiffs ask the Court to issue a stay of the DHS documents "insofar as they subject individuals who have previously been granted parole at ports of entry to expedited removal." Memo at 38.    Although Plaintiffs style their motion as a stay of agency action, the clear import of what Plaintiffs seek is for the Court to preclude DHS from commencing expedited removal against aliens paroled at a port of entry.    Indeed, their amended complaint requests precisely that relief. Amended Compl., ¶ 5, Prayer for Relief (requesting Court "[e]njoin Defendants from applying expedited removal to noncitizens who have previously been granted parole at a port of entry"). That claim falls directly within section 1252(g)'s preclusion of review for actions seeking to challenge DHS's commencement of expedited removal and, therefore, the Court should deny the

application for a stay.  *See* 5 U.S.C. § 701(a)(1) (judicial review of agency action is not available under the APA where another statute precludes judicial review).

Section 1252(g) provides that "notwithstanding any other provision of law (statutory or nonstatutory) ... no court shall have jurisdiction to hear any cause or claim by *or on behalf of any alien* arising from the decision or action by the Attorney General to [1] commence proceedings, [2] adjudicate cases, or [3] execute removal orders against any alien," except through a petition for review from a final order of removal filed in a court of appeals.  (Emphasis added).  Though this section "does not sweep broadly," *Tazu v. Att'y Gen. U.S.*, 975 F.3d 292, 296 (3d Cir. 2020), its "narrow sweep is firm," *E.F.L. v. Prim*, 986 F.3d 959, 964-65 (7th Cir. 2021).  Courts "cannot entertain challenges to the enumerated executive branch decisions or actions" outside a petition for review.  *E.F.L.*, 986 F.3d at 964.  The Supreme Court has explained that 8 U.S.C. § 1252(g) is "directed against a particular evil: attempts to impose judicial constraints upon prosecutorial discretion."  *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 485 & n.9 (1999) ("*AADC*") ("Section 1252(g) seems clearly designed to give some measure of protection to ... discretionary determinations.").

Plaintiffs, "on behalf" of their members, effectively request that this Court "impose judicial constraints" on DHS's "prosecutorial" decision to "commence" expedited removal proceedings against those members.  But that is one of the actions that § 1252(g) bars.  *AADC* is directly on point:  There the Court held that § 1252(g) precluded the district court's review of the aliens' selective prosecution claims which sought to enjoin the Government from commencing deportation proceedings.  *Id.* at 487 ("the language seems to have been crafted with such a challenge precisely in mind").  This applies as well to Plaintiffs' related claim that DHS should not

25

JA455

terminate section 1229a proceedings in order to commence the expedited removal process. That contention is fatally flawed because DHS has unfettered and unreviewable discretion to choose among its statutorily-provided removal options. *Id.; see also Matter of E-R-M-*, 25 I. & N. Dec. 520, 521–24 (BIA 2011) (DHS has discretion whether to process an inadmissible arriving noncitizen for expedited removal or to place the noncitizen in 1229a proceedings).

Plaintiffs cannot bypass section 1252(g) simply because they raise a statutory interpretation question as to DHS's authority to apply expedited removal to paroled aliens or a constitutional challenge to the expedited removal procedures, just as the *AADC* Plaintiffs could not bypass section 1252(g) by alleging selective enforcement constitutional claims. *Id.* Indeed, such an outcome "would gut § 1252(g)" because "[f]uture petitioners could restyle any challenge to the [covered] actions ... as a challenge to the Executive's general lack of authority to violate due process, equal protection, the [Administrative Procedure Act], or some other federal law." *Tazu*, 975 F.3d at 298; *see also E.F.L.*, 986 F.3d at 964 (noting that the restyling of claims would make § 1252(g) a "paper tiger"). For these reasons, section 1252(g) bars the Court from issuing a stay of the agency actions Plaintiffs challenge.

**D.    Plaintiff Organizations Cannot Show They Are Within the Zone of Interests Protected by the Expedited Removal Statute.**

Even if the Plaintiffs passed the threshold of Article III standing, and even if they showed they were making a timely challenge under § 1252(e)(3) that is not barred by subsections (f) or (g), they cannot succeed in asserting violations of the INA. None of the Plaintiffs are natural persons subject to or potentially subject to expedited removal from the United States. *Cf. AILA II*, 199 F.3d at 1360 (explaining that Congress authorized litigation "by, and only by, aliens against whom the new procedures had been applied"). The Plaintiff organizations describe their reason

JA456

for being, *e.g.*, Amended Compl., ¶¶ 91, 109, 110, 126-27, 128, 143, but do not show that Congress created a cause of action allowing them to enforce the limits established by Congress in the INA or, in particular, the expedited removal statute. *See AILA II*, 199 F.3d at 1358 ("We cannot see anything in these provisions allowing litigants—whether individuals or organizations—to raise claims on behalf of those not party to the lawsuit."); *id.* at 1359 ("When we examine other subsections of 8 U.S.C. § 1252(e) dealing with judicial review, we find signs that Congress meant to allow actions only by aliens who have been subjected to the summary procedures contained in § 1225(b) and its implementing regulations.").

A plaintiff must be "adversely affected or aggrieved by agency action within the meaning of a relevant statute" to sue under the APA. 5 U.S.C. § 702. A plaintiff "may not sue unless he falls within the zone of interests sought to be protected by the statutory provision whose violation forms the legal basis for his complaint." *Thompson v. N. Am. Stainless*, 562 U.S. 170, 177 (2011). This inquiry asks whether Congress intended for a particular plaintiff to invoke a particular statute to challenge agency action. *See Clarke v. Security Indus. Ass'n*, 479 U.S. 388, 399 (1987). Plaintiffs do not adequately articulate how they are in the zone of interests of the expedited removal statute. *See* Amended Compl., ¶¶ 16-18, 23-25, 89-143; Memo at 12.

Unlike the Plaintiffs in *Make the Road*, cited by Plaintiffs to support their assertion of "prudential standing," Memo at 12, the organizational Plaintiffs here have failed to provide evidence directly from their alleged members proving that their members can invoke § 1252(e)(3) to challenge the DHS directives. *Cf. Make the Rd. New York v. Wolf*, 962 F.3d 612, 622 (D.C. Cir. 2020) (holding that three Associations challenging the decision to expand expedited removal under the designation provision had associational standing where they provided three declarations

JA457

directly from the Associations' members stating that they were subject to and adversely affected by the new designation). Only a fraction of the aliens Plaintiffs identify throughout their pleadings are actually identified as members. For instance, Plaintiffs focus their stay motion on the story of E.F.S. Memo at 2-3, 29, 35-36. But E.F.S., whose circumstances are only explained through pseudonymous hearsay in two declarations by other individuals, *see* ECF Nos. 22-11, 22-5, is never identified as a member of the three Plaintiff organizations. In fact, Plaintiffs only identify three alleged members who were granted parole and subsequently placed in expedited removal proceedings, in each case through pseudonymous hearsay: CHIR member E.I.R.M. (identified as a member in Amended Compl. ¶ 100 and ECF No. 22-7); CASA member E.M.P. (identified as a member in Amended Compl. ¶ 135 but not in ECF No. 22-10); and CASA member D.L.C. (identified as a member in Amended Compl. ¶ 136 but not in ECF No. 22-13). This is insufficient to establish that Plaintiffs fall within the zone of interests protected by the expedited removal statute.

Furthermore, nothing in the text, structure, or purpose of the INA generally, or § 1225(b)(1)(A) specifically, shows an intent to allow organizational Plaintiffs to challenge agency action. With respect to expedited removal, neither section 1225 nor section 1252 evinces any concern with organizations or their interest in representing individuals subject to expedited removal. *See* 8 U.S.C. § 1225(b)(1)(A); *see also id.* § 1252(e)(1)(B) (limiting class certification for matters subject to judicial review in subsection (e) of the section). These provisions do not regulate the organizational Plaintiffs' conduct or create any benefits for which the organizations may be eligible. For example, section 1252(e)(3) is a jurisdiction-conferring statute and does not "provid[e] plaintiffs with a cause of action to challenge the government's implementation of the

JA458

expedited removal system." *Make the Road N.Y. v. McAleenan*, 405 F. Supp. 3d 1, 36 (D.D.C. 2019); *see also O.A*, 404 F. Supp. 3d at 140 (finding no "feature of § 1252(e)(3) suggesting that it provides a cause of action, much less an exclusive cause of action for claims brought challenging implementation of the expedited removal statute"). And the D.C. Circuit has concluded that immigration statutes are directed at aliens, not organizations advocating for them. *AILA II*, 199 F.3d at 1364 ("[P]laintiff organizations do not have standing to raise claims, whether statutory or constitutional, on behalf of aliens subjected to IIRIRA's expedited removal system.").

Allowing third parties who cannot be subject to expedited removal to challenge the Executive Branch's decisions through the APA would circumvent Congress's statutory design. As Justice O'Connor explained in granting the government's stay application in an immigration case involving similar organizational plaintiffs, organizations that "provide legal help to immigrants" do not satisfy the zone-of-interests test. *INS v. Legalization Assistance Project of L.A. Cty. Fed'n of Labor*, 510 U.S. 1301, 1302 (1993) (O'Connor, J., in chambers). Federal immigration law was "clearly meant to protect the interests of undocumented aliens, not the interests of organizations." *Id.* at 1305. The fact that an immigration regulation "may affect the way an organization allocates its resources" for representing aliens accordingly does not bring the organization "within the zone of interests" that the asylum and withholding statutes protect. *Id.*

Defendants acknowledge that some courts in this District have sometimes held that the zone-of-interests test should be applied permissively and have found organizations to satisfy it, even in the context of the INA. *See, e.g.*, *O.A. v. Trump*, 404 F. Supp. 3d 109, 144 (D.D.C. 2019). However, this relaxed standard does not (and cannot) survive the Supreme Court's *United States v. Texas* decision. 599 U.S. 670 (2023). There, the Court clarified—relying on principles that

29

JA459

inform the scope of Article III and the APA's cause of action—that third parties have no cognizable

interest in the way the Executive enforces the immigration laws against others.  599 U.S. at 674,

677.   us, for this reason as well, the Court should deny the application for a stay.

III.     **Plaintiffs Fail to Establish a Likelihood of Success on the Merits Because Application of Expedited Removal to Plaintiffs' Members Is Lawful.**

A.     **Aliens Paroled into the U.S. at a Port of Entry are Properly Subject to Expedited Removal Because They Are Aliens "Arriving in the United States."**

An alien who arrives at a port of entry and is subsequently paroled into the United States

is subject to expedited removal because he retains his status as an "arriving alien" under the INA.

The statute provides that aliens arriving in the United States who meet the other requirements (*i.e.*,

inadmissibility on fraud and lack-of-documents grounds) may be subject to expedited removal.  8

U.S.C. § 1225(b)(1)(A)(i); 8 C.F.R. § 235.3(b).  Indeed, an alien reverts to the status he possessed

prior to the grant of parole which, in the case of all those paroled at a port of entry, is that of an

applicant for admission standing at the threshold of entry.  *See* 8 U.S.C. § 1182(d)(5)(A).  As

Congress explained, parole "shall not be regarded as an admission of the alien and when the

purposes of such parole shall ... have been served the alien shall forthwith return ... to the custody

from which he was paroled and thereafter his case shall continue to be dealt with in the same

manner as that of any other applicant for admission to the United States."  *Id*.; *see Jennings v.

Rodriguez*, 583 U.S. 281, 288 (2018) (same) (citing statute).  The long-extant parole regulations

confirm what Congress made clear—that an arriving alien who is paroled continues to be

considered an arriving alien.  The governing regulations define arriving alien to include "an

applicant for admission coming or attempting to come into the United States at a port-of-entry."  8

C.F.R. §§ 1.2, 1001.1(q).  "An arriving alien remains an arriving alien even if paroled pursuant to

30

JA460

section 212(d)(5) of the Act [8 U.S.C. § 1182(d)(5)], and even after any such parole is terminated or revoked." 8 C.F.R. § 1.2. Furthermore, the qualifications made to the regulatory definition—that it does *not* cover aliens paroled before a particular date or aliens paroled after that date if particular circumstances exist—highlights that it *does* include the group of aliens paroled at a port of entry who do not meet the exceptions. *Id.* Moreover, the definition of arriving alien does not include any temporal limit to those who could be subject to expedited removal. *See id.*

In light of the clear regulation that includes arriving aliens granted parole at a port of entry within the class of arriving aliens subject to expedited removal, Plaintiffs, in their Amended Complaint—and somewhat more obliquely in their Stay Motion—*concede* that the regulation at section 1.2 is contrary to their position but contend it is inconsistent with the statute. Memo at 18-21. As Defendants have already explained, this contention is untimely. *Supra* at Section I.B.

Even apart from that untimeliness, the contention is devoid of merit. A review of the statutory text, context and structure support the Defendants' position as the best reading of the statute. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024). Congress's use of the phrase "arriving in" encompasses aliens paroled at a port of entry given the statutory and historical backdrop of parole. Congress legislated with the knowledge that the Supreme Court has long established that aliens paroled into the United States are legally in the position of aliens standing at the border, regardless of the duration of their parole. *E.g., Leng May Ma*, 357 U.S. at 188-91; *Ibragimov v. Gonzales*, 476 F.3d 125, 134 (2d Cir. 2007). "This is why a parolee normally fits the regulatory definition of an 'arriving alien'—for legal purposes, the parolee is a 'an applicant for admission coming or attempting to come into the United States at a port-of-entry' even if, in actuality, a paroled alien has already physically come into the United States." *Duarte v. Mayorkas*,

31

JA461

27 F.4th 1044, 1059-60 (5th Cir. 2022) (citation omitted).  Congress amended the parole statute against that background, leaving intact the operative language: "[W]hen the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States." 8 U.S.C. § 1182(d)(5)(A); 8 C.F.R. § 212.5(e)(2)(i) (providing that when parole ends the alien "shall be restored to the status he or she had at the time of parole").  When—nearly 30 years ago—the Department of Justice adopted its definition of "arriving alien" to include paroled aliens, it relied on this well-established statutory principle to conclude that parolees were included among the class of arriving aliens who could be subject to expedited removal.  62 Fed. Reg. at 10,313 ("The inclusion of paroled aliens was based on the statutory language in section 212(d)(5) of the Act ....").  At the time, the Department received an objection to including parolees in the definition of arriving aliens.  However, the legislative treatment of parolees (consistent with the long-standing judicial treatment) led the Department to conclude:  "The Department feels there is solid statutory basis for inclusion of certain paroled aliens in the definition of arriving alien, and so will retain this provision." *Id.*

Plaintiffs urge the court to read the word "arriving" in a vacuum and insist that, grammatically, it cannot apply to aliens who have already "arrived" and been paroled despite the agency's careful consideration of this issue long ago.  Memo at 20.  Not only does this interpretation ignore the unique historical and statutory context discussed above—which Plaintiffs fail to address—but it is also incorrect.  Plaintiffs' interpretation that "arriving" is a momentary status that is soon completed and, once completed, is gone forever, makes little sense.  An alien

JA462

may be subject to expedited removal if the alien "is" arriving, but the use of a form of the verb "to be" does not establish such a limited temporal scope.

In any event, Plaintiffs' analysis overlooks key textual clues which confirm that section 1225(b)(1)(A)(i) applies to aliens paroled at a port of entry:

- If Congress wanted to exclude paroled aliens from the reach of this provision, it could have easily done so, and the fact that Congress *did* specifically exclude paroled aliens from the class of designated aliens in a nearby provision, 8 U.S.C. § 1225(b)(1)(A)(iii), is especially compelling. *Bates v. United States*, 522 U.S. 23, 29-30 (1997) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion *or exclusion*." (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983))) (emphasis added).

- The title of section 1225(b)(1)—"Inspection of aliens arriving in the United States *and certain other aliens who have not been admitted or paroled*." (emphasis added)— reinforces the above point. This title supports Defendants' position that Congress intentionally chose not to exempt paroled aliens from the reach of the "arriving in" provision. Rather, the exclusion of such aliens referenced in the title refers to language in the designation provision at 1225(b)(1)(A)(iii).

- Section 1225(b)(1)(A)(i)(F) provides for a categorical exception to both the "arriving in" and designation provision for certain aliens who are natives or citizens of a country in the Western Hemisphere with whose government the United States does not have full diplomatic relations but contains no such categorical exclusion for paroled aliens.

Thus, the statutory text, context, structure and history support the view that Congress intended for section 1225(b)(1)(A)(i) to apply to aliens paroled at ports of entry as those "arriving in" the United States.

Plaintiffs' remaining argument is also unavailing. They point to the designation provision's explicit exclusion of an alien who "has not been ... paroled" and question why Congress would then allow expedited removal for such aliens pursuant to the "arriving in" provision. Memo at 20.

JA463

But as a matter of statutory interpretation, the fact that Congress included language in one provision but not in another provision in such close proximity significantly undermines Plaintiffs' position. Moreover, contrary to Plaintiffs' suggestion, Defendants' interpretation would not render the designation's language excluding paroled aliens meaningless. *See id.* As explained in more detail below, that language has a very specific purpose, which is to preclude the designation of an alien for expedited removal *for the duration of the alien's parole*. In contrast, the statutory provision governing expedited removal of arriving aliens does *not* provide any exclusion (temporary or permanent) for paroled aliens.

### B. Aliens Paroled into the U.S. at a Port of Entry are Properly Subject to Expedited Removal Because They Are Within the Class of Aliens Designated by the Secretary.

Even apart from the arriving alien definition, aliens paroled at a port of entry may be placed in expedited removal under the designation provision at 8 U.S.C. § 1225(b)(1)(A)(iii), which allows designation of an alien "who has not been admitted or paroled" and who cannot show they have been present in the U.S. continuously for the 2-year period immediately prior to the date of their determination of inadmissibility.

Plaintiffs contend that this conclusion is contrary to the statute. Memo at 15–16. Specifically, Plaintiffs rely on the "who has not been admitted or paroled" language to argue that aliens paroled at a port of entry cannot be designated for expedited removal. Amended Compl., ¶ 149. Not so. Aliens who were (as a historical matter) paroled into the U.S. at a port of entry can be designated for expedited removal in the future when the parole expires or is terminated. 8 U.S.C. § 1225(b)(1)(A)(iii)(II); *see* 8 C.F.R. § 212.5(e)(2) (termination by service of charging document). The use of the present perfect tense ("has not been ... paroled") here reflects a "state that continues into the present." *See Turner v. U.S. Att'y Gen.*, 130 F.4th 1254, 1261–62 (11th Cir.

34

JA464

2025) (construing former 8 U.S.C. § 1432 and explaining that the present perfect tense can "refer to a ... state that continues into the present"). The simplest explanation for this language is Congress's recognition that a person would not be subjected to expedited removal pursuant to 8 U.S.C. § 1225(b)(1)(A)(iii)(II) during the period for which they were designated for parole so long as the alien retains parole.

This textual interpretation comports with the statutory and historical context: when parole is revoked, an alien reverts to the status he possessed prior to the grant of parole. In the case of all those paroled at a port of entry, that is the position of an applicant for admission standing at the threshold of entry. *See* 8 U.S.C. § 1182(d)(5)(A); *Jennings*, 583 U.S. at 288; *Leng May Ma*, 357 U.S. at 188-90; *Duarte*, 27 F.4th at 1059-60; *Ibragimov*, 476 F.3d at 137.[3] The statutory language—"who has not been admitted or paroled"—is best understood as encompassing aliens who are no longer paroled. So long as an alien retains parole, he cannot be numbered among those designated for expedited removal under 8 U.S.C. § 1225(b)(1)(A)(iii). But once parole is terminated or expired then—so long as he has not been present for two years prior to the date of

---

[3] For these reasons, the district court in *Svitlana Doe* misread the designation provision by interpreting the "who had not been admitted or paroled" language to mean that any alien who has ever been paroled, for any length of time, is categorically immune from expedited removal. *See Doe*, 2025 WL 1099602, at *16. That reading is not only contrary to the text and structure of the parole statute and inconsistent with the broader statutory and historical context of parole, it is also inconsistent with longstanding regulations which provide that after parole is terminated, "further inspection or hearing shall be conducted under section 235 or 240 of the Act." 8 C.F.R. § 212.5(e)(2)(i). Section 235 of the Act is 8 U.S.C. § 1225, which includes the expedited removal provision. The Supreme Court's order granting the Government's application for a stay of the district court's order calls into question the soundness of the district court's reasoning, *see Noem v. Doe*, 145 S. Ct. 1524, and the Government's appeal is currently pending with the First Circuit, No. 25-1384.

the determination of inadmissibility—there is no obstacle to his being designated for expedited removal.

Plaintiffs complain that this construction of the statute is not sensible because it leaves in the Government's hands the question of whether a paroled alien could be subject to expedited removal by choosing to revoke or not revoke the parole. Memo at 15-16. But there is nothing incongruous about that conclusion. It is entirely consistent with the terms that Congress provided for parolees, namely, that upon the fulfillment of the purposes of parole "the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States." 8 U.S.C. § 1182(d)(5)(A); 8 C.F.R. § 212.5(e)(2)(i) (providing that when parole ends the alien "shall be restored to the status he or she had at the time of parole"). If the Government has the power to terminate parole, which the Plaintiffs do not dispute, then it has the power to return the alien to the position he had before being paroled, namely, an applicant for admission subject to expedited removal. It is Plaintiffs' proposition—that once paroled an alien is forever immune from expedited removal—that is entirely inconsistent with the parole statute.

Plaintiffs also contend that the application of expedited removal to aliens once paroled at a post of entry is contrary to the agency's own regulations. Memo at 17-18. Plaintiffs rely on a regulation governing expedited removal which speaks of an alien who entered "without having been ... paroled" and which describes the burden on the alien to show he "was ... paroled." *Id.* (citing 8 C.F.R. § 235.3(b)(1)(ii), (6)). Plaintiffs argue that DHS's choice to use the past tense verb reflects an intent to exclude paroled aliens even where the parole has been revoked. This argument fails because the regulations support the Defendants' position.

To begin, a regulation governing the actions to be taken by an asylum officer if an asylum application is to be denied provides for the use of expedited removal to a paroled alien by designation. 8 C.F.R. § 208.14(c)(4)(ii). The regulation directs that for parolees who are inadmissible under the relevant parts of 1182(a)(6) and (7), upon denial of the asylum application, "the asylum officer shall proceed in accordance with § 235.3(b) of this chapter." 8 C.F.R. § 208.14(c)(4)(ii). Notably, under 235.3(b), a parolee who qualifies can be subject to expedited removal either as an arriving alien *or as a designated alien*. 8 C.F.R. 208.14(c)(4)(ii)(A) ("In the case of an applicant who is an arriving alien or is otherwise subject to removal under § 235.3(b) of this chapter....").

In addition, the same expedited removal regulation upon which Plaintiffs rely—8 C.F.R. § 235.3(b)(6)—establishes a process for the termination of the alien's parole. *Id.* ("If the alien establishes that he or she was ... paroled ... the case will be examined to determine ... whether such parole has been, or should be, terminated, and whether the alien is inadmissible under section 212(a)"). The regulation thus envisions the possibility that such an alien with parole terminated could be subject to expedited removal or, at the very least, does not exclude the possibility. The regulation's further reference to an inquiry regarding inadmissibility under section 212(a), *i.e.*, section 1182(a), is consistent with the inquiry DHS must make to consider an alien for expedited removal, which is available only for aliens subject to section *1182(a)*(7) and *1182(a)*(6)(C).

Further still, another regulation (one governing parole) provides for the possibility of expedited removal after termination of parole. 8 C.F.R. § 212.5(e)(2)(i) (after parole is terminated, "further inspection or hearing shall be conducted *under section 235* or 240 of the Act") (emphasis added). This regulation clearly provides that an immigration officer retains discretion to initiate a

37

**JA467**

proceeding under "235," *i.e.,* 8 U.S.C. § 1225, once parole is terminated which includes expedited removal pursuant to 8 U.S.C. § 1225(b)(1). In the end, the regulations weigh in the Government's favor, and the language of the statute controls in any event.

The Supreme Court's recent order granting the Government's application to stay the district court's preliminary injunction in *Doe*, 2025 WL 1099602, implicitly supports the Government's position. The district court stayed the FRN's revocation of parole for aliens of certain countries to the extent parole was revoked "without case-by-case review." *Id.* at *20. That court had found plaintiffs were likely to prevail on their claims, including the claim of legal error in DHS's rationale for immediately terminating parole for individuals already present in the U.S. based on the FRN's invocation of the designation provision—similar to the issue in this case. *Id.* at *16-18. In its stay application to the Supreme Court, the Solicitor General argued, among other things, that the present perfect tense language in the designation provision ("has not been * * * paroled") is best read to reflect a "state that continues into the present"—the same argument the Government presents here. *Doe v. Noem*, No. 24A1079 (filed May 8, 2025). By a 7-2 margin the Court granted a stay of the district court's order. 145 S. Ct. 1524 (2025). Notably, not even the dissenting two Justices defended the district court's stay based on the likelihood-of-success factor but focused on irreparable harm and the balance of equities. *Id.* at 1525-28; *id.* at 1525 ("Even if the Government is likely to win on the merits, in our legal system, success takes time and the stay standards require more than anticipated victory.") (Jackson, J., dissenting). Therefore, although the majority did not provide any reasoning for the order, the stay grant implicitly undercuts Plaintiffs' claim of a likelihood of success on the merits.

JA468

> **C.    Plaintiffs Are Not Likely to Succeed on their APA Claim Because the Documents They Contest Did Not Make the Changes That Plaintiffs Allege and Are Not Inconsistent.**

Plaintiffs raise an APA claim alleging that the DHS documents are inconsistent with each other, not adequately justified, and made substantive policy changes without considering the impact on the affected population. Memo at 21-28; *see also* Amended Compl., ¶¶ 155-57. Plaintiffs misread these documents. The documents are not final agency decisions conferring any new authority on immigration officers that they need to justify; they merely guide immigration officers with regard to the exercise of their existing prosecutorial discretion and statutory and regulatory authority in selecting which INA procedures to use to process removable aliens—a decision that itself is not subject to judicial review, *see infra* at Section II.A (discussing 8 U.S.C. § 1252(g); *AADC*, 525 U.S. at 487).

For this reason, Plaintiffs' APA claims fail on the ground that there is no "final agency action." 5 U.S.C. § 704. To be final, an agency action (i) "must mark the 'consummation' of the agency's decisionmaking process" such that it is not of "a merely tentative or interlocutory nature"; and (ii) "the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citations omitted). As noted above, a long-standing DHS regulation provides that "[a]n arriving alien remains an arriving alien even if paroled pursuant to section 212(d)(5) of the Act," and therefore is subject to expedited removal. 8 C.F.R. § 1.2. None of the three challenged documents address this rule or purport to make any changes in rules governing which aliens are designated within the statutory limit or whether aliens paroled at a port of entry fall into the group of either arriving or designated aliens. Rather, the final agency action Plaintiffs wish to challenge in this suit happened long ago with the promulgation of 8 C.F.R. § 1.2, and the documents challenged now have not

JA469

determined or altered any "rights or obligations" or caused any "legal consequences" with which Plaintiffs are concerned. *See* Memo at 22 (claiming that the documents' explanations "to justify applying the expedited removal statute to individuals inspected and paroled … are, on their face, arbitrary and capricious …").

*Second*, Plaintiffs' attacks on the DHS's justification for applying expedited removal to their members similarly miss the mark because they fundamentally misconstrue the purpose and function of the documents. *See* Memo at 21–26. None of the attacked documents purport to justify applying expedited removal to parolees—doing so would be odd, given that this authority has already existed since at least 1997. 8 C.F.R. § 1.2. In particular, the March 2025 FRN addresses revocation of parole and simply assumes DHS's authority to apply expedited removal to paroled aliens under the designation provision. 90 Fed. Reg. at 13,611. Likewise, the February 18 email "directive" merely instructs immigration officers to consider expedited removal for paroled aliens who qualify, again assuming (correctly) that DHS has the authority to place paroled aliens in expedited removal. The Huffman Memorandum does the same, and does not even address paroled aliens directly. *See* Huffman Memorandum ("(1) For any alien DHS is aware of who is amenable to expedited removal but to whom expedited removal has not been applied …."). What Plaintiffs really wish to attack is the 1997 regulation, which *does* provide the DHS's authority to apply expedited removal to those who were paroled and *did* provide justifications for that authority after notice and comment. 8 C.F.R. § 1.2; 62 Fed. Reg. at 10,313. Of course, they cannot prevail, for their attack comes over twenty-five years too late. 8 U.S.C. § 1252(e)(3).

*Third*, Plaintiffs' attacks on the documents' reasoning as inconsistent rests on other fundamental misunderstandings about the documents. The March 2025 FRN, consistent with the

JA470

other two documents, discusses the designation of those subject to expedited removal in such a way as to also encompass certain parolees. *See* 90 Fed. Reg. at 13,611; *see also* 8 U.S.C. § 1225(b)(1)(A)(iii). Its reference to the designation provision only adds to the potential sources of authority for subjecting parolees to the expedited removal statute. It does not diminish or alter the unambiguous, decades-old regulatory provisions treating paroled arriving aliens as arriving aliens (8 C.F.R. § 1.2) and rendering them amenable to expedited removal (8 C.F.R. § 235.3(b)(1)(i)) or Congress's unambiguous command that when parole ends "thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission," 8 U.S.C. § 1182(d)(5)(A).

Plaintiffs erroneously rely on language in the FRN which states: "Expedited removal is available only when an alien has not been continuously present in the United States for at least the two years preceding the date of the inadmissibility determination." *See* Memo at 23-26; *see also* 90 Fed. Reg. at 13,619 (citing the designation provision); *id.* at 13,620 (if parole were allowed to expire on its own terms, "CHNV parolees may begin to accrue more than two years of continuous presence in the United States, such that DHS would have to initiate section 240 removal proceedings to effectuate their removal.") (same citation). Plaintiffs seize on these statements to argue that DHS's reliance on the designation provision in the FRN is inconsistent with its guidance documents. Amended Compl., ¶ 155; Memo at 23-26. But Plaintiffs' argument fails because the FRN is relying on an *additional* source of authority for applying expedited removal—the designation authority—not changing the statutory or regulatory basis for treating paroled arriving alien as arriving aliens. In turn, nothing requires an agency to use one source of legal authority over another (*i.e.*, § 1225(b)(1)(A)(i) vs. § 1225(b)(1)(A)(iii)), and this type of policy choice is

41

JA471

within the unreviewable discretion of the agency.  *See contra* Memo at 25.  So, while DHS cited its designation authority under § 1225(b)(1)(A)(iii), nothing in the FRN precludes it from exercising the full scope of its statutory authority for expedited removal, including 8 U.S.C. § 1225(b)(1)(A)(i), pursuant to implementing regulations that have been in effect for over twenty-five years.

Moreover, Plaintiffs ignore the context of the statements in the FRN.  The FRN did not set out to decide which individuals would be eligible for expedited removal.  *See* 90 Fed. Reg. at 13,611 (summary and background).  Instead, in issuing this FRN, the Secretary decided to end certain parole programs (an action that Plaintiffs do not challenge) and explained her reasons for doing so.  *Id.* at 13,612-17.  One risk—as evidenced by this litigation—was that allowing parole to continue without prompt termination would raise practical and legal barriers to expedited removal that included a risk that section 1229a removal proceedings would be needed.  *Id.* at 13,619-20.  One need only read the statements in this complaint to understand the legitimacy of the Secretary's concern that removal would become more difficult if parole were let to run its course.  *See* Amended Compl., ¶ 148.  Beyond that, the Secretary did not purport to alter the clear statutory and regulatory rules that treat aliens paroled at ports of entry as arriving aliens.[4]  Even Supreme Court opinions are not to be parsed like a statute, *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 373-74 (2023), or to be read as controlling beyond the facts presented, *Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264, 278 (2023), and the Secretary's decision to assess the risks of continued parole programs on the burden of removal obviously did not purport to reduce

---

[4] Moreover, that the FRN was silent with respect to an *alternative* authority for expedited removal for paroled aliens can in no way be construed to somehow estop the Government from exercising that well-settled authority.

JA472

the removal options once parole was rescinded.  In short, the regulation that defines arriving alien remains in place and individuals who meet that definition and are inadmissible on the specified grounds are subject to expedited removal without regard to whether they previously were granted parole.

*Fourth*, Plaintiffs' charge that the agency's actions violate the APA because they fail to consider the impact of their "changes" on an affected population is inapposite.  *See* Memo at 26-28; *see also* Amended Compl., ¶ 157.  As discussed above, the challenged documents made no policy change with regard to the application of expedited removal when they instructed immigration officers to exercise their well-established authority to consider which removal procedure should be utilized in the individual case.  Moreover, the Court cannot review the agency's decision to adopt policies directing that discretion, 8 U.S.C. § 1252(g), and because there has been no change in policy, Plaintiffs cannot establish that any reliance interests have been upset. Moreover, as those who have been allowed into the country as a matter of grace, *see* 8 U.S.C § 1182(d)(5)(A), who have no other lawful basis to reside in the U.S. and who are subject to being detained and removed when parole ends or is terminated, *see id.*, paroled aliens have no reliance interests in avoiding removal.

*Finally*, to the extent that Plaintiffs' arbitrary and capricious claim is based on a *different* argument, that the documents fail to justify applying expedited removal instead of 240 proceedings or fail to justify commencing removal proceedings at all, that claim is meritless.  The agency has unfettered discretion over whether to initiate proceedings, 8 U.S.C. § 1252(g); *see United States v. Texas*, 599 U.S. 670, 684 (2023) (discussing the Executive Branch's traditional discretion over whether to take enforcement actions against violators of federal law), and if so, to choose between

43

JA473

removal proceedings, and there is no judicially manageable standard in the INA for this Court to review such decisions. *See* 5 U.S.C. § 702(a)(2). The Administration was not required to justify its compliance with the existing letter of the expedited removal statute, which has *always* permitted arriving aliens to be placed in expedited removal proceedings, even if the Executive Branch at times opted not to pursue removal in light of its traditional enforcement discretion. *See* 8 U.S.C. § 1225(b)(1)(B)(ii) ("If an immigration officer determines that an alien … who is arriving in the United States … is inadmissible under section 1182(a)(6)(C) or 1182(a)(7) … the officer *shall* order the alien removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum … or fear of persecution) (emphasis added); *see id.* § 1225(b)(1)(B)(iii) (immigration officer "shall" refer arriving alien who is inadmissible for a credible fear interview). In that sense, this case is easily distinguishable from *Grace v. Barr*, 965 F.3d 883, 902–03 (D.C. Cir. 2020), cited by Plaintiffs, which concerned the agency's guidance to change its choice-of-law policy resulting in less favorable, outcome-determinative substantive law applied to certain asylum-seekers in credible fear proceedings. *Cf.* Memo at 27. Since the time the statute went into effect, DHS has had authority to apply expedited removal to paroled arriving aliens, and DHS need not provide extensive justification for utilizing its long-established enforcement authority, particularly where that decision concerns prosecutorial charging choices traditionally within the unreviewable discretion of the Executive Branch. *See Texas*, 599 U.S. at 684.

In any event, the agency documents easily pass the arbitrary and capricious test—the clear import of all three documents is that expedited removal is the most effective way to implement the Administration's policies to quickly remove aliens who are not entitled to stay in the country and

JA474

there are no viable alternatives that could achieve the same results (and Plaintiffs do not propose any).  DHS need not further justify its use of expedited removal; this policy decision was already decided by Congress in the plain language of 8 U.S.C. § 1225(b)(1)(B).  And while a parolee may prefer to be placed in section 1229a proceedings, parolees received the benefit of temporary parole (such as employment authorization) with the knowledge that inadmissible "arriving" aliens are ultimately removed unless eligible for protection from removal.  8 U.S.C. § 1225(b)(1)(B).  Thus, on the merits, the agency's position is not arbitrary and capricious.  For all of these reasons Plaintiffs cannot demonstrate a likelihood of success on the merits.[5]

**IV.    The Remaining Equitable Factors Weigh Strongly in the Government's Favor.**

    **A.    Plaintiffs have not Established Irreparable Harm.**

Plaintiffs have failed to show they will be irreparably harmed if DHS applies expedited removal.  In alleging such harm, they rely heavily on the argument that their members could suffer persecution or death if removed through the expedited removal process because they could not adequately assert such fear claims in that process.  *See* Memo 28, 31, 33-34.  But Plaintiffs' argument is undermined by the credible fear procedures available to aliens in expedited removal.

---

[5]  Plaintiffs do not base their stay request on the claim that DHS's documents violate their right to due process, as they do in their third claim for relief in the Amended Complaint, ¶¶ 159-162. In any event, that argument is without support.  As discussed above, that challenge is untimely because under 8 U.S.C. § 1252(e)(3)(B), it had to have been raised in this Court within sixty days of the date that the expedited removal statute was "first implemented." *Dugdale v. U.S. Customs & Border Prot.*, 88 F. Supp. 3d 1, 8 (D.D.C. 2015) (constitutional challenge to expedited removal was time-barred).  Moreover, the sufficiency of the expedited removal procedures was upheld long ago in *AILA I*, 18 F. Supp. 2d at 54-56.  Plaintiffs are entitled to all the process set forth in the expedited removal statute and regulations, *see* 8 U.S.C. § 1225(b)(1); 8 C.F.R. § 235.3(b), and that is sufficient to satisfy due process.  *AILA*, 18 F. Supp. 2d at 54-56; *accord Thuraissigiam*, 591 U.S. at 138-39; *see also Mezei*, 345 U.S. at 215 ("aliens who arrive at ports of entry—even those paroled elsewhere in the country for years pending removal—are treated for due process purposes as if stopped at the border") (cleaned up).

JA475

8 U.S.C. § 1225(b)(1)(B)(i); 8 C.F.R. §§ 235.3(b)(4), 208.30; *see also Thuraissigiam*, 591 U.S. at

109-11 (describing the credible fear process). These procedures allow aliens to receive a credible

fear interview before an asylum officer and if the asylum officer finds no credible fear, before a

supervisor who reviews the asylum officer's determination. 8 C.F.R. § 208.30(e)(8). While

Plaintiffs suggest that such review is not sufficient because the asylum officer and supervisor are

employees within DHS, *see* Memo at 29, 31-32, the regulations provide for de novo review of the

negative credible fear finding by an immigration judge, *see* 8 C.F.R. § 1003.42(d). The IJ "may

receive into evidence any oral or written statement which is material and relevant to any issue in

the review." 8 C.F.R. § 1003.42(c). Importantly, an alien "need not show that he or she is in fact

eligible for asylum—a 'credible fear' equates to only a 'significant possibility' that the alien would

be eligible"–a threshold "screening" standard that is lower than the "well-founded fear standard"

required to establish asylum eligibility. *Thuraissigiam*, 591 U.S. at 109–10 ("all that an alien must

show to avoid expedited removal is a 'credible fear'").

Plaintiffs' attempt to show harm by attacking the credible fear procedures as ineffective is

undermined by case law, statistics and even their own declarations. First, the Supreme Court has

upheld the constitutionality of the INA's preclusion of review of the "allegedly flawed credible-

fear proceeding." *Thuraissigiam*, 591 U.S. at 138. In so doing, it has observed that "[a]n alien

subject to expedited removal [] has an opportunity at three levels to obtain an asylum hearing, and

the applicant will obtain one unless the asylum officer, a supervisor, and an immigration judge all

find that the applicant has not asserted a credible fear." *Id.* Plaintiffs' own evidence illustrates that

aliens with a legitimate credible fear are referred to section 1229a proceedings. *See* Declaration

of Meghan Dupuis Maurus ("Maurus Decl."), ¶ 14; Declaration of Melissa Lim Chua ("Chua

JA476

Decl."), ¶ 18; Declaration of Sarah T. Gillman, Esq. ("Gillman Decl."), ¶ 9.  And in one of these cases, the IJ reversed an asylum officer's negative reasonable fear determination.  Gillman Decl., ¶ 9.  In the end, Plaintiffs are attacking well established procedures upheld by the Supreme Court and essential to protecting our borders.

Plaintiffs allege a litany of other harms that will result from expedited removal, including detention, family separation, and a bar on admission to the United States.  Memo at 35.  But these harms are not unique to expedited removal; rather they are the expected consequences of removal that apply to all removed aliens, whether DHS initiates expedited removal or section 1229a removal or some other removal procedure.  For example, aliens in 1229a proceedings can be detained "pending a decision on whether the alien is to be removed from the United States" under 8 U.S.C. § 1226(a), which grants DHS broad and unreviewable discretion to do so. 8 U.S.C. § 1226(e).  *See also Jennings*, 583 U.S. at 306 (discussing DHS's detention authority).  Likewise, removal under section 1229a often results in family separation and, although some aliens may be eligible for cancellation of removal if they can establish extreme and exceptionally unusual hardship to a qualifying relative, that relief is not available to aliens unless they can further establish 10 years of continuous physical presence in the US.  *See* 8 U.S.C. § 1229b(b)(1).  Thus, the specific class of paroled aliens on whose behalf Plaintiffs challenge expedited removal would not be eligible for such relief even if placed in section 1229a proceedings, and none of their declarations appear to indicate otherwise.  Finally, the "bar on admission to the United States" Plaintiffs refer to for aliens removed under expedited removal, Memo at 35, also applies to aliens removed pursuant to section 1229a proceedings, and in fact, the admission bar for aliens removed under section 1229a is longer.  *Compare* 8 U.S.C. § 1182(a)(9)(A)(i) (5-year bar for aliens removed

JA477

under 1225(b)(1)), *with* 8 U.S.C. § 1182(a)(9)(A)(ii)(I) (10-year bar for aliens removed under section 1229a).

Plaintiffs further claim there are a select few forms of "collateral" immigration relief that paroled aliens might be able to pursue if they were not in expedited removal. Memo 29-31. But this does not establish irreparable harm either. Consider adjustment of status, for example. An alternative to seeking to adjust status within the United States is to leave the country and seek consular processing from the U.S. embassy or consulate in the home country. *Adams v. Holder*, 692 F.3d 91, 98-99 (2d Cir. 2012) (comparing consular processing and adjustment of status). That might not be the alien's preferred way to pursue legal status, but requiring aliens to leave the country and apply from abroad is not irreparable harm.[6] In fact, this is the required procedure for aliens who have entered the country illegally, regardless of how long they may have been in the United States. *See* 8 U.S.C. § 1255(a)(2) (requiring aliens to be "admissible" to be eligible to adjust); *Landin-Molina v. Holder*, 580 F.3d 913, 915-16 (9th Cir. 2009).

In any event, Plaintiffs have failed to allege that any of *their members* will lose the opportunity to apply for collateral relief. Plaintiffs identify only three alleged members who were granted parole and subsequently placed in expedited removal proceedings: CHIR member E.I.R.M. (Compl. ¶ 100; ECF No. 22-7); CASA member E.M.P. (Amended Compl. ¶ 135; ECF No. 22-10); and CASA member D.L.C. (Amended Compl. ¶ 136, ECF No. 22-13). None of these

---

[6] As discussed, if such an alien fears returning to their home country to initiate consular processing, they can assert such fear in expedited removal, and, if that is fear found credible, DHS will refer the alien to section 1229a removal where they can seek a continuance with the Immigration Judge while they pursue adjustment with USCIS. *See* 8 C.F.R. § 1245.2(a)(1)(ii) (providing that Immigration Judges generally do not have jurisdiction over arriving aliens' adjustment applications).

JA478

aliens are alleged to have pending applications for adjustment of status.  And the only member who has a "collateral" relief application pending—D.L.C., who has applied for Special Immigrant Juvenile Status—was found to have a credible fear and referred to section 1229a proceedings. ECF No. 22-13, ¶ 18.

Plaintiffs' attempts to establish irreparable harm by attacking the expedited removal procedure as lacking "meaningful process" also fall flat.  *See* Memo 32.  Plaintiffs claim that expedited removal provides no opportunity to challenge the finding of inadmissibility or other statutory or regulatory requirements.  *Id.*  But nowhere in their brief or declarations is there any claim that DHS incorrectly charged any alien (much less one of Plaintiffs' members) with inadmissibility.  Indeed, the very fact that these aliens were paroled into the United States at a port of entry establishes that they lacked valid documentation to enter the United States and were released into the country in the Secretary's discretion and subject to being re-detained at any time. 8 U.S.C. § 1182(d)(5)(A).  The only eligibility criteria for expedited removal that Plaintiffs challenge is DHS's statutory authority to place paroled aliens in such proceedings, and as explained above, Plaintiffs are not likely to succeed on that challenge.  Nor can Plaintiffs show irreparable harm by challenging the adequacy of the protections in the expedited removal statute and its implementing regulations.  *See* Memo at 32-34.  Plaintiffs complain, among other things, that aliens in expedited removal are not given sufficient process and an adequate opportunity to consult with counsel.  *Id.* at 32.  But the D.C. Circuit has upheld the legality of the statute and its implementing regulations rejecting arguments based on many of these alleged flaws, *AILA I*, 18 F. Supp. 2d at 52-60, *aff'd*, *AILA II*, 199 F.3d at 1357.

Finally, the Supreme Court's order in *Doe*, 2025 WL 1534782, granting the Government's application for a stay of the district court's preliminary injunction, *see* 145 S. Ct. 1524, counsels against granting a stay in this case. Notably, the types of harms alleged by Plaintiffs here are similar to those alleged by the aliens in *Doe*, as outlined in Justice Jackson's dissent, and include: arrest and detention, danger in the aliens' home countries, loss of employment, loss of "opportunities to seek any adjustment of status," and family separation. *Id.* at *3. Yet, despite these allegations of such harms, the Court granted the Government's stay application implying it disagreed with the district court's balancing of the equities. The balance of interests in this case are similar, and the Court should deny the stay request.

**B.    The Harm to the Government and the Public's Interest Favor Denying the Stay.**

In contrast, granting the stay would impose significant constraints and burdens on Defendants. The relief Plaintiffs request would prevent DHS from applying expedited removal to potentially hundreds of thousands of paroled aliens whose parole DHS is seeking to revoke or has revoked, thereby frustrating DHS's ability to quickly remove these aliens. *See* 90 Fed. Reg. at 13,618 (noting that "between October 19, 2022, and January 22, 2025, approximately 532,000 inadmissible aliens received parole into the United States pursuant to the CHNV parole programs"). It would also impose substantial administrative burdens and tax agency resources by requiring DHS to initiate and litigate 1229a removal hearings if it chose to pursue removal.

The harm to the Defendants would be particularly acute given the significance of expedited removal to the Government's enforcement efforts. "[When Congress enacted [IIRIRA], it crafted a system for weeding out patently meritless claims and expeditiously removing the aliens making such claims from the country." *Thuraissigiam*, 591 U.S. at 106. Congress was particularly

JA480

concerned with abuses of the asylum system by such aliens. *See* H.R. Rep. No. 469, 104th Cong., 2d Sess. Pt. 1, at 107 (1996) ("House Report"). Without the procedures for expedited removal, those aliens would be placed in removal proceedings under section 1229a and "could reasonably expect that the filing of an asylum application would allow them to remain indefinitely in the United States." *Thuraissigiam*, 591 U.S. at 118. Congress designed the expedited removal system to bypass the more "cumbersome and duplicative" procedures for noncitizens "who arrive in the United States with no valid documents." *Id.* at 107.

Furthermore, vigorous enforcement of the immigration laws and the prompt removal of aliens not entitled to remain here is one of the President's top priorities. *See, e.g.*, *Executive Order Protecting the American People Again*st Invasion, 90 Fed. Reg. 8443 (Jan. 20, 2025) (encouraging the use and expansion of expedited removal); *Securing Our Borders*, 90 Fed. Reg, 8467 (Jan. 20, 2025) (Jan. 30, 2025) (increasing enforcement at the border). The President is "a representative of the people" and holds "the mandate of the people to exercise his executive power." *Myers v. United States*, 272 U.S. 52, 123 (1926). The government has a substantial interest in carrying out the President's policies. The United States suffers a form of irreparable harm to its democratic system when it is prohibited from effectuating those policies against anyone anywhere in the Nation. *Cf. Maryland v. King,* 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers). Those concerns escalate when, as here, the injunction would undermine the Executive Branch's constitutional and statutory authority over immigration and the admission and removal of aliens. As such, Plaintiffs' requested relief would constitute a severe intrusion into the core Executive function of managing the immigration system. *See Arizona v. U.S.*, 567 U.S. 387, 394–96 (2012); *INS v. Legalization Assistance Project*, 510 U.S. 1301, 1305-06 (1993) (O'Connor, J., in chambers)

51

JA481

(warning against "intrusion by a federal court into the workings of a coordinate branch of the Government").

The harm to the party opposing the injunction and the public interest merge when the Government is the opposing party. *Nken*, 556 U.S. at 435. "There is always a public interest in prompt execution of removal orders[.]" *Id. at* 436; *id.* at 427 ("[A] reviewing court may not ... reflexively hold[] a final order in abeyance pending review.... The parties and the public [are] ... generally entitled to the prompt execution of orders that the legislature has made final."); *Lucacela v. Reno*, 161 F.3d 1055, 1059 (7th Cir. 1998) (noting the "clear public interest (as expressed by Congress) in deporting illegal aliens without delay," and acknowledging that "Congress made it clear ... that public policy has now shifted to enforcing deportation orders immediately"); *see also* Sen. Jud. Committee Rep. No. 104-249 at 7, 1996 WL 180026 ("If the United States is to have an immigration policy that is both fair and effective, the law and the commitment of those with the duty to apply or enforce it must be clear .... Aliens who violate U.S. immigration law should be removed from this country as soon as possible."). Thus, the balance of equities tips sharply in Defendants' favor.

**V.   At a Minimum, any Relief Should be Limited to Identifiable Plaintiff Members and Their Specific Harms**

Plaintiffs' request to delay agency action would, if granted and applied to all aliens paroled at a port of entry, preclude DHS from commencing expedited removal against "hundreds of thousands" of aliens. Memo at 1; *see also* Amended Compl. at 54, ¶ 5, Prayer for Relief (requesting that Court "[e]njoin Defendants from applying expedited removal to noncitizens who have previously been granted parole at a port of entry"). Plaintiffs are not entitled to the vastly overbroad relief they seek.

JA482

Even if the Court found a stay was appropriate, it would still be insufficient to stay agency action nationwide. Plaintiffs' lawsuit is brought on behalf of their members, and complete relief is provided by a stay that applies to those members who they can identify as being affected by the challenged agency actions. *Cf. Morice v. Hosp. Serv. Dist. #3*, No. CV 18-7945, 2019 WL 1517954, at *7 (E.D. La. Apr. 8, 2019) (plaintiff "lacks standing to seek injunctive relief for harm that will occur to others, even to others who would allegedly benefit"); *Nutrition Distrib., LLC v. Enhanced Athlete, Inc.*, 2017 WL 5467252, at *2 (E.D. Cal. Nov. 14, 2017) (refusing to consider irreparable harm to third parties"). Article III demands that a remedy "be limited to the inadequacy that produced the injury in fact that the plaintiff has established." *Gill,* 138 S. Ct. at 1931; *see also DHS v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring). A stay, like an injunction, thus must be no broader than "necessary to provide complete relief to the plaintiffs."[7] *Madsen*, 512 U.S. at 765 (citation omitted); *see* 5 U.S.C. § 705 (authorizing a stay only "to the extent necessary to prevent [the] irreparable injury").

Plaintiffs do not ask the Court to set aside the DHS documents following a final decision on the merits with respect to their APA claim, which requires a showing that the agency action at issue is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). They seek a remedy that requires the far more demanding showing on the four factors required for preliminary injunctive relief, including "irreparable injury," 5 U.S.C. § 705,

---

[7] It is also important to note that Plaintiffs have not sought to certify a class under Fed. R. Civ. Pro. 23; nor could they in light of 8 U.S.C. §§ 1252(f)(1) and 1252(e)(1)(B), the latter which precludes the Court from certifying a class "in any action for which judicial review is authorized" under section 1252(e)(3). *AILA*, 199 F.3d at 1359; *see also Monsanto Co. v. Geertson Seed Farm*s, 561 U.S. 139, 163 (2010) (noting that where Plaintiffs "do not represent a class, [] they could not seek to enjoin such an order on the ground that it might cause harm to other parties").

53

JA483

and the other factors, and an order that has the effect of preventing DHS from applying its documents. As explained above, that would enjoin or at least restrain the government's chosen operation of Section 1225(b)(1), and so is barred by Section 1252(f)(1). But even if these limits are not applied, Section 705 does not authorize a nationwide stay except to the extent necessary to redress Plaintiffs' injury. Section 705 permits relief only "to the extent necessary to prevent irreparable injury." Thus, even if the Court believes it can enter relief under Section 705, it must be limited to the parties. Finally, the Court should not grant relief without issuing the bond required by Rule 65(c). Defendants thus request that, if the Court were to stay the documents at issue, the Court require Plaintiffs to "give[s] security in an amount . . . proper to pay the costs and damages sustained" if Defendants are found "to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c).

JA484

# CONCLUSION

For these reasons, the Court should deny the motion for a stay under 5 U.S.C. § 705.


Dated: June 24, 2025                         Respectfully submitted,

                                              BRETT A. SHUMATE
                                              *Assistant Attorney General*
                                              *Civil Division*

                                              AUGUST E. FLENTJE
                                              *Special Counsel for Immigration*

                                              */s/ Papu Sandhu*
                                              PAPU SANDHU
                                              (Mass. Bar No. 630090)
                                              *Assistant Director*
                                              U.S. Department of Justice
                                              Civil Division
                                              Office of Immigration Litigation
                                              General Litigation & Appeals Section
                                              P.O. Box 878, Ben Franklin Station
                                              Washington, DC 20044
                                              Papu.Sandhu@usdoj.gov

                                              TIM RAMNITZ
                                              *Senior Litigation Counsel*

                                              ARIC A. ANDERSON
                                              TARYN ARBEITER
                                              *Trial Attorneys*

                                              *Counsel for Defendants*

JA485

**CERTIFICATE OF SERVICE**

I hereby certify that on June 24, 2025, I electronically filed this OPPOSITION TO

PLAINTIFFS' APPLICATION FOR A STAY UNDER 5 U.S.C. § 705 with the Clerk of the

Court for the United States Court of for the District of Columbia by using the CM/ECF system.

Counsel in the case are registered CM/ECF users and service will be accomplished by the

CM/ECF system.

*/s/ Papu Sandhu*
PAPU SANDHU
Assistant Director
U.S. Department of Justice

JA486

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COALITION FOR HUMANE IMMIGRANT RIGHTS, *et al*., | |
| *Plaintiffs*, | |
| *v.* | Case No.: 1:25-cv-0872 |
| KRISTI NOEM, in her official capacity as Secretary of Homeland Security, *et al.*, | |
| *Defendants.* | |

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR A STAY OF AGENCY ACTION UNDER 5 U.S.C. § 705 TO PRESERVE STATUS AND RIGHTS**

# TABLE OF CONTENTS

                                                                    **Page**

INTRODUCTION ...................................................................................1

ARGUMENT .........................................................................................2

I.     This Court Has Jurisdiction Both to Consider Plaintiffs' Claims and to Issue the Requested Stay. ..........................................................................2

       A.     This Court Has Jurisdiction to Review Plaintiffs' Claims. ...................2

       B.     This Court May Issue a Stay to Remedy Agency Action that Violates the APA. ........................................................................................6

       C.     Plaintiffs Have Jurisdictional and Prudential Standing. ......................10

II.    Plaintiffs are Likely to Succeed in Proving that the Agency Actions Violate the Expedited Removal Statute and the Agency's own Regulations. ...................14

       A.     Noncitizens Paroled into the U.S. at a Port of Entry are Statutorily Exempted from the "Expanded Expedited Removal" Designation. ..............14

       B.     Noncitizens Who Have Been Paroled into the U.S. at a Port of Entry are Not "Arriving in the United States" for Purposes of the Expedited Removal Statute. ..................................................................18

III.   Plaintiffs Are Likely to Succeed in Proving that the Agency Actions are Arbitrary and Capricious. .....................................................................24

       A.     Defendants' directives are reviewable under the APA. ........................24

       B.     Defendants' directives are arbitrary and capricious. ..........................26

IV.    Without a Stay, Plaintiffs' Members and Countless Other Paroled Individuals Will Continue to Suffer Irreparable Harm. ...................................................29

V.     The Balance of Equities and the Public Interest Strongly Tip in Plaintiffs' Favor. ...........32

VI.    A Stay in Full of the Agency's Actions is Appropriate. ...................................32

CONCLUSION ......................................................................................33

JA488

# TABLE OF AUTHORITIES

**Page(s)**

<u>**Cases**</u>

*Abbott v. Perez*,
   585 U.S. 579 (2018)..................................................................................7

*Al Otro Lado, Inc. v. Mayorkas*,
   619 F. Supp. 3d 1029 (S.D. Cal. 2022), *aff'd in part, vacated in part sub nom.*,
   *Al Otro Lado v. Exec. Off. for Immigr. Rev.*, 120 F. 4th 606 (9th Cir. 2024)...........6

*Am. Immigr. Laws. Ass'n v. Reno*,
   199 F.3d 1352 (D.C. Cir. 2000)...............................................................13

*Am. Immigration Laws. Ass'n v. Reno ("AILA")*,
   18 F. Supp. 2d 38 (D.D.C. 1998), *aff'd,* 199 F.3d 1352 (D.C. Cir. 2000)...............30

*Am. Textile Mfrs. Inst., Inc. v. Donovan*,
   452 U.S. 490 ...................................................................................27

*Barrett v. United States*,
   423 U.S. 212 (1976)..............................................................................15

*Bennett v. Spear*,
   520 U.S. 154 (1997)..........................................................................25, 26

*Biden v. Texas*,
   597 U.S. 785 (2022)................................................................................7

*Brown v. Gilmore*,
   533 U.S. 1301 (2001)..............................................................................7

*Cal. Communities. Against Toxics v. EPA*,
   934 F.3d 627 (D.C. Cir. 2019)..................................................................26

*California v. Grace Brethren Church*,
   457 U.S. 393 (1982)................................................................................7

*California v. U.S. Bureau of Land Mgmt.*,
   277 F. Supp. 3d 1106 (N.D. Cal. 2017) .......................................................9

*Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.*,
   98 F.4th 220 (5th Cir. 2024) ...................................................................33

*Castillo v. Bondi*,
   No. 24-3631, 2025 WL 1699534 (6th Cir. June 18, 2025)....................................24

JA489

*Ctr. for Biological Diversity v. Regan*,
    597 F. Supp. 3d 173 (D.D.C. 2022) ........................................................... 9

*D.A.M. v. Barr*,
    486 F. Supp. 3d 404 (D.D.C. 2020) ........................................................... 5

*D.C. v. U.S. Dep't of Agric.*,
    444 F. Supp. 3d 1 (D.D.C. 2020) ........................................................... 33

*Defs. of Wildlife v. Gutierrez*,
    532 F.3d 913 (D.C. Cir. 2008) ........................................................... 12

*DHS v. Regents of the Univ. of California*,
    591 U.S. 1 (2020) ........................................................... 5, 27, 29

*DHS v. Thuraissigiam*,
    591 U.S. 103 (2020) ........................................................... 22, 30

*Diamond Alt. Energy, LLC v. EPA*,
    606 U.S. --, No. 24-7, 2025 WL 1716141 (June 20, 2025) ........................ 13

*Doe v. Noem*,
    No. 1:25-cv-10495 IT, 2025 WL 1099602 (D. Mass. Apr. 14, 2025) ......... 15, 18, 31, 34

*Doe v. Noem*,
    No. 24A1079, 145 S. Ct. 1524 (May 30, 2025) ........................................ 18

*E. Bay Sanctuary Covenant v. Biden*
    993 F.3d 640, 681 (9th Cir. 2021) ........................................................ 33

*Encino Motorcars, LLC v. Navarro*,
    579 U.S. 211 (2016) ........................................................... 18, 28

*Fed. Election Comm'n v. Cruz*,
    596 U.S. 289 (2022) ........................................................... 21

*Fischer v. United States*,
    603 U.S. 480 (2024) ........................................................... 16

*Florida v. Mayorkas*,
    No. 3:23cv9962-TKW-ZCB, 2023 WL 3567851 (N.D. Fla. May 16, 2023) ......... 9

*Florida v. United States*,
    660 F. Supp. 3d 1239 (N.D. Fla. 2023) ................................................. 6

*Garland v. Aleman Gonzalez*,
    596 U.S. 543 (2022) ........................................................... 6, 7

JA490

*Gomez v. Trump*,
    485 F. Supp. 3d 145 (D.D.C. 2020) ....................................................................8

*Grace v. Barr*,
    965 F.3d 883 (D.C. Cir. 2020) ....................................................................4, 10

*Grace v. Whitaker*,
    344 F. Supp. 3d 96 (D.D.C. 2018), *rev'd in part sub nom. Grace v. Barr*, 965
    F.3d 883 (D.C. Cir. 2020) ....................................................................3, 25

*Huisha-Huisha v. Mayorkas*,
    27 F.4th 718 (D.C. Cir. 2022) ....................................................................8

*Immigrant Defs. L. Ctr. v. Mayorkas*,
    No. CV 20-9893 JGB, 2023 WL 3149243 (C.D. Cal. Mar. 15, 2023) ....................6

*Kiakombua v. Wolf*,
    498 F. Supp. 3d 1 (D.D.C. 2020) (K. Jackson, J.) ....................................3, 10, 25, 33

*Kidd v. Mayorkas*,
    734 F. Supp. 3d 967 (C.D. Cal. 2024) ....................................................................6

*Kingdom v. Trump*,
    No. 1:25-cv-691-RCL, 2025 WL 1568238 (D.D.C. June 3, 2025) ....................8

*Kucana v. Holder*,
    558 U.S. 233 (2010) ....................................................................8, 32

*Larson v. Valente*,
    456 U.S. 228 (1982) ....................................................................12

*Las Americas Immigrant Advoc. Ctr. v. DHS*,
    No. CV 24-1702 (RC), 2025 WL 1403811 (D.D.C. May 9, 2025) ....................6

*Las Americas Immigrant Advoc. Ctr. v. Wolf*,
    507 F. Supp. 3d 1 (D.D.C. 2020) (Jackson, K.B., D.J.) ....................................25

*League of Women Voters of the U.S. v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) ....................................................................32

*Lofton v. D.C.*,
    7 F. Supp. 3d 117 (D.D.C. 2013) ....................................................................32

*Loper Bright Enters. v. Raimondo*,
    603 U.S. 369 (2024) ....................................................................5, 14

*Lujan v. Nat'l Wildlife Fed'n*,
    497 U.S. 871 (1990) ....................................................................24

JA491

*Make the Rd. New York v. McAleenan,*
   405 F. Supp. 3d 1 (D.D.C. 2019) ...................................................26

*Make the Road New York v. Wolf,*
   962 F.3d 612 (D.C. Cir. 2020) ..........................................3, 4, 11

*Mata Velasquez v. Kurtzdorfer,*
   Case No. 1:25-cv-00493-LJV (W.D.N.Y. June 18, 2025), ECF No. 42
   (attached hereto as Exhibit A) ....................................................16

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak,*
   567 U.S. 209 (2012) .................................................................13, 14

*Merrill v. Milligan,*
   142 S. Ct. 879 (2022) (Kavanaugh, J., concurring) ...................18

*Michigan Citizens for an Indep. Press v. Thornburgh,*
   No. CIV.A. 88-2322, 1988 WL 90388 (D.D.C. Aug. 17, 1988) ..........33

*Monsanto Co. v. Geertson Seed Farms,*
   561 U.S. 139 (2010)......................................................................7

*Motion Picture Ass'n of Am., Inc. v. FCC,*
   309 F.3d 796 (D.C. Cir. 2002) ....................................................17

*Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs,*
   417 F.3d 1272 (D.C. Cir. 2005) ...................................................24

*Nat'l Ass'n of Mfrs. v. Dep't of Def.,*
   583 U.S. 109 (2018)......................................................................19

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs,*
   145 F.3d 1399 (D.C. Cir. 1998) ...................................................32

*Nat'l TPS All. v. Noem,*
   No. 25-cv-01766-EMC, 2025 WL 957677 (N.D. Cal. Mar. 31, 2025) ..............6, 17

*Nat'l Urb. League v. Ross,*
   977 F.3d 770 (9th Cir. 2020) .......................................................28

*Nielsen v. Preap,*
   586 U.S. 392 (2019).......................................................................2

*Niz-Chavez v. Garland,*
   593 U.S. 155 (2021)......................................................................28

*Nken v. Holder,*
   556 U.S. 418 (2009)...................................................................8, 32

v

JA492

*Noem v. Doe*,
    No. 24A1079, 2025 WL 1534782 (U.S. May 30, 2025) ......................................31

*Northeast Ohio Coalition for Homeless & Service Employees Int'l Union, Local*
    *1199 v. Blackwell*,
    467 F.3d 999 (6th Cir. 2006) ....................................................................................9

*OPM v. American Federation of Government Employees, AFL-CIO*,
    473 U.S. 1301 (1985) ..............................................................................................9

*Pub. Serv. Elec. & Gas Co. v. FERC*,
    989 F.3d 10 (D.C. Cir. 2021) .................................................................................21

*R.I.L.-R. v. Johnson*,
    80 F. Supp. 3d 164 (D.D.C. 2015) .........................................................................32

*Reno v. Am.-Arab Anti-Discrimination Comm.*,
    525 U.S. 471 (1999) .........................................................................................4, 5, 6

*Rodriguez v. Hayes*,
    591 F.3d 1105 (9th Cir. 2010) .................................................................................7

*Safety-Kleen Corp. v. EPA*,
    No. 92-1629, 1996 U.S. App. LEXIS 2324 (D.C. Cir. Jan. 19, 1996) ....................9

*Sampson v. Murray*,
    415 U.S. 61 (1974) ..................................................................................................7

*Sanchez v. Mayorkas*,
    593 U.S. 409 (2021) ..............................................................................................16

*Scripps-Howard Radio v. FCC*,
    316 U.S. 4 (1942) ....................................................................................................7

*SEC v. Chenery Corp.*,
    318 U.S. 80 (1943) ................................................................................................14

*Shvartser v. Lekser*,
    308 F. Supp. 3d 260 (D.D.C. 2018) .......................................................................32

*Sierra Club v. Jackson*,
    833 F. Supp. 2d 11 (D.D.C. 2012) ...........................................................................7

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016) ..............................................................................................12

*Texas v. Biden*,
    646 F. Supp. 3d 753 (N.D. Tex. 2022) ..........................................................*passim*

JA493

*Texas v. United States*,
   40 F.4th 205 (5th Cir. 2022) ..........................................................................6, 7

*Trump v. CASA*,
   No. 24A884, 2025 WL 1773631 (U.S. June 27, 2025) ...............................33

*Turkiye Halk Bankasi A.S. v. United States*,
   598 U.S. 264 (2023) ........................................................................................15

*Turner v. U.S. Att'y Gen.*,
   130 F. 4th 1254 (11th Cir. 2025) .............................................................14, 15

*United States ex rel. Accardi v. Shaughnessy*,
   347 U.S. 260 (1954) ........................................................................................18

*Wyoming v. Dep't of Interior*,
   No. 18–8027, 2018 WL 2727031 (10th Cir. June 4, 2018) ..........................7

## **Statutes**

5 U.S.C.
   § 704 ...........................................................................................................24, 25
   § 705 ...................................................................................................7, 8, 9, 33
   § 706(2) ............................................................................................................33
   § 706(2)(A) ......................................................................................................24

6 U.S.C.
   § 251 ..................................................................................................................2
   § 271(b) .............................................................................................................2

8 U.S.C.
   § 1101(a)(13)(A) .............................................................................................16
   § 1182(d)(5)(A) ...............................................................................................21
   § 1225 ..............................................................................................................19
   § 1225(a)(1) .....................................................................................................21
   § 1225(b) ...............................................................................................1, 4, 10
   § 1225(b)(1) .......................................................................2, 9, 18, 19, 20
   § 1225(b)(1)(A) ...............................................................................................14
   § 1225(b)(1)(A)(i) ..................................................................................*passim*
   § 1225(b)(1)(A)(i)(F) ......................................................................................20
   § 1225(b)(1)(A)(iii) ...........................................................................14, 18, 26, 27
   § 1225(b)(1)(A)(iii)(II) ...........................................................................*passim*
   § 1225(b)(1)(B)(ii) ..........................................................................................31
   § 1225(b)(1)(F) ...............................................................................................19
   § 1225(b)(2)(C) ...............................................................................................19
   § 1225(d)(2) .....................................................................................................19
   § 1252 .......................................................................................................1, 3, 4
   § 1252(a)(2) .......................................................................................................2

JA494

§ 1252(a)(2)(A)(iv) ...................................................................................2
§ 1252(e)(1)(A) ......................................................................................10
§ 1252(e)(3) .................................................................................... *passim*
§ 1252(e)(3)(A) .......................................................................................2
§ 1252(e)(3)(B) .......................................................................................4
§ 1252(f)(1) ....................................................................................6, 7, 8
§ 1252(g) .............................................................................................4, 5
§ 1551 .......................................................................................................2

28 U.S.C.
§ 1253 .......................................................................................................7
§ 1292(a)(1) ............................................................................................7
§ 1651(a) .................................................................................................7

42 U.S.C. § 7607(g) ..................................................................................7

INA
§ 212 ......................................................................................................17
§ 212(a) .................................................................................................17

## Other Authorities

Fed. R. Civ. P
65 ...........................................................................................................33
65(c) ......................................................................................................33

8 C.F.R.
§ 1.2 ..............................................................................10, 12, 21, 22, 25
§ 235.3 .............................................................................................10, 12
§ 235.3(b)(1)(ii) ...................................................................................17
§ 235.3(b)(4)(ii) ...................................................................................31
§ 235.3(b)(6) .........................................................................................17
§ 253.3 ...................................................................................................12
§ 1001.1(q) ...........................................................................................21

62 Fed. Reg.
10312 .....................................................................................................22
10313 .....................................................................................................22
10330 .....................................................................................................22

63 Fed. Reg.
19382 .....................................................................................................22
19384 .....................................................................................................22

71 Fed. Reg.
27,585 ....................................................................................................22
27,588 ....................................................................................................22

JA495

87 Fed. Reg.
    63507............................................................................................................29
    63508............................................................................................................29

88 Fed. Reg.
    1243..............................................................................................................29
    1244..............................................................................................................29
    1255..............................................................................................................29
    1256..............................................................................................................29
    1266..............................................................................................................29
    1268..............................................................................................................29

90 Fed. Reg. ("March 25 CHNV Termination Notice")
    13611..............................................................................................................1
    13618..............................................................................................................3
    13619.......................................................................................................3, 27

103rd Cong. (1994), https://www.congress.gov/bill/103rd-congress/house-
    bill/3363/text;...........................................................................................23

140 Cong. Rec. H3629, H3632 (daily ed. March 2, 1994),
    https://www.congress.gov/103/crecb/1994/03/02/GPO-CRECB-1994-pt3-5-
    2.pdf. .........................................................................................................23

Michael Elsen-Rooney, *A Bronx high schooler showed up for a routine
    immigration court date. ICE was waiting*, Chalkbeat (May 26, 2025),
    https://tinyurl.com/2xc3e36f; ..................................................................11

Joshua Goodman & Gisela Salomon, *ICE agents wait in hallways of immigration
    court as Trump seeks to deliver on mass arrest pledge*, AP News (May 21,
    2025), https://tinyurl.com/53mkncxt ......................................................11

Ted Hesson & Kristina Cooke, *Trump weighs revoking legal status of Ukrainians
    as US steps up deportations*, Reuters (Mar. 6, 2025),
    https://tinyurl.com/3v3ry4fr (citing "internal ICE email" available at
    https://tinyurl.com/mue9jm4x ("February 18 ICE Directive")) ..................... *passim*

H.R. 2602, 103rd Cong. (1993), https://www.congress.gov/bill/103rd-
    congress/house-bill/2602/text ..................................................................23

H.R. Rep. No. 104-469(I), at 157-58 (1996) (emphasis added), *available at* 1996
    WL 168955 ...............................................................................................23

Huffman Memorandum, DHS, Memorandum from Acting Secretary Benjamine
    C. Huffman on Guidance Regarding How to Exercise Enforcement Discretion
    (Jan. 23, 2025), https://tinyurl.com/3ru2fz46 ("January 23 Huffman
    Memorandum")............................................................................................ *passim*

JA496

Dan Katz, *ICE Arrested a 6-year-old Boy with Leukemia at Immigration Court.*
  *His Family is Suing*, Texas Public Radio (June 25, 2025),
  https://www.tpr.org/border-immigration/2025-06-25/ice-arrested-a-6-year-
  old-boy-with-leukemia-at-immigration-court-his-family-is-suing .........................................30

JA497

**INTRODUCTION**

The January 23 Huffman Memorandum,[1] February 18 ICE Directive,[2] and March 25 CHNV Termination Notice[3] have prompted a nationwide blitz of immigration enforcement whereby paroled individuals appearing in immigration court encounter government attorneys moving to dismiss their cases, only then to find ICE personnel waiting to apprehend and detain them and put them into expedited removal proceedings. As Defendants acknowledge, these policy directives are integral to Defendants' efforts "to expeditiously remove" "potentially hundreds of thousands of [parole beneficiaries] whose parole it has terminated or will terminate," Opp. 3. A temporary stay of these policy directives would inflict no concrete harms on Defendants while restoring the status quo until this Court can issue a final judgment on the merits of Plaintiffs' claims.

Defendants take a "kitchen sink" approach to try and persuade the Court that it lacks jurisdiction to consider Plaintiffs' claims and issue such relief. But as Defendants concede, "the language of the statute controls," Opp. 38, and a faithful reading of 8 U.S.C. §§ 1225(b) and 1252 shows that Plaintiffs' claims are timely brought, reviewable and redressable by this Court, and amenable to relief under both § 1252 and the Administrative Procedure Act ("APA").

A faithful reading of § 1225(b) also confirms that noncitizens here in the United States after being inspected and paroled are categorically ineligible for expedited removal, because they are not "arriving in the United States," as required by 8 U.S.C. § 1225(b)(1)(A)(i), and are exempted from 8 U.S.C. § 1225(b)(1)(A)(iii)(II), which only applies to people who have "not been . . . paroled." The statute cannot bear Defendants' interpretation, which defies the plain meaning

---

[1] DHS, Memorandum from Acting Secretary Benjamine C. Huffman on Guidance Regarding How to Exercise Enforcement Discretion (Jan. 23, 2025), https://tinyurl.com/3ru2fz46.

[2] Ted Hesson & Kristina Cooke, *Trump weighs revoking legal status of Ukrainians as US steps up deportations*, Reuters (Mar. 6, 2025), https://tinyurl.com/3v3ry4fr (citing "internal ICE email" available at https://tinyurl.com/mue9jm4x).

[3] Notice, U.S. Dep't of Homeland Sec., Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans, 90 Fed. Reg. 13611 (Mar. 25, 2025).

JA498

of the text and the overall structure of the statute, would in multiple ways effectively strike the limiting language in 8 U.S.C. § 1225(b)(1)(A)(iii)(II) specifying that expanded expedited removal can only be applied to individuals who have "not been admitted or paroled." Defendants, moreover, have neither explained the fundamental inconsistencies in their policy directives, nor accounted for the serious reliance interests at stake. The APA does not tolerate unreasoned agency action that is not in accordance with law.

## ARGUMENT

**I.    This Court Has Jurisdiction Both to Consider Plaintiffs' Claims and to Issue the Requested Stay.**

**A.    This Court Has Jurisdiction to Review Plaintiffs' Claims.**

1. *Plaintiffs' claims are timely and judicial review is available under 8 U.S.C. § 1252(e)(3).* This Court has jurisdiction to review the January 23 Huffman Memorandum, February 18 ICE Directive, and March 25 CHNV Parole Termination Notice under the plain text of 8 U.S.C. § 1252(e)(3). Although § 1252(a)(2) bars judicial review of various aspects of the expedited removal process, including policies to implement the expedited removal statute, § 1252(a)(2)(A)(iv), together with subsection (e), expressly preserves judicial review of "Challenges on validity of the system." In relevant part, § 1252(e)(3)(A) guarantees "judicial review" of "an action instituted in" this Court to determine whether a challenged regulation, "written policy directive, written policy guideline, or written procedure issued by or under the authority of the Attorney General to implement" the expedited removal statute is lawful.[4]

This case is just such an action: Plaintiffs seek this Court's review of the January 23 Huffman Memorandum, which "provides guidance" in "implementing" expedited removal "under 8 U.S.C. § 1225(b)(1);" the February 18 ICE Directive, which directs ICE officers when and how

---

[4] Various INA functions formerly vested in the Attorney General have been transferred to the Secretary of Homeland Security. Some residual statutory references to the Attorney General that pertain to those functions are now deemed to refer to the Secretary of Homeland Security. *See* 6 U.S.C. § 251, 271(b), 542 note, 557; 8 U.S.C. § 1551 note; *see also Nielsen v. Preap*, 586 U.S. 392, 397 n.2 (2019).

JA499

to "consider" or "process for [expedited removal]" certain individuals; and the March 25 CHNV Parole Termination Notice, which terminates individual grants of CHNV parole for the sole purpose of subjecting CHNV parole beneficiaries to expedited removal, and expresses DHS's intent "to remove promptly" such individuals, 90 Fed. Reg. 13618, 13619—three separate written policies issued by Defendants to implement 1225(b). *See Grace v. Whitaker*, 344 F. Supp. 3d 96, 115-17 (D.D.C. 2018) (holding reviewable written directives and guidance regarding the expedited removal process), *rev'd in part sub nom. Grace v. Barr*, 965 F.3d 883 (D.C. Cir. 2020); *Kiakombua v. Wolf*, 498 F. Supp. 3d 1, 35 (D.D.C. 2020) (K. Jackson, J.) (same).

This case, moreover, should be considered "against the backdrop of a familiar principle of statutory construction: the presumption favoring judicial review of administrative action." *Make the Road New York v. Wolf*, 962 F.3d 612, 623 (D.C. Cir. 2020) ("*MRNY*") (citations and internal punctuation omitted); *see also id.* at 624 ("That well-settled and strong presumption in favor of judicial review is so embedded in the law that it applies even when determining the scope of statutory provisions specifically designed to limit judicial review," including § 1252) (citations and internal punctuation omitted). Defendants attempt to insulate their recent policy directives implementing the expedited removal statute by recasting Plaintiffs' claims as untimely challenges to preexisting regulations rather than to "a new policy regarding the application of expedited removal to paroled [individuals]." Opp. 22, 23. But this argument contravenes the express terms of § 1252(e)(3), and Defendants cite no law or logic immunizing from judicial review a writing that falls within the scope of § 1252(e)(3) merely because it may include language from, or otherwise draw upon, prior guidance. *See MRNY*, 962 F.3d at 625 ("[T]he statute's plain language says that there is jurisdiction . . . [over] challenges on validity of the system.") Nor do Defendants explain how a Court is to determine whether a particular writing is "new"—a word that does not appear in the statute. *Cf. Kiakombua*, 498 F. Supp. 3d at 35-36 ("[S]ection 1252(e)(3) plainly authorizes judicial review of written policies, guidelines, or procedures that implement the expedited removal statute, without regard to whether such policies deviate substantively from an agency's prior practices").

JA500

To the contrary, § 1252(e)(3) provides that any written policy directive or guideline is subject to judicial review if suit is brought within 60 days of it being "first implemented," 8 U.S.C. § 1252(e)(3)(B), and Defendants do not dispute that Plaintiffs filed this action within the first 60 days after the January 23 Huffman Memorandum was published. *Grace v. Barr*, 965 F.3d 883, 894 (D.C. Cir. 2020) ("[S]ection 1252(e) operates to preserve district-court jurisdiction so long as the challenged decision implements section 1225(b)"); *MRNY*, 962 F.3d 612, 618, 625-28 (D.C. Cir. 2020) (holding that § 1252(e)(3) provides jurisdiction over the plaintiffs' challenge to the Secretary's designation regarding the expanded use of expedited removal").

2. *Plaintiffs' claims are not barred under 8 U.S.C. § 1252(g)*. Because Plaintiffs' claims are timely brought under § 1252(e)(3), §1252(g), which generally makes unreviewable "any cause or claim . . . arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter"—"*except* as provided in this section [i.e., 8 U.S.C. § 1252]"—poses no bar to Plaintiffs' request for a stay, for two independent reasons. 8 U.S.C. § 1252(g) (emphasis added).

First, the plain language of § 1252(g) carves out actions like the instant lawsuit. Section 1252(g) expressly "[e]xcept[s]" actions "as provided" in § 1252—including "[c]hallenges on validity of the system" under § 1252(e)(3). Here, Plaintiffs are challenging the lawfulness of the January 23 Huffman Memorandum, the February 18 ICE Directive, and the March 25 CHNV Parole Termination Notice, which each seek to "implement" the expedited removal statute by directing when and how federal personnel should consider or process for expedited removal certain individuals who cannot lawfully be subjected to expedited removal. Plaintiffs' claims are authorized and timely brought under § 1252(e)(3), and thus are excepted from the limitations that § 1252(g) places on federal courts' jurisdiction.

Second, as the Supreme Court recognized, § 1252(g) should be construed narrowly and "applies only to three discrete actions that the Attorney General may take: her 'decision or action' to commence proceedings, adjudicate cases, or execute removal orders." *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 482 (1999) ("*AADC*") (emphasis and some internal

4

**JA501**

quotation marks omitted). The Supreme Court reasoned that Congress's "special attention" on insulating these three discrete actions from judicial review was warranted because these actions "represent the initiation or prosecution of various stages in the deportation process" and thus identify stages where the Executive exercises "discretion to abandon the endeavor," either "for humanitarian reasons or simply for its own convenience." *Id.* at 483-84.

Plaintiffs' challenge to the lawfulness of the January 23 Huffman Memorandum, the February 18 ICE Directive, and the March 25 CHNV Parole Termination Notice, and their direction to federal personnel to consider or process for expedited removal the beneficiaries of humanitarian parole programs, does not implicate any of these three actions, or any decision-making where discretion plays a part. *See id.* (acknowledging that 1252(g) does not apply to the "many other decisions or actions that may be part of the deportation process"); *see also DHS v. Regents of the Univ. of California*, 591 U.S. 1, 19 (2020) (holding that 1252(g)'s scope is "narrow" and rejecting as "'implausible' the Government's suggestion that § 1252(g) covers 'all claims arising from deportation proceedings' or imposes 'a general jurisdictional limitation.'" (citing *AADC*, 525 U.S. at 482)). The plain text and overall structure of the expedited removal statute make clear that paroled individuals may not be subjected to expedited removal, *see infra* at II, and as a result, a written policy directive or written policy guidance that instructs agency employees to process paroled beneficiaries for expedited removal, in contravention of the INA, is not an exercise of the agency's discretion insulated from judicial review. *See D.A.M. v. Barr*, 486 F. Supp. 3d 404, 417 n.5 (D.D.C. 2020) ("[I]f the government tries to remove a noncitizen under circumstances where removal is not within the Attorney General's prosecutorial discretion, § 1252(g) does not apply.") (emphasis omitted); *accord Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 392 (2024) ("Under the APA, it thus remains the responsibility of the court to decide whether the law means what the agency says.") (citations and internal punctuation omitted).

JA502

**B.      This Court May Issue a Stay to Remedy Agency Action that Violates the APA.**

1. *Section 1252(f)(1) poses no bar to this Court issuing a stay under the APA.* Section 1252(f)(1) "generally prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out" certain immigration statutes. *Garland v. Aleman Gonzalez*, 596 U.S. 543, 550 (2022). By its own terms, § 1252(f)(1) is "nothing more or less than a limit on injunctive relief." *AADC*, 525 U.S. at 481.

This Court—as well as numerous others, including the Fifth Circuit and at least five other district courts—has rejected Defendants' view that APA relief is functionally an injunction barred by § 1252(f)(1). *Las Americas Immigrant Advoc. Ctr. v. DHS*, No. CV 24-1702 (RC), 2025 WL 1403811, at *22 (D.D.C. May 9, 2025) (rejecting Defendants' contention "that the INA's limitation on injunctions, 8 U.S.C. § 1252(f)(1), applies to vacatur orders."); *see also Texas v. United States*, 40 F.4th 205, 219-20 (5th Cir. 2022) (holding § 1252(f)(1) does not apply "to vacatur" and that DHS was "unlikely to demonstrate" a lack of "jurisdiction to vacate unlawful agency action"); *Nat'l TPS All. v. Noem*, No. 25-cv-01766-EMC, 2025 WL 957677, at *15 (N.D. Cal. Mar. 31, 2025) ("reject[ing] the government's contention that 1252(f)(1) is a bar to Plaintiffs' request for [APA postponement] relief"); *Kidd v. Mayorkas*, 734 F. Supp. 3d 967, 987 (C.D. Cal. 2024) (§1252(f)(1) inapplicable because vacating ICE policy neither "compel[s] nor restrain[s] further agency decision-making") (citation omitted); *Florida v. United States*, 660 F. Supp. 3d 1239, 1284-85 (N.D. Fla. 2023) ("§1252(f)(1) does not strip [the Court] of the authority to vacate either of the challenged policies under the APA"); *Al Otro Lado, Inc. v. Mayorkas*, 619 F. Supp. 3d 1029, 1045-46 (S.D. Cal. 2022) (Section 1252(f)(1) does not prevent "'set[ting] aside' or 'vacating' a policy based upon an APA violation"), *aff'd in part, vacated in part sub nom.*, *Al Otro Lado v. Exec. Off. for Immigr. Rev.*, 120 F. 4th 606 (9th Cir. 2024); *Immigrant Defs. L. Ctr. v. Mayorkas*, No. CV 20-9893 JGB (SHKx), 2023 WL 3149243, at *14 (C.D. Cal. Mar. 15, 2023) (Section 1252(f)(1) "did not bar" vacatur); *Texas v. Biden*, 646 F. Supp. 3d 753, 768 (N.D. Tex. 2022) (same).

Although Defendants cite *Biden v. Texas*, 597 U.S. 785 (2022) for support, Opp. 11, *Texas* explicitly reserved the question of whether 8 U.S.C. § 1252(f)(1) bars relief under the APA, *id.* at 801 n.4, and the district court on remand rejected Defendants' view.[5] *Texas*, 646 F. Supp. 3d at 768. And notwithstanding Defendants' attempts to conflate the types of relief offered by injunctions and the APA, Opp. 11-14,[6] relief under the APA is distinct from injunctive relief—a "drastic and extraordinary remedy." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010). Vacatur is "less drastic," *id.*, and in this motion, Plaintiffs seek only a stay under § 705, which is itself "an interim or lesser form of [relief than] vacatur," *Texas*, 646 F. Supp. 3d at 769. A postponement (or "stay") under § 705 does not "'order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions' at issue;" it merely postpones agency action, *id.* (quoting *Aleman Gonzalez*, 596 U.S. at 550), and like vacatur, "does nothing but" maintain or "re-establish the status quo absent the unlawful agency action."[7] *Texas*,

---

[5] All the other cases Defendants cite to support their argument that Plaintiffs' stay request is "no different than a request for an injunction," Opp. 12, have nothing to do with immigration or the interaction between § 1252(f)(1) and relief available under the APA. *Brown v. Gilmore*, 533 U.S. 1301, 1303 (2001) (concerning an injunction of a state statute under the All Writs Act, 28 U.S.C. § 1651(a)); *Abbott v. Perez*, 585 U.S. 579, 595 (2018) (examining whether "orders" issued by a three-judge panel were reviewable as injunctions under the Judiciary Act, 28 U.S.C. § 1253); *California v. Grace Brethren Church*, 457 U.S. 393, 408 (1982) (holding that the district court had no jurisdiction to issue an injunction under the Tax Injunction Act); *Wyoming v. Dep't of Interior*, No. 18–8027, 2018 WL 2727031, at *1 (10th Cir. June 4, 2018) (examining whether a district court's order was reviewable under the Judiciary Act, 28 U.S.C. § 1292(a)(1)); *Sierra Club v. Jackson*, 833 F. Supp. 2d 11, 25, 28 (D.D.C. 2012) (concerning the Clean Air Act, 42 U.S.C. § 7607(g), which expressly precludes "any stay, injunctive, or similar relief").

[6] Defendants' reliance on *Sampson v. Murray*, 415 U.S. 61 (1974) and *Scripps-Howard Radio v. FCC*, 316 U.S. 4 (1942) is misplaced, Opp. 12, as the Court found that laws governing the judicial review of administrative agency actions "do not disclose any general legislative policy regarding the power to stay administrative orders pending review." *Scripps-Howard Radio*, 316 U.S. at 16.

[7] Defendants claim that Plaintiffs' stay request would "restrain how DHS implements expedited removal," in contravention of § 1252(f)(1), but virtually all orders against the government have the effect of restraining federal officials in some sense. If § 1252(f)(1) prohibited any order that had such an effect, then it would also bar declaratory relief, which it does not. *Texas*, 597 U.S. at 800 (section 1252(f)(1) preserves "jurisdiction to entertain the plaintiffs' request for declaratory relief") (internal quotation marks omitted); *Rodriguez v. Hayes*, 591 F.3d 1105, 1119 (9th Cir. 2010) (same).

7

JA504

40 F.4th at 219-20. Even if vacatur under the APA were analogous to an injunction, the stay relief Plaintiffs seek here still would not violate Section 1252(f)(1), because stays are not injunctions. *Nken v. Holder*, 556 U.S. 418, 428-29 (2009) ("A stay . . . temporarily suspend[s] the source of authority to act," it does not "direct[] an actor's conduct."). And had Congress wanted to prohibit stays in this context, it "could easily have said so." *Kucana v. Holder*, 558 U.S. 233, 248 (2010).

Defendants point to no controlling or persuasive authority that compels this Court to upend settled law and expand the scope of § 1252(f)(1) beyond its plain text. Section 1252(f)(1) does not prohibit this Court from issuing vacating agency action or from temporarily staying the January 23 Huffman Memorandum, the February 18 ICE Directive, and the March 25 CHNV Parole Termination Notice while litigation in this case continues.

2. *The Court may stay agency action that has already commenced*. Defendants rely on dictionary definitions and inapposite cases to contend that 5 U.S.C. § 705 "does not authorize a postponement of the documents" because they are "already in effect." Opp. 14-15. This contention is similarly untethered to the plain language of the statute and unsupported by the case law.

Although § 705 allows both an "agency" and a "reviewing court" to "postpone the effective date of an agency action," it *further* allows a reviewing court "*to preserve status or rights pending conclusion of the review proceedings*." 5 U.S.C. § 705 (emphases added). Consistent with this language, "[c]ourts—including the Supreme Court—routinely stay already-effective agency action under Section 705." *Texas*, 646 F. Supp. 3d at 770 (collecting cases); *see also Gomez v. Trump*, 485 F. Supp. 3d 145, 205 (D.D.C. 2020) (preliminarily staying an already effective policy under § 705); *accord Kingdom v. Trump*, No. 1:25-cv-691-RCL, 2025 WL 1568238, at *5 (D.D.C. June 3, 2025) (rejecting as "unpersuasive" the same argument Defendants press here, "as various courts have interpreted § 705 to permit a 'stay'—which may be more aptly described as a temporary rollback—even of already-consummated agency action"). Relief "under Section 705 (even after the effective date) restores the [] status quo *ex ante*," *Texas*, 646 F. Supp. 3d at 771, i.e., "the last *uncontested* status which preceded the pending controversy," *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 733 (D.C. Cir. 2022) (emphasis in original) (citation omitted).

JA505

Defendants cite no cases to the contrary. *Northeast Ohio Coalition for Homeless & Service Employees Int'l Union, Local 1199 v. Blackwell*, 467 F.3d 999, 1066 (6th Cir. 2006), and *OPM v. American Federation of Government Employees, AFL-CIO*, 473 U.S. 1301, 1303-05 (1985), do not address § 705 at all: the former concerns the immediate appealability of a "mandatory injunction" that went "far beyond preserving the status quo", *Ne. Ohio Coal.*, 467 F.3d at 1006, while the latter held that an *appellate court* lacked authority to stay a regulation following a *denial* of a TRO brought "eight months after Congress had finally fixed" the effective date, and where the denial's consequences were not "grave," because it lacked jurisdiction to consider an appeal of a denied TRO at all, *OPM*, 473 U.S. at 1303-05. *Florida v. Mayorkas*, No. 3:23cv9962-TKW-ZCB, 2023 WL 3567851 (N.D. Fla. May 16, 2023), involved a policy actually "in effect," *id.* at *4, but the district court did "not definitely decide" whether § 705 applied because it granted an injunction, *id.* at *4 n.7. And as Defendants acknowledge, *Safety-Kleen Corp. v. EPA*, No. 92-1629, 1996 U.S. App. LEXIS 2324, at *2-3 (D.C. Cir. Jan. 19, 1996), *Ctr. for Biological Diversity v. Regan*, 597 F. Supp. 3d 173 (D.D.C. 2022), and *California v. U.S. Bureau of Land Mgmt.*, 277 F. Supp. 3d 1106 (N.D. Cal. 2017), concerned *agencies'* authority to postpone rules after an effective date, not judicial authority to issue a stay. The distinction matters because an agency's postponement of an already effective rule is "tantamount to amending or revoking a rule," which must comply with the APA—unlike court orders under § 705. *Texas*, 646 F. Supp. 3d at 770-71 (citations and internal punctuation omitted).

As a "reviewing court," this Court "may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. Nothing about the timing of Plaintiffs' motion deprives the Court of that authority.

3. *Section 1252(e)(1)(A) provides no impediment to this Court's jurisdiction or ability to grant Plaintiffs' requested stay.* Section 1252(e)(1) states (emphasis added) that "no court may . . . enter declaratory, injunctive, or other equitable relief *in an action pertaining to an order to exclude an alien in accordance with section 1225(b)(1) of this title* except as specifically

JA506

authorized in a subsequent paragraph of this subsection." As the D.C. Circuit held in *Grace v. Barr*, the "plain language of this provision makes clear" that § 1252(e)(1)(A) does not apply to "the kind of challenge we face here, namely, a '[c]hallenge[] on [the] validity of the [expedited-removal] system.'" 965 F.3d at 907 (citation omitted; alterations in original); *see also Kiakombua*, 498 F. Supp. 3d at 50-51 (K. Jackson, J.) (rejecting on the same grounds defendants' argument that 1252(e)(1)(A) "strip[s] federal courts of all such equitable remedies in all circumstances") (emphases omitted). Defendants are mixing apples and oranges when they urge this Court to apply the limitations Congress placed on the relief available in actions "pertaining to an order to exclude an alien" under § 1225(b) to actions "[c]halleng[ing]" the "validity of the system."[8] *Compare* 8 U.S.C. § 1252(e)(1)(A) *with id.* § 1252(e)(3).

### C.    Plaintiffs Have Jurisdictional and Prudential Standing.

1. *Plaintiffs' claims are redressable*. Defendants do not dispute that Plaintiffs "have sufficiently pled injury to their members." Opp. 19. Defendants only contend that Plaintiffs have failed to establish redressability, because the definition of "arriving alien" in 8 C.F.R. § 1.2 allows DHS to subject individuals who have been paroled at ports of entry to expedited removal under 8 C.F.R. § 235.3 and 8 U.S.C. § 1225(b). Defendants misapprehend the nature of the harm here.

As the media has reported and as the declarations attached to Plaintiffs' motion substantiate, following Defendants' adoption of the January 23 Huffman Memorandum, February 18 ICE Directive, and March 25 CHNV Parole Termination Notice—and also following a quota issued by the White House that ICE increase arrest and deportation numbers—individuals appearing for their immigration court hearings have been subject to an unprecedented "nationwide

---

[8] Defendants stray yet further from § 1252(e)(3) when they suggest that any determination of the lawfulness of any "written policy directive, written policy guideline, or written procedure issued by or under the authority of the Attorney General to implement [the expedited removal section]" must be a determination "*on the merits*," Opp. 17 (emphasis added), such that preliminary relief is unavailable. Defendants' interpretation "ignores the fact that section 1252(e)(3) is not addressed to remedies," *Kiakombua*, 498 F. Supp. 3d at 51, as well as the fact that the plain text of § 1252(e)(3) does not contain the additional limiting language Defendants have inserted. Defendants cite no case law showing why this Court should read such language into § 1252(e)(3).

JA507

blitz" of ICE enforcement.[9] DHS has begun targeting individuals appearing in court by moving to dismiss their cases, then immediately apprehending them as soon as they leave the courtroom and placing them in ICE detention for processing through expedited removal[10]—an action the January 23 Huffman Memorandum expressly directs the DHS component agencies to take.[11] As the attorneys of some of these detained individuals relate, both the tactic of immediately arresting and detaining individuals after their cases have been dismissed, as well as the practice of subjecting paroled individuals to expedited removal, are "*new*," "*irregular*," "*unusual*," and "*never seen*" before. *See, e.g.*, ECF No. 22-14 (Hirman Decl.) at ¶ 14; ECF No. 22-13 (Chua Decl.) at ¶ 13; ECF No. 22-8 (Montoya Decl.) at ¶¶ 28, 34-35, ECF No. 22-7 (Torres Decl.) at ¶ 6 (emphasis added). Plaintiffs' members are at risk of these new practices being applied to them, *see* ECF No. 22-2 (Escobar Decl.) at ¶¶ 10-17; ECF No. 22-3 (Salas Decl.) at ¶¶ 15-18; ECF No. 22-4 (Lawrence Decl.) at ¶¶ 13-19; in some instances have had these new practices actually applied to them, *see* ECF No. 22-2 (Escobar Decl.) at ¶ 17; ECF No. 22-3 (Salas Decl.) at ¶ 17; and fear for themselves and their families because of these new practices, ECF No. 22-2 (Escobar Decl.) at ¶¶

---

[9] Michael Elsen-Rooney, *A Bronx high schooler showed up for a routine immigration court date. ICE was waiting,* Chalkbeat (May 26, 2025), https://tinyurl.com/2xc3e36f; Joshua Goodman & Gisela Salomon, ICE agents wait in hallways of immigration court as Trump seeks to deliver on mass arrest pledge, AP News (May 21, 2025), https://tinyurl.com/53mkncxt.

[10] *See, e.g.*, ECF No. 22-3, Declaration of Angelica Salas ("Salas Decl."); ECF No. 22-2, Declaration of George Escobar ("Escobar Decl."); ECF No. 22-4, Declaration of Patrice Lawrence ("Lawrence Decl."); ECF No. 22-13, Declaration of Melissa Chua ("Chua Decl."); ECF No. 22-9, Declaration of Enrique Espinoza ("Espinoza Decl."); ECF No. 22-5, Declaration of Andrew Freire ("Freire Decl."); ECF No. 22-17, Declaration of Sarah Gillman ("Gillman Decl."); ECF No. 22-14, Declaration of Michael Hirman ("Hirman Decl."); ECF No. 22-12, Declaration of Meghan DuPuis Maurus ("Maurus Decl."); ECF No. 22-8, Declaration of Cesar Montoya ("Montoya Decl."); ECF No. 22-10, Declaration of Jessica Olive ("Olive Decl."); ECF No. 22-16, Declaration of Sabrina Perez-Arleo ("Perez-Arleo Decl."); ECF No. 22-15, Declaration of Ming Tanigawa-Lau ("Tanigawa-Lau Decl."); ECF No. 22-11, Declaration of Lindsay Toczylowski ("Toczylowski Decl."); ECF No. 22-7, Declaration of Bianca Torres ("Torres Decl.").

[11] Jan. 23 Huffman Memorandum, 2 (directing agencies to take steps to apply expedited removal, which "may include steps to terminate any ongoing removal proceedings and/or any active parole status").

JA508

14-16, 18-19; ECF No. 22-3 (Salas Decl.) at ¶¶ 17-24, ECF No. 22-4 (Lawrence Decl.) at ¶¶ 14-19, 22. Defendants do not dispute these facts in their briefing.

All the evidence before the Court establishes that ICE agents did not engage in ambush-style courthouse enforcement, and did not attempt to subject paroled individuals to expedited removal, until after Defendants adopted the January 23 Huffman Memorandum, February 18 ICE Directive, and March 25 CHNV Parole Termination Notice—each a new written policy directive or written policy guideline issued to implement the expedited removal statute. All the evidence before the Court therefore supports redressability, i.e., that the harm to Plaintiffs' members "is *likely* to be redressed," at least in part, "by a favorable judicial decision" staying the challenged agency actions. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (emphasis added); *see also Defs. of Wildlife v. Gutierrez*, 532 F.3d 913, 925 (D.C. Cir. 2008) (standing exists where "an order from the district court could redress [plaintiff's] injury, at least in part").

The fact that an older regulation seems to allow DHS to apply expedited removal to paroled individuals is of no import to the Court's redressability analysis when the evidence shows that the actions harming Plaintiffs' members did not occur *before* Defendants adopted the January 23 Huffman Memorandum, February 18 ICE Directive, and March 25 CHNV Parole Termination Notice—when, Plaintiffs do not dispute, 8 C.F.R. § 253.3 and the definition of "arriving alien" at 8 C.F.R. § 1.2 were in effect—but only after.[12] Indeed, the evidence makes clear that there is a stark qualitative difference in the enforcement actions taken by ICE personnel pursuant to a decades-old regulation and those taken pursuant to the January 23 Huffman Memorandum, February 18 ICE Directive, and March 25 CHNV Parole Termination. Plaintiffs have more than sufficiently shown that a stay of the challenged agency actions is "likely" to redress at least some of the harms substantiated by the declarations submitted in support of their motion. *See Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982) ("[A] plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself. He need not show that

---

[12] Plaintiffs challenge 8 C.F.R. § 1.2 as *ultra vires*, Am. Compl. ¶¶ 171-83, but have not moved for preliminary relief as to it.

JA509

a favorable decision will relieve his *every* injury.") (citation omitted); *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. --, No. 24-7, 2025 WL 1716141, at *8 (June 20, 2025) (finding redressability when "invalidating the [challenged] regulations would likely redress at least some of the [plaintiffs'] monetary injuries").[13]

2. *Plaintiffs and their members have prudential standing.* Plaintiffs assert interests of themselves and their members that fall within the zone of interests protected by the INA. The zone of interests' prudential analysis only forecloses a lawsuit "when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012) (citation and internal punctuation omitted). The interests of Plaintiffs in serving their members who were paroled into the country under different humanitarian parole processes, and of their members in not being unlawfully subjected to expedited removal, easily meet this test, which is "not meant to be especially demanding" in light of "Congress's evident intent when enacting the APA to make agency action presumptively reviewable." *Id.*

Defendants' claim that Plaintiffs cannot fall within the zone of interests because they are not "subject to expedited removal from the United States," Opp. 26, and "have no cognizable interest in the way the Executive enforces the immigration laws against others," Opp. 30, ignores that Plaintiffs bring this suit on behalf of their members, including members who actually have been subject to expedited removal.[14] Moreover, courts "do not require any indication of

---

[13] Plaintiffs do not dispute that if the Court were to stay the challenged policies on the grounds that the application of expedited removal to persons paroled into the country at ports of entry is contrary to the statute, it would be more than strange for the government to nonetheless proceed with subjecting such paroled individuals to expedited removal on the argument that notwithstanding the Court's preliminary legal conclusion regarding the meaning of the statute, their regulations permit it. As Defendants concede, it is the statute that controls. Opp. 38.

[14] Because the Plaintiffs here are asserting associational standing, *AILA II* does not control, as Defendants suggest, because that case concerned only organizational standing, and not associational standing. *Am. Immigr. Laws. Ass'n v. Reno*, 199 F.3d 1352, 1357 (D.C. Cir. 2000).

JA510

congressional purpose to benefit the would-be plaintiff." *Match-E-Be-Nash-She-Wish*, 567 U.S. at 225 (internal quotation marks omitted).

Plaintiffs have more than sufficiently established standing, and this Court has jurisdiction to consider their claims.

## II. Plaintiffs are Likely to Succeed in Proving that the Agency Actions Violate the Expedited Removal Statute and the Agency's own Regulations.

The plain language of the expedited removal statute, 8 U.S.C. § 1225(b)(1)(A), is clear that noncitizens in the United States after being inspected and paroled are categorically ineligible for expedited removal. Such individuals are not in the process of "arriving in the United States," as required by 8 U.S.C. § 1225(b)(1)(A)(i), and they are exempt from 8 U.S.C. § 1225(b)(1)(A)(iii), which only applies to people who have "not been admitted or paroled." None of Defendants' arguments support a contrary reading. Plaintiffs are therefore likely to succeed on their claim that the January 23 Huffman Memorandum, February 18 ICE Directive, and March 25 CHNV Termination Notice are premised on an erroneous legal interpretation. *See Loper Bright Enters.*, 603 U.S. at 391; *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943) (agency action "may not stand if the agency has misconceived the law").

### A. Noncitizens Paroled into the U.S. at a Port of Entry are Statutorily Exempted from the "Expanded Expedited Removal" Designation.

Although Defendants acknowledge that Congress statutorily exempted admitted and paroled noncitizens from expedited removal under 8 U.S.C. § 1225(b)(1)(A)(iii), Opp. 33, they argue that the exemption should be read to allow DHS to subject paroled individuals to expedited removal once their parole has ended, Opp. 34. Defendants provide no case law endorsing their interpretation, which directly contradicts the statutory text that only allows DHS to subject an individual to expedited removal who "has *not* been . . . paroled." 8 U.S.C. § 1225(b)(1)(A)(iii) (emphasis added). Defendants cite just a single case in support, *Turner v. U.S. Att'y Gen.*, 130 F. 4th 1254, 1261-62 (11th Cir. 2025), which says only—and in the context of a different statutory scheme—that "the use of the present-perfect tense can, as a matter of pure semantics, refer to a

JA511

time in the indefinite past *or* to a past action or state that continues into the present." *Id.* at 1261.

As an initial matter, the statute here uses the negative form of the present perfect tense, which would indicate an event that is neither continuing to the present nor occurred in the past. For example, if you visit a used car lot and say you will only purchase a vehicle that "has not been damaged in an accident," you would be referring to a car that is both not currently damaged from an accident and was not previously damaged in an accident. By including in expedited removal under this provision only noncitizens "who ha[ve] not been admitted or paroled," the statute is excluding those who previously were paroled, even if their current period of parole has expired or been terminated. Thus, even the language Defendants cherry-pick from *Turner* does not help them.

Additionally, Defendants notably omit *Turner*'s explanation that if multiple meanings are permissible, "the question becomes which of those meanings applies in this statutory context . . . [u]pon full review of the statute as a whole." *Id.* at 1261; *accord Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264, 275 (2023) ("[T]his Court has a 'duty to construe statutes, not isolated provisions.'") (citation omitted). In this case, the text, context, and purpose of § 1225(b)(1)(A)(iii)(II) are clear: to permit DHS to utilize expedited removal procedures not only for those noncitizens who lack valid entry documents and who are in the act of "arriving in the United States," but also for "certain other" noncitizens inside the country who completed the act of arrival for expedited removal purposes and entered without inspection (i.e., entered without having been admitted or paroled). *See Doe v. Noem*, No. 1:25-cv-10495 IT, 2025 WL 1099602, at *17 (D. Mass. Apr. 14, 2025) (so holding); *see also Barrett v. United States*, 423 U.S. 212, 216 (1976) (interpreting the present perfect tense in a statute to "denot[e] an act that has been completed").

Defendants' position effectively nullifies the limiting language in § 1225(b)(1)(A)(iii)(II) that focuses expanded expedited removal on noncitizens who have not been admitted or paroled. As Defendants have noted and Plaintiffs do not dispute, Defendants have broad authority to terminate parole. In fact, Defendants take the position in both their opposition brief, Opp. 6 n.1, and the February 18 ICE Directive that issuance of an expedited removal charging document alone

JA512

terminates parole. Defendants are thus arguing that Congress's prohibition on the use of expedited removal against a paroled individual ends when expedited removal is used against the paroled individual. Their position is implausible and absurd, and it renders the textual limitation in 8 U.S.C. § 1225(b)(1)(A)(iii)(II) completely meaningless as to parolees and admittees alike, handing DHS extraordinary, unprecedented, and unchecked power. *See* Mot. 15-16.[15]

Defendants fail to address Plaintiffs' argument that the decision by Congress to pair the terms "paroled" and "admitted" in the phrase "has not been admitted or paroled" further demonstrates that both terms refer to a completed act that cannot be undone—a historical fact about whether an individual is present in the country after having been admitted or paroled. Mot. 17-18. Under our immigration laws, the terms "admission" and "admitted" are defined as "the lawful entry of the alien into the United States after inspection and authorization by an immigration officer." 8 U.S.C. § 1101(a)(13)(A). Whether an individual has been admitted—which turns on that person's manner of entry—is distinct from whether that individual maintains lawful status; in other words, an individual who has been admitted into the country (and thus given status) can lose that status but does not thereby become someone who has not been admitted. *Sanchez v. Mayorkas*, 593 U.S. 409, 415 (2021). So, too, here: someone who has been paroled into the country can likewise have their parole terminated, but that does not change that they have been paroled. Here, the meaning of "paroled" is elucidated by its association with "admitted." *See Fischer v. United States*, 603 U.S. 480, 487 (2024) ("the canon of *noscitur a sociis* teaches that a word is given more

___

[15] In response to an individual challenge brought by an individual paroled into the country at a port of entry who is now being processed for expedited removal, the Department of Justice disavows the argument it is advancing here—and which it advanced in the January 23 Huffman Memorandum and the March 25 CHNV Termination Notice, namely, that a paroled individual (such as the petitioner in that case and the members of Plaintiff Organizations in this case) can be subjected to expanded expedited removal under the "certain other aliens" authority at 8 U.S.C. § 1225(b)(1)(A)(iii)(II). Resp'ts Mem. of Law in Opp'n to the Pet., Compl., and Mot. for Prelim. Inj., *Mata Velasquez v. Kurtzdorfer*, Case No. 1:25-cv-00493-LJV (W.D.N.Y. June 18, 2025), ECF No. 42 (attached hereto as Exhibit A) at 12 ("Petitioner thus argues that because Petitioner—an arriving alien—as paroled, subsection (iii)(II) cannot apply to him. But this misses the point entirely: Petitioner is not subject to subparagraph (iii)(II) he is subject to subparagraph (i) as an arriving alien.").

JA513

precise content by the neighboring words with which it is associated.") (citation and internal quotation marks omitted). Given that "admitted" necessarily refers to a past, completed event—the manner of entry into the United States—the word "paroled" in the same sentence must be read *in pari materia*. *See Motion Picture Ass'n of Am., Inc. v. FCC*, 309 F.3d 796, 802 (D.C. Cir. 2002).

This interpretation is evident in Defendants' own regulations, which make clear that an individual *cannot* be subjected to expedited removal if he can prove he "*was . . . paroled into the United States.*" 8 C.F.R. § 235.3(b)(6) (emphasis added); *see also* 8 C.F.R. § 235.3(b)(1)(ii) (Defendants' regulation describing to whom expanded expedited removal may be applied speaks interchangeably of "aliens who . . . have entered the United States without *having been* admitted or paroled," who have "enter[ed] without inspection," and who were "not inspected and admitted or paroled into the United States") (emphasis added). Defendants have no response other than to badly misconstrue one of the above provisions and to point to other regulations. Opp 36-38. With respect to Section 235.3(b)(6), Defendants puzzlingly suggest that by referencing the possibility that upon termination of parole an individual may be charged with inadmissibility under § 212(a) of the INA, the regulation somehow "envisions the possibility that such an alien with parole terminated could be subject to expedited removal or, at the very least, does not exclude the possibility." Opp. 37. The regulation does no such thing. It establishes clearly that if a person meets their burden of establishing that they were admitted or paroled—a question about something that did or did not happen in the past—they *cannot* be subjected to expedited removal. They can obviously still be *removed*, but that is not the question here.[16]

Unable to rebut the contrary weight of their own regulations, Defendants concede, "the language of the statute controls in any event." Opp. 38. This is true—to a point. Broadly speaking, Plaintiffs agree that the statute is what ultimately constrains Defendants' actions; and of course,

---

[16] Defendants suggest the reference to INA § 212 reinforces the idea that terminated parolees may be subjected to expedited removal because the only two inadmissibility grounds relevant in expedited removal are within § 212, but parolees are *always* subject to *all* the § 212 inadmissibility grounds because they have not been admitted.

JA514

the statute governs Plaintiffs' claim that the challenged policies exceed and conflict with DHS's statutory authority. But Defendants are *also* required to adhere to their own regulations, even where (unlike here) Defendants' actions violate only the regulation and not the statute.[17] *See United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954).

Finally, Defendants claim that the Supreme Court's recent grant of the Government's application for a stay in *Doe v. Noem* supports their position, merely because one of the Solicitor General's arguments was about the interpretation of "has not been . . . paroled" in 8 U.S.C. § 1225(b)(1)(A)(iii). *Doe v. Noem*, No. 24A1079, 145 S. Ct. 1524 (May 30, 2025). But the Supreme Court's one-paragraph order in *Doe* provided no reasoning at all for the grant of the stay, including on the government's argument about the expedited removal statute. A "stay order is not a ruling on the merits." *See, e.g.*, *Merrill v. Milligan*, 142 S. Ct. 879, 879 (2022) (mem.) (Kavanaugh, J., concurring).

**B.    Noncitizens Who Have Been Paroled into the U.S. at a Port of Entry are Not "Arriving in the United States" for Purposes of the Expedited Removal Statute.**

The only other category of noncitizen statutorily eligible for expedited removal is one who "is arriving in the United States." 8 U.S.C. § 1225(b)(1)(A)(i). The statute's use of the present progressive tense indicates an action that is temporary but currently occurring. *See* Mot. 19-20. Defendants say Plaintiffs are incorrect but offer neither argument nor support, offering only *ipsa dixit*. Opp. 32-33. Because those paroled into the United States cannot be said to be in the act or process of arriving in the United States under the statute, they are not eligible for expedited removal on this basis.

The title of § 1225(b)(1) as well as the text and structure of the provision support this understanding of a noncitizen who "is arriving." Two distinct categories of noncitizens may be subjected to expedited removal. First, those who are "arriving in the United States." And second,

---

[17] As explained *infra* at III, the unexplained mismatch between DHS's actions and regulations is also a reason why the former are arbitrary and capricious. *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016).

JA515

"certain *other* aliens" present in the United States who have not been admitted or paroled. The former speaks to those in the act of arriving and the latter speaks to those who already have arrived—two clearly defined, non-overlapping categories delineated by whether the noncitizen without valid entry documents had come to or is now present in the United States. By explicitly carving paroled individuals out of the category of certain other noncitizens present in the country eligible for parole, Congress made clear that such individuals belonged in that category and would be subject to expedited removal under that provision—and not under the "is arriving" provision— in the absence of such a carveout. *Cf. Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 583 U.S. 109, 128-29 (2018) ("As this Court has noted time and time again, the Court is 'obliged to give effect, if possible, to every word Congress used.'").

Other provisions in 8 U.S.C. § 1225 only reinforce what the title, text, and structure of §§ 1225(b)(1) and (b)(1)(A)(iii)(II) already make plain: that the process of arrival, as used in the statute, is one that occurs at the border, and Congress saw those who were "arriving" as distinct from people already present in the United States. For example:

- Section 1225(d)(2) authorizes the detention of noncitizens arriving on the "vessel or aircraft bringing" the noncitizen to the United States or at the "airport of arrival."
- Section 1225(b)(2)(C) authorizes returning a noncitizen "who is arriving on land (whether or not at a designated port of arrival)" to a contiguous territory pending section 240 proceedings.
- Section 1225(b)(1)(F) exempts from expedited removal a noncitizen of certain countries "who arrives by aircraft at a port of entry."

In all these instances, arrival is clearly contemplated to take place at the point of arriving, either at a land or sea border or at an airport, and not an interminable implicit statutory status, as Defendants would have this Court believe. Indeed, Defendants can point to no statutory text or purpose supporting their argument that a noncitizen who came to a port of entry, was inspected and paroled into the country, and has been here for years or even decades remains indefinitely in the process of "arriving in the United States" for purposes of expedited removal and thus forever

JA516

eligible for summary expulsion. Opp. 30-32.

Defendants argue that Plaintiffs overlook other "key textual clues" in the expedited removal statute, Opp. 33, yet none can carry the weight of Defendants' argument. In fact, Defendants' arguments are not even aimed at the contested legal issue here. Defendants argue that if Congress wanted to exclude paroled noncitizens from the "is arriving" category, it would have done so expressly, as it did with regard to those noncitizens present in the country subject to expedited removal by designation. Opp. 31. Defendants also point to the title of § 1225(b)(1) for essentially the same proposition. *Id.* But Defendants' argument is classic question begging, as it assumes that Congress *needed* to exempt parolees from the "is arriving" category, even though that is what Defendants need to prove. On *that* point, Defendants, it appears, have nothing to say.[18] As explained above, there was no need for Congress to explicitly carve paroled individuals out of the category of noncitizens who are "arriving" in the United States both because the process of arrival is inherently temporary and completed for purposes of expedited removal at the point when the noncitizen arrives and becomes present in the country, and because the inclusion of a carveout for paroled individuals in the "certain other aliens" category necessarily meant that such individuals were not included in the entirely distinct category of "arriving" noncitizens.

In their efforts to read meaning into the statute that does not exist, Defendants urge the court to look at statutes and regulations not at issue here and to give words meaning the text cannot bear. None of Defendants' three arguments support their grammatically, legally, and logically nonsensical position.

1.    To support their characterization of paroled individuals as forever "arriving," Defendants misleadingly cite the statutory parole authority for the proposition that upon termination of parole, a noncitizen "reverts to the status . . . of an applicant for admission standing

---

[18] Defendants also bafflingly claim that 8 U.S.C. § 1225(b)(1)(A)(i)(F)—which exempts from both expedited removal bases those noncitizens from Western hemisphere countries with which the United States does not have full diplomatic relations—somehow supports them but do not explain how, and Plaintiffs' counsel have yet to imagine any conceivable basis that it does.

JA517

at the threshold of entry." Opp. 30 *(citing* 8 U.S.C. § 1182(d)(5)(A))*. But that section actually provides that "when the purposes of such parole shall . . . have been served . . . [the noncitizen's] case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States." 8 U.S.C. § 1182(d)(5)(A). The statute itself defines the term "applicant for admission" to include both a noncitizen "present in the United States who has not been admitted" as well as one "who arrives in the United States." 8 U.S.C. § 1225(a)(1). An "applicant for admission" is, therefore, a much broader term that includes not only noncitizens who are arriving, but also people who entered the country without admission (including those who were paroled into the country, whether or not they continue to maintain active parole). It is definitively not synonymous with the category of noncitizens who are "arriving" under the expedited removal statute. The mere fact that a paroled individual whose parole has ended is to "continue to be dealt with" as an "applicant for admission", 8 U.S.C. § 1182(d)(5)(A), does not mean that they would be treated as if they are "arriving"; indeed, if that is what Congress intended, the most natural way to express that intent is to say so, since it defined "applicant for admission" in the very same section in which it created expedited removal. Moreover, and contrary to Defendants' characterization, nowhere in the parole statute does it say a terminated parolee will "revert" to an applicant for admission "at the threshold of entry." Opp. 35. This, too, Congress easily could have done, since it also amended the parole statute when creating expedited removal in 1996. But that is not the statute Congress enacted.

2.    Defendants' reliance on DHS's regulations that define an "arriving alien" to include previously paroled individuals, 8 C.F.R. §§ 1.2, 1001.1(q), is patently misplaced. Opp. 30-31. Agency regulations cannot and do not provide more or different authority than does the underlying statute. "An agency after all, 'literally has no power to act'—including under its regulations— unless and until Congress authorizes it to do so by statute . . . [a]n agency's regulation cannot 'operate independently of' the statute that authorized it." *Fed. Election Comm'n v. Cruz*, 596 U.S. 289, 301 (2022) (citations omitted); *accord Pub. Serv. Elec. & Gas Co. v. FERC*, 989 F.3d 10, 19

(D.C. Cir. 2021) ("[A] regulation can never 'trump the plain meaning of a statute'" (citation omitted)).[19]

3.    Defendants next argue that Congress intended to and did incorporate into the text of the expedited removal statute the "entry fiction," whereby paroled individuals are considered "standing at the border," which Defendants claim is the same thing as "arriving," even long after their actual entry. Opp. 31-32. But whatever relevance the entry fiction continues to have for due process purposes, *see DHS v. Thuraissigiam*, 591 U.S. 103, 139 (2020), Defendants provide no evidence that Congress intended to incorporate it into the completely novel expedited removal process it created in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"). Here again, had Congress wanted to do what Defendants suggest, it easily could have done so; indeed, Defendants have no explanation for why Congress would have chosen to communicate so significant a decision in cryptic language seemingly inconsistent with the text and the structure of the statute itself.[20]

---

[19] As Plaintiffs have not at this time moved for relief on their challenge to 8 C.F.R. § 1.2, Am. Compl. ¶¶ 171-83, they do not at this point address Defendants' contention that those claims are time-barred.

[20] Defendants' position that Congress incorporated the "entry fiction" into the expedited removal statute to treat paroled individuals as arriving is inconsistent with the agency's own position for nearly 30 years. Although the agency's 1997 regulation treated all individuals paroled into the country at ports of entry as arriving aliens for purposes of expedited removal, Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 Fed. Reg. 10312, 10313, 10330 (Mar. 6, 1997), the following year the agency amended the definition of "arriving alien" to say that two large classes of paroled individuals—all of those paroled into the country at ports of entry prior to April 1, 1997, and all of those paroled into the country on or after that date pursuant to a grant of advanced parole—would not be treated as arriving aliens for expedited removal purposes. Amendment of the Regulatory Definition of Arriving Alien, 63 Fed. Reg. 19382, 19384 (Apr. 20, 1998). The agency made this change "as a matter of policy," 63 Fed. Reg. at 19382, thereby recognizing that neither the text of the statute, nor the statute as construed to somehow incorporate the entry fiction, command that paroled individuals be treated as arriving for purposes of expedited removal. A later amendment to the regulation in 2006 clarified further that the classes of paroled individuals exempted from being treated as "arriving" for purposes of expedited removal remain "arriving aliens" for all other purposes. Eligibility of Arriving Aliens in Removal Proceedings to Apply for Adjustment of Status and Jurisdiction to Adjudicate Applications for Adjustment of Status, 71 Fed. Reg. 27,585, 27,588 (May 12, 2006).

JA519

Defendants' atextual appeals to history fare no better. When expedited removal was proposed in 1993, the bill's sponsor explained on the House Floor that the measure was focused on "keeping the people without documents out of the country in the first place."[21] In 1996, when the House Judiciary Committee advanced its version of the bill that would eventually become IRRIRA, it authorized expedited removal for "an alien arriving in the United States" and explained in its Committee Report that "[t]his provision is necessary because thousands of aliens arrive in the U.S. at airports each year *without valid documents* and attempt to illegally enter the United States." H.R. Rep. No. 104-469(I), at 157-58 (1996) (emphasis added), *available at* 1996 WL 168955. The only two grounds of inadmissibility cognizable in expedited removal further emphasize this historical purpose, as both concern the absence of valid entry documents.

Defendants' positions on expedited removal explode their authority far beyond what Congress authorized. One final example: they claim that under 8 U.S.C. § 1225(b)(1)(A)(i), they can subject paroled individuals to expedited removal at any time, no matter how long they have been in the United States and including when their parole is active. But they concede that 8 U.S.C. § 1225(b)(1)(A)(iii)(II) protects paroled individuals from being subjected to expedited removal under a designation "for the duration of the alien's parole." Opp. 34. Defendants offer no explanation for why Congress would have exposed to expedited removal in the "is arriving" section the very people it extended protection to in the designation section.[22]

The answer to all of the textual and structural inconsistencies in Defendants' position is clear: the extraordinary, historically unprecedented expedited removal authority does not extend to individuals like Plaintiffs' members who were inspected and paroled into the country at ports of

---

[21] H.R. 2602, 103rd Cong. (1993), https://www.congress.gov/bill/103rd-congress/house-bill/2602/text; H.R. 3363, 103rd Cong. (1994), https://www.congress.gov/bill/103rd-congress/house-bill/3363/text; 140 Cong. Rec. H3629, H3632 (daily ed. March 2, 1994), https://www.congress.gov/103/crecb/1994/03/02/GPO-CRECB-1994-pt3-5-2.pdf.

[22] The same point is true with respect to individuals continuously present in the country for two years or more after being paroled into the country; such individuals would be statutorily protected from expanded expedited removal under § 1225(b)(1)(A)(iii)(II) but inexplicably face continued and indefinite jeopardy under § 1225(b)(1)(A)(i).

JA520

entry. It was focused on individuals without valid entry documents who showed up at the border or who entered without inspection (and even then, only if apprehended within two years of entry and subject to designation). Finally, were there any doubt, Plaintiffs are entitled to all benefit thereof, further underscoring why they are likely to prevail. *Castillo v. Bondi*, No. 24-3631, 2025 WL 1699534, at *3 (6th Cir. June 18, 2025) (Sutton, C.J.) ("When such uncertainty clouds a deportation statute, the longstanding principle of construing it in favor of the alien kicks into gear." (citations and internal quotation marks omitted)).

### III.   Plaintiffs Are Likely to Succeed in Proving that the Agency Actions are Arbitrary and Capricious.

Because the January 23 Huffman Memorandum, the February 18 ICE Directive, and the March 25 CHNV Termination Notice are based on erroneous interpretations of the expedited removal statute, the Court need not also consider whether these agency actions are also arbitrary and capricious under 5 U.S.C. § 706(2)(A). But Plaintiffs are likely to succeed in proving that they are, as they rely on fundamentally inconsistent legal bases; provide little to no reasoning for the application of expedited removal to paroled individuals; and fail to consider reasonable alternatives, reliance interests, or the impact of expedited removal on paroled individuals, their families, and their communities. Mot. 21-28. Defendants' arguments to the contrary fail.

### A.   Defendants' directives are reviewable under the APA.

Defendants' argument that the January 23 Huffman Memorandum, the February 18 ICE Directive, and the March 25 CHNV Termination Notice are not "final agency action" under the APA is a red herring. Opp. 39 (citing 5 U.S.C. § 704). Not only is this argument fundamentally at odds with their admission that these policy directives "have already gone into effect," Opp. 1, but Defendants also misstate the law and ignore that § 704 makes two kinds of agency action "subject to judicial review": "final agency action" and "[a]gency action made reviewable by statute," 5 U.S.C. § 704. The latter need not be "final." *See Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 882 (1990) (explaining that "the 'agency action' in question must be 'final agency action'" unless "review is sought . . . pursuant to specific authorization in the substantive statute"); *Nat'l Ass'n of*

JA521

*Home Builders v. U.S. Army Corps of Eng'rs,* 417 F.3d 1272, 1278 (D.C. Cir. 2005) ("final agency action" review available under § 704 if "no more specific statute provides for judicial review"). "[S]ection 1252(e)(3) of the INA" makes Defendants' written implementation of expedited removal "'reviewable by statute' within the meaning of section 704 of the APA." *Las Americas Immigrant Advoc. Ctr. v. Wolf,* 507 F. Supp. 3d 1, 35 (D.D.C. 2020) (Jackson, K.B., D.J.); *accord Grace v. Whitaker,* 344 F. Supp. 3d 96, 118 (D.D.C. 2018), *aff'd in part, rev'd in part,* 965 F.3d 883 (D.C. Cir. 2020) (rejecting argument "that Congress limited the application of [§] 1252(e)(3) to only claims involving legislative rules or final agency action").

Each policy directive at issue here is a "written policy directive, written policy guideline, or written procedure" implementing expedited removal. As Defendants themselves characterize them, they "guide immigration officers with regard to the exercise of their existing prosecutorial discretion and statutory and regulatory authority" around the use of expedited removal. Opp. 39; *see also Kiakombua,* 498 F.Supp.3d at 33-34 (finding that document "intended to guide and direct asylum officers in making [credible fear] determinations" is a written directive within the meaning of § 1252(e)(3) and "an agency's written recitation of its understanding of the substantive and procedural standards of asylum law that pertain to credible fear determinations" "designed to help the asylum officers" who make those determinations is an implementation of expedited removal procedures). As such, they are reviewable.

Defendants do not contest that the policies "mark the 'consummation' of the agency's decisionmaking process," satisfying the first prong of the inquiry. *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citation omitted). They contend instead that the directives do not purport to change the rules around which noncitizens are eligible for expedited removal—which Defendants argue was established in the promulgation of 8 C.F.R. § 1.2—so they do not determine "rights or obligations" or cause "legal consequences to flow." *Id.,* 520 U.S. at 178. Defendants are incorrect, as the directives do not merely regurgitate the expedited removal statute, which is a question for the merits besides. Instead, they provide clear guidance and direction to agency officials to

JA522

implement expedited removal in a new and different way.[23] Based on the agency guidance provided in the three directives, paroled individuals will be subjected to expedited removal when they previously were not. The clearest evidence of these "legal consequences" is that, after the issuance of the directives, Plaintiffs' members and paroled noncitizens around the country are in fact being targeted for expedited removal.[24] *Make the Rd. New York v. McAleenan,* 405 F. Supp. 3d 1, 48 (D.D.C. 2019) (finding that where "before the agency issued that statement, immigration officers could not have subjected an undocumented non-citizen . . . to the expedited removal process, whereas . . . pursuant to the issuance of the [statement], such officers were authorized to do so," it is "fairly obvious that 'legal consequences will flow.'"). This is more than enough to meet *Bennett*'s second prong. *Cal. Communities. Against Toxics v. EPA,* 934 F.3d 627, 637 (D.C. Cir. 2019) ("[L]ower courts [are] to make *Bennett* prong-two determinations based on the concrete consequences an agency action has or does not have as a result of the specific statutes and regulations that govern it.").

The written policies are reviewable under the APA.

### B.    Defendants' directives are arbitrary and capricious.

Confronted with the fundamental inconsistencies between the January 23 Huffman Memorandum and the March 25 CHNV Termination Notice, which rely on § 1225(b)(1)(A)(iii) and focus on terminating individual grants of parole within two years to be able to subject the parole beneficiary to expedited removal, and the February 18 ICE Directive, which relies on §

---

[23] *See* January 23 Huffman Memorandum (stating that "[t]his memorandum provides guidance regarding how to exercise enforcement discretion in implementing these [expanded expedited removal] policies," and "directing [ICE, CBP, and USCIS agency leadership] to take the following actions"); February 18 ICE Directive (providing detailed instructions to ICE Enforcement and Removal Operations ("ERO") officers as to processing individuals, including those who have been granted parole, for expedited removal); March 25 CHNV Termination Notice (terminating individuals grants of CHNV parole in order to effectuate the removal of parolees through expedited removal).

[24] ECF No. 22-2 (Escobar Decl.) at ¶¶ 11-17; ECF No. 22-3 (Salas Decl.) at ¶¶ 15-17, 22-23; ECF No. 22-4 (Lawrence Decl.) at ¶¶ 13-19, 22; ECF No. 22-7 (Torres Decl.) at ¶¶ 2, 6; ECF No. 22-13 (Chua Decl.) at ¶¶ 2, 10, 19.

1225(b)(1)(A)(i) and claims that no time limit exists to subject "paroled arriving aliens" to expedited removal, the most Defendants can do is suggest that Plaintiffs are misreading the documents.[25] But Defendants cannot hide from the plain language of either the expedited removal statute or their own policies, and they certainly have not explained why they have flip flopped from one position to another and back in a matter of months.

Defendants only claim that the March 25 CHNV Termination Notice's express statements—that "[e]xpedited removal is available *only* when an alien has not been continuously present in the United States for at least the two years preceding the date of the inadmissibility determination," 90 Fed. Reg. at 13619, and that if Defendants allowed CHNV beneficiaries' parole to expire naturally, "CHNV parolees may begin to accrue more than two years of continuous presence in the United States, such that DHS would *have to* initiate section 240 removal proceedings to effectuate their removal," *id.* at 13620 (emphasis added)—do not mean to limit the expedited removal authority or indicate that paroled individuals can *only* be subjected to expedited removal under 8 U.S.C. § 1225(b)(1)(A)(iii). Instead, Defendants argue, the Notice relies on an "additional" source of authority, and the agency can make a "policy choice" as to which provision of expedited removal to use to process a noncitizen. Opp. 41-42. But these are post-hoc justifications found nowhere in the text of the Notice that the Court cannot and should not consider. *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 22 (2020) (holding that "impermissible post hoc rationalizations" for the Secretary's decisionmaking "are not properly before us"); *Am. Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 539 ("[T]he *post hoc* rationalizations of the agency . . . cannot serve as a sufficient predicate for agency action."). Additionally, the *post hoc* justifications

---

[25] Defendants do reiterate the argument that the documents do nothing more than "assume" the existing expedited removal authority, but as discussed above, this is inaccurate. *See supra* at I.C.; III.A. The directives provide concrete guidance and direction to DHS personnel as to DHS and ICE's implementation of the expedited removal authority, and Defendants do not dispute that it is only *after* they adopted the January 23 Huffman Memorandum, February 18 ICE Directive, and March 25 CHNV Parole Termination Notice that ICE agents began courthouse enforcement and subjecting paroled individuals to expedited removal. *See, e.g.*, ECF No. 22-14 (Hirman Decl.) at ¶¶ 7-8, 14; ECF No. 22-13 (Chua Decl.) at ¶¶ 7-9, 13; ECF. No. 22-8 (Montoya Decl.) at ¶¶ 7-9, 21, 34.

JA524

are patently inconsistent with what the Termination Notice actually says.[26] Finally, the statute does not give any "policy choice" about which source of authority for expedited removal should be used as to any particular noncitizen. Opp. 41-42. As explained above, the two categories of individuals statutorily eligible for expedited removal are entirely distinct ("aliens arriving in the United States and *certain other aliens* who have not been admitted or paroled"), and regardless of which category an individual falls in, the expedited removal process is the same.

Defendants do not otherwise provide a meaningful explanation for how the March 25 CHNV Termination Notice's sole and express reason for terminating grants of parole before the full two-year period of parole expired—i.e., to ensure that parolees could be subjected to expedited removal—can be reconciled with the February 18 ICE Directive's claim that "[t]here is no time limit on the ability to process ['paroled arriving aliens'] for [expedited removal." They likewise provide no explanation for the flip-flop in position between the January 23 Huffman Memo and the February 18 ICE Directive, and then from the ICE Directive to the March 25 CHNV Termination Notice. Where, as here, "the agency has failed to provide even that minimal level of analysis, [the] action is arbitrary and capricious." *Encino Motorcars,* 579 U.S. at 221; *see also id.* at 222 ("[A]n unexplained inconsistency in agency policy is a reason for holding an interpretation to be an arbitrary and capricious change from agency practice.") (internal punctuation and citation omitted).

In addition to failing to meet the "basic procedural requirement of administrative rulemaking" of providing "adequate reasons for [their decisions]," *Encino Motorcars,* 579 U.S. at 212, the challenged policy directives show "basic gaps in the government's attention to the pertinent factors," particularly reliance interests. *Nat'l Urb. League v. Ross*, 977 F.3d 770, 778 (9th

---

[26] Defendants' insistence that the March 2025 CHNV Termination Notice should not be "parsed like a statute," Opp. 42, is likewise untenable. The Notice prematurely and categorically truncates the parole of 500,000 individuals and exposes them to the risk of being subjected to expedited removal. Neither Plaintiffs nor the Court should be forced to look behind the express terms of the Notice for hidden meaning: "If men must turn square corners when they deal with the government, it cannot be too much to expect the government to turn square corners when it deals with them." *Niz-Chavez v. Garland*, 593 U.S. 155, 172 (2021).

JA525

Cir. 2020).  For example, none of the challenged policy directives considers that an express purpose of the CHNV parole processes was to "enable individuals to seek humanitarian relief or other immigration benefits . . . for which they may be eligible,"[27] and that placing such individuals in expedited removal proceedings would upset considerable reliance interests around the adjudication of those applications, including the fact that a positive adjudication would provide the parole beneficiary with an alternate legal status and protection from expedited removal. *See, e.g.*, ECF No. 22-8 (Montoya Decl.) at ¶ 4 (parolee eligible for lawful permanent residence via Cuban Adjustment Act); ECF No. 22-17 (Gillman Decl.) at ¶ 4 (same); ECF No. 22-10 (Olive Decl.) at ¶ 5 (parolee had applied for asylum); ECF No. 22-13 (Chua Decl.) at ¶ 4 (same); ECF No. 22-6 (Declaration of A. Ashley Tabaddor) at ¶¶ 9, 16-17. Nor did Defendants give any meaningful consideration to the significant reliance interests of landlords and employers, or family members and communities, of individuals targeted for expedited removal. *See, e.g.*, ECF No. 22-2 (Escobar Decl.) at ¶¶ 11-19; ECF No. 22-3 (Salas Decl.) at ¶¶ 15-17, 22-23; ECF No. 22-4 (Lawrence Decl.) at ¶¶ 18-19, 22. Defendants' failure to "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns," *Regents,* 591 U.S. at 33, was an arbitrary and capricious failure to consider "important aspect[s] of the problem,'" *State Farm*, 463 U.S. at 43.[28]

## IV.   Without a Stay, Plaintiffs' Members and Countless Other Paroled Individuals Will Continue to Suffer Irreparable Harm.

Plaintiffs' members and paroled noncitizens around the country have been faithfully showing up to routine immigration court hearings only to be ambushed, arrested, detained, and put

---

[27] Implementation of a Parole Process for Venezuelans, 87 Fed. Reg. 63507, 63508 (Oct. 19, 2022); Implementation of a Parole Process for Cubans, 88 Fed. Reg. 1266, 1268 (Jan. 9, 2023); Implementation of a Parole Process for Haitians, 88 Fed. Reg. 1243, 1244 (Jan. 9, 2023); Implementation of a Parole Process for Nicaraguans, 88 Fed. Reg. 1255, 1256 (Jan. 9, 2023).

[28] Defendants make arguments against Plaintiffs' arbitrary and capricious claim "to the extent that [the claim] is based on a *different* argument, that the documents fail to justify applying expedited removal instead of 240 proceedings or fail to justify commencing removal proceedings at all." Opp. 43-44. Plaintiffs' claim is not based on these arguments.

JA526

through a rapid removal process that could result in their deportation within hours, including to countries where they could face persecution or death.[29] Families have been physically torn apart as parents and children are taken away in front of their loved ones.[30] Yet Defendants claim that this is not irreparable harm.

Defendants specifically assert that Plaintiffs' members and other paroled noncitizens who are subject to expedited removal will not suffer irreparable harm because (1) the credible fear procedures will protect against deportation to countries where they will face persecution or death; and (2) some harms caused by expedited removal also result from section 240 removal proceedings. Both arguments ignore the reality of the expedited removal process—and also are beside the point.

*First,* Defendants do not seriously dispute that the credible fear process provides *far* less protection against deportation to countries where noncitizens will face violence and the risk of death. Defendants argue that the credible fear process *exists*, Opp. 45-46, but Plaintiffs have pointed to evidence and statistics showing that for decades, the procedures have not provided meaningful process to noncitizens and have resulted in wrongful deportations, Mot. 31 n.15, 33.[31] Compared to section 240 removal proceedings, noncitizens are not afforded meaningful access to counsel during the credible fear procedures, and they are often detained, which creates significant challenges to consulting with any counsel they do secure and gathering and presenting evidence.

---

[29] ECF No. 22-5 (Freire Decl.) at ¶¶ 6-7; ECF No. 22-8 (Montoya Decl.) at ¶¶ 6-9, 21-25; ECF No. 22-10 (Olive Decl.) at ¶¶ 6-7; ECF No. 22-13 (Chua Decl.) at ¶¶ 7-8; ECF No. 22-14 (Hirman Decl.) at ¶¶ 7-8. *See also* ECF Nos. 22-9 (Espinoza Decl.), 22-11 (Toczylowski Decl.), 22-15 (Tanigawa-Lau Decl.).

[30] ECF No. 22-5 (Freire Decl.) at ¶ 7; ECF No. 22-11 (Toczylowski Decl.) at ¶¶ 6, 9; ECF No. 22-13 (Chua Decl.) at ¶ 8. *See also* Dan Katz, *ICE Arrested a 6-year-old Boy with Leukemia at Immigration Court. His Family is Suing*, Texas Public Radio (June 25, 2025), https://www.tpr.org/border-immigration/2025-06-25/ice-arrested-a-6-year-old-boy-with-leukemia-at-immigration-court-his-family-is-suing.

[31] Defendants' reliance on *AILA* and *DHS v. Thuraissigiam* in this context is misplaced, as the portions they cite do not address irreparable harm. *Am. Immigration Laws. Ass'n v. Reno ("AILA")*, 18 F. Supp. 2d 38 (D.D.C. 1998), *aff'd,* 199 F.3d 1352 (D.C. Cir. 2000); *DHS v. Thuraissigiam,* 591 U.S. 103 (2020).

JA527

ECF No. 22-6 (Tabaddor Decl.) at ¶¶ 19-21. And there is very limited right to judicial review in expedited removal.[32]

*Second,* the other harms of expedited removal are unique and/or significantly amplified when compared to section 240 removal proceedings. For example, noncitizens in expedited removal lose the opportunity to apply for collateral immigration relief for which they are eligible, including adjustment of status, Temporary Protected Status ("TPS"), and Special Immigrant Juvenile Status ("SIJS"). *See* Mot. 29-31. Similarly, while detention and family separation are a possibility in section 240 removal proceedings, they are typical or even mandatory during expedited removal proceedings. *See* ECF No. 22-6 (Tabaddor Decl.) at ¶¶ 18-19; 8 U.S.C. § 1225(b)(1)(B)(ii); C.F.R. § 235.3(b)(4)(ii). This harm is illustrated most clearly by the recent arrests of paroled individuals at courthouses pursuant to Defendants' directives: these individuals were with their families and in community while they were in section 240 proceedings, then abruptly detained and separated from their families when they were processed for expedited removal.[33]

Defendants also attempt again to invoke the Supreme Court decision in *Doe*, specifically Justice Jackson's dissent, as indication that a stay isn't appropriate. However, Justice Jackson's dissent holds no precedential value, and the Supreme Court order is silent as to irreparable harm. *See Noem v. Doe*, No. 24A1079, 2025 WL 1534782 (U.S. May 30, 2025).

In parsing through each of the individually identified harms and trying to cherry-pick differences, Defendants miss the bigger point. While each harm on its own represents a significant consequence and a betrayal of noncitizens who followed lawful pathways to come to the United States, together they paint the full picture of the "certain and great" actual injury inflicted by

---

[32] Review of a negative credible fear finding by an Immigration Judge ("IJ") is limited in scope and based solely on the record of the credible fear interview, often conducted remotely via telephone or videoconference, and has no further judicial review. ECF No. 22-6 (Tabaddor Decl.) at ¶ 14.

[33] *See, e.g.*, ECF Nos. 22-5, 22-8 to 22-10, 22-13 to 22-15.

JA528

expedited removal. *Shvartser v. Lekser*, 308 F. Supp. 3d 260, 267 (D.D.C. 2018). They clearly amount to imminent "irreparable harm for which there is no adequate remedy at law." *Id.*

## V.      The Balance of Equities and the Public Interest Strongly Tip in Plaintiffs' Favor.

Defendants claim that the concrete and irreparable harms inflicted on the Plaintiffs' members are outweighed by abstract injuries to the government. In particular, Defendants claim great harm based on the mere fact that the district court's order contravenes the will of President Trump. Opp. 51. This ignores, however, that the public's primary interest is in government officials obeying the law that the people's representatives have enacted. *See League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("[T]here is a substantial interest in having governmental agencies abide by the federal laws that govern their existence and operations.") (internal punctuation and citation omitted); *see also R.I.L.-R. v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015). Although the President claims the "prompt removal" of noncitizens "not entitled to remain here" as a top priority, Opp. 51, "no law pursues its purposes at all costs," *Kucana v. Holder*, 558 U.S. 233, 252 (2010), and "there is a public interest in preventing [noncitizens] from being wrongfully removed, particularly to countries where they are likely to face substantial harm," *Nken*, 556 U.S. at 43. To the extent the government incurs any extra expense to subject removable noncitizens to regular removal proceedings rather than expedited removal proceedings, the public interest in the proper enforcement of the INA and affording noncitizens the process and rights it provides "out weighs any asserted financial harm" to Defendants. *Lofton v. D.C.*, 7 F. Supp. 3d 117, 125 (D.D.C. 2013) (internal punctuation and citation omitted).

## VI.     A Stay in Full of the Agency's Actions is Appropriate.

The relief Plaintiffs seek—a stay, which is "an interim or lesser form of [relief than] vacatur," *Texas*, 646 F. Supp. 3d at 769—is not overbroad. As the D.C. Circuit has explained, "when a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—*not that their application to the individual plaintiffs is proscribed*." *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (internal punctuation and citation omitted) (emphasis added). Other circuits have held the same. *See, e.g.*,

JA529

*E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 681 (9th Cir. 2021); *Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024) ("Nothing in the text of Section 705, nor of Section 706, suggests that either preliminary or ultimate relief under the APA needs to be limited to [the associational plaintiff] or its members"); *D.C. v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 48 (D.D.C. 2020) ("Similarly [as with § 706], the APA's § 705 must be read to authorize relief from agency action for any person otherwise subject to the action, not just as to plaintiffs.").

A stay that temporarily "takes the unlawful agency action 'off the books'" is "an entirely appropriate response when a plaintiff successfully establishes" a likelihood "that the agency's conduct violates the law." *Kiakombua*, 498 F. Supp. 3d at 50. The Supreme Court's recent decision in the birthright citizenship cases does not hold otherwise and expressly reserves questions around scope of remedy in APA vacatur cases for another day. *See Trump v. CASA*, No. 24A884, 2025 WL 1773631, at *8 n.10 (U.S. June 27, 2025) ("Nothing we say today resolves the distinct question whether the Administrative Procedure Act authorizes federal courts to vacate federal agency action. *See* 5 U. S. C. § 706(2) (authorizing courts to 'hold unlawful and set aside agency action').")*; see also id.* at *19 (Kavanaugh, J., concurring) ("And in cases under the Administrative Procedure Act, plaintiffs may ask a court to preliminarily 'set aside' a new agency rule.") (citations omitted).

## CONCLUSION

Plaintiffs respectfully request that the Court issue a stay of the January 23 Huffman Memorandum, February 18 ICE Directive, and March 25 CHNV Termination Notice insofar as they subject individuals who have previously been granted parole at ports of entry to expedited removal.[34]

---

[34] Defendants assert in passing that "the Court should not grant relief without issuing the bond required by Rule 65(c)," Opp. 54, but ignore that Plaintiffs' motion is not under Rule 65, but rather 5 U.S.C. § 705, which has no bond requirement, *Michigan Citizens for an Indep. Press v. Thornburgh*, No. CIV.A. 88-2322, 1988 WL 90388, at *8 n.12 (D.D.C. Aug. 17, 1988) ("[T]he APA stay provision does not impose a security requirement."). Even if it did, no bond would be

JA530

Dated: July 1, 2025                    Respectfully submitted,

                                       */s/ Hillary Li*
                                       Esther H. Sung (CA00132)
                                       Karen C. Tumlin (CA00129)
                                       Hillary Li (GA0052)
                                       **JUSTICE ACTION CENTER**
                                       P.O. Box 27280
                                       Los Angeles, CA 90027
                                       Telephone: (323) 450-7272
                                       esther.sung@justiceactioncenter.org
                                       karen.tumlin@justiceactioncenter.org
                                       hillary.li@justiceactioncenter.org

                                       Carl Bergquist (*pro hac vice*)
                                       **COALITION FOR HUMANE IMMIGRANT RIGHTS**
                                       2533 West 3rd St, Suite 101
                                       Los Angeles, CA 90057
                                       Telephone: (310) 279-6025
                                       cbergquist@chirla.org

                                       *Attorneys for Plaintiffs*

---

appropriate here. *See, e.g.*, *Doe v. Noem*, 2025 WL 1099602, at *20 n.33 (D. Mass. Apr. 14, 2025) (declining to set a bond because, among other things, "requiring a bond would impose a substantial hardship on the Plaintiffs," and finding "a grave risk that imposing a bond would undesirably deter individuals from enforcing their procedural rights to challenge agency action affecting immigration decisions").

34

JA531

**CERTIFICATE OF SERVICE**

I hereby certify on July 1, 2025, I electronically filed the foregoing with the Clerk of the

Court for the United States District Court for the District of Columbia by using the CM/ECF

system. I certify by all participants in the case are registered CM/ECF users and that service will

be accomplished by the CM/ECF filing system.

*/s/ Hillary Li*
Hillary Li (GA0052)
**JUSTICE ACTION CENTER**
P.O. Box 27280
Los Angeles, CA 90027
Telephone: (323) 450-7272
hillary.li@justiceactioncenter.org

JA532

**[Transcript Pages 1-98 of 98]**

```
            IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLUMBIA

                          ---


COALITION FOR HUMANE          )
IMMIGRANT RIGHTS ET AL.,      )
                              )
                              ) CIVIL NO. 25-872
         Plaintiffs,          )
                              )
v.                            ) Wednesday, July 9, 2025
                              )
KRISTI NOEM, et al.,          )
                              )
                              )
         Defendants.          )
_____)

              TRANSCRIPT OF MOTION HEARING

         BEFORE THE HONORABLE JUDGE JIA M. COBB
             UNITED STATES DISTRICT JUDGE
                          ---

 APPEARANCES:   JUSTICE ACTION CENTER
                BY:  HILLARY LI
                     ESTHER H. SUNG
                     KAREN C. TUMLIN
                     TOM JAWETZ
                P.O. Box 27280
                Los Angeles, CA 90027
                323-450-7262
                Email: Hillary.li@justiceactioncenter.org

                COALITION FOR HUMANE IMMIGRANT RIGHTS
                BY:  CARL BERGQUIST
                2533 West 3rd St, Suite 101
                Los Angeles, CA 90057
                310-279-6025
                Email: Cbergquist@chirla.org

                     For the Plaintiffs


 COURT REPORTER:   CHANDRA R. KEAN, RMR
                   Official Court Reporter
                   333 Constitution Avenue, NW
                   Washington, DC 20001
```

JA533

```
APPEARANCES CONT'D:

                    U.S. DEPARTMENT OF JUSTICE
                    BY: PAPU SANDHU
                        TIM RAMNITZ
                        ARIC A. ANDERSON
                    Office of Immigration Litigation
                    General Litigation and Appeals Section
                    P.O. Box 868, Ben Franklin Station
                    Washington, DC 20044
                    (202) 616-9357
                    Email: Papu.Sandhu@usdoj.gov

                    For the Defendants
                    ---
```

**PROCEEDINGS**

1

2     (Court called to order at 2:12 p.m.)

3         DEPUTY COURTROOM CLERK:  Good afternoon, Your

4     Honor.  We are on the record in civil case 25-872,

5     Coalition for Humane Immigration Rights, et al. v. Noem,

6     et al.

7         Starting with plaintiffs' counsel, please approach

8     the podium and state your appearance for the record.

9         MS. LI:  Good afternoon, Your Honor.  Hillary

10    Li for the plaintiffs.

11        THE COURT:  Okay.  Good afternoon.  Put

12    everyone's appearance on the record, please.

13        MS. LI:  We have Esther Sung for the

14    plaintiffs; Karen Tumlin for the plaintiffs; Carl

15    Bergquist for the plaintiffs; and Tom Jawetz for the

16    plaintiffs.

17        THE COURT:  Okay.  Good afternoon.

18     And for the defendants.

19        MR. SANDHU:  Good afternoon, Your Honor.  Papu

20    Sandhu on behalf of the defendants, as well as Aric

21    Anderson and Tim Ramnitz at counsel's table.

22        THE COURT:  Okay.  Good afternoon.

23     So we're here for a hearing on pending motions.

24     I'll hear from plaintiffs first.

25        MS. LI:  Good afternoon, Your Honor.  Again,

JA535

```
 1    Hillary Li for the plaintiffs.  I am prepared to address
 2    the merits of our motion.  My colleague, Ms. Sung, will
 3    handle all non-merits.  And I'm prepared to just jump
 4    right in to merits and walk you through our arguments on
 5    our contrary to law and arbitrary and capricious claims
 6    around the expedited removal of paroled individuals, if
 7    that works.
 8         THE COURT:  Okay.  I just have a threshold
 9    question about what's at issue and what's being
10    challenged versus what's not.  I don't know if that
11    falls into merit or another bucket.
12         MS. LI:  Sure.
13         THE COURT:  But you're not challenging the
14    definition of "arriving alien" in the regulation,
15    correct?
16         MS. LI:  That's correct.  We're not moving on
17    that in this motion.
18         THE COURT:  Okay.  So I guess my question -- I
19    want to start by having you respond to the government's
20    argument that even absent the three, you know,
21    documents, directives at issue that you're challenging,
22    if you're not challenging the arriving alien definition
23    or its use in the two regulations, then does that --
24    that doesn't prevent them from enforcing, implementing
25    the regulations as written.
```

```
 1              So what is your response to -- they raised it as a
 2       redressability issue.  What's your response to that?
 3              MS. LI:  Yes, I think my colleague, Ms. Sung,
 4       can handle this.
 5              THE COURT:  Okay.  I would just like to
 6       start -- if we can just answer that threshold question.
 7              MS. SUNG:  Absolutely, Your Honor.  Esther Sung
 8       for the plaintiffs.
 9          So with respect to the sole element of
10       redressability --
11              THE COURT:  Can you speak -- come into the
12       microphone a little bit?
13              MS. SUNG:  Sorry.  So sorry.
14              THE COURT:  No problem.
15              MR. SUNG:  -- that the defendants' dispute, I
16       simply would like to point out that all the evidence
17       before the Court paints a very clear picture that it's
18       only after the defendants issued the three writings that
19       are challenged in this lawsuit that the federal
20       government began subjecting paroled individuals in a
21       systematic fashion to expedited removal, including
22       through immigration courthouse enforcement that involves
23       attorneys moving to dismiss, regular removal proceedings
24       so that ICE agents can immediately detain paroled
25       individuals pursuant to the expedited removal process.
```

1   And there are 16 fact declarations from -- if I have

2   it -- the number right -- from the plaintiffs and from

3   practicing attorneys, some of whom who have practiced

4   for decades, who all say that this -- these tactics have

5   never been seen before.

6       And so even if the regulations remain on the books

7   and are not challenged in this specific motion, if the

8   Court stays the three challenged writings at issue in

9   this case, in this motion, that will provide some relief

10  to the plaintiffs.

11          THE COURT:  Even if the regulation that also

12  contains language along the lines of what you're

13  challenging remains on the books and thus can be

14  enforced?

15          MS. SUNG:  Yes, because the evidence is very

16  clear that the world in which the regulations were on

17  the books and in effect is qualitatively different from

18  a world in which the three challenged writings plus the

19  regulations are in effect, and that the harms that the

20  plaintiffs have articulated that their members are

21  experiencing stem from these three challenged writings.

22          THE COURT:  Right.  But could the government

23  still remove individuals who have been paroled under the

24  regulations, even despite the writings at issue?

25          MS. SUNG:  Yes, under the regulations as

1    they're currently written, yes, correct.

2          THE COURT:  And so if you could just respond --

3    I know in -- what I understand you're saying is that in

4    practice, those regulations have been on the books and

5    were never enforced that way, and it's only this recent

6    directive.  So I understand what you're challenging, but

7    if you could just speak to -- if you're acknowledging

8    that the government could take the same action under the

9    regulations as they exist, and what's your best argument

10   for redressability.

11         MS. SUNG:  Well, the relief that the Court

12   grants need not completely relieve all of the

13   plaintiffs' harms.  And I think, again, the evidence is

14   very clear that there are very specific harms stemming

15   from these challenged writings, and that if the Court

16   stays those writings and returns the situation to the

17   status quo, that is an improvement for the plaintiffs

18   and their members, I would submit.

19         THE COURT:  Okay.  All right.  I just wanted to

20   start with that threshold question --

21         MS. SUNG:  Of course.

22         THE COURT:  -- so we can -- if you want to

23   start with the merits and then --

24         MS. SUNG:  Okay.  Thank you.

25         MS. LI:  I can start whenever, and let me make

1      sure this is working.

2          Okay.  So before I jump into the merits, I just

3      want to make one note on terminology for the record.  In

4      various places the statutes, regulations, and cases that

5      we're discussing used the word "alien."  This is not a

6      word that our clients and their members feel identifies

7      them, so I want to note for the Court that I will strive

8      to use different terms, like "noncitizens," but at times

9      I will use the term "alien," especially if I'm quoting

10     directly from the law.

11             THE COURT:  Okay.

12             MS. LI:  On the merits, plaintiffs are likely

13     to succeed in proving that the three agency actions

14     challenged here, the January 23rd Huffman memorandum,

15     the February 18th ICE directive, and the March 25th CHNV

16     termination notice are contrary to law because they

17     violate the expedited removal statute and they violate

18     the agency's own procedures, and they are arbitrary and

19     capricious.

20         The Court need only find for plaintiffs on either

21     the contrary to law or arbitrary and capricious claim

22     for plaintiffs to prevail on the merits.

23         Starting with contrary to law, the INA specifies

24     only two very narrow categories of noncitizens who can

25     be subject to expedited removal.

1   Defendants put forth a lot of distractions to try

2  to steer the Court away from what the plain text of the

3  statute makes clear.  Individuals who have been paroled

4  into the United States at a port of entry are excluded

5  from both categories and cannot be subject to expedited

6  removal.

7   If we go straight to the statute, 8 U.S.C.

8  1225(b)(1), we can see from the title, structure of the

9  statute, and text that it deals with two distinct groups

10  of noncitizens.

11   First, aliens, quote, "arriving in the U.S."  Those

12  are folks who are not yet here in the country.  And

13  second, "certain other aliens who have not been admitted

14  or paroled," but those are folks that are already

15  present in the country.

16   And this second group, as Your Honor is aware, I'll

17  also call the "expanded expedited removal" designation

18  at certain points.

19   The fact that this second category of expanded

20  expedited removal is subject to a discretionary

21  designation by the attorney general is important as

22  well.  It highlights the fact that these are two

23  separate, nonoverlapping groups.  The folks that are in

24  the "is arriving" group, who are not in the U.S., are

25  always statutorily eligible for expedited removal.

1    Whereas, the additional group of noncitizens, who are no

2    longer arriving, are eligible for expedited removal only

3    if the attorney general has implemented a designation

4    and subject to certain limitations.

5        So it's clear that we're dealing with two

6    nonoverlapping groups, and regardless, the paroled

7    individuals are not eligible for expedited removal under

8    either.  And so I'm going to walk through each category

9    to clearly explain why that's the case.

10        I'm going to start with expanded expedited removal

11    because the January 23rd Huffman memorandum and

12    March 25th CHNV termination notice purport to expose

13    paroled individuals to expedited removal under this

14    category.

15        Per the statute -- which is a lot of text on the

16    PowerPoint -- but per the statute, this category can

17    only be applied to a noncitizen who is determined to be

18    inadmissible under the inadmissibility grounds in

19    1182(a)(6)(C) or (a)(7) and meets two requirements:

20    One, he has not been admitted or paroled.  And two, he

21    cannot prove that he has been physically present in the

22    U.S. for two years.

23        Therefore, under the plain language of the statute,

24    an individual who has been paroled is clearly and

25    explicitly exempted from expedited removal under this

JA542

1     provision.

2          THE COURT:  You're reading that to mean has

3     ever been paroled even if the parole is terminated?

4          MS. LI:  That is correct.

5          THE COURT:  So what is your response -- I

6     believe the government cited a case, the Hewitt case, a

7     recent Supreme Court decision where the Court determined

8     that the phrase, "has not been imposed" refers only to

9     something that does not continue to be true or valid so

10    that there's a kind of current temporal understanding

11    with that specific grammatical tense.

12        What's your argument in response to that?

13         MS. LI:  Yes.  Thank you, Your Honor.  Glad to

14    have the opportunity to address the supplemental

15    authority that defendants submitted.

16        So *Hewitt v. United States* actually supports

17    plaintiffs' reading of the statute.  In *Hewitt*, the

18    Supreme Court held that a criminal sentence, quote, "has

19    been imposed" for the purposes of the First Step Act if

20    and only if an offender's previous sentence has not been

21    vacated.

22        The Court, I believe, was very clear in the

23    language that they used here.  And the Court first

24    affirmed that the use of the present perfect tense, like

25    "has" or "has not," can either be used for an event that

1    is now completed or a past action that comes up to and

2    touches the present.

3        Then in the context of the First Step Act's

4    provision, the Court then held very clearly based on the

5    nature and legal effect of vacatur, specifically in the

6    case of vacatur, quote, "by operation of legal fiction

7    the law acts as though the vacated order never

8    occurred."  "A criminal defendant whose judgment of

9    conviction has been vacated is to be treated going

10    forward as though he were never convicted."

11        Therefore, in that situation, it makes sense that a

12    vacated sentence would not count as a sentence that,

13    quote, "has been imposed," that they act like it was

14    never imposed in the first place.

15        In contrast here, a paroled individual whose parole

16    ends or is terminated stops having active parole, but

17    their prior grant of parole is not vacated or made as if

18    it never occurred in the first place.  They don't stop

19    being someone who has been paroled.

20        Defendants' arguments to the contrary simply fail

21    to understand how parole operates within our immigration

22    legal system.

23        For example -- there are several examples of

24    this -- but after parole status has expired or been

25    terminated, the paroled individual can still adjust

JA544

```
 1    status.  Based on that grant of parole, the person isn't
 2    given unlawful presence for the period of time that they
 3    were here on parole, and if they did work on an
 4    employment authorization document attached to their
 5    parole, that period of work doesn't suddenly become
 6    unauthorized.
 7         So essentially, the prior parole continues to have
 8    legal effect even if that person is no longer in active
 9    parole status.  So the termination of parole has neither
10    the nature nor the legal effect of vacatur.
11         THE COURT:  Okay.  So it's -- just so I
12    understand you, there's a distinction between something
13    being terminated versus something being revoked or
14    rescinded.
15         I think in the Supreme Court case the Court gave
16    the example of some -- of an Olympic gold medal
17    holder --
18         MS. LI:  That's right.  Olympic medal holder.
19         THE COURT:  -- whose medal is -- they're
20    stripped of their medal because of some misconduct.
21         MS. LI:  That's right.
22         THE COURT:  And you're saying -- and that fits
23    with what you're saying because you're saying in that
24    situation something was rescinded or revoked as opposed
25    to, you know --
```

```
 1              MS. LI:  Or specifically vacated, yeah, and

 2    made so that it doesn't exist in the first place, which

 3    I assume is the case for Olympic medals, but I don't

 4    have firsthand experience with that.  And so what I do

 5    know is that when parole is terminated, it's clearly not

 6    vacated.

 7         And to go back to the Supreme Court's very clear

 8    language, they concluded that a sentence has been

 9    imposed for the purposes of the Act's provision if and

10    only if that sentence is extant, meaning it has not been

11    vacated.  And so here we're dealing with --

12              THE COURT:  And you were telling me -- I just

13    want to make sure, and if they're in your papers, you

14    can just tell me they're in your papers.  But you were

15    giving some examples of where parole might be terminated

16    but still has legal effect.

17         Can you repeat what you had said?

18              MS. LI:  Yes, absolutely.  I don't know if

19    those are in our briefs so I will certainly repeat

20    them.

21              THE COURT:  Okay.

22              MS. LI:  So after parole has been terminated,

23    the paroled individual can still adjust status, so they

24    can still apply for a green card.  Based on that grant

25    of parole, the person isn't given unlawful presence for
```

JA546

1    the period of time that they were here on parole, like

2    if -- yeah, if parole was vacated, that would just kind

3    of, poof, expire, I suppose.  And that's not the case.

4        And then for folks who got a work permit attached

5    to their parole and worked on that work permit, that

6    period of work doesn't suddenly become unauthorized.  I

7    think those are very clear examples.

8        THE COURT:  I guess I'm trying to understand

9    how the Supreme Court's discussion of the specific verb

10   tense maps on to what you're saying.  Meaning, you know,

11   if you look just at the words used, if that -- if

12   they're saying that suggests something that continues to

13   the present, I get in the context of a sentence being

14   vacated then it's not something that continues to the

15   present.  But if something is terminated, I'm -- I

16   understand the distinction you're drawing.  I'm just

17   trying to map it on to the specific language the court

18   used in considering the grammatical tense.

19       MS. LI:  Sure.  I mean, I think I read --

20       THE COURT:  Because the status has ended at

21   that point, right, when you're --

22       MS. LI:  Right.  You don't have active parole.

23       THE COURT:  You don't have active parole.

24       MS. LI:  Right, but that doesn't change the

25   fact that you have been paroled or that you are a person

JA547

1    that has been paroled in the past.

2    And I think there's other arguments in our briefing

3    that I can also go over about why the language should be

4    used that way, but when it comes to the Supreme Court's

5    decision in *Hewitt*, I read Justice Jackson's opinion

6    very closely to say -- where she says we conclude that a

7    sentence, quote, "has been imposed for purposes of the

8    Act's provision if and only if that sentence is extant,"

9    or like surviving.

10    And so to me that -- to us, when we read that, it

11    means that as long as the sentence is not vacated -- I

12    guess you can look at the reverse -- if the sentence is

13    not vacated, then it still has been imposed in the past.

14        THE COURT:  So I'm just looking at the --

15    pulling up the exact language.

16    "When used in this way, the present perfect tense

17    conveys to a listener that the event in question

18    continues to be true or valid."

19    That doesn't seem to turn on the manner in which

20    the event is terminated, whether it expired, terminated,

21    was rescinded, or revoked.  So I guess that's the

22    difficulty.  I understand the argument you're making.

23    I'm just having difficulty understanding if the Supreme

24    Court has said that tense conveys to a listener that the

25    event in question continues to be true, how does that

JA548

1    map on to -- and the event in question here is the

2    parole status, right?  And so if you're no longer

3    paroled, how does the use of the past perfect tense

4    convey to the listener that that event --

5          MS. LI:  Because I think the event that is

6    still true is that they have been paroled.  They were

7    paroled previously.

8          THE COURT:  Well, the "has been" is the tense

9    we're looking at, and the event is paroled.  Like in the

10   context of the gold medal, the event is winning the gold

11   medal.

12         MS. LI:  Right.

13         THE COURT:  And the question is:  What does

14   that tense convey to a listener about the person's

15   current status?

16         MS. LI:  Yeah, and I think the full context

17   of -- I think I'm only looking at the syllabus right

18   now, but I can try to find it in the decision.  But here

19   it says, "the present perfect tense can refer to an act,

20   stay, or condition that is now completed or a past

21   action that comes up to and touches the present," and

22   then the rest of what you said, and thus conveys that

23   the event in question continues to be true or valid.

24        And I think I would read this part about the

25   grammar in conjunction with the legal effect of vacatur

1    section, and that is kind of how we get to the fact that

2    as long as it's not vacated it still exists, and so that

3    fact that this person has been paroled is still true,

4    still valid up until now, even though they're not

5    currently under parole, active parole status.

6         THE COURT:  Okay.  You can continue.

7         MS. LI:  So I think -- I guess on this point,

8    defendants do concede that while someone is on active

9    parole they are not amenable to expanded expedited

10   removal.  But they argue that this phrase, "has not been

11   paroled," should be read to allow for expedited removal

12   after the person's parole has ended.

13        This, like I was saying, violates the plain text of

14   the statute, but I think the most obvious way that it

15   does is that it renders the protection from expedited --

16   excuse me -- expanded expedited removal that Congress

17   gave paroled individuals completely meaningless.

18        Defendants say that the protection extends only

19   while parole is active, but they also take the position

20   that they can terminate parole at any point by simply

21   serving an expedited removal charging document.

22   Therefore, defendants would like the Court to believe

23   that Congress protected paroled individuals from

24   expedited removal unless and until DHS decides to

25   subject them to expedited removal.

1          So this circular logic gives no effect at all to

2     the limits that Congress placed on the agency's ability

3     to use this unprecedented and extraordinary summary

4     removal process.  An interpretation of the statute that

5     renders provisions in the text meaningless like this

6     must be rejected.

7          Additionally, the fact that Congress exempted both

8     people who have been paroled and admitted from expanded

9     expedited removal supports our reading that "has been

10    paroled" should refer to a historical fact that cannot

11    be undone even if the person loses lawful status,

12    meaning if they have their parole terminated.

13         And to say more on that, the terms "admission" and

14    "admitted" are defined in the immigration laws at 8

15    U.S.C. 1101(a)(13)(A), as, quote, "The lawful entry of

16    the alien into the United States after inspection and

17    authorization by an immigration officer."

18         This definition very clearly turns on the way that

19    the person came into the U.S., which is distinct from

20    the person's lawful status in the U.S.  Like someone can

21    be admitted and have a visa and then that visa is no

22    longer valid, but that doesn't change the fact that they

23    have been admitted.

24         And parole can be a way -- both a way of coming

25    into the United States and a status, but since it's

1    paired here with the term "admitted," we think that that

2    is an indication that we should read "has been paroled"

3    like "has been admitted" to refer to the way that

4    someone comes into the United States, they've gone

5    through inspection, they were granted permission into

6    the country, and it should not refer to the maintenance

7    of a particular legal status.

8        Finally, on expanded expedited removal, DHS's own

9    regulations on expedited removal at 8 C.F.R.,

10    Section 235.3 similarly confirm that expanded ER only

11    applies to people who have not previously been paroled

12    into the country without regard to their current parole

13    status.

14        This is all laid out in our briefing, but I just

15    want to point the Court in particular to 8 C.F.R.,

16    235.3(b)(6), which requires that before being subjected

17    to expanded expedited removal, a noncitizen be given the

18    opportunity to prove that he, quote, "was paroled into

19    the U.S. following inspection at a port of entry, not

20    that he is currently on active parole status."

21        Again, this focuses on the way that the person came

22    into the U.S., not their current status, and it affirms

23    that an individual who can prove that he was previously

24    paroled into the U.S. can't be subject to expanded

25    expedited removal.

```
 1          So defendants' policies that we're challenging here

 2     violate these regulations per the Accardi Doctrine.

 3          Defendants point to certain regulations that they

 4     say stand for an opposing view, but even if that's the

 5     case, when there are conflicting regulations like this,

 6     as you can see on the slides -- we've shown ours here,

 7     and the ones that defendants pull out here -- those

 8     regulations cannot go beyond what the statute allows.

 9     And as defendants agree in their opposition, the statute

10     is what controls.  And so if we focus on the statute, it

11     supports plaintiffs' reading.

12          THE COURT:  Can I just ask you about the issue

13     of conflicts between regulations?

14          Is it your position that the APA imposes a

15     requirement that separate agency actions be consistent

16     with one another?

17          MS. LI:  I think it's -- under the Accardi

18     Doctrine, the government has the responsibility -- or is

19     required to abide by their own regulations, and that I

20     think is what we're trying to get at here with the

21     regulations.  Maybe I mis- --

22          THE COURT:  Is that the relevance of the

23     arguments about inconsistencies that --

24          MS. LI:  Oh --

25          THE COURT:  -- it makes it difficult for them
```

```
1        to comply with inconsistent regulations so that's the

2        problem?  Or are you suggesting that there's some --

3              MS. LI:  So, yeah, so --

4              THE COURT:  -- problem with inconsistent

5        reg- -- that the APA imposes a requirement of

6        regulations or separate agency actions directives, et

7        cetera, be consistent with one another?

8              MS. LI:  Thank you.  Thank you for clarifying.

9        I think I misunderstood at first.

10           I think our argument is -- about the inconsistent

11       regulations is that we are pointing to regulations that

12       support our reading of the expedited removal statute.

13       The government comes back with provisions that they say

14       supports an opposing view that paroled individuals can

15       be subject to expedited removal under the regulations.

16           I think our overarching point is that the

17       regulation can't do anything beyond the statute.  And at

18       the end of the day, the statute is what controls, and so

19       we don't need to get into all of the conflicting

20       regulations that do exist.

21           And also, just -- we can get into arbitrary and

22       capricious, but they also need to be consistent with the

23       law and with each other --

24             THE COURT:  I'm jumping around, sorry.

25             MS. LI:  I'm sorry?
```

JA554

1          THE COURT:  I said I'm jumping around.  So I'm

2     taking you to the arbitrary and capricious argument when

3     we were elsewhere, but it just popped in my head so I

4     just wanted to ask.

5          MS. LI:  Oh absolutely.

6      So yeah, and I think the last thing I want to point

7     the Court to is just an exhibit that we attached to our

8     reply where the DOJ has also adopted plaintiffs' view of

9     the statute, the expanded expedited removal statute

10    specifically, in a separate individual challenge, Mata

11    Velazquez, which -- that we provided as attached as an

12    exhibit.  And this is where the government stated that

13    the petitioner who is a paroled individual is not

14    subject to expanded expedited removal under, yeah, the

15    designation.

16      So the February 18th ICE directive, on the other

17    hand, purports to use the provision of expedited removal

18    in 8 U.S.C. 1225(b)(1)(A)(i) to subject paroled

19    individuals to expedited removal with no time limit.

20      And here, again, the defendants are in violation of

21    the statute because that provision can only be applied

22    to a noncitizen who, quote, "is arriving in the United

23    States.  A noncitizen who came to a port of entry, was

24    inspected and paroled into the country and has been here

25    for years, or even decades, cannot be defined as someone

1    who is arriving in the United States under the expedited

2    removal statute."

3        The evidence, again, is in the statutory text.

4    First, I think it's common parlance and also

5    grammatically correct to say that Congress's use of the

6    present progressive tense "is arriving" means that this

7    category of expedited removal can only be applied to

8    people who are currently in the process of arriving at a

9    port of entry.

10        When someone has arrived, like plaintiffs' members

11    who have been granted permission into the country,

12    they're no longer in the process of arriving.

13        I mean, and if we go back to the point I was making

14    at the beginning that the title and structure of

15    1225(b)(1) divides the noncitizens that can be subject

16    to expedited removal into two distinct and

17    nonoverlapping categories, that supports this

18    understanding.

19        Essentially, if the first category applies to

20    people who are in the process of arriving who are not in

21    the country yet and the second category applies to folks

22    who are already in the country for some length of time

23    subject to the limitations, then the fact that Congress

24    carved paroled individuals out of that second category,

25    we think, is -- support that paroled individuals belong

JA556

1    in that category of people who have already arrived, and

2    without the carve-out they would have potentially been

3    subject to expedited removal under that category.

4         Other provisions -- oh, I forgot to move the

5    slides, but that's okay.

6         Other provisions of 8 U.S.C. 1225 reinforce

7    plaintiffs' reading that the process of arrival, as used

8    in the same statute that created expedited removal or

9    has expedited removal, is one that occurs at the border

10    or at the moment of arrival.  And so Congress saw those

11    who were arriving as distinct from people already

12    present in the U.S.

13         I'm not going to read all of them, but, for

14    example, Section 1225(d)(2), which is the authority to

15    order detention and delivery of, quote, "arriving

16    aliens" authorizes the detention of noncitizens arriving

17    on the vessel or aircraft bringing the noncitizen to the

18    U.S. or at the airport of arrival.

19         So clearly, in all of these examples, "arrival" or

20    "arriving" is contemplated at -- in 8 U.S.C. 1225 to

21    take place at that point of arrival.  It is not a

22    forever status that someone hangs on to after they've

23    entered and been present in the U.S.

24         And I think, again, the clearest way to articulate

25    why this is a statutory violation in addition to

1    violating the plain text is that defendants argue that a

2    noncitizen who came and was inspected, paroled into the

3    country, and has been residing here remains indefinitely

4    in the process of arriving in the U.S. for the purposes

5    of expedited removal.  But this interpretation, again,

6    effectively reads out of the statute the protections

7    included in expanded expedited removal for paroled

8    individuals.

9        Essentially, defendants are saying that if there's

10   a paroled individual here, they can subject them to

11   expedited removal under the "is arriving" provision --

12   excuse me -- at any time, including when their parole is

13   active.  And so if that's the case, it really truly

14   means nothing for the statute to explicitly exempt those

15   same individuals from expedited removal under the

16   expanded expedited removal provision, even if we -- if

17   we accept defendants' point that the purpose of that is

18   to only protect folks under -- while their parole is

19   active -- which we don't agree with, obviously --

20           THE COURT:  Can I ask you a question again?  I

21   might be jumping around.

22       There is a lengthier footnote in your reply brief

23   where there was an argument that the history of the,

24   quote, "arriving aliens" definitions under different

25   iterations of the regulations support your argument.

```
 1    And I just wanted to know if you had -- could expound on
 2    that or explain.
 3         I think it was Footnote 20 of the reply brief.
 4            MS. LI:  Yes, I'm sorry, could you repeat which
 5    footnote you're referring to?
 6            THE COURT:  There was a Footnote 20 in your
 7    reply brief where, at least I read it to argue, that the
 8    history of the arriving aliens definitions under
 9    different iterations of the regulations supports
10    plaintiffs' argument in this case.  And I didn't know if
11    you could expound on that or explain.
12            MS. LI:  Right, okay.
13            THE COURT:  Put a finer point on that point.
14            MS. LI:  Yes.  Okay.  So that is the footnote
15    where we talk about the amendments to the regulations?
16            THE COURT:  Yes.
17            MS. LI:  Okay.  Yes, I'm happy to.
18         So essentially what this footnote and this evidence
19    stands for is that for more than three decades DHS
20    itself actually agreed with plaintiffs that the statute
21    does not require paroled individuals to be considered
22    arriving.  Defendants' argument is that paroled
23    individuals are always arriving, forever arriving.
24    That's required by the statute.
25         But that is not the case, as I've been explaining.
```

1    And also, the agency itself has recognized that when, in

2    1998, it amended the regulation that defines arriving

3    alien to remove two large groups of paroled individuals

4    from that definition.  And that's all of those paroled

5    into the country at ports of entry before April 1st,

6    1997, and all of those paroled into the country on or

7    after that day pursuant to advanced parole.

8       And so essentially the -- in doing this, the agency

9    said that it was making a discretionary policy decision.

10   It said, quote, "as a matter of policy," it was

11   excluding these people.  It didn't say that it was

12   because of the text of the statute.  It wasn't because

13   the statute was somehow construed to incorporate, you

14   know, this understanding that paroled people are always

15   arriving.  It didn't say anything about that.  And the

16   fact that it was a policy choice emphasizes that it

17   wasn't required by the statute.

18          THE COURT:  Okay.

19          MS. LI:  Yes, and I think -- another thing I

20   want to address when it comes to the "is arriving"

21   argument, to make sure that I'm very clear on

22   plaintiffs' position here, is that defendants point

23   repeatedly to the parole statute to argue that a paroled

24   individual should be considered to be arriving because

25   after the purposes of parole have been served, in

1      defendants' words, the paroled individual, quote,

2      "reverts to the status of an applicant for admission,"

3      quote, "standing at this threshold of entry."

4          And I quote from defendants' words because this

5      misstates the parole statute, which actually doesn't say

6      reverts or standing at the threshold of entry at all.

7      All it says is that a paroled individual's case, quote,

8      "shall continue to be dealt with in the same manner as

9      that of any other applicant for admission into the

10     United States."

11             THE COURT:  Can you give me the cite for that?

12             MS. LI:  Absolutely.  8 U.S.C. 1182(d)(5)(A).

13         And so -- to get to what it means.  But essentially

14     what it means is that a paroled person, after their

15     parole has terminated, they'll just continue to be

16     treated as an applicant for admission.  But if we look

17     at this slide, the same statute on expedited removal

18     tells us why this actually does not support defendants'

19     reading at all or their interpretation.

20         So in 1996, in IIRIRA, at the same time that

21     Congress created expedited removal and amended the

22     parole statute to alter the conditions for granting

23     parole, it also defined applicant for admission.  And in

24     8 U.S.C. 1225(a)(1) the statute defines the term

25     "applicant for admission" to include both a noncitizen

JA561

1    present in the United States who has not been admitted

2    and one who arrives in the United States.

3        And so just to make it very clear, because parole

4    is not an admission, a paroled individual is always an

5    applicant for admission.  That is, they can always be

6    subject to the inadmissibility grounds and removed on

7    those grounds.  That is true both when they have parole,

8    and, according to the parole statute, after that parole

9    is terminated.

10       And so that's all the parole statute is saying, and

11   defendants are using it to back up their argument, but

12   it's an inaccurate characterization of the parole

13   statute because clearly, as you can see from this slide,

14   the definition for applicants of admission is much

15   broader.  And in the same statute, Congress then defined

16   much narrower subsets of people who could be subject to

17   expedited removal.

18       They didn't say that all applicants for admission

19   could be subject to expedited removal, they were also

20   amending the parole statute at the time, and they didn't

21   say anything in there about how -- once people have

22   their parole terminated then they would be subject to

23   expedited removal or can be considered arriving.

24   Nothing like that.  And we have to give these choices

25   that Congress made in this statute meaning.

1          And so these are all of the indications that a

2     paroled individual being treated as an applicant for

3     admission does not equate them being considered as

4     arriving for the purposes of expedited removal.

5          And finally, the last thing I want to say on the

6     "is arriving" piece is that, kind of similar to what I

7     was already getting at here, defendants also argue that

8     Congress legislated expedited removal against what we

9     know as the entry fiction.  But even if the concept of

10    the entry fiction may continue to apply for due process

11    purposes, as Your Honor is aware, it does not mean that

12    Congress like -- necessarily mean that Congress applied

13    the entry fiction to the creation of this new expedited

14    removal process, and defendants provide no evidence that

15    they did.

16         But also, even if the Court -- if the Court were to

17    try to apply the entry fiction and treat paroled

18    individuals as forever arriving, it creates a statutory

19    scheme and, like, statute construction that doesn't make

20    any sense and reads out of the statute other protections

21    that Congress intentionally included, which is going

22    back to the point I was making earlier, that if someone

23    is treated as forever arriving and always subject to

24    expedited removal even when their parole is active,

25    there's no purpose to the carve-out for people who have

1    not -- or have been paroled -- excuse me -- in expanded

2    expedited removal.

3        So agency decisions premised on an incorrect

4    understanding of the law cannot stand, and plaintiffs

5    are likely to succeed on their contrary to law claim.

6        I'm happy to move on to arbitrary and capricious,

7    unless you have any additional questions.

8        THE COURT:  I do have some additional questions

9    about the March 25th CHNV termination notice, and that

10   is to ask you to put a finer point on precisely what

11   you're challenging.  And to the extent that you're

12   seeking a stay or vacatur, your position on whether the

13   Supreme Court's recent *Doe* decision precludes that in

14   any way.

15       MS. LI:  The recent *Doe* -- oh, yes, the recent

16   *Doe v. Noem* decision.

17       So first on the CHNV termination FRN, we are asking

18   for this to be stayed only insofar as it purports to

19   subject parole individuals to expedited removal.  We're

20   not asking for a stay of the entire notice or anything

21   related to the parole terminations in this case.

22       It's -- I'm trying to find the language, but the

23   FRN makes very clear that DHS intends to put CHNV

24   parolees whose parole has been terminated through

25   expedited removal, and so that is the scope of our

```
 1    request there.
 2         And then when it comes to the Supreme Court's grant
 3    of the stay of the stay in --
 4              THE COURT:  Yeah, I called it the decision, but
 5    ruling.
 6              MS. LI:  Yes, their ruling.  What I'll say
 7    there is that the Supreme Court provided no reasoning
 8    whatsoever.  They provided just their decision with no
 9    explanation, and so we can't use that -- that doesn't
10    have any effect on our arguments here.
11              THE COURT:  And are you speaking about
12    irreparable injury?
13              MS. LI:  No, my colleague can handle that, if
14    you'd like to go there.
15              THE COURT:  Yes.
16              MS. LI:  Absolutely.
17         Would you like me to talk through arbitrary and
18    capricious or --
19              THE COURT:  No, my only question that I asked
20    out of turn had to do with, you know, the -- how the APA
21    looks at or what's required in terms of consistency
22    among agency actions and whether you're taking the
23    position that there's a requirement that separate agency
24    actions have to be consistent with one another.
25              MS. LI:  Yeah, I think that the APA does
```

JA565

1      require that if there is this inconsistency like this,

2      that it has to be explained, like -- the way we look at

3      it is from the January memo to the February directive to

4      the March notice, there's this flip-flopping of what

5      legal authority they're using to subject paroled

6      individuals to expedited removal with absolutely no

7      recognition of the fact that there has been that change.

8      Also no explanation of why they're subjecting expedited

9      people -- excuse me, paroled people to expedited

10     removal, no consideration of relevant factors, as we

11     briefed in our papers.  So the APA certainly requires

12     more than no explanation.

13             THE COURT:  Okay.  Thank you.

14             MS. LI:  And, yes, my colleague can respond on

15     irreparable injury.

16             THE COURT:  I guess my first question for you

17     is what is your position about the irreparable harm

18     plaintiffs' members would face under expedited removal

19     that they would not face under standard removal

20     proceedings.

21             MS. SUNG:  Sure.  I would point the Court first

22     to the Ashley Tabaddor declaration, which lays out key

23     differences between regular --

24             THE COURT:  I'm sorry, can you -- which

25     declaration?

1          MS. SUNG:  Ashley Tabaddor.

2          THE COURT:  Okay.

3          MS. SUNG:  I believe it's the fourth

4    declaration attached to our motion, if I'm not mistaken,

5    but it lays out the key differences between expedited

6    removal proceedings and regular removal proceedings.

7    And then in addition to that, the declarations

8    themselves -- the fact declarations that we submit

9    illustrate this.

10         For example, the case of E.M.P., who is -- whose

11   story is outlined in Jessica Olive's declaration.  He

12   was in regular removal proceedings before he was then

13   subjected to expedited removal proceedings when he

14   appeared at his immigration court hearing.

15         And so there is a big difference between him being

16   in expedited removal proceedings with easy access to an

17   attorney, him being in his community with his family,

18   and him being detained with very limited access to his

19   attorney, and, again, only being given the opportunity

20   to have a credible fear interview.

21         And so --

22         THE COURT:  And I appreciated from many of the

23   declarations the harm of potentially being returned

24   somewhere that's dangerous where you could face

25   persecution, violence on a protected basis.  But what's

JA567

```
 1   your response to the defendants' argument that the

 2   credible fear procedure under the expedited removal

 3   process is sufficient in that some of the declarations

 4   seem to support that -- given some of the declarants had

 5   such a finding made during the course of their

 6   procedures?

 7           MS. SUNG:  Sure.  It's not sufficient because

 8   all you can articulate is a fear of being returned.  And

 9   so, for example, I believe it's E.I.R.M who is -- whose

10   story is detailed in the Andrew Freire and the Lindsay

11   Toczylowski declarations.  He's engaged to a U.S.

12   citizen.  And in fact, he was detained when they were

13   driving to California to celebrate his birthday.

14       And so the fact that he is engaged to a U.S.

15   citizen and had -- potentially has an avenue to lawful

16   permanent resident status through his future marriage to

17   his fiancee is not something that can be raised in a

18   credible fear interview that will get you a positive

19   credible fear determination.

20       And so the fact that he, among other -- other

21   plaintiffs -- excuse me -- other declarations outline,

22   for example, asylum applications, the ability to adjust

23   status under the Cuban Adjustment Act.  None of those

24   avenues toward other lawful status that would foreclose

25   deportation get you anywhere in a credible fear
```

1    interview.  The only thing that is considered in the

2    credible fear interview is whether you have a credible

3    fear of being returned to a country where you face

4    persecution or death.

5         And so a person can have an avenue toward, again,

6    lawful status here in the United States that would

7    foreclose removal, but it doesn't mean anything in the

8    expedited removal process.

9              THE COURT:  And are you speaking to standing?

10             MS. SUNG:  Yes, I am.

11             THE COURT:  I would be interested in your

12   response to what I understand the defendants' arguments

13   to be that your declarations in this case are

14   insufficient for -- to confer standing as compared to

15   the *Make the Road* -- earlier *Make the Road* decision that

16   the Circuit decided in 2019, I believe.

17             MS. SUNG:  Yes.  And so I would submit that the

18   evidence that we've provided here is no different.

19        What Judge Jackson focused on in that case was that

20   there was evidence of harm to the plaintiffs' members.

21   We have submitted evidence through the declarations of

22   Mr. Escobar, Ms. Salas, and Ms. Lawrence documenting

23   evidence of harm to the plaintiffs' members.  And so if

24   the Court is going to require a sworn declaration, these

25   declarations are sworn.

1        The key point that Judge Jackson -- then-Judge

2   Jackson relied on was that there was evidence of harm,

3   and we would submit that this Court has ample evidence

4   of harm before it.

5        I would also just like to put a finer point on the

6   effect of the *Svitlana Doe* case since you asked my

7   colleague about that.  So the *Svitlana Doe* case concerns

8   the categorical and premature termination of parole for

9   some half a million individuals.  And that's not what

10  we're challenging here in this case.  We are challenging

11  the fact that the federal government wants to subject

12  those half million individuals to expedited parole --

13  excuse me, expedited removal.

14       So the relief that's being requested and the facts

15  at issue in this case, including the facts as to harm,

16  are different.  And so anything that you can infer from

17  the Supreme Court's stay in *Svitlana Doe*, which again is

18  one paragraph, there's no reasoning and no analysis,

19  just factually it doesn't apply to this case.

20            THE COURT:  Okay.

21            MS. SUNG:  Are there other specific questions

22  that I -- I don't want to waste the Court's time.

23            THE COURT:  No, I don't have any additional

24  questions at this point.

25            MS. SUNG:  Okay.  I mean, the only other thing

JA570

1    I would like to bring up before I sit down is your

2    question about redressability at the beginning.

3            THE COURT:  Yes.

4            MS. SUNG:  And I think that if you -- if you

5    take that question again to sort of its logical

6    conclusion here, if the Court is inclined to grant

7    relief here as to the three challenged writings, and if

8    the basis for the Court's ruling is that the writings

9    have to be stayed because they are contrary to the

10   statute -- then you asked if the federal government

11   could continue subjecting paroled individuals to

12   expedited removal simply under the regulations that

13   pre-existed.

14       We mentioned this I think in Footnote 13 of our

15   reply brief.  It would be irregular for the federal

16   government to continue removing paroled individuals

17   through expedited removal under regulations that don't

18   comport with what the statute allows.

19       And this is similar to how declaratory judgment

20   relief is sufficient to support redressability because

21   we presume that the federal government will comply with

22   the finding that their actions don't comport with the

23   statute.

24       And if the defendants do end up taking steps to

25   subject parole beneficiaries to expedited removal under

```
 1    the regulations, we would be back here in front of this

 2    Court.  We have challenged the regulations in the

 3    complaint, in the amended complaint, but they're not at

 4    issue here in this motion.  We're focusing on the

 5    writings that clearly have caused the harm that we are

 6    asking the Court to address in this motion.

 7         And so with regard to the regulations, I would just

 8    say that's a future issue because that's not -- these

 9    expedited removals happening pursuant to the regulations

10    is not what's happening today and not what we're

11    challenging.

12              THE COURT:  Okay.  Thank you.

13              MS. SUNG:  Thank you.

14              THE COURT:  Okay.  Whoever is speaking for

15    defendants.

16              MR. SANDHU:  Good afternoon, again, Your Honor.

17    Papu Sandhu on behalf of the defendants.

18         Your Honor, if it's okay, unless you have questions

19    that you want to ask at the outset, I would begin with

20    redressability.

21              THE COURT:  Sure.  I do have one kind of what

22    I'll call a threshold question.  And that has to do with

23    your argument that essentially what plaintiffs are

24    seeking here is a prohibited injunction through their

25    motion under 705, and I just wanted to kind of
```

1      understand that better.

2          It was my understanding that -- well, at least

3      there's precedent suggesting that vacatur under APA

4      Section 706 is not considered an injunction for purposes

5      of the statute.  And so then, to me, it would follow

6      that if there's precedence suggesting that that's not a

7      prohibited injunction, then a stay pursuant to 705

8      wouldn't be either.

9          So if you could just expound on the government's

10     position that the relief plaintiff seeks is foreclosed

11     by the statute and, you know, what authority do you have

12     contrary to the authority that I've seen that suggests

13     that this is a different situation than an injunction.

14              MR. SANDHU:  Right, and so I think Your Honor

15     was referring to Section 1252(f)(1).

16              THE COURT:  Yes.

17              MR. SANDHU:  The bar on injunction relief.

18              THE COURT:  Right.  And specifically whether

19     what -- plaintiffs are arguing that they're not seeking

20     an injunction.  And it's my understanding that there's

21     precedent that in the context of vacatur under the APA,

22     that that's not considered an injunction for purposes of

23     that very statute.

24          So it seems to me that if -- if there's authority

25     suggesting that vacatur under 706 is not an injunction

JA573

```
1      for purposes of 1252(f)(1), it seems to follow that a

2      stay wouldn't be a prohibited injunction either, so --

3               MR. SANDHU:  Right.

4               THE COURT:  -- yes.

5               MR. SANDHU:  And I understand your question.

6          As I understand it, Your Honor, there is no binding

7      precedent.  And this is an open question in this

8      Circuit, in fact, as was alluded to this morning.  The

9      D.C. Circuit issued a decision recently in the Dixon

10     case in which it clarified the scope of

11     Section 1252(f)(1).  And it adjusted the law as it was

12     previously under the Grace decision because of the

13     intervening decision in Almonte.  And what the D.C.

14     Circuit said was that (f)(1) could apply.  It didn't

15     address the 705 question, but it did say that (f)(1) can

16     apply to agency -- to enjoined agency actions -- or I'm

17     sorry -- to cover agency actions and not just the

18     operation of the statutory provisions.  That was the

19     holding in Almonte.

20         So the government's position is that it does apply

21     and that it's an open question for this Court, that

22     there's no binding case law in this Circuit.  And we

23     would say especially in this case that it's appropriate,

24     because when you look at the complaint and the prayer

25     for relief in this case, they do ask that the Court,
```

JA574

1    quote, "enjoin the defendants from applying expedited

2    removal to noncitizens who have been granted parole at

3    ports of entry."  That is their prayer for relief in the

4    amended complaint, Paragraph 5.

5         And on Page 1 of their stay motion, they say very

6    clearly that they move to stay the defendants' unlawful

7    actions to apply expedited removal to hundreds of

8    thousands of people who have been paroled at ports of

9    entry.  That sounds like very broad injunctive relief.

10   And so part of that argument is essentially that's what

11   they're seeking by seeking to stay these agency

12   documents.

13        THE COURT:  And I just want a better

14   understanding of what the government's position is about

15   what the Court's authority is with respect to relief it

16   can grant.  Because the statute clearly contemplates

17   review, in this court in particular, as it pertains to

18   the expedited removal system.

19        So what is your -- given that, you know, I have the

20   authority to review agency action as outlined by the

21   statute -- I know it's cabined, but there is review in

22   this court.  What is the type of relief that the

23   government contends this Court can provide under the

24   statute?

25        MR. SANDHU:  What's permissible under

1    Section 1252(f)(1)?

2              THE COURT:  Yes.

3              MR. SANDHU:  In the expedited removal context?

4              THE COURT:  Yes.

5              MR. SANDHU:  And I'm glad you raised that

6    because I did want to clarify with my office.  I was

7    here this morning.

8              THE COURT:  Okay.

9              MR. SANDHU:  So we would take the position that

10   the only relief that is available is for individual

11   plaintiffs, because Section 1252(f)(1) specifically

12   carves out an exception for individual plaintiffs.

13        So individual plaintiffs who can show an injury,

14   that they have been impacted by a rule or by a certain

15   guidance, and can succeed on the merits can seek vacatur

16   of their specific expedited removal order.

17        So under (e)(3), if they bring a systematic

18   challenge to some aspect of expedited removal, an

19   individual can proceed and the Court can issue the

20   relief of vacatur of the expedited removal order in the

21   specific individual case.

22             THE COURT:  Okay.  And then -- so how do you

23   square, then, the D.C. Circuit, what I read to be the

24   precedent about associational standing in this context,

25   and standing in for -- a member organization standing in

1    for an individual plaintiff in the way that these

2    plaintiffs are attempting to do?

3        I guess I read the precedent to endorse

4    associational standing, notwithstanding the language

5    that you cited, and understanding, you know, what the

6    court in *Make the Road* discusses.

7        What's your position on that?

8            MR. SANDHU:  You mean granting (f) --

9            THE COURT:  Allowing an organization to bring

10   this challenge, this type of challenge.  Because you're

11   saying it's -- my authority is limited to individual --

12   review of individual plaintiff cases.

13           MR. SANDHU:  Right.  So that would exclude any

14   specific relief in this context, and it would have to be

15   brought by an individual plaintiff.  That's the

16   government's position.

17           THE COURT:  And what is the authority for that

18   in light of --

19           MR. SANDHU:  Well --

20           THE COURT:  There is -- you're saying there is

21   no associational standing for this type of claim?

22           MR. SANDHU:  There's -- there is no remedy that

23   the Court can provide, except the remedy of vacatur for

24   an individual plaintiff.  That is -- I think what we're

25   saying is -- because your question is going to Section

1    1252(f)(1).  We wouldn't say that, you know, in

2    different -- in other contexts you can't raise a claim

3    of associational standing but --

4            THE COURT:  Right.  Well, in an association --

5    in an organizational -- I don't want to mix

6    organizational standing with associational standing, but

7    in a case involving an organization, assuming that

8    there's associational standing available, what relief

9    can the Court grant in the context of a case involving a

10   plaintiff association -- asserting associational

11   standing?

12           MR. SANDHU:  So since that's not an individual

13   plaintiff bringing the claim, there would be no

14   injunctive relief, the Court can rule on the merit

15   certainly.  Right?  As --

16           THE COURT:  So declaratory relief?  Essentially

17   declaring --

18           MR. SANDHU:  I wouldn't say declaratory relief,

19   but it could adjudicate the merits.  And if --

20           THE COURT:  And give no remedy?

21           MR. SANDHU:  And if the, you know -- if the

22   D.C. Circuit agreed with that, then that would be

23   Circuit law, I guess, but --

24           THE COURT:  But if I can't -- if I can't give a

25   remedy, then is -- I mean, part of the process here is

JA578

1 that there's an injury that can be redressed through a

2 ruling which presupposes that there's some relief that I

3 could give.  And so if you're acknowledging that an

4 association under Circuit precedent can bring these

5 types of challenges -- or are you saying an association

6 can't?

7   I know you have a problem with plaintiffs'

8 standing, but just as a general principle of Circuit

9 law, there's no per se bar.  And you agree that the

10 Circuit has said, you know, associational standing

11 has -- has blessed associational standing in these types

12 of challenges.

13    MR. SANDHU:  Right, but under

14 Section 1252(f)(1) there's no remedy for that.

15    THE COURT:  Well, I guess that's what I'm --

16    MR. SANDHU:  Yeah.

17    THE COURT:  Maybe I'm confused.  If the

18 association or organization can bring a lawsuit -- but

19 you're saying they can bring the suit but the Court

20 can't issue any relief.

21    MR. SANDHU:  That's our position under

22 1252(f)(1), Your Honor.

23    THE COURT:  Okay.  I don't -- is there any

24 other circumstance in which there's standing to bring a

25 lawsuit but -- and jurisdiction for the Court to hear

JA579

1    the merits but no authority for the Court to provide any

2    relief?

3            MR. SANDHU:  I would have to --

4            THE COURT:  I mean, I don't even -- I'm not

5    even familiar of -- the idea that you can have a

6    judgment without a remedy.  I mean, what would anyone

7    appeal?  You're appealing a final judgment.

8        I mean, can a Court issue a judgment without a

9    remedy?  I'm not familiar -- I mean, I'm not familiar

10   with that.

11           MR. SANDHU:  We can submit further briefing on

12   that question, Your Honor.  I'm not sure exactly.

13           THE COURT:  Okay.

14           MR. SANDHU:  But if I could begin with

15   redressability, because I think what my friend answered

16   this morning -- this afternoon, I'm sorry -- I

17   understand their position to be that they're not

18   challenging the arriving alien definition at 8 C.F.R.,

19   Section 1.2, and they also seem to concede that the

20   government could continue to implement that provision

21   along with Section 235.3 to apply expedited removal to

22   aliens paroled at a port of entry.

23       And if that's the case, then based on those

24   concessions, I think the Court should deny the motion

25   based on lack of standing -- Article III standing for

```
1    redressability.

2            THE COURT:  Well, can I ask about that?

3        Is it typical -- sometimes there are many purported

4    legal authorities that could justify executive agency

5    action.  And -- is it the case that if -- that a

6    plaintiff doesn't have standing to challenge an agency

7    action just because there might be some other legal

8    authority under which the government could achieve that

9    objective?  I mean, is that usually how we look at

10   standing?

11       You know -- and I guess my -- and I pressed

12   plaintiffs on this, but I'll press you.  You know,

13   they're challenging very specific directives, and

14   they're asking for relief with respect to those

15   directives.

16           MR. SANDHU:  Right.

17           THE COURT:  And even if it is the case that

18   another statute, regulation, et cetera, the government

19   could find a legal way to pursue the same objectives, or

20   a different way to pursue the same objectives, does that

21   mean that they -- that a plaintiff doesn't have standing

22   to challenge whatever they're challenging in the

23   lawsuit?

24       And do you have any authority where the Court has

25   done that and said, well, you know, there's another
```

1    legal avenue where the government could achieve the same

2    objective so I'm going to find you don't have standing

3    to challenge the agency action at issue?

4           MR. SANDHU:  Yeah, I think that is true.  And I

5    think -- the fact that they're not challenging

6    Section 1.2 is, I think, because they're out of time to

7    challenge that, so they're trying to get around that

8    problem.

9        But if you were to look at Justice Gorsuch's

10   concurring opinion in *United States v. Texas*, 599 at

11   U.S. -- at 691 through 692, it's a similar scenario

12   there where Justice Gorsuch is saying, although it is a

13   concurring opinion, that even if the Court were to

14   invalidate the agency guidance on prioritization of

15   prosecutorial discretion in the immigration context,

16   that the agency would still have discretion under the

17   prior law, or the law without the agency documents to

18   proceed the way that it wanted to.  And it said in that

19   case that, you know, federal officials could still

20   implement the policies under the authority that it

21   pre-existed the agency memoranda.

22       And the argument was raised in that case similar to

23   what the plaintiffs argue here, which is that -- well,

24   they argued in that case that if the Court issued a

25   decision invalidating the agency procedures or

1      documents, that that -- that the decision itself would

2      contain an analysis that would, you know -- that if it

3      indicated that the government was not lawfully

4      construing the statutory provisions, that that would

5      somehow cause the government to follow the -- follow,

6      you know, the Court's sort of path that it set out in

7      the decision.

8          And Justice Gorsuch in that concurring opinion

9      rejected that, saying that that was not relevant for

10     purposes of redressability, and said, "It is a federal

11     court's judgment, not its opinion, that remedies an

12     injury; thus, it is the judgment, not the opinion, that

13     demonstrates redressability."  So that would be sort of

14     an analogous situation.  And we would ask the Court,

15     given the concessions, that it deny the motion.

16         I would just add one other thing.  The

17     plaintiffs point to a timeline and argue that the recent

18     actions of applying expedited removal to paroled

19     individuals have to be based on these documents because

20     of the timeline that was set out.

21         However, the Huffman memo, which is the primary

22     memo that they rely on, which is dated January 23rd, and

23     the plaintiffs did not move for a stay until June 11th.

24     So if it were these documents, that seems to be

25     undermined or belied by the very timeline that they rely

```
 1   on.
 2           THE COURT:  Are you -- just me kind of
 3   understanding what's happening on the ground.  Are you
 4   aware of DHS or its predecessors ever applying or
 5   subjecting to expedited removal procedures individuals
 6   who had been previously paroled but whose parole
 7   terminated for whatever reason?
 8           MR. SANDHU:  I'm not, Your Honor.
 9           THE COURT:  Okay.
10           MR. SANDHU:  I --
11           THE COURT:  Is it your understanding that it
12   had not previously been extended in that way or enforced
13   or applied in that way?
14           MR. SANDHU:  My understanding that -- so I
15   haven't found a specific example.  I can certainly go
16   back to the agency and ask further.  But I was referred
17   to a 2011 memo that -- guidance memo that sought to
18   encourage the immigration officers to consider expedited
19   removal for aliens who were paroled for prosecution
20   purposes and for other reasons as well.
21       So there is -- at least we do believe that this has
22   happened before, but I can track that down.
23           THE COURT:  And can I just ask you about the
24   February 18th directive, and specifically, what was the
25   statutory or regulatory basis for that directive.
```

JA584

```
1            Was it 8 C.F.R. 1.2, or something else?
2            MR. SANDHU:  So I think that -- this goes to
3    another important point in this case.  I think that that
4    directive or that document, as well as the Huffman
5    document, the way that I read those is that they are
6    simply reinforcing and reminding immigration officials
7    of their exercise -- of their discretion, of their
8    enforcement discretion to choose between various removal
9    procedures, and they're encouraging them to use
10   expedited removal in appropriate cases.
11        So I don't think the authority comes from 8 C.F.R.
12   1.2.  I think it's just the discretionary authority to
13   direct the agency enforcement officials to consider
14   expedited removal, particularly given two other rules,
15   which plaintiffs don't challenge.
16        I think that's what the Huffman memo alludes to.
17   That is, the expansion of the expedited removal, which
18   we heard about this morning, and the revocation of
19   parole, which is the Svitlana Doe case.
20        And so -- and again, neither of those rules are
21   being challenged here, but in light of those rules
22   revoking parole for certain individuals and expanding
23   expedited removal, this guidance was issued.  And all
24   that the guidance does, Your Honor, is, in both of those
25   documents, it uses the word "consider."
```

```
 1          All it's doing is advising the immigration officers
 2     to consider using whatever removal procedure is
 3     appropriate, including expedited removal.  And --
 4          THE COURT:  So why is it out of time for
 5     plaintiffs to challenge that?  Meaning, if they're
 6     contending that the directive is in error, why are they
 7     out of time -- I mean, you know -- any
 8     regulation/directive is always going to relate to
 9     something that was previously promulgated or passed, or
10     whatever the statute or regulation at issue is.  But if,
11     as you say, there is a directive given to remind people
12     to use their enforcement discretion, including in this
13     context, why can't plaintiff challenge that?
14          MR. SANDHU:  I think there are two reasons,
15     Your Honor.  First is that the authority for paroling
16     or -- I'm sorry, for applying expedited removal to
17     paroled aliens comes from 8 C.F.R. 1.2, which was first
18     implemented in 1997.  And so that's the first reason.
19          THE COURT:  I know, but they're arguing --
20     they're saying that they -- they are challenging a
21     recent directive essentially directing people to
22     consider using expedited removal procedures in contexts
23     that they contend are unlawful.
24          And so at what point does -- can someone challenge
25     that written directive?  Or you're saying that that
```

1    written directive relates to something that's been on

2    the books, which any written directive will, that you're

3    out of time, that that doesn't restart the clock for

4    purposes of implementation of this written directive?

5        MR. SANDHU:  Yeah, I think that's our baseline

6    argument.  But I also -- I would add that I don't

7    think this -- that this document, or these two

8    documents, are in any way creating a rule applying

9    expedited removal to paroled aliens.

10        There's no -- there's nothing in them that lays

11    out, you know, the authority for that rule --

12        THE COURT:  So you dispute that it could be

13    categorized as a written policy directive?

14        MR. SANDHU:  It's a written policy guidance

15    document that is merely speaking in terms of enforcement

16    discretion.  And so --

17        THE COURT:  Isn't that a policy directive?

18    What is your understanding of when the statute refers to

19    written policy directive?

20        MR. SANDHU:  I mean, I think it's fair to say

21    it's a written policy guideline, yes --

22        THE COURT:  Okay.

23        MR. SANDHU:  -- regarding enforcement

24    discretion.  But I don't think that it's addressing what

25    the plaintiffs say it's addressing.  That's sort of a

1    subsidiary argument.  I mean, our baseline argument is

2    that, you know, this question of the authority to apply

3    expedited removal in these circumstances was first

4    addressed in the regulation in 1997.  And so it's out of

5    time in that respect.

6        But secondly, if you look at these memos, they

7    don't -- they don't talk about the designation provision

8    or the arriving provision in any detail.  They don't lay

9    out the specific rule or rationale.  That's set forth in

10    the arriving alien regulation.

11        And moreover, the third document, which is the FRN,

12    really doesn't have anything to do with this case.

13    Plaintiffs say that they want the Court to stay that

14    portion of it which subjects paroled aliens to expedited

15    removal, but that's not what the rule does.

16        The rule, as they later sort of backtracked a

17    little bit when talking about *Svitlana Doe*, that case

18    involved the revocation of parole for hundreds of

19    thousands of individuals.  That's what was at issue

20    there.

21        So the discussion in the FRN about expedited

22    removal was in the context of a justification for

23    categorically precluding parole or withdrawing parole --

24    terminating parole for those individuals.  So these

25    documents we would say in whole, they don't paint the

 1   picture that the plaintiff -- that the plaintiffs, I

 2   think, are trying to convey here.

 3        So that would be another reason that we don't think

 4   that staying these documents really has the effect that

 5   the plaintiffs are alleging that it would have.

 6             THE COURT:  Okay.  I think it would be helpful

 7   to talk about plaintiffs' interpretation and reading of

 8   Section 1225(b)(1) and the two categories of noncitizens

 9   who are subject to expedited removal.

10        So, one, those arriving in the United States.  So

11   according to plaintiffs, those were in the act of

12   arriving.  And two, other designated individuals present

13   in the United States who have not been admitted or

14   paroled, so those are people who have already arrived,

15   which seems to make sense structurally.

16        So what is your disagreement with plaintiffs'

17   reading of the statutory language?

18             MR. SANDHU:  Yeah, so beginning with the first

19   category, "arriving in," I think that it's important to

20   understand here that when Congress used this term

21   "arriving," it was talking about a term of art.  You

22   really have to look at the background of -- the context

23   of what Congress was legislating with that backdrop in

24   mind.

25        So it's very clear that parole does not change an

1 arriving alien's legal status.  And their position --

2 their legal position is one standing at the border, at

3 the threshold of entry.

4  So, for example, we cite in our brief a Second

5 Circuit decision on Page 31 that says, "a parolee

6 normally fits the regulatory definition of an arriving

7 alien for legal purposes."  And it's very important to

8 understand sort of the regulatory, the statutory context

9 when the statute was enacted, as well as the Supreme

10 Court case law that talks about this.

11  So a provision that was discussed earlier, the

12 statute was 8 U.S.C. 1182(d)(5)(A), which is very

13 important because that provision emphasizes that a

14 parole is not an admission.  And it also emphasizes that

15 when parole ends, the alien shall forthwith be returned

16 to custody from which he was paroled.  So in that sense

17 the picture is that a paroled individual is standing at

18 the border as an arriving alien.

19  A case -- the Second Circuit case that we cited

20 says the following:  "Although paroled aliens physically

21 enter the U.S. for a temporary period, they nevertheless

22 remain constructively detained at the border."

23  And there's a line of Supreme Court decisions that

24 say that when paroled -- I'm sorry -- that these

25 individuals who are paroled stand at the boundary line

```
1    and have gained no foothold in the United States.
2    That's the backdrop in which Congress was legislating.
3        Also, I would say -- point you to a regulation, 8
4    C.F.R., Section 212.5(e)(2)(i), which says that when
5    parole ends, the alien shall be restored to the status
6    he or she had at the time of the parole.
7        And so that term has -- has specific meaning in the
8    immigration context.  And so an arriving -- "arriving
9    in" applies to an individual who has -- stands at the
10   border, was stopped at a port of entry, as well as
11   someone who is just sort of released for a finite
12   temporary period of time.  They're -- constructively,
13   they're still detained but they're released for a
14   certain period of time.
15       And that's how parole has always been -- even
16   before it was considered parole.  I mean, temporary
17   release into the country was always considered such.
18   And if you go look at the Supreme Court's decision in
19   Mezei that's exactly how the Court viewed it when it was
20   talking with someone who -- or even I think it was two
21   or three years -- was allowed or released into the
22   country, and they were on Ellis Island.  But, again,
23   when they were looking at their status, they were
24   looking at someone who was standing at the threshold, at
25   the border.
```

```
1              THE COURT:  I'm going to confess, I find

2    this -- I find this confusing so help walk me through

3    it.  Because if "arriving in" -- you're contending it

4    applies to people even with active parole -- who are

5    actively paroled?

6              MR. SANDHU:  Yes, that's right.  Under the

7    "arriving alien," correct.

8              THE COURT:  So why then would the, quote,

9    "certain other aliens" provision require, even under

10   your reading, that parole be terminated?

11             MR. SANDHU:  So that's a more limited

12   authority, so the government's position is that is a

13   more limited authority for designation purposes.

14       If the Secretary chooses to proceed under this

15   specific designation authority, which is separate and

16   apart from sort of the general expedited removal

17   authority.  And there is overlap, we acknowledge that.

18   But that is another avenue or another option.  There's

19   overlapping sort of options here for the Secretary to

20   proceed with expedited removal.

21             THE COURT:  Okay.  And that --

22             MR. SANDHU:  In that situation -- yes.

23             THE COURT:  I guess -- okay.

24       So Congress allows expedited removal of people,

25   under your reading, previously paroled but whose parole
```

1    was terminated within two years of their arrival under

2    the second provision, under category 2.

3         MR. SANDHU:  That's right.

4         THE COURT:  But would also allow the same

5    people to be removed with no time limit because they're

6    arriving aliens.

7         MR. SANDHU:  Correct.  That's right.  It's a

8    broader authority.  There may be --

9         THE COURT:  And can you just explain why?

10        MR. SANDHU:  Yeah.

11        THE COURT:  I'm really having trouble

12   understanding that argument.

13        MR. SANDHU:  I think that the designation

14   procedure is a different procedure, and there may be

15   advantages -- some advantages to the Secretary using its

16   specific designation authority to apply or designate a

17   group of individuals for expedited removal that falls

18   within the statutory bounds, and so that option is

19   available.  But the fact that there is a broader

20   authority and there is a more limiting authority

21   shouldn't mean that we, you know, preclude all

22   authority.

23      Congress clearly intended to apply expedited

24   removal, we believe, to this group of individuals under

25   the primary authority, because they use that term

```
 1    "arriving in."

 2         And if you go back and look at the history of the

 3    regulation, this issue came up, and we set it forth in

 4    our brief.  And that's the understanding of the agency

 5    when they promulgated that rule, was that because of the

 6    backdrop, historical backdrop, the statutory backdrop,

 7    the way that these paroled individuals have always been

 8    treated, that they've always been considered to be

 9    arriving in, arriving aliens.  That's a term of art.

10         THE COURT:  So how is it consistent with the

11    statute to permit expedited removal proceedings for

12    people who are actively paroled?

13         Is it -- I mean, that's your position, that the

14    statute permits that -- I mean, the regulation permits

15    that because that's how you read the statute, but how do

16    you square that with the statutory language?

17         It's your -- the government's position that

18    notwithstanding the language of the statute, people who

19    are paroled, whose parole has not been terminated --

20    whose parole has not been terminated, they can be

21    subject to expedited removal proceedings as arriving

22    aliens?

23         MR. SANDHU:  That's right.  That's correct.

24         THE COURT:  How is that consistent with the

25    language of the statute?
```

JA594

```
1              MR. SANDHU:  Under --

2              THE COURT:  "Has not been admitted or paroled."

3              MR. SANDHU:  Right.  So -- so that is just for

4    a very limited short period of time.  And when --

5              THE COURT:  What is that period of time?

6              MR. SANDHU:  The duration of when they have

7    parole.

8              THE COURT:  Well, that's what I'm saying.  I'm

9    understanding your position and reading to suggest that

10   if the government -- under -- that the government could,

11   if it wanted to, subject someone who is active -- whose

12   parole has not been terminated to expedited removal.

13        Am I wrong about that?

14        Because you're reading that those individuals are

15   still considered arriving aliens and therefore could be

16   subject to expedited removal procedures.

17             MR. SANDHU:  That's correct.

18             THE COURT:  So I'm trying to understand, how

19   does that square with the language of the statute.

20             MR. SANDHU:  Well, when they commence an

21   expedited removal proceeding, the notice of the -- the

22   charging document does automatically, under the

23   regulation, terminate parole.

24             THE COURT:  Well, if that's the case, why would

25   there be a need for the statute to carve out individuals
```

```
 1    who have been admitted or paroled outside of this

 2    expedited removal procedure if starting the procedure

 3    terminates parole?  Why would they need to carve paroled

 4    individuals out?

 5         Does that seem to make -- what's the logic there?

 6         MR. SANDHU:  Under the designation provision --

 7         THE COURT:  Right.  You're saying that

 8    commencement of expedited removal procedures

 9    terminates -- well, and to me, that's -- you said that a

10    person with active parole could be -- who's currently on

11    parole could be submitted to -- or subjected to

12    expedited removal procedures.

13         And I understand you to be saying that the

14    commencement of expedited removal procedures terminates

15    parole, so you would not have a situation where someone

16    who's paroled was subject to expedited removal

17    procedures.  And I'm trying to understand what would be

18    the purpose of this language in the statute if someone

19    who's actively paroled can be subject to expedited

20    removal procedures or if those procedures could

21    terminate parole and thus make a category of people who

22    I read as excluded from the statute covered under the

23    statute?

24         And if you could just help me understand.  Again, I

25    confess my confusion.  If you could just help me
```

1     understand why that makes any sense.

2              MR. SANDHU:  Let me just say one thing about --

3     under the regulation, the termination of parole is

4     automatic through the charging document, unless

5     specified otherwise.  So DHS -- it's not always the case

6     that, you know, issuing a notice of the charging

7     document for expedited removal will terminate parole, if

8     that makes sense.

9          In terms of Your Honor's question regarding the

10    designation provision language, the best that I can

11    explain to you is that I think that that -- the

12    designation is a unique and specific procedure that is

13    available at the disposal of the Secretary.  So it

14    provides an alternative in specific situations that may

15    be advantageous rather than proceeding under the broader

16    authority of the "arriving in" statute.

17             THE COURT:  What's your response -- so the

18    plaintiffs made an argument that Section 1182(d)(5)(A)

19    does not say that a parolee whose parole is terminated

20    reverts to the status of, quote, "an applicant for

21    admission standing at the threshold of entry."  That the

22    statute says that the individual's case shall continue

23    to be dealt with in the same manner as that of any other

24    applicant for admission to the United States.

25         How do you respond to that argument?

1          MR. SANDHU:  Yeah.  So they certainly are an

2     applicant for admission, right, and that's what the

3     parole statute says.  We would cite the parole statute,

4     and our point in our brief was just to -- there is

5     authority that says that they're standing at the

6     threshold, you know, of the border and so should be

7     treated as an arriving alien.

8          But our point about the parole statute and why it's

9     important is for two reasons:  One, it says that

10    admission -- I'm sorry, parole is not an admission.

11         And two, it says that as soon as parole terminates

12    or is revoked, that the parolee shall be immediately

13    detained and be -- and restored to the same status under

14    a different regulation.

15         That along with, again, the unique history -- the

16    statutory and the case law history here create -- really

17    does, I think, evidence a powerful argument that these

18    individuals -- when Congress was referring to "arriving

19    in," they were referring to these individuals who have

20    been paroled into the country.

21         So I think we would use the parole statute for

22    those reasons, and not focusing on the applicant for

23    admission -- which is correct, they're still an

24    applicant for admission.  But as my friend points out,

25    there are, you know, categories of aliens or applicants

1    for admission as well.  And that's not the key point

2    that we're making -- that we're using in citing the

3    parole statute.

4            THE COURT:  And do you agree that the

5    government's reading potentially subjects hundreds of

6    thousands of people who weren't previously subject to

7    expedited removal proceedings to expedited removal

8    proceedings, specifically paroled individuals or people

9    who have been paroled?

10           MR. SANDHU:  That's correct.  I would emphasize

11   to the Court that the agency obviously has discretion so

12   they don't have to apply expedited removal to all

13   individuals.  They would have had the discretion.

14       In fact, the memos talk about if there is a pending

15   asylum application that the -- that that's, you know, a

16   lower priority or maybe even -- I think one of the memos

17   says that they -- you should not consider expedited

18   removal in that situation.

19       So there is discretion in terms of how --

20           THE COURT:  Just given the scope of this, I'm

21   curious as to your position about whether or not this is

22   a major question such that I should look to a more

23   explicit grant of authority to the agency before

24   expanding expedited removal in the way that you're

25   suggesting it be expanded.

JA599

```
 1            MR. SANDHU:  I don't think it's an expansion,

 2    because under the reg -- the reg has been there, but I

 3    would say to your concern, you know, regardless of how

 4    you fit the designation provision with the "arriving in"

 5    provision, I don't think that there is, you know, a

 6    strong argument to say that these parolees don't fall

 7    within the first authority -- the "arriving in"

 8    authority.

 9        So there may be some question about overlap or

10    whether, you know, there's -- how the designation

11    provision adds value here, but I think (a)(1) -- or I'm

12    sorry, (b)(1)(i) is pretty clear on this.  And so we

13    would contend that the Court should find that that is

14    legitimate authority.

15        And also looking at it from the government's side,

16    there are hundreds of thousands of individuals whose,

17    you know, parole potentially now is going to be revoked

18    under the Svitlana Doe, but that means there's a very

19    strong interest on the government's part in terms of

20    enforcement of individuals who aren't -- have no right

21    now to be in the country, no legal basis to be in the

22    country.

23        And some of them -- or many of them will be able to

24    assert , you know, credible fear claims in these

25    proceedings.  And I would point out that in the
```

JA600

1    *Thuraissigiam* decision -- I hope I'm saying that

2    correctly -- Justice Alito pointed out -- and this goes

3    back to the five years before that decision so I don't

4    know what the current statistics are -- but he did point

5    out that 77 percent of the population that asserted

6    or -- a fear of return was found to have a credible

7    fear, and that was for the five years before the

8    decision.

9        So these procedures are meaningful.  And again, I

10   think -- to the question about -- earlier about the

11   difference between expedited removal and Section 240

12   removal, there is -- for purposes of the balance of

13   harms analysis, I don't think the plaintiffs have

14   demonstrated how -- how there's a -- there's harm in the

15   sense that these individuals most likely will be able to

16   be placed in 240 proceedings because they don't have

17   legal status in this country.

18       The fact that one might have more process or might

19   take longer I don't think is sufficient to demonstrate

20   irreparable harm for the plaintiffs.  And I would

21   definitely point out the countervailing interest of the

22   government as were -- recently set forth in the *CASA*

23   decision where -- let's see -- where it said "when a

24   federal court enters a universal injunction against the

25   government, it improperly intrudes on a coordinate

JA601

1    branch of the government and prevents the government

2    from enforcing its policies against nonparties, and that

3    intrusion is sufficient to demonstrate irreparable harm

4    warranting a stay."

5            THE COURT:  Does that apply -- you read that to

6    apply to relief under the APA?

7            MR. SANDHU:  I --

8            THE COURT:  Because I --

9            MR. SANDHU:  We do, Your Honor.

10           THE COURT:  And what authority extends that

11    case's holding to APA relief?

12           MR. SANDHU:  No authority yet, Your Honor, but

13    I would say the analysis that the Court went through

14    would apply.  There, it was in the context of a

15    preliminary injunction.  The same factors for a PI are

16    also relevant for a stay motion under 705.

17           THE COURT:  Am I -- there's been a lot of

18    activity so I'm trying to keep my cases straight.

19        I thought a concurring opinion specifically made

20    the point that the holding either didn't extend or was

21    an open question as to the extent under the APA.

22           MR. SANDHU:  I think they said it was --

23           THE COURT:  It wasn't --

24           MR. SANDHU:  It was a separate question.

25           THE COURT:  A separate question.

```
 1                MR. SANDHU:  Yeah.

 2                THE COURT:  Right.

 3                MR. SANDHU:  But I think the gist of its

 4      analysis is that courts should tailor relief to the

 5      parties in the case.  And when it talked about what was

 6      complete relief, it distinguished complete relief is not

 7      universal relief.  And so it talked about this --

 8      applying, you know, the determination to the specific

 9      parties.

10         So we would say here that if the Court were to

11      issue a stay, it should only apply to the parties -- to

12      the plaintiffs that have been identified that have

13      standing and that could show harm in this context.

14                THE COURT:  You agree that I would be bound by

15      Circuit precedent to the extent the Supreme Court has

16      not weighed in on this question?  Circuit precedent

17      concerning the scope of relief available under the APA?

18                MR. SANDHU:  Yes, if there is Circuit

19      precedent, yes.  But I think that in light of *CASA*, I

20      think, you know -- I mean, even pre-*CASA* there was, you

21      know, sort of a stream of case law that says that courts

22      should tailor the remedy to the parties in the case.

23         And so I would cite the *Madsen* decision, 512 U.S.

24      753, and the *Gill* decision, which is in our briefs, and

25      the -- for the proposition that relief be no more
```

```
 1    burdensome to defendants than to what's necessary to

 2    provide complete relief to the specific plaintiffs in

 3    the case.

 4              THE COURT:  Thank you.

 5              MR. SANDHU:  Thank you very much.

 6              THE COURT:  Any response?

 7         And actually, before you get started, so I'm still

 8    kind of wrestling with the statutory interpretation

 9    question, the grammatical construction of the sentence,

10    your distinction between revocation or being vacated and

11    just the understanding that parole can be revoked if

12    the person doesn't comply with certain procedures.

13         Are you drawing any distinction or is that still a

14    termination?  Meaning it doesn't change the status of

15    the fact that the person had been paroled regardless of

16    the manner in which it's terminated, so there's no

17    distinction between revocation, termination, et cetera.

18              MS. LI:  Not to my knowledge.

19              THE COURT:  Okay.

20              MS. LI:  And also, to our knowledge, defendants

21    are not purporting to or -- and have not purported to,

22    in the past, vacated parole.  It's always been

23    termination or revocation.  And to me -- to us, I

24    believe --

25              THE COURT:  Yeah, that's like revocation.
```

```
1              MS. LI:  Yeah.

2              THE COURT:  Like, parole can be revocated --

3              MS. LI:  Or revoked, yes.

4              THE COURT:  Revoked, I'm sorry.  Parole can be

5    revoked.

6              MS. LI:  But with the legal effect as

7    termination.  It's the same as --

8              THE COURT:  It's the same legal effect as

9    termination.  It's distinct from vacating a sentence in

10   the sense that the sentence should never have existed in

11   the first place.  It doesn't remove the legal import of

12   the status, is your position.

13             MS. LI:  Yes, Your Honor.  That's correct.

14        And on that point I also did want to, I guess, put

15   a finer point on our discussion about Hewitt for this

16   exact reason, because I don't know if I was totally

17   clear.

18        We were talking, Your Honor, about the piece in the

19   opinion that says that the present perfect tense --

20   first, that it can refer to either an act that is now

21   completed or a past action that comes up to the present,

22   but then it thus conveys that the event in question

23   continues to be true or valid.

24        And so to respond directly to that in a clearer

25   way, I hope, based on -- the event that we were talking
```

1    about that continues to be true or valid is the manner

2    or the way that the person came into the United States.

3        When I was explaining how -- because parole is

4    paired with admitted in the statute, that's how we can

5    tell that it's discussing the way that the person came

6    in.  They were inspected.  They were granted permission

7    to come in.  It doesn't deal with their active parole

8    status.  And so that is the event here.  That does

9    continue to be true and valid, the fact that they were

10   inspected and granted parole into the country regardless

11   of whether they currently have that status.

12        And so, yeah, I wanted to revisit that in *Hewitt*.

13            THE COURT:  Okay.

14            MS. LI:  And then on the merits, the main thing

15   that I just wanted to address on rebuttal is that

16   defendants argued repeatedly that Congress legislated

17   expedited removal against this entry fiction that

18   parolees stand at the border.  And I just want to

19   reiterate that they've provided no evidence of the

20   fact -- the idea that Congress injected the entry

21   fiction into expedited removal specifically.

22        And as Your Honor was getting to with your

23   questions, it leads to this incoherent contradictory

24   statute where the carve-out for paroled people and

25   expanded expedited removal loses purpose completely.

```
 1          And I also just want to point Your Honor to

 2    legislative history that we have provided in our

 3    briefing, legislative history of IIRIRA specifically

 4    that indicates that Congress was focused on people

 5    coming to the U.S. without valid documents.

 6          There's -- I can pull up the quotes, if needed, but

 7    essentially, they stand for the idea that they weren't

 8    focused on people who are already in the U.S., like

 9    parolees.  And also, just to add to that, the only two

10    grounds of inadmissibility that can lead to expedited

11    removal emphasize that point.  They're both concerned

12    with the absence of valid entry documents.

13          So this is all clear evidence that plaintiffs have

14    put forth in our papers and, here, that Congress's goal

15    in creating expedited removal was not to target paroled

16    individuals and people who have completed the act of

17    arriving.

18          The government's interpretation makes no sense of

19    the statute.  They want you to ignore the language,

20    ignore the inconsistencies, and explode the agency's

21    ability to subject paroled individuals to expedited

22    removal.  The plain language of the statute simply

23    cannot bear that.

24          THE COURT:  Okay.  All right.  Thanks everyone.

25          Oh, you have something you want to say?
```

JA607

```
 1                  MS. LI:  If you have time.

 2                  THE COURT:  Sure.

 3                  MS. SUNG:  Sorry.  I'll be quick.

 4                  THE COURT:  Okay.

 5                  MS. SUNG:  So -- thank you for your patience,

 6       Your Honor.

 7                  First of all, I just would like to address one

 8       point made by the defendants.  We're not conceding that

 9       the regulations that define "arriving alien" are lawful

10       in any way.  The regs are not what's causing harm here,

11       and so they are not before the Court today.

12                  Second of all, with regards to 1252(f)(1), the

13       Dixon case that the government puts a lot of emphasis

14       on, I think it's not apposite here because it deals with

15       injunctive relief, and that's not what we're asking for

16       here.

17                  And in addition to that, I would just like to point

18       out in Grace v. Barr at 965 F.3d at 907, the government

19       actually took the position that vacatur of an agency

20       action implementing the expedited removal statute is

21       permissible under 1252, specifically 1252(e)(3).

22                  The D.C. Circuit noted in its opinion that the

23       government in that case had taken the position that 1252

24       specifically authorizes relief, namely, that when

25       Section 1252(e)(3) says that judicial review is
```

JA608

1    available but is limited to determinations, then relief

2    in the form of such a determination would authorize both

3    declaratory or set aside relief preventing

4    implementation of the challenged policies, but it

5    wouldn't implement -- excuse me -- it wouldn't authorize

6    system-wide injunctions.

7        Third, really quickly, on the timeliness issue,

8    (e)(3)(B) says that any action instituted must be within

9    60 days.  That is what happened here.  And so the fact

10   that we moved for relief at a later date is of no

11   importance.

12       And then with regards to the March 25th FRN --

13   excuse me, Federal Register Notice, I think the

14   government stood up and tried to say it's not a written

15   guidance that can be challenged here under 1252(e)(3).

16       Obviously, we disagree.  It announces for the first

17   time that DHS will target this population, CHNV parolees

18   that had not previously been targeted for expedited

19   removal, and it also expresses DHS's intent to remove

20   that -- people in that population promptly and to

21   initiate expedited removal proceedings to the maximum

22   extent possible.

23       And if we're going to go to the dictionary, as we

24   often have, both this morning and this afternoon,

25   guidance -- to guide -- it's the act of guiding.  And

JA609

1    the act of guiding is to direct in a way or course, to

2    direct, supervise, or influence usually to a particular

3    end.  And that's what we have here in the March 25th

4    CHNV termination.

5        With regards to irreparable harm, there is harm

6    articulated here, and it is irreparable and not

7    compensable by money damages.  I think that the

8    then-Judge Jackson's decision in *Make the Road New*

9    *York* -- in the first *Make the Road New York* case is

10   instructive.

11       She found injury-in-fact because the associational

12   plaintiff had shown that at least one identified member

13   could be placed in expedited removal.  Because in that

14   case, the defendants had defined a new population that

15   they wanted to subject to expedited removal, and they

16   were very clear that expedited removal as to that

17   population would begin imminently.  And that's what's

18   happening here.

19       And the Lawrence declaration at Paragraph 13, the

20   Salas declaration at Paragraphs 11 through 13, and the

21   Escobar declaration at Paragraph 15 all highlight that

22   the plaintiffs' members are at risk of expedited removal

23   because they fall within the population that these

24   writings have identified as being subjected to expedited

25   removal.  And that risk of being subjected to expedited

1    removal is changing their behavior.

2        They are not taking their kids to school.  They are

3    foregoing medical treatment.  This is irreparable harm.

4    It can't be compensated with money damages.

5        I don't think I need to -- well, actually, I will

6    address the balance of equities very quickly.  Just to

7    give the Court some cites, because, as you can imagine,

8    the Court has raised these same kind of arguments about

9    injury to the executive's authority under the INA and

10    its policy agenda to remove as many people as quickly as

11    possible.  And I just want to point out that multiple

12    courts, both District Courts and the Court of Appeals,

13    have rejected the government's claims that these types

14    of abstract harms tip the balance of equities in favor

15    of the government, especially when confronted with the

16    overwhelming public interest in not having individuals

17    erroneously removed to places where they could face

18    substantial harm, as the Supreme Court in *Nken*

19    articulated.  And also the many harms that are

20    articulated in the plaintiffs' declarations:

21        *J.G.G. v. Trump*, 2025 Westlaw 1577811 at *26.

22        *Philadelphia Yearly Meetings v. DHS*, 767 F. Supp 3d

23    at 334.

24        *Pacito v. Trump*, 768 F. Supp 3d at 1235 through

25    36.

JA611

1      *National TPS Alliance v. Noem*, 773 F. Supp 3d at

2  839 through 44.

3      It continues.  Courts have rejected this notion

4  that the executive's policy agenda in removing people as

5  quickly as possible or in enforcing the immigration laws

6  is what trumps here.

7      Here -- this is my last point.  So you were asking

8  about controlling precedent from the D.C. Circuit.  I

9  think *Grace v. Barr* and other cases control.  And

10  especially given that Justice Kavanaugh's concurrence

11  expressly acknowledges that plaintiffs may still ask a

12  Court to preliminarily set aside a new agency rule in

13  the *Trump v. CASA* decision.  *CASA* leaves APA relief and

14  the case law around APA relief untouched.

15      And so the controlling precedent here is *National*

16  *Mining Association v. U.S. Army Corps of Engineers*, 145

17  F.3d at 1409.  And that states that when agency

18  regulations are unlawful, the ordinary result is that

19  the rule is vacated, not that their application to the

20  individual plaintiffs is proscribed.

21      And there's actually just a recent decision from

22  Judge Bates in this court on July 3rd, 2025, where Judge

23  Bates noted that in a case involving APA vacatur and not

24  a universal or national injunction, the Supreme Court's

25  recent decision in *Trump v. CASA* does not apply.

JA612

```
 1          And that's Doctors for America v. Office of
 2     Personnel Management, 2025 Westlaw, 1836009 at *22, Note
 3     17.
 4          And vacatur of agency action here is consistent
 5     with Section 1252(e)(3), which allows challenges on the
 6     validity of the system.  And as I think Your Honor was
 7     trying to get to, it -- vacatur is consistent with
 8     allowing challenges on the validity of the system,
 9     rather than -- if the Court finds that the agency here
10     is unlawful to leave parts of an invalid system
11     applicable to large parts of the country.
12          And then I would also like to point out that the
13     Congress did authorize challenges on the validity of the
14     system through Section 1252(e)(3) just as it authorized
15     APA vacatur and stay relief and set aside relief in 5
16     U.S.C. 705 and 706.
17          So what the Supreme Court was concerned about in
18     Trump v. CASA about this unbridled equitable discretion
19     of the District Courts to bind the -- excuse me, to
20     issue a national injunction or a universal injunction to
21     bind parties not before the court, that's not what
22     you're dealing with here.  You have not equitable relief
23     but statutorily authorized relief.
24          And then finally to address the defendants'
25     argument that relief should be limited to people who
```

1    have specifically been identified in the papers filed

2    before the Court, we have no quibble with *Madsen v.*

3    *Women's Health Center*.

4        The point is that the Court may provide complete

5    relief.  And even the Supreme Court in *Trump v. CASA*

6    acknowledge this.  And complete relief for an

7    associational plaintiff is relief for that plaintiffs'

8    members.

9        We have established associational standing on

10   behalf of the plaintiffs' organizations, and it has

11   never been the case that an associational plaintiff has

12   to identify all injured members in order to have the

13   Court provide relief.

14       And then secondly and relatedly, it's also never

15   been the case that when the court finds agency action to

16   be unlawful that the plaintiffs have had to identify

17   every single individual who has been or will be harmed

18   by the unlawful agency action in order for the court to

19   provide relief.

20       I think that's it.  I think I would just say in

21   closing with regards to jurisdiction, the clear text of

22   the relevant statutes and the controlling precedent from

23   this Circuit make clear that the Court has jurisdiction

24   to review the plaintiffs' claims.

25       The government has raised all the same

JA614

 1    jurisdictional challenges in the first *Make the Road New*
 2    *York* case, in *Grace v Barr*, in *Kiakombua*.  And all of
 3    the courts in those cases, both district court and
 4    appellate, have rejected these types of jurisdictional
 5    challenges, and the government has not shown why the
 6    Court here needs to do anything different.
 7         Second, on the merits, it's certainly complicated,
 8    but at the end of the day, we agree with the defendants
 9    that the statute is what controls.  The regulations
10    can't do any more than what the statute allows.  The
11    text and the overall structure of 1225(b) are clear that
12    paroled individuals should not be subjected to expedited
13    removal, and the challenged writings here are, as a
14    result, contrary to law.
15         Also the writings, they fail to explain why paroled
16    individuals can and should be subjected to expedited
17    removal.  There's the flip-flop flip between three
18    different writings as to the statutory justification for
19    why parole beneficiaries can be subjected to expedited
20    removal, and they wholly fail to account for any
21    relevant reliance interest and should be considered
22    arbitrary and capricious.
23         And then finally as to the equitable factors, the
24    harms to the plaintiffs' members, their families, their
25    communities, as outlined in the declarations that we

```
 1    provided, they are grave and not compensable by money

 2    damages.  And the abstract injuries articulated by the

 3    government simply do not outweigh, again, the public

 4    interest in not removing people erroneously, and they

 5    also certainly do not outweigh the amount of human

 6    suffering that the challenged writings here have wrought

 7    on plaintiffs' members.  They are afraid.  They are

 8    under the -- what's been set out in the writings, they

 9    are subject to expedited removal and at risk of being

10    picked up, like E.I.R.M. was when he was driving to

11    California with his fiancee to celebrate his birthday.

12    They're foregoing medical treatment, not bringing their

13    kids to school.  They cannot work and lead normal lives

14    to earn money and to care for their families.

15        And they are individuals who did everything that

16    the federal government asked them to.  And now the

17    federal government is trying to renege on the promises

18    made and subject these people to a strip-down removal

19    process that doesn't even have regard for their

20    eligibility for other lawful statuses that would in fact

21    foreclose removal.

22        And so we would respectfully request that the Court

23    grant the motion and stay the challenged writings.  And

24    if the Court sees fit to limit relief, then that relief

25    should extend to all of the organizational plaintiffs'
```

```
1     members -- excuse me -- associational plaintiffs'

2     members, including those who have not been identified in

3     papers before the Court.

4              THE COURT:  Okay.  Thank you.

5              MS. SUNG:  Thank you.

6              THE COURT:  All right.  Thank you, everyone.

7          I will take this under advisement.

8          (Court adjourned 4:08 p.m.)

9                         - - -

10

11

12

13                     CERTIFICATE

14

15      I, Chandra Kean, RMR, hereby certify that the

16     foregoing transcript is a true and correct transcription

17     of the proceedings held in the above-titled matter.

18

19

20     _____       July 11, 2025
       Chandra Kean, RMR              DATE
21

22

23

24

25
```

JA617

## 1

**1** [1] - 43:5
**1.2** [5] - 48:19, 50:6, 53:1, 53:12, 54:17
**11** [2] - 78:20, 85:20
**1101(a)(13)(A** [1] - 19:15
**1182(a)(6)(C** [1] - 10:19
**1182(d)(5)(A** [2] - 58:12, 65:18
**1182(d)(5)(A)** [1] - 29:12
**11th** [1] - 51:23
**1225** [2] - 25:6, 25:20
**1225(a)(1** [1] - 29:24
**1225(b** [1] - 83:11
**1225(b)(1** [3] - 9:8, 24:15, 57:8
**1225(b)(1)(A)(i** [1] - 23:18
**1225(d)(2** [1] - 25:14
**1235** [1] - 79:24
**1252** [2] - 76:21, 76:23
**1252(e)(3** [3] - 76:25, 81:5, 81:14
**1252(e)(3)** [2] - 76:21, 77:15
**1252(f)(1** [6] - 42:1, 44:1, 44:11, 47:14, 47:22, 76:12
**1252(f)(1)** [3] - 41:15, 42:11, 46:1
**13** [3] - 39:14, 78:19, 78:20
**1409** [1] - 80:17
**145** [1] - 80:16
**15** [1] - 78:21
**1577811** [1] - 79:21
**16** [1] - 6:1
**17** [1] - 81:3
**1836009** [1] - 81:2
**18th** [3] - 8:15, 23:16, 52:24
**1996** [1] - 29:20
**1997** [3] - 28:6, 54:18, 56:4
**1998** [1] - 28:2
**1st** [1] - 28:5

## 2

**2** [1] - 61:2
**20** [2] - 27:3, 27:6
**2011** [1] - 52:17
**2019** [1] - 37:16
**2025** [4] - 79:21, 80:22, 81:2, 85:20
**212.5(e)(2)(i** [1] - 59:4

## 22

**22** [1] - 81:2
**235.3** [2] - 20:10, 48:21
**235.3(b)(6** [1] - 20:16
**23rd** [3] - 8:14, 10:11, 51:22
**240** [2] - 69:11, 69:16
**25-872** [1] - 3:4
**25th** [5] - 8:15, 10:12, 32:9, 77:12, 78:3
**26** [1] - 79:21
**2:12** [1] - 3:2

## 3

**31** [1] - 58:5
**334** [1] - 79:23
**36** [1] - 79:25
**3d** [3] - 79:22, 79:24, 80:1
**3rd** [1] - 80:22

## 4

**44** [1] - 80:2
**4:08** [1] - 85:8

## 5

**5** [1] - 43:4, 81:15
**512** [1] - 71:23
**599** [1] - 50:10

## 6

**60** [1] - 77:9
**691** [1] - 50:11
**692** [1] - 50:11

## 7

**705** [5] - 40:25, 41:7, 42:15, 70:16, 81:16
**706** [3] - 41:4, 41:25, 81:16
**753** [1] - 71:24
**767** [1] - 79:22
**768** [1] - 79:24
**77** [1] - 69:5
**773** [1] - 80:1

## 8

**8** [15] - 9:7, 19:14, 20:9, 20:15, 23:18, 25:6, 25:20, 29:12, 29:24, 48:18, 53:1, 53:11, 54:17, 58:12, 59:3
**839** [1] - 80:2

## 9

**907** [1] - 76:18
**965** [1] - 76:18

## A

**a)(1** [1] - 68:11
**a)(7** [1] - 10:19
**abide** [1] - 21:19
**ability** [3] - 19:2, 36:22, 75:21
**able** [2] - 68:23, 69:15
**above-titled** [1] - 85:17
**absence** [1] - 75:12
**absent** [1] - 4:20
**absolutely** [6] - 5:7, 14:18, 23:5, 29:12, 33:16, 34:6
**abstract** [2] - 79:14, 84:2
**Accardi** [2] - 21:2, 21:17
**accept** [1] - 26:17
**access** [2] - 35:16, 35:18
**according** [2] - 30:8, 57:11
**account** [1] - 83:20
**achieve** [2] - 49:8, 50:1
**acknowledge** [2] - 60:17, 82:6
**acknowledges** [1] - 80:11
**acknowledging** [2] - 7:7, 47:3
**Act** [2] - 11:19, 36:23
**act** [7] - 12:13, 17:19, 57:11, 73:20, 75:16, 77:25, 78:1
**Act's** [3] - 12:3, 14:9, 16:8
**action** [13] - 7:8, 12:1, 17:21, 43:20, 49:5, 49:7, 50:3, 73:21, 76:20, 77:8, 81:4, 82:15, 82:18
**actions** [10] - 8:13, 21:15, 22:6, 33:22, 33:24, 39:22, 42:16, 42:17, 43:7, 51:18
**active** [15] - 12:16, 13:8, 15:22, 15:23, 18:5, 18:8, 18:19, 20:20, 26:13, 26:19, 31:24, 60:4, 63:11, 64:10, 74:7
**actively** [3] - 60:5, 62:12, 64:19

**activity** [1] - 70:18
**acts** [1] - 12:7
**add** [3] - 51:16, 55:6, 75:9
**addition** [3] - 25:25, 35:7, 76:17
**additional** [4] - 10:1, 32:7, 32:8, 38:23
**additionally** [1] - 19:7
**address** [9] - 4:1, 11:14, 28:20, 40:6, 42:15, 74:15, 76:7, 79:6, 81:24
**addressed** [1] - 56:4
**addressing** [2] - 55:24, 55:25
**adds** [1] - 68:11
**adjourned** [1] - 85:8
**adjudicate** [1] - 46:19
**adjust** [3] - 12:25, 14:23, 36:22
**adjusted** [1] - 42:11
**Adjustment** [1] - 36:23
**admission** [20] - 19:13, 29:2, 29:9, 29:16, 29:23, 29:25, 30:4, 30:5, 30:14, 30:18, 31:3, 58:14, 65:21, 65:24, 66:2, 66:10, 66:23, 66:24, 67:1
**admitted** [3] - 9:13, 10:20, 19:8, 19:14, 19:21, 19:23, 20:1, 20:3, 30:1, 57:13, 63:2, 64:1, 74:4
**adopted** [1] - 23:8
**advanced** [1] - 28:7
**advantageous** [1] - 65:15
**advantages** [2] - 61:15
**advisement** [1] - 85:7
**advising** [1] - 54:1
**affirmed** [1] - 11:24
**affirms** [1] - 20:22
**afraid** [1] - 84:7
**afternoon** [10] - 3:3, 3:9, 3:11, 3:17, 3:19, 3:22, 3:25, 40:16, 48:16, 77:24
**agency** [33] - 8:13, 21:15, 22:6, 28:1, 28:8, 32:3, 33:22, 33:23, 42:16, 42:17, 43:11, 43:20, 49:4, 49:6, 50:3, 50:14, 50:16, 50:17, 50:21, 50:25, 52:16, 53:13,

62:4, 67:11, 67:23, 76:19, 80:12, 80:17, 81:4, 81:9, 82:15, 82:18
**agency's** [3] - 8:18, 19:2, 75:20
**agenda** [2] - 79:10, 80:4
**agents** [1] - 5:24
**agree** [6] - 21:9, 26:19, 47:9, 67:4, 71:14, 83:8
**agreed** [2] - 27:20, 46:22
**aircraft** [1] - 25:17
**airport** [1] - 25:18
**al** [2] - 3:5, 3:6
**alien** [15] - 4:14, 4:22, 8:5, 8:9, 19:16, 28:3, 48:18, 56:10, 58:7, 58:15, 58:18, 59:5, 60:7, 66:7, 76:9
**alien's** [1] - 58:1
**aliens** [17] - 9:11, 9:13, 25:16, 26:24, 27:8, 48:22, 52:19, 54:17, 55:9, 56:14, 58:20, 60:9, 61:6, 62:9, 62:22, 63:15, 66:25
**Alito** [1] - 69:2
**alleging** [1] - 57:5
**Alliance** [1] - 80:1
**allow** [2] - 18:11, 61:4
**allowed** [1] - 59:21
**allowing** [2] - 45:9, 81:8
**allows** [5] - 21:8, 39:18, 60:24, 81:5, 83:10
**alluded** [1] - 42:8
**alludes** [1] - 53:16
**Almonte** [2] - 42:13, 42:19
**alter** [1] - 29:22
**alternative** [1] - 65:14
**amenable** [1] - 18:9
**amended** [4] - 28:2, 29:21, 40:3, 43:4
**amending** [1] - 30:20
**amendments** [1] - 27:15
**America** [1] - 81:1
**amount** [1] - 84:5
**ample** [1] - 38:3
**analogous** [1] - 51:14
**analysis** [5] - 38:18, 51:2, 69:13, 70:13, 71:4
**Anderson** [1] - 3:21

JA618

**Andrew** [1] - 36:10
**announces** [1] - 77:16
**answer** [1] - 5:6
**answered** [1] - 48:15
**APA** [15] - 21:14, 22:5,
33:20, 33:25, 34:11,
41:3, 41:21, 70:6,
70:11, 70:21, 71:17,
80:13, 80:14, 80:23,
81:15
**apart** [1] - 60:16
**appeal** [1] - 48:7
**appealing** [1] - 48:7
**Appeals** [1] - 79:12
**appearance** [2] - 3:8,
3:12
**appeared** [1] - 35:14
**appellate** [1] - 83:4
**applicable** [1] - 81:11
**applicant** [12] - 29:2,
29:9, 29:16, 29:23,
29:25, 30:5, 31:2,
65:20, 65:24, 66:2,
66:22, 66:24
**applicants** [3] - 30:14,
30:18, 66:25
**application** [2] -
67:15, 80:19
**applications** [1] -
36:22
**applied** [5] - 10:17,
23:21, 24:7, 31:12,
52:13
**applies** [5] - 20:11,
24:19, 24:21, 59:9,
60:4
**apply** [18] - 14:24,
31:10, 31:17, 38:19,
42:14, 42:16, 42:20,
43:7, 48:21, 56:2,
61:16, 61:23, 67:12,
70:5, 70:6, 70:14,
71:11, 80:25
**applying** [6] - 43:1,
51:18, 52:4, 54:16,
55:8, 71:8
**apposite** [1] - 76:14
**appreciated** [1] -
35:22
**approach** [1] - 3:7
**appropriate** [3] -
42:23, 53:10, 54:3
**April** [1] - 28:5
**arbitrary** [8] - 4:5,
8:18, 8:21, 22:21,
23:2, 32:6, 33:17,
83:22
**argue** [7] - 18:10,
26:1, 27:7, 28:23,
31:7, 50:23, 51:17

**argued** [2] - 50:24,
74:16
**arguing** [2] - 41:19,
54:19
**argument** [25] - 4:20,
7:9, 11:12, 16:22,
22:10, 23:2, 26:23,
26:25, 27:10, 27:22,
28:21, 30:11, 36:1,
40:23, 43:10, 50:22,
55:6, 56:1, 61:12,
65:18, 65:25, 66:17,
68:6, 81:25
**arguments** [7] - 4:4,
12:20, 16:2, 21:23,
33:10, 37:12, 79:8
**Aric** [1] - 3:20
**Army** [1] - 80:16
**arrival** [6] - 25:7,
25:10, 25:18, 25:19,
25:21, 61:1
**arrived** [3] - 24:10,
25:1, 57:14
**arrives** [1] - 30:2
**arriving** [58] - 4:14,
4:22, 9:11, 9:24,
10:2, 23:22, 24:1,
24:6, 24:8, 24:12,
24:20, 25:11, 25:15,
25:16, 25:20, 26:4,
26:11, 26:24, 27:8,
27:22, 27:23, 28:2,
28:15, 28:20, 28:24,
30:23, 31:4, 31:6,
31:18, 31:23, 48:18,
56:8, 56:10, 57:10,
57:12, 57:19, 57:21,
58:1, 58:6, 58:18,
59:8, 60:3, 60:7,
61:6, 62:1, 62:9,
62:21, 63:15, 65:16,
66:7, 66:18, 68:4,
68:7, 75:17, 76:9
**art** [2] - 57:21, 62:9
**Article** [1] - 48:25
**articulate** [2] - 25:24,
36:8
**articulated** [5] - 6:20,
78:6, 79:19, 79:20,
84:2
**Ashley** [2] - 34:22,
35:1
**aside** [3] - 77:3, 80:12,
81:15
**aspect** [1] - 44:18
**assert** [1] - 68:24
**asserted** [1] - 69:5
**asserting** [1] - 46:10
**Association** [1] -
80:16

**association** [5] - 46:4,
46:10, 47:4, 47:5,
47:18
**associational** [14] -
44:24, 45:4, 45:21,
46:3, 46:6, 46:8,
46:10, 47:10, 47:11,
78:11, 82:7, 82:9,
82:11, 85:1
**assume** [1] - 14:3
**assuming** [1] - 46:7
**asylum** [2] - 36:22,
67:15
**attached** [5] - 13:4,
15:4, 23:7, 23:11,
35:4
**attempting** [1] - 45:2
**attorney** [4] - 9:21,
10:3, 35:17, 35:19
**attorneys** [2] - 5:23,
6:3
**authorities** [1] - 49:4
**authority** [38] - 11:15,
15:14, 34:5, 41:11,
41:12, 41:24, 43:15,
43:20, 45:11, 45:17,
48:1, 49:8, 49:24,
50:20, 53:11, 53:12,
54:15, 55:11, 56:2,
60:12, 60:13, 60:15,
60:17, 61:8, 61:16,
61:20, 61:22, 61:25,
65:16, 66:5, 67:3,
68:7, 68:8, 68:14,
70:10, 70:12, 79:9
**authorization** [2] -
13:4, 19:17
**authorize** [3] - 77:2,
77:5, 81:13
**authorized** [2] - 81:14,
81:23
**authorizes** [2] - 25:16,
76:24
**automatic** [1] - 65:4
**automatically** [1] -
63:22
**available** [6] - 44:10,
46:8, 61:19, 65:13,
71:17, 77:1
**avenue** [4] - 36:15,
37:5, 50:1, 60:18
**avenues** [1] - 36:24
**aware** [4] - 9:16,
31:11, 52:4

**B**

**b)(1)(i** [1] - 68:12
**backdrop** [5] - 57:23,
59:2, 62:6

**background** [1] -
57:22
**backtracked** [1] -
56:16
**balance** [3] - 69:12,
79:6, 79:14
**bar** [2] - 41:17, 47:9
**Barr** [3] - 76:18, 80:9,
83:2
**based** [7] - 12:4, 13:1,
14:24, 48:23, 48:25,
51:19, 73:25
**baseline** [2] - 55:5,
56:1
**basis** [4] - 35:25, 39:8,
52:25, 68:21
**Bates** [2] - 80:22,
80:23
**bear** [1] - 75:23
**become** [2] - 13:5,
15:6
**began** [1] - 5:20
**begin** [3] - 40:19,
48:14, 78:17
**beginning** [3] - 24:14,
39:2, 57:18
**behalf** [3] - 3:20,
40:17, 82:10
**behavior** [1] - 79:1
**belied** [1] - 51:25
**belong** [1] - 24:25
**beneficiaries** [2] -
39:25, 83:19
**Bergquist** [1] - 3:15
**best** [2] - 7:9, 65:10
**better** [2] - 41:1, 43:13
**between** [10] - 13:12,
21:13, 34:23, 35:5,
35:15, 53:8, 69:11,
72:10, 72:17, 83:17
**beyond** [2] - 21:8,
22:17
**big** [1] - 35:15
**bind** [2] - 81:19, 81:21
**binding** [2] - 42:6,
42:22
**birthday** [2] - 36:13,
84:11
**bit** [2] - 5:12, 56:17
**blessed** [1] - 47:11
**books** [5] - 6:6, 6:13,
6:17, 7:4, 55:2
**border** [8] - 25:9, 58:2,
58:18, 58:22, 59:10,
59:25, 66:6, 74:18
**bound** [1] - 71:14
**boundary** [1] - 58:25
**bounds** [1] - 61:18
**branch** [1] - 70:1
**brief** [7] - 26:22, 27:3,

27:7, 39:15, 58:4,
62:4, 66:4
**briefed** [1] - 34:11
**briefing** [4] - 16:2,
20:14, 48:11, 75:3
**briefs** [2] - 14:19,
71:24
**bring** [7] - 39:1, 44:17,
45:9, 47:4, 47:18,
47:19, 47:24
**bringing** [3] - 25:17,
46:13, 84:12
**broad** [1] - 43:9
**broader** [4] - 30:15,
61:8, 61:19, 65:15
**brought** [1] - 45:15
**bucket** [1] - 4:11
**burdensome** [1] -
72:1

**C**

**C.F.R** [7] - 20:9, 20:15,
48:18, 53:1, 53:11,
54:17, 59:4
**cabined** [1] - 43:21
**California** [2] - 36:13,
84:11
**cannot** [8] - 9:5,
10:21, 19:10, 21:8,
23:25, 32:4, 75:23,
84:13
**capricious** [8] - 4:5,
8:19, 8:21, 22:22,
23:2, 32:6, 33:18,
83:22
**card** [1] - 14:24
**care** [1] - 84:14
**Carl** [1] - 3:14
**carve** [5] - 25:2, 31:25,
63:25, 64:3, 74:24
**carve-out** [3] - 25:2,
31:25, 74:24
**carved** [1] - 24:24
**carves** [1] - 44:12
**CASA** [8] - 69:22,
71:19, 71:20, 80:13,
80:25, 81:18, 82:5
**case** [60] - 3:4, 6:9,
10:9, 11:6, 12:6,
13:15, 14:3, 15:3,
21:5, 26:13, 27:10,
27:25, 29:7, 32:21,
35:10, 37:13, 37:19,
38:6, 38:7, 38:10,
38:15, 38:19, 42:10,
42:22, 42:23, 42:25,
44:21, 46:7, 46:9,
48:23, 49:5, 49:17,
50:19, 50:22, 50:24,

53:3, 53:19, 56:12, 56:17, 58:10, 58:19, 63:24, 65:5, 65:22, 66:16, 71:5, 71:21, 71:22, 72:3, 76:13, 76:23, 78:9, 78:14, 80:14, 80:23, 82:11, 82:15, 83:2

**case's** [1] - 70:11

**cases** [6] - 8:4, 45:12, 53:10, 70:18, 80:9, 83:3

**categorical** [1] - 38:8

**categorically** [1] - 56:23

**categories** [5] - 8:24, 9:5, 24:17, 57:8, 66:25

**categorized** [1] - 55:13

**category** [13] - 9:19, 10:8, 10:14, 10:16, 24:7, 24:19, 24:21, 24:24, 25:1, 25:3, 57:19, 61:2, 64:21

**caused** [1] - 40:5

**causing** [1] - 76:10

**celebrate** [2] - 36:13, 84:11

**Center** [1] - 82:3

**certain** [9] - 9:13, 9:18, 10:4, 21:3, 44:14, 53:22, 59:14, 60:9, 72:12

**certainly** [7] - 14:19, 34:11, 46:15, 52:15, 66:1, 83:7, 84:5

**CERTIFICATE** [1] - 85:13

**certify** [1] - 85:15

**cetera** [3] - 22:7, 49:18, 72:17

**challenge** [12] - 23:10, 44:18, 45:10, 49:6, 49:22, 50:3, 50:7, 53:15, 54:5, 54:13, 54:24

**challenged** [16] - 4:10, 5:19, 6:7, 6:8, 6:18, 6:21, 7:15, 8:14, 39:7, 40:2, 53:21, 77:4, 77:15, 83:13, 84:6, 84:23

**challenges** [7] - 47:5, 47:12, 81:5, 81:8, 81:13, 83:1, 83:5

**challenging** [15] - 4:13, 4:21, 4:22, 6:13, 7:6, 21:1, 32:11, 38:10, 40:11,

48:18, 49:13, 49:22, 50:5, 54:20

**Chandra** [2] - 85:15, 85:20

**change** [5] - 15:24, 19:22, 34:7, 57:25, 72:14

**changing** [1] - 79:1

**characterization** [1] - 30:12

**charging** [4] - 18:21, 63:22, 65:4, 65:6

**CHNV** [7] - 8:15, 10:12, 32:9, 32:17, 32:23, 77:17, 78:4

**choice** [1] - 28:16

**choices** [1] - 30:24

**choose** [1] - 53:8

**chooses** [1] - 60:14

**circuit** [1] - 71:16

**Circuit** [18] - 37:16, 42:8, 42:9, 42:14, 42:22, 44:23, 46:22, 46:23, 47:4, 47:8, 47:10, 58:5, 58:19, 71:15, 71:18, 76:22, 80:8, 82:23

**circular** [1] - 19:1

**circumstance** [1] - 47:24

**circumstances** [1] - 56:3

**cite** [4] - 29:11, 58:4, 66:3, 71:23

**cited** [3] - 11:6, 45:5, 58:19

**cites** [1] - 79:7

**citing** [1] - 67:2

**citizen** [2] - 36:12, 36:15

**civil** [1] - 3:4

**claim** [5] - 8:21, 32:5, 45:21, 46:2, 46:13

**claims** [4] - 4:5, 68:24, 79:13, 82:24

**clarified** [1] - 42:10

**clarify** [1] - 44:6

**clarifying** [1] - 22:8

**clear** [19] - 5:17, 6:16, 7:14, 9:3, 10:5, 11:22, 14:7, 15:7, 28:21, 30:3, 32:23, 57:25, 68:12, 73:17, 75:13, 78:16, 82:21, 82:23, 83:11

**clearer** [1] - 73:24

**clearest** [1] - 25:24

**clearly** [11] - 10:9, 10:24, 12:4, 14:5, 19:18, 25:19, 30:13,

40:5, 43:6, 43:16, 61:23

**CLERK** [1] - 3:3

**clients** [1] - 8:6

**clock** [1] - 55:3

**closely** [1] - 16:6

**closing** [1] - 82:21

**Coalition** [1] - 3:5

**colleague** [5] - 4:2, 5:3, 33:13, 34:14, 38:7

**coming** [2] - 19:24, 75:5

**commence** [1] - 63:20

**commencement** [2] - 64:8, 64:14

**common** [1] - 24:4

**communities** [1] - 83:25

**community** [1] - 35:17

**compared** [1] - 37:14

**compensable** [2] - 78:7, 84:1

**compensated** [1] - 79:4

**complaint** [4] - 40:3, 42:24, 43:4

**complete** [5] - 71:6, 72:2, 82:4, 82:6

**completed** [4] - 12:1, 17:20, 73:21, 75:16

**completely** [3] - 7:12, 18:17, 74:25

**complicated** [1] - 83:7

**comply** [3] - 22:1, 39:21, 72:12

**comport** [2] - 39:18, 39:22

**concede** [2] - 18:8, 48:19

**conceding** [1] - 76:8

**concept** [1] - 31:9

**concern** [1] - 68:3

**concerned** [2] - 75:11, 81:17

**concerning** [1] - 71:17

**concerns** [1] - 38:7

**concessions** [2] - 48:24, 51:15

**conclude** [1] - 16:6

**concluded** [1] - 14:8

**conclusion** [1] - 39:6

**concurrence** [1] - 80:10

**concurring** [4] - 50:10, 50:13, 51:8, 70:19

**condition** [1] - 17:20

**conditions** [1] - 29:22

**confer** [1] - 37:14

**confess** [2] - 60:1, 64:25

**confirm** [1] - 20:10

**conflicting** [2] - 21:5, 22:19

**conflicts** [1] - 21:13

**confronted** [1] - 79:15

**confused** [1] - 47:17

**confusing** [1] - 60:2

**confusion** [1] - 64:25

**Congress** [23] - 18:16, 18:23, 19:2, 19:7, 24:23, 25:10, 29:21, 30:15, 30:25, 31:8, 31:12, 31:21, 57:20, 57:23, 59:2, 60:24, 61:23, 66:18, 74:16, 74:20, 75:4, 81:13

**Congress's** [2] - 24:5, 75:14

**conjunction** [1] - 17:25

**consider** [6] - 52:18, 53:13, 53:25, 54:2, 54:22, 67:17

**consideration** [1] - 34:10

**considered** [12] - 27:21, 28:24, 30:23, 31:3, 37:1, 41:4, 41:22, 59:16, 59:17, 62:8, 63:15, 83:21

**considering** [1] - 15:18

**consistency** [1] - 33:21

**consistent** [8] - 21:15, 22:7, 22:22, 33:24, 62:10, 62:24, 81:4, 81:7

**construction** [2] - 31:19, 72:9

**constructively** [2] - 58:22, 59:12

**construed** [1] - 28:13

**construing** [1] - 51:4

**contain** [1] - 51:2

**contains** [1] - 6:12

**contemplated** [1] - 25:20

**contemplates** [1] - 43:16

**contend** [2] - 54:23, 68:13

**contending** [2] - 54:6, 60:3

**contends** [1] - 43:23

**context** [17] - 12:3, 15:13, 17:10, 17:16, 41:21, 44:3, 44:24,

45:14, 46:9, 50:15, 54:13, 56:22, 57:22, 58:8, 59:8, 70:14, 71:13

**contexts** [2] - 46:2, 54:22

**continue** [10] - 11:9, 18:6, 29:8, 29:15, 31:10, 39:11, 39:16, 48:20, 65:22, 74:9

**continues** [9] - 13:7, 15:12, 15:14, 16:18, 16:25, 17:23, 73:23, 74:1, 80:3

**contradictory** [1] - 74:23

**contrary** [9] - 4:5, 8:16, 8:21, 8:23, 12:20, 32:5, 39:9, 41:12, 83:14

**contrast** [1] - 12:15

**control** [1] - 80:9

**controlling** [3] - 80:8, 80:15, 82:22

**controls** [3] - 21:10, 22:18, 83:9

**convey** [3] - 17:4, 17:14, 57:2

**conveys** [4] - 16:17, 16:24, 17:22, 73:22

**convicted** [1] - 12:10

**conviction** [1] - 12:9

**coordinate** [1] - 69:25

**Corps** [1] - 80:16

**correct** [13] - 4:15, 4:16, 7:1, 11:4, 24:5, 60:7, 61:7, 62:23, 63:17, 66:23, 67:10, 73:13, 85:16

**correctly** [1] - 69:2

**counsel** [1] - 3:7

**counsel's** [1] - 3:21

**count** [1] - 12:12

**countervailing** [1] - 69:21

**country** [20] - 9:12, 9:15, 20:6, 20:12, 23:24, 24:11, 24:21, 24:22, 26:3, 28:5, 28:6, 37:3, 59:17, 59:22, 66:20, 68:21, 68:22, 69:17, 74:10, 81:11

**course** [3] - 7:21, 36:5, 78:1

**Court** [72] - 3:2, 5:17, 6:8, 7:11, 7:15, 8:7, 8:20, 9:2, 11:7, 11:18, 11:22, 11:23, 12:4, 13:15, 16:24,

18:22, 20:15, 23:7, 31:16, 33:7, 34:21, 37:24, 38:3, 39:6, 40:2, 40:6, 42:21, 42:25, 43:23, 44:19, 45:23, 46:9, 46:14, 47:19, 47:25, 48:1, 48:8, 48:24, 49:24, 50:13, 50:24, 51:14, 56:13, 58:10, 58:23, 59:19, 67:11, 68:13, 70:13, 71:10, 71:15, 76:11, 79:7, 79:9, 79:12, 79:18, 80:12, 81:9, 81:17, 82:2, 82:4, 82:5, 82:13, 82:23, 83:6, 84:22, 84:24, 85:3, 85:8

**court** [11] - 15:17, 35:14, 43:17, 43:22, 45:6, 69:24, 80:22, 81:21, 82:15, 82:18, 83:3

**COURT** [130] - 3:11, 3:17, 3:22, 4:8, 4:13, 4:18, 5:5, 5:11, 5:14, 6:11, 6:22, 7:2, 7:19, 7:22, 8:11, 11:2, 11:5, 13:11, 13:19, 13:22, 14:12, 14:21, 15:8, 15:20, 15:23, 16:14, 17:8, 17:13, 18:6, 21:12, 21:22, 21:25, 22:4, 22:24, 23:1, 26:20, 27:6, 27:13, 27:16, 28:18, 29:11, 32:8, 33:4, 33:11, 33:15, 33:19, 34:13, 34:16, 34:24, 35:2, 35:22, 37:9, 37:11, 38:20, 38:23, 39:3, 40:12, 40:14, 40:21, 41:16, 41:18, 42:4, 43:13, 44:2, 44:4, 44:8, 44:22, 45:9, 45:17, 45:20, 46:4, 46:16, 46:20, 46:24, 47:15, 47:17, 47:23, 48:4, 48:13, 49:2, 49:17, 52:2, 52:9, 52:11, 52:23, 54:4, 54:19, 55:12, 55:17, 55:22, 57:6, 60:1, 60:8, 60:21, 60:23, 61:4, 61:9, 61:11, 62:10, 62:24, 63:2, 63:5, 63:8, 63:18, 63:24, 64:7, 65:17, 67:4, 67:20, 70:5, 70:8, 70:10, 70:17, 70:23, 70:25,

23:25, 27:19

**decided** [1] - 37:16

**decides** [1] - 18:24

**decision** [27] - 11:7, 16:5, 17:18, 28:9, 32:13, 32:16, 33:4, 33:8, 37:15, 42:9, 42:12, 42:13, 50:25, 51:1, 51:7, 58:5, 59:18, 69:1, 69:3, 69:8, 69:23, 71:23, 71:24, 78:8, 80:13, 80:21, 80:25

**decisions** [2] - 32:3, 58:23

**declarants** [1] - 36:4

**declaration** [8] - 34:22, 34:25, 35:4, 35:11, 37:24, 78:19, 78:20, 78:21

**declarations** [12] - 6:1, 35:7, 35:8, 35:23, 36:3, 36:11, 36:21, 37:13, 37:21, 37:25, 79:20, 83:25

**declaratory** [4] - 39:19, 46:16, 46:18, 77:3

**declaring** [1] - 46:17

**defendant** [1] - 12:8

**defendants** [28] - 3:18, 3:20, 5:18, 9:1, 11:15, 18:8, 18:18, 18:22, 21:3, 21:7, 21:9, 23:20, 26:1, 26:9, 28:22, 30:11, 31:7, 31:14, 39:24, 40:15, 40:17, 43:1, 72:1, 72:20, 74:16, 76:8, 78:14, 83:8

**defendants'** [12] - 5:15, 12:20, 21:1, 26:17, 27:22, 29:1, 29:4, 29:18, 36:1, 37:12, 43:6, 81:24

**define** [1] - 76:9

**defined** [5] - 19:14, 23:25, 29:23, 30:15, 78:14

**defines** [1] - 28:2, 29:24

**definitely** [1] - 69:21

**definition** [7] - 4:14, 4:22, 19:18, 28:4, 30:14, 48:18, 58:6

**definitions** [2] - 26:24, 27:8

**delivery** [1] - 25:15

**demonstrate** [2] - 69:19, 70:3

**demonstrated** [1] - 69:14

**demonstrates** [1] - 51:13

**deny** [2] - 48:24, 51:15

**deportation** [1] - 36:25

**DEPUTY** [1] - 3:3

**designate** [1] - 61:16

**designated** [1] - 57:12

**designation** [14] - 9:17, 9:21, 10:3, 23:15, 56:7, 60:13, 60:15, 61:13, 61:16, 64:6, 65:10, 65:12, 68:4, 68:10

**despite** [1] - 6:24

**detail** [1] - 56:8

**detailed** [1] - 36:10

**detain** [1] - 5:24

**detained** [5] - 35:18, 36:12, 58:22, 59:13, 66:13

**detention** [2] - 25:15, 25:16

**determination** [3] - 36:19, 71:8, 77:2

**determinations** [1] - 77:1

**determined** [2] - 10:17, 11:7

**DHS** [7] - 18:24, 27:19, 32:23, 52:4, 65:5, 77:17, 79:22

**DHS's** [2] - 20:8, 77:19

**dictionary** [1] - 77:23

**difference** [2] - 35:15, 69:11

**differences** [2] - 34:23, 35:5

**different** [13] - 6:17, 8:8, 26:24, 27:9, 37:18, 38:16, 41:13, 46:2, 49:20, 61:14, 66:14, 83:6, 83:18

**difficult** [1] - 21:25

**difficulty** [1] - 16:22, 16:23

**direct** [3] - 53:13, 78:1, 78:2

**directing** [1] - 54:21

**directive** [17] - 7:6, 8:15, 23:16, 34:3, 52:24, 52:25, 53:4, 54:6, 54:11, 54:21, 54:25, 55:1, 55:2, 55:4, 55:13, 55:17, 55:19

**directives** [4] - 4:21, 22:6, 49:13, 49:15

**directly** [2] - 8:10, 73:24

**disagree** [1] - 77:16

**disagreement** [1] - 57:16

**discretion** [11] - 50:15, 50:16, 53:7, 54:14, 54:12, 55:16, 55:24, 67:11, 67:13, 67:19, 81:18

**discretionary** [3] - 9:20, 28:9, 53:12

**discussed** [1] - 58:11

**discusses** [1] - 45:6

**discussing** [2] - 8:5, 74:5

**discussion** [3] - 15:9, 56:21, 73:15

**dismiss** [1] - 5:23

**disposal** [1] - 65:13

**dispute** [2] - 5:15, 55:12

**distinct** [5] - 9:9, 19:19, 24:16, 25:11, 73:9

**distinction** [5] - 13:12, 15:16, 72:10, 72:13, 72:17

**distinguished** [1] - 71:6

**distractions** [1] - 9:1

**district** [1] - 83:3

**District** [2] - 79:12, 81:19

**divides** [1] - 24:15

**Dixon** [2] - 42:9, 76:13

**Doctors** [1] - 81:1

**Doctrine** [2] - 21:2, 21:18

**document** [10] - 13:4, 18:21, 53:4, 53:5, 55:7, 55:15, 56:11, 63:22, 65:4, 65:7

**documenting** [1] - 37:22

**documents** [12] - 4:21, 43:12, 50:17, 51:1, 51:19, 51:24, 53:25, 55:8, 56:25, 57:4, 75:5, 75:12

**Doe** [9] - 32:13, 32:15, 32:16, 38:6, 38:7, 38:17, 53:19, 56:17, 68:18

**DOJ** [1] - 23:8

**done** [1] - 49:25

**down** [3] - 39:1, 52:22, 84:18

**drawing** [1] - 15:16, 72:13

71:2, 71:14, 72:4, 72:6, 72:19, 72:25, 73:2, 73:4, 73:8, 74:13, 75:24, 76:2, 76:4, 85:4, 85:6

**Court's** [12] - 14:7, 15:9, 16:4, 32:13, 33:2, 38:17, 38:22, 39:8, 43:15, 51:6, 59:18, 80:24

**court's** [1] - 51:11

**courthouse** [1] - 5:22

**COURTROOM** [1] - 3:3

**courts** [5] - 71:4, 71:21, 79:12, 80:3, 83:3

**Courts** [2] - 79:12, 81:19

**cover** [1] - 42:17

**covered** [1] - 64:22

**create** [1] - 66:16

**created** [2] - 25:8, 29:21

**creates** [1] - 31:18

**creating** [2] - 55:8, 75:15

**creation** [1] - 31:13

**credible** [9] - 35:20, 36:2, 36:18, 36:19, 36:25, 37:2, 68:24, 69:6

**criminal** [2] - 11:18, 12:8

**Cuban** [1] - 36:23

**curious** [1] - 67:21

**current** [5] - 11:10, 17:15, 20:12, 20:22, 69:4

**custody** [1] - 58:16

**D**

**D.C** [6] - 42:9, 42:13, 44:23, 46:22, 76:22, 80:8

**damages** [3] - 78:7, 79:4, 84:2

**DATE** [1] - 85:20

**date** [1] - 77:10

**dated** [1] - 51:22

**days** [1] - 77:9

**deal** [1] - 74:7

**dealing** [3] - 10:5, 14:11, 81:22

**deals** [2] - 9:9, 76:14

**dealt** [2] - 29:8, 65:23

**death** [1] - 37:4

**decades** [3] - 6:4,

JA621

**driving** [2] - 36:13, 84:10
**due** [1] - 31:10
**duration** [1] - 63:6
**during** [1] - 36:5

## E

**e)(3** [1] - 44:17
**e)(3)(B** [1] - 77:8
**E.I.R.M** [2] - 36:9, 84:10
**E.M.P** [1] - 35:10
**earn** [1] - 84:14
**easy** [1] - 35:16
**effect** [2] - 6:17, 6:19, 12:5, 13:8, 13:10, 14:16, 17:25, 19:1, 33:10, 38:6, 57:4, 73:6, 73:8
**effectively** [1] - 26:6
**either** [7] - 8:20, 10:8, 11:25, 41:8, 42:2, 70:20, 73:20
**element** [1] - 5:9
**eligibility** [1] - 84:20
**eligible** [3] - 9:25, 10:2, 10:7
**Ellis** [1] - 59:22
**elsewhere** [1] - 23:3
**emphasis** [1] - 76:13
**emphasize** [2] - 67:10, 75:11
**emphasizes** [3] - 28:16, 58:13, 58:14
**employment** [1] - 13:4
**enacted** [1] - 58:9
**encourage** [1] - 52:18
**encouraging** [1] - 53:9
**end** [4] - 22:18, 39:24, 78:3, 83:8
**ended** [2] - 15:20, 18:12
**endorse** [1] - 45:3
**ends** [3] - 12:16, 58:15, 59:5
**enforced** [3] - 6:14, 7:5, 52:12
**enforcement** [7] - 5:22, 53:8, 53:13, 54:12, 55:15, 55:23, 68:20
**enforcing** [3] - 4:24, 70:2, 80:5
**engaged** [2] - 36:11, 36:14
**Engineers** [1] - 80:16
**enjoin** [1] - 43:1
**enjoined** [1] - 42:16

**enter** [1] - 58:21
**entered** [1] - 25:23
**enters** [1] - 69:24
**entire** [1] - 32:20
**entry** [21] - 9:4, 19:15, 20:19, 23:23, 24:9, 28:5, 29:3, 29:6, 31:9, 31:10, 31:13, 31:17, 43:3, 43:9, 48:22, 58:3, 59:10, 65:21, 74:17, 74:20, 75:12
**equate** [1] - 31:3
**equitable** [3] - 81:18, 81:22, 83:23
**equities** [2] - 79:6, 79:14
**ER** [1] - 20:10
**erroneously** [2] - 79:17, 84:4
**error** [1] - 54:6
**Escobar** [2] - 37:22, 78:21
**especially** [4] - 8:9, 42:23, 79:15, 80:10
**essentially** [11] - 13:7, 24:19, 26:9, 27:18, 28:8, 29:13, 40:23, 43:10, 46:16, 54:21, 75:7
**established** [1] - 82:9
**Esther** [2] - 3:13, 5:7
**et** [5] - 3:5, 3:6, 22:6, 49:18, 72:17
**event** [13] - 11:25, 16:17, 16:20, 16:25, 17:1, 17:4, 17:5, 17:9, 17:10, 17:23, 73:22, 73:25, 74:8
**evidence** [15] - 5:16, 6:15, 7:13, 24:3, 27:18, 31:14, 37:18, 37:20, 37:21, 37:23, 38:2, 38:3, 66:17, 74:19, 75:13
**exact** [2] - 16:15, 73:16
**exactly** [2] - 48:12, 59:19
**example** [6] - 12:23, 13:16, 25:14, 35:10, 36:9, 36:22, 52:15, 58:4
**examples** [4] - 12:23, 14:15, 15:7, 25:19
**except** [1] - 45:23
**exception** [1] - 44:12
**exclude** [1] - 45:13
**excluded** [2] - 9:4, 64:22

**excluding** [1] - 28:11
**excuse** [10] - 18:16, 26:12, 32:1, 34:9, 36:21, 38:13, 77:5, 77:13, 81:19, 85:1
**executive** [1] - 49:4
**executive's** [2] - 79:9, 80:4
**exempt** [1] - 26:14
**exempted** [2] - 10:25, 19:7
**exercise** [1] - 53:7
**exhibit** [2] - 23:7, 23:12
**exist** [3] - 7:9, 14:2, 22:20
**existed** [3] - 39:13, 50:21, 73:10
**exists** [1] - 18:2
**expanded** [17] - 9:17, 9:19, 10:10, 18:9, 18:16, 19:8, 20:8, 20:10, 20:17, 20:24, 23:9, 23:14, 26:7, 26:16, 32:1, 67:25, 74:25
**expanding** [2] - 53:22, 67:24
**expansion** [2] - 53:17, 68:1
**expedited** [135] - 4:6, 5:21, 5:25, 8:17, 8:25, 9:5, 9:17, 9:20, 9:25, 10:2, 10:7, 10:10, 10:13, 10:25, 18:9, 18:11, 18:15, 18:16, 18:21, 18:24, 18:25, 19:9, 20:8, 20:9, 20:17, 20:25, 22:12, 22:15, 23:9, 23:14, 23:17, 23:19, 24:1, 24:7, 24:16, 25:3, 25:8, 26:5, 26:5, 26:7, 26:11, 26:15, 26:16, 29:17, 29:21, 30:17, 30:19, 30:23, 31:4, 31:8, 31:13, 31:24, 32:2, 32:19, 32:25, 34:6, 34:8, 34:9, 34:18, 35:5, 35:13, 35:16, 36:2, 37:8, 38:12, 38:13, 39:12, 39:17, 39:25, 40:9, 43:1, 43:7, 43:18, 44:3, 44:16, 44:18, 44:20, 48:21, 51:18, 52:5, 52:18, 53:10, 53:14, 53:17, 53:23, 54:3, 54:16, 54:22, 55:9,

56:3, 56:14, 56:21, 57:9, 60:16, 60:20, 60:24, 61:17, 61:23, 62:11, 62:21, 63:12, 63:16, 63:21, 64:2, 64:8, 64:12, 64:14, 64:16, 64:19, 65:7, 67:7, 67:12, 67:17, 67:24, 69:11, 74:17, 74:21, 74:25, 75:10, 75:15, 75:21, 76:20, 77:18, 77:21, 78:13, 78:15, 78:16, 78:22, 78:24, 78:25, 83:12, 83:16, 83:19, 84:9
**experience** [1] - 14:4
**experiencing** [1] - 6:21
**expire** [1] - 15:3
**expired** [2] - 12:24, 16:20
**explain** [6] - 10:9, 27:2, 27:11, 61:9, 65:11, 83:15
**explained** [1] - 34:2
**explaining** [2] - 27:25, 74:3
**explanation** [2] - 33:9, 34:8, 34:12
**explicit** [1] - 67:23
**explicitly** [2] - 10:25, 26:14
**explode** [1] - 75:20
**expose** [1] - 10:12
**expound** [3] - 27:1, 27:11, 41:9
**expresses** [1] - 77:19
**expressly** [1] - 80:11
**extant** [2] - 14:10, 16:8
**extend** [2] - 70:20, 84:25
**extended** [1] - 52:12
**extends** [2] - 18:18, 70:10
**extent** [4] - 32:11, 70:21, 71:15, 77:22
**extraordinary** [1] - 19:3

## F

**f)(1** [2] - 42:14, 42:15
**F.3d** [2] - 76:18, 80:17
**face** [5] - 34:18, 34:19, 35:24, 37:3, 79:17
**fact** [28] - 6:1, 9:19, 9:22, 15:25, 18:1, 18:3, 19:7, 19:10, 19:22, 24:23, 28:16,

34:7, 35:8, 36:12, 36:14, 36:20, 38:11, 42:8, 50:5, 61:19, 67:14, 69:18, 72:15, 74:9, 74:20, 77:9, 78:11, 84:20
**factors** [2] - 34:10, 70:15, 83:23
**facts** [2] - 38:14, 38:15
**factually** [1] - 38:19
**fail** [3] - 12:20, 83:15, 83:20
**fair** [1] - 55:20
**fall** [2] - 68:6, 78:23
**falls** [2] - 4:11, 61:17
**familiar** [3] - 48:5, 48:9
**families** [2] - 83:24, 84:14
**family** [1] - 35:17
**fashion** [1] - 5:21
**favor** [1] - 79:14
**fear** [11] - 35:20, 36:2, 36:8, 36:18, 36:19, 36:25, 37:2, 37:3, 68:24, 69:6, 69:7
**February** [4] - 8:15, 23:16, 34:3, 52:24
**federal** [10] - 5:19, 38:11, 39:10, 39:15, 39:21, 50:19, 51:10, 69:24, 84:16, 84:17
**Federal** [1] - 77:13
**fiancee** [2] - 36:17, 84:11
**fiction** [7] - 12:6, 31:9, 31:10, 31:13, 31:17, 74:17, 74:21
**filed** [1] - 82:1
**final** [1] - 48:7
**finally** [4] - 20:8, 31:5, 81:24, 83:23
**finer** [4] - 27:13, 32:10, 38:5, 73:15
**finite** [1] - 59:11
**first** [24] - 3:24, 9:11, 11:23, 12:14, 12:18, 14:2, 22:9, 24:4, 24:19, 32:17, 34:16, 34:21, 54:15, 54:17, 54:18, 56:3, 57:18, 68:7, 73:11, 73:20, 76:7, 77:16, 78:9, 83:1
**First** [2] - 11:19, 12:3
**firsthand** [1] - 14:4
**fit** [2] - 68:4, 84:24
**fits** [2] - 13:22, 58:6
**five** [2] - 69:3, 69:7
**flip** [3] - 34:4, 83:17

flip-flop [1] - 83:17
flip-flopping [1] - 34:4
flop [1] - 83:17
flopping [1] - 34:4
focus [1] - 21:10
focused [3] - 37:19, 75:4, 75:8
focuses [1] - 20:21
focusing [2] - 40:4, 66:22
folks [6] - 9:12, 9:14, 9:23, 15:4, 24:21, 26:18
follow [4] - 41:5, 42:1, 51:5
following [2] - 20:19, 58:20
foothold [1] - 59:1
footnote [4] - 26:22, 27:5, 27:14, 27:18
Footnote [3] - 27:3, 27:6, 39:14
foreclose [3] - 36:24, 37:7, 84:21
foreclosed [1] - 41:10
foregoing [3] - 79:3, 84:12, 85:16
forever [4] - 25:22, 27:23, 31:18, 31:23
forgot [1] - 25:4
form [1] - 77:2
forth [5] - 9:1, 56:9, 62:3, 69:22, 75:14
forthwith [1] - 58:15
forward [1] - 12:10
fourth [1] - 35:3
Freire [1] - 36:10
friend [2] - 48:15, 66:24
FRN [5] - 32:17, 32:23, 56:11, 56:21, 77:12
front [1] - 40:1
full [1] - 17:16
future [2] - 36:16, 40:8

**G**

gained [1] - 59:1
general [4] - 9:21, 10:3, 47:8, 60:16
Gill [1] - 71:24
gist [1] - 71:3
given [11] - 13:2, 14:25, 20:17, 35:19, 36:4, 43:19, 51:15, 53:14, 54:11, 67:20, 80:10
glad [2] - 11:13, 44:5
goal [1] - 75:14
gold [3] - 13:16, 17:10

Gorsuch [2] - 50:12, 51:8
Gorsuch's [1] - 50:9
government [34] - 5:20, 6:22, 7:8, 11:6, 21:18, 22:13, 23:12, 38:11, 39:10, 39:16, 39:21, 43:23, 48:20, 49:8, 49:18, 50:1, 51:3, 51:5, 63:10, 69:22, 69:25, 70:1, 76:13, 76:18, 76:23, 77:14, 79:15, 82:25, 83:5, 84:3, 84:16, 84:17
government's [12] - 4:19, 41:9, 42:20, 43:14, 45:16, 60:12, 62:17, 67:5, 68:15, 68:19, 75:18, 79:13
Grace [4] - 42:12, 76:18, 80:9, 83:2
grammar [1] - 17:25
grammatical [3] - 11:11, 15:18, 72:9
grammatically [1] - 24:5
grant [9] - 12:17, 13:1, 14:24, 33:2, 39:6, 43:16, 46:9, 67:23, 84:23
granted [5] - 20:5, 24:11, 43:2, 74:6, 74:10
granting [2] - 29:22, 45:8
grants [1] - 7:12
grave [1] - 84:1
green [1] - 14:24
ground [1] - 52:3
grounds [4] - 10:18, 30:6, 30:7, 75:10
group [5] - 9:16, 9:24, 10:1, 61:17, 61:24
groups [4] - 9:9, 9:23, 10:6, 28:3
guess [12] - 4:18, 15:8, 16:12, 16:21, 18:7, 34:16, 45:3, 46:23, 47:15, 49:11, 60:23, 73:14
guidance [8] - 44:15, 50:14, 52:17, 53:23, 53:24, 55:14, 77:15, 77:25
guide [1] - 77:25
guideline [1] - 55:21
guiding [2] - 77:25, 78:1

**H**

half [2] - 38:9, 38:12
hand [1] - 23:17
handle [3] - 4:3, 5:4, 33:13
hangs [1] - 25:22
happy [2] - 27:17, 32:6
harm [17] - 34:17, 35:23, 37:20, 37:23, 38:2, 38:4, 38:15, 40:5, 69:14, 69:20, 70:3, 71:13, 76:10, 78:5, 79:3, 79:18
harmed [1] - 82:17
harms [7] - 6:19, 7:13, 7:14, 69:13, 79:14, 79:19, 83:24
head [1] - 23:3
Health [1] - 82:3
hear [2] - 3:24, 47:25
heard [1] - 53:18
hearing [2] - 3:23, 35:14
held [3] - 11:18, 12:4, 85:17
help [3] - 60:2, 64:24, 64:25
helpful [1] - 57:6
hereby [1] - 85:15
Hewitt [5] - 11:6, 11:16, 11:17, 16:5, 73:15, 74:12
highlight [1] - 78:21
highlights [1] - 9:22
Hillary [2] - 3:9, 4:1
historical [2] - 19:10, 62:6
history [7] - 26:23, 27:8, 62:2, 66:15, 66:16, 75:2, 75:3
holder [2] - 13:17, 13:18
holding [3] - 42:19, 70:11, 70:20
Honor [25] - 3:4, 3:9, 3:19, 3:25, 5:7, 9:16, 11:13, 31:11, 40:16, 40:18, 41:14, 42:6, 47:22, 48:12, 52:8, 53:24, 54:15, 70:9, 70:12, 73:13, 73:18, 74:22, 75:1, 76:6, 81:6
Honor's [1] - 65:9
hope [2] - 69:1, 73:25
Huffman [5] - 8:14, 10:11, 51:21, 53:4, 53:16
human [1] - 84:5

Humane [1] - 3:5
hundreds [4] - 43:7, 56:18, 67:5, 68:16

**I**

ICE [3] - 5:24, 8:15, 23:16
idea [3] - 48:5, 74:20, 75:7
identified [5] - 71:12, 78:12, 78:24, 82:1, 85:2
identifies [1] - 8:6
identify [2] - 82:12, 82:16
ignore [2] - 75:19, 75:20
Ill [1] - 48:25
IIRIRA [2] - 29:20, 75:3
illustrate [1] - 35:9
imagine [1] - 79:7
immediately [2] - 5:24, 66:12
Immigration [1] - 3:5
immigration [11] - 5:22, 12:21, 19:14, 19:17, 35:14, 50:15, 52:18, 53:6, 54:1, 59:8, 80:5
imminently [1] - 78:17
impacted [1] - 44:14
implement [3] - 48:20, 50:20, 77:5
implementation [2] - 55:4, 77:4
implemented [2] - 10:3, 54:18
implementing [2] - 4:24, 76:20
import [1] - 73:11
importance [1] - 77:11
important [6] - 9:21, 53:3, 57:19, 58:7, 58:13, 66:9
imposed [7] - 11:8, 11:19, 12:13, 12:14, 14:9, 16:7, 16:13
imposes [2] - 21:14, 22:5
improperly [1] - 69:25
improvement [1] - 7:17
INA [2] - 8:23, 79:9
inaccurate [1] - 30:12
inadmissibility [3] - 10:18, 30:6, 75:10
inadmissible [1] - 10:18

inclined [1] - 39:6
include [1] - 29:25
included [2] - 26:7, 31:21
including [6] - 5:21, 26:12, 38:15, 54:3, 54:12, 85:2
incoherent [1] - 74:23
inconsistencies [2] - 21:23, 75:20
inconsistency [1] - 34:1
inconsistent [3] - 22:1, 22:4, 22:10
incorporate [1] - 28:13
incorrect [1] - 32:3
indefinitely [1] - 26:3
indicated [1] - 51:3
indicates [1] - 75:4
indication [1] - 20:2
indications [1] - 31:1
individual [27] - 10:24, 12:15, 12:25, 14:23, 20:23, 23:10, 23:13, 26:10, 28:24, 29:1, 30:4, 31:2, 44:10, 44:12, 44:13, 44:19, 44:21, 45:1, 45:11, 45:12, 45:15, 45:24, 46:12, 58:17, 59:9, 80:20, 82:17
individual's [2] - 29:7, 65:22
individuals [51] - 4:6, 5:20, 5:25, 6:23, 9:3, 10:7, 10:13, 18:17, 18:23, 22:14, 23:19, 24:24, 24:25, 26:8, 26:15, 27:21, 27:23, 28:3, 31:18, 32:19, 34:6, 38:9, 38:12, 39:11, 39:16, 51:19, 52:5, 53:22, 56:19, 56:24, 57:12, 58:25, 61:17, 61:24, 62:7, 63:14, 63:25, 64:4, 66:18, 66:19, 67:8, 67:13, 68:16, 68:20, 69:15, 75:16, 75:21, 79:16, 83:12, 83:16, 84:15
infer [1] - 38:16
influence [1] - 78:2
initiate [1] - 77:21
injected [1] - 74:20
injunction [14] - 40:24, 41:4, 41:7, 41:13, 41:17, 41:20, 41:22, 41:25, 42:2,

69:24, 70:15, 80:24, 81:20

**injunctions** [1] - 77:6

**injunctive** [3] - 43:9, 46:14, 76:15

**injured** [1] - 82:12

**injuries** [1] - 84:2

**injury** [7] - 33:12, 34:15, 44:13, 47:1, 51:12, 78:11, 79:9

**injury-in-fact** [1] - 78:11

**insofar** [1] - 32:18

**inspected** [4] - 23:24, 26:2, 74:6, 74:10

**inspection** [3] - 19:16, 20:5, 20:19

**instituted** [1] - 77:8

**instructive** [1] - 78:10

**insufficient** [1] - 37:14

**intended** [1] - 61:23

**intends** [1] - 32:23

**intent** [1] - 77:19

**intentionally** [1] - 31:21

**interest** [5] - 68:19, 69:21, 79:16, 83:21, 84:4

**interested** [1] - 37:11

**interpretation** [6] - 19:4, 26:5, 29:19, 57:7, 72:8, 75:18

**intervening** [1] - 42:13

**interview** [4] - 35:20, 36:18, 37:1, 37:2

**intrudes** [1] - 69:25

**intrusion** [1] - 70:3

**invalid** [1] - 81:10

**invalidate** [1] - 50:14

**invalidating** [1] - 50:25

**involved** [1] - 56:18

**involves** [1] - 5:22

**involving** [3] - 46:7, 46:9, 80:23

**irregular** [1] - 39:15

**irreparable** [8] - 33:12, 34:15, 34:17, 69:20, 70:3, 78:5, 78:6, 79:3

**Island** [1] - 59:22

**issue** [19] - 4:9, 4:21, 5:2, 6:8, 6:24, 21:12, 38:15, 40:4, 40:8, 44:19, 47:20, 48:8, 50:3, 54:10, 56:19, 62:3, 71:11, 77:7, 81:20

**issued** [4] - 5:18, 42:9, 50:24, 53:23

**issuing** [1] - 65:6

**iterations** [2] - 26:25, 27:9

**itself** [3] - 27:20, 28:1, 51:1

---

## J

**J.G.G** [1] - 79:21

**Jackson** [3] - 37:19, 38:1, 38:2

**Jackson's** [2] - 16:5, 78:8

**January** [4] - 8:14, 10:11, 34:3, 51:22

**Jawetz** [1] - 3:15

**Jessica** [1] - 35:11

**Judge** [6] - 37:19, 38:1, 78:8, 80:22

**judgment** [7] - 12:8, 39:19, 48:6, 48:7, 48:8, 51:11, 51:12

**judicial** [1] - 76:25

**July** [2] - 80:22, 85:20

**jump** [2] - 4:3, 8:2

**jumping** [3] - 22:24, 23:1, 26:21

**June** [1] - 51:23

**jurisdiction** [3] - 47:25, 82:21, 82:23

**jurisdictional** [2] - 83:1, 83:4

**Justice** [6] - 16:5, 50:9, 50:12, 51:8, 69:2, 80:10

**justification** [2] - 56:22, 83:18

**justify** [1] - 49:4

---

## K

**Karen** [1] - 3:14

**Kavanaugh's** [1] - 80:10

**Kean** [2] - 85:15, 85:20

**keep** [1] - 70:18

**key** [4] - 34:22, 35:5, 38:1, 67:1

**Kiakombua** [1] - 83:2

**kids** [2] - 79:2, 84:13

**kind** [9] - 11:10, 15:2, 18:1, 31:6, 40:21, 40:25, 52:2, 72:8, 79:8

**knowledge** [2] - 72:18, 72:20

---

## L

**lack** [1] - 48:25

**laid** [1] - 20:14

**language** [18] - 6:12, 10:23, 11:23, 14:8, 15:17, 16:3, 16:15, 32:22, 45:4, 57:17, 62:16, 62:18, 62:25, 63:19, 64:18, 65:10, 75:19, 75:22

**large** [2] - 28:3, 81:11

**last** [3] - 23:6, 31:5, 40:7

**law** [20] - 4:5, 8:10, 8:16, 8:21, 8:23, 12:7, 22:23, 32:4, 32:5, 42:11, 42:22, 46:23, 47:9, 50:17, 58:10, 66:16, 71:21, 80:14, 83:14

**lawful** [8] - 19:11, 19:15, 19:20, 36:15, 36:24, 37:6, 76:9, 84:20

**lawfully** [1] - 51:3

**Lawrence** [2] - 37:22, 78:19

**laws** [2] - 19:14, 80:5

**lawsuit** [4] - 5:19, 47:18, 47:25, 49:23

**lay** [1] - 56:8

**lays** [3] - 34:22, 35:5, 55:10

**lead** [2] - 75:10, 84:13

**leads** [1] - 74:23

**least** [4] - 27:7, 41:2, 52:21, 78:12

**leave** [1] - 81:10

**leaves** [1] - 80:13

**legal** [21] - 12:5, 12:6, 12:22, 13:8, 13:10, 14:16, 17:25, 20:7, 34:5, 49:4, 49:7, 49:19, 50:1, 58:1, 58:2, 58:7, 68:21, 69:17, 73:6, 73:8, 73:11

**legislated** [2] - 31:8, 74:16

**legislating** [2] - 57:23, 59:2

**legislative** [2] - 75:2, 75:3

**legitimate** [1] - 68:14

**length** [1] - 24:22

**lengthier** [1] - 26:22

**LI** [48] - 3:9, 3:13, 3:25, 4:12, 4:16, 5:3, 7:25, 8:12, 11:4, 11:13, 13:18, 13:21, 14:1, 14:18, 14:22, 15:19, 15:22, 15:24,

17:5, 17:12, 17:16, 18:7, 21:17, 21:24, 22:3, 22:8, 22:25, 23:5, 27:4, 27:12, 27:14, 27:17, 28:19, 29:12, 32:15, 33:6, 33:13, 33:16, 33:25, 34:14, 72:18, 72:20, 73:1, 73:3, 73:6, 73:13, 74:14, 76:1

**Li** [2] - 3:10, 4:1

**light** [3] - 45:18, 53:21, 71:19

**likely** [3] - 8:12, 32:5, 69:15

**limit** [3] - 23:19, 61:5, 84:24

**limitations** [2] - 10:4, 24:23

**limited** [7] - 35:18, 45:11, 60:11, 60:13, 63:4, 77:1, 81:25

**limiting** [1] - 61:20

**limits** [1] - 19:2

**Lindsay** [1] - 36:10

**line** [2] - 58:23, 58:25

**lines** [1] - 6:12

**listener** [4] - 16:17, 16:24, 17:4, 17:14

**lives** [1] - 84:13

**logic** [2] - 19:1, 64:5

**logical** [1] - 39:5

**look** [12] - 15:11, 16:12, 29:16, 34:2, 42:24, 49:9, 50:9, 56:6, 57:22, 59:18, 62:2, 67:22

**looking** [6] - 16:14, 17:9, 17:17, 59:23, 59:24, 68:15

**looks** [1] - 33:21

**loses** [2] - 19:11, 74:25

**lower** [1] - 67:16

---

## M

**Madsen** [2] - 71:23, 82:2

**main** [1] - 74:14

**maintenance** [1] - 20:6

**major** [1] - 67:22

**Management** [1] - 81:2

**manner** [5] - 16:19, 29:8, 65:23, 72:16, 74:1

**map** [2] - 15:17, 17:1

**maps** [1] - 15:10

**March** [6] - 8:15, 10:12, 32:9, 34:4, 77:12, 78:3

**marriage** [1] - 36:16

**Mata** [1] - 23:10

**matter** [2] - 28:10, 85:17

**maximum** [1] - 77:21

**mean** [23] - 11:2, 15:19, 24:13, 31:11, 31:12, 37:7, 38:25, 45:8, 46:25, 48:4, 48:6, 48:8, 48:9, 49:9, 49:21, 54:7, 55:20, 56:1, 59:16, 61:21, 62:13, 62:14, 71:20

**meaning** [7] - 14:10, 15:10, 19:12, 30:25, 54:5, 59:7, 72:14

**meaningful** [1] - 69:9

**meaningless** [2] - 18:17, 19:5

**means** [6] - 16:11, 24:6, 26:14, 29:13, 29:14, 68:18

**medal** [6] - 13:16, 13:18, 13:19, 13:20, 17:10, 17:11

**medals** [1] - 14:3

**medical** [2] - 79:3, 84:12

**Meetings** [1] - 79:22

**meets** [1] - 10:19

**member** [2] - 44:25, 78:12

**members** [14] - 6:20, 7:18, 8:6, 24:10, 34:18, 37:20, 37:23, 78:22, 82:8, 82:12, 83:24, 84:7, 85:1, 85:2

**memo** [6] - 34:3, 51:21, 51:22, 52:17, 53:16

**memoranda** [1] - 50:21

**memorandum** [2] - 8:14, 10:11

**memos** [3] - 56:6, 67:14, 67:16

**mentioned** [1] - 39:14

**merely** [1] - 55:15

**merit** [2] - 4:11, 46:14

**merits** [12] - 4:2, 4:3, 4:4, 7:23, 8:2, 8:12, 8:22, 44:15, 46:19, 48:1, 74:14, 83:7

**Mezei** [1] - 59:19

**microphone** [1] - 5:12

**might** [5] - 14:15,
26:21, 49:7, 69:18
**million** [2] - 38:9,
38:12
**mind** [1] - 57:24
**Mining** [1] - 80:16
**mis** [1] - 21:21
**misconduct** [1] -
13:20
**misstates** [1] - 29:5
**mistaken** [1] - 35:4
**misunderstood** [1] -
22:9
**mix** [1] - 46:5
**moment** [1] - 25:10
**money** [4] - 78:7, 79:4,
84:1, 84:14
**moreover** [1] - 56:11
**morning** [5] - 42:8,
44:7, 48:16, 53:18,
77:24
**most** [2] - 18:14,
69:15
**motion** [13] - 4:2,
4:17, 6:7, 6:9, 35:4,
40:4, 40:6, 40:25,
43:5, 48:24, 51:15,
70:16, 84:23
**motions** [1] - 3:23
**move** [4] - 25:4, 32:6,
43:6, 51:23
**moved** [1] - 77:10
**moving** [2] - 4:16,
5:23
**MR** [63] - 3:19, 5:15,
40:16, 41:14, 41:17,
42:3, 42:5, 43:25,
44:3, 44:5, 44:9,
45:8, 45:13, 45:19,
45:22, 46:12, 46:18,
46:21, 47:13, 47:16,
47:21, 48:3, 48:11,
48:14, 49:16, 50:4,
52:8, 52:10, 52:14,
53:2, 54:14, 55:5,
55:14, 55:20, 55:23,
57:18, 60:6, 60:11,
60:22, 61:3, 61:7,
61:10, 61:13, 62:23,
63:1, 63:3, 63:6,
63:17, 63:20, 64:6,
65:2, 66:1, 67:10,
68:1, 70:7, 70:9,
70:12, 70:22, 70:24,
71:1, 71:3, 71:18,
72:5
**MS** [68] - 3:9, 3:13,
3:25, 4:12, 4:16, 5:3,
5:7, 5:13, 6:15, 6:25,
7:11, 7:21, 7:24,

7:25, 8:12, 11:4,
11:13, 13:18, 13:21,
14:1, 14:18, 14:22,
15:19, 15:22, 15:24,
17:5, 17:12, 17:16,
18:7, 21:17, 21:24,
22:3, 22:8, 22:25,
23:5, 27:4, 27:12,
27:14, 27:17, 28:19,
29:12, 32:15, 33:6,
33:13, 33:16, 33:25,
34:14, 34:21, 35:1,
35:3, 36:7, 37:10,
37:17, 38:21, 38:25,
39:4, 40:13, 72:18,
72:20, 73:1, 73:3,
73:6, 73:13, 74:14,
76:1, 76:3, 76:5,
85:5
**multiple** [1] - 79:11
**must** [2] - 19:6, 77:8

**N**

**namely** [1] - 76:24
**narrow** [1] - 8:24
**narrower** [1] - 30:16
**National** [2] - 80:1,
80:15
**national** [2] - 80:24,
81:20
**nature** [2] - 12:5,
13:10
**necessarily** [1] - 31:12
**necessary** [1] - 72:1
**need** [7] - 7:12, 8:20,
22:19, 22:22, 63:25,
64:3, 79:5
**needed** [1] - 75:6
**needs** [1] - 83:6
**never** [6] - 6:5, 7:5,
12:7, 12:10, 12:14,
12:18, 73:10, 82:11,
82:14
**nevertheless** [1] -
58:21
**New** [3] - 78:8, 78:9,
83:1
**new** [3] - 31:13, 78:14,
80:12
**Nken** [1] - 79:18
**Noem** [3] - 3:5, 32:16,
80:1
**non** [1] - 4:3
**non-merits** [1] - 4:3
**noncitizen** [7] - 10:17,
20:17, 23:22, 23:23,
25:17, 26:2, 29:25
**noncitizens** [8] - 8:8,
8:24, 9:10, 10:1,

24:15, 25:16, 43:2,
57:8
**none** [1] - 36:23
**nonoverlapping** [3] -
9:23, 10:6, 24:17
**nonparties** [1] - 70:2
**normal** [1] - 84:13
**normally** [1] - 58:6
**Note** [1] - 81:2
**note** [2] - 8:3, 8:7
**noted** [2] - 76:22,
80:23
**nothing** [3] - 26:14,
30:24, 55:10
**notice** [7] - 8:16,
10:12, 32:9, 32:20,
34:4, 63:21, 65:6
**Notice** [1] - 77:13
**notion** [1] - 80:3
**notwithstanding** [2] -
45:4, 62:18
**number** [1] - 6:2

**O**

**objective** [2] - 49:9,
50:2
**objectives** [2] - 49:19,
49:20
**obvious** [1] - 18:14
**obviously** [3] - 26:19,
67:11, 77:16
**occurred** [2] - 12:8,
12:18
**occurs** [1] - 25:9
**offender's** [1] - 11:20
**Office** [1] - 81:1
**office** [1] - 44:6
**officer** [1] - 19:17
**officers** [2] - 52:18,
54:1
**officials** [3] - 50:19,
53:6, 53:13
**often** [1] - 77:24
**Olive's** [1] - 35:11
**Olympic** [3] - 13:16,
13:18, 14:3
**once** [1] - 30:21
**One** [1] - 66:9
**one** [17] - 8:3, 10:20,
21:16, 22:7, 25:9,
30:2, 33:24, 38:18,
40:21, 51:16, 57:10,
58:2, 65:2, 67:16,
69:18, 76:7, 78:12
**ones** [1] - 21:7
**open** [3] - 42:7, 42:21,
70:21
**operates** [1] - 12:21
**operation** [2] - 12:6,

42:18
**opinion** [9] - 16:5,
50:10, 50:13, 51:8,
51:11, 51:12, 70:19,
73:19, 76:22
**opportunity** [3] -
11:14, 20:18, 35:19
**opposed** [1] - 13:24
**opposing** [2] - 21:4,
22:14
**opposition** [1] - 21:9
**option** [2] - 60:18,
61:18
**options** [1] - 60:19
**order** [7] - 3:2, 12:7,
25:15, 44:16, 44:20,
82:12, 82:18
**ordinary** [1] - 80:18
**organization** [4] -
44:25, 45:9, 46:7,
47:18
**organizational** [3] -
46:5, 46:6, 84:25
**organizations** [1] -
82:10
**otherwise** [1] - 65:5
**outline** [1] - 36:21
**outlined** [3] - 35:11,
43:20, 83:25
**outset** [1] - 40:19
**outside** [1] - 64:1
**outweigh** [2] - 84:3,
84:5
**overall** [1] - 83:11
**overarching** [1] -
22:16
**overlap** [2] - 60:17,
68:9
**overlapping** [1] -
60:19
**overwhelming** [1] -
79:16
**own** [3] - 8:18, 20:8,
21:19

**P**

**p.m** [2] - 3:2, 85:8
**Pacito** [1] - 79:24
**Page** [2] - 43:5, 58:5
**paint** [1] - 56:25
**paints** [1] - 5:17
**paired** [2] - 20:1, 74:4
**papers** [6] - 14:13,
14:14, 34:11, 75:14,
82:1, 85:3
**Papu** [2] - 3:19, 40:17
**paragraph** [1] - 38:18
**Paragraph** [2] - 43:4,
78:19, 78:21

**Paragraphs** [1] -
78:20
**parlance** [1] - 24:4
**parole** [103] - 11:3,
12:15, 12:16, 12:17,
12:21, 12:24, 13:1,
13:3, 13:5, 13:7,
13:9, 14:5, 14:15,
14:22, 14:25, 15:1,
15:2, 15:5, 15:22,
15:23, 17:2, 18:5,
18:9, 18:12, 18:19,
18:20, 19:12, 19:24,
20:12, 20:20, 26:12,
26:18, 28:7, 28:23,
28:25, 29:5, 29:15,
29:22, 29:23, 30:3,
30:7, 30:8, 30:10,
30:12, 30:20, 30:22,
31:24, 32:19, 32:21,
32:24, 38:8, 38:12,
39:25, 43:2, 52:6,
53:19, 53:22, 56:18,
56:23, 56:24, 57:25,
58:14, 58:15, 59:5,
59:6, 59:15, 59:16,
60:4, 60:10, 60:25,
62:19, 62:20, 63:7,
63:12, 63:23, 64:3,
64:10, 64:11, 64:15,
64:21, 65:3, 65:7,
65:19, 66:3, 66:8,
66:10, 66:11, 66:21,
67:3, 68:17, 72:11,
72:22, 73:2, 73:4,
74:3, 74:7, 74:10,
83:19
**paroled** [91] - 4:6,
5:20, 5:24, 6:23, 9:3,
9:14, 10:6, 10:13,
10:20, 10:24, 11:3,
12:15, 12:19, 12:25,
14:23, 15:25, 16:1,
17:3, 17:6, 17:7,
17:9, 18:3, 18:11,
18:17, 18:23, 19:8,
19:10, 20:2, 20:11,
20:18, 20:24, 22:14,
23:13, 23:18, 23:24,
24:24, 24:25, 26:2,
26:7, 26:10, 27:21,
27:22, 28:3, 28:4,
28:6, 28:14, 28:23,
29:1, 29:7, 29:14,
30:4, 31:2, 31:17,
32:1, 34:5, 34:9,
39:11, 39:16, 43:8,
48:22, 51:18, 52:6,
52:19, 54:17, 55:9,
56:14, 57:14, 58:16,
58:17, 58:20, 58:24,

58:25, 60:5, 60:25, 62:7, 62:12, 62:19, 63:2, 64:1, 64:3, 64:16, 64:19, 66:20, 67:8, 67:9, 72:15, 74:24, 75:15, 75:21, 83:12, 83:15

**parolee** [3] - 58:5, 65:19, 66:12

**parolees** [5] - 32:24, 68:6, 74:18, 75:9, 77:17

**paroling** [1] - 54:15

**part** [4] - 17:24, 43:10, 46:25, 68:19

**particular** [4] - 20:7, 20:15, 43:17, 78:2

**particularly** [1] - 53:14

**parties** [5] - 71:5, 71:9, 71:11, 71:22, 81:21

**parts** [2] - 81:10, 81:11

**passed** [1] - 54:9

**past** [7] - 12:1, 16:1, 16:13, 17:3, 17:20, 72:22, 73:21

**path** [1] - 51:6

**patience** [1] - 76:5

**pending** [2] - 3:23, 67:14

**people** [35] - 19:8, 20:11, 24:8, 24:20, 25:1, 25:11, 28:11, 28:14, 30:16, 30:21, 31:25, 34:9, 43:8, 54:11, 54:21, 57:14, 60:4, 60:24, 61:5, 62:12, 62:18, 64:21, 67:6, 67:8, 74:24, 75:4, 75:8, 75:16, 77:20, 79:10, 80:4, 81:25, 84:4, 84:18

**per** [4] - 10:15, 10:16, 21:2, 47:9

**percent** [1] - 69:5

**perfect** [5] - 11:24, 16:16, 17:3, 17:19, 73:19

**period** [9] - 13:2, 13:5, 15:1, 15:6, 58:21, 59:12, 59:14, 63:4, 63:5

**permanent** [1] - 36:16

**permissible** [2] - 43:25, 76:21

**permission** [3] - 20:5, 24:11, 74:6

**permit** [3] - 15:4, 15:5, 62:11

**permits** [2] - 62:14

**persecution** [2] - 35:25, 37:4

**person** [15] - 13:1, 13:8, 14:25, 15:25, 18:3, 19:11, 19:19, 20:21, 29:14, 37:5, 64:10, 72:12, 72:15, 74:2, 74:5

**person's** [3] - 17:14, 18:12, 19:20

**Personnel** [1] - 81:2

**pertains** [1] - 43:17

**petitioner** [1] - 23:13

**Philadelphia** [1] - 79:22

**phrase** [2] - 11:8, 18:10

**physically** [2] - 10:21, 58:20

**PI** [1] - 70:15

**picked** [1] - 84:10

**picture** [3] - 5:17, 57:1, 58:17

**piece** [2] - 31:6, 73:18

**place** [5] - 12:14, 12:18, 14:2, 25:21, 73:11

**placed** [3] - 19:2, 69:16, 78:13

**places** [2] - 8:4, 79:17

**plain** [5] - 9:2, 10:23, 18:13, 26:1, 75:22

**plaintiff** [14] - 41:10, 45:1, 45:12, 45:15, 45:24, 46:10, 46:13, 49:6, 49:21, 54:13, 57:1, 78:12, 82:7, 82:11

**plaintiffs** [44] - 3:10, 3:14, 3:15, 3:16, 3:24, 4:1, 5:8, 6:2, 6:10, 6:20, 7:17, 8:12, 8:20, 8:22, 27:20, 32:4, 36:21, 40:23, 41:19, 44:11, 44:12, 44:13, 45:2, 49:12, 50:23, 51:17, 51:23, 53:15, 54:5, 55:25, 56:13, 57:17, 57:5, 57:11, 65:18, 69:13, 69:20, 71:12, 72:2, 75:13, 80:11, 80:20, 82:16

**plaintiffs'** [24] - 3:7, 7:13, 11:17, 21:11, 23:8, 24:10, 25:7, 27:10, 28:22, 34:18, 37:20, 37:23, 47:7, 57:7, 57:16, 78:22,

79:20, 82:7, 82:10, 82:24, 83:24, 84:7, 84:25, 85:1

**plus** [1] - 6:18

**podium** [1] - 3:8

**point** [41] - 5:16, 15:21, 18:7, 18:20, 20:15, 21:3, 22:16, 23:6, 24:13, 25:21, 26:17, 27:13, 28:22, 31:22, 32:10, 34:21, 38:1, 38:5, 38:24, 51:17, 53:3, 54:24, 59:3, 66:4, 66:8, 67:1, 68:25, 69:4, 69:21, 70:20, 73:14, 73:15, 75:1, 75:11, 76:8, 76:17, 79:11, 80:7, 81:12, 82:4

**pointed** [1] - 69:2

**pointing** [1] - 22:11

**points** [2] - 9:18, 66:24

**policies** [4] - 21:1, 50:20, 70:2, 77:4

**policy** [10] - 28:9, 28:10, 28:16, 55:13, 55:14, 55:17, 55:19, 55:21, 79:10, 80:4

**poof** [1] - 15:3

**popped** [1] - 23:3

**population** [6] - 69:5, 77:17, 77:20, 78:14, 78:17, 78:23

**port** [6] - 9:4, 20:19, 23:23, 24:9, 48:22, 59:10

**portion** [1] - 56:14

**ports** [3] - 28:5, 43:3, 43:8

**position** [24] - 18:19, 21:14, 28:22, 32:12, 33:23, 34:17, 41:10, 42:20, 43:14, 44:9, 45:7, 45:16, 47:21, 48:17, 58:1, 58:2, 60:12, 62:13, 62:17, 63:9, 67:21, 73:12, 76:19, 76:23

**positive** [1] - 36:18

**possible** [3] - 77:22, 79:11, 80:5

**potentially** [5] - 25:2, 35:23, 36:15, 67:5, 68:17

**powerful** [1] - 66:17

**PowerPoint** [1] - 10:16

**practice** [1] - 7:4

**practiced** [1] - 6:3

**practicing** [1] - 6:3

**prayer** [2] - 42:24, 43:3

**pre** [3] - 39:13, 50:21, 71:20

**pre-CASA** [1] - 71:20

**pre-existed** [2] - 39:13, 50:21

**precedence** [1] - 41:6

**precedent** [12] - 41:3, 41:21, 42:7, 44:24, 45:3, 47:4, 71:15, 71:16, 71:19, 80:8, 80:15, 82:22

**precisely** [1] - 32:10

**preclude** [1] - 61:21

**precludes** [1] - 32:13

**precluding** [1] - 56:23

**predecessors** [1] - 52:4

**preliminarily** [1] - 80:12

**preliminary** [1] - 70:15

**premature** [1] - 38:8

**premised** [1] - 32:3

**prepared** [2] - 4:1, 4:3

**presence** [2] - 13:2, 14:25

**present** [16] - 9:15, 10:21, 11:24, 12:2, 12:13, 15:15, 16:16, 17:19, 17:21, 24:6, 25:12, 25:23, 30:1, 57:12, 73:19, 73:21

**press** [1] - 49:12

**pressed** [1] - 49:11

**presume** [1] - 39:21

**presupposes** [1] - 47:2

**pretty** [1] - 68:12

**prevail** [1] - 8:22

**prevent** [1] - 4:24

**preventing** [1] - 77:3

**prevents** [1] - 70:1

**previous** [1] - 11:20

**previously** [10] - 17:7, 20:11, 20:23, 42:12, 52:6, 52:12, 54:9, 60:25, 67:6, 77:18

**primary** [2] - 51:21, 61:25

**principle** [1] - 47:8

**prioritization** [1] - 50:14

**priority** [1] - 67:16

**problem** [5] - 5:14, 22:2, 22:4, 47:7, 50:8

**procedure** [7] - 36:2, 54:2, 61:14, 64:2,

65:12

**procedures** [15] - 8:18, 36:6, 50:25, 52:5, 53:9, 54:22, 63:16, 64:8, 64:12, 64:14, 64:17, 64:20, 69:9, 72:12

**proceed** [4] - 44:19, 50:18, 60:14, 60:20

**proceeding** [2] - 63:21, 65:15

**proceedings** [15] - 5:23, 34:20, 35:6, 35:12, 35:13, 35:16, 62:11, 62:21, 67:7, 67:8, 68:25, 69:16, 77:21, 85:17

**PROCEEDINGS** [1] - 3:1

**process** [14] - 5:25, 19:4, 24:8, 24:12, 24:20, 25:7, 26:4, 31:10, 31:14, 36:3, 37:8, 46:25, 69:18, 84:19

**progressive** [1] - 24:6

**prohibited** [3] - 40:24, 41:7, 42:2

**promises** [1] - 84:17

**promptly** [1] - 77:20

**promulgated** [2] - 54:9, 62:5

**proposition** [1] - 71:25

**proscribed** [1] - 80:20

**prosecution** [1] - 52:19

**prosecutorial** [1] - 50:15

**protect** [1] - 26:18

**protected** [2] - 18:23, 35:25

**protection** [2] - 18:15, 18:18

**protections** [2] - 26:6, 31:20

**prove** [3] - 10:21, 20:18, 20:23

**provide** [9] - 6:9, 31:14, 43:23, 45:23, 48:1, 72:2, 82:4, 82:13, 82:19

**provided** [7] - 23:11, 33:7, 33:8, 37:18, 74:19, 75:2, 84:1

**provides** [1] - 65:14

**proving** [1] - 8:13

**provision** [20] - 11:1, 12:4, 14:9, 16:8, 23:17, 23:21, 26:11,

26:16, 48:20, 56:7, 56:8, 58:11, 58:13, 60:9, 61:2, 64:6, 65:10, 68:4, 68:5, 68:11
**provisions** [6] - 19:5, 22:13, 25:4, 25:6, 42:18, 51:4
**public** [2] - 79:16, 84:3
**pull** [2] - 21:7, 75:6
**pulling** [1] - 16:15
**purport** [1] - 10:12
**purported** [2] - 49:3, 72:21
**purporting** [1] - 72:21
**purports** [2] - 23:17, 32:18
**purpose** [4] - 26:17, 31:25, 64:18, 74:25
**purposes** [16] - 11:19, 14:9, 16:7, 26:4, 28:25, 31:4, 31:11, 41:4, 41:22, 42:1, 51:10, 52:20, 55:4, 58:7, 60:13, 69:12
**pursuant** [4] - 5:25, 28:7, 40:9, 41:7
**pursue** [2] - 49:19, 49:20
**put** [8] - 3:11, 9:1, 27:13, 32:10, 32:23, 38:5, 73:14, 75:14
**puts** [1] - 76:13

**Q**

**qualitatively** [1] - 6:17
**questions** [6] - 32:7, 32:8, 38:21, 38:24, 40:18, 74:23
**quibble** [1] - 82:2
**quick** [1] - 76:3
**quickly** [4] - 77:7, 79:6, 79:10, 80:5
**quo** [1] - 7:17
**quote** [18] - 9:11, 11:18, 12:6, 12:13, 16:7, 19:15, 20:18, 23:22, 25:15, 26:24, 28:10, 29:1, 29:3, 29:4, 29:7, 43:1, 60:8, 65:20
**quotes** [1] - 75:6
**quoting** [1] - 8:9

**R**

**raise** [1] - 46:2
**raised** [6] - 5:1, 36:17, 44:5, 50:22, 79:8,

82:25
**Ramnitz** [1] - 3:21
**rather** [2] - 65:15, 81:9
**rationale** [1] - 56:9
**read** [14] - 15:19, 16:5, 16:10, 17:24, 18:11, 20:2, 25:13, 27:7, 44:23, 45:3, 53:5, 62:15, 64:22, 70:5
**reading** [14] - 11:2, 11:17, 19:9, 21:11, 22:12, 25:7, 29:19, 57:7, 57:17, 60:10, 60:25, 63:9, 63:14, 67:5
**reads** [2] - 26:6, 31:20
**really** [7] - 26:13, 56:12, 57:4, 57:22, 61:11, 66:16, 77:7
**reason** [4] - 52:7, 54:18, 57:3, 73:16
**reasoning** [2] - 33:7, 38:18
**reasons** [4] - 52:20, 54:14, 66:9, 66:22
**rebuttal** [1] - 74:15
**recent** [9] - 7:5, 11:7, 32:13, 32:15, 51:17, 54:21, 80:21, 80:25
**recently** [2] - 42:9, 69:22
**recognition** [1] - 34:7
**recognized** [1] - 34:2
**record** [4] - 3:4, 3:8, 3:12, 8:3
**redressability** [10] - 5:2, 5:10, 7:10, 39:2, 39:20, 40:20, 48:15, 49:1, 51:10, 51:13
**redressed** [1] - 47:1
**refer** [5] - 17:19, 19:10, 20:3, 20:6, 73:20
**referred** [1] - 52:16
**referring** [4] - 27:5, 41:15, 66:18, 66:19
**refers** [3] - 11:8, 55:18
**reg** [3] - 22:5, 68:2
**regard** [3] - 20:12, 40:7, 84:19
**regarding** [2] - 55:23, 65:9
**regardless** [4] - 10:6, 68:3, 72:15, 74:10
**regards** [4] - 76:12, 77:12, 78:5, 82:21
**Register** [1] - 77:13
**regs** [1] - 76:10
**regular** [4] - 5:23, 34:23, 35:6, 35:12

**regulation** [14] - 4:14, 6:11, 22:17, 28:2, 49:18, 54:10, 56:4, 56:10, 59:3, 62:3, 62:14, 63:23, 65:3, 66:14
**regulation/directive** [1] - 54:8
**regulations** [36] - 4:23, 4:25, 6:6, 6:16, 6:19, 6:24, 6:25, 7:4, 7:9, 8:4, 20:9, 21:2, 21:3, 21:5, 21:8, 21:13, 21:19, 21:21, 22:1, 22:6, 22:11, 22:15, 22:20, 26:25, 27:9, 27:15, 39:12, 39:17, 40:1, 40:2, 40:7, 40:9, 76:9, 80:18, 83:9
**regulatory** [3] - 52:25, 58:6, 58:8
**reinforce** [1] - 25:6
**reinforcing** [1] - 53:6
**reiterate** [1] - 74:19
**rejected** [5] - 19:6, 51:9, 79:13, 80:3, 83:4
**relate** [1] - 54:8
**related** [1] - 32:21
**relatedly** [1] - 82:14
**relates** [1] - 55:1
**release** [1] - 59:17
**released** [3] - 59:11, 59:13, 59:21
**relevance** [1] - 21:22
**relevant** [5] - 34:10, 51:9, 70:16, 82:22, 83:21
**reliance** [1] - 83:21
**relied** [1] - 38:2
**relief** [51] - 6:9, 7:11, 38:14, 39:7, 39:20, 41:10, 41:17, 42:25, 43:3, 43:9, 43:15, 43:22, 44:10, 44:20, 45:14, 46:8, 46:14, 46:16, 46:18, 47:2, 47:20, 48:2, 49:14, 70:6, 70:11, 71:4, 71:6, 71:7, 71:17, 71:25, 72:2, 76:15, 76:24, 77:1, 77:3, 77:10, 80:13, 80:14, 81:15, 81:22, 81:23, 81:25, 82:5, 82:6, 82:7, 82:13, 82:19, 84:24
**relieve** [1] - 7:12
**rely** [2] - 51:22, 51:25

**remain** [2] - 6:6, 58:22
**remains** [2] - 6:13, 26:3
**remedies** [1] - 51:11
**remedy** [8] - 45:22, 45:23, 46:20, 46:25, 47:14, 48:6, 48:9, 71:22
**remind** [1] - 54:11
**reminding** [1] - 53:6
**removal** [142] - 4:6, 5:21, 5:23, 5:25, 8:17, 8:25, 9:6, 9:17, 9:20, 9:25, 10:2, 10:7, 10:10, 10:13, 10:25, 18:10, 18:11, 18:16, 18:21, 18:24, 18:25, 19:4, 19:9, 20:8, 20:9, 20:17, 20:25, 22:12, 22:15, 23:9, 23:14, 23:17, 23:19, 24:2, 24:7, 24:16, 25:3, 25:8, 25:9, 26:5, 26:7, 26:11, 26:15, 26:16, 29:17, 29:21, 30:17, 30:19, 30:23, 31:4, 31:8, 31:14, 31:24, 32:2, 32:19, 32:25, 34:6, 34:10, 34:18, 34:19, 35:6, 35:12, 35:13, 35:16, 36:2, 37:7, 37:8, 38:13, 39:12, 39:17, 39:25, 43:2, 43:7, 43:18, 44:3, 44:16, 44:18, 44:20, 48:21, 51:18, 52:5, 52:19, 53:8, 53:10, 53:14, 53:17, 53:23, 54:2, 54:3, 54:16, 54:22, 55:9, 57:9, 60:16, 60:20, 60:24, 61:17, 61:24, 62:11, 62:21, 63:12, 63:16, 63:21, 64:2, 64:8, 64:12, 64:14, 64:16, 64:20, 65:7, 67:7, 67:12, 67:18, 67:24, 69:11, 69:12, 74:17, 74:21, 74:25, 75:11, 75:15, 75:22, 76:20, 77:19, 77:21, 78:13, 78:15, 78:16, 78:22, 78:25, 79:1, 83:13, 83:17, 83:20, 84:9, 84:18, 84:21
**removals** [1] - 40:9
**remove** [5] - 6:23, 28:3, 73:11, 77:19,

79:10
**removed** [3] - 30:6, 61:5, 79:17
**removing** [3] - 39:16, 80:4, 84:4
**renders** [2] - 18:15, 19:5
**renege** [1] - 84:17
**repeat** [3] - 14:17, 14:19, 27:4
**repeatedly** [2] - 28:23, 74:16
**reply** [5] - 23:8, 26:22, 27:3, 27:7, 39:15
**request** [2] - 33:1, 84:22
**requested** [1] - 38:14
**require** [4] - 27:21, 34:1, 37:24, 60:9
**required** [4] - 21:19, 27:24, 28:17, 33:21
**requirement** [3] - 21:15, 22:5, 33:23
**requirements** [1] - 10:19
**requires** [2] - 20:16, 34:11
**rescinded** [3] - 13:14, 13:24, 16:21
**resident** [1] - 36:16
**residing** [1] - 26:3
**respect** [4] - 5:9, 43:15, 49:14, 56:5
**respectfully** [1] - 84:22
**respond** [5] - 4:19, 7:2, 34:14, 65:25, 73:24
**response** [8] - 5:1, 5:2, 11:5, 11:12, 36:1, 37:12, 65:17, 72:6
**responsibility** [1] - 21:18
**rest** [1] - 17:22
**restart** [1] - 55:3
**restored** [2] - 59:5, 66:13
**result** [2] - 80:18, 83:14
**return** [1] - 69:6
**returned** [4] - 35:23, 36:8, 37:3, 58:15
**returns** [1] - 7:16
**reverse** [1] - 16:12
**reverts** [3] - 29:2, 29:6, 65:20
**review** [6] - 43:17, 43:20, 43:21, 45:12, 76:25, 82:24

**revisit** [1] - 74:12
**revocated** [2] - 72:11, 73:2
**revocation** [6] - 53:18, 56:18, 72:10, 72:17, 72:23, 72:25
**revoked** [8] - 13:13, 13:24, 16:21, 66:12, 68:17, 73:3, 73:4, 73:5
**revoking** [1] - 53:22
**Rights** [1] - 3:5
**risk** [3] - 78:22, 78:25, 84:9
**RMR** [2] - 85:15, 85:20
**Road** [6] - 37:15, 45:6, 78:8, 78:9, 83:1
**rule** [10] - 44:14, 46:14, 55:8, 55:11, 56:9, 56:15, 56:16, 62:5, 80:12, 80:19
**rules** [3] - 53:14, 53:20, 53:21
**ruling** [4] - 33:5, 33:6, 39:8, 47:2

## S

**Salas** [2] - 37:22, 78:20
**SANDHU** [62] - 3:19, 40:16, 41:14, 41:17, 42:3, 42:5, 43:25, 44:3, 44:5, 44:9, 45:8, 45:13, 45:19, 45:22, 46:12, 46:18, 46:21, 47:13, 47:16, 47:21, 48:3, 48:11, 48:14, 49:16, 50:4, 52:8, 52:10, 52:14, 53:2, 54:14, 55:5, 55:14, 55:20, 55:23, 57:18, 60:6, 60:11, 60:22, 61:3, 61:7, 61:10, 61:13, 62:23, 63:1, 63:3, 63:6, 63:17, 63:20, 64:6, 65:2, 66:1, 67:10, 68:1, 70:7, 70:9, 70:12, 70:22, 70:24, 71:1, 71:3, 71:18, 72:5
**Sandhu** [2] - 3:20, 40:17
**saw** [1] - 25:10
**scenario** [1] - 50:11
**scheme** [1] - 31:19
**school** [2] - 79:2, 84:13
**scope** [4] - 32:25, 42:10, 67:20, 71:17

**se** [1] - 47:9
**Second** [2] - 58:4, 58:19
**second** [8] - 9:13, 9:16, 9:19, 24:21, 24:24, 61:2, 76:12, 83:7
**secondly** [2] - 56:6, 82:14
**Secretary** [4] - 60:14, 60:19, 61:15, 65:13
**Section** [19] - 20:10, 25:14, 41:4, 41:15, 42:11, 44:1, 44:11, 45:25, 47:14, 48:19, 48:21, 50:6, 57:8, 59:4, 65:18, 69:11, 76:25, 81:5, 81:14
**section** [1] - 18:1
**see** [4] - 9:8, 21:6, 30:13, 69:23
**seek** [1] - 44:15
**seeking** [5] - 32:12, 40:24, 41:19, 43:11
**seeks** [1] - 41:10
**seem** [4] - 16:19, 36:4, 48:19, 64:5
**sees** [1] - 34:24
**sense** [9] - 12:11, 31:20, 57:15, 58:16, 65:1, 65:8, 69:15, 73:10, 75:18
**sentence** [14] - 11:18, 11:20, 12:12, 14:8, 14:10, 15:13, 16:7, 16:8, 16:11, 16:12, 72:9, 73:9, 73:10
**separate** [8] - 9:23, 21:15, 22:6, 23:10, 33:23, 60:15, 70:24, 70:25
**served** [1] - 28:25
**serving** [1] - 18:21
**set** [9] - 51:6, 51:20, 56:9, 62:3, 69:22, 77:3, 80:12, 81:15, 84:8
**several** [1] - 12:23
**shall** [5] - 29:8, 58:15, 59:5, 65:22, 66:12
**short** [1] - 63:4
**show** [2] - 44:13, 71:13
**shown** [3] - 21:6, 78:12, 83:5
**side** [1] - 68:15
**similar** [4] - 31:6, 39:19, 50:11, 50:22
**similarly** [1] - 20:10
**simply** [7] - 5:16,

**12:20, 18:20, 39:12, 53:6, 75:22, 84:3
**single** [1] - 82:17
**sit** [1] - 39:1
**situation** [8] - 7:16, 12:11, 13:24, 41:13, 51:14, 60:22, 64:15, 67:18
**situations** [1] - 65:14
**slide** [2] - 29:17, 30:13
**slides** [2] - 21:6, 25:5
**sole** [1] - 5:9
**someone** [12] - 12:19, 18:8, 19:20, 20:4, 23:25, 24:10, 25:22, 31:22, 54:24, 59:11, 59:20, 59:24, 63:11, 64:15, 64:18
**sometimes** [1] - 49:3
**somewhere** [1] - 35:24
**soon** [1] - 66:11
**sorry** [14] - 5:13, 22:24, 22:25, 27:4, 34:24, 42:17, 48:16, 54:16, 58:24, 66:10, 68:12, 73:4, 76:3
**sort** [10] - 39:5, 51:6, 51:13, 55:25, 56:16, 58:8, 59:11, 60:16, 60:19, 71:21
**sought** [1] - 52:17
**sounds** [1] - 43:9
**speaking** [4] - 33:11, 37:9, 40:14, 55:15
**specific** [19] - 6:7, 7:14, 11:11, 15:9, 15:17, 38:21, 44:16, 44:21, 45:14, 49:13, 52:15, 56:9, 59:7, 60:15, 61:16, 65:12, 65:14, 71:8, 72:2
**specifically** [13] - 12:5, 14:1, 23:10, 41:18, 44:11, 52:24, 67:8, 70:19, 74:21, 75:3, 76:21, 76:24, 82:1
**specified** [1] - 65:5
**specifies** [1] - 8:23
**square** [3] - 44:23, 62:16, 63:19
**stand** [5] - 21:4, 32:4, 58:25, 74:18, 75:7
**standard** [1] - 34:19
**standing** [31] - 29:3, 29:6, 37:9, 37:14, 44:24, 44:25, 45:4, 45:21, 46:3, 46:6, 46:8, 46:11, 47:8,

**47:10, 47:11, 47:24, 48:25, 49:6, 49:10, 49:21, 50:2, 58:2, 58:17, 59:24, 65:21, 66:5, 71:13, 82:9
**stands** [2] - 27:19, 59:9
**start** [6] - 4:19, 5:6, 7:20, 7:23, 7:25, 10:10
**started** [1] - 72:7
**starting** [3] - 3:7, 8:23, 64:2
**state** [1] - 3:8
**States** [17] - 9:4, 11:16, 19:16, 19:25, 20:4, 23:23, 24:1, 29:10, 30:1, 30:2, 37:6, 50:10, 57:10, 57:13, 59:1, 65:24, 74:2
**states** [1] - 80:17
**statistics** [1] - 69:4
**status** [32] - 7:17, 12:24, 13:1, 13:9, 14:23, 15:20, 17:2, 17:15, 18:5, 19:11, 19:20, 19:25, 20:7, 20:13, 20:20, 20:22, 25:22, 29:2, 36:16, 36:23, 36:24, 37:6, 58:1, 59:5, 59:23, 65:20, 66:13, 69:17, 72:14, 73:12, 74:8, 74:11
**statuses** [1] - 84:20
**statute** [79] - 8:17, 9:3, 9:7, 9:9, 10:15, 10:16, 10:23, 11:17, 18:14, 19:4, 21:8, 21:9, 21:10, 22:12, 22:17, 22:18, 23:9, 23:21, 24:2, 25:8, 26:6, 26:14, 27:20, 27:24, 28:12, 28:13, 28:17, 28:23, 29:5, 29:17, 29:22, 29:24, 30:8, 30:10, 30:13, 30:15, 30:20, 30:25, 31:19, 31:20, 39:10, 39:18, 39:23, 41:5, 41:11, 41:23, 43:16, 43:21, 43:24, 49:18, 54:10, 55:18, 58:9, 58:12, 62:11, 62:14, 62:15, 62:18, 62:25, 63:19, 63:25, 64:18, 64:22, 64:23, 65:16, 65:22, 66:3, 66:8, 66:21, 67:3, 74:4,

**74:24, 75:19, 75:22, 76:20, 83:9, 83:10
**statutes** [2] - 8:4, 82:22
**statutorily** [2] - 9:25, 81:23
**statutory** [14] - 24:3, 25:25, 31:18, 42:18, 51:4, 52:25, 57:17, 58:8, 61:18, 62:6, 62:16, 66:16, 72:8, 83:18
**stay** [18] - 17:20, 32:12, 32:20, 33:3, 38:17, 41:7, 42:2, 43:5, 43:6, 43:11, 51:23, 56:13, 70:4, 70:16, 71:11, 81:15, 84:23
**stayed** [2] - 32:18, 39:9
**staying** [1] - 57:4
**stays** [2] - 6:8, 7:16
**steer** [1] - 9:2
**stem** [1] - 6:21
**stemming** [1] - 7:14
**Step** [2] - 11:19, 12:3
**steps** [1] - 39:24
**still** [18] - 6:23, 12:25, 14:16, 14:23, 14:24, 16:13, 17:6, 18:2, 18:3, 18:4, 50:16, 50:19, 59:13, 63:15, 66:23, 72:7, 72:13, 80:11
**stood** [1] - 77:14
**stop** [1] - 12:18
**stopped** [1] - 59:10
**stops** [1] - 12:16
**story** [2] - 35:11, 36:10
**straight** [2] - 9:7, 70:18
**stream** [1] - 71:21
**strip** [1] - 84:18
**strip-down** [1] - 84:18
**stripped** [1] - 13:20
**strive** [1] - 8:7
**strong** [2] - 68:6, 68:19
**structurally** [1] - 57:15
**structure** [3] - 9:8, 24:14, 83:11
**subject** [33] - 8:25, 9:5, 9:20, 10:4, 18:25, 20:24, 22:15, 23:14, 23:18, 24:15, 24:23, 25:3, 26:10, 30:6, 30:16, 30:19, 30:22, 31:23, 32:19,

34:5, 38:11, 39:25, 57:9, 62:21, 63:11, 63:16, 64:16, 64:19, 67:6, 75:21, 78:15, 84:9, 84:18

**subjected** [8] - 20:16, 35:13, 64:11, 78:24, 78:25, 83:12, 83:16, 83:19

**subjecting** [4] - 5:20, 34:8, 39:11, 52:5

**subjects** [2] - 56:14, 67:5

**submit** [5] - 7:18, 35:8, 37:17, 38:3, 48:11

**submitted** [3] - 11:15, 37:21, 64:11

**subsets** [1] - 30:16

**subsidiary** [1] - 56:1

**substantial** [1] - 79:18

**succeed** [3] - 8:13, 32:5, 44:15

**suddenly** [2] - 13:5, 15:6

**suffering** [1] - 84:6

**sufficient** [5] - 36:3, 36:7, 39:20, 69:19, 70:3

**suggest** [1] - 63:9

**suggesting** [5] - 22:2, 41:3, 41:6, 41:25, 67:25

**suggests** [2] - 15:12, 41:12

**suit** [1] - 47:19

**summary** [1] - 19:3

**SUNG** [21] - 5:7, 5:13, 5:15, 6:15, 6:25, 7:11, 7:21, 7:24, 34:21, 35:1, 35:3, 36:7, 37:10, 37:17, 38:21, 38:25, 39:4, 40:13, 76:3, 76:5, 85:5

**Sung** [4] - 3:13, 4:2, 5:3, 5:7

**supervise** [1] - 78:2

**Supp** [3] - 79:22, 79:24, 80:1

**supplemental** [1] - 11:14

**support** [6] - 22:12, 24:25, 26:25, 29:18, 36:4, 39:20

**supports** [6] - 11:16, 19:9, 21:11, 22:14, 24:17, 27:9

**suppose** [1] - 15:3

**Supreme** [19] - 11:7,

11:18, 13:15, 14:7, 15:9, 16:4, 16:23, 32:13, 33:2, 33:7, 38:17, 58:9, 58:23, 59:18, 71:15, 79:18, 80:24, 81:17, 82:5

**surviving** [1] - 16:9

**Svitlana** [6] - 38:6, 38:7, 38:17, 53:19, 56:17, 68:18

**sworn** [2] - 37:24, 37:25

**syllabus** [1] - 17:17

**system** [7] - 12:22, 43:18, 77:6, 81:6, 81:8, 81:10, 81:14

**system-wide** [1] - 77:6

**systematic** [2] - 5:21, 44:17

## T

**Tabaddor** [2] - 34:22, 35:1

**table** [1] - 3:21

**tactics** [1] - 6:4

**tailor** [2] - 71:4, 71:22

**talks** [1] - 58:10

**target** [2] - 75:15, 77:17

**targeted** [1] - 77:18

**temporal** [1] - 11:10

**temporary** [3] - 58:21, 59:12, 59:16

**tense** [12] - 11:11, 11:24, 15:10, 15:18, 16:16, 16:24, 17:3, 17:8, 17:14, 17:19, 24:6, 73:19

**term** [8] - 8:9, 20:1, 29:24, 57:20, 57:21, 59:7, 61:25, 62:9

**terminate** [4] - 18:20, 63:23, 64:21, 65:7

**terminated** [23] - 11:3, 12:16, 12:25, 13:13, 14:5, 14:15, 14:22, 15:15, 16:20, 19:12, 29:15, 30:9, 30:22, 32:24, 52:7, 60:10, 61:1, 62:19, 62:20, 63:12, 65:19, 72:16

**terminates** [4] - 64:3, 64:9, 64:14, 66:11

**terminating** [1] - 56:24

**termination** [13] - 8:16, 10:12, 13:9, 32:9, 32:17, 38:8, 65:3, 72:14, 72:17,

72:23, 73:7, 73:9, 78:4

**terminations** [1] - 32:21

**terminology** [1] - 8:3

**terms** [7] - 8:8, 19:13, 33:21, 55:15, 65:9, 67:19, 68:19

**Texas** [1] - 50:10

**text** [10] - 9:2, 9:9, 10:15, 18:13, 19:5, 24:3, 26:1, 28:12, 82:21, 83:11

**THE** [130] - 3:11, 3:17, 3:22, 4:8, 4:13, 4:18, 5:5, 5:11, 5:14, 6:11, 6:22, 7:2, 7:19, 7:22, 8:11, 11:2, 11:5, 13:11, 13:19, 13:22, 14:12, 14:21, 15:8, 15:20, 15:23, 16:14, 17:8, 17:13, 18:6, 21:12, 21:22, 21:25, 22:4, 22:24, 23:1, 26:20, 27:6, 27:13, 27:16, 28:18, 29:11, 32:8, 33:4, 33:11, 33:15, 33:19, 34:13, 34:16, 34:24, 35:2, 35:22, 37:9, 37:11, 38:20, 38:23, 39:3, 40:12, 40:14, 40:21, 41:16, 41:18, 42:4, 43:13, 44:2, 44:4, 44:8, 44:22, 45:9, 45:17, 45:20, 46:4, 46:16, 46:20, 46:24, 47:15, 47:17, 47:23, 48:4, 48:13, 49:2, 49:17, 52:2, 52:9, 52:11, 52:23, 54:4, 54:19, 55:12, 55:17, 55:22, 57:6, 60:1, 60:8, 60:21, 60:23, 61:4, 61:9, 61:11, 62:10, 62:24, 63:2, 63:5, 63:8, 63:18, 63:24, 64:7, 65:17, 67:4, 67:20, 70:5, 70:8, 70:10, 70:17, 70:23, 70:25, 71:2, 71:14, 72:4, 72:6, 72:19, 72:25, 73:2, 73:4, 73:8, 74:13, 75:24, 76:2, 76:4, 85:4, 85:6

**themselves** [1] - 35:8

**then-Judge** [2] - 38:1, 78:8

**therefore** [4] - 10:23,

12:11, 18:22, 63:15

**they've** [4] - 20:4, 25:22, 62:8, 74:19

**third** [2] - 56:11, 77:7

**thousands** [4] - 43:8, 56:19, 67:6, 68:16

**three** [10] - 4:20, 5:18, 6:8, 6:18, 6:21, 8:13, 27:19, 39:7, 59:21, 83:17

**threshold** [10] - 4:8, 5:6, 7:20, 29:3, 29:6, 40:22, 58:3, 59:24, 65:21, 66:6

**Thuraissigiam** [1] - 69:1

**Tim** [1] - 3:21

**timeline** [3] - 51:17, 51:20, 51:25

**timeliness** [1] - 77:7

**tip** [1] - 79:14

**title** [2] - 9:8, 24:14

**titled** [1] - 85:17

**Toczylowski** [1] - 36:11

**today** [2] - 40:10, 76:11

**Tom** [1] - 3:15

**took** [1] - 76:19

**totally** [1] - 73:16

**touches** [2] - 12:2, 17:21

**toward** [2] - 36:24, 37:5

**TPS** [1] - 80:1

**track** [1] - 52:22

**transcript** [1] - 85:16

**transcription** [1] - 85:16

**treat** [1] - 31:17

**treated** [5] - 12:9, 29:16, 31:2, 31:23, 62:8, 66:7

**treatment** [2] - 79:3, 84:12

**tried** [1] - 77:14

**trouble** [1] - 61:11

**true** [12] - 11:9, 16:18, 16:25, 17:6, 17:23, 18:3, 30:7, 50:4, 73:23, 74:1, 74:9, 85:16

**truly** [1] - 26:13

**Trump** [6] - 79:21, 79:24, 80:13, 80:25, 81:18, 82:5

**trumps** [1] - 80:6

**try** [3] - 9:1, 17:18, 31:17

**trying** [11] - 15:8,

15:17, 21:20, 32:22, 50:7, 57:2, 63:18, 64:17, 70:18, 81:7, 84:17

**Tumlin** [1] - 3:14

**turn** [2] - 16:19, 33:20

**turns** [1] - 19:18

**two** [20] - 4:23, 8:24, 9:9, 9:22, 10:5, 10:19, 10:20, 10:22, 24:16, 28:3, 53:14, 54:14, 55:7, 57:8, 57:12, 59:20, 61:1, 66:9, 66:11, 75:9

**type** [3] - 43:22, 45:10, 45:21

**types** [4] - 47:5, 47:11, 79:13, 83:4

**typical** [1] - 49:3

## U

**U.S** [20] - 9:11, 9:24, 10:22, 19:19, 19:20, 20:19, 20:22, 20:24, 25:12, 25:18, 25:23, 26:4, 36:11, 36:14, 50:11, 58:21, 71:23, 75:5, 75:8, 80:16

**U.S.C** [9] - 9:7, 19:15, 23:18, 25:6, 25:20, 29:12, 29:24, 58:12, 81:16

**unauthorized** [2] - 13:6, 15:6

**unbridled** [1] - 81:18

**under** [66] - 6:23, 6:25, 7:8, 10:7, 10:13, 10:18, 10:23, 10:25, 18:5, 21:17, 22:15, 23:14, 24:1, 25:3, 26:11, 26:15, 26:18, 26:24, 27:8, 34:18, 34:19, 36:2, 36:23, 39:12, 39:17, 39:25, 40:25, 41:3, 41:21, 41:25, 42:12, 43:23, 43:25, 44:17, 47:4, 47:13, 47:21, 44:8, 50:16, 50:20, 60:6, 60:9, 60:14, 60:25, 61:1, 61:2, 61:24, 63:1, 63:10, 63:22, 64:6, 64:22, 65:3, 65:15, 66:13, 68:2, 68:18, 70:6, 70:16, 70:21, 71:17, 76:21, 77:15, 79:9, 84:8, 85:7

**undermined** [1] - 51:25

**undone** [1] - 19:11
**unique** [2] - 65:12, 66:15
**United** [17] - 9:4, 11:16, 19:16, 19:25, 20:4, 23:22, 24:1, 29:10, 30:1, 30:2, 37:6, 50:10, 57:10, 57:13, 59:1, 65:24, 74:2
**universal** [4] - 69:24, 71:7, 80:24, 81:20
**unlawful** [8] - 13:2, 14:25, 43:6, 54:23, 80:18, 81:10, 82:16, 82:18
**unless** [4] - 18:24, 32:7, 40:18, 65:4
**unprecedented** [1] - 19:3
**untouched** [1] - 80:14
**up** [12] - 12:1, 16:15, 17:21, 18:4, 30:11, 39:1, 39:24, 62:3, 73:21, 75:6, 77:14, 84:10
**uses** [1] - 53:25

**V**

**vacated** [16] - 11:21, 12:7, 12:9, 12:12, 12:17, 14:1, 14:6, 14:11, 15:2, 15:14, 16:11, 16:13, 18:2, 72:10, 72:22, 80:19
**vacating** [1] - 73:9
**vacatur** [16] - 12:5, 12:6, 13:10, 17:25, 32:12, 41:3, 41:21, 41:25, 44:15, 44:20, 45:23, 76:19, 80:23, 81:4, 81:7, 81:15
**valid** [10] - 11:9, 16:18, 17:23, 18:4, 19:22, 73:23, 74:1, 74:9, 75:5, 75:12
**validity** [3] - 81:6, 81:8, 81:13
**value** [1] - 68:11
**various** [2] - 8:4, 53:8
**Velazquez** [1] - 23:11
**verb** [1] - 15:9
**versus** [2] - 4:10, 13:13
**vessel** [1] - 25:17
**view** [3] - 21:4, 22:14, 23:8
**viewed** [1] - 59:19
**violate** [3] - 8:17, 21:2

**violates** [1] - 18:13
**violating** [1] - 26:1
**violation** [2] - 23:20, 25:25
**violence** [1] - 35:25
**visa** [2] - 19:21

**W**

**walk** [3] - 4:4, 10:8, 60:2
**wants** [1] - 38:11
**warranting** [1] - 70:4
**waste** [1] - 38:22
**weighed** [1] - 71:16
**Westlaw** [2] - 79:21, 81:2
**whatsoever** [1] - 33:8
**whereas** [1] - 10:1
**whole** [1] - 56:25
**wholly** [1] - 83:20
**wide** [1] - 77:6
**winning** [1] - 17:10
**withdrawing** [1] - 56:23
**women's** [1] - 82:3
**word** [3] - 8:5, 8:6, 53:25
**words** [3] - 15:11, 29:1, 29:4
**works** [1] - 4:7
**world** [2] - 6:16, 6:18
**wrestling** [1] - 72:8
**writings** [17] - 5:18, 6:8, 6:18, 6:21, 6:24, 7:15, 7:16, 39:7, 39:8, 40:5, 78:24, 83:13, 83:15, 83:18, 84:6, 84:8, 84:23
**written** [11] - 4:25, 7:1, 54:25, 55:1, 55:2, 55:4, 55:13, 55:14, 55:19, 55:21, 77:14
**wrought** [1] - 84:6

**Y**

**Yearly** [1] - 79:22
**years** [6] - 10:22, 23:25, 59:21, 61:1, 69:3, 69:7
**York** [3] - 78:9, 83:2

JA630

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

COALITION FOR HUMANE
IMMIGRANT RIGHTS, *et al.*,

      Plaintiffs,

      v.

KRISTI NOEM, in her official capacity as
Secretary of Homeland Security, *et al.*,

      Defendants.

Case No. 1:25-cv-00872 (JMC)

Hon. Jia M. Cobb

### DEFENDANTS' NOTICE OF SUPPLEMENTAL AUTHORITY

A hearing on Plaintiffs' motion for a stay of agency action was held July 9, 2025.

Defendants provide this notice to supplement their response to the following question the Court

asked at the hearing:  "Are you aware of DHS or its predecessors ever applying or subjecting to

expedited removal procedures individuals who had been previously paroled but whose parole

terminated for whatever reason?"  ECF No. 35 (Hearing Transcript) at 52:3-7.  In response,

undersigned counsel stated Defendants were not aware of any such instance but referred the

Court to a "2011 memo" which provided guidance regarding the use of "expedited removal for

aliens who were paroled for prosecution purposes and for other reasons as well."  ECF No. 35 at

52:8, 16-20.  Because the memo— issued by the United States Immigration and Customs

Enforcement (ICE)—was not cited in Defendants' Response to Motion to Stay Agency Action

(*see* ECF No. 26), Defendants inform the Court the memo is available at:

https://www.ice.gov/doclib/foia/policy/11009.1_StrategicUseExpeditedRemovalAuthority_04.5.
2011.pdf (last accessed July 14, 2025), and attach a copy with this Notice.  *See* Exhibit A.

Defendants further inform the Court in response to the Court's question stated above that,

JA631

following the hearing, undersigned counsel became aware of examples where DHS has applied

expedited removal to paroled aliens prior to the date of the agency documents challenged in this

case.  *See, e.g., Cordon-Linarez v. Garland*, No. 3:24-CV-00488, 2024 WL 4652824, at *1

(M.D. Pa. Nov. 1, 2024), *appeal pending*, No. 24-3068 (3d Cir.) (*see also* Exhibit B, attaching

expedited removal order in the case); *United States v. Arredondo-Martinez*, No. CR 10-525-

GHK, 2011 WL 13196331, at *6 (C.D. Cal. Oct. 3, 2011), *aff'd* 492 F. App'x 823 (9th Cir.

2012).


Dated: July 16, 2025                        Respectfully submitted,

                                            */s/ Papu Sandhu*
                                            PAPU SANDHU
                                            (Mass. Bar No. 630090)
                                            Assistant Director
                                            U.S. Department of Justice, Civil Division
                                            Office of Immigration Litigation
                                            General Litigation and Appeals Section
                                            P.O. Box 868, Ben Franklin Station
                                            Washington, D.C. 20044
                                            Tel: (202) 616-9357
                                            Email: papu.sandhu@usdoj.gov
                                            *Attorneys for Defendants*

JA632

**CERTIFICATE OF SERVICE**

I hereby certify that on July 16, 2025, I electronically filed this NOTICE OF

SUPPLEMENTAL AUTHORITY with the Clerk of the Court for the United States Court of for

the District of Columbia by using the CM/ECF system.  Counsel in the case are registered

CM/ECF users and service will be accomplished by the CM/ECF system.

*/s/ Papu Sandhu*
PAPU SANDHU
Assistant Director
U.S. Department of Justice

JA633

# EXHIBIT A

Operations

**U.S. Department of Homeland Security**
500 12th Street, SW
Washington, DC 20536



**U.S. Immigration
and Customs
Enforcement**

APR 5 2011

MEMORANDUM FOR:    Field Office Directors
                   Deputy Field Office Directors

FROM:              Gary Mead
                   Executive Associate Director

SUBJECT:           Strategic Use of Expedited Removal Authority

Expedited removal (ER), authorized by section 235(b) of the Immigration and Nationality Act
(INA), is a valuable enforcement tool that enhances the ability of immigration officers to make
the best use of limited agency resources. Expedited removal may be used for two categories of
aliens, as follows: (1) "arriving aliens," as defined by 8 C.F.R. § 1.1(q), which includes aliens
paroled into the United States, and (2) "certain other aliens" designated by the Department of
Homeland Security (DHS) who are present without admission or parole and are unable to
establish continuous physical presence in the United States for the two years immediately
preceding the determination of inadmissibility. To date, DHS has extended that designation to
aliens who are present in the United States without having been admitted or paroled and are
*encountered within 100 air miles of any international land border and cannot establish that
they were present in the United States for more than 14 days prior to the encounter*. See 69
Fed. Reg. 48877 (Aug. 11, 2004) (emphasis added).

Consistent with the agency's enforcement priorities, Field Office Directors and their senior
staff are encouraged to identify ways to use ER within their respective areas of responsibility.
ERO personnel are reminded that they should not use ER on the following classes of aliens:

- o Unaccompanied minors;
- o Asylees, refugees, and lawful permanent residents;
- o Crewmen or stowaways;
- o Members of the class settlement in <u>American Baptist Churches v. Thornburgh</u>, 760
  F. Supp. 796 (N.D. Cal. 1991);
- o Aliens who may be eligible for cancellation of removal under section 240A of the
  Act; and
- o Natives or citizens of Cuba.

Furthermore, ERO officers must refer aliens who assert to have a credible fear for a credible
fear interview. This is true even if the alien initially denied a credible fear and asserts it later in
the process.

ICE Policy # 11009.1

SUBJECT:  Strategic Use of Expedited Removal Authority
Page 2

ERO officers should screen incarcerated aliens to determine if ER is appropriate.  The determination should include whether the incarcerated alien is an "arriving alien" or an alien present without admission or parole who was encountered by an immigration officer within 100 miles of an international land border within 14 days of the date they entered.

Finally, ERO officers should use ER for all arriving aliens paroled into the United States for prosecution, regardless of how long they have been present in the United States.   However, ER should be used for an arriving alien paroled for reasons other than prosecution only if the parole has expired or been terminated <u>and</u> the alien has been continuously present in the United States for less than one year.

Questions concerning the scope of expedited removal authority may be directed to the local Office of the Chief Counsel.

JA636

# EXHIBIT B

JA637

Case: 24-3006872 Document: 161 Page: 54 Date Filed: 01/27/2025 3
USCA Case #25-5289        Document #2145852        Filed: 11/17/2025        Page 291 of 309

Case 3:24-cv-00488-JFS        Document 1-8        Filed 03/20/24        Page 2 of 9



DEPARTMENT OF HOMELAND SECURITY
U.S. Immigration and Customs Enforcement

## NOTICE AND ORDER OF EXPEDITED REMOVAL

DETERMINATION OF INADMISSIBILITY        **Event Number:** WPO2308000256

**File No:** _____

**Date:** August 7, 2023

In the Matter of:   **LUIS E. CORDON LINAREZ**

Pursuant to section 235(b)(1) of the Immigration and Nationality Act (Act), (8 U.S.C. 1225(b)(1)), the Department of Homeland Security has determined that you are inadmissible to the United States under section(s) 212(a) ☐ (6)(C)(i); ☐ (6)(C)(ii); ☒ (7)(A)(i)(I); ☐ (7)(A)(i)(II); ☐ (7)(B)(i)(I); and/or ☐ (7)(B)(i)(II); of the Act, as amended, and therefore are subject to removal, in that:

1. You are not a citizen or national of the United States;

2. You are a native of GUATEMALA and a citizen of GUATEMALA;

3. On December 15, 2020, you were paroled into the United States at Fort Lauderdale, FL for criminal prosecution;

4. On July 20, 2021, you were convicted in the United States District Court for the Southern District of Florida, Miami Division, for the offense of conspiracy to distribute five kilograms or more of cocaine, knowing or having reasonable cause to believe that the cocaine would be unlawfully imported into the United   See I-831

T 4884 HANCOX
DO
_____
Name and title of immigration officer (Print)

_____
Signature of immigration officer (Sign in ink)

### ORDER OF REMOVAL
### UNDER SECTION 235(b)(1) OF THE ACT

Based upon the determination set forth above and evidence presented during inspection or examination pursuant to section 235 of the Act, and by the authority contained in section 235(b)(1) of the Act, you are found to be inadmissible as charged and ordered removed from the United States.

T 4884 HANCOX
DO
_____
Name and title of immigration officer (Print)

_____
Signature of immigration officer (Sign in ink)

STEPHEN WAITE
SDDO
_____
Name and title of supervisor (Print)

_____
Signature of supervisor, if available (Sign in ink)

☐ Check here if supervisory concurrence was obtained by telephone or other means (no supervisor on duty).

---

### CERTIFICATE OF SERVICE

I personally served the original of this notice upon the above-named person on _____.
                                                                                              (Date)

_____
Signature of immigration officer (Sign in ink)

_____              _____
Signature of alien (Sign in ink)                             (Date)

ICE Form I-860 (5/11)                                                                                   Page 1 of 1

Case: 24-3006 Document: 16-1 Page: 55 Date Filed: 01/27/2025
USCA Case #25-5289    Document #2145852       Filed: 11/17/2025    Page 292 of 309

Case 3:24-cv-00488-JFS    Document 1-8    Filed 03/20/24    Page 3 of 9

U.S. Department of Homeland Security

Continuation Page for Form **I-860**

| Alien's Name | File Number | Date |
|---|---|---|
| CORDON LINAREZ, LUIS EMILIO | | 08/07/2023 |
| | Event No: WPO2308000256 | |

**NARRATIVE**
---------

States, in violation of Title 21 United States Code Section 963 for which a sentence of 108 months imprisonment was imposed;

5. You are an immigrant not in possession of a valid unexpired immigrant visa, reentry permit, border crossing card, or other valid entry document required by the Immigration and Nationality Act;

6. You are an immigrant not in possession of a valid unexpired passport, or other suitable travel document, or document of identity and nationality.

7. ON THE BASIS OF THE FOREGOING, IT IS CHARGED THAT YOU ARE SUBJECT TO REMOVAL FROM THE UNITED STATES PURSUANT TO THE FOLLOWING PROVISION OF
LAW: ===============================================================================
====212(a)(7)(A)(i)(I) of the Immigration and Nationality Act (Act), as amended, as an immigrant who, at the time of application for admission, is not in possession of a valid unexpired immigrant visa, reentry permit, border crossing card, or other valid entry document required by the Act, and a valid unexpired passport, or other suitable travel document, or document of identity and nationality as required under the regulations issued by the Attorney General under section 211(a) of the Act.

| Signature | Title |
|---|---|
| T 4884 HANCOX | DO |

2 of 2 Pages

Form I-831 Continuation Page (Rev. 08/01/07)

JA639**A 92**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| |
|---|
| COALITION FOR HUMANE IMMIGRANT RIGHTS, *et al*., |
| *Plaintiffs*, |
| *v.* |
| KRISTI NOEM, in her official capacity as Secretary of Homeland Security, *et al.*, |
| *Defendants*. |

Case No.: 1:25-cv-0872

## PLAINTIFFS' RESPONSE TO DEFENDANTS' NOTICE OF SUPPLEMENTAL AUTHORITY (ECF 36)

The 2011 memorandum and cases that Defendants submitted to the Court (ECF 36) are irrelevant to Plaintiffs' claims. That Defendants discovered after briefing and oral argument a rarely used 2011 ICE memorandum on the "Strategic Use of Expedited Removal Authority" and have identified two historical instances of individuals being processed for expedited removal after being paroled into the country for criminal prosecution is of no matter to Plaintiffs' timely challenge to—and request to stay—three written policy directives purporting to radically expand the use of the expedited removal statute to target hundreds of thousands of individuals who have previously been paroled into the country on humanitarian grounds. As Plaintiffs have made clear in their briefing and during the hearing on July 9, it is the January 23 Huffman Memorandum, February 18 ICE Directive, and March 25 CHNV Termination Notice—and not this hitherto unreferenced and inapposite 2011 memorandum—that are guiding the current administration's unprecedented broadening of expedited removal and have caused, and are continuing to cause, harm to plaintiffs' members.

JA640

Moreover, the 2011 memorandum and individual instances of expedited removal being used against paroled individuals do not provide additional authority for using expedited removal against paroled individuals now pursuant to the three challenged written directives, given Plaintiffs' challenge to the lack of statutory authority for using expedited removal in this manner. *See* ECF No. 22-1 at 14-21. Rather, they only provide further examples that Defendants have, at times before and to an infinitesimally lesser degree than is occurring today, used expedited removal against paroled individuals in contravention of the express terms of the expedited removal statute.

Dated: July 17, 2025                    Respectfully submitted,

                                        */s/ Hillary Li*
                                        Esther H. Sung (CA00132)
                                        Karen C. Tumlin (CA00129)
                                        Hillary Li (GA0052)
                                        **JUSTICE ACTION CENTER**
                                        P.O. Box 27280
                                        Los Angeles, CA 90027
                                        Telephone: (323) 450-7272
                                        esther.sung@justiceactioncenter.org
                                        karen.tumlin@justiceactioncenter.org
                                        hillary.li@justiceactioncenter.org

                                        Tom-Tsvi M. Jawetz (*pro hac vice*)
                                        *JAC Cooperating Attorney*
                                        1358 Jefferson St. NW
                                        Washington, DC 20011
                                        Telephone: (202) 413-5208
                                        tom.jawetz@gmail.com

                                        Carl Bergquist (*pro hac vice*)
                                        **COALITION FOR HUMANE IMMIGRANT RIGHTS**
                                        2533 West 3rd St, Suite 101
                                        Los Angeles, CA 90057
                                        Telephone: (310) 279-6025
                                        cbergquist@chirla.org

                                        *Attorneys for Plaintiffs*

JA641

**CERTIFICATE OF SERVICE**

I hereby certify on July 17, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the District of Columbia by using the CM/ECF system. I certify by all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF filing system.

*/s/ Hillary Li*
Hillary Li (GA0052)
**JUSTICE ACTION CENTER**
P.O. Box 27280
Los Angeles, CA 90027
Telephone: (323) 450-7272
hillary.li@justiceactioncenter.org

JA642

## *1:25cv872, Coalition For Humane Immigrant Rights Et Al V. Noem Et Al*

US District Court Docket

United States District Court, District of Columbia

(Washington, DC)

**This case was retrieved on 11/10/2025**

# Header

**Case Number:** 1:25cv872
**Date Filed:** 03/24/2025
**Assigned To:** Judge Jia M. Cobb
**Nature of Suit:** Other Statutes - Administrative Procedure
Act/Review or Appeal of Agency Decision (899)
**Cause:** Immigration and Nationality Act
**Lead Docket:** None
**Other Docket:** *1:25cv00190*, USCA, 25-05289
**Jurisdiction:** U.S. Government Defendant

**Class Code:** Open
**Statute:** 8:1101
**Jury Demand:** None
**Demand Amount:** $0
**NOS Description:** Other Statutes - Administrative Procedure
Act/Review or Appeal of Agency Decision

# Participants

## Litigants

Coalition for Humane Immigrant Rights
**Plaintiff**

## Attorneys

Carl Bergquist
LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE
NOTICED
COALITION FOR HUMANE IMMIGRANT RIGHTS
2533 West 3rd St Suite 101
Los Angeles, CA  90057
USA
310-279-6025 Email:Cbergquist@chirla.Org

Hillary Li
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
Justice Action Center
P.O. Box 27280
Los Angeles, CA  90027
USA
323-450-7262 Email:Hillary.Li@justiceactioncenter.Org

Karen C. Tumlin
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
Justice Action Center
P.O. Box 27280
Los Angeles, CA  90027
USA
323-316-0944 Email:Karen.Tumlin@justiceactioncenter.Org

Laura Flores-Perilla
LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE
NOTICED

Tim Ramnitz

JA643

## Litigants

## Attorneys

JUSTICE ACTION CENTER
P.O. Box 27280
Los Angeles, CA  90027
USA
323-450-7267 Email:Laura.Flores-
Perilla@justiceactioncenter.Org

Brandon Galli-Graves
PRO HAC VICE;ATTORNEY TO BE NOTICED
Justice Action Center
P.O. Box 27280
Los Angeles, CA  90027
USA
323-864-0798 Email:Brandon.Galli-
Graves@justiceactioncenter.Org

Tom-Tsvi M. Jawetz
PRO HAC VICE;ATTORNEY TO BE NOTICED

1358 Jefferson St. Nw Washington
Washington, DC  20011
USA
202-413-5208 Email:Tom.Jawetz@gmail.Com

Esther H. Sung
ATTORNEY TO BE NOTICED
JUSTICE ACTION CENTER
P.O. Box 27280
Los Angeles, CA  90027
USA
323-316-0944 Email:Esther.Sung@justiceactioncenter.Org

UndocuBlack Network
**Plaintiff**

Carl Bergquist
LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE
NOTICED
COALITION FOR HUMANE IMMIGRANT RIGHTS
2533 West 3rd St Suite 101
Los Angeles, CA  90057
USA
310-279-6025 Email:Cbergquist@chirla.Org

Hillary Li
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
Justice Action Center
P.O. Box 27280
Los Angeles, CA  90027
USA
323-450-7262 Email:Hillary.Li@justiceactioncenter.Org

Karen C. Tumlin
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
Justice Action Center
P.O. Box 27280
Los Angeles, CA  90027
USA
323-316-0944 Email:Karen.Tumlin@justiceactioncenter.Org

Laura Flores-Perilla
LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE

## Litigants

## Attorneys

NOTICED
JUSTICE ACTION CENTER
P.O. Box 27280
Los Angeles, CA  90027
USA
323-450-7267 Email:Laura.Flores-
Perilla@justiceactioncenter.Org

Brandon Galli-Graves
PRO HAC VICE;ATTORNEY TO BE NOTICED
Justice Action Center
P.O. Box 27280
Los Angeles, CA  90027
USA
323-864-0798 Email:Brandon.Galli-
Graves@justiceactioncenter.Org

Tom-Tsvi M. Jawetz
PRO HAC VICE;ATTORNEY TO BE NOTICED

1358 Jefferson St. Nw Washington
Washington, DC  20011
USA
202-413-5208 Email:Tom.Jawetz@gmail.Com

Esther H. Sung
ATTORNEY TO BE NOTICED
JUSTICE ACTION CENTER
P.O. Box 27280
Los Angeles, CA  90027
USA
323-316-0944 Email:Esther.Sung@justiceactioncenter.Org

CASA, Inc.
**Plaintiff**

Carl Bergquist
LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE
NOTICED
COALITION FOR HUMANE IMMIGRANT RIGHTS
2533 West 3rd St Suite 101
Los Angeles, CA  90057
USA
310-279-6025 Email:Cbergquist@chirla.Org

Hillary Li
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
Justice Action Center
P.O. Box 27280
Los Angeles, CA  90027
USA
323-450-7262 Email:Hillary.Li@justiceactioncenter.Org

Karen C. Tumlin
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
Justice Action Center
P.O. Box 27280
Los Angeles, CA  90027
USA
323-316-0944 Email:Karen.Tumlin@justiceactioncenter.Org

Laura Flores-Perilla

## Litigants                                                     ## Attorneys

| Litigants | Attorneys |
|---|---|
| | LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>JUSTICE ACTION CENTER<br>P.O. Box 27280<br>Los Angeles, CA  90027<br>USA<br>323-450-7267 Email:Laura.Flores-Perilla@justiceactioncenter.Org |
| | Nicholas Charles Katz<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>[Terminated: 07/07/2025]<br>NATIONAL IMMIGRATION LAW CENTER<br>P.O. Box 34573<br>Washington, DC  20043<br>USA<br>213-493-6503 Email:Katz@nilc.Org |
| | Brandon Galli-Graves<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Justice Action Center<br>P.O. Box 27280<br>Los Angeles, CA  90027<br>USA<br>323-864-0798 Email:Brandon.Galli-Graves@justiceactioncenter.Org |
| | Tom-Tsvi M. Jawetz<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br><br>1358 Jefferson St. Nw Washington<br>Washington, DC  20011<br>USA<br>202-413-5208 Email:Tom.Jawetz@gmail.Com |
| | Esther H. Sung<br>ATTORNEY TO BE NOTICED<br>JUSTICE ACTION CENTER<br>P.O. Box 27280<br>Los Angeles, CA  90027<br>USA<br>323-316-0944 Email:Esther.Sung@justiceactioncenter.Org |
| Kristi Noem<br>in her official capacity as Secretary of Homeland Security \|<br>**Defendant** | Papu Sandhu<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DOJ-Civ<br>Office Of Immigration Litigation 450 5th Street Nw<br>Washington Dc 20001 Ste 10300<br>Washington, DC  20001<br>USA<br>202-616-9357 Email:Papu.Sandhu@usdoj.Gov |
| | Aric Anderson<br>ATTORNEY TO BE NOTICED<br>DOJ-CIV<br>Poc Agostinho, Jean 1100 L St., N.W. 8142<br>Washington, DC  20530<br>USA<br>202-307-0340 Email:Aric.Anderson@usdoj.Gov |

| Litigants | Attorneys |
|---|---|
| | Sean Skedzielewski<br>ATTORNEY TO BE NOTICED<br>DOJ-Civ<br>950 Pennsylvania Ave Nw Ste Ofc. 3631<br>Washington, DC  20530<br>USA<br>202-307-1697 Email:Sean.Skedzielewski@usdoj.Gov<br><br>Tim Ramnitz<br>ATTORNEY TO BE NOTICED<br>DOJ-Civ<br>Poc Agostinho, Jean 1100 L St., N.W. 8142<br>Washington, DC  20530<br>USA<br>202-307-0340 Email:Tim.Ramnitz@usdoj.Gov<br><br>Tyler J. Becker<br>ATTORNEY TO BE NOTICED<br>U.S. DEPARTMENT OF JUSTICE<br>Office Of The Assistant Attorney General, Civil Division 950 Pennsylvania Ave Nw Rm. 3632<br>Washington, DC  20530<br>USA<br>202-514-4052 Email:Tyler.Becker@usdoj.Gov |
| Todd M. Lyons<br>in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement \|<br>**Defendant** | Papu Sandhu<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DOJ-Civ<br>Office Of Immigration Litigation 450 5th Street Nw Washington Dc 20001 Ste 10300<br>Washington, DC  20001<br>USA<br>202-616-9357 Email:Papu.Sandhu@usdoj.Gov<br><br>Aric Anderson<br>ATTORNEY TO BE NOTICED<br>DOJ-CIV<br>Poc Agostinho, Jean 1100 L St., N.W. 8142<br>Washington, DC  20530<br>USA<br>202-307-0340 Email:Aric.Anderson@usdoj.Gov<br><br>Sean Skedzielewski<br>ATTORNEY TO BE NOTICED<br>DOJ-Civ<br>950 Pennsylvania Ave Nw Ste Ofc. 3631<br>Washington, DC  20530<br>USA<br>202-307-1697 Email:Sean.Skedzielewski@usdoj.Gov<br><br>Tim Ramnitz<br>ATTORNEY TO BE NOTICED<br>DOJ-Civ<br>Poc Agostinho, Jean 1100 L St., N.W. 8142<br>Washington, DC  20530<br>USA<br>202-307-0340 Email:Tim.Ramnitz@usdoj.Gov |

JA647

## Litigants

## Attorneys

| Litigants | Attorneys |
|---|---|
| | Tyler J. Becker<br>ATTORNEY TO BE NOTICED<br>U.S. DEPARTMENT OF JUSTICE<br>Office Of The Assistant Attorney General, Civil Division 950 Pennsylvania Ave Nw Rm. 3632<br>Washington, DC  20530<br>USA<br>202-514-4052 Email:Tyler.Becker@usdoj.Gov |
| Pete R. Flores<br>in his official capacity as Acting Commissioner of U.S. Customs and Border Enforcement \|<br>**Defendant** | Papu Sandhu<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DOJ-Civ<br>Office Of Immigration Litigation 450 5th Street Nw<br>Washington Dc 20001 Ste 10300<br>Washington, DC  20001<br>USA<br>202-616-9357 Email:Papu.Sandhu@usdoj.Gov |
| | Aric Anderson<br>ATTORNEY TO BE NOTICED<br>DOJ-CIV<br>Poc Agostinho, Jean 1100 L St., N.W. 8142<br>Washington, DC  20530<br>USA<br>202-307-0340 Email:Aric.Anderson@usdoj.Gov |
| | Sean Skedzielewski<br>ATTORNEY TO BE NOTICED<br>DOJ-Civ<br>950 Pennsylvania Ave Nw Ste Ofc. 3631<br>Washington, DC  20530<br>USA<br>202-307-1697 Email:Sean.Skedzielewski@usdoj.Gov |
| | Tim Ramnitz<br>ATTORNEY TO BE NOTICED<br>DOJ-Civ<br>Poc Agostinho, Jean 1100 L St., N.W. 8142<br>Washington, DC  20530<br>USA<br>202-307-0340 Email:Tim.Ramnitz@usdoj.Gov |
| | Tyler J. Becker<br>ATTORNEY TO BE NOTICED<br>U.S. DEPARTMENT OF JUSTICE<br>Office Of The Assistant Attorney General, Civil Division 950 Pennsylvania Ave Nw Rm. 3632<br>Washington, DC  20530<br>USA<br>202-514-4052 Email:Tyler.Becker@usdoj.Gov |
| Kika Scott<br>in her official capacity as the Senior Official Performing the Duties of the Director of U.S. Citizenship and Immigration Services \|<br>[Terminated: 06/11/2025]<br>**Defendant** | Papu Sandhu<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DOJ-Civ<br>Office Of Immigration Litigation 450 5th Street Nw<br>Washington Dc 20001 Ste 10300<br>Washington, DC  20001<br>USA<br>202-616-9357 Email:Papu.Sandhu@usdoj.Gov |
| | Tim Ramnitz |

Page 7 of 14

USCA Case #25-5289    Document #2145852    Filed: 11/17/2025    Page 302 of 309
1:25cv872, Coalition For Humane Immigrant Rights Et Al V. Noem Et Al

| Litigants | Attorneys |
|---|---|
| Donald J. Trump<br>in his official capacity as President of the United States \|<br>**Defendant** | ATTORNEY TO BE NOTICED<br>DOJ-Civ<br>Poc Agostinho, Jean 1100 L St., N.W. 8142<br>Washington, DC  20530<br>USA<br>202-307-0340 Email:Tim.Ramnitz@usdoj.Gov<br><br>Papu Sandhu<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DOJ-Civ<br>Office Of Immigration Litigation 450 5th Street Nw<br>Washington Dc 20001 Ste 10300<br>Washington, DC  20001<br>USA<br>202-616-9357 Email:Papu.Sandhu@usdoj.Gov<br><br>Aric Anderson<br>ATTORNEY TO BE NOTICED<br>DOJ-CIV<br>Poc Agostinho, Jean 1100 L St., N.W. 8142<br>Washington, DC  20530<br>USA<br>202-307-0340 Email:Aric.Anderson@usdoj.Gov<br><br>Sean Skedzielewski<br>ATTORNEY TO BE NOTICED<br>DOJ-Civ<br>950 Pennsylvania Ave Nw Ste Ofc. 3631<br>Washington, DC  20530<br>USA<br>202-307-1697 Email:Sean.Skedzielewski@usdoj.Gov<br><br>Tim Ramnitz<br>ATTORNEY TO BE NOTICED<br>DOJ-Civ<br>Poc Agostinho, Jean 1100 L St., N.W. 8142<br>Washington, DC  20530<br>USA<br>202-307-0340 Email:Tim.Ramnitz@usdoj.Gov<br><br>Tyler J. Becker<br>ATTORNEY TO BE NOTICED<br>U.S. DEPARTMENT OF JUSTICE<br>Office Of The Assistant Attorney General, Civil Division 950 Pennsylvania Ave Nw Rm. 3632<br>Washington, DC  20530<br>USA<br>202-514-4052 Email:Tyler.Becker@usdoj.Gov |
| Angelica Alfonso-Royals<br>**Defendant** | Papu Sandhu<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DOJ-Civ<br>Office Of Immigration Litigation 450 5th Street Nw<br>Washington Dc 20001 Ste 10300<br>Washington, DC  20001<br>USA<br>202-616-9357 Email:Papu.Sandhu@usdoj.Gov<br><br>Aric Anderson<br>ATTORNEY TO BE NOTICED<br>DOJ-CIV |

JA649

## Litigants

## Attorneys

Poc Agostinho, Jean 1100 L St., N.W. 8142
Washington, DC  20530
USA
202-307-0340 Email:Aric.Anderson@usdoj.Gov

Sean Skedzielewski
ATTORNEY TO BE NOTICED
DOJ-Civ
950 Pennsylvania Ave Nw Ste Ofc. 3631
Washington, DC  20530
USA
202-307-1697 Email:Sean.Skedzielewski@usdoj.Gov

Tyler J. Becker
ATTORNEY TO BE NOTICED
U.S. DEPARTMENT OF JUSTICE
Office Of The Assistant Attorney General, Civil Division 950
Pennsylvania Ave Nw Rm. 3632
Washington, DC  20530
USA
202-514-4052 Email:Tyler.Becker@usdoj.Gov

## Proceedings

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 1 | 03/24/2025 | COMPLAINT  against All Defendants  ( Filing fee $ 405 receipt number ADCDC-11563573) filed by CASA, INC., UNDOCUBLACK NETWORK, COALITION FOR HUMANE IMMIGRANT RIGHTS OF LOS ANGELES. (Attachments: # 1 Civil Cover Sheet, # 2 Summons Kristi Noem DHS, # 3 Summons Todd Lyons ICE, # 4 Summons Pete Flores CBP, # 5 Summons Kika Scott USCIS, # 6 Summons Donald Trump)(Sung, Esther) (Entered: 03/24/2025) | |
| 2 | 03/24/2025 | NOTICE OF RELATED CASE by All Plaintiffs. Case related to Case No. 25-cv-0190. (Sung, Esther) (Entered: 03/24/2025) | |
| | 03/25/2025 | Case Assigned to Judge Jia M. Cobb. (znmw) (Entered: 03/25/2025) | |
| 3 | 03/25/2025 | SUMMONS (5) Issued Electronically as to All Defendants. (Attachments: # 1 Notice and Consent(znmw) (Entered: 03/25/2025) | |
| | 03/25/2025 | NOTICE OF NEW CASE ERROR regarding 1 Complaint,. The following error(s) need correction: Missing summonses- U.S. government. When naming a U.S. government agent or agency as a defendant, you must supply a summons for each defendant & two additional summonses for the U.S. Attorney & U.S. Attorney General. Please submit using the event Request for Summons to Issue. (znmw) (Entered: 03/25/2025) | |
| 4 | 03/25/2025 | REQUEST FOR SUMMONS TO ISSUE  filed by CASA, INC., UNDOCUBLACK NETWORK, COALITION FOR HUMANE IMMIGRANT RIGHTS. Related document: 1 Complaint, filed by CASA, INC., UNDOCUBLACK NETWORK, COALITION FOR HUMANE IMMIGRANT RIGHTS. (Attachments: # 1 Summons AG Bondi)(Sung, Esther) (Entered: 03/25/2025) | |
| 5 | 03/25/2025 | SUMMONS (2) Issued Electronically as to U.S. Attorney and U.S. Attorney General (Attachments: # 1 Notice and Consent)(zdp) (Entered: 03/25/2025) | |

JA650

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 6 | 03/27/2025 | NOTICE of Appearance by Esther H. Sung on behalf of All Plaintiffs (Sung, Esther) (Entered: 03/27/2025) | |
| 7 | 03/27/2025 | NOTICE of Appearance by Karen C. Tumlin on behalf of All Plaintiffs (Tumlin, Karen) (Entered: 03/27/2025) | |
| | 03/28/2025 | RESOLVED.....NOTICE of Provisional/Government Not Certified Status re 7 NOTICE of Appearance by Karen C. Tumlin on behalf of All Plaintiffs (Tumlin, Karen).Your attorney renewal/government certification has not been received. As a result, your membership with the U.S. District & Bankruptcy Courts for the District of Columbia is not in good standing, and you are not permitted to file. Pursuant to Local Civil Rule 83.9, you must immediately correct your membership status by following the appropriate instructions on this page of our website: https://www.dcd.uscourts.gov/attorney-renewal. Please be advised that the presiding judge in this case has been notified that you are currently not in good standing to file in this court. Renewal Due by 4/4/2025. (zapb) Modified on 3/31/2025 (zhcn). (Entered: 03/28/2025) | |
| 8 | 04/14/2025 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. TODD LYONS served on 3/31/2025 (Sung, Esther) (Entered: 04/14/2025) | |
| 9 | 04/14/2025 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 3/31/2025. Answer due for ALL FEDERAL DEFENDANTS by 5/30/2025. (Sung, Esther) (Entered: 04/14/2025) | |
| 10 | 04/14/2025 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Carl Bergquist,  Filing fee $ 100, receipt number ADCDC-11613907. Fee Status: Fee Paid. by CASA, INC., COALITION FOR HUMANE IMMIGRANT RIGHTS, UNDOCUBLACK NETWORK. (Attachments: # 1 Declaration Attorney Declaration, # 2 Supplement Certificate of Good Standing, # 3 Text of Proposed Order Proposed Order)(Sung, Esther) (Entered: 04/14/2025) | |
| 11 | 04/14/2025 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- NICHOLAS KATZ,  Filing fee $ 100, receipt number ADCDC-11613955. Fee Status: Fee Paid. by CASA, INC., COALITION FOR HUMANE IMMIGRANT RIGHTS, UNDOCUBLACK NETWORK. (Attachments: # 1 Declaration Attorney Declaration, # 2 Supplement Certificate of Good Standing, # 3 Text of Proposed Order Proposed Order)(Sung, Esther) (Entered: 04/14/2025) | |
| | 04/23/2025 | MINUTE ORDER granting 10 Motion for Leave to Appear Pro Hac Vice: Attorney Carl Bergquist is hereby admitted pro hac vice to appear in this matter. Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a). Click for instructions. Signed by Judge Jia M. Cobb on April 23, 2025. (lcjmc1) (Entered: 04/23/2025) | |
| | 04/23/2025 | MINUTE ORDER granting 11 Motion for Leave to Appear Pro Hac Vice: Attorney Nicholas Katz is hereby admitted pro hac vice to appear in this matter. Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a). Click for instructions. Signed by Judge Jia M. Cobb on April 23, 2025. (lcjmc1) (Entered: 04/23/2025) | |
| 12 | 04/24/2025 | NOTICE of Appearance by Nicholas Charles Katz on behalf of CASA, INC. (Katz, Nicholas) (Main Document 12 replaced on 4/25/2025) (znmw). (Entered: 04/24/2025) | |
| 13 | 04/25/2025 | NOTICE of Appearance by Papu Sandhu on behalf of All Defendants (Sandhu, Papu) (Entered: 04/25/2025) | |
| 14 | 04/28/2025 | NOTICE of Appearance by Carl Bergquist on behalf of All Plaintiffs (Bergquist, Carl) Modified on 4/28/2025 (zdp). (Entered: | |

| # | Date | Proceeding Text | Source |
|---|------|----------------|--------|
| | | 04/28/2025) | |
| 15 | 05/05/2025 | NOTICE of Appearance by Hillary Li on behalf of All Plaintiffs (Li, Hillary) (Entered: 05/05/2025) | |
| 16 | 05/07/2025 | NOTICE of Appearance by Tim Ramnitz on behalf of All Defendants (Ramnitz, Tim) (Entered: 05/07/2025) | |
| 17 | 05/07/2025 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. KIKA SCOTT served on 4/7/2025 (Li, Hillary) (Entered: 05/07/2025) | |
| 18 | 05/07/2025 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. PETE R. FLORES served on 4/7/2025; KRISTI NOEM served on 4/7/2025; DONALD J. TRUMP served on 4/7/2025 (Li, Hillary) (Entered: 05/07/2025) | |
| 19 | 05/07/2025 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on United States Attorney General. Date of Service Upon United States Attorney General 04/07/2025. (Li, Hillary) (Entered: 05/07/2025) | |
| 20 | 05/30/2025 | MOTION to Dismiss Complaint by PETE R. FLORES, TODD LYONS, KRISTI NOEM, KIKA SCOTT, DONALD J. TRUMP. (Attachments: # 1 Text of Proposed Order)(Sandhu, Papu) (Entered: 05/30/2025) | |
| 21 | 06/11/2025 | AMENDED COMPLAINT  against PETE R. FLORES, TODD LYONS, KRISTI NOEM, DONALD J. TRUMP, ANGELICA ALFONSO-ROYALS filed by CASA, INC., UNDOCUBLACK NETWORK, COALITION FOR HUMANE IMMIGRANT RIGHTS. (Attachments: # 1 Exhibit Redline of Amendment)(Sung, Esther) (Entered: 06/11/2025) | |
| 22 | 06/11/2025 | MOTION to Stay Agency Action by CASA, INC., COALITION FOR HUMANE IMMIGRANT RIGHTS, UNDOCUBLACK NETWORK. (Attachments: # 1 Memorandum in Support of Motion for Stay of Agency Action, # 2 Declaration of George Escobar, # 3 Declaration of Angelica Salas, # 4 Declaration of Patrice Lawrence, # 5 Declaration of Andrew Freire, # 6 Declaration of Ashley Tabaddor, # 7 Declaration of Bianca Torres, # 8 Declaration of Cesar Montoya, # 9 Declaration of Enrique Espinoza, # 10 Declaration of Jessica Olive, # 11 Declaration of Lindsay Toczylowski, # 12 Declaration of Meghan Maurus, # 13 Declaration of Melissa Chua, # 14 Declaration of Michael Hirman, # 15 Declaration of Ming Tanigawa-Lau, # 16 Declaration of Sabrina Perez Arleo, # 17 Declaration of Sarah Gillman, # 18 Text of Proposed Order)(Sung, Esther) (Entered: 06/11/2025) | |
| | 06/12/2025 | MINUTE ORDER denying as moot 20 Motion to Dismiss: Because Plaintiffs have amended their complaint as of right within 21 days after Defendants filed their motion to dismiss, that motion to dismiss is hereby DENIED as MOOT. See Barnes v. District of Columbia, 42 F. Supp. 3d 111, 117 (D.D.C. 2014); Smalls v. Spencer, No. 17-cv-606, 2018 WL 1461963, at *2 (D.D.C. Mar. 22, 2018). Signed by Judge Jia M. Cobb on June 12, 2025. (lcjmc1) (Entered: 06/12/2025) | |
| | 06/12/2025 | MINUTE ORDER: The Parties are hereby ORDERED to file, by June 18, 2025, a joint proposed briefing schedule for 22 Plaintiffs' motion to stay agency action. Signed by Judge Jia M. Cobb on June 12, 2025. (lcjmc1) (Entered: 06/12/2025) | |
| 23 | 06/16/2025 | PROPOSED BRIEFING SCHEDULE for Plaintiffs' Motion to Stay Agency Action by CASA, INC., COALITION FOR HUMANE IMMIGRANT RIGHTS, UNDOCUBLACK NETWORK. (Sung, Esther) (Entered: 06/16/2025) | |
| | 06/17/2025 | MINUTE ORDER: Having considered the Parties' joint statement regarding a briefing schedule for 22 Plaintiffs' motion to stay agency action, the Court hereby ORDERS the following briefing | |

1:25cv872, Coalition For Humane Immigrant Rights Et Al V. Noem Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | schedule: Defendants' opposition is due by June 24, 2025; and Plaintiffs' reply is due by July 1, 2025. It is further ORDERED that Defendants shall file a response to 21 Plaintiffs' amended complaint within 14 days of the date the Court rules on Plaintiffs' motion to stay agency action. Signed by Judge Jia M. Cobb on June 17, 2025. (lcjmc1) (Entered: 06/17/2025) | |
| 24 | 06/23/2025 | Unopposed MOTION for Leave to File Excess Pages for Defendants' response to Plaintiffs' stay motion by PETE R. FLORES, TODD LYONS, KRISTI NOEM, KIKA SCOTT, DONALD J. TRUMP. (Attachments: # 1 Text of Proposed Order)(Sandhu, Papu) (Entered: 06/23/2025) | |
| 25 | 06/23/2025 | NOTICE of Appearance by Papu Sandhu on behalf of ANGELICA ALFONSO-ROYALS (Sandhu, Papu) (Entered: 06/23/2025) | |
| | 06/24/2025 | MINUTE ORDER granting 24 Unopposed Motion for Leave to File Excess Pages: Having considered the unopposed motion, and for good cause shown, the Court GRANTS the motion. It is further ORDERED that Defendants may file a response to 22 Plaintiffs' motion to stay agency action that exceeds the page limit by ten pages or fewer. Signed by Judge Jia M. Cobb on June 24, 2025. (lcjmc1) (Entered: 06/24/2025) | |
| | 06/24/2025 | MINUTE ORDER Setting Hearing: The Parties are hereby ORDERED to appear for a hearing on 22 Plaintiffs' motion to stay agency action on July 9, 2025, at 02:00 PM in Courtroom 3- In Person before Judge Jia M. Cobb. Each side will have 30 minutes for argument. Signed by Judge Jia M. Cobb on June 24, 2025. (lcjmc1) (Entered: 06/24/2025) | |
| 26 | 06/24/2025 | RESPONSE re 22 MOTION to Stay Agency Action filed by ANGELICA ALFONSO-ROYALS, PETE R. FLORES, TODD LYONS, KRISTI NOEM, KIKA SCOTT, DONALD J. TRUMP. (Attachments: # 1 Text of Proposed Order)(Sandhu, Papu) (Entered: 06/24/2025) | |
| 27 | 06/30/2025 | Unopposed MOTION for Leave to File Excess Pages for Plaintiffs' Reply In Support of Motion for Stay by CASA, INC., COALITION FOR HUMANE IMMIGRANT RIGHTS, UNDOCUBLACK NETWORK. (Attachments: # 1 Text of Proposed Order)(Li, Hillary) (Entered: 06/30/2025) | |
| | 07/01/2025 | MINUTE ORDER granting 27 Unopposed Motion for Leave to File Excess Pages: Having considered Plaintiffs' unopposed motion, and for good cause shown, the Court GRANTS the motion. It is further ORDERED that Plaintiffs' reply brief may be extended to up to 35 pages. Signed by Judge Jia M. Cobb on July 1, 2025. (lcjmc1) (Entered: 07/01/2025) | |
| 28 | 07/01/2025 | REPLY to opposition to motion re 22 Motion to Stay,,, filed by CASA, INC., COALITION FOR HUMANE IMMIGRANT RIGHTS, UNDOCUBLACK NETWORK. (Attachments: # 1 Exhibit A: Mata Velasquez Brief)(Li, Hillary) (Entered: 07/01/2025) | |
| 29 | 07/02/2025 | NOTICE of Appearance by Aric Anderson on behalf of All Defendants (Anderson, Aric) (Entered: 07/02/2025) | |
| 30 | 07/03/2025 | NOTICE of Appearance by Sean Skedzielewski on behalf of All Defendants (Skedzielewski, Sean) (Main Document 30 replaced on 7/8/2025) (zdp). (Entered: 07/03/2025) | |
| 31 | 07/03/2025 | NOTICE OF SUPPLEMENTAL AUTHORITY by ANGELICA ALFONSO-ROYALS, PETE R. FLORES, TODD LYONS, KRISTI NOEM, DONALD J. TRUMP (Sandhu, Papu) (Entered: 07/03/2025) | |
| 32 | 07/07/2025 | NOTICE OF WITHDRAWAL OF APPEARANCE as to CASA, INC.. Attorney Nicholas Charles Katz terminated. (Katz, Nicholas) (Entered: 07/07/2025) | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 33 | 07/07/2025 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Tom-Tsvi Jawetz,  Filing fee $ 100, receipt number ADCDC-11800102. Fee Status: Fee Paid. by CASA, INC., COALITION FOR HUMANE IMMIGRANT RIGHTS, UNDOCUBLACK NETWORK. (Attachments: # 1 Declaration Attorney Declaration, # 2 Supplement Certificate of Good Standing, # 3 Text of Proposed Order Proposed Order)(Sung, Esther) (Entered: 07/07/2025) | |
| | 07/08/2025 | MINUTE ORDER granting 33 Motion for Leave to Appear Pro Hac Vice: Attorney Tom-Tsvi M Jawetz is hereby admitted pro hac vice to appear in this matter. Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a). Click for instructions. Signed by Judge Jia M. Cobb on July 8, 2025. (lcjmc1) (Entered: 07/08/2025) | |
| 34 | 07/08/2025 | NOTICE of Appearance by Tom-Tsvi M. Jawetz on behalf of All Plaintiffs (Jawetz, Tom-Tsvi) (Entered: 07/08/2025) | |
| | 07/09/2025 | Minute Entry for proceedings held on 7/9/2025 before Judge Jia M. Cobb: Motion Hearing re Plaintiff's 22 Motion for a Stay of Agency Action. The Court heard arguments from the parties and took the matter under advisement. (Court Reporter: Chandra Kean) (zakb) (Entered: 07/09/2025) | |
| 35 | 07/11/2025 | TRANSCRIPT OF PROCEEDINGS before Judge Jia M. Cobb held on July 9, 2025; Page Numbers: 1-98. Date of Issuance: July 11, 2025. Court Reporter/Transcriber Chandra Kean, RMR, Telephone number 202-354-3404. Transcripts may be ordered by submitting the Transcript Order Form.For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.NOTICE RE REDACTION OF TRANSCRIPTS: The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.Redaction Request due 8/1/2025. Redacted Transcript Deadline set for 8/11/2025. Release of Transcript Restriction set for 10/9/2025.(Kean, Chandra) (Entered: 07/11/2025) | |
| 36 | 07/16/2025 | NOTICE OF SUPPLEMENTAL AUTHORITY by ANGELICA ALFONSO-ROYALS, PETE R. FLORES, TODD LYONS, KRISTI NOEM, DONALD J. TRUMP (Attachments: # 1 Appendix Exhibit A, # 2 Appendix Exhibit B)(Sandhu, Papu) (Entered: 07/16/2025) | |
| 37 | 07/17/2025 | RESPONSE re 36 NOTICE OF SUPPLEMENTAL AUTHORITY filed by CASA, INC., COALITION FOR HUMANE IMMIGRANT RIGHTS, UNDOCUBLACK NETWORK. (Li, Hillary) (Entered: 07/17/2025) | |
| 38 | 07/23/2025 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name-Brandon Galli-Graves,  Filing fee $ 100, receipt number ADCDC-11839315. Fee Status: Fee Paid. by CASA, INC., COALITION FOR HUMANE IMMIGRANT RIGHTS, UNDOCUBLACK NETWORK. (Attachments: # 1 Declaration Attorney Declaration, # 2 Supplement Certificate of Good Standing, # 3 Text of Proposed Order Proposed Order)(Li, Hillary) (Entered: 07/23/2025) | |
| 39 | 07/24/2025 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name-Laura Flores-Perilla,  Filing fee $ 100, receipt number ADCDC-11840472. Fee Status: Fee Paid. by CASA, INC., COALITION FOR HUMANE IMMIGRANT RIGHTS, UNDOCUBLACK | |

1:25cv872, Coalition For Humane Immigrant Rights Et Al V. Noem Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | NETWORK. (Attachments: # 1 Declaration Attorney Declaration, # 2 Supplement Certificate of Good Standing, # 3 Text of Proposed Order Proposed Order)(Li, Hillary) (Entered: 07/24/2025) | |
| 40 | 08/01/2025 | ORDER granting 22 Motion to Stay: See document for details. Signed by Judge Jia M. Cobb on August 1, 2025. (lcjmc1) (Entered: 08/01/2025) | |
| 41 | 08/01/2025 | MEMORANDUM OPINION re 22 Motion for Stay: See document for details. Signed by Judge Jia M. Cobb on August 1, 2025. (lcjmc1) (Entered: 08/01/2025) | |
| | 08/01/2025 | MINUTE ORDER granting 38 Motion for Leave to Appear Pro Hac Vice: Attorney Brandon Galli-Graves is hereby admitted pro hac vice to appear in this matter. Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a). Click for instructions. Signed by Judge Jia M. Cobb on August 1, 2025. (lcjmc1) (Entered: 08/01/2025) | |
| | 08/01/2025 | MINUTE ORDER granting 39 Motion for Leave to Appear Pro Hac Vice: Attorney Laura Flores-Perilla is hereby admitted pro hac vice to appear in this matter. Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a). Click for instructions. Signed by Judge Jia M. Cobb on August 1, 2025. (lcjmc1) (Entered: 08/01/2025) | |
| | 08/01/2025 | *****ENTERED IN ERROR***** case Stayed. (zcll) Modified on 8/4/2025 (zcll). (Entered: 08/04/2025) | |
| | 08/04/2025 | Case Unstayed. (case stayed in error - clerical error). (zcll) (Entered: 08/04/2025) | |
| 42 | 08/04/2025 | MOTION to Stay Court's August 1, 2025 Order by ANGELICA ALFONSO-ROYALS, PETE R. FLORES, TODD LYONS, KRISTI NOEM, KIKA SCOTT, DONALD J. TRUMP. (Attachments: # 1 Text of Proposed Order)(Sandhu, Papu) (Main Document 42 replaced on 8/5/2025 at the request of the parties/Chambers) (zcll). (Entered: 08/04/2025) | |
| 43 | 08/05/2025 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 40 Order on Motion to Stay, 41 Memorandum & Opinion by PETE R. FLORES, KIKA SCOTT, DONALD J. TRUMP, KRISTI NOEM, ANGELICA ALFONSO-ROYALS, TODD LYONS. Fee Status: No Fee Paid. Parties have been notified. (Sandhu, Papu) (Entered: 08/05/2025) | |
| 44 | 08/05/2025 | NOTICE of Appearance by Laura Flores-Perilla on behalf of All Plaintiffs (Flores-Perilla, Laura) (Entered: 08/05/2025) | |
| 45 | 08/06/2025 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals docketing fee was not paid because the appeal was filed by the government re 43 Notice of Appeal to DC Circuit Court,. (zdp) (Entered: 08/06/2025) | |
| 46 | 08/06/2025 | NOTICE of Appearance by Brandon Galli-Graves on behalf of All Plaintiffs (Galli-Graves, Brandon) (Entered: 08/06/2025) | |
| 47 | 08/08/2025 | NOTICE of Appearance by Tyler J. Becker on behalf of All Defendants (Becker, Tyler) (Entered: 08/08/2025) | |
| | 08/11/2025 | USCA Case Number 25-5289 for 43 Notice of Appeal to DC Circuit Court, filed by ANGELICA ALFONSO-ROYALS, KIKA SCOTT, DONALD J. TRUMP, KRISTI NOEM, PETE R. FLORES, TODD M. LYONS. (mg) (Entered: 08/11/2025) | |
| 48 | 08/11/2025 | Memorandum in opposition to re 42 MOTION to Stay Court's August 1, 2025 Order filed by CASA, INC., COALITION FOR HUMANE IMMIGRANT RIGHTS, UNDOCUBLACK NETWORK. (Li, Hillary) (Entered: 08/11/2025) | |
| 49 | 08/13/2025 | ORDER denying 42 Motion to Stay: See document for details. Signed by Judge Jia M. Cobb on August 13, 2025. (lcjmc1) (Entered: 08/13/2025) | |

JA655

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 50 | 08/14/2025 | Joint MOTION to Vacate Defendants' deadline to answer amended complaint by ANGELICA ALFONSO-ROYALS, PETE R. FLORES, TODD M. LYONS, KRISTI NOEM, KIKA SCOTT, DONALD J. TRUMP. (Attachments: # 1 Text of Proposed Order)(Sandhu, Papu) (Entered: 08/14/2025) | |
| | 08/14/2025 | MINUTE ORDER granting 50 Joint Motion to Vacate Defendants' deadline to answer amended complaint: IT IS HEREBY ORDERED THAT the 50 Joint Motion is GRANTED and the Defendants' deadline to answer the Amended Complaint is VACATED. The parties shall file a joint status report within 10 days of a decision from the D.C. Circuit regarding Defendants' appeal of the Court's August 1, 2025 Order granting a stay of agency action. IT IS FURTHER ORDERED THAT Defendants shall serve Plaintiffs with the agency record in this case within 60 days of the filing of this motion, so long as the August 1, 2025 stay of agency action remains in place in the interim. If Defendants are granted a stay pending appeal or other extraordinary relief from the stay order, Defendants shall serve Plaintiffs with the administrative record within 14 days after such relief is granted. IT IS SO ORDERED. Signed by Judge Jia M. Cobb on August 14, 2025. (lcjmc1) (Entered: 08/14/2025) | |
| 51 | 10/24/2025 | MOTION FOR LIMITED RELIEF FROM STANDING ORDER 25-55 by CASA, INC., COALITION FOR HUMANE IMMIGRANT RIGHTS, UNDOCUBLACK NETWORK. (Attachments: # 1 Exhibit A, # 2 Text of Proposed Order Proposed Order)(Li, Hillary) (Entered: 10/24/2025) | |
| 52 | 11/03/2025 | Memorandum in opposition to re 51 MOTION FOR LIMITED RELIEF FROM STANDING ORDER 25-55 filed by ANGELICA ALFONSO-ROYALS, PETE R. FLORES, TODD M. LYONS, KRISTI NOEM, KIKA SCOTT, DONALD J. TRUMP. (Attachments: # 1 Exhibit Exhibit A)(Sandhu, Papu) (Entered: 11/03/2025) | |
| 53 | 11/07/2025 | REPLY to opposition to motion re 51 Motion for Miscellaneous Relief from Standing Order 25-55 filed by CASA, INC., COALITION FOR HUMANE IMMIGRANT RIGHTS, UNDOCUBLACK NETWORK. (Attachments: # 1 Declaration of Hillary Li)(Li, Hillary) (Entered: 11/07/2025) | |

Copyright © LexisNexis CourtLink, Inc. All Rights Reserved.
*** THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY ***

**End of Document**