No. 25-5289

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

—————————

COALITION FOR HUMANE IMMIGRANT RIGHTS, *et al.*,

*Appellees*,

v.

KRISTI NOEM, in her official capacity as
Secretary of Homeland Security, *et al.*,

*Appellants.*

—————————

On Appeal from the U.S. District Court
for the District of Columbia
No. 1:25-cv-00872 (Cobb, J.)

—————————

**JOINT APPENDIX, VOLUME 1 OF 2 (JA1 to JA349)**
—————————

HILLARY LI

Justice Action Center

PO Box 27280

Los Angeles, CA 90027

hillary.li@justiceactioncenter
.org

(323) 450-7562

*Appellees' Counsel*

DREW C. ENSIGN

*Deputy Assistant Attorney General*

U.S. Department of Justice,

Civil Division

950 Pennsylvania Avenue, NW

Washington, DC 20530

Drew.C.Ensign@usdoj.gov

(202) 514-2000

*Appellants' Counsel*

# JOINT APPENDIX INDEX
## TABLE OF CONTENTS

| Document | Dist. Ct. Docket No. | Page Nos. |
|---|---|---|
| **VOLUME 1 of 2** | | |
| Order Granting Plaintiffs' Motion for a Stay of Agency Action under 5 U.S.C. § 705 | 40 | 1 |
| Memorandum Opinion | 41 | 2-85 |
| Complaint | 1 | 86-120 |
| Amended Complaint | 21 | 121-175 |
| Plaintiffs' Motion for a Stay of Agency Action Under 5 U.S.C. § 705 | 22 | 176-179 |
| Plaintiff's Motion for a Stay of Agency Action; Declarations | 22-2 to 22-12 | 180-349 |

| Document | Dist. Ct. Docket No. | Page Nos. |
|---|---|---|
| **VOLUME 2 of 2** | | |
| Plaintiff's Motion for a Stay of Agency Action; Declarations (continued) | 22-13 to 22-17 | 350-419 |
| Memorandum of Points and Authorities in Support of Defendant's Opposition to Plaintiffs' Motion for a Stay of Agency Action Under 5 U.S.C. § 705 | 26 | 420-486 |
| Plaintiffs' Reply in Support of Motion for a Stay of Agency Action Under 5 U.S.C. § 705 | 28 | 487-532 |
| Transcript of July 9, 2025 Stay Hearing before the Honorable Jia M. Cobb, U.S. District Judge | 35 | 533-630 |
| Defendants' Notice of Supplemental Authority | 36 | 631-633 |
| Defendants' Notice of Supplemental Authority; Exhibits | 36-1 to 36-2 | 634-639 |

i

| | | |
|---|---|---|
| Plaintiffs' Response to Defendants' Notice of Supplemental Authority | 37 | 640-642 |
| District Court Docket Sheet as of November 10, 2025 | | 643-656 |

ii

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COALITION FOR HUMANE IMMIGRANT RIGHTS, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> KRISTI NOEM, in her official capacity as Secretary of Homeland Security, *et al.*, <br><br> Defendants. | Case No. 25-cv-872 (JMC) |

### ORDER

For the reasons stated in the accompanying memorandum opinion, it is hereby **ORDERED** that Plaintiffs' Motion for a Stay of Agency Action under 5 U.S.C. § 705, ECF 22, is **GRANTED**.

It is further **ORDERED** that, to preserve status or rights pending conclusion of the review proceedings, the effective dates of implementation and enforcement of the January 23 Huffman Memorandum, February 18 ICE Directive, and March 25 Parole Termination Notice for Cubans, Haitians, Nicaraguans, and Venezuelans (CHNV) are immediately postponed and stayed insofar as they subject individuals who have previously been granted parole at ports of entry to expedited removal.

**SO ORDERED.**

_____
JIA M. COBB
United States District Judge

Date: August 1, 2025

1

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

COALITION FOR HUMANE IMMIGRANT RIGHTS, *et al.*,

        Plaintiffs,

    v.

KRISTI NOEM, in her official capacity as Secretary of Homeland Security, *et al.*,

        Defendants.

Case No. 25-cv-872 (JMC)

## <u>MEMORANDUM OPINION</u>

## Table of Contents

I.    INTRODUCTION ................................................................ 2

II.    BACKGROUND ................................................................ 5

  A.   Statutory and Regulatory Framework ................................................ 5
    1.   Expedited Removal ...................................................................... 5
    2.   Parole ........................................................................................ 14
    3.   Relevant Avenues of Immigration Relief ................................... 18

  B.   Factual Background ........................................................................ 19
    1.   The Challenged Actions ............................................................. 19
    2.   Plaintiffs ...................................................................................... 22
    3.   This Suit ...................................................................................... 24

III.    LEGAL STANDARD ........................................................... 25

IV.    ANALYSIS ......................................................................... 26

  A.   Plaintiffs Are Substantially Likely to Succeed on the Merits ................ 26
    1.   Jurisdictional and Other Bars Do Not Block Plaintiffs' Requested Stay ................ 26
    2.   The Challenged Actions Exceed DHS's Statutory Authority ........... 44
    3.   The Challenged Actions Are Arbitrary and Capricious ................... 65

  B.   Plaintiffs' Members Face Irreparable Harm ..................................... 73

  C.   The Balance of the Equities and the Public Interest Favor a Stay ........ 77

  D.   A Stay as to All Noncitizens Paroled into the United States, Not Just Plaintiffs' Members, Is Standard and Appropriate, and No Bond Is Required. ................. 80

V.    CONCLUSION .................................................................. 84

JA002

## I.    INTRODUCTION

M.A.R., a Cuban national, arrived at the San Ysidro port of entry in San Diego, California, on March 14, 2024. ECF 22-8 ¶ 17. [1] Although he entered with travel authorization, he hoped to stay in the United States because he faced threats, harassment, and retaliation from Cuban authorities for his vocal opposition to the Cuban Government. *Id.* ¶ 29. Upon inspection at the border, he was paroled into the United States (i.e., released into the country pending removal proceedings) and issued a Notice to Appear (NTA) in immigration court. *Id.* ¶¶ 17–18. Since arriving, he has obtained work authorization and a job, married a United States citizen, met all his legal obligations, and committed no crimes. *Id.* ¶ 19. He also filed an application for adjustment of status under the Cuban Adjustment Act (CAA), which has long permitted Cuban nationals who were admitted or paroled into the United States to become lawful permanent residents after being here for more than a year. *See* Cuban Adjustment Act of 1966 ("CAA"), 89 Pub. L. 732, 80 Stat. 1161; 8 U.S.C. § 1255 note; ECF 22-8 at 26.

On May 28, 2025, M.A.R. attended his first hearing at the immigration court in Santa Ana, California. ECF 22-8 ¶ 21. Immediately after exiting the courtroom at the end of his hearing, M.A.R. was detained by Immigration and Customs Enforcement (ICE) officers. *Id.* ¶ 25. His pending immigration proceeding had not been dismissed at the hearing, and he received no indication at that hearing (or upon his arrest) that anything about his parole or proceedings had changed. *Id.* ¶¶ 23, 25–27. No indication, that is, besides his unexplained detention. M.A.R.'s attorney determined that he was being subjected to expedited removal, an abbreviated alternative to standard removal proceedings applicable only to certain noncitizens. *Id.* ¶ 27. Even so, he has

---

[1] Unless otherwise indicated, the formatting of citations has been modified throughout this opinion, for example, by omitting internal quotation marks, emphases, citations, and alterations and by altering capitalization. All pincites to documents filed on the docket in this case are to the automatically generated ECF Page ID number that appears at the top of each page.

yet to receive what minimal process expedited removal provides, namely a "credible fear" screening to identify potential eligibility for asylum. *Id.* ¶¶ 26, 30; *see* 8 U.S.C. § 1225(b)(1)(B)(ii). Unless M.A.R. passes that screening, which comes with limited administrative appeal rights and no judicial review, he will be unable to pursue adjustment of status under the CAA or based on his marriage—and he will be sent back to Cuba.

R.J.L.B., a Venezuelan national, arrived at the San Ysidro port of entry on January 17, 2025, with a scheduled appointment using the "CBP One" application.[2] ECF 22-14 ¶¶ 3–4. An officer in the Venezuelan military, R.J.L.B. seeks to defect to the United States to assist the U.S. military or intelligence services. *Id.* ¶¶ 3, 9. His home and his family in Venezuela are under surveillance by the Venezuelan government, and he believes he will be killed for desertion and disobedience if he is forced to return. *Id.* ¶¶ 3, 12. After inspection at San Ysidro, he was paroled into the United States and received an NTA. *Id.* ¶ 4. A month later, he submitted his application for asylum. *Id.* ¶ 6. When he appeared for a hearing on May 21, 2025, the Department of Homeland Security (DHS) attorney moved orally to dismiss his case. *Id.* ¶ 7. His attorney, believing this dismissal meant DHS thought he had a good case for asylum and could handle it administratively (as is often done in the attorney's experience), did not oppose the motion. *Id.* Neither the DHS attorney nor the Immigration Judge (IJ) mentioned expedited removal. Yet, as soon as R.J.L.B. left his hearing, ICE officers arrested him, telling him he was being removed through expedited removal. *Id.* ¶ 8. When R.J.L.B. and his attorney informed the ICE officers that he was a military officer seeking to help the United States, they "openly scoffed." *Id.* at ¶ 9. His attorney does not

---

[2] CBP One was a mobile application launched by the Department of Homeland Security (DHS) in October 2020. ECF 22-2 ¶ 11. It enabled noncitizens to book an appointment to appear for inspection at a port of entry, submit information in advance, and potentially obtain parole or admission into the country. *See id.*; U.S. Customs and Border Protection, CBP Removes Scheduling Functionality in CBP One™ App (Jan. 21, 2025), https://perma.cc/4XCF-ZX2S. At noon on January 20, 2025, DHS removed the scheduling functionality from the CBP One app. *See id.* DHS has also since renamed the application CBP Home, which it now says facilitates "voluntary self-deport[ation]." *See* Dep't of Homeland Sec., CBP Home: Assistance to Voluntarily Self-Deport, https://perma.cc/C9ED-4YPQ.

know whether he has received a credible fear interview or will receive consideration for asylum or other relief before being removed. *Id.* ¶¶ 10–13.

M.A.R. and R.J.L.B. are two of hundreds of thousands of noncitizens who were paroled into the United States in recent years after inspection at a port of entry and who now face the threat of removal under highly truncated procedures that have rarely, if ever, been applied at any scale to parolees. Organizations whose memberships include tens of thousands of such parolees have come to this Court to challenge three recent DHS agency actions that expanded expedited removal to this new population. They seek a stay of those actions pending final resolution of this case.

Narrowly, this is a straightforward case of statutory interpretation and agency rationality. Neither the applicable statutes nor principles of reasoned decision-making authorizes the challenged agency actions. More broadly, this case presents a question of fair play. Plaintiffs' members, and hundreds of thousands of others like them, fled oppressive regimes and perilous conditions in their home countries. They arrived for inspection at the United States border pursuant to procedures created and advocated by the U.S. Government. They were paroled into this country under those procedures and given the chance to prove their claims for asylum or other relief authorized by our laws. In a world of bad options, they played by the rules. Now, the Government has not only closed off those pathways for new arrivals but changed the game for parolees already here, restricting their ability to seek immigration relief and subjecting them to summary removal despite statutory law prohibiting the Executive Branch from doing so. This case's underlying question, then, asks whether parolees who escaped oppression will have the chance to plead their case within a system of rules. Or, alternatively, will they be summarily removed from a country that—as they are swept up at checkpoints and outside courtrooms, often by plainclothes officers

without explanation or charges, *see, e.g.*, ECF 22-10 ¶ 7; ECF 22-13 ¶ 9—may look to them more and more like the countries from which they tried to escape?

This Court will **GRANT** the requested stay. The challenged agency actions exceed DHS's statutory authority and are arbitrary and capricious. And Plaintiffs' members and others in their position face imminent, irreparable injury from those actions that outweighs any harm to the Government or the public from pressing pause. Accordingly, the challenged agency actions will be stayed, until the conclusion of this litigation, as to all noncitizens who have been, at any point in time, paroled into the United States at a port of entry.

## II.    BACKGROUND

### A.    Statutory and Regulatory Framework

#### 1.    *Expedited Removal*

##### i.    What Is Expedited Removal?

In the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRAIRA"), Congress established two main processes for removing noncitizens deemed ineligible to enter or remain in the United States. [3] *See* IIRAIRA, Pub. L. 104-208, 110 Stat. 3009, 3009-546 (1996). The first, commonly referred to as "section 240" proceedings due to the statutory section in which they appear, are the standard mechanism for removing inadmissible noncitizens. [4] Section 240 removal proceedings take place before an IJ, an employee of the Department of Justice (DOJ) who must be a licensed attorney and has a duty to develop the record in cases before them. 8 U.S.C. § 1229a(a)(1), (b)(1) ("The immigration judge shall administer oaths, receive evidence,

---

[3] The statute and regulations at issue typically use the term "alien" rather than "noncitizen." However, Plaintiffs advocate using the term "noncitizen." ECF 35 at 8 (Hr'g Tr. 8:2–10). Accordingly, the Court will use "noncitizen" unless quoting from a statute or regulation that uses "alien."

[4] Defendants sometimes refer to these proceedings instead as "section 1229a" proceedings, because that is the section of Chapter 8 of the U.S. Code in which section 240 of IIRAIRA was later codified. For simplicity, the Court will stick with "section 240" unless otherwise necessary for clarity.

and interrogate, examine, and cross-examine the alien and any witnesses."); ECF 22-6 ¶¶ 4, 6.[5]
They are adversarial proceedings in which the noncitizen has the right to hire counsel, examine
and present evidence, and cross-examine witnesses. 8 U.S.C. § 1229a(b)(4). The hearings are
recorded, and a transcript is made available if a party appeals the decision. *Id.* § 1229a(b)(4)(C);
ECF 22-6 ¶ 13. A section 240 proceeding typically takes place over the course of multiple hearings
due to the built-in procedures. ECF 22-6 ¶ 9. This allows time for noncitizens to both gather
evidence in support of petitions for relief available in immigration court (like asylum and certain
adjustments of status) and seek collateral relief from other components of DHS (like adjustment
of status on the basis of marriage or family). *Id.* Upon a decision by the IJ, either party may appeal
to the Board of Immigration Appeals (BIA). 8 C.F.R. §§ 1240.15, 1003.1. If the BIA upholds a
removal order, the noncitizen may then appeal that decision to a U.S. court of appeals. 8 U.S.C.
§ 1252. The Congress that passed IIRAIRA referred to the new section 240 as a "streamlined"
removal process relative to what came before it because, among other things, it removed a layer
of appellate review. H.R. Rep. 104-469, at 12, 107–08 (1996). And, replacing the multiplicity of
proceedings that preceded it, the new section 240 framework would be a "single form of removal
proceeding" "[f]or illegal aliens already present in the U.S." *Id.* at 108.

Still, IIRAIRA included a second, even more streamlined form of proceeding applicable
only to certain noncitizens: expedited removal. Relative to section 240 removal, "[e]xpedited
removal lives up to its name." *Make the Rd. New York v. Wolf*, 962 F.3d 612, 619 (D.C. Cir. 2020).
In expedited removal, an immigration officer, not an IJ, conducts the initial fact-finding. 8 C.F.R.

---

[5] Plaintiffs' motion includes a declaration from A. Ashley Tabaddor, who among other credentials previously served as an Immigration Judge, as President of the National Association of Immigration Judges, and as Chief Counsel at the U.S. Citizenship and Immigration Services (USCIS) at DHS. *See* ECF 22-6 ¶ 2. Her declaration includes helpful information about removal proceedings that this Court considers alongside—and only to the extent it is not inconsistent with—the applicable statutes and regulations. Defendants have not objected to anything in her declaration or its use as evidence here.

§ 235.3(b)(2)(i). If a noncitizen is eligible for expedited removal, an immigration officer asks them

a short series of questions to determine (a) their "identity, alienage, and inadmissibility," and (b)

whether they intend to apply for asylum, fear persecution or torture, or fear returning to their

country of origin. *Id.* § 235.3(b)(2)(i), (b)(4). Noncitizens are not entitled to counsel during this

questioning, and no recording or transcript is made. ECF 22-6 ¶¶ 11, 17; *compare* 8 C.F.R.

§ 235.3(b)(2)(i) *with* 8 U.S.C. § 1229a(b)(4)(C). If the noncitizen is inadmissible and does not

indicate intent to apply for asylum or fear of persecution or torture, the inspecting officer issues a

Notice and Order of Expedited Removal (NOER), and the noncitizen may respond in a sworn

statement. 8 C.F.R. § 235.3(b)(2)(i). Once a supervising officer reviews and signs off on the

inspecting officer's determination, the noncitizen is ordered removed. *See id.* The noncitizen has

no right to appeal that decision to an IJ, the BIA, or (with one exception discussed below) any

court. *Id.* § 235.3(b)(2)(ii); 8 U.S.C. § 1252(a)(2)(A)(i).

"The process is scarcely more involved" if the noncitizen "assert[s] an intention to apply

for asylum or a fear of prosecution." *Make the Rd.*, 962 F.3d at 619. If the noncitizen so indicates,

the inspecting officer must refer them to a "credible fear interview," to be conducted by an asylum

officer. 8 C.F.R. § 235.3(b)(4). If that asylum officer finds the noncitizen to have a credible fear

of persecution, the noncitizen will be moved either to full section 240 removal proceedings or to

USCIS administrative asylum proceedings. *Id.* § 208.30(f). If, however, the officer makes a

negative credible fear determination, a supervisory officer will review the determination. *Id.*

§ 208.30(e)(8). And if the supervisor agrees, the noncitizen can request review by an IJ. *Id.*

§ 208.30(g). The IJ's review "is meant to conclude within 24 hours" and is final. *Make the Rd.*,

962 F.3d at 619. With narrow exceptions discussed below, no further administrative or judicial

review is available. *Id.*

Unlike section 240 proceedings, which often take place over the course of several months, the expedited removal process is "conducted on a very compressed schedule and can result in deportation in hours or days." ECF 22-6 ¶ 11. As a result, noncitizens subject to expedited removal have little time to secure counsel—and no right to a continuance to give them time to do so. *Id.* And although the noncitizen may bring counsel to their credible fear interview, they typically have only a short window (24 to 48 hours on average) to secure counsel and ensure they can attend the interview. *Id.* ¶ 12. Meanwhile, asylum officers have no explicit duty to advise noncitizens of their rights or the requirements for relief. *Id.* ¶ 13. That fast pace also gives noncitizens little time to prepare evidence related to their credible-fear claim. *Id.* ¶ 17. Further, noncitizens in expedited removal have no way to pursue any other immigration relief besides asylum, such as adjustment of status or family-based petitions (e.g., for marriage)—even if they are eligible and were pursuing them before entering expedited removal. *Id.* ¶ 16. Only if they establish credible fear and return to section 240 proceedings can they then continue to pursue those other forms of relief. *Id.* ¶¶ 16–17. Compounding all those challenges, noncitizens are typically detained pending the outcome of their expedited removal proceedings, often in remote locations that may be far from their counsel or families. 8 U.S.C. § 1225(b)(1)(B)(iii)(IV); 8 C.F.R. § 235.3(b)(2)(iii); ECF 22-6 ¶¶ 17–20.

Key to that expedition is the lack of almost any role for judicial review. IIRAIRA provides that "no court shall have jurisdiction to review" issues related to expedited removal unless they fall into a narrow set of exceptions outlined at 8 U.S.C. § 1252(e). 8 U.S.C. § 1252(a)(2)(A). Under subsection (e), two forms of judicial proceedings are available. First, a noncitizen may file a habeas petition to challenge their expedited removal. However, that habeas proceeding is limited to the narrow grounds of (a) whether the petitioner is an alien, (b) whether the petitioner was ordered removed under the expedited removal provision, and (c) whether the petitioner can prove that they

JA009

were lawfully admitted or granted asylum. 8 U.S.C. § 1252(e)(2). Second, noncitizens may challenge expedited removal determinations, as well as the implementation of the expedited removal section, in this Court. *Id.* § 1252(e)(3)(A). In such suits, referred to in the statute as "[c]hallenges on validity of the system," a plaintiff may challenge either (i) whether the statute's expedited removal section, or any regulation implementing it, is constitutional, or (ii) "whether such a regulation, or a written policy directive, written policy guideline, or written procedure issued by or under the authority of the Attorney General to implement such section, is not consistent with applicable provisions of this subchapter or is otherwise in violation of law." *Id.* § 1252(e)(3). This kind of suit must be filed within 60 days after the date the challenged statutory provision or agency action is first implemented, *id.* § 1252(e)(3)(B), and it may not be a class action, *id.* § 1252(e)(1)(B).

Finally, the statute limits the relief a court may grant in such cases. Specifically, it provides,

Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter, as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 [which includes the expedited removal section], other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated.

*Id.* § 1252(f)(1).

All that said, the expedited removal regulations provide a few other escape hatches for individuals to prove that they are not in fact eligible for expedited removal under the statute. Specifically, during the initial interview by the immigration officer, an individual in expedited removal proceedings may "claim[] to have been lawfully admitted for permanent residence, admitted as a refugee under section 207 of the Act, granted asylum under section 208 of the Act, or claim[] to be a U.S. citizen." 8 C.F.R. § 235.3(b)(5)(i). If the immigration officer can verify any of those claims, the individual will not be removed. *Id.* § 235.3(b)(5)(ii-iv). If the immigration

officer cannot verify the claim, but the individual makes the claim under penalty of perjury, the case is referred for review by an IJ. *Id.* § 235.3(b)(5)(iv). In addition, the regulation provides that the individual must be given "a reasonable opportunity to establish to the satisfaction of the examining immigration officer that he or she was admitted or paroled into the United States following inspection at a port-of-entry." *Id.* § 235.3(b)(6). "If the alien establishes that he or she was lawfully admitted or paroled," the regulation continues, the agency reviews whether the noncitizen's parole "has been, or should be, terminated." *Id.* If the noncitizen cannot establish that they were "lawfully admitted or paroled," they "will be ordered removed pursuant to" the expedited removal provision. *Id.*

## ii.    Who Is Subject to Expedited Removal?

Noncitizens may be eligible for expedited, rather than section 240, removal only if they are inadmissible on the basis that they either lack proper entry documents or falsified or misrepresented their application for admission. 8 U.S.C. § 1225(b)(1)(A)(i); *see id.* § 1182(a)(6)(C), (a)(7) (grounds of inadmissibility). Among that set, only two categories of noncitizens are eligible for expedited removal: (1) noncitizens "arriving in the United States," and (2) noncitizens who "ha[ve] not been admitted or paroled into the United States" and cannot affirmatively show that they have been "physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility." 8 U.S.C. § 1225(b)(1)(A)(i)–(iii).[6] The statute permits the Attorney General (who has since delegated this authority to the DHS Secretary) to designate the population of noncitizens within that second category who will be subject to expedited removal. And that designation lies within the Secretary's

---

[6] In addition, the statute exempts from expedited removal noncitizens who are "native[s] or citizen[s] of a country in the Western Hemisphere with whose government the United States does not have full diplomatic relations and who arrives by aircraft at a port of entry." 8 U.S.C. § 1225(b)(1)(F).

"sole and unreviewable discretion." *Id.* § 1225(b)(1)(A)(iii); *see* 8 C.F.R. § 235.3(b)(ii).[7] This opinion refers to the statutory provision outlining the first category as the "Arriving Aliens Provision," and the provision defining the second category as the "Designation Provision."

The statute itself does not define "arriving" for purposes of the Arriving Aliens Provision. But a DHS regulation first promulgated in 1997, the year after the statute's passage, does. *See* Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 Fed. Reg. 10312, 10312–13 (Mar. 6, 1997) [*hereinafter* 1997 Rulemaking]. That definition has been altered only slightly since 1997 and today reads as follows:

> Arriving alien means an applicant for admission coming or attempting to come into the United States at a port-of-entry, or an alien seeking transit through the United States at a port-of-entry, or an alien interdicted in international or United States waters and brought into the United States by any means, whether or not to a designated port-of-entry, and regardless of the means of transport. An arriving alien remains an arriving alien even if paroled pursuant to section 212(d)(5) of the Act, and even after any such parole is terminated or revoked. However, an arriving alien who was paroled into the United States before April 1, 1997, or who was paroled into the United States on or after April 1, 1997, pursuant to a grant of advance parole which the alien applied for and obtained in the United States prior to the alien's departure from and return to the United States, will not be treated, solely by reason of that grant of parole, as an arriving alien under section 235(b)(1)(A)(i) of the Act.

8 C.F.R. § 1.2; *see id.* § 235.3(b)(i) (applying that definition).

The regulation also expands upon the criteria for designation under the Designation Provision. Eligible for designation under that section are

> aliens who arrive in, attempt to enter, or have entered the United States without having been admitted or paroled following inspection by an immigration officer at a designated port-of-entry, and who have not established to the satisfaction of the immigration officer that they have been physically present in the United States

---

[7] This designation authority originally belonged to the Commissioner of the Immigration and Nationalization Service before that agency was abolished and DHS was created in 2002. *See Make the Rd. New York v. McAleenan*, 405 F. Supp. 3d 1, 16 n.7 (D.D.C. 2019) (K.B. Jackson, J.) (citing Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 (Nov. 25, 2002); 6 U.S.C. § 557).

continuously for the 2–year period immediately prior to the date of determination of inadmissibility.

8 C.F.R. § 235.3(b)(ii).

Since IIRAIRA's passage, the Executive Branch has altered its designation under that provision a handful of times. Initially, DHS's predecessor agency[8] did not make any designation under the Designation Provision, thereby limiting expedited removal only to "arriving aliens." 1997 Rulemaking, 62 Fed. Reg. at 10313. In so doing, the agency "acknowledge[d] that application of the expedited removal provisions to aliens already in the United States w[ould] involve more complex determinations of fact and will be more difficult to manage." *Id.* In fact, no designation was made under the Designation Provision until 2002, when the DHS Secretary designated for expedited removal "aliens who arrive in the United States by sea, either by boat or other means, who are not admitted or paroled, and who have not been physically present in the United States continuously for the two-year period prior to a determination of inadmissibility." Notice Designating Aliens Subject to Expedited Removal Under Section 235(b)(1)(A)(iii) of the Immigration and Nationality Act, 67 Fed. Reg. 68924, 68925 (Nov. 13, 2002).

DHS has made four other designations, or recissions of designations, between that 2002 Notice and today:

- In 2004, DHS designated noncitizens "who are physically present in the U.S. without having been admitted or paroled following inspection by an immigration officer at a designated port-of-entry, who are encountered by an immigration officer within 100 air miles of any U.S. international land border, and who have not established to the satisfaction

---

[8] The Commissioner of the Immigration and Nationalization Service (INS) used to make this designation before that agency was abolished and DHS was created in 2002. *See Make the Rd. New York v. McAleenan*, 405 F. Supp. 3d 1, 16 n.7 (D.D.C. 2019) (K.B. Jackson, J.) (citing Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 (Nov. 25, 2002); 6 U.S.C. § 557).

of an immigration officer that they have been physically present in the U.S. continuously for the 14-day period immediately prior to the date of encounter." Designating Aliens For Expedited Removal, 69 Fed. Reg. 48877, 48880 (Aug. 11, 2004).

- In 2019, DHS additionally designated "[a]liens . . . who are physically present in the United States without having been admitted or paroled following inspection by an immigration officer at a designated port of entry, and who either (a) did not arrive by sea, are encountered by an immigration officer anywhere in the United States more than 100 air miles from a U.S. international land border, and have not been physically present in the United States continuously for the two-year period immediately prior to the date of the determination of inadmissibility, or (b) did not arrive by sea, are encountered by an immigration officer within 100 air miles from a U.S. international land border, and have been physically present in the United States continuously at least 14 days but less than two years immediately prior to the date of the determination of inadmissibility." Designating Aliens for Expedited Removal, 84 Fed. Reg. 35409, 35414 (July 23, 2019) [*hereinafter* 2019 Designation Notice]. This designation, when combined with the previous designations, expanded expedited removal to the full scope of the statutory authorization under the Designation Provision. *See id.* at 35411. This Designation Notice clarified that it "d[id] not apply to aliens who arrive at U.S. ports of entry, because those aliens are already subject to expedited removal." *Id.* at 35414.

- In 2022, DHS rescinded the 2019 designation while leaving in place the 2002 and 2004 designations. Rescission of the Notice of July 23, 2019, Designating Aliens for Expedited Removal, 87 Fed. Reg. 16022, 16022 (Mar. 21, 2022) [*hereinafter* 2022 Rescission Notice].

- In January of 2025, DHS rescinded the 2022 Recission Notice, returning the designation to its 2019 scope. Designating Aliens for Expedited Removal, 90 Fed. Reg. 8139, 8139 (Jan. 24, 2025) [*hereinafter* 2025 Designation Notice].[9]

Thus, as of January 21, 2025, DHS asserts the authority to apply expedited removal to all noncitizens described in the Designation Provision, alongside those described in the Arriving Aliens Provision, for the first time since the 2019 Designation Notice.[10]

### 2. *Parole*

Immigration law has long allowed the Executive Branch to exercise its discretion to temporarily allow into the United States noncitizens who are applying for admission to the country instead of holding them in detention. *See* 8 U.S.C. § 1182(d)(5)(A). Currently, the DHS Secretary holds that parole authority by statute.[11] *See id.* Parole may be granted "under such conditions as [the DHS Secretary] may prescribe" and "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." *Id*. Parole "shall not be regarded as an admission of the alien." *Id.* And the DHS Secretary may, in their discretion, terminate any grant of parole and return the noncitizen "to the custody from which he was paroled." *Id*. At that point, the noncitizen's "case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States." *Id.*

---

[9] This Notice was effective on January 21, 2025, and was published in the Federal Register on January 24, 2025. *See* 2025 Designation Notice, 90 Fed. Reg. at 8139.

[10] That chronology overstates the amount of time in which DHS executed on that full designation; the 2019 Designation Notice was preliminarily enjoined in September 2019. *See Make the Rd.*, 405 F. Supp. 3d at 72. The D.C. Circuit reversed that preliminary injunction the following year, in June 2020. *See Make the Rd.*, 962 F.3d at 635. And in February 2021, President Biden directed DHS to consider rescinding the 2019 designation, suggesting the administration had begun de-prioritizing its enforcement. *See* Exec. Order 14010, 86 Fed. Reg. 8267, 8270–71 (Feb. 2, 2021).

[11] The Secretary has further delegated that authority by regulation to various officials below them. *See* 8 C.F.R. § 212.5(a).

JA015

Congress has amended the parole statute a few times since its original enactment. Notably, in 1996, Congress restricted the Executive Branch's discretion under the statute by adding the language that parole be granted only on "a case-by-case basis for urgent humanitarian reasons or significant public benefit." *See* IIRAIRA § 602(a), 110 Stat. at 3009-689. Congress also added a reporting requirement, in which the Executive must report to Congress each year "the number and categories of aliens paroled into the United States" and related data. *Id.* § 602(b), 110 Stat. at 3009-689–90.

A DHS regulation fleshes out the conditions under which the DHS Secretary and her delegees may grant and terminate parole. *See* 8 C.F.R. § 212.5(a). As relevant here, the regulation provides that DHS may terminate a noncitizen's parole either "automatically" or "[o]n notice." *Id.* § 212.5(e)(1), (e)(2). A grant of parole terminates automatically, without written notice, (a) when the noncitizen departs the United States, or (b) "if not departed, at the expiration of the time for which parole was authorized." *Id.* § 212.5(e)(1). In all other cases, parole "shall be terminated upon written notice to the alien." *Id.* § 212.5(e)(2). Those other cases include when the "purpose for which parole was authorized" is "accomplish[ed]" or "when in the opinion of" the DHS Secretary or their delegee "neither humanitarian reasons nor public benefit warrants the continued presence of the alien in the United States." *Id.* A "charging document" (i.e., "the written instrument which initiates a proceeding before an Immigration Judge") constitutes written notice "unless otherwise specified." *Id*; *id.* § 244.1.[12] At that point, the noncitizen either moves to "further

---

[12] The parole regulation does not define "charging document," but other sections in the same chapter of the Code of Federal Regulations define it as follows: "*Charging document* means the written instrument which initiates a proceeding before an Immigration Judge. For proceedings initiated prior to April 1, 1997, these documents include an Order to Show Cause, a Notice to Applicant for Admission Detained for Hearing before Immigration Judge, and a Notice of Intention to Rescind and Request for Hearing by Alien. For proceedings initiated after April 1, 1997, these documents include a Notice to Appear, a Notice of Referral to Immigration Judge, and a Notice of Intention to Rescind and Request for Hearing by Alien." 8 C.F.R. § 244.1; *id.* § 1003.13; *see also* 1997 Rulemaking, 62 Fed. Reg. 10312, 10332 (defining the term in the same exact way in the regulation adopting IIRAIRA's changes to parole and expedited removal).

inspection or hearing" under "section 235 or 240 of the Act," or any previous "order of exclusion, deportation, or removal" against the noncitizen "shall be executed." *Id.* § 212.5(e)(2).

In 2022 and 2023, DHS issued four notices establishing parole processes for nationals from Cuba, Haiti, Nicaragua, and Venezuela—referred to collectively in this opinion as the "CHNV Parole Programs." *See* Implementation of a Parole Process for Venezuelans, 87 Fed. Reg. 63507 (Oct. 19, 2022); Implementation of a Parole Process for Cubans, 88 Fed. Reg. 1266 (Jan. 9, 2023); Implementation of a Parole Process for Haitians, 88 Fed. Reg. 1243 (Jan. 9, 2023); Implementation of a Parole Process for Nicaraguans, 88 Fed. Reg. 1255 (Jan. 9, 2023). Each notice created a process under which noncitizens, along with a U.S.-based supporter, could apply in advance to travel to a U.S. port of entry. *See, e.g.*, 87 Fed. Reg. at 63515–16. Once the noncitizen arrived at a port of entry, they would be subjected to inspection and additional vetting and "considered for a grant of discretionary parole for a period of up to two years on a case-by-case-basis." *Id.* at 63516. If granted parole, that parole would generally last for "up to two years, subject to applicable health and vetting requirements." *Id.* During that period of parole, the noncitizen would be "eligible to apply for employment authorization under existing regulations." *Id.* Between October 2022 and January 2025, approximately 532,000 noncitizens were paroled into the United States under the CHNV Parole Programs. Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans, 90 Fed. Reg. 13611, 13612 (Mar. 25, 2025) [*hereinafter* March 25 CHNV Termination Notice].

On October 4, 2024, DHS announced that it would not "re-parole" anyone paroled under the CHNV Parole Programs. *Id.* Accordingly, once their initial period of parole—granted when they arrived for inspection at a port of entry—ended, CHNV parolees would have to "leave the United States" or would otherwise be "placed in removal proceedings." *Id.*

Then, on March 25, 2025, DHS announced that it was terminating the CHNV Parole

Programs entirely. *Id.* at 13611. Accordingly, DHS announced,

> The temporary parole period of aliens in the United States under the CHNV parole
> programs and whose parole has not already expired by April 24, 2025 will terminate
> on that date unless the Secretary makes an individual determination to the contrary.
> Parolees without a lawful basis to remain in the United States following this
> termination of the CHNV parole programs must depart the United States before
> their parole termination date.

*Id*.

A group of noncitizens challenged the March 25 CHNV Termination Notice. Judge

Talwani in the District of Massachusetts stayed the Notice "insofar as it revokes, without case-by-

case review, the previously granted parole and work authorization issued to noncitizens paroled

into the United States pursuant to parole programs for noncitizens from Cuba, Haiti, Nicaragua,

and Venezuela . . . prior to the noncitizen's originally stated parole end date." *Doe v. Noem*, No.

1:25-cv-10495, 2025 WL 1099602, at *20 (D. Mass. Apr. 14, 2025). On May 30, 2025, in an

unsigned and unexplained order, the Supreme Court granted a stay of the District Court's order

pending resolution of the Government's appeal to the First Circuit and petition for certiorari to the

Supreme Court. *Noem v. Doe*, 145 S. Ct. 1524, 1524 (2025). Thus, as of that date, the March 25

CHNV Termination Notice remains in full effect.

All the while, DHS retains the authority to grant parole upon inspection at a port of entry

on a case-by-case basis, as well as to later terminate it. During the Biden Administration, DHS

began directing noncitizens to use the CBP One mobile application as the primary, if not exclusive,

mechanism to seek parole and/or asylum at the southwestern border. *See* Circumvention of Lawful

Pathways, 88 Fed. Reg. 31314, 31317–18. (May 16, 2023). The Trump Administration disabled

that functionality in CBP One in January 2025 and terminated all grants of parole authorized

through that application in April 2025. Valerie Gonzalez, *Trump's DHS Revokes Legal Status for*

JA018

*Migrants Who Entered the US on Biden-Era CBP One App* (Apr. 8, 2025), https://perma.cc/FX74-BN5Z; *see also* Dep't of Homeland Sec., Six Months of Keeping America Safe Under President Trump and Secretary Noem (July 20, 2025), https://perma.cc/7Z6X-328H ("President Trump ended the CBP One app that allowed more than one million aliens to illegally enter the U.S.").

### 3. *Relevant Avenues of Immigration Relief*

Immigration law supplies a few relevant avenues under which noncitizens who arrive in the United States without entry documents can gain lawful admission (as distinct from parole, which is not admission). First, pursuant to statute and treaties, the United States offers asylum to a set number of noncitizens per year whom DHS deems to be "refugee[s]." 8 U.S.C. § 1158(b)(1)(A). To qualify as a refugee, a noncitizen must show that they are "unable or unwilling to return to, and . . . unable or unwilling to avail himself or herself of the protection of, [the last country in which they habitually resided] because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." *Id.* § 1101(a)(42). In section 240 proceedings, the IJ can make that assessment and grant or deny asylum to the noncitizen. 8 C.F.R. § 208.14(a). Alternatively, an asylum officer within USCIS can grant or deny asylum. *Id.* § 208.14(b). In expedited removal, noncitizens must first establish a "credible fear" of such persecution to the satisfaction of an asylum officer, who then refers them to proceedings in immigration court to prove that they meet the higher standard of "well-founded fear" necessary to claim asylum status. *See id.* § 235.3(b)(4); *id.* § 208.30.

Second, noncitizens who were admitted or paroled into the United States can seek "adjustment of status," granting them lawful permanent resident status, on a variety of bases. 8 U.S.C. § 1255. For instance, the noncitizen or their spouse may seek the noncitizen's adjustment

JA019

of status if the spouse is a U.S. citizen. *See id.* § 1154(a)(1)(A). Parents and children of U.S. citizens may do the same. *See id.* So may noncitizens who were victims of human trafficking, *id.* § 1255(l), victims of crimes against women, *id.* § 1255(m), or juveniles abused or abandoned by their parents, *id.* § 1101(a)(27)(J), § 1255(g). So, too, may Cuban natives or citizens who were inspected and admitted or paroled at a port of entry and have been physically present in the United States for at least one year. 8 U.S.C. § 1255 note.

Noncitizens may pursue some of those forms of relief in section 240 proceedings, but most can be obtained only through separate applications to USCIS or another entity. ECF 22-6 ¶ 9. In section 240 proceedings, noncitizens typically have time to pursue such collateral relief through USCIS. *Id.* ¶¶ 9–10. Not so in expedited removal proceedings. Indeed, none of those forms of relief is available to noncitizens in expedited removal unless they manage to establish credible fear and get transferred back to section 240 proceedings. *Id.* ¶ 17.

## B. Factual Background

### 1. The Challenged Actions

Against that statutory and regulatory backdrop, DHS took three actions during the first two months of the second Trump Administration to subject a significantly greater number of noncitizens to expedited removal. Plaintiffs here challenge each one.

i.    The January 23 Huffman Memorandum

On January 23, 2025, Acting Secretary of DHS Benjamine Huffman issued a memorandum to the leadership of USCIS and U.S. Customs and Border Protection (CBP) "provid[ing] guidance regarding how to exercise enforcement discretion in implementing" two "policies" that he had announced in the days prior. Dep't of Homeland Sec., Memorandum from Acting Secretary

Benjamine C. Huffman on Guidance Regarding How to Exercise Enforcement Discretion (Jan. 23, 2025), https://perma.cc/4HPX-45Z7 [*hereinafter* January 23 Huffman Memorandum]. The first of the two "policies" was a January 20 memorandum "clarif[ying] DHS's position regarding the scope of the parole statute" and authorizing DHS components to "pause, modify, or terminate, effective immediately, any parole program . . . inconsistent with" that memorandum. *Id.* at 1. The second was the 2025 Designation Notice rescinding the 2022 Recission Notice and returning DHS's assertion of expedited removal authority to the full scope of the Designation Provision. *Id.*

The January 23 Huffman Memorandum "direct[ed]" USCIS and CBP officials to "consider" placing in expedited removal "any alien DHS is aware of who is amenable to expedited removal but to whom expedited removal has not been applied." *Id.* at 2. The Memorandum indicated that applying expedited removal "may include steps to terminate any ongoing removal proceeding and/or active parole status." *Id.*

The January 23 Huffman Memorandum also included a few qualifiers to its directives. For one, it repeatedly emphasized that the instructions were to be understood as "consistent with the principles of enforcement discretion"—namely, that "'[t]he Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case,'" including in immigration enforcement. *Id.* at 1–2 (quoting *United States v. Nixon*, 418 U.S. 683, 693 (1974)). In addition, the Memorandum stated that "actions contemplated by" it "shall be taken in a manner consistent with applicable statutes, regulations, and court orders," as well as "in a manner that takes account of legitimate reliance interests." *Id.* at 2.

ii.    The February 18 ICE Directive

On February 18, 2025, ICE leadership issued an internal directive to its Enforcement and Removal Operations (ERO) personnel directing them to "consider for expedited removal" a

different set of categories of noncitizens (the "February 18 ICE Directive").[13] The one relevant to Plaintiffs' members here, "paroled arriving aliens," it described as "any arriving alien (i.e., encountered at a port of entry) who CBP determined to be inadmissible and released, as long as the alien is inadmissible under" the two inadmissibility criteria to which expedited removal applies (i.e., lack of valid immigration documents or fraud or willful misrepresentation). February 18 ICE Directive at 1. For that category, the Directive explained, "[t]here is no time limit on the ability to process such aliens for [expedited removal]." *Id.* That Directive included no similar discussion of enforcement discretion, or reference to legality or reliance interests, as the January 23 Huffman Memorandum did.

### iii.    The March 25 CHNV Termination Notice

As discussed above, on March 25, 2025, DHS terminated the CHNV Parole Programs instituted in 2022 and 2023. *See supra* Section II.A.2. And after a stay by another district court, the March 25 CHNV Termination Notice remains back in effect as of May 30, 2025, pursuant to the Supreme Court's emergency order.

As relevant here, the March 25 CHNV Termination Notice terminated parole for hundreds of thousands of noncitizens for the express purpose of subjecting them to expedited removal when they otherwise would not be. In justifying the parole terminations, DHS relied in large part on "the U.S. government's strong interest in promptly removing parolees when the basis for the underlying program no longer exists." March 25 CHNV Termination Notice at 13619. Termination of the parole programs was necessary, the Notice continued, because "[e]xpedited removal is available

---

[13] DHS has not published this directive; instead, it was reported by Reuters in early March 2025. *See* Ted Hesson & Kristina Cooke, *Trump Weighs Revoking Legal Status of Ukrainians as US Steps Up Deportations*, Reuters (March 6, 2025), https://perma.cc/MT7S-MR4Y (citing "internal ICE email" available at https://perma.cc/S3LJ-AFJM). This opinion refers to this document, as published by Reuters, as the February 18 ICE Directive. Defendants do not dispute the authenticity of this document, and their argument proceeds on the basis that it is authentic. *See, e.g.*, ECF 26 at 51.

only when an alien has not been continuously present in the United States for at least the two years preceding the date of the inadmissibility determination." *Id.* (citing 8 U.S.C. § 1225(b)(1)(iii)(II); 8 CFR § 235.3). If DHS did not terminate the CHNV Parole Programs and instead had to wait for the grants of parole to expire at the end of their terms, "DHS would be compelled to place a greater proportion of this population in section 240 removal proceedings to effectuate their removal." *Id.* That is because, the Notice explained, "parolees may begin to accrue more than two years of continuous presence in the United States," disqualifying them from expedited removal under the Designation Provision and therefore requiring "section 240 removal proceedings" as the only way to remove them. *Id.* at 13620.

Like the February 18 ICE Directive, and unlike the January 23 Huffman Memorandum, this Notice also contained no qualification about compliance with applicable law. It did state that it was being issued in response to an Executive Order that directed DHS to "take all appropriate action," "consistent with applicable law," to terminate the CHNV Parole Programs. *Id.* at 13611. (quoting Exec. Order 14165, 90 Fed. Reg. 8467, 8468 (Jan. 20, 2025)). But the Notice did not qualify its own actions with that or any similar language.

### 2. *Plaintiffs*

Plaintiffs here are three membership organizations whose members include parolees subject to, and in many cases already undergoing, expedited removal under one or more of the three Challenged Actions.

Plaintiff Coalition for Humane Immigrant Rights ("CHIRLA") is a nonprofit organization headquartered in Los Angeles with offices throughout California and in Washington, D.C. ECF 22-3 ¶ 2. CHIRLA is "the largest statewide immigrant rights organization in California," with approximately 51,297 members across the state. *Id.* ¶¶ 4–5. Many of CHIRLA's members were

granted parole via either the CBP One app or the CHNV Parole Programs and are now subject to expedited removal under the Challenged Actions. *Id.* ¶ 15. One CHIRLA member, for instance, was arrested at a CBP checkpoint on March 7, 2025, despite having active parole, and is now being processed for expedited removal. *Id.* ¶ 17.

Plaintiff CASA, Inc. ("CASA") is a national nonprofit organization with more than 173,000 members across the United States, most of whom are noncitizens. ECF 22-2 ¶ 1. Of those, more than 33,000 "entered the United States after the CBP One app first launched in October 2020," and "a significant portion of those members were likely granted parole through CBP One," according to the organization. *Id.* ¶ 11. In addition, about 2,250 CASA members are nationals of Cuba, Haiti, Nicaragua, or Venezuela and entered the United States after full implementation of the CHNV Parole Programs in January 2023. *Id.* ¶ 12. Thus, "[a] significant number of them were likely sponsored for and granted parole through CHNV parole." *Id.* As of the Supreme Court's termination of the district court's stay of the March 25 CHNV Termination Notice, they are now in the Government's view eligible for expedited removal—and some members have received letters terminating their parole status and "directing them to leave the country." *Id.* They now may be detained and put into expedited removal at any point, including at their section 240 removal hearings, which have been a primary site of the ramp-up in immigration enforcement in recent weeks. *Id.* ¶ 13. And they face adverse consequences for themselves and their families if they are removed without a full chance to prove asylum eligibility or eligibility for other relief, including risks of persecution or worse in their country of origin. *See id.* ¶¶ 16–19.

Finally, Plaintiff UndocuBlack Network ("UndocuBlack") is a membership organization with more than 1,000 active members—all of whom are immigrants and identify as Black—across New York, Los Angeles, and Washington, D.C. ECF 22-4 ¶¶ 1, 7–8. Among those are at least 300

Haitian nationals who were paroled into the United States through either the CHNV Parole Programs or the CBP One app. *Id.* ¶ 11. UndocuBlack's members, too, run the risk of detention and expedited removal at immigration courthouses, where they must report for their section 240 hearings, and of losing the opportunity to gain collateral immigration relief if they are detained before they can do so. *Id.* ¶¶ 13–15. UndocuBlack's members face family separation, as well as "extreme danger," if forced to return to Haiti. *Id.* ¶ 22.

### 3. *This Suit*

Plaintiffs filed a complaint in this Court on March 24, 2025, alleging that the Challenged Actions exceeded DHS's statutory authority under IIRAIRA and the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(A), (C); was arbitrary and capricious in violation of the APA, *id.* § 706(2)(A); and violated the Due Process Clause of the Fifth Amendment. ECF 1 ¶¶ 102–115. Plaintiffs sued DHS Secretary Kristi Noem; ICE, CBP, and USCIS officials Todd Lyons, Pete Flores, and Kika Scott; and President Donald Trump, all in their official capacities (collectively, Defendants). *Id.* at 1. On June 11, 2025, Plaintiffs amended their complaint and added two more causes of action: a claim that the January 23 Huffman Memorandum and CHNV Termination Notice violated the rule of *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954), that agencies must comply with their own regulations, ECF 21 ¶¶ 163–170; and a claim that the 1997 DHS regulation codified at 8 C.F.R. § 1.2 defining "arriving alien" exceeded the agency's statutory authority under IIRAIRA and the APA, *id.* ¶¶ 171–183.

That same day, June 11, Plaintiffs filed a motion to stay agency action, under 5 U.S.C. § 705, as to the three Challenged Actions (but not 8 C.F.R. § 1.2) "insofar as they subject individuals who have been previously granted parole at ports of entry to expedited removal." ECF 22 at 1; *see* ECF 28 at 23 n.12 (explaining that "Plaintiffs challenge 8 C.F.R. § 1.2 as *ultra*

*vires* . . . but have not moved for preliminary relief as to it"). For purposes of their stay motion,
Plaintiffs also do not advance their Due Process claim, instead limiting their argument to claims
that the Challenged Actions are *ultra vires* and arbitrary and capricious. *See* ECF 22-1 at 22. In
their motion, Plaintiffs submit evidence that expedited removals of their members and others in
their communities had ramped up in the weeks prior—particularly since the March 25 CHNV
Termination went back into effect in May 2025—and that they therefore faced widespread actual
or imminent irreparable harm. ECF 22 at 1; ECF 22-1 at 15–16; ECF 22-3 ¶ 21; ECF 22-4 ¶ 13.[14]

Defendants filed an opposition to Plaintiffs' motion for a stay, ECF 26, and Plaintiffs
replied, ECF 28. The Court heard oral argument on the motion on July 9, 2025. *See* July 9, 2025
Min. Entry.

## III.    LEGAL STANDARD

Section 705 of the APA authorizes courts to "issue all necessary and appropriate process
to postpone the effective date of an agency action or to preserve status or rights pending conclusion
of the review proceedings." 5 U.S.C. § 705. The court may do so "[o]n such conditions as may be
required and to the extent necessary to prevent irreparable injury." *Id.*

The factors governing issuance of a section 705 stay are the same as those that govern the
grant of a preliminary injunction. *Dist. of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 15
(D.D.C. 2020) (citing, *inter alia*, *Cuomo v. U.S. Nuclear Regul. Comm'n*, 772 F.2d 972, 974 (D.C.
Cir. 1985)). To prevail on such a motion, the movant "must show (1) a substantial likelihood of

---

[14] This increase in expedited removals also coincided, according to Plaintiffs, with a May 20, 2025, directive from
Secretary Noem and White House Deputy Chief of Staff Stephen Miller telling ICE officials to increase immigration
arrests to 3,000 per day—triple the status quo. ECF 22-1 at 15. That is consistent with Plaintiffs' argument, addressed
further below, that the Challenged Actions caused the increase in expedited removals. As Plaintiffs' declarations
demonstrate, and as the March 25 CHNV Termination Notice states, DHS sees and is using expedited removal as a
basis to arrest and detain immigrants previously paroled from detention in section 240 removal proceedings. *See, e.g.*,
ECF 22-2 ¶ 13; ECF 22-3 ¶¶ 14, 17; ECF 22-8 ¶ 21; ECF 22-10 ¶ 7; ECF 22-14 ¶ 8; March 25 CHNV Termination
Notice at 13614–15 (discussing the need to increase the incentives against illegal immigration through, *inter alia*,
"detention capabilities" and the problem of "releases from [U.S. Border Patrol] custody").

success on the merits, (2) that it would suffer irreparable injury if the [stay] were not granted, (3) that a[] [stay] would not substantially injure other interested parties, and (4) that the public interest would be furthered by the [stay]." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). In a case like this one, where the Government is the non-movant, the third and fourth factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## IV.    ANALYSIS

In this section, the Court assesses each of those four factors in turn to decide whether a stay under section 705 is warranted. Because each favors granting a stay, the Court will do so. In addition, this section discusses the scope of the stay the Court will order.

### A.  Plaintiffs Are Substantially Likely to Succeed on the Merits

To decide whether Plaintiffs are substantially likely to succeed on the merits, the Court must first assess whether a "substantial likelihood of jurisdiction" exists to hear those claims. *Church v. Biden*, 573 F. Supp. 3d 118, 133 (D.D.C. 2021); *see also Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015). This section answers that first question in the affirmative. It then finds that Plaintiffs are also substantially likely to succeed on the merits of their claims that the Challenged Actions are both *ultra vires* and arbitrary and capricious.

#### 1.  *Jurisdictional and Other Bars Do Not Block Plaintiffs' Requested Stay*

IIRAIRA leaves little room for noncitizens, or those suing on their behalf, to seek judicial relief from expedited removal. That is by design; expedited removal's expedition derives in no small part from its insulation from judicial review. But Congress left a clear opening for suits challenging the expedited removal system's compliance with the law. Despite Defendants' myriad arguments to the contrary, Plaintiffs' suit falls squarely within that opening, as does their motion for preliminary relief. Accordingly, this Court likely has jurisdiction to hear this case, and no

JA027

constitutional requirement or statutory provision bars this Court from granting the requested relief.[15]

i.     8 U.S.C. § 1252(f)(1) Does Not Bar Relief

Defendants' first volley against Plaintiffs' suit invokes 8 U.S.C. § 1252(f)(1)'s limitation on injunctive relief in immigration suits. Defendants argue that, "[w]hile Plaintiffs have styled their request for relief as a stay rather than an injunction, the relief requested is the same in substance." ECF 26 at 22. Accordingly, Defendants reason, section 1252(f)(1)'s prohibition on any "court (other than the Supreme Court) . . . enjoin[ing] or restrain[ing] the operation of the provisions of" the section of the U.S. code at issue, including the expedited removal provisions, prohibits the requested relief here. *Id.* (quoting 8 U.S.C. § 1252(f)(1)). Plaintiffs respond that section 1252(f)(1) by its terms is "nothing more or less than a limit on injunctive relief" and that a stay under APA section 705 does not constitute an injunction subject to that provision. ECF 28 at 17 (quoting *Reno v. Am.-Arab Anti-Discrimination Comm.* (*"AADC"*), 525 U.S. 471, 481 (1999)).

Plaintiffs have the better of the argument. Although neither the Supreme Court nor the D.C. Circuit has addressed this question, both the Fifth Circuit and numerous district courts, including in this District, have held that section 1252(f)(1) does not bar a remedy of vacatur under APA section 706.[16] As the Fifth Circuit explained, "a vacatur does nothing but re-establish the status quo absent the unlawful agency action. Apart from the constitutional or statutory basis on which

---

[15] In their opposition, Defendants frame some of the issues discussed in this section as questions of "jurisdiction" and others as whether section 705 provides a basis for the requested relief. *See* ECF 26 at 2. The Court analyzes these threshold issues together, without categorizing them as "jurisdictional," "prudential," "claims-processing," or otherwise, because those distinctions do not, at this point, matter to the Court's resolution of the issues.

[16] *See, e.g., Texas v. United States*, 40 F.4th 205, 220 (5th Cir. 2022); *Las Americas Immigrant Advoc. Ctr. v. DHS*, No. CV 24-1702, 2025 WL 1403811, at *22 (D.D.C. May 9, 2025); *Texas v. Biden*, 646 F. Supp. 3d 753, 768 (N.D. Tex. 2022); *Kidd v. Mayorkas*, 734 F. Supp. 3d 967, 987 (C.D. Cal. 2024); *Florida v. United States*, 660 F. Supp. 3d 1239, 1284-85 (N.D. Fla. 2023); *Immigrant Defs. L. Ctr. v. Mayorkas*, No. CV 20-9893, 2023 WL 3149243, at *14 (C.D. Cal. Mar. 15, 2023).

the court invalidated an agency action, vacatur neither compels nor restrains further agency decision-making." *Texas v. United States*, 40 F.4th 205, 220 (5th Cir. 2022). A court in the Northern District of Texas extended that logic to hold that § 1252(f)(1) also does not bar a stay under section 705. *See Texas v. Biden*, 646 F. Supp. 3d 753, 768 (N.D. Tex. 2022). "Unlike an injunction," that court reasoned, "a stay [under section 705] would not 'order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions' at issue," which is all section 1252(f)(1) prohibits according to the Supreme Court. *Id*. at 769 (quoting *Garland v. Aleman Gonzalez*, 596 U.S. 543, 550 (2022)). Those opinions persuade this Court.

    Defendants offer a two-fold response. First, Defendants point to a series of cases describing various forms of stays as equivalent to injunctions. But none of those cases involved, or purported to interpret, section 1252(f)(1) or its relationship to APA remedies. *See* ECF 26 at 23 (citing, for example, *Brown v. Gilmore*, 533 U.S. 1301, 1303 (2001) (Rehnquist, C.J., in chambers), which distinguished between stay of a lower court judgment and injunction against enforcement of a presumptively valid state statute for purposes of the All Writs Act). And Defendants fail to explain any analogical relevance those opinions might have. Defendants also pointed at oral argument to the D.C. Circuit's recent decision in *N.S. v. Dixon*, which held that section 1252(f)(1) bars injunctions not just of statutory provisions of the INA or IIRAIRA but also injunctions of agency actions implementing the statutory provisions. 141 F.4th 279, 288–90 (D.C. Cir. 2025); *see* ECF 35 at 42 (Hr'g Tr. 42:5–19). Although that case clarified a prior D.C. Circuit case on the scope of section 1252(f)(1), however, it had nothing to do with vacatur or stay under the APA but rather with a class-wide permanent injunction. *See Dixon*, 141 F.4th at 281; *N.S. v. Dixon,* No. 1:20-cv-101, 2021 WL 4622490 (D.D.C. Oct. 7, 2021), *vacated and remanded*, 141 F.4th 279 (D.C. Cir.

2025). Further, it relied heavily on the Supreme Court's decision in *Aleman Gonzalez*, a decision that is consistent with the analysis above and with the analysis in cases like *Texas v. Biden*. 646 F. Supp. 3d at 769.

Second, Defendants invoke IIRAIRA's legislative history, in which a House Report described the purpose of section 1252(f)(1) as ensuring that, in challenges to procedures under the Act, "the procedures w[ould] remain in force while such lawsuits are pending." ECF 26 at 25 (quoting H.R. Rep. 104-469, at 161 (1996)). On its face, that statement supports Defendants' position. But it is difficult to square with the unanimous view of the caselaw on section 1252(f)(1), including the Supreme Court's statement that the section effects "nothing more or less than a limit on injunctive relief." *AADC*, 525 U.S. at 481. In addition, Defendants' interpretation presents a structural problem: it would leave associational plaintiffs like those in this case without any remedy when suing in this Court, despite the statute's clear grant of jurisdiction for suits in this Court under section 1252(e). The D.C. Circuit has held that section 1252(e)(3) authorizes suits by associations to "prosecute a case on behalf of individuals directly regulated and affected by" an agency action challengeable under that provision. *Make the Rd.*, 962 F.3d at 627–28. And suits under section 1252(e)(3) must be brought "in the United States District Court for the District of Columbia." 8 U.S.C. § 1252(e)(3)(A). If the statute authorizes suits by associations in this Court, but authorizes no relief for anyone besides "an individual alien" that looks anything like an injunction, stay, or vacatur, *id.* § 1252(f)(1), then what relief could this Court grant?

When pressed on this question at oral argument, Defendants came up empty. First, they insisted that only an individual noncitizen could seek relief under section 1252(e)(3)(A) without hitting up against the bar of section 1252(f)(1). ECF 35 at 44 (Hr'g Tr. 44:9–12). But when confronted with the binding precedent on associational standing in *Make the Road*, Defendants

JA030

claimed that in such a case "there is no remedy that the Court can provide." *Id.* at 45 (Hr'g Tr. 45:22–23). A bizarre result. When pressed further still, Defendants assured the Court that it could still "adjudicate the merits" of the dispute, just not "issue any relief," including declaratory relief. *Id.* at 46–47 (Hr'g Tr. 46:18–47:22). And a Party could then, the Court supposes under Defendants' theory, appeal the merits decision until it reached the Supreme Court, at which point that Court could issue an injunction under section 1252(f)(1). Even more bizarre. The Court declines to give the statute such an absurd meaning based on a single sentence in the legislative history. *See United States v. Cook*, 594 F.3d 883, 891 (D.C. Cir. 2010) ("A statutory outcome is absurd if it defies rationality by rendering a statute nonsensical or superfluous . . . ." (cleaned up)).

The final problem with Defendants' legislative history argument is that their quote from the House Report does not match up to the statute's text. The legislative history appears to envision that section 1252(f)(1) would prevent preliminary relief of any kind. *See* H.R. Rep. 104-469, at 161 (1996) (discussing what happens while challenges to expedited removal procedures "are pending"). The statute's text, though, prohibits all orders that "enjoin or restrain the operation of" the statute's provisions, not just preliminary ones. 8 U.S.C. § 1252(f)(1). In short, because the statute's text, alongside the D.C. Circuit's interpretation of it, does not permit Defendants' reading, the Court will not give it that reading based on the legislative history alone. *See Int'l Bhd. of Elec. Workers, Loc. Union No. 474, AFL-CIO v. N.L.R.B.*, 814 F.2d 697, 699–700 (D.C. Cir. 1987) ("Although legislative history may give meaning to ambiguous statutory provisions, courts have no authority to *enforce* alleged principles gleaned *solely* from legislative history that has no statutory reference point." (emphasis in original)).

ii.    <u>APA Section 705 Permits Stays of Agency Actions Already in Effect</u>

In their next attack on the relief Plaintiffs seek, Defendants assert that a court may not stay

agency actions under APA section 705 that have already gone into effect. ECF 26 at 25–28. APA

section 705 permits an agency to "postpone the effective date" of its own actions pending judicial

review and, separately, permits a court to "postpone the effective date of an agency

action or . . . preserve status or rights pending conclusion of the review proceedings." 5 U.S.C.

§ 705. Defendants' argument here relies on cases interpreting the term "postpone the effective

date" as it relates to agencies' own stays of their agency actions. *See* ECF 26 at 26 (citing *Safety-

Kleen Corp. v. EPA*, Nos. 92-1629, 92-1639, 1996 U.S. App. LEXIS 2324, at *2-3 (D.C. Cir. Jan.

19, 1996); *Ctr. for Biological Diversity v. Regan*, No. 21-cv-119, 2022 WL 971067, at *21 (D.D.C.

Mar. 30, 2022); *California v. U.S. Bureau of Land Mgmt.*, 277 F. Supp. 3d 1106, 1118 (N.D. Cal.

2017)). Defendants argue that the same phrase in the same statute should be given the same

meaning; a court, therefore, should not be able to stay an agency action after it has gone into effect

if an agency under the same provision cannot. *Id.* at 26.

However, as Plaintiffs point out, Defendants' argument omits the other authority that

section 705 grants only courts, not agencies. While an agency may only "postpone the effective

date of action taken by it," a court may either "postpone the effective date of an agency action" *or*

"preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. And

"[c]ourts—including the Supreme Court—routinely stay already-effective agency action." *Texas

v. Biden*, 646 F. Supp. 3d at 770 (citing, *e.g.*, *W. Virginia v. E.P.A.*, 577 U.S. 1126 (2016)); *accord

Kingdom v. Trump*, No. 1:25-cv-691, 2025 WL 1568238, at *5 (D.D.C. June 3, 2025) (noting that

"various courts have interpreted § 705 to permit a 'stay'—which may be more aptly described as

a temporary rollback—even of already-consummated agency action"). Moreover, "[w]hile some

courts have held that an agency may not issue a § 705 stay for an already-effective action because that would amount to an amendment requiring a period of notice and comment, that reasoning plainly does not apply to courts." *Cabrera v. U.S. Dep't of Lab.*, No. 25-cv-1909, 2025 WL 2092026, at *8 (D.D.C. July 25, 2025) (internal citation and emphasis omitted). Thus, the fact that all three Challenged Actions are already in effect does not bar this Court from staying them—and returning things to the *status quo ante* while this case proceeds—under section 705. *See Texas v. Biden*, 646 F. Supp. 3d at 771.

### iii.    8 U.S.C. § 1252(e)(1) Does Not Prohibit the Requested Relief

Defendants next invoke the provision of section 1252 that prohibits courts from "enter[ing] declaratory, injunctive, or other equitable relief in any action pertaining to an order to exclude an alien in accordance with section 1225(b)(1) of this title [i.e., the expedited removal provision] except as specifically authorized in a subsequent paragraph of this subsection." 8 U.S.C. § 1252(e)(1)(A). Although Plaintiffs bring this suit under section 1252(e)(3), which is carved out of that prohibition, Defendants insist that Plaintiffs' stay motion must fail because the sole remedy section (e)(3) authorizes is a final "determination[]" on the merits—not interim relief. ECF 26 at 28 (quoting 8 U.S.C. § 1252(e)(3)(A)). Further, Defendants urge, section 1252(e)(3) authorizes suits "by, and only by, aliens against whom the new procedures had been applied"—not by associations suing on behalf of their noncitizen members. *Id.* (quoting *Am. Immigr. Lawyers Ass'n v. Reno* ("*AILA*"), 199 F.3d 1352, 1360 (D.C. Cir. 2000)).

Defendants miss on both swings. As to interim versus final relief, Plaintiffs correctly observe that "section 1252(e)(3) is not addressed to remedies." ECF 28 at 21 n.8 (quoting *Kiakombua v. Wolf*, 498 F. Supp. 3d 1, 51 (D.D.C. 2020) (K.B. Jackson, J.)). Instead, its use of the term "determinations" refers to determination of "*certain legal issues*, including whether the

[challenged] written policy directive, guideline, or procedure is consistent with the [statute]." *Kiakombua*, 498 F. Supp. 3d at 51 (citing 8 U.S.C § 1252(e)(3)(A)(ii)) (emphasis in original). That is clear from the text of section 1252(e)(3), which nowhere mentions remedies but clearly describes legal grounds for suit. And with regard to suits by associations, Defendants' argument blinks the D.C. Circuit's holding in *Make the Road*. There, the Circuit rejected the very argument that the Government makes here, holding instead that associations *can* bring suit under § 1252(e) on behalf of their members. *See Make the Rd.*, 962 F.3d at 627–28 (explaining that *AILA*, the Government's primary case there and here, "rejected third-party organizational standing" but "did not address associational standing," and that associational suits, unlike organizational suits, "seek[] to remedy the individual members' injuries"). The caselaw thus forecloses Defendants' position.

iv.    Plaintiffs' Asserted Injuries Are Redressable

Moving to standing, Defendants do not challenge Plaintiffs' claimed injuries to their members—but they do challenge those injuries' redressability by this suit. ECF 26 at 31.[17] According to Defendants, Plaintiffs' members' injuries are not redressable because a regulatory provision that has been in place since 1997 and that Plaintiffs do not seek to stay in this motion already "allows DHS to apply expedited removal to aliens paroled at ports of entry." *Id.* at 29. Specifically, Defendants cite 8 C.F.R. § 235.3(b)(1)(i), which authorizes application of expedited removal to "[a]rriving aliens," and 8 C.F.R. § 1.2, which defines "arriving alien[s]" to include those who are "paroled . . . and even after any such parole is terminated or revoked." Based on these longstanding regulations, Defendants reason, DHS could already do exactly what Plaintiffs allege they are doing here, and thus Plaintiffs' injuries are "in no way contingent on" the

---

[17] Defendants briefly argue that Plaintiffs have "failed to plead an injury" sufficient for organizational standing, but they then acknowledge that Plaintiffs instead invoke associational standing and "do not challenge" Plaintiffs' asserted injury on that latter basis. ECF 26 at 30–31.

Challenged Actions. ECF 26 at 30. In other words, because "none of these documents are necessary for DHS to apply expedited removal to aliens paroled at a port of entry," "staying their implementation will not prevent the harms Plaintiffs allege they cause." *Id.*

The first problem with Defendants' argument is that it contradicts the factual record now before the Court. While DHS has long asserted the authority to apply expedited removal to parolees, Plaintiffs present evidence that the agency has only begun doing so *en masse* since the Challenged Actions—particularly the March 25 CHNV Termination Notice. *See* ECF 22-1 at 15–16; ECF 22-3 ¶ 21; ECF 22-4 ¶ 13; *see also supra* at n.13. Plaintiffs' employees testified in declarations that expedited removal has ramped up significantly among their memberships. *See id.* And multiple immigration attorneys who submitted declarations in this case, each of whom has years of experience representing immigrants in removal proceedings, swore that they have rarely, if ever, seen expedited removal applied to parolees or others already in section 240 proceedings before the past few months. *See, e.g.*, ECF 22-8 ¶ 28; ECF 22-14 ¶ 14.

Defendants do little to rebut that evidence. They first point to a memorandum issued by an ICE official in April 2011 instructing agents to "screen incarcerated aliens to determine if [expedited removal] is appropriate," including whether they qualify as an "arriving alien" under the regulation. ECF 36-1 at 2–3 (Memorandum from Gary Mead, ICE Executive Associate Director, to Field Officer Directors and Deputy Field Office Directors (Apr. 5, 2011)). Second, they refer the Court to two cases initiated prior to January 2025 in which DHS applied expedited removal to parolees. *See* ECF 36 at 2 (citing *Cordon-Linarez v. Garland*, No. 3:24-CV-00488, 2024 WL 4652824, at *1 (M.D. Pa. Nov. 1, 2024), *appeal pending*, No. 24-3068 (3d Cir.); *United States v. Arredondo-Martinez*, No. CR 10-525, 2011 WL 13196331, at *6 (C.D. Cal. Oct. 3, 2011), *aff'd* 492 F. App'x 823 (9th Cir. 2012)).

That scant evidence does not overcome the record Plaintiffs have developed. For one thing, the 2011 memorandum proves only that ICE officials considered and encouraged using their asserted authority under the "arriving alien" regulatory definition. Defendants offer no evidence of how often or how pervasively ICE officials actually used that authority. Indeed, Defendants did not even offer this memorandum in their initial briefing; instead, they submitted it after this Court's questions at oral argument as to any examples of DHS applying expedited removal to parolees before this year. *See id.* at 1. That Defendants could then muster just two examples of the agency applying that regulatory definition to specific noncitizens prior to 2025 only highlights the dearth of evidence. Further, in both of Defendants' cited cases, the noncitizens were charged with crimes and paroled into the country for purposes of criminal prosecution. *See Cordon-Linarez*, 2024 WL 4652824, at *4; *Arrendondo-Martinez*, 2011 WL 13196331, at *1. Additionally, the 2011 memorandum contained separate directives for noncitizens paroled into the United States for prosecution versus those paroled for another reason. It said that ICE officers "should use [expedited removal] for all arriving aliens paroled into the United States for prosecution, regardless of how long they have been present in the United States," but should only consider expedited removal for other parolees "if the parole has expired or been terminated <u>and</u> the alien has been continuously present in the United States for less than one year." ECF 36-1 at 3. Thus, Defendants provide *no* evidence that, prior to the Challenged Actions, DHS ever applied expedited removal to the many parolees—including the hundreds of thousands of parolees under the CHNV Parole Programs and others like them—who were paroled into the United States for a purpose other than criminal prosecution. And they certainly have no evidence that DHS applied expedited removal to that population at the scale it is doing so now. Plaintiffs' evidence, then, stands unrebutted.

Meanwhile, Defendants' own statements elsewhere in their briefing flatly contradict what is left of their redressability argument. Although Defendants insist for redressability purposes that they could do the exact same things they are doing here, and inflict the exact same injuries, even if the Court stayed the Challenged Actions, they assert for balance-of-the-equities purposes that "[t]he relief Plaintiffs request would prevent DHS from applying expedited removal to potentially hundreds of thousands of paroled aliens whose parole DHS is seeking to revoke or has revoked, thereby frustrating DHS's ability to quickly remove these aliens." ECF 26 at 61. That could only be true if DHS was not, in fact, already equipped to apply expedited removal to parolees without reliance on the Challenged Actions. Needless to say, Defendants cannot have it both ways. And Defendants' latter argument, that the Challenged Actions have some independent effect, matches the factual record. Indeed, at least one of the three Challenged Actions appears to be based on, and purports to implement, the "arriving alien" definition in 8 C.F.R. § 1.2. *See* February 18 ICE Directive at 1 (suggesting that ICE agents may commence expedited removal proceedings for noncitizens whose parole was terminated regardless of how long they have been present in the United States, which matches the Arriving Aliens Provision but not the Designation Provision). That evidence, too, undermines any claim that the Challenged Actions are entirely redundant.[18]

That record decides this question because redressability is ultimately a question of fact. This Court must examine the whole record and determine whether Plaintiffs' asserted injuries are "likely to be redressed" by a favorable decision. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Defendants' cited cases only reinforce that point. In each of the cases Defendants cite, the courts

---

[18] Ironically, the main evidence in the record in favor of Defendants' position is a filing Plaintiffs attach to their Reply, which shows that, in at least one case, DHS has explicitly relied upon the Arriving Aliens Provision rather than the Designation Provision to subject a parolee to expedited removal in recent months. *See* ECF 28-1 at 18. But such a position is fully consistent with the proposition that the February 18 ICE Directive implemented 8 C.F.R. §§ 1.2 and 235.3, thereby having some independent effect.

found no redressability based on factual findings that the alternative legal route for the agency to do the same thing would necessarily, or at least likely, cause the exact same injury to the plaintiffs. In *Texas v. EPA*, the statute was "self-executing," and therefore would have exactly the same effect with or without the challenged regulations. 726 F.3d 180, 198 (D.C. Cir. 2013). In *Kaspersky Lab, Inc. v. DHS*, the court found that another regulation would "independently produce the same alleged result." 311 F. Supp. 3d 187, 219 (D.D.C. 2018), *aff'd*, 909 F.3d 446 (D.C. Cir. 2018). So, too, in *Delta Const. Co., Inc. v. EPA*. *See* 783 F.3d 1291, 1297 (D.C. Cir. 2015) ("Because a separate action—NHTSA's standards—independently causes the same alleged harm as the challenged action, the California Petitioners are unable to establish the 'necessary causal connection' between the EPA standards and their purported injury."). Here, Defendants have not demonstrated, as a factual matter, that 8 C.F.R. § 1.2 would have the same result had none of the three Challenged Actions been issued. Moreover, relief need only be likely to relieve the asserted injury "in part," not even the entirety of the injury. *Defs. of Wildlife v. Gutierrez*, 532 F.3d 913, 925 (D.C. Cir. 2008); *see also Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982) ("[A] plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself. He need not show that a favorable decision will relieve his *every* injury." (emphasis original)). The factual record allows Plaintiffs to clear at least that bar.

Finally, Defendants attempt to fall back on a non-binding, and ultimately inapposite, concurrence by Justice Gorsuch in *United States v. Texas*, 599 U.S. 670, 689–93 (Gorsuch, J., concurring). There, the Justice (joined by Justices Thomas and Barrett) argued that the States' alleged injury arising from DHS guidance instructing non-enforcement against certain noncitizens was not redressable by vacatur of that guidance because immigration officers would still have

JA038

prosecutorial discretion not to arrest and remove any given noncitizen even without the challenged guidance. *Id.* at 690–91.

Of course, a three-Justice concurrence is not the law. Moreover, binding Supreme Court precedent holds that "a litigant to whom Congress has accorded a procedural right to protect his concrete interests . . . can assert that right without meeting all the normal standards for redressability and immediacy." *Massachusetts v. EPA.*, 549 U.S. 497, 517–18 (2007) (internal citations and quotation marks omitted). Here, Congress has specifically permitted challenges to any "written policy directive, written policy guideline, or written procedure" that implements the expedited removal system. 8 U.S.C. § 1252(e)(3). By definition, such documents implement some other regulatory or statutory authority. *See Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 252 (D.C. Cir. 2014) ("An agency action that merely explains how the agency will enforce a statute or regulation—in other words, how it will exercise its broad enforcement discretion or permitting discretion under some extant statute or rule—is a general statement of policy," also known as "guidance"). The statute thus permits procedural challenges to, and provides constitutionally suitable redress from, sub-regulatory guidance that causes injury in fact. This suit meets those criteria. Justice Gorsuch's concurrence does not address that legal theory at all, much less foreclose it.

v.    <u>Plaintiffs' Suit Is Not Time Barred</u>

Next up, Defendants challenge the timeliness of Plaintiffs' suit. The statute permitting challenges, like this one, to the expedited removal system requires that such challenges be filed "no later than 60 days after the date the challenged section, regulation, directive, guideline, or procedure . . . is first implemented." 8 U.S.C. § 1252(e)(3)(B). Because DHS has asserted the

authority to subject parolees to expedited removal since a regulation promulgated on April 1, 1997, Defendants contend, Plaintiffs are about 28 years too late. ECF 26 at 32.

Defendants' argument fails for the same basic reason as some of its previous ones: The statute permits Plaintiffs to challenge not just statutes and agency regulations, but also "written policy directive[s], written policy guideline[s], [and] written procedure[s]" that "implement" the expedited removal statute. 8 U.S.C. § 1252(e)(3)(A)(ii). In only a slight variation on their previous arguments, Defendants contend that the Challenged Actions were not in fact "first implemented" when they were issued, *id.* § 1252(e)(3)(B), because they merely restated the "long-established principle that aliens paroled at a port of entry are subject to expedited removal." ECF 26 at 33–34. Yet, by its text, "section 1252(e)(3) plainly authorizes judicial review of written policies, guidelines, or procedures that implement the expedited removal statute, without regard to whether such policies deviate substantively from an agency's prior practices." *Kiakombua*, 498 F. Supp. 3d at 36. Indeed, as already explained, sub-regulatory guidance necessarily implements statutory or regulatory principles. If no such guidance could be challenged, most of section 1252(e)(3)A)(ii) would be rendered nugatory. But courts "presume that Congress did not 'include words [in statutes] that have no effect.'" *Mercy Hosp., Inc. v. Azar*, 891 F.3d 1062, 1068 (D.C. Cir. 2018) (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 176–77 (2012)); *accord United States v. Menasche*, 348 U.S. 528, 538–39 (1955) ("It is our duty to give effect, if possible, to every clause and word of a statute." (internal quotations omitted)). Moreover, as demonstrated above, the Challenged Actions have had effects independent of the preexisting 1997 regulation and cannot be understood merely to restate that regulation. *See supra* Section IV.A.1.iv.

JA040

Plaintiffs brought this suit within 60 days of the first Challenged Action, the January 23 Huffman Memorandum. Their suit is therefore timely under 8 U.S.C. § 1252(e)(3)(B).

vi.    <u>8 U.S.C. § 1252(g) Does Not Foreclose the Requested Stay</u>

Proceeding down the page of the U.S. Code, Defendants invoke section 1252(g)'s "[e]xclusive jurisdiction" provision, which states in relevant part,

> Except as provided in this section . . . no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.

8 U.S.C. § 1252(g). Defendants argue that Plaintiffs' suit seeks just that prohibited kind of relief, pointing to a prayer for relief in Plaintiffs' amended complaint that asks the Court to "[e]njoin Defendants from applying expedited removal to noncitizens who have previously been granted parole at a port of entry." ECF 26 at 35 (quoting ECF 21 at 54).

Not so. Defendants' argument breezes right past the first five words of that provision—"[e]xcept as provided in this section." 8 U.S.C. § 1252(g). That "section" includes section 1252(e)(3)(A), which authorizes challenges to expedited removal policies and procedures of the exact kind that Plaintiffs bring here. The provision's text thereby fully resolves the issue.

Defendants attempt to get out from under that text by accusing Plaintiffs of merely "restyl[ing]" their challenge to their members' expedited removals in a way that is easily manipulable and would render section 1252(g) a "paper tiger." ECF 26 at 37 (quoting *Tazu v. Att'y Gen. United States*, 975 F.3d 292, 298 (3d Cir. 2020); *E.F.L. v. Prim*, 986 F.3d 959, 965 (7th Cir. 2021)). Yet none of the three cases Defendants cite for that proposition purported to analyze the line between section 1252(e)(3) actions and those barred by section 1252(g). Instead, they all involved actions that clearly did not fall under section 1252(e)(3). *See Tazu*, 975 F.3d at 295–98 (challenging the timing of DHS decision to execute plaintiff's removal); *E.F.L.*, 986 F.3d at 964–

65 (challenging DHS decision to execute plaintiff's removal order while plaintiff sought administrative relief); *AADC*, 525 U.S. at 487 (selective prosecution challenge, which the Parties there appeared to agree did not fall under section 1252(e)(3)(A)). Thus, Defendants' arguments on this provision fail.

vii.    Plaintiffs Have Prudential Standing to Sue Under 8 U.S.C. § 1252(e)(3)(A)

The final threshold barrier that Defendants seek to erect is a claim that Plaintiffs fall outside the zone of interests protected by section 1252(e)(3) and therefore lack a cause of action to sue under it. ECF 26 at 37; *see Thompson v. N. Am. Stainless*, 562 U.S. 170, 177 (2011) (holding that a plaintiff "may not sue unless he falls within the zone of interests sought to be protected by the statutory provision whose violation forms the legal basis for his complaint" (internal quotations omitted)). Defendants point to language in the D.C. Circuit's decision in *AILA* stating that the Circuit "cannot see anything in these provisions allowing litigants—whether individuals or organizations—to raise claims on behalf of those not party to the lawsuit." 199 F.3d at 1358. Only "individual aliens who . . . were aggrieved by the statute's implementation," the *AILA* court reasoned, may sue under section 1252(e)(3)(A). *Id.* at 1359.

Once again, though, Defendants' argument runs headlong into the D.C. Circuit's later decision in *Make the Road*, 962 F.3d 612. There, the Circuit permitted a suit under section 1252(e)(3)(A) by membership associations because "[w]hether aggrieved individuals sue on their own or band together through a representative association does not change the nature of the lawsuit as seeking to remedy the individual members' injuries." *Make the Rd.*, 962 F.3d at 628. Here, Plaintiffs' members are aggrieved by the Challenged Actions. Plaintiffs sue to redress those members' injuries. *See* ECF 22-2; ECF 22-3; ECF 22-4. That takes this case out of the *AILA* category and places it firmly under *Make the Road*. Indeed, judges in this District have found that

membership associations fall within the zone of interest of this statute on precisely that basis. *See, e.g.*, *Nat'l Ass'n for the Advancement of Colored People v. Trump*, 298 F. Supp. 3d 209, 235 (D.D.C. 2018), *adhered to on denial of reconsideration*, 315 F. Supp. 3d 457 (D.D.C. 2018), and *aff'd and remanded sub nom. Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891 (2020); *Hisp. Affs. Project v. Perez*, 319 F.R.D. 3, 7–8 (D.D.C. 2016).[19]

Defendants try to distinguish *Make the Road* on factual grounds, arguing that Plaintiffs' declarations do not sufficiently prove that their members are aggrieved by the Challenged Actions in the way the *Make the Road* plaintiffs' declarations did. Plaintiffs' declarations are deficient, Defendants posit, because they (a) do not come from the members themselves, (b) contain hearsay, (c) do not identify members by their full names, and (d) sometimes do not identify whether the noncitizen being discussed is a member of any of the Plaintiff associations. ECF 26 at 39. It is true that the record in *Make the Road* included "three declarations from the Associations' members stating that they were subject to and adversely affected by" the challenged expedited removal policy. *Make the Rd.*, 962 F.3d at 622. But Plaintiffs' declarations here similarly attest to harms Plaintiffs' members face from being newly subjected to expedited removal, including those currently in expedited removal proceedings or eligible for them. *See, e.g.*, ECF 22-2 ¶¶ 10–17; ECF 22-3 ¶¶ 14–23; ECF 22-4 ¶¶ 13–22. *Make the Road* imposes no requirement that the declarations identify members by their actual names. Nor does it require declarations from members themselves; declarations from others speaking about the members' circumstances based on the declarant's personal knowledge and observations serve the equivalent function.[20] And

---

[19] Justice O'Connor's decision in chambers in *INS v. Legalization Assistance Project of L.A. Cty. Fed'n of Labor*, 510 U.S. 1301, 1302 (1993), does not hold to the contrary. Although her opinion did say that the immigration law at issue there was "clearly meant to protect the interests of undocumented aliens, not the interests of organizations," she specifically clarified that "membership organizations which have members whose claims are ripe" could sue "on behalf of those members." *Id.* at 1305–06.

[20] To be sure, some portions of some of Plaintiffs' declarations do include hearsay. The Court does not rely on any hearsay in the declarations.

though a few of the declarations fail to identify whether certain described noncitizens are members, the record as a whole contains enough (non-hearsay) testimony about members of each Plaintiff association to demonstrate their standing.[21] Thus, Plaintiffs stand in the same position as those in *Make the Road*.

Defendants make one last ditch effort to get out from under that binding precedent by pointing to the Supreme Court's opinion in *United States v. Texas*, 599 U.S. 670 (2023). According to Defendants, that case decided that "third parties have no cognizable interest in the way the Executive enforces the immigration laws against others." ECF 26 at 41. But such a statement reads the Court's decision way too broadly. *United States v. Texas* was a decision about Article III standing in which the Supreme Court found that a state lacked a judicially cognizable injury in fact arising from the federal government's decision not to arrest or prosecute certain noncitizens. As the Supreme Court explained, that "case raise[d] only the narrow Article III standing question of whether the Federal Judiciary may in effect order the Executive Branch to take enforcement actions against violators of federal law—here, by making more arrests." 599 U.S. at 684–85. The instant case presents no such question, nor anything particularly close to it. *Texas* therefore does nothing

---

[21] *See, e.g.*, ECF 22-2 ¶ 11 (discussing CASA declarant's knowledge about "CASA members who have had their grants of CBP One parole prematurely terminated, putting them at risk of being subjected to expedited removal); ECF 22-3 ¶ 17 (discussing CHIRLA declarant's knowledge about a CHIRLA member's experience being detained and processed for expedited removal); ECF 22-4 ¶ 17 (discussing UndocuBlack declarant's knowledge of its "members who are Haitian parole beneficiaries" and are newly eligible for removal due to the Challenged Actions, and who therefore face the heightened risk of "abrupt family separation," and "deport[ation] to Haiti where they don't have family or resources and where they may be at risk of violence or even death"); ECF 22-10 (discussing CASA member's experience in the expedited removal process based on the member's attorney's personal knowledge and observations). Defendants also seem to suggest that the only declarations that can support Plaintiffs' prudential standing are those from members who are already in expedited removal proceedings. ECF 26 at 39 ("In fact, Plaintiffs only identify three alleged members who were granted parole and subsequently placed in expedited removal proceedings, in each case through pseudonymous hearsay. . . . This is insufficient to establish that Plaintiffs fall within the zone of interests protected by the expedited removal statute."). But *none* of the declarants in *Make the Road* was already being processed for expedited removal, and yet their declarations sufficed for those plaintiff associations' standing. *See Make the Rd.*, 405 F. Supp. 3d at 33.

JA044

to alter *Make the Road*'s application to this case. Plaintiffs fall within the statute's zone of interests and may sue for relief under section 1252(e)(3)(A) and the APA cause of action.

### 2. *The Challenged Actions Exceed DHS's Statutory Authority*

Satisfied that it likely has jurisdiction to resolve this case, and that no statutory provision or doctrine raised by Defendants bars this suit, the Court proceeds to the merits of Plaintiffs' claims. The Court first addresses Plaintiffs' arguments that each of the three Challenged Actions exceeds DHS's statutory authority. Plaintiffs are likely to succeed on that claim.

Defendants argue that two statutory authorities justify the Challenged Actions: the Designation Provision and the Arriving Aliens Provision of 8 U.S.C. § 1225(b)(1)(A). The Court addresses each in turn.

### i.    The Designation Provision Does Not Authorize Expedited Removal of Parolees

Defendants attempt to ground the Challenged Actions' lawfulness partially in the provision of 8 U.S.C. § 1225(b)(1)(A) that permits the DHS Secretary to designate certain noncitizens for expedited removal—i.e., the Designation Provision. As a reminder, that provision, in relevant part, authorizes the Attorney General (now delegated to the DHS Secretary) to designate as eligible for expedited removal any

> alien . . . who has not been admitted or paroled into the United States, and who has not affirmatively shown, to the satisfaction of an immigration officer, that the alien has been physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility under this subparagraph.

8 U.S.C. § 1225(b)(1)(A)(iii)(II). As of January 21, 2025, DHS has expanded its designation to the full scope permitted under that statutory provision. *See* 2025 Designation Notice at 8139.

Two of the three Challenged Actions explicitly relied upon the Designation Provision, and the DHS Secretary's designation thereunder, as their authority. The January 23 Huffman Memorandum noted that the then-Acting Secretary of DHS had, in the 2025 Designation Notice,

JA045

"expand[ed] the scope of expedited removal to the statutory maximum under 8 U.S.C. § 1225(b)(1) which . . . includes certain aliens who have not been continuously present in the United States for two years." January 23 Huffman Memorandum at 1. The Memorandum purported to "provide[] guidance regarding how to exercise enforcement discretion in implementing these policies," with "these policies" referring in part to the scope of DHS's designation. *Id.*[22] Meanwhile, the March 25 CHNV Termination Notice discussed DHS's authority under the Designation Provision in some detail as a primary reason for its termination of the CHNV Parole Programs. Among other references, the Notice stated that, because of the Designation Provision's less-than-two-year continuous presence requirement, "[e]xpedited removal is available only when an alien has not been continuously present in the United States for at least the two years preceding the date of the inadmissibility determination." March 25 CHNV Termination Notice at 13619.

Whether the third Challenged Action, the February 18 ICE Directive, also relied upon the Designation Provision is a bit less clear. That confusion raises a separate defect, arbitrariness, which the Court discusses further below. But for present purposes, the Directive appears to invoke the Designation Provision in one of its sections, in which it directed officers to "consider for expedited removal" certain paroled noncitizens who "ha[ve] not been continuously physically present in the United States for two years prior to the finding of inadmissibility by the ERO." February 18 ICE Directive at 1–2.

But the Designation Provision under the statute does not authorize the Challenged Actions. That is because the Designation Provision forbids the expedited removal of noncitizens who have been, at any point in time, paroled into the United States.

---

[22] The other "polic[y]" to which that sentence referred was a January 20 memorandum "clarif[ying] DHS's position regarding the scope of the parole statute" and encouraging pauses, modifications, or termination of parole grants given under categorical programs. January 23 Huffman Memorandum at 1.

As with any question of statutory interpretation, the Court "begin[s] with the text." *City of Clarksville v. FERC*, 888 F.3d 477, 482 (D.C. Cir. 2018). The Designation Provision authorizes designation for expedited removal of any noncitizen who, among other requirements, "has not been admitted or paroled into the United States." 8 U.S.C. § 1225(b)(1)(A)(iii)(II). On the text, the Parties' dispute comes down to the meaning of Congress's use of the present-perfect tense: "has not been . . . paroled." Plaintiffs claim that "the negative form of the present perfect tense," as the statute employs, "indicate[s] an event that is neither continuing to the present nor occurred in the past." ECF 28 at 26. They reason that the present-perfect tense "can, as a matter of pure semantics, refer to a time in the indefinite past *or* to a past action or state that continues into the present." *Id.* at 25–26 (quoting *Turner v. U.S. Att'y Gen.*, 130 F.4th 1254, 1261 (11th Cir. 2025) (emphasis in original)). It follows, they argue, that the negative form of the present-perfect tense must indicate that the event *neither* happened in the indefinite past *nor* is continuing into the present. *Id.* at 26. Under that reading, whether a noncitizen's parole is active, or has expired or been terminated, does not matter. Either way, if the noncitizen was ever "paroled into the United States," 8 U.S.C. § 1225(b)(1)(A)(iii)(II), the Designation Provision may not be applied to them, ECF 28 at 26.

Yet, as Defendants correctly point out, Plaintiffs' logic does not necessarily hold. Indeed, the Supreme Court recently held that a particular statutory phrase framed in the present-perfect tense "conveys to a listener that the event in question continues to be true or valid," even when used in the negative. *Hewitt v. United States*, 145 S. Ct. 2165, 2172 (2025). That case concerned a section of the First Step Act that applied "to any offense that was committed before the date of enactment of this Act, if a sentence for the offense *has not been imposed* as of such date of enactment." *Id.* at 2170 (quoting First Step Act § 403(b), 132 Stat. 5194, 5222 (2018) (emphasis added)). The Court determined that, "[w]hen used in this way," a sentence that "has not been

imposed" means a sentence that has no "continued legal validity," even if the sentence *was* imposed and had legal validity at some point in the past. *Id.* at 2172–73. By analogy, Defendants suggest, the Designation Provision exempts only those whose parole has not been terminated and continues to be valid. ECF 31 at 1; ECF 26 at 46.

Ultimately, the pure semantics of the phrase at issue cannot resolve this question. The Supreme Court's analysis in *Hewitt* alone disproves Plaintiffs' mistaken syllogism that the negative form of the present-perfect tense necessarily means that neither of the potential meanings of the positive present-perfect tense applies. At the same time, Defendants err in suggesting that *Hewitt* decided that the present-perfect tense *always* refers to an event that continues into the present. To the contrary, the *Hewitt* Court indicated that its grammatical conclusion—that the present-perfect tense necessarily refers to something that continues into the present—depended on the "way" in which the phrase at issue was "used." *Hewitt*, 145 S.Ct. at 2172. Specifically, the present-perfect tense holds the meaning the Court ascribed to it when it "describe[s] situations involving a specific change of state that produces a continuing result." *Id.* (internal citation and quotation marks omitted). In addition, the *Hewitt* Court referenced adjacent provisions of the statute and background legal principles to determine whether its grammatical holding made sense in the context of the statute as a whole. *Id.* at 2172–74. That analysis is consistent with the Eleventh Circuit's statement in *Turner* that the present-perfect tense can refer to two different things (either "a time in the indefinite past or . . . a past action or state that continues into the present"), and that "the question becomes which of those meanings applies in this statutory context." *Turner*, 130 F.4th at 1261 (citing *Pulsifer v. United States*, 601 U.S. 124, 133 (2024)).

Examining the statutory context, Plaintiffs point to the words immediately surrounding the phrase at issue. Again, the statute permits designation for expedited removal of noncitizens who

"ha[ve] not been *admitted* or paroled." 8 U.S.C. § 1225(b)(1)(A)(iii)(II) (emphasis added).

Applying the canon of *noscitur a sociis*, Plaintiffs argue that "the meaning of 'paroled' is

elucidated by its association with 'admitted.'" ECF 28 at 27–28 (citing *Fischer v. United States*,

603 U.S. 480, 487 (2024), for the proposition that "a word is given more precise content by the

neighboring words with which it is associated"). And in immigration law, "admission" is

something that happens at a specific point in time; it is not a "continuing status." ECF 22-1 at 25–

26 (quoting *Sanchez v. Mayorkas*, 593 U.S. 409, 415 (2021) as stating, "[l]awful status and

admission . . . are distinct concepts in immigration law"); *see also* 8 U.S.C. § 1101(a)(13)(A)

(defining "admission" and "admitted" as "the lawful entry of the alien into the United States after

inspection and authorization by an immigration officer"). Plaintiffs acknowledge that "[p]arole,"

unlike "admission," can refer to "both a manner of entry and a status." ECF 22-1 at 26. But when

accompanied by "admitted," which refers only to a manner of entry, "paroled" likely refers to a

manner of entry, too. *Id.* And if that is true, then *Hewitt*'s rule does not apply here, because *Hewitt*'s

grammatical conclusion applies when the present-perfect word at issue "describe[s] situations

involving a specific change of state that produces a continuing result"—i.e., a change in "status."

*Hewitt*, 145 S.Ct. at 2172–73. Defendants offer no response to this persuasive argument from

Plaintiffs.

Like the *Hewitt* Court, Plaintiffs also look to "[b]ackground [legal] principles." *Id.* at 2173;

*see* ECF 35 at 12–15 (Hr'g Tr. 12:3–15:7). As Plaintiffs rightly observe, *Hewitt* hung its holding

in part on the "legal effect of vacatur" of a sentence. *Hewitt*, 145 S.Ct. at 2173 (citing *Bond v.*

*United States*, 572 U.S. 844, 857 (2014) for the proposition that "Congress legislates against the

backdrop of certain unexpressed presumptions" (cleaned up)). Because "the law acts as though [a]

vacated [court] order never occurred," it makes sense for an offender whose sentence was vacated

JA049

to be treated under the First Step Act the same as someone who was never sentenced in the first place. *Id.* at 2174. Here, background principles suggest the opposite: that termination of parole, unlike vacatur of a sentence, does not render that parole "void *ab initio*." *Id.* at 2173. For example, Plaintiffs observe that a noncitizen is generally ineligible to apply for adjustment of status if the noncitizen "was not admitted or paroled following inspection by an immigration officer." 8 C.F.R. § 245.1(b)(3); *see* ECF 35 at 14–15 (Hr'g Tr. 14:22–15:3). If the noncitizen was paroled into the country but that parole later expired or was terminated (as all parole does, since parole under 8 U.S.C. § 1182(d)(5) must be temporary), the regulation does not indicate that the noncitizen is therefore ineligible for adjustment of status. To the contrary, because the noncitizen "was . . . paroled," they would remain eligible under that requirement. *See* 8 C.F.R. § 245.1(b)(3). Thus, for at least some purposes, parole has ongoing legal effect even after it expires or is terminated. And, under *Hewitt*'s logic, it would therefore make sense for the Designation Provision to treat noncitizens who were paroled into the United States differently, even once their parole ends, than noncitizens who entered the country without parole.

Defendants respond by pointing the Court to a different background principle that they say informed the Designation Provision: the so-called "entry fiction." ECF 28 at 33; ECF 26 at 46. Under that principle, Defendants explain, "when parole is revoked, an alien reverts to the status he possessed prior to the grant of parole." ECF 26 at 46. "In the case of all those paroled at a port of entry," Defendants continue, "that is the position of an applicant for admission standing at the threshold of entry." *Id.* Defendants point to a few sources for that principle. First, they reference the parole statute, which has long stated that parole "shall not be regarded as an admission of the alien," and "when the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served the alien shall forthwith return or be returned to the custody from which

JA050

he was paroled and thereafter his case shall continue to be dealt with in the same manner as that

of any other applicant for admission to the United States." 8 U.S.C. § 1182(d)(5)(A). They also

cite a Supreme Court case that held, for purposes of a since-repealed provision of the Immigration

and Nationality Act (INA), that a noncitizen paroled into the United States is treated the same as

a noncitizen held in detention and therefore is not considered to be "within the United States."

*Leng May Ma v. Barber*, 357 U.S. 185, 186–188 (1958) (citing INA § 243(h)); *see* ECF 26 at 46.

Finally, Defendants cite a Supreme Court decision and two decisions from other circuits that post-

date IIRAIRA's passage by at least a decade and interpret, or just recite, the above-quoted text in

8 U.S.C. § 1182(d)(5)(A). *See* ECF 26 at 46 (citing *Jennings v. Rodriguez*, 583 U.S. 281, 288

(2018); *Duarte v. Mayorkas*, 27 F.4th 1044, 1058 (5th Cir. 2022); *Ibragimov v. Gonzales*, 476 F.3d

125, 137 (2d Cir. 2007)).

Defendants' sources do not establish the background principle they need to show. First,

section 1182(d)(5)(A) does not, as Defendants insist, say that parolees return, upon the termination

or expiration of their parole, to "the position of an applicant for admission standing at the threshold

of entry." ECF 26 at 46. Rather, the provision says that two things happen to such a parolee: (1) he

"shall forthwith return or be returned to the custody from which he was paroled"; and

(2) "thereafter his case shall continue to be dealt with in the same manner as that of any other

applicant for admission to the United States." In other words, the noncitizen is physically brought

back into immigration detention ("custody") and then legally continues to be treated as an

"applicant for admission," because his parole itself did not constitute an admission. *See* 8 U.S.C.

§ 1182(d)(5)(A) (stating that parole "shall not be regarded as an admission of the alien"). That

does not prove that the law treats the parole as if it never happened. At minimum, it recognizes

that the parole physically happened, because it contemplates that the noncitizen must be returned

to detention. Moreover, it does not imply a *return* to the status of an applicant for admission, because a noncitizen is already an "applicant[] for admission" while their parole is active. *See, e.g.*, *Biden v. Texas*, 597 U.S. 785, 806 ("[T]he INA expressly authorizes DHS to process applicants for admission under a third option: parole.") (citing 8 U.S.C. § 1182(d)(5)(A)). Accordingly, the statute says that the noncitizen whose parole is terminated "continue[s]" to be treated as an applicant for admission, not that she "returns" to the status of applicant for admission.

The cases Defendants cite do not get them there, either. Again, *Leng May Ma* interpreted different statutory language ("within the United States") in a different, since-replaced provision of the INA. 357 U.S. at 186. Defendants supply no evidence that Congress intended to incorporate that decision into the distinct text and context of IIRAIRA's expedited removal provisions. To the contrary, as explained below, the legislative history conflicts with Defendants' interpretation. As for the other cases, *Jennings* merely repeated the language of section 1182(d)(5)(A) to show that parole is distinct from detention. 583 U.S. at 288. *Duarte* just said that parole allows a noncitizen "physically . . . to enter the country" even though his "legal status" remains "the same as if he or she were still being held at the border waiting for his or her application for admission to be granted or denied." 27 F.4th at 1058. That is perfectly consistent with the above reading of section 1182(a)(5)(A): a parolee has the legal status of "applicant for admission" before being paroled, during their parole, and after their parole ends. *Accord id.* ("[W]hen an alien is granted parole, immigration authorities temporarily allow the alien access to the country while his or her application for admission is pending."). Similarly, all *Ibragimov* said is that, "[a]lthough paroled aliens physically enter the United States for a temporary period, they nevertheless remain constructively detained at the border, *i.e.* legally unadmitted, while their status is being resolved by immigration officials." 476 F.3d at 134. Again, it does not follow that a noncitizen whose parole

ends "returns" to a previous status as if their parole never happened. Instead, under section 1182(d)(5), they physically return to custody and legally remain an applicant for admission. Thus, that section offers no real support to Defendants' reading of the Designation Provision.

To buttress their interpretation of the Designation Provision's text, Plaintiffs next turn to DHS's own regulations, including those promulgated closely following IIRAIRA's enactment. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 388 (2024) (explaining that, when interpreting a statute in an APA challenge, "the informed judgment of the Executive Branch—especially in the form of an interpretation issued contemporaneously with the enactment of the statute—[may] be entitled to great weight" (internal quotations omitted)). Plaintiffs note, for example, that multiple provisions in 8 C.F.R. § 235.3—the expedited removal regulation, adopted shortly after IIRAIRA passed—refer to parole in the past tense, rather than the present-perfect tense of the statute. *See, e.g.*, 8 C.F.R. § 235.3(b)(6) ("If the Commissioner determines that the expedited removal provisions . . . shall apply to any or all aliens described in [the Designation Provision], such alien will be given a reasonable opportunity to establish to the satisfaction of the examining immigration officer that he or she *was admitted or paroled into the United States follow inspection at a port-of-entry*.") (emphasis added); *id.* § 235.3(b)(1)(ii) ("An alien who *was not inspected and admitted or paroled into the United States* but who establishes that he or she has been continuously physically present in the United States for the 2-year period . . . .") (emphasis added). In addition, the regulation's Designation Provision describes noncitizens eligible for designation as "aliens who arrive in, attempt to enter, or have entered the United States *without having been admitted or paroled* following inspection by an immigration officer at a designated port-of-entry." *Id.* (emphasis added). Both such uses—with the word parole in some version of a past tense alongside other verbs that are all present tense—makes clear that parole under those provisions refers to a

moment in time when the noncitizen entered the country at a port of entry and was granted parole. The regulation thus reinforces Plaintiffs' position that parole operates under the Designation Provision as a method of entry, not a status.

So, too, does DHS's apparent understanding of its authority under the Designation Provision in the years since that regulation. For example, in DHS's 2019 Designation Notice, in which the agency designated for expedited removal all those it believed to be eligible under the Designation Provision, the agency stated that a key question for eligibility was whether a noncitizen was "physically present in the United States without having been admitted or paroled following inspection by an immigration officer at a designated port of entry." 2019 Designation Notice at 35414. A further clue lies in the Designation Notice's statement that its designation "does not apply to aliens who arrive at U.S. ports of entry, because those aliens are already subject to expedited removal." *Id.* That statement unmistakably refers to the fact that DHS has defined the term "arriving alien" for purposes of the statute's Arriving Aliens Provision to include noncitizens "paroled pursuant to [8 U.S.C. § 1182(d)(5)], and even after any such parole is terminated or revoked." 8 C.F.R. § 1.2. In the following section, this Court finds that regulatory definition to be *ultra vires* to the extent it subjects parolees to expedited removal. But DHS has, of course, believed its regulation to be valid. Thus, its statement in the 2019 Designation Notice that its new designation "d[id] not apply to" arriving aliens suggests it believed that its new designation did not apply to those with either active or terminated parole. 2019 Designation Notice at 35414.[23]

---

[23] Indeed, the Government has even in recent months (since issuing the Challenged Actions) reiterated that prior understanding, stating in a filing in an individual noncitizen's removal case the following: "Petitioner . . . argues that because Petitioner—an arriving alien—was paroled, [the Designation Provision] cannot apply to him. But this misses the point entirely: Petitioner is not subject to [the Designation Provision], he is subject to [the Arriving Aliens Provision] as an arriving alien." Resp'ts Mem. of Law in Opp'n to the Pet., Compl., and Mot. for Prelim. Inj., *Mata Velasquez v. Kurtzdorfer*, Case No. 1:25-cv-493 (W.D.N.Y. June 18, 2025), ECF No. 42.

Defendants respond not by contesting Plaintiffs' interpretations of those DHS regulations but instead by pointing to another regulation that suggests parolees are subject to expedited removal. ECF 26 at 47–49. One of the agency's asylum regulations states that an asylum officer may, upon denying a noncitizen's asylum claim, proceed with expedited removal of a paroled asylum applicant if the applicant "is an arriving alien or is otherwise subject to removal under § 235.3(b) of this chapter, and was paroled into the United States on or after April 1, 1997," and if that parole "has expired or been terminated." 8 C.F.R. § 208.14(c)(4)(ii). According to Defendants, this demonstrates that the regulation envisions parolees to be subject to expedited removal under either the "arriving alien" definition *or* the Designation Provision (i.e., the other basis for expedited removal eligibility under 8 C.F.R. § 235.3(b)).

On its face, that language does seem to negate Plaintiffs' suggestion that DHS regulations uniformly treated the Designation Provision as inapplicable to noncitizens who were paroled into the United States at any point. At best for Defendants, that shows that the agency's regulations are internally contradictory and therefore provide little insight into the statute's meaning. Still, any implication from section 208.14(c)(4)(ii) is weak. First, unlike the regulatory provisions Plaintiffs cite, this provision does not appear in the original 1997 rulemaking that first implemented IIRAIRA's expedited removal system. *See* 1997 Rulemaking.[24] Second, the regulation draws a sharp distinction between noncitizens paroled before and after April 1, 1997. *Compare* 8 C.F.R. § 208.14(c)(4)(i) (providing that those paroled before that date may be subject only to section 240 removal) *with id.* § 208.14(c)(4)(ii) (providing that those paroled after that date may be subject to expedited removal). Such a distinction appears nowhere in the regulation construing the statute's Designation Provision. It does, however, appear in the regulatory definition of "arriving alien."

---

[24] Instead, DHS's predecessor agency added this paragraph in 2000. *See* Asylum Procedures, 65 Fed. Reg. 76121, 76134 (Dec. 6, 2000).

*See* 8 C.F.R. § 1.2; Amendment of the Regulatory Definition of Arriving Alien, 63 Fed. Reg. 19382, 19382 (Apr. 20, 1998). That fact adds to the implication that the asylum regulation envisioned expedited removal of parolees only pursuant to the agency's asserted authority under the Arriving Aliens Provision, not the Designation Provision.

The other regulations Defendants invoke help them even less. Defendants point to 8 C.F.R. § 235.3(b)(6), arguing that, because it establishes a process for termination of parole, it "envisions the possibility that such an alien with parole terminated could be subject to expedited removal or, at the very least, does not exclude that possibility." ECF 26 at 48. In context of the rest of the regulatory provision, that is a possible reading. But the language is hardly clear. While the provision discusses termination of parole, the only people it specifically says should be subject to expedited removal are those who "cannot satisfy the examining officer that [they] w[ere] lawfully admitted or paroled." 8 C.F.R. § 235.3(b)(6). It says nothing about what should happen to those who were "paroled" but whose parole the officer decides to terminate. *Id.*

Finally, Defendants note a provision of the parole regulation which states that, after a noncitizen's parole is terminated, "[a]ny further inspection or hearing shall be conducted under section 235 or 240 of the Act." 8 C.F.R. § 212.5(e)(2)(i); *see* ECF 26 at 48. Section 235 of the INA, as amended by IIRAIRA, does indeed contain the expedited removal provisions, whereas section 240 contains the standard removal proceedings in front of an IJ. *See* 8 U.S.C. §§ 1225, 1229a. But section 235 does not *only* contain the expedited removal provisions. Rather, as its title suggests, section 235 governs "[i]nspection by immigration officers" generally. *See also id.* § 1225(a)(3) (stating that "[a]ll aliens" applying for admission "shall be inspected by immigration officers"). More specifically, it provides that certain noncitizens (those that fall under the Arriving Aliens Provision or, if/when designated, the Designation Provision) are subject to expedited

removal proceedings, which it then outlines. *See id.* § 1225(b)(1). It then provides that all "other aliens" who are "applicant[s] for admission" and who do not "clearly and beyond a doubt" meet the criteria for admission "shall be detained for a proceeding under section 1229a of this title" (i.e., a section 240 proceeding). *Id.* § 1225(b)(2). Thus, the parole regulation Defendants cite is easily read as providing not, as Defendants insist, for either expedited removal or section 240 removal for noncitizens whose parole is terminated. Instead, it appears to provide for either inspection under section 235 (which can then lead to either expedited or regular removal proceedings) or, if the parolee does not require any "further inspection," to section 240 proceedings. 8 C.F.R. § 212.5(e)(2)(i). All told, then, regulatory provisions implementing or involving the Designation Provision favor Plaintiffs' interpretation.

As a last gasp, Defendants try to divine meaning from the Supreme Court's stay of Judge Talwani's decision preliminarily enjoining termination of the CHNV Parole Programs. *See* ECF 26 at 46 n.3 (citing *Doe*, 145 S. Ct. 1524). In reviewing the March 25 CHNV Termination Notice, Judge Talwani decided that the Designation Provision does not permit expedited removal of a noncitizen if the noncitizen was paroled when they entered the United States upon inspection at the border. *Doe*, 2025 WL 1099602, at *16. The Supreme Court granted the Government's request to stay that injunction without explanation. *Doe*, 145 S. Ct. 1524. Defendants say that stay "calls into question the soundness of the district court's reasoning." ECF 26 at 46 n.3. This Court cannot make that leap. After all, "[t]he [Supreme] Court's stay order is not a decision on the merits." *Merrill v. Milligan*, 142 S. Ct. 879, 879 (2022) (Kavanaugh, J., concurring in grant of application for stays). And this Court does not know why the lower court order was stayed (i.e., because of likelihood of success on the merits, irreparable harm, or something else).

JA057

Because the Designation Provision does not authorize designation for expedited removal of any noncitizen who has, at any point in time, been paroled into the United States, that statutory provision does not authorize the Challenged Actions.

ii.    The Arriving Aliens Provision Does Not Authorize Expedited Removal of Parolees

To survive on the merits, the Challenged Actions must instead conform to the authority granted to DHS under the Arriving Aliens Provision. They do not.

Recall that, under IIRAIRA, the only other set of noncitizens eligible for expedited removal besides those covered under the Designation Provision are those who "[are] arriving" in the United States. 8 U.S.C. § 1225(b)(1)(A)(i). The statute does not define the term "arriving." Plaintiffs argue that its use of the present-progressive tense "signals an action that is temporary but currently occurring." ECF 22-1 at 27. Thus, the statute's category of "arriving" noncitizens refers to "people who are currently in the process of arriving in the United States at a port of entry and who will no longer be arriving once that action has ended." *Id.* at 27–28. Once inspected at the border and paroled into the country, Plaintiffs reason, a noncitizen is no longer in the process of "arriving." *Id.* at 28 (citing *Bollat Vasquez v. Wolf*, 460 F. Supp. 3d 99, 111 (D. Mass. 2020), which interpreted the Arriving Aliens Provision to mean, "if [noncitizen] applicants [for admission] are apprehended while crossing the border (whether or not at a check point), they are 'arriving' applicants under the statute, and if apprehended at some point thereafter, they are not 'arriving,' but rather 'aliens present in the United States who have not been admitted.'" (cleaned up)). To support that reading, Plaintiffs note that other uses of the words "arriving," "arrival," or "arrive" in 8 U.S.C. § 1225 plainly refer to a process that occurs upon physical entry at the border, "not an interminable implicit statutory status." ECF 28 at 30. *See, e.g.*, 8 U.S.C. § 1225(d)(2) (authorizing detention of noncitizens "on the vessel or at the airport of arrival"); *id.* § 1225(b)(2)(C) (authorizing returning

a noncitizen "who is arriving on land (whether or not at a designated port of arrival)" to a contiguous territory after section 240 proceedings); *id.* § 1225(b)(1)(F) (exempting from expedited removal a noncitizen from certain countries "who arrives by aircraft at a port of entry").

Meanwhile, Defendants lean once again on the purported background principle, discussed above, that "aliens paroled into the United States are legally in the position of aliens standing at the border, regardless of the duration of their parole." ECF 26 at 42 (citing *Leng May Ma*, 357 U.S. at 188–91; *Ibragimov*, 476 F.3d at 134). And they point, yet again, to language in the parole statute and regulation providing that a noncitizen whose parole ends "shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States." 8 U.S.C. § 1182(d)(5)(A); 8 C.F.R. § 212.5(e)(2)(i) (providing that when parole ends the alien "shall be restored to the status that he or she had at the time of parole"); *see* ECF 26 at 43. Finally, Defendants refer back to the regulatory definition of "arriving alien," which since the first rulemaking under IIRAIRA has provided that "[a]n arriving alien remains an arriving alien even if paroled pursuant to section 212(d)(5) of the Act, and even after any such parole is terminated or revoked." ECF 26 at 41–42 (quoting 8 C.F.R. § 1.2). They also note the agency's statement, upon adopting that definition, that its "inclusion of paroled aliens was based on the statutory language in section 212(d)(5) of the Act," i.e., the statutory parole provision. *Id.* at 43 (quoting 62 Fed. Reg. at 10313).

All told, Plaintiffs' interpretation is the best reading of the statute, despite DHS's longstanding regulation to the contrary. *See Loper Bright*, 603 U.S. at 394 (holding that "courts must exercise independent judgment in determining the meaning of statutory provisions" and need not defer to agencies' interpretations). When interpreting a statutory term Congress did not define,

courts first look to the term's ordinary meaning. *United States v. Alford*, 89 F.4th 943, 949 (D.C. Cir.), *cert. denied*, 145 S. Ct. 180 (2024)). "Arrive" means "to reach a destination" or "to make an appearance." *Arrive*, Merriam-Webster's Collegiate Dictionary (1996); *see also Arrive*, Oxford English Reference Dictionary (1996) (defining "arrive," when followed by "in," as "reach a destination; come to the end of a journey or a specified part of a journey"). Read according to its plain meaning, a noncitizen "arriving" in the United States would be one who is in the process of reaching his or her destination (the United States) and making an appearance here. It would not naturally be read to refer to someone who previously reached the United States via a port of entry, underwent inspection at that port of entry, and then was paroled into the United States (beyond their original destination) for an indefinite period of time. Thus, if the plain language governs, Plaintiffs have the upper hand.

The term's context within the rest of the statute accords with that ordinary meaning. Plaintiffs are correct that multiple other provisions in IIRAIRA section 235 use "arrive," or some conjugation thereof, to refer to physical arrival at a port of entry. *See* 8 U.S.C. § 1225(d)(2); *id.* § 1225(b)(2)(C); *id.* § 1225(b)(1)(F). Defendants offer no response to those provisions. They do, however, point to other provisions of the statute they call "textual clues" demonstrating that parolees are always considered "arriving." ECF 26 at 44. First, they note that Congress explicitly excluded paroled noncitizens from the Designation Provision but wrote no similar exclusion into the Arriving Aliens provision, and the Court should give meaning to that choice. *Id.* (citing *Bates v. United States*, 522 U.S. 23, 29–30 (1997), for the proposition, "where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion"). That argument just begs the question, though: Congress would only think it needed

to carve out parolees from the category of "aliens" who are "arriving" in the United States if it thought the term would otherwise include parolees. The Designation Provision, by contrast, carves out parolees from the larger category of "aliens," which of course otherwise includes parolees. *See* 8 U.S.C. § 1225(b)(1)(A)(iii). Second, Defendants point to the title of section 1225(b)(1), "[i]nspection of aliens arriving in the United States and *certain other aliens who have not been admitted or paroled*." ECF 26 at 44 (emphasis added). They say this highlights Congress's exclusion of parolees only from the "other aliens" defined in the Designation Provision. *Id.* But that does not really follow; the title is just as easily read as modifying both "aliens arriving" and "other aliens' with "have not been admitted or paroled." And regardless, all it does is track the language of the Arriving Aliens and Designation Provisions. A statutory title, while informative, does not displace the meaning of the statutory text itself. *See City & Cnty. of San Francisco v. EPA*, 145 S. Ct. 704, 714 (2025). Finally, Defendants note that Congress exempted from expedited removal certain noncitizens from certain Western Hemisphere nations, but did not carve out parolees. *See* 8 U.S.C. § 1225(b)(1)(F). Again, that just begs the question. Those noncitizens could otherwise have been eligible for expedited removal under the Arriving Aliens or Designation Provisions. Not so, necessarily, for parolees.

So the statutory text and context weighs in Plaintiffs' favor. Nonetheless, Defendants insist that the term "arriving" represents a "term of art" and should be given that meaning. ECF 35 at 57 (Hr'g Tr. 57:18–24). Yet, just as it did for the Designation Provision, Defendants' argument from background principles comes apart on further inspection. First, none of the sources Defendants cite interpret the word "arriving," which makes it hard to consider it a "term of art." Recall that *Leng May Ma* interpreted the distinct term "within the United States" for purposes of a different provision of the INA. 357 U.S. at 188. Even worse for Defendants, *Ibragimov* described parole as

"a means by which the government allows aliens *who have arrived at a port-of-entry* to temporarily remain in the United States pending the review and adjudication of their immigration status." 476 F.3d at 134 (emphasis added). Under that construction, while a parolee remains "legally unadmitted," they "have arrived"—i.e., their arrival is complete, whereas their admission is not. *Id.* That reading is consistent with the statute's distinction between aliens who have been "admitted" and those who have been "paroled." 8 U.S.C. § 1225(b)(1)(A)(iii)(II). It does little to prove Defendants' preferred definition of "arrived." And *Duarte*, the other circuit case Defendants cite, merely noted the regulatory definition reflected in 8 C.F.R. § 1.2 (that "a parolee normally fits the regulatory definition of an 'arriving alien'") but did not actually scrutinize that regulation. Instead, it was concerned with whether parolees are considered "applicant[s] for admission while on parole" (a question it answered in the affirmative). 27 F.4th at 1059–60. Thus, none of those cases establishes the term of art that Defendants claim Congress inserted into the statute. And "absent" any "evidence" that Congress intended to employ a term of art, "those whose lives are governed by law are entitled to rely on its ordinary meaning, not left to speculate about hidden messages." *Feliciano v. Dep't of Transp.*, 145 S. Ct. 1284, 1291 (2025).

Worse yet, even Defendants' reading of the parole statute suggests a background principle altogether different from the one Defendants need to prove. Recall that Defendants believe the parole statute enshrined the principle that "when parole is revoked, an alien reverts to the status he possessed prior to the grant of parole," namely "the position of an applicant for admission standing at the threshold of entry." ECF 26 at 46. As discussed in the previous section, the statute actually says something more limited. But neither account supports DHS's position in its regulatory definition of "arriving alien," which is that noncitizens are considered arriving both when their parole is active and after it is terminated. *See* 8 C.F.R. § 1.2. To what "status" does a noncitizen

whose parole was revoked "revert[]?" ECF 26 at 46. It cannot be the "status" of "arriving alien"; under 8 C.F.R. § 1.2, a parolee never leaves that status, even when their parole is active. It is therefore no saving grace of Defendants' position that DHS's predecessor agency said it relied upon the parole statute when coming up with the definition of "arriving alien" in its 1997 regulation. *See* 62 Fed. Reg. at 10313. Rather, that claim only highlights the regulatory definition's conflict with the statutory scheme.

Indeed, the regulatory definition conflicts even with another portion of the *regulatory* scheme. The language in 8 C.F.R. § 235.3(b)(6) at least heavily implies that noncitizens with active parole may not be subjected to expedited removal. *See* 8 C.F.R. § 235.3(b)(6) (giving noncitizens in expedited removal proceedings "a reasonable opportunity to establish to the satisfaction of the examining immigration officer that he or she was admitted or paroled into the United States following inspection at a port-of-entry" and providing that "[a]n alien who cannot satisfy the examining officer that he or she was lawfully admitted or paroled will be ordered removed pursuant to section 235(b)(1) of the Act.")  Whether it allows the agency to terminate that parole and then send the noncitizen to expedited removal is another matter, discussed above. But if the Arriving Aliens Provision permitted the agency to subject a noncitizen to expedited removal even while that parole is active, this entire regulatory provision would be irrelevant. At best, then, the regulatory definition provides little insight into the statutory definition—the latter of which is our concern here. *See Loper Bright*, 603 U.S. at 388 (explaining that courts interpreting a regulatory statute give more or less weight to an agency interpretation depending on "'the thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control'" (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

JA063

Legislative history and purpose put a final nail in the coffin of Defendants' interpretation. Although the relevant legislative history is thin, it contains some indications that Congress focused its concern on noncitizens physically arriving at the border for entry, not those already physically present within the country. For instance, one House Report noted that the law's new expedited removal procedures were "necessary because thousands of aliens arrive in the U.S. at airports each year without valid documents and attempt to illegally enter the U.S." H.R. Rep. 104-469, 157–58 (1996). "Unless such aliens claim to be U.S. nationals, or state a fear of persecution," the Report went on, "there is no requirement under the Constitution or international treaty to do anything other than return them, as promptly as possible, to where they boarded the plane to come here." *Id.* Although that provision did not discuss parole, it did use the term "arrive" in a way that clearly describes physical arrival at a port of entry (specifically, an airport). And it described "return[ing] them" to their country from which they flew. *Id.* It did not explicitly contemplate a regime wherein noncitizens arriving at airports are paroled into the country and returned to their airport of origin months or years later.

Defendants' interpretation also creates an oddity that appears to contradict the statute's purpose. Under Defendants' definition of "arriving alien," a noncitizen who snuck into the country outside of an inspection point gets a full section 240 removal hearing as long as they have been physically present in the United States for two years. By contrast, a noncitizen who entered at an inspection point and was paroled after inspection can face expedited removal forever, regardless of how long they have been physically present in the United States. Defendants offer no explanation for such a counterintuitive result, nor does the legislative history show that Congress intended that result. Quite the opposite: such a result flies in the face of the House Report's statement that IIRAIRA was intended to "replace certain aspects of the current 'entry doctrine,'

JA064

under which illegal aliens who have entered the United States without inspection gain equities and privileges in immigration proceedings that are not available to aliens who present themselves for inspection at a port of entry." H.R. 104-469 at 225.

Yet another aspect of the legislative history supports Plaintiffs' reading and undermines Defendants'. The 1996 House Report shows that IIRAIRA was intended in part to restrict parole, but not by subjecting parolees to expedited removal. It noted that, in 1994, the Clinton Administration made a migration agreement with Cuba that included using the parole authority to admit up to 20,000 Cuban nationals annually, who would then be entitled to adjust to permanent resident status under the Cuban Adjustment Act. The House Report called that "a misuse" of the parole system that "ha[d] not been authorized by Congress." H.R. 104-469 at 140–41. And accordingly, the proposed bill, which eventually became IIRAIRA, tightened the criteria for granting parole. *Id.* at 140. Nowhere in that Report, or elsewhere in the legislative history, did it say that Congress sought to address what it saw as excessive parole by subjecting parolees to expedited removal once they were already paroled in.[25] If the Congress that was so concerned about abuse of the parole system had created a solution by which the Executive could summarily deport parolees using expedited removal, you would think it would have noted as much.

In the end, the only way to make sense of the statutory scheme Congress created is to see that parolees fall under neither the Arriving Aliens Provision nor the Designation Provision. Any other result conflicts with other aspects of the statute and regulations, Congress's evident purpose, and the ordinary meaning of the statute's words. At bottom, Defendants rest their argument under

---

[25] Instead, the Report said the following: "The text of section 212(d)(5) is clear that the parole authority was intended to be used on a case-by-case basis to meet specific needs, and not as a supplement to Congressionally-established immigration policy. In recent years, however, parole has been used increasingly to admit entire categories of aliens who do not qualify for admission under any other category in immigration law, with the intent that they will remain permanently in the United States. This contravenes the intent of section 212(d)(5), but also illustrates why further, specific limitations on the Attorney General's discretion are necessary." H.R. Rep. 104-469 at 140.

both provisions on a purported background legal principle that they cannot even pin down. In the face of all the evidence to the contrary, Defendants' thin argument cannot stand. Accordingly, neither the Designation Provision nor the Arriving Aliens Provision authorizes the Challenged Actions, and the Challenged Actions are therefore likely invalid as *ultra vires*.

### 3. *The Challenged Actions Are Arbitrary and Capricious*

Independent of being *ultra vires*, the Challenged Actions are also likely invalid as arbitrary and capricious. Under blackletter administrative law, agencies must provide "reasoned explanation[s]" for their actions. *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 35 (2020). An agency action is arbitrary and capricious if it "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). In short, "an agency must give adequate reasons for its decisions," *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016), such that a reviewing court can "evaluate the agency's rationale at the time of decision," *Pension Ben. Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 654 (1990). This includes at least some explanation of the agency's legal "conclusion," especially if the legal conclusion upon which the action relies conflicts with the agency's prior view. *Bauer v. DeVos*, 325 F. Supp. 3d 74, 109 (D.D.C. 2018). It also includes consideration of "alternatives that are within the ambit of the [previous] policy" and any "legitimate reliance" on the previous policy. *Regents*, 591 U.S. at 30 (cleaned up).

In Plaintiffs' view, the Challenged Actions fail that standard in multiple ways. For one thing, they contend, the Challenged Actions contain little in the way of explanation at all. ECF 22-

1 at 30–31. To the extent they do, Plaintiffs argue, those explanations are inconsistent with one another and provide conflicting interpretations of the agency's own statutory authority. *Id.* at 31–34. And beyond that, the Challenged Actions' explanations lack "even any mention, much less any analysis, of the impact that applying expedited removal to parolees would have on parole beneficiaries . . . their families, their sponsors, their employers, and their communities," nor do they contain analysis of "the humanitarian purpose of parole" or "available alternatives." *Id.* at 34–36.

Defendants first fight the premise that arbitrary-and-capricious review is available at all. Such review, they argue, applies only to "final agency action," defined as an action (1) that "mark[s] the consummation of the agency's decisionmaking process," and (2) "from which legal consequences will flow." ECF 26 at 50 (quoting 5 U.S.C. § 704; *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (cleaned up)). The Challenged Actions, Defendants reason, do not "purport to make any changes in rules governing which aliens are" subject to expedited removal, but rather merely restate the agency's longstanding interpretation of expedited removal eligibility under the "arriving aliens" definition of 8 C.F.R. § 1.2. *Id.* Next, Defendants argue that, even if arbitrary-and-capricious review did apply, the Challenged Actions would pass it. The Challenged Actions, they say, merely "assume[]" the authority to subject parolees to expedited removal; they do not purport to create that authority, so they do not need to explain their reasons for that assertion of authority. *Id.* at 51. Moreover, the Challenged Actions' legal justifications are not "inconsistent," as Plaintiffs allege; they just rely on alternative but equally available legal authorities (the Arriving Aliens Provision and/or the Designation Provision). *Id.* at 51–53. Defendants also invoke DHS's "unfettered discretion over whether to initiate [removal] proceedings" and which type of removal proceeding to initiate—decisions that Defendants call unreviewable. *Id.* at 54–55. Finally,

Defendants claim that the Challenged Actions are so clearly authorized under the expedited removal statute that the agency need not justify Congress's "policy decision" any further. *Id.* at 55–56.

Defendants' threshold objection—that arbitrary-and-capricious review does not apply—lacks merit. APA section 704 authorizes judicial review both of "[a]gency action" that is "made reviewable by statute" *and* "final agency action." 5 U.S.C. § 704. Defendants completely omit that first criterion from their discussion. Yet, as Plaintiffs note, that first criterion covers the Challenged Actions. *See* 8 U.S.C. § 1252(e)(3)(A) (authorizing "[j]udicial review" in this District of "whether . . . a written policy directive, written policy guideline, or written procedure issued by or under the authority of the Attorney General to implement [section 1225(b)], is not consistent with applicable provisions of this subchapter or is otherwise in violation of law"). As this Court already decided above, the Challenged Actions qualify under that provision. Thus, the statute authorizes judicial review of them for purposes of the APA. *Accord Las Americas Immigrant Advoc. Ctr. v. Wolf*, 507 F. Supp. 3d 1, 34 (D.D.C. 2020) (K.B. Jackson, J.), *voluntarily dismissed sub nom. Las Americas Immigrant Advoc. Ctr. v. Mayorkas*, No. 20-5386, 2024 WL 3632500 (D.C. Cir. Aug. 1, 2024); *Grace v. Whitaker*, 344 F. Supp. 3d 96, 118 (D.D.C. 2018), *aff'd in part*, *rev'd in part on other grounds and remanded sub nom. Grace v. Barr*, 965 F.3d 883 (D.C. Cir. 2020). That result resolves the issue, because judicial review under the APA includes consideration of whether the challenged agency action (whether "final" or otherwise) is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

On the substance, the Challenged Actions do indeed fail even the "fundamentally deferential" standard of arbitrary-and-capricious review. *Fox v. Clinton*, 684 F.3d 67, 75 (D.C. Cir. 2012) (explaining that the standard is "fundamentally deferential" but that "no deference is

owed to an agency action that is based on an agency's purported expertise where the agency's explanation for its action lacks any coherence" (internal citation and quotation marks omitted)). First, the January 23 Huffman Memorandum claimed to "provide[] guidance regarding how to exercise enforcement discretion in implementing" two previously announced "policies"—a memorandum authorizing DHS components to terminate certain grants of parole "immediately," and the 2025 Designation Notice expanding expedited removal to the full scope of the Designation Provision. January 23 Huffman Memorandum at 1. Specifically, it "direct[ed]" DHS components to "consider" subjecting to expedited removal "any alien DHS is aware of" who "is amenable to expedited removal but to whom expedited removal has not been applied," including by terminating any such noncitizen's "active parole status." *Id.* at 2. It also "direct[ed]" those components to "consider" placing in "removal proceedings" (note: not "expedited removal") noncitizens who "d[id] not meet the conditions described in (1)" (i.e., were not "amenable to expedited removal") and were subject to a categorical parole policy that Huffman's earlier memorandum directed be "paused, modified, or "terminated." *Id.*

Because the January 23 Huffman Memorandum referenced the 2025 Designation Notice and its two-year-continuous-presence-limit, *see id.* at 1, it seems possible that the reason for the differential treatment of parolees—directing some to be considered for expedited removal and some for (presumably section 240) removal—was that the latter group included parolees continuously present in the United States for more than two years and thus ineligible for expedited removal under even the Defendants' view of the Designation Provision. But the Memorandum did not state that reason, much less justify it. And it would seem to require some explanation, given Defendants' view of its authority under the Arriving Aliens Provision. Under DHS's longstanding regulation applying that Provision, 8 C.F.R. § 1.2, all noncitizens who were paroled at a port of

entry (whether that parole is active or terminated) are "amenable to expedited removal," as the Memorandum put it. *Id.* at 2. Indeed, Defendants claim in this litigation that the "arriving aliens" regulatory definition, not the Designation Provision, was the basis for the Memorandum, despite the lack of any citation to that regulation anywhere in the document. *See* ECF 26 at 51. So whom would the second category—noncitizens with parole granted through a categorical program that Huffman had directed be paused or terminated—include? Under Defendants' interpretation of its authority since 1997, potentially no one. Alternatively, it may include those who do not meet the inadmissibility criteria (fraud/misrepresentation or lack of documents) for expedited removal. *See* 8 U.S.C. § 1225(b)(1)(A). But the Court is left guessing, because the Memorandum did not cite its legal authorities for expedited removal eligibility or explain how it was directing DHS components to interpret and apply them. Instead, the Memorandum merely directed that "actions contemplated by this memorandum shall be taken in a manner consistent with the applicable statutes, regulations, and court orders." January 23 Huffman Memorandum at 2. The question, though, is which statutes and regulations did the agency believe to be applicable? Nor is the Memorandum's reference to "enforcement discretion" sufficient. Even guidance documents that give room for enforcement discretion must explain their legal basis and reasoning. *See, e.g.*, *Regents*, 591 U.S. at 26–28. Without any such explanation of the legal lines the Memorandum was drawing, the Court cannot "evaluate the agency's rationale at the time of decision." *Pension Ben. Guar. Corp.*, 496 U.S. at 654.

Take next the February 18 ICE Directive, which was similarly legally opaque. That document's section on expedited removal of parolees cited no legal authorities whatsoever besides the inadmissibility criteria of sections 1182(a)(6)(C) and 1182(a)(7). *See* February 18 ICE Directive at 1. Those authorities say nothing about eligibility of parolees to expedited removal.

JA070

The Directive suggested, by its use of the term "paroled arriving aliens," that it was invoking the agency's definition of "arriving aliens" under 8 C.F.R. § 1.2, but it did not say so explicitly. So, too, did its statement that "[t]here is no time limit on the ability to process such aliens for [expedited removal]." *Id.* That is true of expedited removal under the Arriving Aliens Provision but not the Designation Provision. On its own, perhaps the February 18 ICE Directive's use of the regulatorily defined term sufficed to indicate that Directive's legal authority.

Things get considerably murkier, though, when looking to the third Challenged Action, the March 25 CHNV Termination Notice. There, DHS stated that "[e]xpedited removal is available only when an alien has not been continuously present in the United States for at least the two years preceding the date of the inadmissibility determination." March 25 CHNV Termination Notice at 13619 (citing 8 U.S.C. § 1225(b)(1)(A)(iii)(II)[26]; 8 C.F.R. § 235.3). That is true under the Designation Provision but not the Arriving Aliens Provision. Indeed, under the agency's own interpretation of its statutory authority, that statement is flat wrong. And yet, that statement played an important role in DHS's explanation for why it chose to terminate the CHNV Parole Programs and begin subjecting those parolees to expedited removal: it was on the clock. *See id.* ("If DHS were to allow the CHNV parolee population to remain for the full duration of their two-year parole, DHS would be compelled to place a greater proportion of this population in section 240 removal proceedings to effectuate their removal . . . ."); *id.* at 13620 ("Any lengthening of the wind-down period will increase the likelihood that additional CHNV parolees are no longer subject to expedited removal."). DHS gave no explanation for departing from its longstanding interpretation of its statutory authority—no less from the stated policy in the February 18 ICE Directive issued just five weeks prior.

---

[26] The Termination Notice actually cites "8 U.S.C. § 1225(b)(1)(iii)(II)," but that appears to be a typo because a provision with that numbering does not exist.

Taking the three Challenged Actions together, DHS's policy appears to be both that it must first terminate a noncitizen's parole before subjecting them to expedited removal, *see* January 23 Huffman Memorandum at 2, and that it can subject even active parolees to expedited removal, *see* February 18 ICE Directive at 1. The agency believes both that it must (and should) subject former parolees to expedited removal within two years of the beginning of their continuous presence, *see* March 25 CHNV Termination Notice at 13619, and that it is under "no time limit," February 18 ICE Directive at 1. Call it Schrödinger's legal justification. But unlike a quantum particle, an agency's legal justification cannot be two opposing things at once. Rather "unacknowledged and unexplained inconsistency," including of the agency's legal conclusions, "is the hallmark of arbitrary and capricious decision-making." *Bauer*, 325 F. Supp. 3d at 109; *see also FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) ("[T]he requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it *is* changing position. An agency may not, for example, depart from a prior policy *sub silentio* or simply disregard rules that are still on the books." (emphasis in original)); *Johnson v. Copyright Royalty Bd.*, 969 F.3d 363, 389–91 (D.C. Cir. 2020) (remanding an agency decision that "failed to explain the legal authority" for a change in position).

In view of these inconsistencies, Defendants' remaining arguments here fall apart. Defendants' claim that the Challenged Actions do not "purport to justify applying expedited removal to parolees" because "this authority has already existed since at least 1997," ECF 26 at 51, might make sense if the Challenged Actions clearly and consistently relied upon the 1997 regulatory definition of "arriving alien." But they did not. Instead, at various points, the Challenged Actions implicitly abjured reliance on that definition, if not outright contradicted it. *See, e.g.*, March 25 CHNV Termination Notice at 13619. Similarly, the flatly incorrect (under DHS's

JA072

regulation) legal justification in the March 25 CHNV Termination Notice belies Defendants' claim that the document merely "rel[ied] on an *additional* source of authority for applying expedited removal—the designation authority." *Id.* at 52 (emphasis in original). At best, Defendants' explanation is an "impermissible *post hoc* rationalization[]"; more accurately, it is nonsensical. *Regents*, 591 U.S. at 22; *see Am. Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 539 ("[T]he *post hoc* rationalizations of the agency or the parties to this litigation cannot serve as a sufficient predicate for agency action.").

Finally, Defendants' claim that none of this rational-decision-making stuff matters because DHS has unreviewable discretion to choose between expedited removal and section 240 removal proceedings ignores the statutory scheme. Section 1252(e)(3)(A) permits challenges to written policy directives, guidelines, and procedures implementing section 1225(b)'s expedited removal system. As already established, the Challenged Actions fall into that category. Thus, they are by Congress's clear command "[j]udicial[ly] review[able]." 8 U.S.C. § 1252(e)(3)(A). Defendants' argument to the contrary amounts to little more than a mad-libs of Executive-speak untethered to the laws Congress enacted. *See* ECF 26 at 54–55 ("The agency has unfettered discretion over whether to initiate proceedings, . . . and if so, to choose between removal proceedings, and there is no judicially manageable standard in the INA for this Court to review such decisions."); *id.* at 55 ("DHS need not provide extensive justification for utilizing its long-established enforcement authority, particularly where that decision concerns prosecutorial charging choices traditionally within the unreviewable discretion of the Executive Branch.").

Plaintiffs raise other important questions, such as whether the Challenged Actions sufficiently assessed reasonable alternatives and reliance interests. But the Challenged Actions' scattershot legal explanations suffice to render them likely arbitrary and capricious in this

preliminary posture. Accordingly, Plaintiffs are likely to succeed on the merits of their arbitrary and capricious claim.

**B.  Plaintiffs' Members Face Irreparable Harm**

In addition to showing a likelihood of success on the merits, Plaintiffs must also establish that they face irreparable injury absent the requested preliminary relief. *Nat'l Min. Ass'n v. Jackson*, 768 F. Supp. 2d 34, 50 (D.D.C. 2011); *Chaplaincy*, 454 F.3d at 297. To constitute irreparable injury, the injury "must be 'both certain and great,' 'actual and not theoretical,' 'beyond remediation,' and 'of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm.'" *Mexichem Specialty Resins, Inc. v. EPA.*, 787 F.3d 544, 555 (D.C. Cir. 2015) (quoting *Chaplaincy*, 454 F.3d at 297) (emphasis in original).

Plaintiffs offer evidence of four categories of ongoing or imminent irreparable harm to their members and others like them: (1) lack of opportunity to apply for immigration relief in expedited removal, as compared to section 240 removal proceedings; (2) lack of meaningful process in expedited removal, including lack of judicial review and limited access to counsel; (3) risks of persecution and death if/when noncitizens subject to expedited removal are removed; and (4) detention and family separation during expedited removal proceedings. ECF 22-1 at 36–44.

Defendants contest each category. They claim that Plaintiffs' members' lack of ability to pursue immigration relief (besides asylum) in expedited removal does not impose irreparable harm because noncitizens can pursue an alternative, consular processing, outside of the United States at a U.S. embassy or consulate. ECF 26 at 59. And anyway, Defendants assert, none of Plaintiffs' members described in Plaintiffs' declarations both (a) are currently in expedited removal proceedings and (b) have a pending application for adjustment of status. *Id.* at 59–60. As to the

extent of the process under expedited removal, Defendants insist that the credible fear screening process suffices to permit asylum-seekers to make such a claim, that the Supreme Court has "upheld the constitutionality" of this process, and that multiple instances recounted in Plaintiffs' own declarations show the effectiveness of those screenings. *Id.* at 56–58 (citing *Thuraissigiam*, 591 U.S. at 109–10). Defendants also point to the D.C. Circuit's decision upholding expedited removal and "rejecting arguments based on many of these alleged [procedural] flaws" that Plaintiffs raise. *Id.* at 60 (citing *AILA*, 18 F. Supp. 2d at 52–60, *aff 'd*, 199 F.3d at 1357). Further, Defendants insist that any irreparable harm from expedited removal besides fear of persecution or death (e.g., detention, family separation, a bar on returning to the United States) applies equally under section 240 removal and therefore cannot be attributed to the Challenged Actions. *Id.* at 58–59. Finally, Defendants hark back to the Supreme Court's stay order in *Noem v. Doe*, which they say implicitly rejected similar arguments of irreparable injury in that case. *Id.* at 61 (citing *Doe*, 145 S. Ct. 1524).

Defendants vastly understate Plaintiffs' evidence of irreparable injury. Summarized, Plaintiffs' asserted irreparable injuries fall into two buckets: (1) the risk of erroneous removal arising from lack of meaningful process, whether as to asylum-based claims or other claims for immigration relief; and (2) injuries resulting from the fact of being in expedited removal, such as detention in far-flung facilities and family separation during such detention. As to the first bucket, Plaintiffs present unrebutted evidence that expedited removal proceedings lack as thorough procedures as section 240 procedures and likely result in more wrongful removals. *See, e.g.*, ECF 22-1 at 39 n.15 (citing U.S. Comm'n on Int'l Religious Freedom, Report on Asylum Seekers in Expedited Removal: Volume I: Findings & Recommendations 4, 10 (2005), https://perma.cc/56WL-6VQC; U.S. Comm'n on Int'l Religious Freedom, Barriers to Protection:

The Treatment of Asylum Seekers in Expedited Removal 2–3 (2016), https://perma.cc/67CM-YFY7; U.S. Comm'n on Int'l Religious Freedom, Barriers to Protection as of 2024: Updated Recommendations on Asylum Seekers in Expedited Removal 2–3, 10–11 (2025), https://perma.cc/YEE4-XQM3); ECF 22-7 ¶ 12 (discussing CHIRLA member's "limited rights and lack of meaningful process provided in the credible fear process, including barriers to accessing counsel and evidence since he is detained," relative to his section 240 proceedings); ECF 22-10 ¶¶ 9–10 (discussing CASA member's lack of notice about the expedited removal process and inability to gather evidence to support his asylum claim from his detention facility far from his home and "to regularly communicate with his attorney"); ECF 22-16 ¶ 12 (discussing parolee's inability to prepare with his attorney and family, or to present expert testimony, for his credible fear interview in expedited removal, unlike section 240 removal, which his attorney suggests resulted in him receiving a negative credible fear determination). And although Defendants note that some of the parolees discussed in the declarations are not identified as members of one of the Plaintiff organizations, several others who have faced or are currently facing these and similar procedural deficiencies are so identified. *See, e.g.*, ECF 22-7 ¶ 2; ECF 22-10 ¶ 2; ECF 22-13 ¶ 2.

Defendants' legal arguments are similarly unavailing. It is well established that a noncitizen's removal to a country where they face persecution, torture, or death constitutes irreparable harm. *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 733–34 (D.C. Cir. 2022). So, too, does the "delta between what the law requires with respect to the traditional [section 240] process and" the truncated procedures in the expedited removal context. *Make the Rd. New York v. McAleenan*, 405 F. Supp. 3d 1, 62 (D.D.C. 2019) (K.B. Jackson, J.), *rev'd on other grounds and remanded sub nom. Make the Rd.*, 962 F.3d 612; *accord Kiakombua*, 498 F. Supp. 3d at 57. All Defendants offer in response are cases in which both the Supreme Court and the D.C. Circuit held

JA076

that the expedited removal procedures Congress created could not be challenged on due-process grounds because the plaintiffs in those cases had no cognizable due process right to a certain removal procedure. *See Thuraissigiam*, 591 U.S. at 138–39; *AILA*, 18 F. Supp. 2d at 58–60. But Plaintiffs do not raise a constitutional due process claim here. Nor do Plaintiffs argue that the expedited removal procedures themselves violate IIRAIRA, as in *AILA*, *see* 18 F. Supp. 2d at 52–57; instead, they argue that parolees should not be subject to those procedures, compliant with IIRAIRA or not, at all. In the irreparable injury analysis, the Court "assumes, without deciding, that the movant has demonstrated a likelihood that the non-movant's conduct violates the law." *Chaplaincy*, 454 F.3d at 303. On the assumption (as the Court found above) that parolees likely are not subject to expedited removal under IIRAIRA, the question is just whether expedited removal procedures avert the irreparable injuries of wrongful removal to the same degree as section 240 procedures. Neither *Thuraissigiam* nor *AILA* stands for that proposition. And Plaintiffs' evidence shows the opposite.

Plaintiffs' asserted irreparable injuries from detention and family separation during the expedited removal process also withstand Defendants' attacks. Plaintiffs' declarations are replete with uncontested evidence that their members and other parolees have (a) been detained pursuant to explicit or apparent expedited removal proceedings, when they were previously undergoing section 240 proceedings without being detained, (b) often been detained in far-flung locations away from their families and attorneys, (c) faced poor conditions in detention more commonly associated with expedited removal facilities than others, and (d) suffered mental and physical health challenges as a result of their detention. ECF 22-1 at 43–44; *see, e.g.*, ECF 22-13 ¶¶ 8, 10, 20 (CASA member separated from his mother and suffering from a chronic health condition for which he is not receiving the treatment in detention that he was able to receive while in section

240 proceedings); ECF 22-5 ¶¶ 7–10 (discussing separation of parolee from his wife and son, who remained non-detained and in section 240 removal when he was sent to expedited removal, detained, and held for weeks pending a credible fear interview that as of the declaration had still not occurred); ECF 22-9 ¶ 14 (overcrowded conditions where detainees are "forc[ed] . . . to sleep on the floor," in out-of-state detention far from counsel); ECF 22-6 ¶¶ 17–20 (discussing detention in remote locations and that those in expedited removal face fewer options to avoid detention than in section 240 proceedings). Defendants' response that section 240 proceedings can also involve detention and family separation do not address—much less refute—Plaintiffs' evidence that, in many of the cases Plaintiffs identify, parolees were not detained or separated from their families until after (or just before) their section 240 proceedings were terminated and expedited removal proceedings begun. *See* ECF 26 at 58.

Finally, Defendants' reliance once again on the Supreme Court's order in *Noem v. Doe*, 145 S. Ct. 1524, falls flat for the same reason as before: without any explanation from the Supreme Court for its decision, this Court simply cannot apply it to any case besides the single case it (preliminarily) decided.

## C. The Balance of the Equities and the Public Interest Favor a Stay

On the final two stay factors, which merge here, Defendants' arguments hold little weight. First, Defendants claim that a stay of the Challenged Actions would "prevent DHS from applying expedited removal to potentially hundreds of thousands of paroled aliens whose parole DHS is seeking to revoke or has revoked, thereby frustrating DHS's ability to quickly remove these aliens." ECF 26 at 61. In addition, a stay would "impose substantial administrative burdens and tax agency resources by requiring DHS to initiate and litigate [section 240 proceedings] if it chose to pursue removal." *Id.* And because of the "significance of expedited removal to the

JA078

Government's enforcement efforts," the harm to the Government "would be particularly acute." *Id.* Those claims are all consistent with the record before the Court (and they undermine other aspects of Defendants' arguments, particularly their redressability objection). But subjecting parolees to expedited removal likely violates the law, and "there is generally no public interest in the perpetuation of unlawful agency action." *Shawnee Tribe v. Mnuchin*, 984 F.3d 94, 102 (D.C. Cir. 2021) (internal citations and quotation marks omitted).

Moreover, while the Supreme Court has said that "[t]here is always a public interest in prompt execution of removal orders" because "[t]he continued presence of an alien lawfully deemed removable undermines the streamlined removal proceedings [IIRAIRA] established," *Nken*, 556 U.S. at 436, section 240 proceedings *are* the main "streamlined" removal proceedings that IIRAIRA established, H.R. Rep. 104-469, 12, 107–08. Similarly, the Government's other case on this point, *Lucacela v. Reno*, also discusses the "clear public interest (as expressed by Congress) in deporting illegal aliens without delay" in the context, it appears, of *section 240* removal proceedings rather than expedited removal proceedings. 161 F.3d 1055, 1059 (7th Cir. 1998). Under those cases, then, the public's interest in removal of unauthorized immigrants is fully vindicated by section 240 proceedings and does not require expedited removal—much less expedited removal in violation of the substantive statute and the APA. What's more, "the public has an interest in 'preventing [noncitizens] from being wrongfully removed, particularly to countries where they are likely to face substantial harm.'" *A.B.-B. v. Morgan*, 548 F. Supp. 3d 209, 222 (D.D.C. 2020) (quoting *Nken*, 556 U.S. at 436).

Defendants next point to "the Executive Branch's constitutional and statutory authority over immigration and the admission and removal of aliens," into which they say the requested stay would "severe[ly] intru[de]." ECF 26 at 62. Yet, the immigration system is a responsibility shared

by the Executive and Legislative branches. On some questions, in fact, Congress's power over immigration is "plenary." *Plyler v. Doe*, 457 U.S. 202, 225 (1982) ("The Constitution grants Congress the power to 'establish an uniform Rule of Naturalization.' Drawing upon this power, upon its plenary authority with respect to foreign relations and international commerce, and upon the inherent power of a sovereign to close its borders, Congress has developed a complex scheme governing admission to our Nation and status within our borders." (quoting U.S. Const. Art. I., § 8, cl. 4)). As relevant here, it is Congress, not the President, that "specifie[s] which aliens may be removed from the United States and the procedures for doing so." *Arizona v. United States*, 567 U.S. 387, 396 (2012). When the Executive Branch circumvents Congress's decision, it undermines that separation of powers. A court order staying such a circumvention, by contrast, vindicates it.[27]

Defendants try one final argument: "[t]he government has a substantial interest in carrying out the President's policies," and "vigorous enforcement of the immigration laws and the prompt removal of aliens not entitled to remain here is one of the President's top priorities." ECF 26 at 62. For support, Defendants cite Chief Justice Roberts's opinion in chambers in *Maryland v. King*, 567 U.S. 1301 (2012) (Roberts, J., in chambers), for the proposition that "[t]he United States suffers a form of irreparable harm to its democratic system when it is prohibited from effectuating [the President's] policies against anyone anywhere in the Nation." ECF 26 at 62. But the actual quote from the case says something else: "Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *King*, 567

---

[27] Defendants attempt, once again, to fall back on Justice O'Connor's opinion in *Legalization Assistance Project*, which found that the balance of the equities tipped in favor of staying a lower-court decision that constituted an "improper intrusion by a federal court into the workings of a coordinate branch of Government." 510 U.S. at 1306 (O'Connor, J., in chambers). But there, the lower-court's decision was an "improper intrusion" because it permitted a suit by plaintiffs without prudential standing. *See id.* ("Moreover, *if the above analysis is correct* the order is not merely an erroneous adjudication of a lawsuit between private litigants, but an improper intrusion . . . ." (emphasis added)) Here, by contrast, this Court follows the D.C. Circuit in holding that Plaintiffs here *do* fall within the zone of interests, and thus this order is no "improper intrusion" under Justice O'Connor's reasoning.

U.S. at 1303 (quoting *New Motor Vehicle Bd. of California v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers)). That case does not stand for the proposition that the public has an interest in carrying out presidential policies that violate statutes. Rather, it affirms the public interest in enforcement of duly enacted statutes—statutes like IIRAIRA and its limitations on which noncitizens may be subject to expedited removal.

This Court will not "endorse[] the radical proposition that the President is harmed, irreparably, whenever he cannot do something he wants to do, even if what he wants to do is break the law." *Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2581 (2025) (Sotomayor, J., dissenting). Defendants point to no case endorsing such a proposition. Indeed, in *CASA*, the Court's majority rejected that proposition, too.[28] The Executive Branch must follow duly enacted laws or ask Congress to change them, and the public has a strong interest in seeing that principle upheld.

All told, the balance of the equities and the public interest, like the other stay factors, weigh in favor of Plaintiffs' requested relief.

### D. A Stay as to All Noncitizens Paroled into the United States, Not Just Plaintiffs' Members, Is Standard and Appropriate, and No Bond Is Required.

Because all four factors weigh in favor of a stay, the Court will grant a stay of the Challenged Actions. Still, Defendants ask that if this Court does so, it limit the stay to Plaintiffs' "members who [Plaintiffs] can identify as being affected by the challenged agency actions." ECF 26 at 64. Yet, as the D.C. Circuit has repeatedly held, vacatur of the agency action—not merely exempting plaintiffs from the agency action— is the normal remedy under APA section 706. *Nat'l*

---

[28] The *CASA* majority disclaimed any reliance on the "radical proposition" alleged in Justice Sotomayor's dissent. Instead, the Court said the irreparable harm came not from the President being unable to enforce the Birthright Citizenship Order but from "the District Courts' entry of injunctions that likely exceed the authority conferred by the Judiciary Act." *CASA*, 145 S. Ct. at 2562; *see also id.* ("The dissent is wrong to say, however, that a stay applicant cannot demonstrate irreparable harm from a threshold error without also showing that, at the end of the day, it will prevail on the underlying merits."). The majority did not dispute that the proposition Justice Sotomayor described is indeed a "radical" one. *Id.* at 2581 (Sotomayor, J., dissenting).

*Min. Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998). Courts in this and

other circuits have applied that same rule to section 705 stays. *See, e.g.*, *Career Colls. & Schs. of*

*Tex. v. U. S. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024), *cert. granted in part sub nom. Dep't*

*of Educ. v. Career Colls. & Schs. of Tex.*, 145 S. Ct. 1039 (2025); *Dist. of Columbia v. U.S. Dep't*

*of Agric.*, 444 F. Supp. 3d at 48; *Cabrera*, 2025 WL 2092026, at *8. Those decisions track the text

of section 705, which authorizes the reviewing court to "postpone the effective date of an agency

action or preserve status or rights" full stop, not only as to plaintiffs before the court. 5 U.S.C.

§ 705. Against that authority, Defendants provide no case in which a court has granted a section

705 stay only as to the plaintiffs, rather than as against the Government and its enforcement of the

challenged agency action in general.

Defendants do attempt to argue, also without any supporting caselaw, that section 705 stays

must be limited to the plaintiffs because they may only be granted "to the extent necessary to

prevent irreparable injury." 5 U.S.C. § 705. But the statue does not say "to the extent necessary to

prevent irreparable injury *to the plaintiffs*" or "*to the challengers of the agency action*." And here,

Plaintiffs have established irreparable injury to their members and to "others similarly situated."

ECF 22-1 at 19; *see also id.* at 36 (discussing irreparable injury to "Plaintiffs' members and other

noncitizens around the country who were paroled into the United States and are now being

processed for expedited removal"). Without more, Defendants' perfunctory textual analysis cannot

overcome the weight of the statutory text and the caselaw.

Defendants also err in relying on *CASA*, which expressly reserved the question of relief

under section 706. *See* 145 S. Ct. at 2554 n.10 ("Nothing we say today resolves the distinct

question whether the Administrative Procedure Act authorizes federal courts to vacate federal

agency action."). Accordingly, Justice Kavanaugh's concurrence highlighted that, even after

*CASA*, "plaintiffs may ask a court to preliminarily 'set aside' a new agency rule" "in cases under the Administrative Procedure Act." *Id.* at 2567 (Kavanaugh, J., concurring). That is precisely what Plaintiffs ask this Court to do here, and the Court has the power to do so under current precedent.

Finally, it is worth pausing on the significant practical challenges and limited benefits that would result from a stay limited to Plaintiffs' members. By design, the expedited removal process offers few opportunities to raise objections to eligibility for removal, or to get a neutral adjudicator's eyes on such objections. Moreover, Plaintiffs' cited studies and declarations show that the agencies struggle even to follow the limited procedures that exist—and that individuals in expedited removal are often unaware of their rights. *See supra* Section IV.B. Now imagine the Executive Branch having to implement, across every immigration facility and officer nationwide, additional procedures to determine whether individuals in expedited removal are members of one of the Plaintiff organizations. Recall that individuals in expedited removal lack ready access to their belongings, families, or counsel. *See id.* Would they be expected to carry around a membership card everywhere they went, in case they were picked up for expedited removal? How would the agency verify their membership? These problems may be surmountable, but Defendants do not explain how. On the flip side, one of the key practical benefits of plaintiff-confined relief, percolation of suits across different districts and circuits, would not materialize here. *See CASA*, 145 S. Ct. at 2584 (Sotomayor, J., dissenting) (describing the percolation argument). Instead, under section 1252(e)(3)(A), all suits like this one challenging the expedited removal system must be brought in this District. In the end, then, the Court sees numerous reasons to stay the Challenged Actions as to all noncitizens paroled into the United States at any point in time and few reasons not to.

Defendants also ask the Court to, if it grants relief, require Plaintiffs to put forward a bond pursuant to Federal Rule of Civil Procedure 65(c). That rule requires the Court when issuing a preliminary injunction or temporary restraining order to order the movant to "give[] security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Yet, Plaintiffs here seek a stay under APA section 705, which is neither a preliminary injunction nor a temporary restraining order. *Mich. Citizens for an Indep. Press v. Thornburgh*, No. 88-CV-2322, 1988 WL 90388, at *8 n.12 (D.D.C. Aug. 17, 1988) ("[T]he APA stay provision does not impose a security requirement."). Further, even if a section 705 stay did require bond in a "proper" amount, that proper amount would be zero dollars here because bond would "impose a substantial hardship on the Plaintiffs" and "undesirably deter individuals from enforcing their procedural rights to challenge agency action affecting immigration decisions." *See* Fed. R. Civ. P. 65(c); *Doe*, 2025 WL 1099602, at *20 n.33.

One last note on remedy: The March 25 CHNV Termination Notice plainly does more than implement the expedited removal statute. It also terminates the CHNV Parole Programs. Appropriately, Plaintiffs do not ask the Court to stay that Notice in its entirety, but instead ask that the Court stay the Notice, like the other Challenged Actions, only "insofar as [it] subject[s] individuals who have previously been granted parole at ports of entry to expedited removal." ECF 22-1 at 38; ECF 22-18 at 1 (Proposed Order). The Court does so today. To be clear, in other words, the Court is not staying termination of the CHNV Parole Programs. Instead, the Court's order "re-establish[es] the status quo absent the unlawful agency action," which was that CHNV Parole Program parolees were generally not subject to expedited removal (unless they were already subject to one of the other two Challenged Actions, which are also stayed). *Texas*, 40 F.4th at 220.

JA084

JA085

## V.   CONCLUSION

For the foregoing reasons, Plaintiffs' motion for a stay of agency action, ECF 22, is **GRANTED**. The Challenged Actions (the January 23 Huffman Memorandum, February 18 ICE Directive, and March 25 CHNV Termination Notice) are hereby **STAYED**, pending conclusion of these review proceedings, to the extent the Challenged Actions subject to expedited removal individuals who have been, at any time, paroled into the United States at a point of entry.

A separate order accompanies this memorandum opinion.

**SO ORDERED.**

_(signature)_

JIA M. COBB
United States District Judge

Date: August 1, 2025

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

COALITION FOR HUMANE IMMIGRANT RIGHTS,
2533 W. 3rd Street, Suite 101, Los Angeles, CA 90057;

UNDOCUBLACK NETWORK,
1032 15th Street #415, Washington, DC 20005;

CASA, INC.,
8151 15th Ave., Hyattsville, MD 20528;

                Plaintiffs,


           – *versus* –


KRISTI NOEM, in her official capacity as Secretary of
Homeland Security, 245 Murray Lane, SW, Washington,
DC 20528;

TODD M. LYONS, in his official capacity as Acting
Director of U.S. Immigration and Customs Enforcement,
500 12th St., SW, Washington, DC 20538;

PETE R. FLORES, in his official capacity as Acting
Commissioner of U.S. Customs and Border Enforcement,
1300 Pennsylvania Avenue, NW, Washington, DC 20229;

KIKA SCOTT, in her official capacity as the Senior
Official Performing the Duties of the Director of U.S.
Citizenship and Immigration Services, 5900 Capital
Gateway Drive, Camp Springs, MD 20746;

DONALD J. TRUMP, in his official capacity as President
of the United States, 1600 Pennsylvania Ave., NW,
Washington, DC 20500;

                Defendants.

**No: _____**

JA086

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**INTRODUCTION**

1.      This lawsuit challenges the Trump administration's various agency policies expanding expedited removal to expose hundreds of thousands of people who entered the country legally through humanitarian parole processes to summary deportation.

2.      Expedited removal is an extraordinary procedure that allows removal from the United States with little to no due process. While expedited removal has historically been used only for people in the process of seeking admission at a port of entry or for people encountered in the country a short time after entry and within 100 miles of a land border who had "not been admitted or paroled into the United States," on January 21, the administration decided to expand the scope of expedited removal to include individuals throughout the United States who have been continuously present here for less than two years.

3.      On January 23, the administration issued a memorandum implementing the above expansion of expedited removal by directing agency personnel to consider using the fast-track removal authority on any noncitizen eligible for processing through expedited removal, including individuals who had previously been granted parole.

4.      Shortly thereafter, on February 18, the administration issued a directive that purports to expose individuals paroled into the country at ports of entry to the threat of expedited removal with "no time limit on the ability to process such aliens for ER [expedited removal]."

5.      The administration also issued a series of commands, both public and private, terminating various humanitarian parole programs, under which hundreds of thousands of individuals fleeing turmoil in their own countries have been lawfully allowed to enter the country for periods typically of two years to attempt to rebuild their lives. The administration additionally ended the use of CBP One, a mobile application, which allowed certain individuals outside the

JA087

country to schedule appointments to appear at certain land ports of entry to be inspected and considered for parole. Many CBP One parolees were also placed in ordinary removal proceedings. All of these paroled individuals have been able to apply for work authorization and, when eligible, for immigration benefits, such as asylum, Temporary Protected Status ("TPS"), or other forms of relief, and in some circumstances could re-apply for another period of parole.

6.     On March 21, the administration posted for public inspection a Federal Register notice that would upon publication formally terminate four such parole processes for nationals of Cuba, Haiti. Nicaragua, and Venezuela (the "CHNV" parole processes). In this notice, the administration again discusses the application of expedited removal to these parolees, but observes that expedited removal only can be used with respect to individuals who have been continuously present in the country for less than two years. The March 21 notice is inconsistent with the February 18 directive not only with respect to whether individuals like CHNV parolees may be processed for expedited removal without any time limit, but more fundamentally with respect to the legal basis for exposing them to expedited removal at all.

7.     The simultaneous expansion of expedited removal in various and inconsistent ways and the termination of humanitarian parole programs places recipients of parole at risk of being uprooted from this country and removed without basic due process rights.

8.     Without relief from this Court, individuals who have lawfully been granted parole and are living and working throughout the United States—many with families—are at constant risk of being arrested, detained, and removed from the country through a process that not only lacks basic procedural safeguards (like judicial review), but that cannot even be applied to them legally.

JA088

9.      Plaintiffs Coalition for Humane Immigrant Rights ("CHIRLA"), UndocuBlack Network ("UndocuBlack"), and CASA, Inc. ("CASA") are nonprofit, membership-based, immigrant rights organizations whose work, services, and programming are guided by their members. Each group's members include noncitizens subject to expedited removal under the policies challenged in this litigation.

10.      CHIRLA's members include newly arrived migrant families who fled persecution, torture, and the threat of death, and who sought safety in the United States using the CBP One mobile application. Although granted parole and permitted to enter the country temporarily with the opportunity of applying for various forms of protection, these members are now faced with the possibility of being sent back to the dangers they fled without notice and a full opportunity to secure relief for which they are eligible. One CHIRLA member, for example, is an Afghan man who fled under fear of execution by the Taliban and attacks by ISIS due to his ethnicity, religion, and prior activism. If he is rapidly deported to Afghanistan, he would be in immediate danger of bodily injury and death, as well as severe limits to his freedoms of religion, expression, and movement.

11.      UndocuBlack's members include Black migrants who were granted parole through the CHNV parole processes or after securing an appointment at a land port of entry through the CBP One mobile application. Since their entry into the country, these members have been targeted constantly in the United States by anti-Black, anti-Haitian violence, and are plagued by the constant fear of losing their parole and being subjected to rapid deportation back to persecution and danger in Haiti. One of these members, a Haitian man who fled political persecution in his home country, describes feeling now under the administration's expedited removal directives like he is "one second away from losing everything, including [his] life."

4

JA089

12.    CASA's members include both individuals who were sponsored to come to the United States through the CHNV parole processes and individuals who came through using the CBP One mobile application, and they are experiencing widespread anxiety, fear, and confusion about the administration's new policies on parole and expedited removal. One Venezuelan CASA member was granted TPS after he came to the United States on CHNV parole, but because of the administration's termination of Venezuelan TPS and expansion of expedited removal to apply to paroled individuals, he is now at risk of soon being subjected to expedited removal and separated from his young child.

13.    Plaintiffs seek a declaration that the application of expedited removal under 8 U.S.C. § 1225(b)(1)(A) to individuals like their members who have previously been granted parole at a port of entry is unlawful; an injunction prohibiting the Department of Homeland Security ("DHS") from continuing to apply its unlawful construction of the statute to expose individuals who have previously been granted parole at a port of entry to the threat of expedited removal; and vacatur of agency actions taken pursuant the agency's erroneous understanding of the law.

14.    There are other pending cases challenging (1) the expansion of expedited removal to individuals in the interior of the country who have lived here for less than two years and (2) the termination of various humanitarian parole programs. This case is largely focused on the intersection of those issues to ensure that people who were previously granted parole at a port of entry and have been living here continuously since that time are not subject to summary expulsion once they have been stripped of parole status or their period of parole has expired.

## JURISDICTION AND VENUE

15.    This Court has subject matter jurisdiction under 8 U.S.C. § 1252(e)(3). Section 1252(e)(3) provides jurisdiction in the United States District Court for the District of Columbia for

(Page 93 of Total)

JA090

an action challenging as unlawful "a written policy directive, written policy guidance, or written procedure" implementing the expedited removal statute. This Court additionally has jurisdiction under 28 U.S.C. § 1331.

16.    Venue is proper in this District because 8 U.S.C. § 1252(e)(3)(A) requires that all Section 1252(e)(3) actions be brought in the United States District Court for the District of Columbia. In addition, venue is proper under 28 U.S.C. § 1391(e)(1) because a substantial part of the events or omissions giving rise to this action occurred in this District and Defendants are officers of the United States being sued in their official capacity and reside in the District.

## PARTIES

17.    Plaintiff  **Coalition for Humane Immigrant Rights ("CHIRLA")** is a nonprofit membership organization headquartered in Los Angeles, California, with eight offices throughout California and a national policy office in Washington, D.C. CHIRLA was founded in 1986, and it is the largest statewide immigrant rights organization in California, with approximately 50,597 active members. CHIRLA's members include noncitizens who entered the United States on some form of humanitarian parole and are subject to Defendants' application of expedited removal to parolees.

18.    Plaintiff **UndocuBlack Network ("UndocuBlack")** is a nonprofit membership organization incorporated in the District of Columbia. Created in 2016, UndocuBlack is a multigenerational network of Black immigrants that advocates for and supports Black immigrants through facilitating access to resources, storytelling, organizing, and community wellness. Since its inception, UndocuBlack has provided direct services and support to Haitian migrants who have sought protection in the United States as conditions in their home country have deteriorated.

JA091

UndocuBlack has numerous members who are CHNV and CBP One parole beneficiaries from Haiti and are subject to Defendants' application of expedited removal to parolees.

19.     Plaintiff **CASA, Inc. ("CASA")** is a national nonprofit membership organization headquartered in Langley Park, Maryland, with offices in Maryland, Virginia, Pennsylvania, and Georgia. Founded in 1985, CASA has more than 173,000 lifetime members from across the United States. CASA's members are predominantly noncitizens in a variety of immigration statuses, including members who entered the United States on some form of humanitarian parole and are subject to Defendants' application of expedited removal to parolees.

20.     Defendant Kristi Noem is sued in her official capacity as the Secretary of the U.S. Department of Homeland Security ("DHS"), a position to which she was confirmed by the Senate on January 25, 2025.

21.     Defendant Todd M. Lyons is sued in his official capacity as the Acting Director of Immigration and Customs Enforcement ("ICE"), a component agency of DHS.

22.     Defendant Pete R. Flores is sued in his official capacity as the Acting Commissioner of Customs and Border Protection ("CBP"), a component agency of DHS.

23.     Defendant Kika Scott is sued in her official capacity as the Senior Official Performing the Duties of the Director of U.S. Citizenship and Immigration Services ("USCIS"), a component agency of DHS.

24.     Defendant Donald J. Trump is sued in his official capacity as the President of the United States. He was inaugurated on January 20, 2025.

(Page 95 of Total)

JA092

## BACKGROUND

### The Statutory Parole Authority

25.      For more than 70 years, the Nation's immigration laws have granted the Executive the authority to temporarily parole certain noncitizens into the country. Such grants of parole do not constitute an admission into the country, but for the duration of their parole status noncitizens may apply for employment authorization and, in some cases, request that their period of parole be extended. Like other noncitizens, parolees can also apply for other forms of immigration relief. Certain noncitizens who were inspected and paroled into the country also may apply to adjust their status to lawful permanent residence.

26.      From 1952 until 1996, the Attorney General was authorized by statute to grant parole "for emergent reasons" or "for reasons deemed strictly in the national interest." Neither phrase was defined by Congress.

27.      Since 1996, the Attorney General (now the Secretary of Homeland Security) has been authorized by statute to grant parole for "urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). Again, neither phrase has ever been defined by Congress.

28.      Humanitarian parole has been a key component of immigration policy since the Eisenhower administration used it to allow 30,000 Hungarians fleeing Soviet invasion to come to the United States. Parole has been used over 125 times by administrations of both parties—including the first Trump administration—to promote the national interest by advancing various humanitarian, foreign policy, regional security, and migration management objectives.

### Exercises of the Statutory Parole Authority

29.      In the past two decades alone, various challenges associated with managing migration throughout the Western Hemisphere and at the U.S.-Mexico border, as well as fallout

JA093

and displacement resulting from armed conflicts elsewhere in the world, informed decisions by DHS to create a variety of processes to facilitate the consideration of individuals for entry into the United States for a temporary period of time through the statutory parole authority.

30.    **Operation Allies Welcome.** When Afghanistan's military and government quickly fell to the Taliban upon the withdrawal of the U.S. military in August 2021, the U.S. government evacuated approximately 124,000 people from the country through Operation Allies Welcome. After evacuees went through medical, security, and other screenings in third countries, approximately 75,000 were authorized to travel to the United States and were inspected and paroled into the country. Fewer than 50,000 Afghans remain in the United States on current grants of parole by virtue of OAW.

31.    **Uniting for Ukraine.** In the weeks following Russia's invasion of Ukraine in February 2022, which marked the start of a war that continues to this day, significant numbers of Ukrainian nationals began presenting at U.S. ports of entry at the U.S.-Mexico border to request humanitarian protection. Initially, CBP generally paroled these individuals into the country, but in the interest of creating a safe, orderly, and humane pathway for displaced Ukrainian nationals and their immediate family members in Europe to request entry to the United States, DHS established the Uniting for Ukraine ("U4U") Parole Process. *See* Implementation of the Uniting for Ukraine Parole Process, 87 Fed. Reg. 25040 (Apr. 17, 2022).

32.    Under U4U, qualifying individuals who passed background and security checks and had a financial supporter in the United States would be granted travel authorization to fly to the United States at no expense to the government and present themselves at an interior port of entry to be inspected and considered for parole. Approximately 200,000 Ukrainians are in the

JA094

United States today by way of parole. Most had preexisting ties to the United States, which is why they came here for refuge when they fled their home country.

33.    **Cuban, Haitian, Nicaraguan, and Venezuelan Parole Processes:** Faced with a marked increase in the number of Cuban, Haitian, Nicaraguan, and Venezuelan nationals arriving at the U.S.-Mexico border in fiscal year 2022—and given the difficulties of repatriating CHNV nationals to their home countries for a variety of humanitarian and diplomatic reasons—the Biden Administration created for each country a parole process modelled on U4U.

34.    In October 2022, DHS established a parole process for certain Venezuelans. *See* Implementation of a Parole Process for Venezuelans, 87 Fed. Reg. 63507 (Oct. 19, 2022). Approximately two months later, and in light of the effectiveness of the Venezuelan parole process in reducing encounters of Venezuelan nationals between the ports of entry, DHS expanded the Venezuelan parole process, *see* Implementation of Changes to the Parole Process for Venezuelans, 88 Fed. Reg. 1279 (Jan. 9, 2023), and established similar parole processes for certain Cubans, Haitians, and Nicaraguans. *See* Implementation of a Parole Process for Cubans, 88 Fed. Reg. 1266 (Jan. 9, 2023); Implementation of a Parole Process for Haitians, 88 Fed. Reg. 1243 (Jan. 9, 2023); Implementation of a Parole Process for Nicaraguans, 88 Fed. Reg. 1255 (Jan. 9, 2023). The Federal Register Notices announcing the CHNV parole processes identified a series of significant public benefits and urgent humanitarian reasons that would be advanced through the use of parole for individuals availing themselves of the processes and additionally connected the implementation of the processes to ongoing foreign relations initiatives aimed at increasing regional cooperation in and capacity to effectively and responsibly manage migration throughout the Western Hemisphere.

35.    Over a half million Cubans, Haitians, Nicaraguans, and Venezuelans received parole through CHNV.

JA095

36.    **CBP One:** Around the same time that the administration created the CHNV parole processes, it also made available to migrants in Central and Northern Mexico a mobile application called CBP One, which could be used to schedule an in-person appointment at one of several land ports of entry along the U.S.-Mexico border. Upon receiving an appointment, migrants could present themselves at the port of entry for inspection and be considered for parole into the country. Typically, paroled individuals would also be issued a Notice to Appear in immigration court where they would be able to pursue any form of immigration relief for which they might be eligible. Together with the new CHNV parole processes, the CBP One appointment process was designed to facilitate safe and orderly processing of migrants at certain land ports of entry to reduce the incidence of migrants entering the country without inspection between ports of entry.

37.    **Central American Minors Parole:** Central American Minors (CAM) parole was created in 2014 as part of a broader initiative that also involved the consideration of certain Central American minors and qualifying family members for refugee status and potential resettlement in the United States; individuals determined not to be eligible for refugee status were considered, on a case-by-case basis, for parole into the United States. The CAM Refugee and Parole Program was largely prompted by the significant number of unaccompanied children from the Northern Triangle countries of El Salvador, Guatemala, and Honduras coming to the U.S.-Mexico border. Under the program, certain nationals of those countries who are lawfully present in the United States may request that their children still in their home countries be considered for refugee status and, in the alternative, humanitarian parole, so that their families could be safely reunited. In addition to family reunification, the CAM program was intended to create a lawful and orderly pathway to disincentivize children from making the overland journey to the U.S.-Mexico border. In addition to being dangerous and potentially enriching smugglers, unaccompanied children presenting at the

JA096

border create unique operational challenges for DHS. CAM parolees in the United States have been able to apply for and receive re-parole when their initial grants of parole expired.

38.    **Family Reunification Parole Programs:** In 2007, DHS created the Cuban Family Reunification Parole Program to allow certain approved beneficiaries of immigrant visa petitions, upon invitation by the federal government, to apply to be considered for parole into the United States so that they would not have to wait abroad—sometimes for years—for a visa number to become available. *See* Cuban Family Reunification Parole Program, 72 Fed. Reg. 65588 (Nov. 21, 2007). Similar programs were created for Haitian family members in 2014, family members of Filipino World War II veterans and their spouses in 2016, and family members from additional countries in Central and South America in 2023. *See, e.g.* Implementation of Haitian Family Reunification Parole Program, 79 Fed. Reg. 75581 (Dec. 18, 2014); Filipino World War II Veterans Parole Policy, 81 Fed. Reg. 28097 (May 9, 2016); Implementation of a Family Reunification Parole Process for Guatemalans, 88 Fed. Reg. 43581 (July 10, 2023).

## Summary Termination of Parole Processes

39.    On January 20, 2025, President Donald Trump issued Executive Order 14165, "Securing Our Borders," that, among other things, directed the Secretary of Homeland Security (the "Secretary") to terminate all so-called "categorical parole program . . . including the program known as the 'Processes for Cubans, Haitians, Nicaraguans, and Venezuelans.'"

40.    That same day, Acting Secretary Benjamine C. Huffman issued a memorandum entitled, "Exercising Appropriate Discretion Under Parole Authority," to the heads of ICE, CBP, and USCIS. In that memorandum, Acting Secretary Huffman set out a narrow and legally incorrect interpretation of the parole statute, directed that every action regarding parole henceforth use this interpretation, and authorized pausing and terminating parole programs.

41.     Also on January 20, Acting Commissioner of CBP Pete Flores issued a memorandum restricting the CBP personnel authorized to grant parole and requiring that each parole granted by any CBP official be reported to him and the Chief of Staff, along with a justification for the grant. Acting Commissioner Flores' memorandum expressly supersedes any prior conflicting guidance.

42.     Further on that day, CBP terminated the ability of noncitizens to use the CBP One mobile application to schedule appointments to appear at select land ports of entry for inspection and consideration for parole and cancelled existing appointments.

43.     Later that same week, Acting Director of USCIS Jennifer Higgins issued a directive prohibiting USCIS staff from making any further decisions on any request for, among other things, parole or re-parole made through the OAW, U4U, CHNV, or other named parole processes.

44.     On March 21, DHS posted for public inspection a Federal Register Notice that purports to formally terminate the CHNV parole processes and to terminate *en masse* at the end of a 30-day period all grants of parole issued to individuals pursuant to the CHNV parole processes. *See* Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans, Mar. 21, 2025, https://public-inspection.federalregister.gov/2025-05128.pdf ("CHNV Termination Notice"). The termination of parole will have the effect of immediately rendering void employment authorization documents issued to individuals on the basis of the grant of parole and will result in the accrual of unlawful presence for individuals who are not shielded from accruing unlawful presence through some other means (e.g., if they have a pending application for asylum, and/or have been granted Temporary Protected Status). The Notice asserts that the federal government has a "strong interest in promptly removing parolees when the basis for the underlying program no longer exists," but notes that "[e]xpedited removal is available only when an alien has not been

JA098

continuously present in the United States for at least the two years preceding the date of the inadmissibility determination." *Id*. at 27 (citing 8 U.S.C. § 1225(b)(1)(iii)(II); 8 C.F.R. § 235.5)." The Notice further observes that "[i]f DHS were to allow the CHNV parolee population to remain for the full duration of their two-year parole, DHS would be compelled to place a greater proportion of this population in section 240 removal proceedings to effectuate their removal." *Id*. The Notice is scheduled to be published in the Federal Register on March 25.

45.    The termination of various humanitarian parole processes is being challenged in separate litigation. *See*, *e.g.*, *Svitlana Doe v. Trump*, No. 1:25cv10495 (D. Mass. filed Feb. 28, 2025) (challenging, among other things, the termination of OAW, U4U, CHNV, and certain other parole processes).

### The Statutory Expedited Removal Authority

46.    Under our immigration laws and unless otherwise specified, removal proceedings conducted in immigration court—with the right to appellate review before the Board of Immigration Appeals and federal court review—are the "sole and exclusive procedure" for determining whether a person should be admitted to or removed from the country. 8 U.S.C. § 1229a(a)(3).

47.    One specified exception to full removal proceedings is the expedited removal process created by Congress in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996. Under expedited removal, certain noncitizens determined by an immigration officer to be "inadmissible" because they engaged in fraud or misrepresentation to procure admission or other immigration benefits, 8 U.S.C. § 1182(a)(6)(C), or because they lack the requisite documents for entry, Section 1187(a)(7), may be ordered removed by that officer "without further hearing or review." 8 U.S.C. § 1225(b)(1)(A)(i).

JA099

48.    Individuals processed through expedited removal who express a fear of persecution or an intent to apply for asylum are entitled to a credible fear screening interview, *see* 8 U.S.C. § 1225(b)(1), and are entitled to "further consideration of the application for asylum," typically through placement in full removal proceedings, only if they are found to possess the requisite credible fear. *See* 8 U.S.C. § 1225(b)(1)(B).

49.    By statute, the use of expedited removal is authorized for only two categories of noncitizens. First, a noncitizen who "is arriving in the United States" may be processed for expedited removal if they are found to be inadmissible on the grounds described above. *See* 8 U.S.C. § 1225(b)(1)(A)(i).

50.    Second, the statute permits the Attorney General (now the Secretary of Homeland Security) to apply expedited removal to certain other noncitizens found inadmissible on the above grounds who have entered and remain in the United States but who "ha[ve] not been admitted or paroled into the United States." *See* U.S.C. § 1225(b)(1)(A)(iii). For expedited removal to be used in this way, the Secretary must designate certain noncitizens in the country to whom this so-called "expanded expedited removal" may be applied. Expanded expedited removal may not be applied to any noncitizen who can prove to the "satisfaction of an immigration officer" that they have been continuously physically present in the country for two years. *See* 8 U.S.C. § 1225(b)(1)(A)(iii)(II); 8 C.F.R. §§ 235.3(b)(1)(ii), (b)(6).

51.    On January 21, 2025, Acting Secretary Huffman issued for public inspection and effective immediately a designation expanding the scope of expedited removal to apply nationwide and to certain noncitizens who are unable to prove they have been in the country continuously for two years. The designation was published in the Federal Register three days later on January 24,

JA100

2025. *See* U.S. Dep't of Homeland Sec., *Designating Aliens for Expedited Removal*, 90 Fed. Reg.

8139 (Jan. 24, 2025).

52.    This expansion of expedited removal is being challenged in separate litigation. *See*

*Make the Road New York v. Huffman*, 25-cv-00190 (D.D.C. filed Jan. 22, 2025).

**Application of Expedited Removal to Noncitizens Who Have Been Paroled**

53.    On January 23, 2025, Acting Secretary Huffman issued a memorandum entitled,

"Guidance Regarding How to Exercise Enforcement Discretion," to the leadership of ICE, CBP,

and USCIS. The memorandum describes the Acting Secretary's January 20 memorandum

authorizing the pausing or termination of various parole programs and the January 21 designation

expanding the scope of expedited removal—both of which are described above—and "provides

guidance regarding how to exercise enforcement discretion in implementing these policies."

54.    Specifically, the January 23 Huffman memorandum explains that "[t]o effectively

implement these two new policies," agency personnel are directed to consider applying expedited

removal to "any alien DHS is aware of who is amenable to expedited removal but to whom

expedited removal has not been applied." The memorandum notes that this may include taking

steps to terminate ongoing removal proceedings in immigration courts and/or "active parole

status."

55.    For individuals DHS is aware of who do not meet the conditions above but have

"been granted parole under a policy that may be paused, modified, or terminated immediately

under the January 20 memorandum," the January 23 Huffman memorandum directs that they be

considered for placement in removal proceedings and that the continued appropriateness of their

parole be reviewed.

JA101

56.     On or about February 18, 2025, a directive was sent by ICE leadership to all Enforcement and Removal Operations personnel directing such officers to consider for expedited removal "paroled arriving aliens" who have not applied affirmatively for asylum with USCIS. The directive claims that "[t]here is no time limit on the ability to process such aliens for [expedited removal]," thereby exposing individuals paroled into the United States after inspection at a port of entry to the *indefinite* threat of this fast-track removal process. Although this directive has not been officially released, a copy of the directive was published by Reuters in connection with its reporting on the impact of the directive. *See* Ted Hesson and Kristina Cooke, "Trump weighs revoking legal status of Ukrainians as US steps up deportations," Reuters, Mar. 6, 2025, https://www.reuters.com/world/us/trump-plans-revoke-legal-status-ukrainians-who-fled-us-sources-say-2025-03-06/.

57.     The February 18 directive further states that the issuance to the individual of an expedited removal charging document has the effect of terminating that individual's active parole status.

58.     On March 21, DHS posted for inspection the CHNV Termination Notice, which discusses in multiple places when and under what authority the agency intends to process CHNV parolees for expedited removal. The notice states that "[e]xpedited removal is available only when an alien has not been continuously present in the United States for at least the two years preceding the date of the inadmissibility determination." CHNV Termination Notice at 27.   Because "thousands of CHNV parolees . . . will become ineligible for expedited removal upon the natural termination of their two-year parole," *id*. at 29 n.77, and to "initiate expedited removal proceedings to the maximum extent possible for the appropriate CHNV population," *id*. at 29, the Department decided to terminate grants of parole early rather than allowing individuals the benefit of the two-

JA102

year period they have been granted and made terminations effective 30 days after the publication date rather than at some later date.

### Harm to Plaintiff Organizations and Their Members

59.     Plaintiffs are nonprofit membership-based organizations whose members include individuals who have been paroled into the United States through some of the humanitarian parole processes relevant to this case. Defendants' directives to apply expedited removal to parolees cause Plaintiffs' members substantial injury.

60.     Plaintiff **CHIRLA**'s mission is to advance the human and civil rights of immigrants and refugees and ensure immigrant communities are fully integrated into society with full rights and access to resources.

61.     In furtherance of this mission, CHIRLA provides a range of services that reach tens of thousands of Californians each year. These services include education programs, legal services programs, and an assistance hotline that fields on average 15,000 calls a year. CHIRLA educates its membership as well as the broader community through know-your-rights trainings, workshops, and social media and educational literature about a variety of social services and benefits, including immigration law, financial literacy, workers' rights, and civic engagement.

62.     CHIRLA serves individuals who were paroled into the country under humanitarian parole processes through all of its different programs. In particular, CHIRLA provides trauma-informed wrap-around case management services to newly arrived migrant families who were paroled through CBP One and Afghan nationals who arrived through Operation Allies Welcome. These include benefits navigation, employment services, housing search, cultural orientation, pro se legal services, and other services needed for newcomers to successfully integrate into their new communities.

JA103

63.    CHIRLA members play an important role in deciding what CHIRLA's priorities are and how CHIRLA serves the community. CHIRLA receives feedback from its members during an annual member meeting and other member convenings where CHIRLA staff meet with members to discuss priorities for CHIRLA's work.

64.    CHIRLA membership is voluntary, and it is open to anyone who believes in the importance of social justice and supports an immigrant community, and who embodies diversity, equality and inclusion. By becoming a CHIRLA member, an individual agrees to take a stand for immigrant rights.

65.    To become a CHIRLA member, an individual must submit an online application for membership, make an annual dues payment, and agree to the values and mission of CHIRLA. The current membership fee for individuals is $25, which can be paid manually every year or by setting up an annual recurring payment. There is also a family membership option, which is $60, and an enhanced individual membership (called a "community membership") option, which is $100 and provides select additional benefits. The fee can be (and occasionally has been) waived for individuals who experience financial hardship or are otherwise unable to pay. Once an individual becomes a CHIRLA member, they will receive a membership card and access to CHIRLA legal services and educational resources, year-round events and membership calls, and other benefits.

66.    CHIRLA's membership is diverse and includes U.S. citizens, non-U.S. citizens with lawful status, and non-U.S. citizens without lawful status. Members include individuals who were paroled into the country through the CBP One application and through the Operation Allies Welcome parole process. CHIRLA has serviced hundreds of CBP One parolees, at least a dozen of whom have already become CHIRLA members.

JA104

67.    Members include both noncitizens who have been granted parole and have been continuously present in the United States for less than two years, as well as those who have been here for two years or more. Some of these parolee members are in active removal proceedings already, and some are not.

68.    These parolee members of CHIRLA include many who would be deeply and severely harmed if they were subject to expedited removal. For example, CHIRLA John Doe 1 is an Ecuadorian man who was paroled into the United States through CBP One during the latter half of 2024 after he fled Ecuador out of fear for his life. After a cartel began extorting him for money, threatening to kill him if he didn't make regular payments and if he tried to leave town, he felt he had no other option but to flee the country. The cartel told him that if they heard that he was trying to sell his possessions and leave town, they would find him and kill him on the spot. CHIRLA John Doe 1 was aware of this happening to other people, as extortion was common in the area where he lived. Additionally, if he got further involved in the extortion scheme, it was equivalent to joining the cartel. Unable to make payments, and unwilling to resort to a life of crime, CHIRLA Doe 1 left his home, fearing for his life. Expedited removal back to Ecuador would put CHIRLA John Doe 1 back at risk of being murdered by the cartel.

69.    Another CHIRLA member is a Guatemalan woman whose husband was the target of death threats back in Guatemala. A man who was the head of a local criminal network and was rumored to have murdered at least one other person in the community made verbal threats to their family, including to their son, and stalked them, hanging around their house at all hours. Before the death threats and stalking, he and members of his network had also harassed the CHIRLA member and her family when they went outside, impeding their ability to move freely. The CHIRLA member and her family tried to file reports with the police to obtain help but, as the man

was a former police officer, the police did not get involved. For their safety, she and her family left their home for the United States and were paroled into the country through CBP One during the summer of 2023. If they were subject to expedited removal, they would be rapidly sent back to the same severe risk of harm, including of death, from which they fled.

70.    Another CHIRLA member is an Afghan man who was paroled into the United States through CBP One during the summer of 2024. He fled Afghanistan because he is a member of a minority community that the Taliban and ISIS systematically target for violence, killings, and bombings. He has survived attacks in the past, but the fall of Kabul in August 2021 escalated the threats against him and his community. He is also an activist, so he faces an even higher risk of persecution, torture, and even execution in Afghanistan. If he is put into expedited removal proceedings and deported to Afghanistan, he would be in immediate danger of kidnapping, torture, and death at the hands of the Taliban. He would face severe restrictions on his freedom to exercise his religion, freedom of expression, and freedom of movement.

71.    CHIRLA members live in areas where encounters with ICE officers and detention by ICE are common. ICE actively detains noncitizens all over California, including in and near Los Angeles.

72.    Because of the services that CHIRLA provides to its members, CHIRLA is acutely aware of the harms that Defendants' application of expedited removal to parolees will cause to its members.

73.    Parolee clients and members have expressed fears to CHIRLA around their parole status being revoked and then being subject to expedited removal. Beyond being fearful, CBP One parolees also express a sense of betrayal as they followed an established process laid out by the U.S. government, with many of them waiting months and in some cases over a year in Mexico—

21

JA106

often in dangerous and difficult settings—for their appointments to appear at a land port of entry for inspection and consideration for parole. OAW Afghan parolees have expressed an even more heightened sense of disappointment as many of them risked their lives to support the U.S. military, and the government is now turning its back on them.

74.    Expedited removal of parolees like CHIRLA's members would be particularly harmful because of the rapid, summary nature of the process. It makes it more difficult for members and their families to have a plan in place; it causes more devastating, sudden family separation, which has a severe impact on any children involved; and the community around the members suffer as well. Additionally, the rapid deportation process would deprive some CHIRLA members of the opportunity to submit applications for immigration protections that they are entitled to. For those who may be eligible for asylum or Convention Against Torture protections in the United States, the credible fear screenings that exists in the expedited removal process—which depend upon case referrals by enforcement personnel to asylum officers and typically involve little to no access to counsel—is often badly flawed and result in the removal of people to horrible circumstances abroad.

75.    In its educational materials and know-your-rights trainings, CHIRLA has been teaching members about the risk of detention and deportation, including through expedited removal, and what they can do to prepare themselves and their families for the possibility.

76.    Plaintiff **UndocuBlack's** mission is to foster community, facilitate access to resources, and contribute to transforming the realities of its members – who are Black immigrants – so they can thrive and live their fullest lives.

77.    UndocuBlack's community-centered approach aspires to empower members to identify their needs and help shape the trajectory of UndocuBlack's work. UndocuBlack engages

JA107

and supports their members and advocates for policies that protect members and Black immigrants at large through different areas of work including community engagement and organizing, community wellness, narrative and storytelling, and policy and advocacy.

78.     UndocuBlack serves thousands of immigrants around the country, including in New York, Florida, California, and the greater D.C./Maryland/Virginia area. The largest concentration of UndocuBlack's membership is in New York, where there is an active local chapter.

79.     UndocuBlack's membership is approximately 700 members. To become an UndocuBlack member, an individual need only (1) identify as Black, (2) be an immigrant, and (3) submit a form to indicate their interest in joining the membership. There are no membership dues required.

80.     UndocuBlack has long served and supported the Haitian community in particular. Prior to the Trump administration's termination of humanitarian parole programs, UndocuBlack helped many Haitian members in the United States determine if they were eligible to sponsor family members for CHNV parole based on their income. UndocuBlack also assisted Haitian members and their families with school enrollment, getting connected to English Language Learner programs, applying for work authorizations, and completing applications for other immigration benefits like TPS.

81.     UndocuBlack has numerous members who are Haitian CHNV and CBP One parole beneficiaries. The Trump administration's application of expedited removal to parolees directly harms these members.

82.     Since the administration's expansion of expedited removal to apply nationwide and to certain noncitizens who cannot prove they have been here for two years and the various directives that expose parolees to expedited removal, UndocuBlack has received countless

23

JA108

inquiries from its members and the UndocuBlack community at large, including from those with parole, regarding what these policies mean and how they will be used to arrest, detain, and expeditiously remove parolees. In response to members' questions and requests for additional information, UndocuBlack created a Frequently Asked Questions (FAQ) resource to share with members and the broader community. UndocuBlack has also conducted member calls that have included Know Your Rights (KYR) trainings; such trainings have covered the impact that the expansion of expedited removal will have on parolees and safeguards that parolees should take to protect themselves and their families.

83.    Expedited removal of Haitian CHNV and CBP One beneficiaries will severely harm UndocuBlack members in many ways. Some UndocuBlack members who are Haitian CHNV parolees did not come in time to apply for TPS and even those who now have TPS recognize that the Trump administration is working to terminate those protections early (i.e., by August 3, 2025). UndocuBlack's Haitian CHNV parolees also have family members with different immigration statuses. UndocuBlack expects that many affected members will experience abrupt family separation, will lose one or more household incomes, fear sending their children to school, and may be deported to Haiti where they don't have family or resources, and where they may be at risk of violence.

84.    UndocuBlack members who may be eligible for asylum or Convention Against Torture protections in the United States still fear that they could be deported through expedited removal, given the flaws in the credible fear screening process. The screenings depend on case referrals by enforcement personnel to asylum officers, and noncitizens are given little opportunity to gather relevant documents, present evidence, or consult counsel. Due to these and other

JA109

inadequacies, the screenings can result in, and have resulted in, the removal of people to dangerous circumstances abroad.

85.    One UndocuBlack member, UBN Jane Doe 1, is a Haitian woman who was sponsored to come to the United States through the Haitian CHNV parole process. She applied for and was granted TPS, but now, due to the administration's efforts to terminate Haitian TPS prematurely, that status will likely expire in August, and she could be subject to expedited removal. UBN Jane Doe 1's son, who is back in Haiti, is ill, and being able to work in the U.S. through CHNV has been the only way UBN Jane Doe 1 has been able to provide for him. The anticipated early terminations of both TPS and parole, together with the possibility of being removed expeditiously without a meaningful opportunity to request any possible form of relief, have caused significant harm to UBN Jane Doe 1, who has relied upon CHNV parole to provide for herself and her ailing child. Moreover, the government's betrayal and stripping of time that was given to her— which would be exacerbated by efforts to quickly remove her without process—will cause deep financial and psychological harm to her.

86.    Another UndocuBlack member, UBN Jane Doe 2, is a 45-year-old mother who fled Haiti and was paroled into the U.S. with her young son through CBP One in March 2024. As she struggles to navigate the complex asylum process without legal representation, she lives in constant fear for both her life and her child's. Her greatest terror is that stepping outside for any reason could mean never returning to her son. Through free legal resources, she has learned that she must always be prepared to show documentation of at least two years of presence in the U.S. But the harsh reality is that she simply does not have that. The weight of this requirement, coupled with the uncertainty of her status, leaves her paralyzed with fear—afraid to attend her own hearings, afraid to send her son to school, and even afraid to stay in her own home. Any knock at

the door or passing shadow, even from the mail carrier, fills her with terror. She lives in a constant state of anxiety, fearing that at any minute, she will be processed for expedited removal, forced to try and quickly defend her asylum claim alone and without the opportunity to see a judge, without the ability to pay for an attorney, and while battling language barriers.

87.    UndocuBlack members live in areas where encounters with ICE officers and detention by ICE are common. ICE actively detains noncitizens all over New York, where the largest concentration of UndocuBlack members reside.

88.    UndocuBlack and its members see the expedited removal policies at issue in this case as another anti-Black, anti-Haitian attack in a long line of such discrimination and violence by the Trump administration.

89.    As an organization with some undocumented members who are also Black, UndocuBlack's members will be disproportionately affected by the Trump administration's expedited removal expansion. Due to intersectional bias around race and criminality, Black people in the United States experience a higher rate of interaction with law enforcement than people of other races. This racial bias and profiling coupled with a person's immigration status and possible language barrier will mean that Haitian parolees will be some of the most adversely affected by this expansion.

90.    Plaintiff **CASA**'s mission is to create a more just society by building power and improving the quality of life in working-class Black, Latino/a/e, Afro-descendent, Indigenous, and immigrant communities. From its beginnings in a church basement, CASA has envisioned a future with diverse and thriving communities living free from discrimination and fear, working together with mutual respect to achieve human rights for all.

JA111

91.     In furtherance of this mission, CASA offers a wide variety of social, health, job training, employment, and legal services to immigrant communities, with a particular focus in Maryland, Washington, D.C., Virginia, Pennsylvania, and Georgia. CASA also offers a more limited suite of services remotely to members across the United States. Those individuals who do not live in an area with a local CASA organizing committee are offered the opportunity to join a national organizing committee, whose members are entitled to vote on CASA's organizational priorities and are integrated into its member-led system of internal democratic governance. CASA also conducts campaigns to inform members of immigrant communities of their rights and assists individuals in applying for a variety of government benefits. In addition, CASA provides its members with free remote legal assistance, including free legal consultations and referrals on immigration issues. Capacity permitting, CASA provides legal representation to members in removal defense cases and on affirmative immigration applications to USCIS.

92.     A CASA member is a person who shares CASA's values, envisions a future where we can achieve full human rights for all, and is convinced that, when united and organized, we can create a more just society by building power in our working-class and immigrant communities. CASA members play an important role in deciding what campaigns CASA works on and how CASA serves the community.

93.     CASA membership is voluntary. To become a member, an individual must apply, pay dues, and subscribe to the principles of CASA. CASA members also must self-identify as members of an immigrant or working-class community. Currently, the annual fee for CASA membership is $35. Alternatively, individuals may pay a recurring membership fee of $5 per month. The membership fee can be waived when appropriate. Members are also offered the opportunity, for an additional $5, to obtain a CASA ID. This is a physical, picture identification

JA112

card that contains basic information about the member. For many of CASA's immigrant members, this card may be the only type of picture identification they have, other than documents from their home country. In certain jurisdictions, CASA IDs are recognized for the purposes of engaging with certain government agencies, including the police.

94.    CASA has members who have been paroled into the United States, including members who have received parole after presenting at a land port of entry with a CBP One appointment and through the CHNV parole processes.

95.    CASA John Doe 1, for example, is a CASA member originally from Venezuela who now resides in Maryland. His sister, who has TPS, sponsored him to come to the United States on the Venezuelan CHNV parole program in May 2023. After arriving, CASA John Doe 1 applied for and was granted TPS as well, but with the administration's early termination of Venezuelan TPS, that status is set to expire in April. CASA John Doe 1 works in construction and lives with his wife and 9-year-old daughter, who depend on him for financial support. He fears returning to Venezuela, because he was targeted by the government there. If he were subjected to expedited removal, he would be separated from his family, which would be especially harmful for his young daughter. He is also the sole breadwinner for his family, and they would struggle to support themselves without him. CASA John Doe 1 has worked hard to build a life in the United States, to establish a safe place for himself and his family to thrive. He is active in his community and regularly attends church. He is proud to pay his taxes and abide by the law in this country.

96.    CASA Jane Doe 1 is a CASA member originally from Honduras who currently resides in Maryland. A single mother, she and her three children – ages 18, 13, and 6 – entered the United States on humanitarian parole after attending a CBP One appointment at the southern border in July 2024. CASA Jane Doe 1's youngest two children are in school in the U.S., which is

JA113

an opportunity they did not have while living in Honduras, and she works at a fruit factory, helping to pack fruit for distribution, to ensure that her family have their daily necessities. CASA Jane Doe 1 fears being deported to Honduras, because she faced domestic violence by her ex-partner there, including death threats against her and the children. She is very afraid of being separated from her children, because they could not support themselves without her. She has a pending asylum claim that she would not be able to pursue from Honduras as well. Rapid deportation would deprive her of the opportunity to find safety in the U.S. for herself and her children.

97.    CASA John Doe 2 and CASA Jane Doe 2 are a married couple originally from Venezuela who currently live in Maryland. They, along with their four children – ages 16, 13, 8, and 5 – were granted humanitarian parole through CBP One in July 2024. CASA John Doe 2 works as a DoorDash driver to support their family, and CASA Jane Doe 2 devotes her time to taking care of their children. Their 8-year-old son suffers from a disability called psychomotor delay that slows his learning process. He still requires diapers, has difficulty walking, and cannot write. He requires constant support. While he does attend school, CASA Jane Doe 2 often has to go to the school to help the teachers with his care. CASA John Doe 2 was a politically active small business owner back in Venezuela, and he was targeted and attacked by the government for supporting its opposition. If he and CASA Jane Doe 2 were subject to rapid, expedited deportation back to Venezuela, they fear their family's safety would be at risk, and they would not be able to pursue their pending asylum claims.

98.    CASA is acutely aware of the harms that Defendants' application of expedited removal to parolees will cause. CASA has heard from its members that there is widespread confusion and fear from the administration's decisions to end parole processes and expand expedited removal. There has also been a chilling effect among members, with members unsure

JA114

about whether it is safe to share their information with government agencies, including by applying for further immigration benefits for which they qualify. Given all of the recent policy reversals, they have significant and legitimate fear that their information will now be weaponized against them.

99.    CASA members who may be eligible for asylum or Convention Against Torture protections in the United States still fear that they could be deported through expedited removal, given the ever-shifting nature of policy changes within this administration. They do not know if they will be able to have their case properly heard by an immigration judge, or if anyone will care about their legitimate fear of return.

100.    In response, CASA has devoted significant resources to deportation defense and preparing its membership for potential immigration enforcement actions, including developing new Know Your Rights resources and devoting additional resources to immigration counseling and rapid response to immigration enforcement. Stripping legal protections from hundreds of thousands of people, and subjecting them to rapid deportation via expedited removal, has a deep negative impact on CASA's membership.

101.    All of the foregoing allegations are incorporated into each of the following claims for relief as set forth therein.

## FIRST CLAIM FOR RELIEF

### (Violation of the Immigration and Nationality Act, 8 U.S.C. § 1225(b)(1)(A); Administrative Procedure Act, 5 U.S.C. § 706(2); 8 U.S.C. § 1252(e)(3))

102.    An immigration officer may process a noncitizen for expedited removal upon determining that such noncitizen "is arriving in the United States or is described in clause (iii)" and is inadmissible under 8 U.S.C. §§ 1182(a)(6)(C) or 1182(a)(7). *See* 8 U.S.C. § 1225(b)(1)(A)(i).

(Page 118 of Total)

JA115

103.    Subclause (I) of clause (iii) referenced above provides that the Secretary may apply expedited removal to "any or all aliens described in subclause (II) as designated by the [Secretary]." 8 U.S.C. § 1225(b)(1)(A)(iii)(I).

104.    Subclause (II) referenced above includes a description of noncitizens who may be designated by the Secretary to be amenable to expedited removal and specifies that such noncitizens must not "ha[ve] been admitted or paroled into the United States." 8 U.S.C. § 1225(b)(1)(A)(iii)(II). A noncitizen who "ha[s] been admitted or paroled following inspection by an immigration officer at a designated port-of-entry" is excluded from expedited removal under 8 U.S.C. § 1225(b)(1)(A)(i). 8 C.F.R. § 235.3(b)(1)(ii). *See also* 8 C.F.R. § 235.3(b)(6) (requiring that noncitizen be given a "reasonable opportunity" to establish to an immigration officer "that he or she was admitted or paroled into the United States following inspection at a port-of-entry," and cannot thereby be processed for expedited removal).

105.    The February 18 directive violates the INA and is "not in accordance with law" and "in excess of statutory . . . authority" under the APA, 5 U.S.C. § 706(2)(A), (C), to the extent that it authorizes the use of expedited removal for noncitizens who were inspected and granted parole at a port of entry and are currently present in the United States subsequent to that parole. Such individuals have already arrived in the United States and have begun establishing their lives here and are therefore no longer in the act of "arriving." Because such noncitizens are not "arriving in the United States," they cannot be subjected to expedited removal under 8 U.S.C. § 1225(b)(1)(A)(i).

106.    The January 23 Huffman memorandum and the March 21 CHNV Termination Notice violate the INA and are "not in accordance with law" and "in excess of statutory . . . authority" under the APA, 5 U.S.C. § 706(2)(A), (C), to the extent that they authorize the use of

so-called expanded expedited removal for CHNV and other parole beneficiaries who have not

"been physically present in the United States continuously for the 2-year period immediately prior

to the date of the determination of inadmissibility." 8 U.S.C. § 1225(b)(1)(A)(iii)(II). *See* CHNV

Termination Notice (noting that "CHNV parolees . . . will become ineligible for expedited removal

upon the natural expiration of their two-year parole."). Such individuals "ha[ve] been . . . paroled

into the United States," which makes them ineligible for expedited removal under 8 U.S.C. §

1225(b)(1)(A)(iii)(II), regardless of whether they have been physically present in the United States

for less than two years.

107.    Each of these policies must therefore be held unlawful, set aside, and/or otherwise

vacated.

## SECOND CLAIM FOR RELIEF

### (Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A))

108.    The APA provides that courts "shall . . . hold unlawful and set aside agency action"

that is arbitrary and capricious. 5 U.S.C. § 706(2)(A).

109.    The agency's various articulations of its authority to expose individuals inspected

and granted parole at ports of entry to expedited removal are unexplained and entirely inconsistent

with each other. In the January 23 Huffman memorandum and the March 21 CHNV Termination

Notice, the Department contemplates using expedited removal against parolees pursuant to 8

U.S.C. § 1225(b)(1)(A)(iii). The March 21 CHNV Termination Notice in particular is clear that

under the expedited removal statute, CHNV parolees may be removed only under this provision,

which is why the Department decided to terminate their paroles precipitously in order to maximize

the number of people who may be expeditiously removed by minimizing the number who have

been continuously present in the country for two years. The February 18 directive, however,

JA117

appears to make all individuals who were granted parole at ports of entry and are now present in the United States eligible for expedited removal under 8 U.S.C. § 1225(b)(1)(A)(i). The directive additionally is explicit that "[t]here is no time limit on the ability to process [such parole beneficiaries] for expedited removal."

110.    None of the agency policies described above contains any reasoned explanation for why parole beneficiaries may be processed for expedited removal, and any explanation that exists in the January 23 and March 21 agency policies is inconsistent with any explanation that exists in the February 18 directive. The arbitrariness and capriciousness of each agency policy is further evidenced by the failure of such policy to consider the agency's own contrary conclusions regarding the legal authority for the agency to adopt the policy as contemplated. Indeed, the inconsistent agency interpretations are both incorrect as a matter of law.

111.    Moreover, none of the agency policies consider the impact of their decision to apply expedited removal to some population of parolees on paroled individuals themselves, their families, their communities, and any financial supporters, as well as any reasonable alternatives.

112.    Each of these policies must therefore be held unlawful, set aside, and/or otherwise vacated.

### THIRD CLAIM FOR RELIEF

### (Violation of the Due Process Clause of the Fifth Amendment to the United States Constitution)

113.    The Due Process Clause of the Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law."

114.    Plaintiffs who are at risk of being subjected to expedited removal under the January 23 Huffman memorandum, the February 18 directive, and/or the March 21 CHNV Termination Notice are entitled under the Due Process Clause to notice, an opportunity to be heard, and to have

JA118

the law correctly applied to their cases, including to a meaningful process before they can be removed from the country.

115.    The January 23 Huffman memorandum, the February 18 directive, and the March 21 Federal Register Notice must therefore be enjoined as violative of the Fifth Amendment's guarantee of due process.

<strong>PRAYER FOR RELIEF</strong>

**WHEREFORE**, Plaintiffs respectfully request that this Court:

1.    Declare that noncitizens who have previously been granted parole at ports of entry are not amenable to expedited removal under 8 U.S.C. § 1225(b)(1)(A) and that the January 23 Huffman memorandum, February 18 directive, and March 21 CHNV Termination Notice are unconstitutional and contrary to law and arbitrary and capricious in violation of the APA;

2.    Preliminarily enjoin and stay the January 23 Huffman memorandum, February 18 directive, and March 21 CHNV Termination Notice pursuant to Federal Rule of Civil Procedure 65(a) and 5 U.S.C. § 705 during the pendency of this suit;

3.    Permanently enjoin and vacate the January 23 Huffman memorandum, February 18 directive, and March 21 CHNV Termination Notice at final judgment;

4.    Enjoin Defendants from applying expedited removal to noncitizens who have previously been granted parole at a port of entry;

5.    Award Plaintiffs' counsel reasonable attorneys' fees under the Equal Access to Justice Act, and any other applicable statute or regulation; and

6.    Grant such relief as the Court deems just, equitable, and appropriate.


Dated: March 24, 2025                        Respectfully submitted,

                                             */s/ Esther H. Sung*

34

<strong>JA119</strong>

Esther H. Sung (CA00132)
Karen C. Tumlin (CA00129)
Hillary Li (application for admission forthcoming)
Laura Flores-Perilla (*pro hac vice* forthcoming)
Brandon Galli-Graves (*pro hac vice* forthcoming)
**JUSTICE ACTION CENTER**
P.O. Box 27280
Los Angeles, CA 90027
Telephone: (323) 450-7272
esther.sung@justiceactioncenter.org
karen.tumlin@justiceactioncenter.org
hillary.li@justiceactioncenter.org
laura.flores-perilla@justiceactioncenter.org
brandon.galli-graves@justiceactioncenter.org

Nicholas Katz, Esq. (*pro hac vice* forthcoming)
**CASA, INC.**
8151 15th Avenue
Hyattsville, MD 20783
Telephone: (240) 491-5743
nkatz@wearecasa.org

Carl Bergquist (D.C. Bar # 1720816)
**COALITION FOR HUMANE IMMIGRANT RIGHTS**
2533 West 3rd St, Suite 101
Los Angeles, CA 90057
Telephone: (310) 279-6025
cbergquist@chirla.org

*Attorneys for Plaintiffs*

JA120

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| COALITION FOR HUMANE IMMIGRANT RIGHTS, *et al.*, |
| *Plaintiffs*, |
| *v.* |
| KRISTI NOEM, in her official capacity as Secretary of Homeland Security, *et al.*, |
| *Defendants.* |

Case No.: 1:25-cv-0872

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**INTRODUCTION**

1.      This lawsuit challenges the Trump administration's various agency policies expanding expedited removal to categorically expose hundreds of thousands of people who entered the country legally through humanitarian parole processes to summary deportation.

2.      Expedited removal is an extraordinary procedure that allows removal from the United States with little to no due process. While expedited removal has historically been used only for people in the process of seeking admission at a port of entry, or for people encountered in the country *a short time* after entry and within 100 miles of a land border who had "not been admitted or paroled into the United States," on January 21, the administration decided to expand the scope of expedited removal to include individuals throughout the United States who have been continuously present here for less than two years.

3.      On January 23, the administration issued a memorandum implementing the above expansion of expedited removal by directing agency personnel to "consider" using the fast-track

removal authority on any noncitizen eligible for processing through expedited removal, including individuals who had previously been granted parole, including by terminating active removal proceedings and any active parole status (the "January 23 Huffman Memorandum").

4.    Shortly thereafter, on February 18, the administration issued a directive that purports to expose individuals who have been paroled into the country at ports of entry and who do not have a pending asylum application to the threat of expedited removal, with "no time limit on the ability to process such aliens for ER [expedited removal]" (the "February 18 ICE Directive").

5.    The administration also issued a series of commands, both public and private, terminating various humanitarian parole programs under which hundreds of thousands of individuals fleeing turmoil in their own countries have been lawfully allowed to enter the United states for periods of up to two years, permitting them to live and work safely for the duration of their authorized period of parole or any subsequent lawful authorized stay, such as during the consideration or granting of another immigration filing. The administration additionally ended the use of CBP One, a mobile application, which allowed certain individuals outside the country, also fleeing turmoil in their home countries, to schedule appointments to appear at certain land ports of entry to be inspected and considered for parole. Many CBP One parolees were also placed in ordinary removal proceedings, on a case-by-case basis, at the same time that they were granted parole. All of these paroled individuals have been able to apply for work authorization and, when eligible, for immigration benefits, such as asylum, Temporary Protected Status ("TPS"), or other forms of relief, and in some circumstances could re-apply for another period of parole.

6.    On March 25, the administration published a Federal Register Notice that formally terminated four such humanitarian parole processes for nationals of Cuba, Haiti. Nicaragua, and

JA122

Venezuela (the "CHNV" parole processes) and purported to categorically terminate all grants of parole previously extended to CHNV nationals ("the March 25 CHNV Termination Notice"). In this Notice, the administration again discussed the application of expedited removal to these parolees and observed that expedited removal only can be used with respect to individuals who have been continuously present in the country for less than two years. The March 25 CHNV Termination Notice is inconsistent with the February 18 directive not only with respect to whether individuals like CHNV parolees may be processed for expedited removal without any time limit, but more fundamentally with respect to the legal basis for exposing them to expedited removal at all.

7.     Starting around May 21, 2025—the same day that White House Deputy Chief of Staff Stephen Miller was reported to have demanded that U.S. Immigration and Customs Enforcement ("ICE") leadership meet high quotas for detentions and removals, pressuring them to go to locations such as Home Depot and 7 Eleven to fulfill quotas without regard to individuals' criminal history—Plaintiffs, attorneys, and noncitizens nationwide began reporting and experiencing the widespread implementation of the administration's policies targeting for expedited removal individuals who had been previously paroled into the United States at ports of entry.

8.     In immigration courtrooms around the country, ICE Trial Attorneys representing the Department of Homeland Security ("DHS") started to file motions to dismiss removal proceedings against certain noncitizens who were appearing for routine hearings, including noncitizens who had been inspected and paroled into the United States at a land port of entry during an appointment secured through DHS's CBP One mobile application. Some motions were filed in writing; others, orally. Some motions disclosed that ICE intended to process the noncitizens for

JA123

expedited removal upon dismissal of proceedings and some made no mention of plans to continue pursuing removal.

9.      At the conclusion of proceedings, where the immigration judge had granted the government's motion to dismiss, ICE officers waiting outside the courtroom arrested these noncitizens without warning, and without a warrant of any kind.

10.      Many of those arrested were (and many remain) wholly unaware of why they are detained or that they are going to be processed for expedited removal. Many had also already appeared for multiple prior court hearings without being detained, and many had requests for immigration relief pending with the immigration court or with U.S. Citizenship and Immigration Services (USCIS).

11.      Those arrested are often being separated from family—sometimes physically pulled away from loved ones in sight of the courtroom—and detained in remote immigration detention facilities, facing rapid deportation with limited access to counsel and without a meaningful opportunity to present claims for relief for which they are eligible.

12.      The simultaneous expansion of expedited removal in various and inconsistent ways and the attempted *en masse* termination of hundreds of thousands of previously-issued grants of parole, combined with the recent rise in the use of expedited removal on the ground, including against noncitizens who have been paroled into the country at ports of entry, place these parole recipients at imminent risk of being uprooted from this country and removed without basic due process rights and in violation of precise statutory limits.

13.      In addition to courthouse arrests, there have been sweeping worksite raids taking place across the country, from Washington, D.C. to Los Angeles, California, including significant

JA124

enforcement actions taking place in Los Angeles in June 2025. These actions further reinforce that parole beneficiaries are at imminent risk of expedited removal and all its concomitant harms.

14.     Without relief from this Court, individuals who have lawfully been granted parole and are living and working throughout the United States—many with families—are at significant risk of being arrested, detained, and removed from the country through a process that not only lacks basic procedural safeguards (including judicial review), but that cannot even be applied to them legally.

15.     Plaintiffs Coalition for Humane Immigrant Rights ("CHIRLA"), UndocuBlack Network ("UndocuBlack"), and CASA, Inc. ("CASA") are nonprofit, membership-based, immigrant rights organizations whose work, services, and programming are guided by their members. Each group's members include noncitizens subject to expedited removal under the policies challenged in this litigation who are at risk of being arrested or detained at any point.

16.     CHIRLA's members include newly arrived migrant families who fled persecution, torture, and the threat of death, and who sought safety in the United States using the CBP One mobile application. Although granted parole and permitted to enter the country temporarily with the opportunity of applying for various forms of protection, these members are now faced with the possibility of being sent back to the dangers they fled without notice and a full opportunity to secure relief for which they are eligible. One CHIRLA member, for example, is an Afghan man who fled under fear of execution by the Taliban and attacks by ISIS due to his ethnicity, religion, and prior activism. If he is rapidly deported to Afghanistan, he would be in immediate danger of bodily injury and death, as well as severe limits to his freedoms of religion, expression, and movement.

JA125

17.     UndocuBlack's members include Black migrants who were granted parole through the CHNV parole processes or after securing an appointment at a land port of entry through the CBP One mobile application. Since their entry into the country, these members have been targeted constantly in the United States by anti-Black, anti-Haitian violence, and are plagued by the constant fear of losing their parole and being subjected to rapid deportation back to persecution and danger in Haiti. One of these members, a Haitian man who fled political persecution in his home country, describes feeling now under the administration's expedited removal directives like he is "one second away from losing everything, including [his] life."

18.     CASA's members include both individuals who were sponsored to come to the United States through the CHNV parole processes and individuals who came through using the CBP One mobile application, and they are experiencing widespread anxiety, fear, and confusion about the administration's new policies on parole and expedited removal. One Venezuelan CASA member was granted TPS after he came to the United States on CHNV parole, but because of the administration's termination of Venezuelan TPS and expansion of expedited removal to apply to paroled individuals, he is now at risk of soon being subjected to expedited removal and separated from his young child.

19.     Plaintiffs seek a declaration that the application of expedited removal under 8 U.S.C. § 1225(b)(1)(A) to individuals like their members who have previously been granted parole at a port of entry is unlawful; an injunction prohibiting the Department of Homeland Security ("DHS") from continuing to apply its unlawful construction of the statute to expose individuals who have previously been granted parole at a port of entry to the threat of expedited removal; and vacatur of agency actions taken pursuant the agency's erroneous understanding of the law.

JA126

20.      There are other pending cases challenging (1) the expansion of expedited removal to individuals in the interior of the country who have lived here for less than two years and (2) the termination of various humanitarian parole programs. This case is largely focused on the intersection of those issues to ensure that people who were previously granted parole at a port of entry and have been living here continuously since that time are not subject to summary expulsion once they have been stripped of parole status or their period of parole has expired.

## JURISDICTION AND VENUE

21.      This Court has subject matter jurisdiction under 8 U.S.C. § 1252(e)(3). Section 1252(e)(3) provides jurisdiction in the United States District Court for the District of Columbia for an action challenging as unlawful "a written policy directive, written policy guidance, or written procedure" implementing the expedited removal statute. This Court additionally has jurisdiction under 28 U.S.C. § 1331.

22.      Venue is proper in this District because 8 U.S.C. § 1252(e)(3)(A) requires that all Section 1252(e)(3) actions be brought in the United States District Court for the District of Columbia. In addition, venue is proper under 28 U.S.C. § 1391(e)(1) because a substantial part of the events or omissions giving rise to this action occurred in this District and Defendants are officers of the United States being sued in their official capacity and reside in the District.

## PARTIES

23.      Plaintiff **Coalition for Humane Immigrant Rights ("CHIRLA")** is a nonprofit membership organization headquartered in Los Angeles, California, with ten offices throughout California and a national policy office in Washington, D.C. CHIRLA was founded in 1986, and it is the largest statewide immigrant rights organization in California, with approximately 50,597 active members. CHIRLA's members include noncitizens who entered the United States on some

(Page 130 of Total)

JA127

form of humanitarian parole and are subject to and are being harmed by Defendants' application of expedited removal to parolees.

24.      Plaintiff **UndocuBlack Network ("UndocuBlack")** is a nonprofit membership organization incorporated in the District of Columbia. Created in 2016, UndocuBlack is a multigenerational network of Black immigrants that advocates for and supports Black immigrants through facilitating access to resources, storytelling, organizing, and community wellness. Since its inception, UndocuBlack has provided direct services and support to Haitian migrants who have sought protection in the United States as conditions in their home country have deteriorated. UndocuBlack has numerous members who are CHNV and CBP One parole beneficiaries from Haiti and are subject to and are being harmed by Defendants' application of expedited removal to parolees.

25.      Plaintiff **CASA, Inc. ("CASA")** is a national nonprofit membership organization headquartered in Langley Park, Maryland, with offices in Maryland, Virginia, Pennsylvania, and Georgia. Founded in 1985, CASA has more than 173,000 lifetime members from across the United States. CASA's members are predominantly noncitizens in a variety of immigration statuses, including members who entered the United States on some form of humanitarian parole and are subject to and are being harmed by Defendants' application of expedited removal to parolees.

26.      Defendant Kristi Noem is sued in her official capacity as the Secretary of the U.S. Department of Homeland Security ("DHS"), a position to which she was confirmed by the Senate on January 25, 2025.

27.      Defendant Todd M. Lyons is sued in his official capacity as the Acting Director of Immigration and Customs Enforcement ("ICE"), a component agency of DHS.

JA128

28.     Defendant Pete R. Flores is sued in his official capacity as the Acting Commissioner of Customs and Border Protection ("CBP"), a component agency of DHS.

29.     Defendant Angelica Alfonso-Royals is sued in her official capacity as the Acting Director of U.S. Citizenship and Immigration Services ("USCIS"), a component agency of DHS.

30.     Defendant Donald J. Trump is sued in his official capacity as the President of the United States. He was inaugurated on January 20, 2025.

## BACKGROUND

### The Statutory Parole Authority

31.     For more than 70 years, the Nation's immigration laws have granted the Executive the authority to temporarily parole certain noncitizens into the country. Such grants of parole do not constitute an admission into the country, but for the duration of their parole status, noncitizens may apply for employment authorization and, in some cases, request that their period of parole be extended. Like other noncitizens, parolees can also apply for other forms of immigration relief. Certain noncitizens who were inspected and paroled into the country also may apply to adjust their status to lawful permanent residence.

32.     From 1952 until 1996, the Attorney General was authorized by statute to grant parole "for emergent reasons" or "for reasons deemed strictly in the national interest." Neither phrase was defined by Congress.

33.     Since 1996, the Attorney General (now the Secretary of Homeland Security) has been authorized by statute to grant parole for "urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). Again, neither phrase has ever been defined by Congress.

34.     Humanitarian parole has been a key component of immigration policy since the Eisenhower administration used it to allow 30,000 Hungarians fleeing Soviet invasion to come to the United States. Parole has been used over 125 times by administrations of both parties—

JA129

including the first Trump administration—to promote the national interest by advancing various humanitarian, foreign policy, regional security, and migration management objectives.

### Exercises of the Statutory Parole Authority

35.    In the past two decades alone, various challenges associated with managing migration throughout the Western Hemisphere and at the U.S.-Mexico border, as well as fallout and displacement resulting from armed conflicts elsewhere in the world, informed decisions by DHS to create a variety of processes to facilitate the consideration of individuals for entry into the United States for a temporary period of time through the statutory parole authority.

36.    **Operation Allies Welcome.** When Afghanistan's military and government quickly fell to the Taliban upon the withdrawal of the U.S. military in August 2021, the U.S. government evacuated approximately 124,000 people, including Afghan foreign nationals, from the country through Operation Allies Welcome. After Afghan foreign national evacuees went through medical, security, and other screenings in third countries, approximately 75,000 of them were authorized to travel to the United States and were inspected and paroled into the country. Fewer than 15,000 Afghans remain in the United States on current grants of parole by virtue of OAW.

37.    **Uniting for Ukraine.** In the weeks following Russia's invasion of Ukraine in February 2022, which marked the start of a war that continues to this day, significant numbers of Ukrainian nationals began presenting at U.S. ports of entry at the U.S.-Mexico border to request humanitarian protection. Initially, CBP generally paroled these individuals into the country, but in the interest of creating a safe, orderly, and humane pathway for displaced Ukrainian nationals and their immediate family members in Europe to request entry to the United States, DHS established the Uniting for Ukraine ("U4U") Parole Process. *See* Implementation of the Uniting for Ukraine Parole Process, 87 Fed. Reg. 25040 (Apr. 17, 2022).

38.    Under U4U, qualifying individuals who passed background and security checks and had a financial supporter in the United States would be granted travel authorization to fly to the United States at no expense to the government and present themselves at an interior port of entry to be inspected and considered for parole. Approximately 200,000 Ukrainians are in the United States today by way of parole, the vast majority of whom were granted two years of parole on a case-by-case basis. Most had preexisting ties to the United States, which is why they came here for refuge when they fled their home country.

39.    **Cuban, Haitian, Nicaraguan, and Venezuelan Parole Processes:** Faced with a marked increase in the number of Cuban, Haitian, Nicaraguan, and Venezuelan nationals arriving at the U.S.-Mexico border in fiscal year 2022—and given the difficulties of repatriating CHNV nationals to their home countries for a variety of humanitarian and diplomatic reasons—the Biden Administration created for each country a parole process modelled on U4U.

40.    In October 2022, DHS established a parole process for certain Venezuelans. *See* Implementation of a Parole Process for Venezuelans, 87 Fed. Reg. 63507 (Oct. 19, 2022). Approximately two months later, and in light of the effectiveness of the Venezuelan parole process in reducing encounters of Venezuelan nationals between the ports of entry, DHS expanded the Venezuelan parole process, *see* Implementation of Changes to the Parole Process for Venezuelans, 88 Fed. Reg. 1279 (Jan. 9, 2023), and established similar parole processes for certain Cubans, Haitians, and Nicaraguans. *See* Implementation of a Parole Process for Cubans, 88 Fed. Reg. 1266 (Jan. 9, 2023); Implementation of a Parole Process for Haitians, 88 Fed. Reg. 1243 (Jan. 9, 2023); Implementation of a Parole Process for Nicaraguans, 88 Fed. Reg. 1255 (Jan. 9, 2023). The Federal Register Notices announcing the CHNV parole processes identified a series of significant public benefits and urgent humanitarian reasons that would be advanced through the use of parole for

JA131

individuals availing themselves of the processes and additionally connected the implementation of the processes to ongoing foreign relations initiatives aimed at increasing regional cooperation in and capacity to effectively and responsibly manage migration throughout the Western Hemisphere.

41.    CBP granted parole on a case-by-case basis, for most individuals for two years, to over a half million Cubans, Haitians, Nicaraguans, and Venezuelans parole through CHNV.

42.    **CBP One:** Around the same time the administration created the CHNV parole processes, it also made available to migrants in Central and Northern Mexico a mobile application called CBP One, which could be used to schedule an in-person appointment at one of several land ports of entry along the U.S.-Mexico border. Upon receiving an appointment, migrants could present themselves at the port of entry for inspection and be considered for parole on a case-by-case basis into the country. Typically, paroled individuals would also be issued a Notice to Appear in immigration court where they would be able to pursue any form of immigration relief for which they might be eligible. Together with the new CHNV parole processes, the CBP One appointment process was designed to facilitate safe and orderly processing of qualified migrants at certain land ports of entry to reduce the incidence of migrants entering the country without inspection between ports of entry.

43.    **Central American Minors Parole:** Central American Minors (CAM) parole was created in 2014 as part of a broader initiative that also involved the consideration of certain Central American minors and qualifying family members for refugee status and potential resettlement in the United States; individuals determined not to be eligible for refugee status were considered, on a case-by-case basis, for parole into the United States. The CAM Refugee and Parole Program was largely prompted by the significant number of unaccompanied children from the Northern Triangle countries of El Salvador, Guatemala, and Honduras coming to the U.S.-Mexico border. Under the

JA132

program, certain nationals of those countries who are lawfully present in the United States may request that their children still in their home countries be considered for refugee status and, in the alternative, humanitarian parole, so that their families could be safely reunited. In addition to family reunification, the CAM program was intended to create a lawful and orderly pathway to disincentivize children from making the overland journey to the U.S.-Mexico border. In addition to being dangerous and potentially enriching smugglers, unaccompanied children presenting at the border create unique operational challenges for DHS. CAM parolees in the United States have been able to apply for and receive re-parole when their initial grants of parole expired.

44.    **Family Reunification Parole Programs:** In 2007, DHS created the Cuban Family Reunification Parole Program to allow certain approved beneficiaries of immigrant visa petitions, upon invitation by the federal government, to apply to be considered for parole into the United States so that they would not have to wait abroad—sometimes for years—for a visa number to become available. *See* Cuban Family Reunification Parole Program, 72 Fed. Reg. 65588 (Nov. 21, 2007). Similar programs were created for Haitian family members in 2014, family members of Filipino World War II veterans and their spouses in 2016, and family members from additional countries in Central and South America in 2023. *See, e.g.* Implementation of Haitian Family Reunification Parole Program, 79 Fed. Reg. 75581 (Dec. 18, 2014); Filipino World War II Veterans Parole Policy, 81 Fed. Reg. 28097 (May 9, 2016); Implementation of a Family Reunification Parole Process for Guatemalans, 88 Fed. Reg. 43581 (July 10, 2023).

<u>Summary Termination of Parole Processes</u>

45.    On January 20, 2025, President Donald Trump issued Executive Order 14165, "Securing Our Borders," that, among other things, directed the Secretary of Homeland Security (the "Secretary") to terminate all so-called "categorical parole program . . . including the program known as the 'Processes for Cubans, Haitians, Nicaraguans, and Venezuelans.'"

46.     That same day, Acting Secretary Benjamine C. Huffman issued a memorandum entitled, "Exercising Appropriate Discretion Under Parole Authority," to the heads of ICE, CBP, and USCIS. In that memorandum, Acting Secretary Huffman set out a narrow and legally incorrect interpretation of the parole statute, directed that every action regarding parole henceforth use this interpretation, and authorized pausing and terminating parole programs.

47.     Also on January 20, Acting Commissioner of CBP Pete Flores issued a memorandum restricting the CBP personnel authorized to grant parole and requiring that each parole granted by any CBP official be reported to him and the Chief of Staff, along with a justification for the grant. Acting Commissioner Flores' memorandum expressly supersedes any prior conflicting guidance.

48.     Further on that day, CBP terminated the ability of noncitizens to use the CBP One mobile application to schedule appointments to appear at select land ports of entry for inspection and consideration for parole and cancelled existing appointments.

49.     Later that same week, Acting Director of USCIS Jennifer Higgins issued a directive prohibiting USCIS staff from making any further decisions on any request for, among other things, parole or re-parole made through the OAW, U4U, CHNV, or other named parole processes.

50.     On March 21, DHS posted for public inspection a Federal Register Notice that purports to formally terminate the CHNV parole processes and to terminate *en masse* at the end of a 30-day period all grants of parole issued to individuals pursuant to the CHNV parole processes. *See* Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans, Mar. 21, 2025, https://public-inspection.federalregister.gov/2025-05128.pdf ("CHNV Termination Notice"). Through the Notice, DHS seeks to end all grants of parole and related employment authorization documents and to make as many of these individuals as possible begin to accrue

JA134

unlawful presence. The Notice asserts that the federal government has a "strong interest in promptly removing parolees when the basis for the underlying program no longer exists," and notes that "[e]xpedited removal is available only when an alien has not been continuously present in the United States for at least the two years preceding the date of the inadmissibility determination." *Id*. at 27 (citing 8 U.S.C. § 1225(b)(1)(iii)(II); 8 C.F.R. § 235.5)." The Notice further observes that "[i]f DHS were to allow the CHNV parolee population to remain for the full duration of their two-year parole, DHS would be compelled to place a greater proportion of this population in section 240 removal proceedings to effectuate their removal." *Id*. The Notice was published in the Federal Register on March 25.

51.     The termination of various humanitarian parole processes is being challenged in separate litigation. *See*, *e.g.*, *Svitlana Doe v. Noem*, No. 1:25-cv-10495 (D. Mass. filed Feb. 28, 2025) (challenging, among other things, the termination of OAW, U4U, CHNV, and certain other parole processes).

### The Statutory Expedited Removal Authority

52.     Under our immigration laws and unless otherwise specified, removal proceedings conducted in immigration court—with the right to appellate review before the Board of Immigration Appeals and federal court review—are the "sole and exclusive procedure" for determining whether a person should be admitted to or removed from the country. 8 U.S.C. § 1229a(a)(3).

53.     One specified exception to full removal proceedings is the expedited removal process created by Congress in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), which was first implemented through regulations adopted by the agency in 1997, *see* Inspection and Expedited Removal of Aliens; Conduct of Removal Proceedings; asylum Procedures, 62 Fed. Reg. 10,312 (Mar. 6, 1997).

54.    IIRIRA introduced a shift from the prior exclusion/deportation framework that "turned on whether [a noncitizen] had *physically entered* the United States" to "a new framework that turned on whether [a noncitizen] had been *lawfully admitted* into the country by immigration authorities." Hillel R. Smith, Cong. Rsch. Serv., R45314, *Expedited Removal of Aliens: Legal Framework* (2019), https://www.congress.gov/crs-product/R45314.

55.    Under expedited removal, certain noncitizens determined by an immigration officer to be "inadmissible" because they engaged in fraud or misrepresentation to procure admission or other immigration benefits, 8 U.S.C. § 1182(a)(6)(C), or because they lack the requisite documents for entry, Section 1187(a)(7), may be ordered removed by that officer "without further hearing or review." 8 U.S.C. § 1225(b)(1)(A)(i). There is no neutral arbiter in this proceeding—the officer who initiates the removal order also adjudicates it.

56.    By statute, the use of expedited removal is authorized for only two categories of noncitizens. First, under 8 U.S.C. § 1225(b)(1)(A)(i), a noncitizen who "is arriving in the United States" may be processed for expedited removal if they are found to be inadmissible on the grounds described above.

57.    Second, 8 U.S.C. § 1225(b)(1)(A)(iii) permits the Attorney General (now the Secretary of Homeland Security) to apply expedited removal to certain other noncitizens found inadmissible on the above grounds who have entered and remain in the United States but who "ha[ve] not been admitted or paroled into the United States." For expedited removal to be used in this way, the Secretary must designate certain noncitizens in the country to whom 8 U.S.C. § 1225(b)(1)(A)(iii) may be applied, although regardless of the Secretary's designation, it may not be applied to any noncitizen who can prove to the "satisfaction of an immigration officer" that they were "admitted or paroled into the United States following inspection at a port-of-entry" and

16

JA136

have been continuously physically present in the country for two years. *See* 8 U.S.C. § 1225(b)(1)(A)(iii)(II); 8 C.F.R. §§ 235.3(b)(1)(ii), (b)(6).

58.    Historically, expedited removal under 8 U.S.C. § 1225(b)(1)(A)(iii)(II) has been applied only to people in the process of seeking admission at a port of entry or for people encountered in the country a short time after entry and within 100 miles of a land border who had "not been admitted or paroled into the United States." On January 21, 2025, Acting Secretary Huffman issued for public inspection a designation, effective immediately, expanding the scope of expedited removal to apply nationwide and to certain noncitizens who are unable to prove they have been in the country continuously for two years. The designation was published in the Federal Register three days later on January 24, 2025. *See* U.S. Dep't of Homeland Sec., *Designating Aliens for Expedited Removal*, 90 Fed. Reg. 8139 (Jan. 24, 2025).

59.    This expansion of expedited removal is being challenged in separate litigation. *See Make the Road New York v. Huffman*, 25-cv-00190 (D.D.C. filed Jan. 22, 2025).

**<u>Application of Expedited Removal to Noncitizens Who Have Been Paroled</u>**

60.    On January 23, 2025, Acting Secretary Huffman issued a memorandum entitled, "Guidance Regarding How to Exercise Enforcement Discretion," to the leadership of ICE, CBP, and USCIS. The memorandum describes the Acting Secretary's January 20 memorandum authorizing the pausing or termination of various parole programs and the January 21 designation expanding the scope of expedited removal—both of which are described above—and "provides guidance regarding how to exercise enforcement discretion in implementing these policies."

61.    Specifically, the January 23 Huffman Memorandum explains that "[t]o effectively implement these two new policies," agency personnel are "direct[ed]" to consider applying expedited removal to "any alien DHS is aware of who is amenable to expedited removal but to whom expedited removal has not been applied." The memorandum notes that this may include

JA137

taking steps to "terminate any ongoing removal proceeding" in immigration court and/or "any active parole status."

62.    For individuals DHS is aware of who do not meet the conditions above but have "been granted parole under a policy that may be paused, modified, or terminated immediately under the January 20 memorandum," the January 23 Huffman Memorandum directs that they be considered for placement in removal proceedings and that the continued appropriateness of their parole be reviewed.

63.    On or about February 18, 2025, a directive was sent by ICE leadership to all Enforcement and Removal Operations personnel, citing a new Executive Order issued by President Trump on January 20, 2025 entitled "Securing Our Borders," and directing such officers to consider for expedited removal "paroled arriving aliens" who have not applied affirmatively for asylum with USCIS. The directive claims that "[t]here is no time limit on the ability to process such aliens for [expedited removal]," thereby exposing individuals paroled into the United States after inspection at a port of entry to the *indefinite* threat of this fast-track removal process. Although this directive has not been officially released, a copy of the directive was published by Reuters in connection with its reporting on the impact of the directive. *See* Ted Hesson and Kristina Cooke, "Trump weighs revoking legal status of Ukrainians as US steps up deportations," Reuters, Mar. 6, 2025, https://www.reuters.com/world/us/trump-plans-revoke-legal-status-ukrainians-who-fled-us-sources-say-2025-03-06/.

64.    The February 18 ICE Directive further states that the issuance to the individual of an expedited removal charging document has the effect of terminating that individual's active parole status.

65.     On March 25, DHS published in the Federal Register the CHNV Termination Notice, which discusses in multiple places when and under what authority the agency intends to process CHNV parolees for expedited removal. Like the February 18 ICE Directive, the March 25 CHNV Termination Notice cites the January 20, 2025 "Securing Our Borders" Executive Order and its direction to "terminate all categorical parole programs," including the CHNV program, and announces the termination of the CHNV parole program. The Notice further states that "[e]xpedited removal is available only when an alien has not been continuously present in the United States for at least the two years preceding the date of the inadmissibility determination." CHNV Termination Notice at 27. Because "thousands of CHNV parolees . . . will become ineligible for expedited removal upon the natural termination of their two-year parole," *id*. at 29 n.77, and to "initiate expedited removal proceedings to the maximum extent possible for the appropriate CHNV population," *id*. at 29, the March 25 CHNV Termination Notice seeks to terminate all existing grants of CHNV parole early, rather than allowing individuals the benefit of the two-year period they have been granted, effective 30 days after the publication date.

66.     The March 25 CHNV Termination Notice also states that "DHS intends to prioritize for removal" individuals who had not filed an immigration benefit request before the Notice's publication date and are not the beneficiary of an immigration benefit request filed by another on their behalf.

67.     As directed by the January 23 Huffman Memorandum and the February 18 ICE Directive, some noncitizens who have been paroled into the country at ports of entry have been subjected to expedited removal when attorneys for DHS filed motions to dismiss their pending removal proceedings in order to initiate expedited removal proceedings.

19

68.    Starting around May 21, 2025, noncitizens and their attorneys nationwide began reporting this practice on a far broader scale. As noncitizens and their attorneys showed up to scheduled immigration court hearings, attorneys for DHS were filing motions, sometimes oral and sometimes written, to dismiss the noncitizens' removal proceedings. Some motions provided limited or no reasoning; others expressed DHS's intent to process the noncitizen for expedited removal. Noncitizens were not always given the opportunity to oppose the motion.

69.    If, as was often the case, an immigration judge granted the motion and dismissed the case, noncitizens—and, in the case of noncitizens represented by counsel, their attorneys— often left these proceedings believing that the noncitizen was free of removal proceedings and would be able to proceed with affirmative applications for relief outside of immigration court.

70.    As they were leaving the courtroom, ICE officers were waiting outside to arrest and detain them, without a warrant of any kind, so they could be processed for expedited removal. In some instances, ICE officers separated noncitizens from their family members, including young children, so they could apprehend and detain the noncitizens.

71.    In some cases, noncitizens were detained after their immigration court hearings even though their removal proceedings had *not* been dismissed. They were told the proceedings would be dismissed, and that they were going to be processed for expedited removal.

72.    News reporting has indicated that this practice is widespread at immigration courts around the country.

73.    Noncitizens who have been paroled into the United States, including Plaintiffs' members and clients, are increasingly being subject to expedited removal.

## Harm to Plaintiff Organizations and Their Members

74.    The flaws and deficiencies in the expedited removal process, including when compared to standard/normal removal proceedings under 8 USC § 1229a ("section 240 removal proceedings"), are widespread and well-documented.

75.    While section 240 removal proceedings are formal adversarial civil proceedings conducted before a neutral adjudicator (an Immigration Judge), in expedited removal proceedings DHS officers both initiate and adjudicate the removal order. None of the officers involved in expedited removal is required to serve as a neutral arbiter of fact.

76.    In section 240 proceedings, noncitizens are afforded the opportunity to retain counsel and request continuances to secure representation. In expedited removal, there is no statutory or regulatory right to counsel prior to removal, and the compressed timeframes and remote locations in which these proceedings take place significantly diminish the ability of noncitizens to locate and retain counsel. As the term "expedited" implies, such proceedings are conducted on a very compressed schedule and can result in deportation in hours or days.

77.    Section 240 proceedings also grant noncitizens reasonable time to gather and submit evidence, including documents and witness testimony, and present legal motions. Expedited removal does not. If a noncitizen in expedited removal expresses a fear of return to their home country, they should be referred for a "credible fear" screening interview with an asylum officer (who is also an employee of DHS), but will be severely limited in the time they have to gather and present evidence during that interview and, as mentioned above, they have no right to counsel during the interview.

78.    While section 240 proceedings generate a formal record including transcripts and written decisions that are subject to appellate and judicial review, expedited removal results in

summary paperwork with no routine oversight or external review unless a credible fear claim is accepted.

79.    Clients who are not fluent in English have been forced to sign expedited removal forms in English without translation or interpretation. And noncitizens have very limited rights to judicial review of an expedited removal order.

80.    During the recent courthouse arrests of noncitizens who have been paroled into the country, some noncitizens have been arrested without being told, and/or without understanding, that they are being processed for expedited removal. They have not been given the opportunity to contest the charges.

81.    The expedited removal process also does not provide noncitizens with the opportunity to apply for any forms of immigration relief for which they are eligible, including those that would lead to permanent lawful status in this country, such as asylum or a green card based on marriage to a U.S. citizen. If noncitizens subjected to expedited removal are permitted to and do persuade an immigration official (in a brief interview often done telephonically, without legal representation) that there is a sufficiently high likelihood that they will be tortured, killed, or persecuted if returned to their home country, those noncitizens are diverted from the expedited removal system to the regular removal system. It is only then, in regular removal proceedings (or in no removal proceedings of any kind), that noncitizens can seek affirmative immigration relief.

82.    The credible fear screenings, moreover, lack basic procedural safeguards. Enforcement officers must refer an individual to a USCIS asylum officer to conduct the credible fear interview, but studies show that enforcement officers fail to do so consistently. As a result, asylum seekers have been deported through expedited removal without any opportunity to be screened for fear, much less to apply for asylum.

JA142

83.    Even if noncitizens are referred for a credible fear interview, they are often detained in immigration detention facilities when they are interviewed, far from their attorneys, family members, and communities, with limited access to resources to help them prepare for the screening. They have limited access to counsel, and it is difficult for them to gather relevant documents, present evidence, or otherwise prepare. These inadequacies have led to the removal of people back to countries where they face persecution and violence.

84.    For noncitizens who are prima facie eligible for collateral relief (i.e., relief from removal that can be granted not by an immigration court but by another entity like USCIS) such as applications for adjustment of status through a U.S. citizen immediate relative or other green card category, Temporary Protected Status ("TPS"), or Special Immigrant Juvenile Status ("SIJS"), they have options in section 240 proceedings to request that the immigration judge manage the case in a way that will allow them to pursue those applications. For example, an immigration judge could grant a continuance, administratively close proceedings, or place the case on the status docket to provide time for USCIS to adjudicate the collateral relief, which would obviate the need for the removal proceedings.[1] The immigration judge could terminate the proceedings as well. These options are commonly used by immigration judges to manage their dockets and allow noncitizens to secure relief for which they are eligible under the law.

85.    In expedited removal proceedings, all of these options are foreclosed. The speed at which expedited removal proceedings move, and the lack of an independent arbiter separate from

---

[1] U.S. Dep't of Justice, EOIR, Memorandum from Director James R. McHenry III re use of status dockets, PM 19-13, at 1 (Aug. 16, 2019), https://www.justice.gov/eoir/page/file/1196336/dl (explaining that the status docket can be used for cases where "an immigration judge is required to continue the case . . . in order to await the adjudication of an application or petition by [USCIS]"); see also U.S. Dep't of Justice, EOIR, Memorandum from Acting Director Sirce E. Owen re reinstatement of Memorandum 19-13, PM 25-27 (Mar. 21, 2025), https://www.justice.gov/eoir/media/1394086/dl?inline.

23

JA143

the agency actively pursuing removal who decides when principles of fairness counsel in favor of giving individuals more time to pursue relief, means that noncitizens with pathways to green cards or other collateral relief will lose the opportunity to pursue them.

86.    Noncitizens who were paroled into the United States but arrested and detained for expedited removal in the last few weeks have already reported that they will lose the opportunity to have applications for adjustment of status and SIJS adjudicated due to the government's decision to detain them and process them for expedited removal.

87.    Many of the noncitizens who were granted parole at ports of entry into the United States and recently arrested to be processed for expedited removal either had asylum applications already pending with the immigration court or were preparing to file them when they were detained. They now face all of these new barriers.

88.    Expedited removal orders have additional consequences for noncitizens beyond removal itself, including a five-year ban on admission to the United States unless they are granted a discretionary waiver, 8 U.S.C. §1182(a)(9)(A)(i); 8 C.F.R. § 212.2. Noncitizens issued expedited removal orders after having been found inadmissible based on misrepresentation are subject to a lifetime bar unless they are granted a discretionary exception or waiver.

89.    Plaintiffs are nonprofit membership-based organizations whose members include individuals who have been paroled into the United States through some of the humanitarian parole processes relevant to this case and are thus subject to the challenged policies implementing the expedited removal statute. Defendants' directives to apply expedited removal to parolees are causing Plaintiffs' members substantial injury.

90.    Plaintiff **CHIRLA**'s mission is to advance the human and civil rights of immigrants and refugees and ensure immigrant communities are fully integrated into society with full rights and access to resources.

91.    In furtherance of this mission, CHIRLA provides a range of services that reach tens of thousands of Californians each year. These services include education programs, legal services programs, and an assistance hotline that fields on average 15,000 calls a year. CHIRLA educates its membership as well as the broader community through know-your-rights trainings, workshops, and social media and educational literature about a variety of social services and benefits, including immigration law, financial literacy, workers' rights, and civic engagement.

92.    CHIRLA serves individuals who were paroled into the country under humanitarian parole processes through all of its different programs. In particular, CHIRLA provides trauma-informed wrap-around case management services to newly arrived migrant families who were paroled through CBP One and Afghan nationals who arrived through Operation Allies Welcome. These include benefits navigation, employment services, housing search, cultural orientation, pro se legal services, and other services needed for newcomers to successfully integrate into their new communities.

93.    CHIRLA members play an important role in deciding what CHIRLA's priorities are and how CHIRLA serves the community. CHIRLA receives feedback from its members during an annual member meeting and other member convenings where CHIRLA staff meet with members to discuss priorities for CHIRLA's work.

94.    CHIRLA membership is voluntary, and it is open to anyone who believes in the importance of social justice and supports an immigrant community, and who embodies diversity,

JA145

equality and inclusion. By becoming a CHIRLA member, an individual agrees to take a stand for immigrant rights.

95.    To become a CHIRLA member, an individual must submit an online application for membership, make an annual dues payment, and agree to the values and mission of CHIRLA. The current membership fee for individuals is $25, which can be paid manually every year or by setting up an annual recurring payment. There is also a family membership option, which is $60, and an enhanced individual membership (called a "community membership") option, which is $100 and provides select additional benefits. The fee can be (and occasionally has been) waived for individuals who experience financial hardship or are otherwise unable to pay. Once an individual becomes a CHIRLA member, they will receive a membership card and access to CHIRLA legal services and educational resources, year-round events and membership calls, and other benefits.

96.    CHIRLA's membership is diverse and includes U.S. citizens, non-U.S. citizens with lawful status, and non-U.S. citizens without lawful status. Members include individuals who were paroled into the country through the CBP One application, the Operation Allies Welcome parole process, and the CHNV parole process. CHIRLA has serviced hundreds of CBP One parolees, at least a dozen of whom have already become CHIRLA members.

97.    Members include both noncitizens who have been granted parole and have been continuously present in the United States for less than two years, as well as those who have been here for two years or more. Some of these parolee members are in active removal proceedings already, and some are not.

98.    Because of the services CHIRLA provides to its members, CHIRLA is acutely aware of the harms that Defendants' application of expedited removal to parolees is causing and

JA146

will continue to cause to its members. Parolee members of CHIRLA include individuals who are currently being processed for expedited removal and are actively and significantly harmed by Defendants' directives.

99.    Specifically, CHIRLA has members who were granted parole through the CBP One application and are currently in section 240 removal proceedings, who must appear in immigration court for regular hearings. Many of these members fear that they will be apprehended at immigration court and summarily removed from the country because they have heard of the exact same thing happening to others. CHIRLA also has members whose parole was prematurely terminated and who have been in the country for less than two years, including some who do not have any pending applications for asylum or other immigration relief. CHIRLA members are well aware of the recent significant increase in immigration enforcement at courthouses across the country and in and around Los Angeles. The stepped-up immigration enforcement underlines how exposed CHIRLA members are to the administration's drive to terminate individual grants of parole and subject paroled individuals to expedited removal.

100.    For example, E.I.R.M., a member of CHIRLA, arrived in the United States in 2023 after securing a CBP One appointment, presenting at a port of entry on the appointed date, and being inspected and paroled through late 2025. At the same time as he was granted parole, he was issued a Notice to Appear that required him to appear at an immigration court hearing. While living and working in Arizona afterwards, he got engaged to a U.S. citizen, appeared for all his scheduled immigration court hearings, and timely filed an asylum application with the immigration court. In March 2025, however, even though his parole was still valid, CBP arrested him when he drove through an interior CBP checkpoint and transferred him to ICE detention.

101.    E.I.R.M. has been in detention since then, during which time DHS moved to dismiss his removal proceedings so that they could process him for expedited removal. The immigration judge granted the motion without providing time for E.I.R.M. to respond.

102.    E.I.R.M. now faces severe barriers to having his asylum claim adjudicated. He was not provided access to counsel during his CFI, and he has received neither a transcript of his interview, nor the immigration judge review he requested of his negative CFI determination. As he will become eligible to apply for adjustment of status once he and his fiancée are married, the dismissal of his removal proceedings and placement of his case in expedited removal have effectively foreclosed his opportunity to pursue that form of relief from removal. E.I.R.M. has been in detention, and thus separated from his fiancée and family, for several months, which has caused him mental distress as well. He fears swift deportation back to Mexico, where he would face harm. Both he and his brother received death threats from a Mexican cartel that the US government has designated as a Foreign Terrorist Organization.

103.    The parolee members of CHIRLA also include many individuals who face an imminent risk of expedited removal given Defendants' application of their directives to increase the use of expedited removal against parolees, and who would be deeply and severely harmed if they were subject to expedited removal. For example, CHIRLA John Doe 1 is an Ecuadorian man who was paroled into the United States through CBP One and concurrently issued an NTA during the latter half of 2024, after he fled Ecuador out of fear for his life. After a cartel began extorting him for money, threatening to kill him if he didn't make regular payments and if he tried to leave town, he felt he had no other option but to flee the country. Unable to make payments, and unwilling to give into pressure to join the cartel, CHIRLA Doe 1 left his home, fearing for his life. Given Defendants' use of expedited removal against individuals like him—who made a CBP One

appointment and were subsequently inspected and paroled into the country at a port of entry, and were concurrently placed in section 240 removal proceedings—CHIRLA John Doe 1 is likely to be similarly targeted for expedited removal in the near future. Expedited removal back to Ecuador would put CHIRLA John Doe 1 back at risk of being murdered by the cartel.

104.     Another CHIRLA member is a Guatemalan woman whose husband was the target of death threats back in Guatemala. A man who was the head of a local criminal network and who was rumored to have murdered at least one other person in the community made verbal threats to their family, including to their son, and stalked them, hanging around their house at all hours. Before the death threats and stalking, he and members of his network had also harassed the CHIRLA member and her family when they went outside, impeding their ability to move freely. The CHIRLA member and her family tried to file reports with the police to obtain help but, as the man was a former police officer, the police did not get involved. For their safety, she and her family left their home and arrived in the United States in the summer of 2023 after being paroled into the country following a CBP One appointment. She was issued an NTA at the same time she was granted parole. Given Defendants' use of expedited removal against individuals like her who entered and were granted parole through a CBP One appointment and are in section 240 removal proceedings, this CHIRLA member and her family are likely to be similarly targeted for expedited removal in the near future. The CHIRLA member has applied for asylum, but the expedited removal process will pose more significant barriers to having that claim heard. If she and her family were subject to expedited removal, they would be rapidly sent back to the same severe risk of harm, including of death, from which they fled.

105.     Another CHIRLA member is an Afghan man who was paroled into the United States through CBP One during the summer of 2024 and issued an NTA at the same time. He fled

JA149

Afghanistan because he is a member of a minority community that the Taliban and ISIS systematically target for violence, killings, and bombings. He has survived attacks in the past, but the fall of Kabul in August 2021 escalated the threats against him and his community. He is also an activist, so he faces an even higher risk of persecution, torture, and even execution in Afghanistan. Given Defendants' use of expedited removal against individuals like him who entered and were granted parole through a CBP One appointment and are in section 240 removal proceedings, this CHIRLA member is likely to be similarly targeted for expedited removal in the near future. If he is put into expedited removal proceedings and deported to Afghanistan, he would be in immediate danger of kidnapping, torture, and death at the hands of the Taliban. He would face severe restrictions on his freedom to exercise his religion, freedom of expression, and freedom of movement.

106.    CHIRLA members live in areas where encounters with ICE officers and detention by ICE are common. ICE actively detains noncitizens all over California, including in and near Los Angeles.

107.    Parolee clients and members have expressed fears to CHIRLA around their parole status being revoked and then being subject to expedited removal. Beyond being fearful, CBP One parolees also express a sense of betrayal as they followed an established process laid out by the U.S. government, with many of them waiting months and in some cases over a year in Mexico—often in dangerous and difficult settings—for their appointments to appear at a land port of entry for inspection and consideration for parole. OAW Afghan parolees have expressed an even more heightened sense of disappointment as many of them risked their lives to support the U.S. military, and the government is now turning its back on them.

30

JA150

108.    Expedited removal of parolees like CHIRLA's members would be particularly harmful because of the rapid, summary nature of the process. It makes it more difficult for members and their families to have a plan in place; it causes more devastating, sudden family separation, which has a severe impact on any children involved; and the community around the members suffer as well. Additionally, the rapid deportation process would deprive some CHIRLA members of the opportunity to submit applications for immigration protections to which they are entitled, as described above.

109.    In its educational materials and know-your-rights trainings, CHIRLA has been teaching members about the risk of detention and deportation, including through expedited removal, and what they can do to prepare themselves and their families for the possibility.

110.    Plaintiff **UndocuBlack's** mission is to foster community, facilitate access to resources, and contribute to transforming the realities of its members—who are Black immigrants—so they can thrive and live their fullest lives.

111.    UndocuBlack's community-centered approach aspires to empower members to identify their needs and help shape the trajectory of UndocuBlack's work. UndocuBlack engages and supports their members and advocates for policies that protect members and Black immigrants at large through different areas of work including community engagement and organizing, community wellness, narrative and storytelling, and policy and advocacy.

112.    UndocuBlack has members across the country with chapters in New York, Los Angeles, and Washington, D.C. UndocuBlack serves thousands of immigrants through its organizational chapters with a national network across approximately thirty states.

113.    UndocuBlack's membership is over 1,000 active members. To become an active UndocuBlack member, an individual must (1) identify as Black, (2) be an immigrant, and is asked

to (3) apply by submitting a form to indicate their interest in joining the membership. There are no membership dues required. UndocuBlack also considers individuals in the larger Undo:uBlack community—a diverse, inclusive, and expansive network—who have been involved with UndocuBlack programming or who have reached out to the organization for services to be members of UndocuBlack.

114.    UndocuBlack has long served and supported the Haitian community in particular. Prior to the Trump administration's termination of humanitarian parole programs, UndocuBlack helped many Haitian members in the United States determine if they were eligible to sponsor family members for CHNV parole based on their income. UndocuBlack also assisted Haitian members and their families with school enrollment, getting connected to English Language Learner programs, applying for work authorizations, and completing applications for other immigration benefits like TPS.

115.    UndocuBlack's members include at least 300 Haitian parole beneficiaries who were granted parole through either CHNV parole or CBP One. The Trump administration's application of expedited removal to parolees directly harms these members. Under the administration's recent policies, UndocuBlack's members who are Haitian CHNV and CBP One parole beneficiaries face an imminent risk of being processed for expedited removal, which would cause them severe harm.

116.    Members who were paroled into the country through the Haitian CHNV parole program have now had their parole terminated early, and they face the impending threat of expedited removal given that in the March 25 CHNV Termination Notice, the federal government expressed a strong interest in initiating expedited removal proceedings "to the maximum extent possible" for CHNV parole beneficiaries.

32

JA152

117.    Some UndocuBlack members who are Haitian CHNV parolees did not come to the United States in time to apply for TPS, and even those who now have TPS recognize that the Trump administration is working to terminate those protections early (i.e., by August 3, 2025). Many have pending applications for other kinds of immigration relief, including asylum and adjustment of status, but some do not or are still preparing to file such applications. Given the March 25 CHNV Termination Notice and the government's increased use of expedited removal against paroled individuals, these members are at imminent risk of being processed for expedited removal and facing significant barriers to presenting the claims for which they are eligible.

118.    Additionally, although the March 25 CHNV Termination Notice indicated that individuals without pending immigration benefits will be prioritized for expedited removal, UndocuBlack's members are well aware of news reports of the Trump administration canceling other immigrants' visas and green card petitions and fear that their own petitions could likewise by canceled or otherwise rendered invalid. They are also well aware of news reports of the Trump administration's directives instructing DHS agencies to consider revoking individuals' grants of parole in order to subject them to expedited removal. Many CBP One parole beneficiaries have already had their parole revoked, and all CHNV parole beneficiaries will likely have their parole swiftly terminated soon.

119.    UndocuBlack's Haitian CHNV parolees also often have family members with different immigration statuses. UndocuBlack expects that many affected members, if they are put in expedited removal, will experience abrupt family separation and/or will lose one or more household incomes. UndocuBlack members could also be deported to Haiti where they do not have family or resources, and where they may be at risk of violence.

JA153

120.    UndocuBlack members who were granted parole through a CBP One appointment are also likely to be processed for expedited removal, given the recent rise in arrests at courthouses of noncitizens after their removal proceedings for that purpose. This practice of courthouse arrests poses particular danger to UndocuBlack members who are CBP One parolees, because many of them were placed in removal proceedings at the time of their parole and must appear regularly in immigration court.

121.    UndocuBlack members who may be eligible for asylum or Convention Against Torture protections in the United States still fear that they could be deported through expedited removal, given the flaws in the credible fear screening process. The screenings depend on case referrals by enforcement personnel to asylum officers, and noncitizens are given little opportunity to gather relevant documents, present evidence, or consult counsel. Due to these and other inadequacies, the screenings can result, and have resulted in, the removal of people to dangerous circumstances abroad.

122.    One UndocuBlack member, UBN Jane Doe 1, is a Haitian woman who was sponsored to come to the United States through the Haitian CHNV parole process. She applied for and was granted TPS, but now, due to the administration's efforts to terminate Haitian TPS prematurely, that status will likely expire in August, and she could be subject to expedited removal. UBN Jane Doe 1's son, who is back in Haiti, is ill, and being able to work in the U.S. through CHNV has been the only way UBN Jane Doe 1 has been able to provide for him. The termination of her CHNV parole and the anticipated early termination of her TPS, together with the possibility of being removed expeditiously without a meaningful opportunity to request any possible form of relief, have caused significant harm to UBN Jane Doe 1, who has relied upon CHNV parole to provide for herself and her ailing child. Moreover, the government's betrayal and stripping of time

JA154

that was given to her—which would be exacerbated by efforts to quickly remove her without process—will cause deep financial and psychological harm to her. Given Defendants' stated intention to initiate expedited removal proceedings to the maximum extent possible for CHNV beneficiaries like her, UBN Jane Doe 1 is likely to be targeted for expedited removal in the near future.

123.    Another UndocuBlack member, UBN Jane Doe 2, is a 45-year-old mother who fled Haiti and was paroled into the U.S. with her young son through CBP One in March 2024. She is in removal proceedings, and as she struggles to navigate the complex asylum process without legal representation, she lives in constant fear for both her life and her child's. Her greatest terror is that stepping outside for any reason could mean never returning to her son. Through free legal resources, she has learned that she must always be prepared to show documentation of at least two years of presence in the U.S., but the harsh reality is that she simply does not have that. The weight of this requirement, coupled with the uncertainty of her status, leaves her paralyzed with fear— afraid to attend her own hearings, afraid to send her son to school, and even afraid to stay in her own home. Any knock at the door or passing shadow, even from the mail carrier, fills her with terror. She lives in a constant state of anxiety, fearing that at any minute she will be processed for expedited removal, forced to try and quickly defend her asylum claim alone and without the opportunity to see a judge, without the ability to pay for an attorney, and while battling language barriers. Given Defendants' use of expedited removal against individuals like her who entered and were granted parole through a CBP One appointment and are in section 240 removal proceedings, this UndocuBlack member is likely to be similarly targeted for expedited removal in the near future.

JA155

124.    UndocuBlack members live in areas where encounters with ICE officers and detention by ICE are common. ICE actively detains noncitizens all over New York, where the largest concentration of UndocuBlack members reside. In the last several months, this activity has increased significantly, including for noncitizens granted parole.

125.    Since the administration's expansion of expedited removal to apply nationwide and to certain noncitizens who cannot prove they have been here for two years and the various directives that expose parolees to expedited removal, UndocuBlack has received countless inquiries from its members and the UndocuBlack community at large, including from those with parole, regarding what these policies mean and how they will be used to arrest, detain, and expeditiously remove parolees. In response to members' questions and requests for additional information, UndocuBlack created a Frequently Asked Questions (FAQ) resource to share with members and the broader community. UndocuBlack has also conducted member calls that have included Know Your Rights (KYR) trainings; such trainings have covered the impact that the expansion of expedited removal will have on parolees and safeguards that parolees should take to protect themselves and their families.

126.    UndocuBlack and its members see the expedited removal policies at issue in this case as another anti-Black, anti-Haitian attack in a long line of such discrimination and violence by the Trump administration.

127.    As an organization with some undocumented members who are also Black, UndocuBlack's members will be disproportionately affected by the Trump administration's expedited removal expansion. Due to intersectional bias around race and criminality, Black people in the United States experience a higher rate of interaction with law enforcement than people of other races. This racial bias and profiling coupled with a person's immigration status and possible

JA156

language barrier will mean that Haitian parolees will be some of the most adversely affected by this expansion.

128.    Plaintiff **CASA**'s mission is to create a more just society by building power and improving the quality of life in working-class Black, Latino/a/e, Afro-descendent, Indigenous, and immigrant communities. From its beginnings in a church basement, CASA has envisioned a future with diverse and thriving communities living free from discrimination and fear, working together with mutual respect to achieve human rights for all.

129.    In furtherance of this mission, CASA offers a wide variety of social, health, job training, employment, and legal services to immigrant communities, with a particular focus in Maryland, Washington, D.C., Virginia, Pennsylvania, and Georgia. CASA also offers a more limited suite of services remotely to members across the United States. Those individuals who do not live in an area with a local CASA organizing committee are offered the opportunity to join a national organizing committee, whose members are entitled to vote on CASA's organizational priorities and are integrated into its member-led system of internal democratic governance. CASA also conducts campaigns to inform members of immigrant communities of their rights and assists individuals in applying for a variety of government benefits. In addition, CASA provides its members with free remote legal assistance, including free legal consultations and referrals on immigration issues. Capacity permitting, CASA provides legal representation to members in removal defense cases and on affirmative immigration applications to USCIS.

130.    A CASA member is a person who shares CASA's values, envisions a future where we can achieve full human rights for all, and is convinced that, when united and organized, we can create a more just society by building power in our working-class and immigrant communities.

JA157

CASA members play an important role in deciding what campaigns CASA works on and how CASA serves the community.

131.    CASA membership is voluntary. To become a member, an individual must apply, pay dues, and subscribe to the principles of CASA. CASA members also must self-identify as members of an immigrant or working-class community. Currently, the annual fee for CASA membership is $35. Alternatively, individuals may pay a recurring membership fee of $5 per month. The membership fee can be waived when appropriate. Members are also offered the opportunity, for an additional $5, to obtain a CASA ID. This is a physical, picture identification card that contains basic information about the member. For many of CASA's immigrant members, this card may be the only type of picture identification they have, other than documents from their home country. In certain jurisdictions, CASA IDs are recognized for the purposes of engaging with certain government agencies, including the police.

132.    CASA has members who have been paroled into the United States, including members who have received parole after presenting at a land port of entry with a CBP One appointment and through the CHNV parole processes.

133.    More than 33,000 CASA members entered the United States after the CBP One app first launched in October 2020, and a significant portion of those members were likely granted parole through CBP One. We are aware of CASA members who have had their grants of CBP One parole prematurely terminated, putting them at risk of being subjected to expedited removal.

134.    Some CASA members have already been directly harmed by being processed for expedited removal under Defendants' directives and recent actions increasing the use of expedited removal against paroled individuals.

JA158

135.    For example, E.M.P. is a member of CASA and Venezuelan national who was paroled into the

country through a CBP One appointment in December 2023 and issued an NTA. He filed an

application for asylum with the court in late 2024. When E.M.P. appeared in immigration court on

May 21, 2025 for his second master calendar hearing, the attorney representing DHS moved to

dismiss his case and the Immigration Judge granted dismissal, advising E.M.P. to apply for asylum

affirmatively with USCIS if he wanted to continue his asylum claim. It was not clear to E.M.P.

that dismissal meant that he was going to be put in expedited removal. However, as he was leaving

the courtroom, ICE officers followed him and arrested him. He has been detained since, which has

been detrimental to his mental and physical health, and he is awaiting a credible fear interview. In

expedited removal, he now faces significant barriers to presenting and fighting his asylum case,

including that he is detained far from his attorney and loved ones, and the risk of swift deportation

back to a country to which he fears returning.

136.    Similarly, D.L.C., a 20-year-old national of Venezuela and CASA member, was

granted parole into the United States in May 2024 through a CBP One appointment and

simultaneously issued an NTA. Once in the U.S., he lived with his mother, also a CASA member,

and started attending public school to learn English. He also filed an application for asylum with

the immigration court detailing his fear of removal to Venezuela. In October 2024, D.L.C. attended

his first master calendar hearing, during which the Immigration Judge scheduled a second hearing

for May 2025. Prior to that second hearing, D.L.C. began the process of seeking Special Immigrant

Juvenile Status ("SIJS"), a pathway to a green card for children under 21 years of age who have

been "abused, neglected, or abandoned" by one or more parents. D.L.C. is *prima facie* eligible for

SIJS relief. On May 21, 2025, when D.L.C. and his mother attended his second master calendar

hearing in New York, the attorney for DHS moved to dismiss D.L.C.'s proceedings. Neither

JA159

D.L.C. nor his mother realized that dismissal would lead to D.L.C.'s arrest, and both believed that it would allow him to pursue his asylum and SIJS applications more easily. However, after the immigration judge granted dismissal and D.L.C. and his mother left the courtroom, ICE officers followed them into the elevator, ordered them up against the wall, and arrested and detained D.L.C. It was only when D.L.C. was scheduled for a CFI that he and his counsel realized he was being processed for expedited removal. Being subject to expedited removal put D.L.C. at great risk of losing his ability to pursue SIJS and created significant barriers to his ability to pursue his asylum claim. He is also deprived of consistent access to counsel and separated from his family, school, and other support. D.L.C. also suffers from serious, chronic health issues for which he is unable to get treatment while in detention.

137.    CASA has multiple members who could be placed in expedited removal proceedings under the Trump administration's current policies at any point because they fit one or more of the various profiles the administration has prioritized for expedited removal. CASA has multiple members whose parole has been prematurely terminated and who have been in the United States for less than two years, including some do not have any pending applications for alternate immigration relief. CASA also has multiple members who were granted parole through the CBP One application and are currently in section 240 removal proceedings, who must appear in immigration court for regular hearings and who run the risk of having their proceedings dismissed and subsequently being placed in expedited removal. The significant ramp-up in immigration enforcement in recent weeks, including but not limited to courthouse arrests and raids in Los Angeles that have resulted in swift and summary deportations, only underlines the vulnerability of CASA members to the harms of the administration's policies terminating individual grants of parole and exposing paroled individuals to expedited removal.

(Page 163 of Total)

138.    CASA member J.N.M., for example, is a Haitian national whose sister sponsored him to come to the United States with his two children on CHNV parole in July 2024. In Haiti, J.N.M. was assaulted at gun point, and gangs threatened to kidnap his children, which forced him to stop taking them to school. Since being paroled into the United States with his family, J.N.M. has for the first time in many years been able to live in peace, with his children attending school and no longer fearing for their physical safety. However, now that his CHNV parole is subject to imminent termination, he is at risk of being subjected to expedited removal because he fits the profile outlined in the March 25 CHNV Termination Notice. After consulting with a CASA attorney, J.N.M. was advised to apply for asylum, but he has not been able to find an attorney to assist him with the application and CASA has not been able to provide him with representation due to resource constraints. To his knowledge, he does not have a case in immigration court, but he has a pending sibling petition his sister filed for him approximately seven years ago. He is terrified of being subjected to expedited removal without the chance to pursue an asylum application and while the sibling petition remains unadjudicated. All of the gang members who threatened his children know who he is and know that he left, so if he returns to Haiti he fears it will be a death sentence for him and his family.

139.    L.Z.P. is a CASA member originally from Honduras who currently resides in Maryland. A single mother, she and her three children—ages 18, 13, and 6—entered the United States on humanitarian parole after attending a CBP One appointment at the southern border in July 2024. L.Z.P.'s youngest two children are in school in the U.S., which is an opportunity they did not have while living in Honduras, and she works at a fruit factory, helping to pack fruit for distribution, to ensure that her family have their daily necessities. Over the last month, LZP received notice that both her parole status and work authorization have been terminated, despite

the fact that her parole was not supposed to expire until June 2, 2026 and her work authorization was valid through July 1, 2026. These terminations have made her even more afraid that she could be returned to Honduras, because she faced domestic violence by her ex-partner there, including death threats against her and the children. She is very afraid of being separated from her children, because they could not support themselves without her. She has a pending asylum claim and intends to apply for work authorization based on her pending asylum application as soon as she is eligible, but recent reporting about individuals who, like her, were paroled into the country being detained after immigration court and placed into expedited removal makes her afraid to go to her next scheduled hearing. This places her in a terrible situation where she is afraid to pursue her legitimate asylum claim, since even going to court could mean that she would be summarily detained and removed from the country without the process she is relying upon. Yet she knows that in order to have any hope for the future she must fight her case and plans to continue complying with all of her legal obligations, including presenting for immigration court.

140.    N.D.G. and Y.P.C. are a married couple originally from Venezuela who currently live in Maryland. Both are CASA members. They, along with their four children—ages 16, 13, 8, and 5—were granted humanitarian parole through CBP One in July 2024. They were also issued NTAs, so they are in section 240 removal proceedings. N.D.G. works as a DoorDash driver to support their family, and Y.P.C. devotes her time to taking care of their children. Their 8-year-old son suffers from a disability called psychomotor delay that slows his learning process. He still requires diapers, has difficulty walking, and cannot write. He requires constant support. While he does attend school, Y.P.C. often has to go to the school to help the teachers with his care. N.D.G. was a politically active small business owner back in Venezuela, and he was targeted and attacked by the government for supporting its opposition. If he and Y.P.C. were subject to rapid, expedited

JA162

deportation back to Venezuela, they fear their family's safety would be at risk, and they would not be able to pursue their pending asylum claims. Given Defendants' use of expedited removal against individuals like them who entered and were granted parole through a CBP One appointment and are in section 240 removal proceedings, N.D.G. and Y. P.C. are likely to be similarly targeted for expedited removal in the near future.

141.    CASA is acutely aware of the harms that Defendants' application of expedited removal to parolees is actively causing and will continue to cause. CASA has heard from its members that there is widespread confusion and fear from the administration's decisions to end parole processes and expand expedited removal. There has also been a chilling effect among members, with members unsure about whether it is safe to share their information with government agencies, including by applying for further immigration benefits for which they qualify. Given all of the recent policy reversals, they have significant and legitimate fear that their information will now be weaponized against them.

142.    CASA members who may be eligible for asylum or Convention Against Torture protections in the United States still fear that they could be deported through expedited removal, given the ever-shifting nature of policy changes within this administration. They do not know if they will be able to have their case properly heard by an immigration judge, or if anyone will care about their legitimate fear of return.

143.    In response, CASA has devoted significant resources to deportation defense and preparing its membership for potential immigration enforcement actions, including developing new Know Your Rights resources and devoting additional resources to immigration counseling and rapid response to immigration enforcement. Stripping legal protections from hundreds of

JA163

thousands of people, and subjecting them to rapid deportation via expedited removal, has a deep

negative impact on CASA's membership.

## **FIRST CLAIM FOR RELIEF**

### **(Violation of the Immigration and Nationality Act, 8 U.S.C. § 1225(b)(1)(A);**
### **Administrative Procedure Act, 5 U.S.C. § 706(2); 8 U.S.C. § 1252(e)(3))**
**(as to the January 23 Huffman Memorandum, the February 18 ICE Directive,**
**and the March 25 CHNV Termination Notice)**

144.    All the foregoing allegations are repeated and incorporated as though fully set forth

herein.

145.    An immigration officer may process a noncitizen for expedited removal upon

determining that such noncitizen "is arriving in the United States or is described in clause (iii)"

and is inadmissible under 8 U.S.C. §§ 1182(a)(6)(C) or 1182(a)(7). *See* 8 U.S.C. §

1225(b)(1)(A)(i).

146.    Subclause (I) of clause (iii) referenced above provides that the Secretary may apply

expedited removal to "any or all aliens described in subclause (II) as designated by the

[Secretary]." 8 U.S.C. § 1225(b)(1)(A)(iii)(I).

147.    Subclause (II) referenced above includes a description of noncitizens who may be

designated by the Secretary to be amenable to expedited removal and specifies that such

noncitizens must not "ha[ve] been admitted or paroled into the United States." 8 U.S.C. §

1225(b)(1)(A)(iii)(II). A noncitizen who "ha[s] been admitted or paroled following inspection by

an immigration officer at a designated port-of-entry" is excluded from expedited removal under 8

U.S.C. § 1225(b)(1)(A)(i). 8 C.F.R. § 235.3(b)(1)(ii); *see also* 8 C.F.R. § 235.3(b)(6) (requiring

that noncitizen be given a "reasonable opportunity" to establish to an immigration officer "that he

or she was admitted or paroled into the United States following inspection at a port-of-entry"

before being subjected to expedited removal).

JA164

148.    The February 18 ICE Directive violates the INA and is "not in accordance with law" and "in excess of statutory . . . authority" under the APA, 5 U.S.C. § 706(2)(A), (C), to the extent that it authorizes the use of expedited removal for noncitizens who were inspected and granted parole at a port of entry and are currently present in the United States subsequent to that parole. Such individuals have already arrived in the United States and have lawfully applied for and secured employment, enrolled their children in school, and taken steps to settle their lives here for the duration of their parole or prospective immigration pathways, and are therefore no longer in the act of "arriving." Because such noncitizens are not "arriving in the United States," they cannot be subjected to expedited removal under 8 U.S.C. § 1225(b)(1)(A)(i).

149.    The January 23 Huffman Memorandum and the March 25 CHNV Termination Notice violate the INA and are "not in accordance with law" and "in excess of statutory . . . authority" under the APA, 5 U.S.C. § 706(2)(A), (C), to the extent that they authorize the use of so-called expanded expedited removal for CHNV and other parole beneficiaries who have not "been physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility." 8 U.S.C. § 1225(b)(1)(A)(iii)(II). *See* CHNV Termination Notice (noting that "CHNV parolees . . . will become ineligible for expedited removal upon the natural expiration of their two-year parole."). Such individuals "ha[ve] been . . . paroled into the United States," which makes them ineligible for expedited removal under 8 U.S.C. § 1225(b)(1)(A)(iii)(II), regardless of whether they have been physically present in the United States for less than two years.

150.    Each of these policies must therefore be held unlawful, set aside, and/or otherwise vacated.

(Page 168 of Total)

JA165

151.    Each of these policies constitutes a new and unique "written policy directive, written policy guideline, or written procedure issued by or under the authority of the [Secretary of Homeland Security] to implement [8 U.S.C. § 1225(b), the expedited removal statute]." 8 U.S.C. § 1252(e)(3)(A)(ii).

152.    Because this claim was brought within 60 days of the issuance of the January 23 Huffman Memorandum, the earliest issued of these policies, this action is timely instituted under 8 U.S.C. § 1252(e)(3)(B).

## SECOND CLAIM FOR RELIEF

### (Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) – arbitrary and capricious)
### (as to the January 23 Huffman Memorandum, the February 18 ICE Directive, and the March 25 CHNV Termination Notice)

153.    All the foregoing allegations are repeated and incorporated as though fully set forth herein.

154.    The APA provides that courts "shall . . . hold unlawful and set aside agency action" that is arbitrary and capricious. 5 U.S.C. § 706(2)(A).

155.    The agency's various articulations of its authority to expose individuals inspected and granted parole at ports of entry to expedited removal are unexplained and entirely inconsistent with each other. In the January 23 Huffman Memorandum and the March 25 CHNV Termination Notice, the Department contemplates using expedited removal against parolees pursuant to 8 U.S.C. § 1225(b)(1)(A)(iii). The March 25 CHNV Termination Notice in particular clearly articulates the Department's view that under the expedited removal statute, CHNV parolees may be removed only under this provision, which is why the Department decided to terminate CHNV beneficiaries' paroles precipitously in order to maximize the number of people who may be expeditiously removed by minimizing the number who have been continuously present in the

JA166

country for two years. The February 18 ICE Directive, however, appears to make all individuals who were granted parole at ports of entry and are now present in the United States eligible for expedited removal under 8 U.S.C. § 1225(b)(1)(A)(i) as individuals who are "arriving." The directive additionally is explicit that "[t]here is no time limit on the ability to process [such parole beneficiaries] for expedited removal."

156.    Neither the January 23 Huffman Memorandum, nor the February 18 ICE Directive, nor the March 25 CHNV Termination Notice contains any reasoned explanation for why parole beneficiaries may be processed for expedited removal, and any explanation that exists in the January 23 Huffman Memorandum and March 25 CHNV Termination Notice is inconsistent with any explanation that exists in the February 18 ICE Directive. The arbitrariness and capriciousness of each agency policy is further evidenced by the failure of each such policy to consider the agency's own contrary conclusions regarding the legal authority for the agency to adopt the policy as contemplated. None of these documents acknowledges, much less provides an explanation for, the inconsistency and the change in policy from the January 23 Huffman Memorandum to the February 18 ICE Directive to the March 25 CHNV Termination Notice. Indeed, the inconsistent agency interpretations are both incorrect as a matter of law.

157.    Moreover, none of the agency policies consider the impact of their decision to apply expedited removal to some population of parolees on paroled individuals themselves, their families, their employers, their communities, and any financial supporters, as well as any reasonable alternatives.

158.    Each of these policies must therefore be held unlawful, set aside, and/or otherwise vacated.

47

JA167

**THIRD CLAIM FOR RELIEF**

**(Violation of the Due Process Clause of the Fifth Amendment to
the United States Constitution)**
**(as to the January 23 Huffman Memorandum, the February 18 ICE Directive,
and the March 25 CHNV Termination Notice)**

159.    All the foregoing allegations are repeated and incorporated as though fully set forth

herein.

160.    The Due Process Clause of the Fifth Amendment provides that "[n]o person shall

. . . be deprived of life, liberty, or property, without due process of law."

161.    Plaintiffs who are at risk of being subjected to expedited removal under the January

23 Huffman Memorandum, the February 18 ICE Directive, and/or the March 25 CHNV

Termination Notice are entitled under the Due Process Clause to notice, an opportunity to be heard,

and to have the law correctly applied to their cases, including to a meaningful process before they

can be removed from the country.

162.    The January 23 Huffman Memorandum, the February 18 ICE Directive, and the

March 25 CHNV Termination Notice must therefore be enjoined as violative of the Fifth

Amendment's guarantee of due process.

**FOURTH CLAIM FOR RELIEF**

**(Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2) –**
***Accardi* Doctrine)**
**(as to the January 23 Huffman Memorandum and the March 25 CHNV Termination
Notice)**

163.    All the foregoing allegations are repeated and incorporated as though fully set forth

herein.

164.    Title 8 U.S.C. § 1225(b)(1)(A)(iii)(II) states that the Secretary of Homeland

Security may apply expedited removal to an individual "who has not been admitted or paroled into

JA168

the United States" and cannot show that he or she "has been physically present in the United States continuously" for two years.

165.    Under DHS regulations, when the federal government determines that the expedited removal provisions of 8 U.S.C. § 1225(b)(1) apply to an individual described in an expedited removal designation made by the Secretary of Homeland Security under 8 U.S.C. § 1225(b)(1)(A)(iii),[2] that individual "will be given a reasonable opportunity to establish to the satisfaction of the examining immigration officer that he or she *was admitted or paroled* into the United States following inspection at a port-of-entry." 8 C.F.R. § 235.3(b)(6) (emphasis added). An individual who cannot show "that he or she *was lawfully admitted or paroled* will be ordered removed pursuant to [section 235(b)(1) of the INA, the expedited removal authority]." *Id.* (emphasis added); *see also* 8 C.F.R. § 235.3(b)(1)(ii) (stating that expedited removal under 8 U.S.C. § 1225(b)(1)(A)(iii)(II) applies only to certain noncitizens in the United States "without *having been* admitted or paroled," while section 240 removal proceedings apply to a noncitizen has been present in the country for at least  two years notwithstanding the fact that the noncitizen "*was not* inspected and admitted or paroled." (emphasis added)).

166.    The January 23 Huffman Memorandum instructs the component DHS agencies to consider whether to apply expedited removal to paroled individuals, including taking "steps to terminate any ongoing removal proceeding and/or any active parole status." The March 25 CHNV

---

[2] 8 C.F.R. § 235.3(b)(6) contains what appears to be an erroneous cross-reference that has been in place since the interim final rule was published in 1997. Namely, although the text of the regulation says it applies to "any or all aliens described in paragraph (b)(2)(ii) of this section," it appears to be meant to be referring to paragraph (b)(1)(ii) of this section. The reference to (b)(2)(ii) appeared in the original Notice of Proposed Rulemaking (Inspection and Expedited Removal of Aliens, 62 Fed. Reg. 444-01, 480 (proposed Jan. 3, 1997)), and remained in place when the Interim Final Rule was published, even though the Interim Final Rule switched the order of § 235.3(b)(1) and (b)(2). Inspection and Expedited Removal of Aliens, 62 Fed. Reg. 10312, 10314 (interim rule promulgated Mar. 6, 1997).

JA169

Notice further states that CHNV parolees "will become ineligible for expedited removal upon the natural expiration of their two-year parole," and as a result states that all grants of CHNV parole will terminate on April 24, 2025, to serve DHS's "strong interest in preserving the ability to initiate expedited removal proceedings to the maximum extent possible for the appropriate CHNV population." These policies are based on Defendants' interpretation of 8 U.S.C. § 1225(b)(1)(A)(iii)(II) that a noncitizen who has been paroled into the country becomes a person who has not been paroled into the country once their parole status terminates or expires. *See Doe v. Noem,* No. 1:25-cv-10495 IT, 2025 WL 1099602, at *17 (D. Mass. Apr. 14, 2025) (summarizing Defendants' position); *see also* Defs.'s Mot. Dismiss, Dkt. No. 20, at 39-40 (arguing that only an individual who "retains parole status" is exempt from expedited removal, while an individual whose "parole is terminated or expired" may be subject to expedited removal).

167.     Defendants' actions are contrary to the express terms of the statute and the implementing regulation at 8 C.F.R. § 235.3(b)(1)(ii) and (b)(6), which expressly contemplate that an individual who can demonstrate to an immigration officer's satisfaction "that he or she was admitted or paroled into the United States" at a point in the past may not "be ordered removed pursuant to [8 U.S.C. § 1225(b)(1)]."

168.     Defendants' interpretation of the statute and relevant regulations, as set forth above, violate agency procedures, including those found at 8 C.F.R. § 235.3(b)(1)(ii) and (b)(6).

169.     Defendants' actions, as set forth above, should therefore be set aside under the principle articulated in *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954).

170.     Defendants' actions, as set forth above, fail to comply with the issuing agencies' regulations and are therefore arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).

JA170

**FIFTH CLAIM FOR RELIEF**

**(Violation of the Immigration and Nationality Act, 8 U.S.C. § 1225(b)(1)(A);
Administrative Procedure Act, 5 U.S.C. § 706(2); 8 U.S.C. § 1252(e)(3))**
**(as to 8 C.F.R. § 1.2 definition of "arriving alien" only)**

171.   All the foregoing allegations are repeated and incorporated as though fully set forth

herein.

172.   The INA specifies in precise terms only two circumstances under which a

noncitizen may be subjected to expedited removal: if the noncitizen "is arriving in the United

States" and is inadmissible either because they engaged in fraud to procure admission or other

immigration benefits, or because they lack the requisite documents for entry, *see* 8 U.S.C. §

1225(b)(1)(A)(i); or if the noncitizen "has not been admitted or paroled into the United States" and

has not been in the United States continuously for at least two years before the date the noncitizen

is determined to be inadmissible, *see* 8 U.S.C. § 1225(b)(1)(A)(iii)(II).

173.   The expedited removal statute "thus allows for expedited removal for a non-citizen

'arriving in the United States' (i.e., arriving at the border or a port of entry)." *Doe v. Noem,* No.

1:25-cv-10495 IT, 2025 WL 1099602, at *16 (D. Mass. Apr. 14, 2025). It also allows for expedited

removal "for a non-citizen who entered the United States without authorization, except that a non-

citizen who entered the United States without authorization, that is an individual who 'has not been

paroled or admitted into the United States,' may not be subject to the expedited removal period if

that individual has been present in the United States for two years." *Id*. But "[t]he statute does not

subject persons who were authorized to enter the United States to expedited removal, regardless

of how long they have been in the United States." *Id.*

174.   Title 8 C.F.R. § 1.2 defines an "arriving alien" as:

> an applicant for admission coming or attempting to come into the
> United States at a port-of-entry, or an alien seeking transit through
> the United States at a port-of-entry, or an alien interdicted in

51

JA171

> international or United States waters and brought into the United
> States by any means, whether or not to a designated port-of-entry,
> and regardless of the means of transport. An arriving alien remains
> an arriving alien even if paroled pursuant to section 212(d)(5) of the
> Act, and even after any such parole is terminated or revoked.

175. Title 8 C.F.R. § 235.3(b), the regulation that implements the expedited removal statute, refers to and incorporates 8 C.F.R. § 1.2's definition of "arriving alien" when outlining the two classes of noncitizens to whom "[t]he expedited removal provisions shall apply."

176. The breadth of 8 C.F.R. § 1.2's definition of "arriving alien" means that, via 8 C.F.R. § 235.3, more classes of individuals are subjected to expedited removal than permitted by the expedited removal statute, 8 U.S.C. § 1225(b)(1)(A). Title 8 C.F.R. § 1.2's definition of "arriving alien" is therefore "not in accordance with law" and "in excess of statutory . . . authority." 5 U.S.C. § 706(2)(A), (C).

177. The statutory limits on the Secretary's expedited removal authority are clear: the Secretary may "utilize expedited removal only with regard to those arriving at the border or a port of entry, or those who entered the country unlawfully and have not been present in the country long enough to warrant consideration of any interests their residence may have created." *Doe*, 2025 WL 1099602, at *17.

178. The overbroad definition of "arriving alien" in 8 C.F.R. § 1.2, when Defendants apply it through 8 C.F.R. § 235.3, means that any paroled individual may be subjected to expedited removal at *any* time, regardless of the fact that the individual was lawfully paroled into the United States, and regardless of how long the individual has been continuously in the country, impermissibly expanding the narrow classes of noncitizens that Congress determined should be subjected to expedited removal and deprived of the normal due process protections available in ordinary removal proceedings under 8 U.S.C. § 1229a.

JA172

179.    To the extent the unlawfully overbroad definition of "arriving alien" in 8 C.F.R. §
1.2 permits the application of expedited removal to individuals who have been paroled into the
United States at a port of entry, regardless of the fact that the individual was lawfully paroled into
the United States, and regardless of how long such an individual has been continuously present in
the United States, the definition of "arriving alien" in 8 C.F.R. § 1.2 must be held unlawful, set
aside, and/or otherwise vacated.

180.    To the extent the overbroad definition of "arriving alien" in 8 C.F.R. § 1.2 reflects
the agency's considered interpretation of the INA, that interpretation is not entitled to deference
from courts reviewing agency action under the APA. *Loper Bright Enters. v. Raimondo,* 603 U.S.
369, 392 (2024) ("Section 706 [of the APA] makes clear that agency interpretations of statutes—
like agency interpretations of the Constitution—are *not* entitled to deference. Under the APA, it
thus 'remains the responsibility of the court to decide whether the law means what the agency
says.'" (quoting *Perez v. Mortgage Bankers Ass'n,* 575 U.S. 92, 109 (2015)).).

181.    The regulatory definition of "arriving alien" in 8 C.F.R. § 1.2 is not subject to 8
U.S.C. § 1252(a)(2), which makes certain matters pertaining to 8 U.S.C. § 1225 not subject to
judicial review. As a result, it does not need to fit within the jurisdiction preservation provisions
of 8 U.S.C. § 1252(e), including the filing deadline provision in (e)(3) for suits challenging the
implementation of the expedited removal statute.

182.    This claim is timely because it is brought within six years of when Plaintiffs' right
of action accrued. *See* 28 U.S.C. § 2401(a); *Corner Post, Inc. v. Bd. of Governors of Fed. Reserve
Sys.*, 603 U.S. 799, 808, 825 (2024) ("An APA claim does not accrue for purposes of § 2401(a)'s
6-year statute of limitations until the plaintiff is injured by final agency action.").

(Page 176 of Total)

183.    In the alternative and to the extent this claim is subject to the judicial review provisions of 8 U.S.C. § 1252(a)(2) and (e)(3), this claim is timely even if it is subject to the 60-day deadline in 8 U.S.C. § 1252(e)(3)(B), based on equitable tolling. *Boechler, P.C. v. Commissioner*, 596 U.S. 199, 209 (2022) ("[N]onjurisdictional limitations periods are presumptively subject to equitable tolling.").

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court:

1.    Declare that noncitizens who have previously been granted parole at ports of entry are not amenable to expedited removal under 8 U.S.C. § 1225(b)(1)(A) and that the January 23 Huffman Memorandum, February 18 ICE Directive, and March 25 CHNV Termination Notice are unconstitutional and contrary to law and arbitrary and capricious in violation of the APA;

2.    Declare that the definition of "arriving aliens" in 8 C.F.R. § 1.2 conflicts with the INA and is *ultra vires.*

3.    Preliminarily enjoin and stay the January 23 Huffman Memorandum, February 18 ICE Directive, and March 25 CHNV Termination Notice pursuant to Federal Rule of Civil Procedure 65(a) and 5 U.S.C. § 705 during the pendency of this suit;

4.    Permanently enjoin and vacate the January 23 Huffman Memorandum, February 18 ICE Directive, the March 25 CHNV Termination Notice, and 8 C.F.R. § 1.2's definition of "arriving alien" at final judgment;

5.    Enjoin Defendants from applying expedited removal to noncitizens who have previously been granted parole at a port of entry;

6.    Enter an order vacating the order of expedited removal of any member of a Plaintiff organization wrongfully subjected to expedited removal as a consequence of Defendants' action(s) challenged here;

JA174

7.    Enter an order requiring Defendants to facilitate the return to the United States of any member of a Plaintiff organization wrongfully removed pursuant to an order of expedited removal issued in accordance with Defendants' action(s) challenged here;

8.    Award Plaintiffs' counsel reasonable attorneys' fees under the Equal Access to Justice Act, and any other applicable statute or regulation; and

9.    Grant such relief as the Court deems just, equitable, and appropriate.

Dated: June 11, 2025                    Respectfully submitted,

*/s/ Esther H. Sung*
Esther H. Sung (CA00132)
Karen C. Tumlin (CA00129)
Hillary Li (GA0052)
JUSTICE ACTION CENTER
P.O. Box 27280
Los Angeles, CA 90027
Telephone: (323) 450-7272
esther.sung@justiceactioncenter.org
karen.tumlin@justiceactioncenter.org
hillary.li@justiceactioncenter.org

Nicholas Katz, Esq. (*pro hac vice*)
CASA, INC.
8151 15th Avenue
Hyattsville, MD 20783
Telephone: (240) 491-5743
nkatz@wearecasa.org

Carl Bergquist (*pro hac vice*)
COALITION FOR HUMANE IMMIGRANT RIGHTS
2533 West 3rd St, Suite 101
Los Angeles, CA 90057
Telephone: (310) 279-6025
cbergquist@chirla.org

*Attorneys for Plaintiffs*

JA175

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

COALITION FOR HUMANE IMMIGRANT RIGHTS,
*et al*.,

     *Plaintiffs,*

     *v.*

KRISTI NOEM, in her official capacity as Secretary of
Homeland Security, *et al.*,

     *Defendants.*

Case No.: 1:25-cv-0872

---

## MOTION FOR A STAY OF AGENCY ACTION UNDER 5 U.S.C. § 705

Plaintiffs Coalition for Humane Immigrant Rights ("CHIRLA"), CASA, Inc. ("CASA"), and UndocuBlack Network ("UndocuBlack") respectfully move under 5 U.S.C. § 705 of the Administrative Procedure Act ("APA") to stay the effective date of agency actions. Plaintiffs seek an order immediately postponing and staying the effective dates of implementation and enforcement of the January 23 Huffman Memorandum, February 18 ICE Directive, and March 25 Parole Termination Notice for Cubans, Haitians, Nicaraguans, and Venezuelans (CHNV) insofar as they subject individuals who have previously been granted parole at ports of entry to expedited removal. Defendants oppose this motion.

Plaintiffs file this motion to stop the irreparable harm that their members, their members' families and communities, and the public are suffering due to the agency actions. In recent weeks, Defendants have aggressively targeted for expedited removal individuals who entered the country lawfully after being inspected and paroled at official ports of entry, including by moving to dismiss their ongoing removal proceedings in immigration courts across the country. Paroled individuals

JA176

showing up to routine court appearances are being unexpectedly arrested and detained once their

proceedings have been dismissed—and occasionally when proceedings have not been dismissed—

and are then placed in a rapid, summary deportation process (or threatened with such placement)

despite the fact that they have been dutifully appearing for court hearings and, in many cases,

timely filed applications for asylum or other immigration relief. Plaintiffs' members already have

been subjected to serious harm by Defendants' actions, and other members of the Plaintiff

organizations who were paroled into the country at ports of entry are at imminent risk of being

similarly subjected to expedited removal in violation of the law. Defendants' actions, pursuant to

the January 23 Huffman Memorandum, February 18 ICE Directive, and March 25 CHNV Parole

Termination Notice, are unlawful and place Plaintiffs' members at risk of deportation without due

process, loss of immigration relief for which they are eligible, and separation from their families

and lives in the United States.

This Motion is based upon this Motion; the accompanying Memorandum of Law; the

supporting declarations and evidence filed concurrently herewith; the pleadings and filings in this

case; any additional matter of which the Court may take judicial notice; and such further evidence

or argument as may be presented before, at, or after a hearing on this Motion.

A proposed order is attached hereto.

## **REQUEST FOR ORAL ARGUMENT**

Plaintiffs respectfully request an oral argument pursuant to Local Rule 7(f) on this Motion.


Dated: June 11, 2025                                  Respectfully submitted,

                                                                */s/ Esther H. Sung*
                                                                Esther H. Sung (CA00132)
                                                                Karen C. Tumlin (CA00129)

JA177

Hillary Li (GA0052)
**JUSTICE ACTION CENTER**
P.O. Box 27280
Los Angeles, CA 90027
Telephone: (323) 450-7272
esther.sung@justiceactioncenter.org
karen.tumlin@justiceactioncenter.org
hillary.li@justiceactioncenter.org

Nicholas Katz, Esq. (*pro hac vice*)
**CASA, INC.**
8151 15th Avenue
Hyattsville, MD 20783
Telephone: (240) 491-5743
nkatz@wearecasa.org

Carl Bergquist (*pro hac vice*)
**COALITION FOR HUMANE IMMIGRANT RIGHTS**
2533 West 3rd St, Suite 101
Los Angeles, CA 90057
Telephone: (310) 279-6025
cbergquist@chirla.org

*Attorneys for Plaintiffs*

JA178

## CERTIFICATE OF SERVICE

I hereby certify on June 11, 2025, I caused a copy of the foregoing to be transmitted to all

Defendants through the CM/ECF filing system.

*/s/ Esther H. Sung*
Esther H. Sung (CA00132)
**JUSTICE ACTION CENTER**
P.O. Box 27280
Los Angeles, CA 90027
Telephone: (323) 450-7272
esther.sung@justiceactioncenter.org

4

JA179

Docusign Envelope ID: 5B7836FA-AA48-4BAE-A69D-1D55A1442B5E

Case 1:25-cv-00872-JMC    Document 22-2    Filed 06/11/25    Page 1 of 9
USCA Case #25-5289    Document #2146004    Filed: 11/18/2025    Page 183 of 352

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

COALITION FOR HUMANE IMMIGRANT
RIGHTS, *et al.*,

       *Plaintiffs*,

       v.

KRISTI NOEM, in her official capacity as
Secretary of Homeland Security, *et al.*,

       *Defendants*.

Case No. 1:25-cv-0872

## DECLARATION OF GEORGE ESCOBAR,
## CHIEF OF PROGRAMS AND SERVICES, CASA, INC.

I, George Escobar, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

1.      I am the Chief of Programs and Services of CASA, Inc. ("CASA"). CASA is a national nonprofit membership organization headquartered in Langley Park, Maryland, with offices in Maryland, Virginia, Pennsylvania, and Georgia. Founded in 1985, CASA has more than 173,000 lifetime members from across the United States. CASA's members are predominantly noncitizens in a variety of immigration statuses.

2.      I have worked at CASA for fourteen years. In my role, I oversee CASA's portfolio of community-facing direct services, including its health, legal, and educational services; employment and workforce development programs; financial literacy and tax programs; and parent engagement programs. An important part of my role is to understand the needs and experiences of our members so that I can work with my staff to design appropriate interventions to address those needs. I therefore speak frequently with community members and receive feedback from my staff regarding CASA members' fears, concerns, and decisions.

Docusign Envelope ID: 5B7836FA-AA48-4BAF-A69D-1D55A1442B5E

Case 1:25-cv-00872-JMC    Document 22-2    Filed 06/11/25    Page 2 of 9
USCA Case #25-5289    Document #2146004    Filed: 11/18/2025    Page 184 of 352

3.      I make this statement based upon personal knowledge, files and documents of

CASA that I have reviewed (such as case files, reports, and collected case metrics), as well as

information supplied to me by employees of CASA whom I believe to be reliable. These files,

documents, and information are of a type that is generated in the ordinary course of our business

and that I would customarily rely upon in conducting CASA business.

**CASA's Mission and Activities**

4.      A CASA member is a person who shares CASA's values, envisions a future

where we can achieve full human rights for all, and is convinced that, when united and

organized, we can create a more just society by building power in our working-class and

immigrant communities. CASA members play an important role in deciding what campaigns we

work on and how CASA serves the community.

5.      CASA membership is voluntary. In order to become a member, an individual

must apply for membership, pay dues, and subscribe to the principles of CASA. CASA members

also must self-identify as members of an immigrant or working-class community.

6.      Currently, the annual fee for CASA membership is $35. Alternatively, individuals

may pay a recurring membership fee of $5 per month. The membership fee can be waived for

individuals who experience financial hardship or are otherwise unable to pay. Members are also

offered the opportunity, for an additional $5, to obtain a CASA ID. This is a physical picture

identification card that contains basic information about the member. For many of our immigrant

members, this card may be the only type of picture identification they have, other than

documents from their home country. In certain jurisdictions, CASA IDs are recognized for the

purposes of engaging with certain government agencies, including the police.

7.      CASA's mission is to create a more just society by building power and improving

Docusign Envelope ID: 5B7836FA-AA48-4BAE-A69D-1D55A1442B5E

the quality of life in working-class Black, Latino/a/e, Afro-descendent, Indigenous, and immigrant communities. From CASA's beginnings in a church basement, we have envisioned a future with diverse and thriving communities living free from discrimination and fear, working together with mutual respect to achieve human rights for all.

8.      In furtherance of this mission, CASA offers a wide variety of social, health, job training, employment, and legal services to immigrant communities, with a particular focus in Maryland, Washington, D.C., Virginia, Pennsylvania, and Georgia. CASA also offers a more limited suite of services remotely to our members across the United States. Those individuals who are not geographically close to a physical CASA office are offered the opportunity to join a national organizing committee, whose members are entitled to vote on CASA's organizational priorities and integrated into our member-led system of internal democratic governance. CASA also conducts campaigns to inform members of immigrant communities of their rights and assists individuals in applying a variety of government benefits. In addition, CASA provides its members with free remote legal assistance, including free legal consultations on immigration issues.

**Harm to CASA's Members**

9.      On January 23, 2025, the U.S. Department of Homeland Security ("DHS") issued a memorandum authorizing the revocation of parole status for individuals who had been legally allowed to enter the United States and further authorizing DHS to subject them to expedited removal. Since that date, DHS has taken further action to implement that directive, which has sparked deep fear and confusion in our membership and the immigrant community generally. The expedited removal process has minimal procedural safeguards and would expose our members to rapid deportation, destroying the lives that they've created here in the U.S. and

Docusign Envelope ID: 5B7836FA-AA48-4BAF-A69D-1D55A1442B5E

Case 1:25-cv-00872-JMC    Document 22-2    Filed 06/11/25    Page 4 of 9
USCA Case #25-5289    Document #2146004    Filed: 11/18/2025    Page 186 of 352

denying them the opportunity to seek longer lasting protection.

10.    CASA has a large number of members who have already been, or are likely to be, directly harmed by the administration's attempt to end humanitarian parole protections and expose paroled individuals to expedited removal. Many of our members are noncitizens, including individuals with U.S. citizen children or other family members with permanent status in the United States, and we have members specifically who were granted parole through either CBP One or the parole processes for Cuba, Haiti, Nicaragua, and Venezuela ("CHNV parole"). CASA has provided legal and other social services to thousands of of immigrant community members and is a national leader in advocating for immigration protections.

11.    More than 33,000 CASA members entered the United States after the CBP One app first launched in October 2020, and a significant portion of those members were likely granted parole through CBP One. We are aware of CASA members who have had their grants of CBP One parole prematurely terminated, putting them at risk of being subjected to expedited removal.

12.    Approximately 2,250 CASA members from Cuba, Haiti, Nicaragua or Venezuela entered after the full implementation of the CHNV parole program in January 2023. A significant number of them were likely sponsored for and granted parole through CHNV parole. Due to a recent Supreme Court order staying a district court decision that had temporarily prevented the Trump administration from categorically terminating all grants of CHNV parole, all CASA members who had been paroled into the United States on CHNV parole are now at risk of having their parole terminated at any point, and then being subjected to expedited removal. We have seen our members who are beneficiaries of CHNV parole receive letters terminating their parole status and, in some cases, directing them to leave the country, which

Docusign Envelope ID: 5B7836FA-AA48-4BAE-A69D-1D55A1442B5E

Case 1:25-cv-00872-JMC    Document 22-2    Filed 06/11/25    Page 5 of 9
USCA Case #25-5289    Document #2146004    Filed: 11/18/2025    Page 187 of 352

stoked fear and created a lot of uncertainty for them.

13.    CASA has multiple members who could be placed in expedited removal

proceedings under the Trump administration's current policies because they fit one or more of

the various profiles the administration has prioritized for expedited removal. CASA has multiple

members whose parole has been prematurely terminated and who have been in the United States

for less than two years, including some do not have any pending applications for alternate

immigration relief. CASA also has multiple members who were granted parole through the CBP

One application and are currently in section 240 removal proceedings, who must appear in

immigration court for regular hearings and who run the risk of having their proceedings

dismissed and subsequently being placed in expedited removal. The significant ramp-up in

immigration enforcement in recent weeks, including but not limited to courthouse arrests and

raids in Los Angeles that have resulted in swift and summary deportations, only underlines the

vulnerability of CASA members to the harms of the administration's policies terminating

individual grants of parole and exposing paroled individuals to expedited removal.

14.    LZP is a CASA member originally from Honduras who currently resides in

Maryland.  She is a single mother who entered the United States with her three children, now

aged 18, 13 and 6, on humanitarian parole after attending a CBP One appointment at the

southern border in July 2024.  LZP's two youngest children are attending school in the United

States, which is an opportunity they did not have in Honduras. She currently works at a fruit

factory, helping to pack fruit for distribution, to support her family. Over the last month, LZP

received notice that both her parole status and work authorization have been terminated, despite

the fact that her parole was not supposed to expire until June 2, 2026 and her work authorization

was valid through July 1, 2026.  She was notified of this via a message in an application on her

Docusign Envelope ID: 5B7836FA-AA48-4BAE-A69D-1D55A1442B5E

Case 1:25-cv-00872-JMC     Document 22-2     Filed 06/11/25     Page 6 of 9
USCA Case #25-5289     Document #2146004     Filed: 11/18/2025     Page 188 of 352

phone called "Migra Connect" and confirmed it on the USCIS website. These terminations have made her even more afraid that she could be returned to Honduras, where she was a victim of domestic violence and death threats. It has made her afraid to even go outside. She sees what immigration agents are doing, that they are even detaining people who have pending asylum claims or other forms of relief. LZP applied for asylum on February 28, 2025 and intends to apply for work authorization based on her pending asylum application as soon as she is eligible. Her next scheduled immigration court hearing is in April 2026. Recent reporting about individuals who, like her, were paroled into the country being detained after immigration court and placed into expedited removal makes her afraid to go to her hearing. This places her in a terrible situation where she is afraid to pursue her legitimate asylum claim, since even going to court could mean that she would be summarily detained and removed from the country without the process she is relying upon. Yet she knows that in order to have any hope for the future she must fight her case and plans to continue complying with all of her legal obligations, including presenting for immigration court.

15.     NDG and YPC are a married couple, both of whom are CASA members. They have four children, aged 16, 13, 8 and 5. All of them were granted humanitarian parole to enter the U.S. through a CBP One appointment in July 2024. They were also issued NTAs and placed into Section 240 removal proceedings. NDG works as a delivery driver to support their family, while YPC takes care of their children – including their 8-year-old son who suffers from a disability called psychomotor delay that slows his learning process. He still requires diapers, has difficulty walking, and cannot write. NDG was a politically active small business owner in Venezuela, and he was targeted and attacked by the government for supporting the opposition party. If he and his family were subjected to expedited removal back to Venezuela, they fear that

their family's safety would be at risk, and they would not be able to pursue their pending asylum claims.

16.    CASA member JNM is originally from Haiti and entered the U.S. with his two children on CHNV parole in July 2024.  In Haiti JNM was assaulted at gun point, and gangs threatened to kidnap his children, which forced him to stop taking them to school.  Since being paroled into the United States with his family, JNM has for the first time in many years been able to live in peace, with his children attending school and no longer fearing for their physical safety. On March 29, 2025, however, that sense of security was shattered when he received a letter indicating that his CHNV parole authorization was being terminated and directing him to depart the country by April 24, 2025. After receiving this letter, and consulting with a CASA attorney, JNM was advised to apply for asylum but has not been able to find an attorney to assist him with the application and CASA has not been able to provide him with representation due to resource constraints. To his knowledge he does not have a case in immigration court, but he has a pending sibling petition his sister filed for him approximately seven years ago.  His sister was also the one who sponsored him to enter the country on parole.  JNM is at risk of being subjected to expedited removal because he fits the profile outlined in the March 25 CHNV termination memo.  He is terrified of being subjected to expedited removal without the chance to pursue an asylum application.  All of the gang members who threatened his children know who he is and know that he left, so if he returns he fears it will be a death sentence for him and his family.

17.    Another CASA member, EMP, was pursuing a defensive asylum case in New York and had those proceedings dismissed, only so the government could detain him and seek to place him in expedited removal proceedings.  Without judicial action to protect those whose parole status has been summarily revoked, potentially thousands of CASA members could be

subjected to a similar fate.

18.    These members—and countless others like them—represent the human cost of the administration's attempt to dramatically reverse course, rapidly stripping parolees of their legal status and work authorization and potentially subjecting them to immediate expulsion from this country via expedited removal.  Those members who entered on parole went through rigorous hurdles to come to this country, often fleeing terrible and unsafe conditions in their home countries. They followed the process set up by the government to seek safety here, and for the last several years have been building back their lives, starting families, working and contributing to their communities—making this country stronger.

19.    If the administration is allowed to destroy that promise and continue subjecting parolees to expedited removal, without any of the normal protections of due process, it will irreparably harm the communities CASA serves by placing families at risk of separation, jeopardizing livelihoods, and cutting off access to essential healthcare and services. It has also exacerbated the fear and anxiety among immigrants, especially those who have built their lives here and contribute meaningfully to their communities.  As our member's stories indicate, the tactics we are seeing by the administration, including arrests at immigration courthouses and blanket revocation of parole status and work authorization with direction to self-deport, make that fear and confusion even more acute.  This places our members at risk of exposing themselves to harm by returning to countries that are not safe for them, and upends their ability to continue supporting their families and communities here in the United States.

Docusign Envelope ID: 5B7836FA-AA48-4BAE-A69D-1D55A1442B5E

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June10, 2025
Washington, District of Columbia

_George Escobar_ (signature)

53A219C43A584F2...

_____
George Escobar

JA188

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COALITION FOR HUMANE IMMIGRANT RIGHTS, *et al.*, | |
| *Plaintiffs*, | Case No 25-cv-00872. |
| v. | |
| Noem, *et al.* | |
| *Defendants*. | |

## DECLARATION OF ANGELICA SALAS, EXECUTIVE DIRECTOR OF THE COALITION FOR HUMANE IMMIGRANT RIGHTS ("CHIRLA")

I, Angelica Salas, upon my personal knowledge, hereby declare as follows:

1.      I am the Executive Director of the Coalition for Humane Immigrant Rights ("CHIRLA"). I have held this position since 1999. In this capacity, I oversee all of CHIRLA's program areas and am responsible for strategic planning and CHIRLA's annual budget.

2.      CHIRLA is a nonprofit organization headquartered in Los Angeles, California, with ten offices throughout California and a national policy office in Washington, D.C. CHIRLA was founded in 1986 and its mission is to advance the human and civil rights of immigrants and refugees and ensure immigrant communities are fully integrated into our society with full rights and access to resources.

## CHIRLA's Mission, Membership, and Services

3.      CHIRLA's mission is to ensure that immigrant communities are fully integrated into our society with full rights and access to resources. CHIRLA's first director was Father Luis Olivares, the pastor at Our Lady Queen of Angels Church. As a leading voice of the Sanctuary movement, Olivares used his church to protect refugees fleeing human rights abuses in Central

America in the 1980s. Since its founding in 1986, CHIRLA has continued to advocate for immigrant rights, organizing, educating, serving, and defending immigrants and refugees in Los Angeles and throughout California.

4.     Today, CHIRLA is the largest statewide immigrant rights organization in California, with fourteen unique departments and over 185 staff members who help provide a range of services that reach tens of thousands of Californians each year. For example, over the last three years, CHIRLA's education programs have reached over 820,000 people through more than 7,800 events, and its legal department has assisted approximately 30,000 people. In furtherance of its mission, CHIRLA handles the full spectrum of needs of those primarily residing within low-income immigrant communities in an area with very high costs of living and in areas of California that have long been underserved.

5.     CHIRLA is a membership-based organization with approximately 51,279 members across California, about 38,926 of whom reside in Los Angeles County. CHIRLA is funded, in part, by its members. The fee for an individual membership starts at $25, and families may become members for $60.

6.     CHIRLA's membership is diverse, and includes U.S. citizens, non-U.S. citizens with lawful status, and non-U.S. citizens without lawful status. Many of our members belong to mixed-status families—that is, families consisting of both individuals with citizenship or lawful immigration status and individuals without. Most of our members are low-income. CHIRLA educates its membership as well as our broader community through know-your-rights trainings, workshops, social media and educational literature about a variety of social services and benefits, including immigration law, financial literacy, workers' rights, and civic engagement.

7.     In 2012, CHIRLA launched its legal services program to support its members and

2

JA190

others in the community in seeking the benefits and protections of Deferred Action for

Childhood Arrivals ("DACA"). Since then, we have expanded the program, first by representing

clients in applying for permanent residence and citizenship as well as other affirmative

applications before U.S. Citizenship and Immigration Services ("USCIS"), and then expanding

in 2017 to representing individuals in removal proceedings in immigration court. We now have

three main components within our Department of Legal Services: 1) Programs and Subcontract

Administration; 2) Worker Rights and Labor; and 3) Immigration Legal Programs, with over

sixty staff members across the components. Subcontract Administration oversees funding from

the California Department of Social Services, the County of Los Angeles, and the City of Los

Angeles, and in this way helps ensure wider access across Los Angeles and the State of

California to legal services.  During the past three years, CHIRLA has conducted nearly 30,000

legal consultations and has assisted with hundreds of immigration matters, including I-130

family petitions and attendant adjustments of status, Military Parole in Place cases, consular

processes, as well as humanitarian-based applications including asylum, U visas, and Special

Immigrant Juvenile Status ("SIJS") and Violence Against Women Act ("VAWA") petitions.

       8.      There is overlap between our membership and the clients that our legal services

program serves. Some members join CHIRLA first as members and then become legal services

clients due to need, while others are clients before they become members.

       9.      Part of the CHIRLA Department of Legal Services, the Removal Defense Unit

(RDU), serves immigrants during their initial immigration court proceedings as well as

occasionally on appeal. RDU has recently experienced a large increase in consultation requests

and due to the Trump Administration's ongoing efforts to enact its mass deportation agenda,

RDU is adapting and expanding into assisting detained clients including those facing expedited

JA191

removal.

10.     CHIRLA's programs also include a hotline where individuals—including members, clients, and community members—can call with questions. The assistance hotline that CHIRLA operates fields on average 15,000 calls per year. Given CHIRLA's deep community ties and longstanding legal services programs, CHIRLA is often a first point of contact for individuals seeking information about recent policy changes impacting immigrants.

11.     In 2023, in response to a growing need, CHIRLA formed a new Department of Humanitarian Assistance. We were experiencing the arrival of a growing number of recent immigrants to Los Angeles, most of whom needed logistical and legal support. The need became particularly acute when the Governor of Texas, Greg Abbott, began sending buses filled with recent arrivals to cities around the country, including Los Angeles. CHIRLA began working with partner organizations and the City of Los Angeles to assist the newcomers and their families and help them get settled. The vast majority of these new arrivals were paroled into the U.S., primarily via the CBP One application process, and thus are currently at risk of being detained and subjected to expedited removal as has been happening at immigration courts around the country. CHIRLA also has a dedicated program that helps Afghan nationals who arrived both via Operation Allies Welcome and CBP One.

12.     CHIRLA reaches its members and community members through in-person meetings and events throughout California and through its social media and other virtual platforms, including a Facebook Live series "CHIRLA en tu Casa," CHIRLA TV YouTube channel, and TikTok. Organizers, along with legal and communications staff, work collaboratively to prepare materials and content for these events that are geared towards members and non-members alike.

JA192

13.     In addition to its education initiatives and legal services, CHIRLA engages in policy advocacy efforts on behalf of its members at the local, state, and national levels. For example, a recent CHIRLA campaign focused on advocacy for stronger health and safety protections for domestic workers. This campaign began in response to COVID-19, where domestic workers were at the forefront of the pandemic. Since then, CHIRLA has been supporting state legislation that would remove an exemption that denies domestic workers the same health and safety protections as other workers.

### Harm to CHIRLA's Members

14.     On January 23, 2025, the U.S. Department of Homeland Security ("DHS") issued a memorandum authorizing the revocation of parole status for individuals who had been legally allowed to enter the United States and further authorizing DHS to subject them to expedited removal. Since that date, DHS has taken further action to implement that directive and aggressively target parole beneficiaries for expedited removal, including prematurely terminating grants of parole for individuals who came through the processes for Cubans, Haitians, Nicaraguans, and Venezuelans ("CHNV parole") and arresting individuals who were paroled into the country through CBP One after their immigration court hearings. This has spread fear and confusion in CHIRLA's membership and the immigrant community generally.  The expedited removal process has minimal procedural safeguards and would expose our members to swift, summary deportation, depriving them of the opportunity to seek relief for which they are eligible and uprooting the lives that they and their families have created in the United States.

15.     CHIRLA has many members who have already been, or are likely to be, directly harmed by the administration's attempt to end humanitarian parole protections and expose paroled individuals to expedited removal. We have members specifically who were granted

JA193

parole through either CBP One or the parole processes for Cuba, Haiti, Nicaragua, and Venezuela ("CHNV parole") and who could be placed in expedited removal proceedings under the Trump administration's current policies.

16.    Specifically, CHIRLA has members who were granted parole through the CBP One application and are currently in section 240 removal proceedings, who must appear in immigration court for regular hearings. Many of these members fear that they will be apprehended at immigration court and summarily removed from the country because they have heard of the exact same thing happening to others. CHIRLA also has members whose parole was prematurely terminated and who have been in the country for less than two years, including some who do not have any pending applications for asylum or other immigration relief. CHIRLA members are well aware of the recent significant increase in immigration enforcement at courthouses across the country and in and around Los Angeles. The stepped-up immigration enforcement underlines how exposed CHIRLA members are to the administration's drive to terminate individual grants of parole and subject paroled individuals to expedited removal.

17.    For example, CHIRLA member E.I.R.M. entered the U.S. with inspection in November 2023 and was paroled into the U.S. via the CBP One parole program.  He received a Notice to Appear and attended all his master calendar hearings. On March 7, 2025, he was arrested at a CBP checkpoint and detained despite his parole still being valid, and he is now being processed for expedited removal. While in detention, he was given a credible fear interview and given a negative credible fear finding. His attorney asked an immigration judge to review the determination, and although such reviews are supposed to be held within seven days of a negative determination, more than a month has passed and they have not received any review, nor a transcript of the interview. E.I.R.M.'s mental state has declined due to his detention

6

JA194

and the fact that he does not know how much longer it will last.  He went through the entire immigration process in complete compliance with all the rules set out for him, and now he has been separated for months from his family and fiancée, unsure of when, or even if, he will get to see them again. Additionally, he faces harm if he were to be forcibly returned to Mexico, where he and his brother have received death threats from a cartel that the U.S. Government has designated a foreign terrorist group and a transnational criminal organization.

18.    Other CHIRLA members who entered the U.S. during the last two years and were paroled in via the CBP One parole program have expressed significant fears of being detained at court hearings, based on footage in the news media of immigration agents arresting people at courthouses. These members also reported a fear of being detained, a fear of harm should they be deported to countries that they fled due to dangers they faced there, and a fear of being separated from their families if they are detained and/or deported. Additionally, some members fear the loss of income to their households if their detention or deportation disrupts their ability to work and hurts their capacity to earn income at the level needed to support their households.

19.    For CHIRLA's members, as well as their families and communities, the use of and threat of expedited removal against lawfully paroled individuals is causing widespread fear and uncertainty. This fear has increased significantly for CHIRLA members as a result of the recent sweeping ICE raids in Los Angeles, which have already resulted in the arrests of many noncitizens and has compelled CHIRLA members to refrain from going about their daily lives.

20.    In Los Angeles County, home to nearly 40,000 CHIRLA members, any sense of normalcy has been shattered by a high-profile blitz by federal immigration authorities on workplaces and other sites central to people's daily lives.  Immigrant Angelenos are inundated by reports of warrantless surprise raids, of their community members snatched up by masked

JA195

men, loaded into unmarked vans, and spirited away to unknown locations.  Often, family

members and lawyers representing or seeking to represent these individuals are unable to

ascertain their whereabouts, adding to people's sense of grave danger. And reports are reaching

the immigrant community of detained people being deported within a day or two of their arrest,

without a hearing in front of an Immigration Judge or other forms of due process. For all these

reasons, many of CHIRLA's members are currently living through a period of intense fear,

anxiety and dread.

21.    CHIRLA has been receiving many inquiries from members, clients, and

community members who were granted parole and are now concerned about that status being

revoked and being subject to expedited removal. Since the widespread courthouse arrests began

around May 20, 2025, the number of inquiries has increased and CHIRLA's Humanitarian

Services department is now facing a wave of inquiries from paroled clients who have received

termination notifications via email and are very fearful that they will be detained at their

upcoming immigration court hearings.

22.    CHIRLA has already identified several existing clients as well who are vulnerable

to the use of expedited removal against parolees. At least four of CHIRLA's existing clients and

an additional five children in their families face the risk of expedited removal when they attend

their scheduled court hearings in the next few months.

23.    For example, one of CHIRLA's clients and his two children fled organized crime

in their home country after relocating internally when their tormentor was released after serving

three years out of a 20-year sentence. After all semblance of government protection vanished,

and their police report was ignored, they fled the country and entered the U.S. using CBP One. In

a few months, the family has a hearing in immigration court, and they fear their case will be

JA196

dismissed and they will be arrested for expedited removal like has happened to others who are in similar situations.

24.     The administration has made clear—both through written policies and its recent actions in apprehending and detaining scores of individuals across the country—that it intends to remove noncitizens, including parole beneficiaries, as quickly as possible, in as large numbers as possible. CHIRLA members are at significant risk of being subjected to expedited removal proceedings rather than regular removal proceedings because of the administration's express intent to target parole beneficiaries, including by terminating ongoing removal proceedings and active parole status. This threat of expedited removal and all the harm it inflicts on individuals and their families is causing widespread fear among CHIRLA members.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed June 11, 2025, in Los Angeles, California.

Angelica Salas

(Page 200 of Total)

JA197

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

COALITION FOR HUMANE IMMIGRANT
RIGHTS, *et al.*,

        *Plaintiffs*,

        v.

KRISTI NOEM, in her official capacity as
Secretary of Homeland Security, *et al.*,

        *Defendants*.

Case No. 1:25-cv-0872

## DECLARATION OF PATRICE LAWRENCE,
## EXECUTIVE DIRECTOR, UNDOCUBLACK NETWORK

I, Patrice Lawrence, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and

declare as follows:

1.      I am the Executive Director of UndocuBlack Network ("UndocuBlack"). Created

in 2016, UndocuBlack is a nonprofit membership organization and multigenerational network of

Black immigrants that advocates for and supports Black immigrants through facilitating access to

resources, storytelling, organizing, and community wellness.

2.      I have worked at UndocuBlack for nine years. In my role, I oversee several core

departments critical to our mission: Community Wellness, Policy and Advocacy, Community

Engagement, Development, and Narrative and Media. Through this work, I help guide the

strategic vision for how we support and uplift Black immigrants across the country and ensure

our programs are responsive to the evolving needs of our members.

**UndocuBlack's Mission and Activities**

3.      UndocuBlack's mission is to foster community, facilitate access to resources, and

contribute to transforming the realities of its members – who are Black immigrants – so they can

1

JA198

thrive and live their fullest lives.

4.      At its core, UndocuBlack's work is centered on engaging and supporting its members and advocating for policies that protect members and Black immigrants at large through different areas of work including community engagement and organizing, community wellness, narrative and storytelling, and policy and advocacy.

5.      Since its inception, UndocuBlack has served and supported the Haitian community in particular. UndocuBlack has provided a wide range of services to its Haitian members that include providing legal assistance to sponsors and beneficiaries of humanitarian parole programs and enrolling family members in school and social services programs.

6.      As a part of our policy and advocacy work, UndocuBlack provides educational information and advocacy on behalf of its members. For example, UndocuBlack frequently conducts Know Your Rights trainings with its members to explain new policies that aim to adversely impact the UndocuBlack community.

**UndocuBlack membership**

7.      UBN has members across the nation with chapters in New York, Los Angeles and Washington, DC. UBN serves thousands of immigrants through its organizational chapters with a national network across approximately thirty states.

8.      As of the date of this declaration, UndocuBlack's membership is over 1000 active members. To become an active UndocuBlack member, an individual must (1) identify as Black, (2) be an immigrant, and is asked to (3) apply by submitting a form to indicate their interest in joining the membership. There are no membership dues required.

9.      UndocuBlack also serves those who are part of our larger UndocuBlack Community. The communities in the UndocuBlack network include, but are not limited to,

2

JA199

currently and formerly undocumented young people, elders, students, differently abled people, entrepreneurs, LGBTQ people, houseless and unhoused people, formerly incarcerated people, and people holding temporary legal status. This diverse, inclusive, and expansive network (the "UndocuBlack Community") fosters community, facilitates access to resources, and advocates to transform the realities of UndocuBlack Community members across the United States, helping them to not only survive, but thrive. UndocuBlack's vision is to foster inclusive immigrant rights and racial justice movements that advocate for the rights of, and provide support, healing, and community to those with intersecting identities. UndocuBlack works to achieve this mission and to improve the lives of UndocuBlack Community members.

10.    UndocuBlack considers individuals in the UndocuBlack Community who have been involved with UndocuBlack programming or who have reached out to the organization for services to be members of UndocuBlack.

11.    UndocuBlack's members include at least 300 Haitian parole beneficiaries who were granted parole through either the parole processes for Cubans, Haitians, Nicaraguans, and Venezuelans (CHNV) or CBP One appointments at a port of entry.

12.    UndocuBlack members live in areas where encounters with U.S. Immigration and Customs Enforcement (ICE) officials are common. ICE actively detains noncitizens all over New York, where the largest concentration of UndocuBlack members reside. In the last several months, this activity has increased significantly, including for noncitizens who have a temporary status like parole.

**Harm to UndocuBlack's Members**

13.    Under the government's recent policies, UndocuBlack's many members who are Haitian CBP One and CHNV parole beneficiaries face the imminent risk of being processed for

JA200

expedited removal, which would cause them severe harm. Our Haitian members who were paroled into the country with the help of sponsors through the CHNV parole program are now likely to have their parole terminated quickly as a result of the Supreme Court's recent decision to stay the lower court order that had previously protected their parole status from the administration's efforts to terminate status early. In the Federal Register Notice that ended the CHNV parole program, and which categorically and prematurely terminated all grants of CHNV parole, the federal government clearly expressed a strong interest in initiating expedited removal proceedings "to the maximum extent possible" for CHNV parole beneficiaries, and in fact justified the *en masse* termination of all CHNV parole grants for precisely that purpose. The same Federal Register Notice also specified that the federal government would prioritize for expedited removal those CHNV parole beneficiaries who had not filed an immigration benefit request for alternate legal status before the publication of the Federal Register Notice, or who are not the beneficiary of an immigration benefit request filed by someone else on their behalf. Given that UndocuBlack has many CHNV parole beneficiary members, we are aware of multiple individuals within our membership, including in New York, who are at this heightened risk of expedited removal under the Federal Register Notice, due to not having any other applications for legal status filed or on their behalf.

14.    We have additionally heard from our members who have expressed fear about the recent rise in arrests at courthouses of noncitizens after their removal proceedings so they can be processed for expedited removal, particularly because paroled individuals have been arrested as part of these enforcement actions. This practice of courthouse arrests poses particular danger to our many members who are CBP One parolees, because many of them were placed in removal proceedings at the time of their parole and must appear regularly in immigration court.

JA201

15.    Our members who are parole beneficiaries are frightened based on the reports around the country that they will be arrested and subject to expedited removal. Some UndocuBlack members who are Haitian parole beneficiaries did not come to the United States in time to apply for Temporary Protected Status (TPS), and even those who now have TPS recognize that the Trump administration is attempting to terminate those protections early, so that status is precarious. Many of these members therefore have pending applications for other kinds of immigration relief, including asylum and adjustment of status, or are preparing to file such applications. Although the Federal Register Notice that terminated all individual grants of CHNV parole indicated that individuals who do not have pending immigration benefits applications will be prioritized for expedited removal, our members are well aware of news reports of the Trump administration canceling other immigrants' visas and green card petitions and fear that their own petitions could likewise be canceled or otherwise rendered invalid. They are also well aware of directives from the Trump administration instructing DHS agencies to consider revoking individuals' parole in order to subject them to expedited removal, and indeed, multiple CBP One parole beneficiaries have had their parole revoked, and now all CHNV parole beneficiaries will likely have their parole swiftly terminated, too. If UndocuBlack's parole beneficiary members are processed for expedited removal, they will face significant challenges to presenting any claims for other immigration benefits, or lose the opportunity to do so altogether.

16.    Specifically, UndocuBlack members who may be eligible for asylum or Convention Against Torture protections in the United States would face tremendous obstacles if they were targeted for expedited removal and would have to rely only on the credible fear screening process. The screenings depend on case referrals by enforcement personnel to asylum

JA202

officers, and noncitizens are given little opportunity to gather relevant documents, present evidence, or consult counsel, all while battling difficulties with language barriers. Due to these and other inadequacies, the screenings can result in, and have resulted in, the removal of people to dangerous circumstances abroad without the opportunity to develop the kind of case that would have secured relief in immigration court.

17.     UndocuBlack's members who are Haitian parole beneficiaries also have family in the United States with different immigration statuses. As a result, UndocuBlack expects that these members, if they are put in expedited removal, will experience abrupt family separation and lose one or more household incomes. They could also be deported to Haiti where they don't have family or resources and where they may be at risk of violence or even death.

18.     One UndocuBlack member, UBN Jane Doe 1, is a Haitian woman who was sponsored to come to the United States through the Haitian CHNV parole process. She applied for and was granted TPS, but now, due to the administration's efforts to terminate Haitian TPS prematurely, that status will likely expire in August, and she could be subject to expedited removal.  UBN Jane Doe 1's son, who is back in Haiti, is ill, and being able to work in the U.S. through CHNV has been the only way UBN Jane Doe 1 has been able to provide for him. The termination of her CHNV parole and the anticipated early terminations of her TPS, together with the possibility of being removed expeditiously without a meaningful opportunity to request any possible form of relief, have caused significant harm to UBN Jane Doe 1, who has relied upon CHNV parole to provide for herself and her ailing child. Moreover, the government's betrayal and stripping of time that was given to her—which would be exacerbated by efforts to quickly remove her without process—will cause deep financial and psychological harm to her.

19.     Another UndocuBlack member, UBN Jane Doe 2, is a 45-year-old mother who

6

JA203

fled Haiti and was paroled into the U.S. with her young son through CBP One in March 2024. As she struggles to navigate the complex asylum process without legal representation, she lives in constant fear for both her life and her child's. Her greatest terror is that stepping outside for any reason could mean never returning to her son. Through free legal resources, she has learned that she must always be prepared to show documentation of at least two years of presence in the U.S. But the harsh reality is that she simply does not have that. The weight of this requirement, coupled with the uncertainty of her status, leaves her paralyzed with fear—afraid to attend her own hearings, afraid to send her son to school, and even afraid to stay in her own home. Any knock at the door or passing shadow, even from the mail carrier, fills her with terror. She lives in a constant state of anxiety, fearing that at any minute, she will be processed for expedited removal, forced to try and quickly defend her asylum claim alone and without the opportunity to see a judge, without the ability to pay for an attorney, and while battling language barriers.

20.    UndocuBlack has dedicated many resources to ensure its members are well-informed about the danger that they now face due to the increased use of expedited removal against parole beneficiaries. UndocuBlack has heard directly from many members who are fearful of being detained, including members who have not been in the United States for two years, which we understand is one of the requirements the government uses to say they are eligible for expedited removal.

21.    UndocuBlack's members who entered on parole after making a CBP One appointment or through the CHNV parole process invested considerable time and resources in applying for these humanitarian parole programs, often while fleeing dangerous circumstances in their home country. They did everything the United States government asked of them to satisfy the requirements established by these parole processes, including vetting and inspection

JA204

requirements, and now the government aims to remove them as quickly as possible. UndocuBlack members, and other CHNV and CBP One parole beneficiaries like them, have done nothing to deserve this abrupt change in course; to the contrary, they are hard-working individuals, dedicated to supporting their families and uplifting their communities.

22.     Not only will families face separation, but our members would face extreme danger if forced to return home to Haiti. The threat of being subject to expedited removal already feels very real for our members given what is happening around the country at courthouses, and it has already sown extreme fear in our Black immigrant communities. We have heard from members who are afraid to seek medical services they desperately require, take their children to school, or even answer a knock at the door. The members and communities that UndocuBlack serves will be irreparably harmed if the government is permitted to continue targeting parole beneficiaries for expedited removal.


I declare under penalty of perjury that the foregoing is true and correct.


Executed on June 9, 2025
Washington, District of Columbia


Respectfully submitted,

*P. S. Lawrence*
_____
Patrice Lawrence

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COALITION FOR HUMANE IMMIGRANT RIGHTS, *et al.*, | |
| *Plaintiffs,* | |
| *v.* | Case No.: 1:25-cv-0872 |
| KRISTI NOEM, in her official capacity as Secretary of Homeland Security, *et al.*, | |
| *Defendants.* | |

**DECLARATION OF ANDREW MAGNO FREIRE**

I, Andrew Magno Freire, upon my personal knowledge, hereby declare as follows:

1. I am over the age of 18 and competent to testify to the facts and matters set forth herein.

2. I am a staff attorney at Immigrant Defenders Law Center, and I am an attorney in good standing of the State Bar of California. I have been practicing law for one and half years and have solely focused on immigration deportation defense for minors and adults in Southern California.

3. I provided pro bono assistance to E.F.S., an individual who was paroled into the United States at a port of entry in 2024 and is now being placed in expedited removal proceedings. On May 23, 2025, I met with E.F.S. in Los Angeles, California, when he was in the custody of U.S. Immigration and Customs Enforcement (ICE), and he recounted to me all the following information.

4. E.F.S. is a national of Honduras who presented for inspection at the port of entry in Eagle Pass, Texas on June 26, 2024. At that time, E.F.S., his wife, and their young son were in

JA206

receipt of an appointment that they made using the Department of Homeland Security's CBP One mobile application. That same day, E.F.S. and his family members were granted parole into the United States until June 25, 2025. At the same time, they were issued a Notice to Appear informing them that they were required to appear in Immigration Court for immigration proceedings at a later date. Attached as Exhibit A to this declaration is a true and correct copy of the Notice to Appear with all personally identifiable information redacted. At that time, E.F.S. and his family's cases were consolidated, and their first Master Calendar Hearing (MCH) was scheduled for May 23, 2025, in Los Angeles Immigration Court.

5. After E.F.S. and his family were paroled into the United States, they stayed in a shelter in San Antonio for twelve days, then moved to San Pedro, California. In advance of their MCH, E.F.S. and his family began working on their application for asylum. They were in the process of finalizing their asylum application when they attended their first hearing in immigration court.

6. On May 23, 2025, E.F.S. and his family appeared without counsel for their first MCH. At that time, a trial attorney from the ICE Office of the Principal Legal Advisor (OPLA) who was representing the government moved to sever E.F.S.'s case from his wife and son's case and then moved the court to dismiss his case. Despite E.F.S.' attempt to oppose the motion to dismiss, the Immigration Judge presiding over the case granted the OPLA attorney's oral motions, stating that OPLA has power to decide how to handle these cases, including if they don't want to continue with the case and want to close the case. The OPLA attorney informed the court on the record that E.F.S. was going to be placed in expedited removal. The Immigration Judge then granted E.F.S.' wife and son a

2

JA207

continuance to seek an attorney, noting that it is customary for respondents to be granted another court date to find an attorney. E.F.S. was not given this opportunity.

7. Upon leaving the courtroom, ICE enforcement officers arrested and detained E.F.S. in front of his wife and 8-year-old son. The officers brought E.F.S. down to ICE's detention processing floor in the building, where they informed him that he would be transported to another detention center and then deported. They asked E.F.S. if he is afraid to return to his home country and E.F.S. replied that he does fear returning to Honduras. The officers provided E.F.S. documents related to participating in a Credible Fear Interview (CFI), and he signed the documents.. ICE officers affirmed that they would send him a notice about the CFI interview, but did not specify when or where the CFI would occur. As part of my pro bono assistance, I have helped prepare E.F.S. for his CFI but he has still not received a CFI.

8. E.F.S. remains in detention at the Northwest Detention Center in Tacoma, Washington.

9. E.F.S. has a fear of returning to his home country, but because his immigration proceedings have been dismissed and he has been placed in expedited removal, he will now not be able to present his asylum claim unless immigration officials decide during his CFI that he has established a credible fear of persecution. Because he is in detention, E.F.S.'s ability to marshal and present evidence and communicate with counsel is significantly diminished. If E.F.S. is deported back to Honduras, he risks being tortured or killed by gang members who extorted, attacked, and threatened to kill him and his family.

10. E.F.S. should have had a meaningful opportunity to present his asylum application, and to oppose the OPLA attorney's motion to sever and dismiss his consolidated case with his

3

JA208

Case 1:25-cv-00872-JMC    Document 22-5    Filed 06/11/25    Page 4 of 7

wife and son. At his first MCH, he was not given the opportunity to enter pleadings, nor state what form of relief he is actively pursuing. Instead, his case was quickly severed from his family's case and dismissed. At the very least, he should have had the opportunity to find legal counsel, as the Immigration Judge permitted for his wife and son. Now, E.F.S. has suffered—and is continuing to suffer—mental and emotional harm from being suddenly separated from his family and detained with threats of deportation.

11. In my experience providing legal representation to individuals like E.F.S., his situation was extremely unusual and therefore deeply troubling to me. First, I have never seen the federal government move to sever and dismiss an individual's removal proceedings in order to separate family members pursuing the same form of relief and to pursue expedited removal of a particular family member. When I met E.F.S.'s wife and 8-year-old son immediately after E.F.S. was arrested and pulled away into ICE's basement office for processing, they were terrified, confused and could barely speak to me. They were in a state of shock, and did not know when or how they would next communicate with E.F.S.

12. Additionally, I have never seen the federal government pursue expedited removal of an individual who has been granted parole into the United States. That individuals like E.F.S. are being targeted and separated from their families in this manner is especially concerning and egregious considering that E.F.S. and his family were granted parole, complied with all of their obligations before EOIR, and were actively pursuing a form of relief when his case was dismissed.

13. As I now provide E.F.S. legal representation, there are significant barriers for me to work with E.F.S. and prepare his own signed declaration. The significant difficulty in obtaining

4

JA209

a signed declaration from E.F.S. at this time is exacerbated by the government's decision

to transfer him to an immigration detention facility in Tacoma, Washington, where I have

experienced repeated delays in establishing a telephone call to confidentially

communicate with E.F.S.

I declare under penalty of perjury and under the laws of the United States that the foregoing
is true and correct to the best of my knowledge.

Executed in Los Angeles, California on June 10, 2025.

Andrew Magno Freire

JA210

# EXHIBIT A

JA211

DEPARTMENT OF HOMELAND SECURITY
**NOTICE TO APPEAR**

0 6 2 6 2 4

| | |
|---|---|
| In removal proceedings under section 240 of the Immigration and Nationality Act: | Event No: ▮▮▮ |
| Subject ID : ▮▮▮    FAMU : ▮▮▮ | |
| SIGMA Event: ▮▮▮ | File No ▮▮▮ |
| In the Matter of: | |

Respondent: ▮▮▮                                    currently residing at:

▮▮▮

(Number, street, city, state and ZIP code)         (Area code and phone number)

[x] You are an arriving alien.

[ ] You are an alien present in the United States who has not been admitted or paroled.

[ ] You have been admitted to the United States, but are removable for the reasons stated below.

The Department of Homeland Security alleges that you:
1. You are not a citizen or national of the United States;
2. You are a native of HONDURAS and a citizen of HONDURAS;
3. You applied for admission on 06/26/2024 at EAGLE PASS (BRIDGE 2), TX, USA;
4. You are an immigrant not in possession of a valid unexpired immigrant visa, reentry permit, border crossing card, or other valid entry document required by the Immigration and Nationality Act; and/or you are an immigrant not in possession of a valid unexpired passport, or other suitable travel document, or document of identity and nationality.

On the basis of the foregoing, it is charged that you are subject to removal from the United States pursuant to the following provision(s) of law:
See Continuation Page Made a Part Hereof

[ ] This notice is being issued after an asylum officer has found that the respondent has demonstrated a credible fear of persecution or torture.

[ ] Section 235(b)(1) order was vacated pursuant to:    [ ] 8CFR 208.30    [ ] 8CFR 235.3(b)(5)(iv)

YOU ARE ORDERED to appear before an immigration judge of the United States Department of Justice at:
300 N LOS ANGELES ST RM 4330,
LOS ANGELES, CA, US 90012

(Complete Address of Immigration Court, including Room Number, if any)

on May 23, 2025    at 08:00 AM    to show why you should not be removed from the United States based on the
(Date)         (Time) ESCAMILLA, Ricardo D

charge(s) set forth above.    CBP OFFICER

(Signature and Title of Issuing Officer)    Digitally Acquired Signature

Date: June 26, 2024    Eagle Pass, TEXAS

(City and State)

DHS Form I-862 (6 /22)    Page 1 of 4

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

COALITION FOR HUMANE IMMIGRANT RIGHTS, *et al.*,

 *Plaintiffs,*

 *v.*

KRISTI NOEM, in her official capacity as Secretary of Homeland Security, *et al.*,

 *Defendants.*

Case No.: 1:25-cv-0872

# DECLARATION OF A. ASHLEY TABADDOR

 I, A. Ashley Tabaddor, upon my personal knowledge, hereby declare as follows:

1. I am over the age of 18 and competent to testify to the facts and matters set forth herein.

2. I am currently a Distinguished Visiting Jurist at Southwestern Law School and an attorney in good standing with the State Bar of California. I have over 25 years of experience in immigration law and policy. From 2005 to 2021, I served as a U.S. Immigration Judge in Los Angeles, California, where I presided over a docket of several thousand cases covering a broad range of issues in removal proceedings. In my tenure I presided over both detained and non-detained dockets. From 2017 to 2021, I served as President of the National Association of Immigration Judges, where I was invited to testify before U.S. House and Senate subcommittees in support of establishing an independent immigration court. From 2021 to 2025, I served as Chief Counsel at the U.S. Citizenship and Immigration Services (USCIS) at the Department of Homeland Security, where I led the agency's legal program and provided counsel on, *inter alia*, immigration policy, law, and adjudications. I have also served as an Assistant U.S. Attorney where I primarily handled civil trial defensive litigation, and a Trial Attorney at the Civil

Division, Office of Immigration Litigation, U.S. Department of Justice where I primarily handled civil appellate litigation.

3. I submit this declaration to provide background, based on my experience and knowledge, on how formal removal proceedings under Section 240 of the Immigration and Nationality Act ("the Act") differ in process and function from expedited removal proceedings under Section 235(b) of the Act, particularly with regard to procedural safeguards and access to legal and humanitarian forms of relief.

**Overview of § 240 Proceedings**

4. Section 240 removal proceedings are formal adversarial civil proceedings conducted before an Immigration Judge ("IJ") within the Executive Office for Immigration Review ("EOIR") in the U.S. Department of Justice. The minimum requirement to be considered for an appointment as an IJ by the Attorney General is seven years in good standing as a licensed attorney.  Once appointed, IJs are expected to exercise independent decision-making authority.  They are responsible for ensuring that the proceedings are fundamentally fair and that due process rights of the parties are protected.

5. Section 240 removal proceedings are initiated with the filing of a charging document, entitled a "notice to appear" ("NTA"), by the Department of Homeland Security ("DHS") against noncitizens, who are the "respondents."  The respondents are entitled to receive written notice of the charges and the factual basis for those charges against them. They are entitled to be represented by counsel of their own choice at no expense to the government. The IJ is responsible for ensuring that the respondent understands the nature of the proceedings and their rights and responsibilities within it.

6. IJs have a duty to fully develop the record in cases before them. That means they have the ability to examine and cross-examine and must ensure that all relevant information is presented and considered. They must actively elicit information from respondents to create a complete record. This is particularly crucial when a respondent in proceedings is not represented by counsel. When that is so, the judge must explain all legal rights, responsibilities of the parties to the proceedings, and legal requirements for proving eligibility for relief from removal and deportation. This duty is mandated so that respondents have a fair opportunity to present their case and are not disadvantaged by

JA214

their self-representation. Failure by an IJ to fully develop the record is presumptively prejudicial error and can be a basis for reversal of the IJ decision on appeal.

7. IJs must fully articulate the basis of their decisions, including indicating the law upon which they are relying, the salient facts presented during the hearing, and their analysis of how these interact, thereby providing adequate justification for the decision and outcome of the proceedings.

8. DHS has the initial burden of proof of showing that the respondent is not a citizen or national of the United States. The respondent is afforded the opportunity to contest the charges, move to suppress evidence, apply for relief from removal, present testimony and evidence, object to DHS evidence and witness testimony, and receive a decision from the IJ. They are entitled to the hearings being interpreted for them in the language they read and understand best. These hearings are all recorded, and transcribed if the decision is appealed. Either party, DHS or the respondent, has a right to appeal an IJ's decision to the Board of Immigration Appeals (BIA), which is an administrative appellate body, also within EOIR.

9. Section 240 removal proceedings are often scheduled over multiple hearings to ensure compliance with the applicable constitutional and statutory framework; it is well-settled that respondents are entitled to due process in removal proceedings. In practice, this structure should allow respondents reasonable time to retain counsel, gather documentation and evidence to present to the court in support of a variety of available applications for relief, including asylum, withholding of removal, protection under the Convention Against Torture, adjustment of status, cancellation of removal, etc. It also permits the opportunity to pursue parallel immigration applications before other components of DHS. For noncitizens with collateral relief (which is relief from removal that can be granted not by an immigration court but by another entity like USCIS) like certain applications for adjustment of status through a U.S. citizen immediate relative or other green card category, Temporary Protected Status ("TPS"), or Special Immigrant Juvenile Status ("SIJS"), they can, in section 240 proceedings, request that the IJ allow them to pursue those applications. An IJ has options to do so, including granting a continuance, administratively closing proceedings, placing the case on the "status docket" to provide time for USCIS to adjudicate the collateral relief, or terminating the case

(Page 218 of Total)

JA215

altogether. In my experience, these options were commonly used by IJs to manage their dockets and to allow noncitizens to apply for relief for which they are eligible.

10. In my experience as an IJ, it was also common for proceedings to be continued at least once, if not more, to permit individuals—particularly minors or vulnerable populations—to secure representation or necessary supporting documents. Where individuals had legal avenues to remain in the United States, such as through family-based petitions, SIJS, VAWA self-petitions, or humanitarian programs, these cases were often continued to avoid premature adjudication in court before those processes could be completed outside of court.

**Overview of Expedited Removal**

11. In contrast, expedited removal under § 235(b) is a process conducted by DHS enforcement officers, not IJs. It applies to certain individuals who are apprehended at ports of entry or shortly after entry into the United States and who are determined to be inadmissible under designated grounds. Individuals subject to expedited removal do not receive a hearing before an IJ, nor are they entitled to seek or be represented by counsel. Moreover, as the term "expedited" implies, such proceedings are conducted on a very compressed schedule and can result in deportation in hours or days.

12. If a person in expedited removal indicates a fear of return, they are referred for a "credible fear" screening interview with an asylum officer who is also an employee of DHS. There is no right to counsel during the credible fear determination. The asylum officer exclusively conducts the interview.  The non-citizen may be accompanied by a trusted individual, who may be counsel, but only if they are able to contact and secure one within a very limited time provided to them (on average 24 to 48 hours). Since this typically takes place in a custodial setting – within CBP or ICE custody – the ability to meet the deadline is severely constrained. Moreover, even when counsel is secured, counsel is not permitted to "present" the individual's case.  Only the asylum officer determines the line and scope of questioning. At most, if present, counsel may be permitted to offer a closing statement.

4

JA216

13. Asylum officers are not required to be attorneys and have no explicit requirement to advise or even explain to an applicant the requirements needed to qualify for asylum or persecution related relief.

14. If the asylum officer finds no credible fear, the individual may request a limited review by an IJ. This review is typically conducted telephonically or via videoconference and focuses solely on whether the credible fear determination was proper. If no fear is expressed, or if the claim is found not credible, removal may occur within hours or days of apprehension. There is no judicial review of the IJ decision here.

15. Additionally, it is my understanding that regulations were promulgated after my departure from the bench to allow individuals who are subjected to § 235(b) expedited removal proceedings, who are then found to possess a credible fear of persecution or torture, to be placed into "streamlined" removal proceedings. These streamlined proceedings, as laid out in 8 C.F.R. § 1240.17, operate on a truncated timeline and are to be completed within 90 to 100 days of the serving of the NTA. 8 C.F.R. § 1240.17(f). These proceedings thus afford fewer opportunities for respondents to secure counsel or pursue collateral forms of relief from removal. The determination of whether the individual's proceedings will be regular § 240 removal proceedings, or the more truncated "streamlined" version, depends on DHS's choice of procedure in whether to have USCIS or EOIR consider the individual's asylum application in the first instance subsequent to a positive credible fear finding.

16. Unlike § 240 proceedings, there is no mechanism within expedited removal for individuals to pursue or even disclose eligibility for other forms of relief, such as pending family-based petitions, special immigration visas, TPS, or adjustment of status under humanitarian or employment-based provisions. The process is not designed to assess those forms of eligibility. As a result, with respect to individuals who would have valid claims for relief from removal – either directly before the IJ or indirectly through collateral relief that the IJ frequently would afford respondents time to pursue outside of court – their placement in expedited removal rather than 240 proceedings can eliminate their ability to secure relief from removal that would otherwise be available to them.

**Key Distinctions Between the Two Processes**

5

JA217

17. The primary distinctions between § 240 and § 235(b) proceedings involve procedural protections, adjudicator neutrality, transparency, and legal opportunities for relief:

    a.  <u>Adjudicator</u>: In § 240 proceedings, an IJ who is sworn to serve as a neutral judge presides over adversarial court proceedings. In § 235 proceedings, DHS officers both initiate and adjudicate the removal order. None of the officers involved in § 235 proceedings, including the adjudication and the credible fear interview, is required to be an attorney or serve as a neutral arbiter of facts.

    b.  <u>Access to Counsel</u>: Respondents in § 240 proceedings are afforded the opportunity to retain counsel and request continuances to secure representation. In expedited removal, there is no statutory or regulatory right to counsel prior to removal and the compressed timeframes and remote locations in which these proceedings take place greatly diminish the opportunities available to non-citizens to locate and retain counsel.

    c.  <u>Opportunity to Prepare and Present Evidence</u>: Section 240 proceedings grant people reasonable time to gather and submit documents, witness testimony, and legal motions. Expedited removal does not. Respondents who have a fear of return may struggle to articulate the full basis of their claims during a single screening interview in 235(b) removal protocols.

    d.  <u>Relief Eligibility</u>: In § 240 removal proceedings, individuals may pursue multiple forms of relief, including asylum and other forms of immigration relief before the IJ, or adjustment of status or SIJS through applications to USCIS (for which the removal proceedings before the IJ would be administratively closed or otherwise continued in some form or fashion). In contrast, those who are subjected to 235(b) expedited removal protocols may avoid removal only by expressing intention to apply for asylum or a fear of persecution or torture and then demonstrating to an immigration officer's satisfaction that they possess a credible fear of persecution. Only by establishing a fear-based reason to avoid expedited removal can an individual be returned to 240 removal proceedings, where they may in theory able to secure lawful permanent residence from the IJ or in collateral proceedings through marriage to a U.S. citizen spouse, or other types of visas such as special immigration visa, or diversity visa, or employment-based visas.

JA218

e. <u>Transparency and Review</u>: § 240 proceedings generate a formal record, including transcripts and written decisions, subject to appellate and judicial review in the circuit court of appeals. Expedited removal results in summary paperwork with no routine oversight or external review unless a credible fear claim is accepted. While review of a negative credible fear finding allows an IJ to accept new evidence, a finding that an applicant did not provide credible testimony to the asylum officer has great weight in the ultimate determination of whether an applicant is found to be a credible witness before the IJ. Witness credibility takes on great importance since many, if not most, asylum applicants are unable to produce specific documentary evidence to support their claims. The lack of recordings or verbatim transcripts of expedited removal interviews greatly increases the possibility of errors.

**Role and Impact of Detention**

18. Separate from the legal framework, a significant distinction between the two processes also lies in the use and impact of detention. In § 240 proceedings, individuals may be detained or released on bond, parole, or their own recognizance, depending on statutory authority and agency discretion.

19. In expedited removal, individuals are typically detained from the time of apprehension through the conclusion of their case.

20. In my experience, detention practically:

    a. Severely restricts or eliminates access to counsel;

    b. Complicates the logistics of gathering evidence or coordinating with family;

    c. Impairs meaningful participation in fear interviews or other screenings;

    d. Can result in withdrawal of legal representation, particularly if the detention location is far from the attorney's base of practice or if attorney-client communication becomes unworkable.

21. In my experience, the combination of short timelines and detention conditions significantly impact the quality and completeness of the information presented by noncitizens in both the credible fear process and expedited removal more broadly.

JA219

I declare under penalty of perjury and under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Executed in Los Angeles, California on June 9, 2025.

A. Ashley Tabaddor

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COALITION FOR HUMANE IMMIGRANT RIGHTS, *et al.*,<br><br>*Plaintiffs,*<br><br>*v.*<br><br>KRISTI NOEM, in her official capacity as Secretary of Homeland Security, *et al.*,<br><br>*Defendants.* | Case No.: 1:25-cv-0872 |

## DECLARATION OF BIANCA L. TORRES

I, Bianca L. Torres, upon my personal knowledge, hereby declare as follows:

1. I am over the age of 18 and competent to testify to the facts and matters set forth herein.

2. I am an attorney at The Law Office of Bianca L. Torres, PLLC, and I am an attorney in good standing of the State Bar of Arizona. I represent E.I.R.M., a national of Mexico who was paroled into the United States at a port of entry in November 2023 and was subsequently targeted and processed for expedited removal. E.I.R.M. is a member of The Coalition for Humane Immigrant Rights (CHIRLA).

3. On November 21, 2023, E.I.R.M. presented at the Calexico, California port of entry. E.I.R.M. and his brother and sister had used the Department of Homeland Security (DHS) CBP One application to schedule an appointment at this port of entry. Following their inspection by U.S. Customs and Border Protection (CBP) personnel, they were each granted parole into the United States that day through November 19, 2025. At the same time, they were each issued a Notice to Appear that required them to appear at the

JA221

Imperial, California Immigration Court on January 9, 2024. Attached as Exhibit A to this declaration is a true and correct copy of E.I.R.M.'s Notice to Appear with all personally identifiable information redacted. E.I.R.M. and his family moved to Tempe, Arizona, and hired me as their attorney. I, as counsel, filed a motion to change the venue of their immigration court proceedings to Phoenix, Arizona.

4. After the three siblings were paroled into the United States, they resided in Tempe, Arizona, and obtained work authorization based on their grants of parole. While in Tempe, E.I.R.M. was working, became engaged to be married to a United States citizen, and had no encounters with law enforcement. E.I.R.M. appeared at all of his Master Calendar Hearings, filed an application for asylum with the immigration court, and was preparing evidence for his final hearing, which was scheduled for April 2, 2026. E.I.R.M. will also be eligible to adjust his status once he is married to his fiancée.

5. On March 7, 2025, while E.I.R.M. and his fiancée were driving to California for a birthday trip for E.I.R.M., they passed through an interior CBP checkpoint in Blythe, California. Although his parole was still valid, CBP personnel arrested and detained E.I.R.M. Although he was initially detained in California, Immigration and Customs Enforcement (ICE) transferred him to the Eloy Detention Center in Eloy, Arizona. On March 14, 2025, DHS filed a motion to change venue to Eloy. On March 26, 2025, the motion to change venue was granted.

6. On April 9, 2025, DHS filed a written motion to dismiss citing 8 C.F.R. § 1239.2(c) and 8 C.F.R. § 239.2(a)(6), stating that the Notice to Appear—the charging document issued to E.I.R.M. when he was first paroled into the country and that initiated his ongoing immigration proceedings—was improvidently issued because, according to DHS,

JA222

E.I.R.M. purportedly qualifies for expedited removal pursuant to INA § 235(b). Attached as Exhibit B to this declaration is a true and correct copy of this motion to dismiss with all personally identifiable information redacted. In my many years of practicing immigration law, and representing individuals paroled into the United States, I have never seen or heard of paroled individuals being placed into Expedited Removal proceedings. This is unusual because normally this is a decision made at the port of entry, not months/years after their interaction with CBP.

7. The Immigration Judge granted DHS's motion on April 11, 2025, without providing the usual ten days for the Respondent to respond. As a result, on April 14, 2025, I filed a motion to reconsider, objecting to the motion to dismiss; the Immigration Judge granted my motion on April 16, 2025, allowing for E.I.R.M. to file a response to DHS's motion. On April 25, 2025, I filed an opposition to DHS's motion and DHS filed a reply on May 1, 2025. That same day, the Immigration Judge granted the government's motion to dismiss E.I.R.M.'s removal proceedings. Attached as Exhibit C to this declaration is a true and correct copy of the immigration judge's May 1, 2025, decision with all personally identifiable information redacted. I have filed an appeal with the Board of Immigration Appeals, which is currently pending. Attached as Exhibit D to this declaration is a true and correct copy of this appeal with all personally identifiable information redacted.

8. While E.I.R.M. was detained at the Eloy Detention Center and before his immigration proceedings had even been dismissed by the immigration court, I received communication from his family advising me that an officer met with him on April 22, 2025, asking whether he was afraid of returning to Mexico. I understood this to mean that

JA223

the government was moving forward with processing him for expedited removal and that they were determining whether to refer him to a U.S. Citizenship and Immigration Services (USCIS) asylum officer for a credible fear interview. I spoke to my client directly and advised him to request my presence at this interview. I also sent an email to the ICE Office in Eloy and the USCIS Asylum Office with my Form G-28 Notice of Appearance as Attorney requesting that I be present for any credible fear interview USCIS provided to my client. Attached as Exhibits E and F to this declaration are true and correct copies of my emails to the ICE Office and the USCIS Asylum office with all personally identifiable information redacted. I did not receive a response from USCIS to my request.

9. On May 1, 2025, my client was escorted by detention officers to visitation for a credible fear interview via telephone. At that time, E.I.R.M. told the USCIS asylum officer that he wanted his attorney present to answer questions. The USCIS officer attempted to contact me with no advance notice but I was unable to answer because I was in Court at that time. The USCIS officer then told my client that they had to proceed with the interview and if he did not answer they would simply find him not credible. As a result, my client answered the questions and at the end of the interview was told he did not have a credible fear of returning to Mexico. He requested that an Immigration Judge review the determination. To this day, he has not received this review or even a copy of the transcript of his credible fear interview.

10. E.I.R.M. has been significantly harmed throughout this process. His mental state has significantly declined knowing that he is being detained for an unspecified amount of time, and he struggles to understand why. He followed the steps to request legal entry

4

JA224

into the United States, timely filed an application for asylum, attended all court dates and was actively preparing for his final hearing, and had both a valid parole document and work permit when he was detained. E.I.R.M. has now been separated from his fiancée and his family for well over two months, with no notion of when, or even if, they will ever be able to be together again. Conditions in the detention center where he has been held are worsening as the number of individuals detained in Eloy has risen significantly. E.I.R.M. shares a small room with another individual. Within his "pod" approximately 50 people share two microwaves and four telephones. The food provided at the Eloy Detention Center is often expired or close to expiration.

11. E.I.R.M. has also been left in limbo with regard to his immigration case. He was told he did not pass his credible fear interview, but he has not seen an Immigration Judge for the review that he requested and is entitled to, even though his interview was conducted more than a month ago. This is unusual because an Immigration Judge review of a negative credible fear interview is supposed to be held within seven days of the negative finding according to the regulations. *See* 8 C.F.R. § 1003.42(e). If E.I.R.M. is scheduled for a review before an Immigration Judge, I, as his attorney, will be present to advocate on his behalf. His ordinary removal proceedings are also ongoing due to the pendency of his appeal to the Board of Immigration Appeals of the court's dismissal order.

12. Additionally, the illegal dismissal of these proceedings so that DHS can subject E.I.R.M. to expedited removal would result in his swift return to Mexico where he would face harm. E.I.R.M. and his brother received various credible death threats from a Mexican cartel that has been designated a Foreign Terrorist Organization group and a Specially Designated Global Terrorist group by the current administration. *See* U.S. Dep't of State,

JA225

*Designation of International Cartels*, Feb. 20, 2025, at

https://www.state.gov/designation-of-international-cartels/. The dismissal has deprived

E.I.R.M. of his right to have his meritorious asylum claim adjudicated in the immigration

court. The limited rights and lack of meaningful process provided in the credible fear

process, including barriers to accessing counsel and evidence since he is detained, are

inadequate to protect E.I.R.M.'s legitimate interests. USCIS should not have conducted

the credible fear interview without making reasonable efforts to allow my presence. One

phone call, without any prior notice, or communication regarding scheduling, is not a

reasonable effort.

13. I, as the legal representative of E.I.R.M., have personal knowledge of the statements

about his immigration history, immigration status, and immigration case. I further declare

that these statements are true and correct to the best of my knowledge.

I declare under penalty of perjury and under the laws of the United States that the foregoing
is true and correct to the best of my knowledge.

Executed in Mesa, Arizona on June 9, 2025.

Bianca L. Torres, Esq.

# EXHIBIT A

JA227

DEPARTMENT OF HOMELAND SECURITY

## NOTICE TO APPEAR

| | |
|---|---|
| **In removal proceedings under section 240 of the Immigration and Nationality Act:** | Event No: ▮▮▮▮▮ |
| Subject ID : ▮▮▮▮   FIN #: ▮▮▮▮ | |
| SIGMA Event: ▮▮   DOB: ▮▮▮ | File No: ▮▮▮▮▮ |
| In the Matter of: ▮▮▮▮ | |

Respondent: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮   currently residing at:

▮▮▮▮▮▮ Yuma, ARIZONA 85365, UNITED STATES OF AMERICA   ▮▮▮▮▮▮

(Number, street, city, state and ZIP code)          (Area code and phone number)

[x] You are an arriving alien.

[ ] You are an alien present in the United States who has not been admitted or paroled.

[ ] You have been admitted to the United States, but are removable for the reasons stated below.

The Department of Homeland Security alleges that you:
1. You are not a citizen or national of the United States;
2. You are a native of MEXICO and a citizen of MEXICO;
3. You applied for admission on 11/21/2023 at CALEXICO, CA, USA;
4. You are an immigrant not in possession of a valid unexpired immigrant visa, reentry permit, border crossing card, or other valid entry document required by the Immigration and Nationality Act;
5. You are an immigrant not in possession of a valid unexpired passport, or other suitable travel document, or document of identity and nationality.

On the basis of the foregoing, it is charged that you are subject to removal from the United States pursuant to the following provision(s) of law:
See Continuation Page Made a Part Hereof

[ ] This notice is being issued after an asylum officer has found that the respondent has demonstrated a credible fear of persecution or torture.

[ ] Section 235(b)(1) order was vacated pursuant to:   [ ] 8CFR 208.30   [ ] 8CFR 235.3(b)(5)(iv)

YOU ARE ORDERED to appear before an immigration judge of the United States Department of Justice at:
2409 LA BRUCHERIE RD,
IMPERIAL, CA, US 92251

*(Complete Address of Immigration Court, including Room Number, if any)*

on  January 9, 2024  at  09:00 AM   to show why you should not be removed from the United States based on the
    *(Date)*           *(Time)*  MARTINEZ, Diana L

charge(s) set forth above.   CBP OFFICER

*(Signature and Title of Issuing Officer)*   *Digitally Acquired Signature*

Date: November 21, 2023   CALEXICO, CALIFORNIA

*(City and State)*

Uploaded on: 11/21/2023 at 02:41:54 PM (Pacific Standard Time) Case 1:23-cv-00872-JMC Document 22-4 Filed 06/11/25 Page 9 of 33

USCA Case #25-5289 Document #2146004 Filed: 11/18/2025 Page 232 of 352

Notice to Respondent

**Warning:** Any statement you make may be used against you in removal proceedings.

**Alien Registration:** This copy of the Notice to Appear served upon you is evidence of your alien registration while you are in removal proceedings. You are required to carry it with you at all times.

**Representation:** If you so choose, you may be represented in this proceeding, at no expense to the Government, by an attorney or other individual authorized and qualified to represent persons before the Executive Office for Immigration Review, pursuant to 8 CFR 1003.16. Unless you so request, no hearing will be scheduled earlier than ten days from the date of this notice, to allow you sufficient time to secure counsel. A list of qualified attorneys and organizations who may be available to represent you at no cost will be provided with this notice.

**Conduct of the hearing:** At the time of your hearing, you should bring with you any affidavits or other documents that you desire to have considered in connection with your case. If you wish to have the testimony of any witnesses considered, you should arrange to have such witnesses present at the hearing. At your hearing you will be given the opportunity to admit or deny any or all of the allegations in the Notice to Appear, including that you are inadmissible or removable. You will have an opportunity to present evidence on your own behalf, to examine any evidence presented by the Government, to object, on proper legal grounds, to the receipt of evidence and to cross examine any witnesses presented by the Government. At the conclusion of your hearing, you have a right to appeal an adverse decision by the immigration judge. You will be advised by the immigration judge before whom you appear of any relief from removal for which you may appear eligible including the privilege of voluntary departure. You will be given a reasonable opportunity to make any such application to the immigration judge.

**One-Year Asylum Application Deadline:** If you believe you may be eligible for asylum, you must file a Form I-589, Application for Asylum and for Withholding of Removal. The Form I-589, Instructions, and information on where to file the Form can be found at **www.uscis.gov/i-589.** Failure to file the Form I-589 within one year of arrival may bar you from eligibility to apply for asylum pursuant to section 208(a)(2)(B) of the Immigration and Nationality Act.

**Failure to appear:** You are required to provide the Department of Homeland Security (DHS), in writing, with your full mailing address and telephone number. You must notify the Immigration Court and the DHS immediately by using Form EOIR-33 whenever you change your address or telephone number during the course of this proceeding. You will be provided with a copy of this form. Notices of hearing will be mailed to this address. If you do not submit Form EOIR-33 and do not otherwise provide an address at which you may be reached during proceedings, then the Government shall not be required to provide you with written notice of your hearing. If you fail to attend the hearing at the time and place designated on this notice, or any date and time later directed by the Immigration Court, a removal order may be made by the immigration judge in your absence, and you may be arrested and detained by the DHS.

**Mandatory Duty to Surrender for Removal:** If you become subject to a final order of removal, you must surrender for removal to your local DHS office, listed on the internet at **http://www.ice.gov/contact/ero,** as directed by the DHS and required by statute and regulation. Immigration regulations at 8 CFR 1241.1 define when the removal order becomes administratively final. If you are granted voluntary departure and fail to depart the United States as required, fail to post a bond in connection with voluntary departure, or fail to comply with any other condition or term in connection with voluntary departure, you must surrender for removal on the next business day thereafter. If you do not surrender for removal as required, you will be ineligible for all forms of discretionary relief for as long as you remain in the United States and for ten years after your departure or removal. This means you will be ineligible for asylum, cancellation of removal, voluntary departure, adjustment of status, change of nonimmigrant status, registry, and related waivers for this period. If you do not surrender for removal as required, you may also be criminally prosecuted under section 243 of the Immigration and Nationality Act.

**U.S. Citizenship Claims:** If you believe you are a United States citizen, please advise the DHS by calling the ICE Law Enforcement Support Center toll free at (855) 448-6903.

**Sensitive locations:** To the extent that an enforcement action leading to a removal proceeding was taken against Respondent at a location described in 8 U.S.C. § 1229(e)(1), such action complied with 8 U.S.C. § 1367.

## Request for Prompt Hearing

To expedite a determination in my case, I request this Notice to Appear be filed with the Executive Office for Immigration Review as soon as possible. I waive my right to a 10-day period prior to appearing before an immigration judge and request my hearing be scheduled.

Before: _____     _____
                                                                                                  *(Signature of Respondent)*

                                                                                                  Date: _____

_____
*(Signature and Title of Immigration Officer)*

## Certificate of Service

This Notice To Appear was served on the respondent by me on <u>November 21, 2023</u>, in the following manner and in compliance with section 239(a)(1) of the Act.

[x] in person   [ ] by certified mail, returned receipt # _____ requested   [ ] by regular mail
[ ] Attached is a credible fear worksheet.
[x] Attached is a list of organization and attorneys which provide free legal services.

The alien was provided oral notice in the _____ **SPANISH** _____ language of the time and place of his or her hearing and of the consequences of failure to appear as provided in section 240(b)(7) of the Act.

                                                              **MARTINEZ, Diana L**
█████████████                                  **CBP OFFICER**
*Digitally Acquired Signature*                                                                    *Digitally Acquired Signature*
*(Signature of Respondent if Personally Served)*                     *(Signature and Title of officer)*

Privacy Act Statement

**Authority:**

The Department of Homeland Security through U.S. Immigration and Customs Enforcement (ICE), U.S. Customs and Border Protection (CBP), and U.S. Citizenship and Immigration Services (USCIS) are authorized to collect the information requested on this form pursuant to Sections 103, 237, 239, 240, and 290 of the Immigration and Nationality Act (INA), as amended (8 U.S.C. 1103, 1229, 1229a, and 1360), and the regulations issued pursuant thereto.

**Purpose:**

You are being asked to sign and date this Notice to Appear (NTA) as an acknowledgement of personal receipt of this notice. This notice, when filed with the U.S. Department of Justice's (DOJ) Executive Office for Immigration Review (EOIR), initiates removal proceedings. The NTA contains information regarding the nature of the proceedings against you, the legal authority under which proceedings are conducted, the acts or conduct alleged against you to be in violation of law, the charges against you, and the statutory provisions alleged to have been violated. The NTA also includes information about the conduct of the removal hearing, your right to representation at no expense to the government, the requirement to inform EOIR of any change in address, the consequences for failing to appear, and that generally, if you wish to apply for asylum, you must do so within one year of your arrival in the United States. If you choose to sign and date the NTA, that information will be used to confirm that you received it, and for recordkeeping.

**Routine Uses:**

For United States Citizens, Lawful Permanent Residents, or individuals whose records are covered by the Judicial Redress Act of 2015 (5 U.S.C. § 552a note), your information may be disclosed in accordance with the Privacy Act of 1974, 5 U.S.C. § 552a(b), including pursuant to the routine uses published in the following DHS systems of records notices (SORN): DHS/USCIS/ICE/CBP-001 Alien File, Index, and National File Tracking System of Records, DHS/USCIS-007 Benefit Information System, DHS/ICE-011 Criminal Arrest Records and Immigration Enforcement Records (CARIER), and DHS/ICE-003 General Counsel Electronic Management System (GEMS), and DHS/CBP-023 Border Patrol Enforcement Records (BPER). These SORNs can be viewed at https://www.dhs.gov/system-records-notices-sorns. When disclosed to the DOJ's EOIR for immigration proceedings, this information that is maintained and used by DOJ is covered by the following DOJ SORN: EOIR-001, Records and Management Information System, or any updated or successor SORN, which can be viewed at https://www.justice.gov/opcl/doj-systems-records. Further, your information may be disclosed pursuant to routine uses described in the abovementioned DHS SORNs or DOJ EOIR SORN to federal, state, local, tribal, territorial, and foreign law enforcement agencies for enforcement, investigatory, litigation, or other similar purposes.

For all others, as appropriate under United States law and DHS policy, the information you provide may be shared internally within DHS, as well as with federal, state, local, tribal, territorial, and foreign law enforcement; other government agencies; and other parties for enforcement, investigatory, litigation, or other similar purposes.

**Disclosure:**

Providing your signature and the date of your signature is voluntary. There are no effects on you for not providing your signature and date; however, removal proceedings may continue notwithstanding the failure or refusal to provide this information.

EOIR — 3 of 4

DHS Form I-862 (6/22)

JA230

**U.S. Department of Homeland Security**                    Continuation Page for Form $^{I862}$

| Alien's Name | File Number | Date |
|---|---|---|
| ▮▮▮▮▮▮ | SIGMA Event: ▮▮▮ | November 21, 2023 |
| | Event No: ▮▮▮ | |

ON THE BASIS OF THE FOREGOING, IT IS CHARGED THAT YOU ARE SUBJECT TO REMOVAL FROM THE
UNITED STATES PURSUANT TO THE FOLLOWING PROVISION(S) OF LAW:
=================================================================================

212(a)(7)(A)(i)(I) of the Immigration and Nationality Act (Act), as amended, as an
immigrant who, at the time of application for admission, is not in possession of a valid
unexpired immigrant visa, reentry permit, border crossing card, or other valid entry
document required by the Act, and a valid unexpired passport, or other suitable travel
document, or document of identity and nationality as required under the regulations issued
by the Attorney General under section 211(a) of the Act.

| Signature | Title |
|---|---|
| ~~signature~~  MARTINEZ, Diana L | CBP OFFICER |

*Digitally Acquired Signature*

# EXHIBIT B

Uploaded on: 04/09/2025 at 10:30:52 PM (Mountain Standard Time) Base City: ELO    Page 13 of 33
Case 1:25-cv-00872-JMC    Document 22-7    Filed 06/11/25    Page 13 of 33
USCA Case #25-5289    Document #2146004    Filed: 11/18/2025    Page 236 of 352

Corina Almeida
Chief Counsel

**DETAINED**

Derek Faraldo
Assistant Chief Counsel
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security
1705 E. Hanna Rd.
Eloy, AZ 85131

**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**IMMIGRATION COURT**
**ELOY, ARIZONA**

| | |
|---|---|
| _____ ) | |
| In the Matter of: ) | |
| ) | |
| ██████████████████ ) | File No.: ███████ |
| ) | |
| In removal proceedings ) | |
| _____ ) | |

Immigration Judge: ORECHWA, NICOLAS          Next Hearing: 4/15/2025

**DEPARTMENT OF HOMELAND SECURITY**
**MOTION TO DISMISS WITHOUT PREJUDICE**

**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**IMMIGRATION COURT**
**ELOY, ARIZONA**

In the Matter of:                              )
                                               )
                                               )
▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆          )          File No.: ▆▆▆▆▆▆▆▆
                                               )
In removal proceedings                         )
_____          )

**DEPARTMENT OF HOMELAND SECURITY**
**MOTION TO DISMISS WITHOUT PREJUDICE**

Pursuant to 8 C.F.R. § 1239.2(c) and 8 C.F.R. § 239.2(a)(6), the Department of

Homeland Security (the Department) hereby moves to dismiss the removal proceedings on the

Notice to Appear (NTA), issued on or about November 21, 2023, because the NTA was

improvidently issued as the respondent qualifies for expedited removal pursuant to Immigration

and Nationality Act § 235(b).

**WHEREFORE**, for the reasons stated above, the Department requests this Court grant

its motion to dismiss without prejudice.

Respectfully submitted on this 9th day of April 2025.

DEREK A
FARALDO
Digitally signed
by DEREK A
FARALDO
Date: 2025.04.09
22:28:53 -07'00'

_____
Derek Faraldo
Assistant Chief Counsel

Corina E. Almeida
Chief Counsel
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security

Uploaded on: 04/09/2025 at 10:30:52 PM (Mountain Standard Time) Base City: ELO    Page 15 of 33
Case 1:25-cv-00872-JMC    Document 22-7    Filed 06/11/25    Page 15 of 33
USCA Case #25-5289    Document #2146004    Filed: 11/18/2025    Page 238 of 352

### CERTIFICATE OF SERVICE

I hereby certify that this Department of Homeland Security Motion to Dismiss Without Prejudice and any attached documents was/were served upon the respondent (or his/her representative):

☐ by placing a true copy in a sealed envelope, with postage fully to be prepaid and causing the same to be mailed by first class mail to the address set forth below:

☐ by placing a true copy in a sealed envelope into the inter/intra-office mail at Choose an item., to the address set forth below:

☐ by e-service or email to the address set forth below:

☐ by UPS to the address set forth below:

████████████████████

███████████
ELOY, AZ  85131

☒ through the EOIR Courts and Appeals System (ECAS), in which both parties are participating. Therefore, no separate service was completed.

DEREK A FARALDO
Digitally signed by DEREK A FARALDO
Date: 2025.04.09 22:28:22 -07'00'

Date:  April 9, 2025

_____
Assistant Chief Counsel

EOIR — 3 of 4

**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**IMMIGRATION COURT**
**ELOY, ARIZONA**

In the matter of: ███████████████████        A Number: ████████

**ORDER OF THE IMMIGRATION JUDGE**

Upon consideration of **Department of Homeland Security's Motion To Dismiss Without Prejudice,** it is **HEREBY ORDERED** that the motion be

(  ) **GRANTED**    (  )  **DENIED** because:

   (  )   DHS does not oppose the motion.
   (  )   The respondent does not oppose the motion.
   (  )   A response to the motion has not been filed with the court.
   (  )   Good cause has been established for the motion.
   (  )   The court agrees with the reasons stated in the opposition to the motion.
   (  )   The motion is untimely per _____.
   (  )   Other:

Deadlines:

   (  )   The application(s) for relief must be filed by _____.
   (  )   The respondent must comply with DHS biometrics instructions by _____.
   (  )   The Department/Respondent/Both must file their documents by _____.


_____          _____
Date                                                              Immigration Judge


Certificate of Service
This document was served by:          [  ]  Mail          [  ]  Personal Service
To:  [  ] Alien  [  ] Alien c/o Custodial Officer    [  ] Alien's Atty/Rep  [  ] DHS
Date: _____    By: Court Staff _____

EOIR – 4 of 4

# EXHIBIT



**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**ELOY IMMIGRATION COURT**

Respondent Name:

███████████████████

To:

Torres, Bianca L
1910 S. Stapley Dr.
Suite 221
Mesa, AZ 85204

A-Number:

███████████

Riders:
In Removal Proceedings
Initiated by the Department of Homeland Security
Date:
05/01/2025

**ORDER ON MOTION TO DISMISS**

☐ The Respondent ☑ the Department of Homeland Security ☐ the parties jointly has/have filed a motion to dismiss these proceedings under 8 CFR 1239.2(c). The moving party has given notice of the motion to the non-moving party and the court has provided the non-moving party with an opportunity to respond. The motion is ☑ opposed ☐ unopposed.

After considering the facts and circumstances, the immigration court orders that the motion to dismiss is:

☑ Granted without prejudice
☐ Denied

Further explanation:

The court considered the respondent's opposition filed April 25, 2025, and DHS's reply filed May 1, 2025. The dismissal is without prejudice and the respondent may still seek relief from removal.

IT IS SO ORDERED.

JA238

Immigration Judge: ORECHWA, NICOLAS 05/01/2025

**Certificate of Service**

This document was served:

Via: [ M ] Mail | [ P ] Personal Service | [ E ] Electronic Service | [ U ] Address Unavailable

To: [ ] Noncitizen | [ ] Noncitizen c/o custodial officer | [ E ] Noncitizen's atty/rep. | [ E ] DHS

Respondent Name : ██████████████████ | A-Number : ████████

Riders:

Date: 05/01/2025 By: HARCHUT, MARGARET ANN, Court Staff

# EXHIBIT

Filed at BIA on: 05/02/2025 at 06:59:32 PM (Eastern Daylight Time)  Case #:25-cv-008072-JMS   Document #:22-7   Filed 06/11/25   Page 21 of 33

USCA Case #25-5289   Document #2146004   Filed: 11/18/2025   Page 244 of 352

OMB# 1125-0002

**U.S. Department of Justice**
Executive Office for Immigration Review
*Board of Immigration Appeals*

**Notice of Appeal from a Decision of an Immigration Judge**

---

*Staple Check or Money Order Here. Include Name(s) and "A" Number(s) on the face of the check or money order.*

**1.** List Name(s) and "A" Number(s) of all Respondent(s)/Applicant(s):

For Official Use Only

⚠ **WARNING:** Names and "A" Numbers of **everyone** appealing the Immigration Judge's decision must be written in item #1. The names and "A" numbers listed will be the only ones considered to be the subjects of the appeal.

**2.** I am ☑ the Respondent/Applicant   ☐ DHS-ICE *(Mark only one box.)*

**3.** I am ☑ DETAINED   ☐ NOT DETAINED *(Mark only one box.)*

**4.** My last hearing was at Eloy, Arizona _____ *(Location, City, State)*

---

**5.** **What decision are you appealing?**

*Mark only one box below. If you want to appeal more than one decision, you must use more than one Notice of Appeal (Form EOIR-26).*

☐ I am filing an appeal from the Immigration Judge's decision *in **merits** proceedings* (example: removal, deportation, exclusion, asylum, etc.) dated_____.

☐ I am filing an appeal from the Immigration Judge's decision *in **bond** proceedings* dated _____. (For DHS use only: Did DHS invoke the automatic stay provision before the Immigration Court? ☐ Yes. ☐ No.)

☑ I am filing an appeal from the Immigration Judge's decision ***denying a motion to reopen or a motion to reconsider*** dated May 1, 2025 , granting motion to dismiss

*(Please attach a copy of the Immigration Judge's decision that you are appealing.)*

Form EOIR-26
Revised Sept. 2019

Filed at BIA on: 05/02/2025 at 06:50:32 PM (Eastern Daylight Time)

Case 1:25-cv-00872-JMC    Document 22-7    Filed 06/11/25    Page 22 of 33
USCA Case #25-5289    Document #2146004    Filed: 11/18/2025    Page 245 of 352

6.

**State in detail the reason(s) for this appeal. Please refer to the General Instructions at item F for further guidance. You are not limited to the space provided below; use more sheets of paper if necessary. Write your name(s) and "A" number(s) on every sheet.**

The Immigration Judge erred in granting the Department of Homeland Security's motion to dismiss without prejudice.

Subjecting Respondent to expedited removal would violate Congress's carefully crafted statutory scheme for processing noncitizen applicants for admission. INA § 235(b) provides Department with several choices for how to process a noncitizen whom it alleges is an inadmissible applicant for admission, but there is no statutory authority for Department to later reverse that choice.

*(Attach additional sheets if necessary)*

 **WARNING:** You must clearly explain the specific facts and law on which you base your appeal of the Immigration Judge's decision. The Board may summarily dismiss your appeal if it cannot tell from this Notice of Appeal, or any statements attached to this Notice of Appeal, why you are appealing.

7. Do you desire oral argument before the Board of Immigration Appeals? ☐ Yes ☑ No

8. Do you intend to file a separate written brief or statement after filing this Notice of Appeal? ☑ Yes ☐ No

 **WARNING:** If you mark "Yes" in item #7, you should also include in your statement above why you believe your case warrants review by a three-member panel. The Board ordinarily will not grant a request for oral argument unless you also file a brief.

If you mark "Yes" in item #8, you will be expected to file a written brief or statement after you receive a briefing schedule from the Board. The Board may summarily dismiss your appeal if you do not file a brief or statement within the time set in the briefing schedule..

9.

| Sign Here ➡ | X _____ | 05/02/2025 |
|---|---|---|
| | Signature of Person Appealing *(or attorney or representative)* | Date |

Form EOIR-26
Revised Sept. 2019

EOIR 2 of 5

| 10. | Mailing Address of Respondent(s)/Applicant(s) | 11. | Mailing Address of Attorney or Representative for the Respondent(s)/Applicant(s) |
|---|---|---|---|

**10.**

Mailing Address of Respondent(s)/Applicant(s)

███████████████

(Name)

███████████████

(Street Address)

_____

(Apartment or Room Number)

Eloy, AZ 85131

(City, State, Zip Code)

_____

(Telephone Number)

**11.**

Mailing Address of Attorney or Representative for the Respondent(s)/Applicant(s)

Bianca L. Torres

(Name)

1910 S. Stapley Dr.,

(Street Address)

Suite 221

(Suite or Room Number)

Mesa AZ 85204

(City, State, Zip Code)

_____

(Telephone Number)

**NOTE:** You must notify the Board within five (5) working days if you move to a new address or change your telephone number. You must use the Change of Address Form/Board of Immigration Appeals (Form EOIR-33/BIA).

**NOTE:** If an attorney or representative signs this appeal for you, he or she must file *with this appeal*, a Notice of Entry of Appearance as Attorney or Representative Before the Board of Immigration Appeals (Form EOIR-27).

**12.**

## PROOF OF SERVICE (You Must Complete This)

I Bianca L. Torres _____ mailed or delivered a copy of this Notice of Appeal

(Name)

on May 1, 2025 _____ to DHS/ICE _____

(Date)                              (Opposing Party)

at VIA ECAS _____

(Number and Street, City, State, Zip Code)

| SIGN HERE ➡ | X _~~signature~~_ |
|---|---|
| | Signature |

**NOTE:** If you are the Respondent or Applicant, the "Opposing Party" is the Assistant Chief Counsel of DHS - ICE.

**WARNING:** If you do not complete this section properly, your appeal will be rejected or dismissed.

**WARNING:** If you do not attach the fee or a completed Fee Waiver Request (Form EOIR-26A) to this appeal, your appeal may be rejected or dismissed.

### HAVE YOU?

☐ Read all of the General Instructions
☐ Provided all of the requested information
☐ Completed this form in English
☐ Provided a certified English translation for all non-English attachments
☐ Signed the form

☐ Served a copy of this form and all attachments on the opposing party
☐ Completed and signed the Proof of Service
☐ Attached the required fee or Fee Waiver Request
☐ If represented by attorney or representative, attach a completed and signed EOIR-27

**Page 3 of 3**

Form EOIR-26
Revised Sept. 2019

EOIR 3 of 5

JA243



**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**ELOY IMMIGRATION COURT**

Respondent Name:

A-Number:

To:

Riders:
In Removal Proceedings
Torres, Bianca L
1910 S. Stapley Dr.
Suite 221
Mesa, AZ 85204
Initiated by the Department of Homeland Security
Date:
05/01/2025

## ORDER ON MOTION TO DISMISS

☐ The Respondent ☑ the Department of Homeland Security ☐ the parties jointly has/have
filed a motion to dismiss these proceedings under 8 CFR 1239.2(c). The moving party has given
notice of the motion to the non-moving party and the court has provided the non-moving party
with an opportunity to respond. The motion is ☑ opposed ☐ unopposed.

After considering the facts and circumstances, the immigration court orders that the motion to
dismiss is:

☑ Granted without prejudice
☐ Denied

Further explanation:

The court considered the respondent's opposition filed April 25, 2025, and DHS's reply filed
May 1, 2025. The dismissal is without prejudice and the respondent may still seek relief from
removal.

IT IS SO ORDERED.

EOIR 4 of 5

JA244

Filed at BIA on: 05/02/2025 at 06:59:32 PM (Eastern Daylight Time)
USCA Case #25-5289    Document #2146004    Filed: 11/18/2025    Page 248 of 352
Case 1:25-cv-00872-JMF    Document 22-7    Filed 06/11/25    Page 25 of 33

Immigration Judge: ORECHWA, NICOLAS 05/01/2025

## Certificate of Service

This document was served:

Via: [ M ] Mail | [ P ] Personal Service | [ E ] Electronic Service | [ U ] Address Unavailable

To: [ ] Noncitizen | [ ] Noncitizen c/o custodial officer | [ E ] Noncitizen's atty/rep. | [ E ] DHS

Respondent Name : ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ | A-Number : ▮▮▮▮▮▮▮

Riders:

Date: 05/01/2025 By: HARCHUT, MARGARET ANN, Court Staff

# EXHIBIT E

JA246

 Gmail

**Bianca Torres <bianca.torres@torrespllc.com>**

███████████████████

3 messages

**Bianca Torres** <bianca.torres@torrespllc.com>                Wed, Apr 23, 2025 at 3:10 PM
To: "EAZ-Outreach," <EAZ-Outreach@ice.dhs.gov>

Good Afternoon,
My client ████████████████ and he has informed me he is being scheduled for a Credible Fear
Interview.  Attached is my G28, that should already be on file.  I would like to be present for this interview.  Please
coordinate with me for scheduling.  Additionally, I wanted to inform ICE that my motion to reconsider the dismissal of his
case was granted please see attached.  Thus, his case is not yet closed before an Immigration Judge.

Lastly, my client indicated he signed some documents a couple of weeks ago.  May I have a copy of what he has signed.

Best,
Bianca L. Torres, Esq.

Attorney
1910 S. Stapley Dr., Suite 221,
Mesa AZ 85204 | (480) 626 2077

**2 attachments**

📄 **New G28 ████████████.pdf**
311K

📄 **Order on Motin to Reconsider.pdf**
460K

**EAZ-Outreach,** <EAZ-Outreach@ice.dhs.gov>                Thu, Apr 24, 2025 at 11:21 AM
To: Bianca Torres <bianca.torres@torrespllc.com>

Received and forwarded to Deportation Officer Peru.

Thank you,

EAZ-Outreach

**From:** Bianca Torres <bianca.torres@torrespllc.com>
**Sent:** Wednesday, April 23, 2025 3:11 PM
**To:** EAZ-Outreach, <EAZ-Outreach@ice.dhs.gov>
**Subject:** ████████████████

JA247

**CAUTION:** This email originated from outside of DHS. DO NOT click links or open attachments unless you recognize and/or trust the sender. Please use the Cofense Report Phishing button to report. If the button is not present, click here and follow instructions.

[Quoted text hidden]

2 attachments

 New G28 ████████████.pdf
311K

 Order on Motin to Reconsider.pdf
460K

---

**EAZ-Outreach,** <EAZ-Outreach@ice.dhs.gov>                    Thu, Apr 24, 2025 at 4:30 PM
To: Bianca Torres <bianca.torres@torrespllc.com>

Good day,

You must reach out to USCIS if you like to be present in the Credible Fear interview, as USCIS conducts those interviews. Also, your client decline to sign M-444 Information about Credible Fear Interview, I will be submitting it as a refused to sign in order to proceed with scheduling his interview.

Respectfully,

*Ema V. Peru*

*Deportation Officer*

*Phoenix Field Office, Eloy Detention Center*

*Enforcement and Removal Operations*

**U.S. Immigration and Customs Enforcement**

*Cell: 520-840-6330*

Warning: This document is UNCLASSIFIED//FOR OFFICIAL USE ONLY (U//FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official. No portion of this report should be furnished to the media, either in written or verbal form.

---

**From:** Bianca Torres <bianca.torres@torrespllc.com>
**Sent:** Wednesday, April 23, 2025 3:11 PM
**To:** EAZ-Outreach, <EAZ-Outreach@ice.dhs.gov>
**Subject:** ████████████

**CAUTION:** This email originated from outside of DHS. DO NOT click links or open attachments unless you recognize and/or trust the sender. Please use the Cofense Report Phishing button to report. If the button is not present, click here and follow instructions.

Good Afternoon,

[Quoted te t hidden]

 

Bianca Torres <bianca.torres@torrespllc.com>

**3 messages**

**Peru, Ema V** <Ema.V.Peru@ice.dhs.gov>                    Thu, Apr 24, 2025 at 4:28 PM
To: "bianca.torres@torrespllc.com" <bianca.torres@torrespllc.com>

Good day,

You must reach out to USCIS if you like to be present in the Credible Fear interview, as USCIS conducts credible fear interviews. Also, your client declines to sign M-444 Information about Credible Fear Interview, I will be submitting it as a refused to sign to proceed with scheduling his interview.

Respectfully,

*Ema V. Peru*

*Deportation Officer*

*Phoenix Field Office, Eloy Detention Center*

*Enforcement and Removal Operations*

**U.S. Immigration and Customs Enforcement**

*Cell: 520-840-6330*

**Warning: This document is UNCLASSIFIED//FOR OFFICIAL USE ONLY (U//FOUO)**It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official. **No portion of this report should be furnished to the media, either in written or verbal form.**

**Bianca Torres** <bianca.torres@torrespllc.com>                    Fri, Apr 25, 2025 at 11:20 AM
To: "Peru, Ema V" <Ema.V.Peru@ice.dhs.gov>

Thank you for the information, I sent an email to the LA Asylum Office.  Do you know if there is another way I need to notify USCIS?

My client stated he did sign some documents but it was a couple weeks back, could you please share with me the documents he did sign?

Best,

JA250

Bianca L. Torres, Esq.



Attorney
1910 S  Stapley Dr , Suite 221,
Mesa AZ 85204 | (480) 626-2077

[Quoted text hidden]

---

**Bianca Torres** <bianca.torres@torrespllc.com>                    Tue, Apr 29, 2025 at 4:19 PM
To: "Peru, Ema V" <Ema.V.Peru@ice.dhs.gov>

Hello again,

I am following up on my previous email. My client had an attempted interview but requested my presence.  I have not had
any communication with USCIS regarding his CFI.  I sent my G28 to the LA Asylum Office email box, do you have
anyther point of contact for USCIS CFI's?


Best,
Bianca L. Torres, Esq.



Attorney
1910 S  Stapley Dr , Suite 221,
Mesa AZ 85204 | (480) 626-2077

[Quoted text hidden]

JA251

# EXHIBIT

 Gmail

**Bianca Torres <bianca.torres@torrespllc.com>**

---

## G28 for pending CFI interview
1 message

---

**Bianca Torres** <bianca.torres@torrespllc.com>                                    Fri, Apr 25, 2025 at 11:17 AM
To: losangelesasylum@uscis.dhs.gov

Good Afternoon,
My client ██████████████ has informed me he is being scheduled for a Credible Fear Interview.
Attached is my G28.  I would like to be present for this interview.  Please coordinate with me for scheduling.  Additionally, I wanted to inform USCIS/ICE that my motion to reconsider the dismissal of his case was granted please see attached.
Thus, his case is not yet closed before an Immigration Judge and he is still in removal proceedings.


Best,
Bianca L. Torres, Esq.



Attorney
1910 S  Stapley Dr , Suite 221,
Mesa AZ 85204 | (480) 626-2077

---

**2 attachments**

📄 **Order on Motin to Reconsider.pdf**
460K

📄 **g28** ██████████ **.pdf**
344K

---

JA253

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COALITION FOR HUMANE IMMIGRANT RIGHTS, *et al.*, <br><br>    *Plaintiffs,* <br><br>    *v.* <br><br> KRISTI NOEM, in her official capacity as Secretary of Homeland Security, *et al.*, <br><br>    *Defendants.* | Case No.: 1:25-cv-0872 |

## DECLARATION OF CESAR O. MONTOYA, ESQ.

I, Cesar O. Montoya, Esq., upon my personal knowledge, hereby declare as follows:

1.  I am over the age of 18 and competent to testify to the facts and matters set forth herein.

2.  I am an attorney in good standing of the State Bar of California, and I have been practicing immigration law for over six years. I am the managing attorney at MCM Law Group, P.C. based in Santa Ana, California.

3.  In my practice, I represent numerous noncitizens, including individuals paroled into the United States under various humanitarian processes.

4.  My clients include Cuban nationals who entered the U.S. legally, have complied with all reporting and legal obligations, and are eligible to adjust their status to lawful permanent resident status under the Cuban Adjustment Act (CAA).

### D.R.A.

5.  One such client is D.R.A., a 63-year-old Cuban national who presented at the Calexico port of entry on June 28, 2024, for inspection after making a CBP One appointment.

JA254

D.R.A. was inspected and paroled into the country on June 28, 2024 and was at that time

issued a Notice to Appear requiring her to appear before the Santa Ana Immigration

Court on December 9, 2024. Attached as **Exhibit A** is a true and correct copy of the

Notice to Appear that D.R.A. received with all personally identifiable information

redacted.

6.  After D.R.A. was paroled into the United States, she resided in California and obtained

work authorization based on her parole status. She has been working as a housekeeper.

D.R.A. has no criminal history and has met all obligations under the law. She is also

prima facie eligible to adjust her status under the CAA as a result of her parole into the

country more than one year ago.

7.  On May 20, 2025, D.R.A. attended a scheduled master calendar hearing at the

Immigration Court in Santa Ana, California. This was her second master calendar

hearing; the first took place on April 22, 2025, which she also attended. I represented her

at the May 20, 2025, hearing. Another master calendar hearing is currently scheduled for

June 13, 2025, at 1:00 PM.

8.  At that time, the Immigration and Customs Enforcement (ICE) Trial Attorney did not file

or make any oral motion to dismiss the case. The respondent, D.R.A., was not served

with any written motion to dismiss prior to or at the hearing. There was no indication

from the ICE Trial Attorney that the respondent would be taken into custody or subject to

expedited removal following the hearing. The Immigration Judge did not issue any order

dismissing the proceedings.

2

JA255

9.  Immediately after leaving the courtroom, however, D.R.A. was detained outside the court by ICE officers. D.R.A. has not received a Form I-860, which is the Notice and Order of Expedited Removal.

10. As of this time, DHS has not filed any motion to dismiss the case.

11. D.R.A. was inspected and paroled into the country on June 28, 2024. Although her parole was initially for a longer period, her current Form I-94 indicates an "Admit Until Date" of April 18, 2025. Attached as **Exhibit B** to this declaration is a true and correct copy of D.R.A.'s I-94, last checked on June 9, 2025, with all personally identifiable information redacted. I understand this to mean that D.R.A.'s parole status has been terminated.

12. A motion for custody redetermination has since been filed on her behalf and is currently pending before the Immigration Court.

13. My belief that D.R.A. is being processed for expedited removal—or is at imminent risk of being processed for expedited removal—is based on the fact that she was detained following the dismissal of her case, without being issued a new Notice to Appear, being given a bond hearing, or being provided any further information or documentation, and in light of widespread reports that other paroled individuals like D.R.A. have been detained and placed in expedited removal after their removal proceedings were dismissed.

14. D.R.A. has a well-founded fear of returning to Cuba, where she was previously subjected to political persecution due to her outspoken opposition to the regime. If she is processed for expedited removal, she will be unable to present her asylum claim before an Immigration Judge unless she first establishes credible fear during a detention interview.

(Page 259 of Total)

JA256

15. Furthermore, being placed in expedited removal will prevent her from obtaining other forms of relief for which she is eligible, including adjustment of status under the CAA, to which she remains prima facie eligible due to her parole into the United States.

16. In addition to these procedural barriers, D.R.A. suffers from age-related medical conditions, including hypertension, chronic joint pain, dizziness, and mental health challenges such as anxiety and depression, all exacerbated by detention. The lack of adequate medical and mental health care in detention, combined with limited due process protections and restricted access to counsel and evidence, poses a serious risk to her well-being.

**M.A.R.**

17. A second client of mine facing this treatment is M.A.R., a 46-year-old Cuban national who presented at the San Ysidro port of entry on March 14, 2024, for inspection. He entered with travel authorization and was also paroled into the United States. As with D.R.A., M.A.R.'s current I-94 shows an "Admit Until" date of April 18, 2025, which I similarly understand to mean that his parole status was terminated early. Attached as **Exhibit C** to this declaration is a true and correct copy of M.A.R.'s I-94, last checked on June 9, 2025, with all personally identifiable information redacted. M.A.R. did not receive any notice indicating that his parole would be revoked or terminated.

18. At the same time as his parole, he was issued a Notice to Appear requiring him to appear before the Miami Immigration Court on March 11, 2025. Attached as **Exhibit D** to this declaration is a true and correct copy of M.A.R.'s Notice to Appear with all personally identifiable information redacted. After relocating to California, the client filed a motion

4

JA257

to change venue, which was granted on March 11, 2025, prior to his scheduled hearing. A

new hearing date was set for March 28, 2025, before the Santa Ana Immigration Court.

19. After M.A.R. was paroled into the United States, he resided in Florida and then moved to

California. He obtained work authorization based on his parole status and has been

working as a houseman. On February 28, 2025, he married a U.S. citizen. M.A.R. has no

criminal history and has met all obligations under the law. He is also prima facie eligible

to adjust his status under the CAA as a result of his parole into the country more than one

year ago.

20. M.A.R. has filed an application for adjustment of status. Attached as **Exhibit E** is a true

and correct copy of the Form I-797C, Notice of Action, reflecting the biometrics

appointment for his I-485 application, which was stamped on April 17, 2025, the date on

which he completed his biometrics.

21. On May 28, 2025, M.A.R. attended a scheduled master calendar hearing at the

Immigration Court in Santa Ana, California. This was his first master calendar hearing. I

did not represent him at this appearance, as he had been handling his immigration matters

on his own without issue. However, shortly after this hearing, he was unexpectedly

arrested.

22. Prior to the hearing, M.A.R. had filed several pro se motions to terminate proceedings, on

February 21, 2025, March 6, 2025, and the most recent on May 23, 2025, seeking to

continue his adjustment under the CAA. DHS had opposed these motions.

23. Shortly after the master calendar hearing, DHS filed a written motion to dismiss the case.

M.A.R. was never provided a copy of this motion prior to or during the hearing. At no

JA258

point did the ICE Trial Attorney inform M.A.R. or the court that dismissal would result in immediate detention or expedited removal.

24. The motion to dismiss was granted during the pendency of our motion to change venue and before we could file a custody redetermination request on his behalf.

25. Immediately after exiting the courtroom, M.A.R. was detained by ICE officers. He was not served with a Form I-860 (Notice and Order of Expedited Removal) at the time of detention or afterward.

26. There is no indication that M.A.R. was referred for a credible fear interview (CFI) prior to the hearing, during the hearing, or since being taken into custody.

27. My belief that M.A.R. is being processed for expedited removal is that he was taken into custody without warning following dismissal of proceedings and has not been issued a new charging document, notice of bond hearing, or any other paperwork indicating that removal proceedings are ongoing. ICE has also failed to provide any formal explanation for his current detention.

28. Based on my 6 years of immigration law practice, this situation is highly irregular. It is not typical practice to detain parolees for expedited removal immediately after dismissal of their removal proceedings without due notice, service of documents, or termination of parole status. This process departs significantly from what I have previously encountered.

29. Although he had previously been placed in Section 240 removal proceedings and was attending court as scheduled, M.A.R. was unexpectedly arrested and processed for expedited removal after appearing at his first master calendar hearing on May 28, 2025. As a result, he was denied the opportunity to fully present his case before an Immigration Judge with the benefit of due process and legal representation. Like many Cuban

(Page 262 of Total)

JA259

nationals who voice opposition or resist state control, he has faced threats, harassment, and retaliation from Cuban authorities. He fears he will be punished if returned, a fear that is credible and well-founded given the Cuban government's documented history of targeting dissidents. M.A.R. is now only able to seek asylum or related protection if he can establish a credible fear during a high-stakes, time-limited interview while in detention, without meaningful access to counsel, community support, or the evidence necessary to support his claim.

30. It is of additional concern that M.A.R. has not yet been given a fear screening or referred to U.S. Citizenship and Immigration Services for a credible fear interview. And to the extent D.R.A. is similarly being detained for expedited removal purposes, it is of concern that she has not yet been given such a fear screening or CFI referral.

31. This abrupt shift to expedited removal proceedings not only deprives respondents of due process but also eliminates the ability of Cuban nationals like D.R.A. and M.A.R. to request practical procedural safeguards available in Section 240 proceedings, such as the use of the status docket, administrative closure, or continuances to allow USCIS sufficient time to adjudicate their adjustment applications under the CAA.

32. Although Cuban nationals in 240 proceedings may not be able to adjust directly before the Immigration Judge, the availability of these procedural tools is essential in facilitating relief through USCIS. The use of the status docket, in particular, was reaffirmed through recent EOIR policy guidance reinstated by Director Sirce Owen.

33. Expedited removal forecloses access to these safeguards entirely, replacing the neutral adjudication process of the immigration court with a swift, opaque process in which no Immigration Judge is involved unless a credible fear is established. M.A.R. has filed an

JA260

application for adjustment of status under the CAA. In addition, by virtue of his marriage to a U.S. citizen, he is eligible to file an I-130 Petition for Alien Relative and an I-485 Application to Register Permanent Residence or Adjust Status.

34. Because of the government's new policy or practice of arresting noncitizens—including parolees who are prima facie eligible for immigration relief—in or near immigration court facilities to process them for expedited removal, many of my clients are now afraid to attend court hearings. This has eroded their trust in the legal system and threatens to undermine their due process right to fundamentally fair removal proceedings.

35. Additionally, this new policy or practice further destabilizes vulnerable communities and undermines the statutory scheme Congress enacted to provide pathways to lawful immigration status, including for Cuban nationals under the CAA.

36. I reviewed the contents of this declaration pertaining to D.R.A. over the phone with her and she confirmed that the statements about her immigration history, status, and case are all true and correct to the best of her knowledge. I reviewed the contents of this declaration pertaining to M.A.R. over the phone with him and he confirmed that the statements about his immigration history, status, and case are all true and correct to the best of his knowledge. Because my clients are now detained and I am only able to reach them by phone occasionally, it is not reasonably possible to obtain a signed declaration directly from them.

I declare under penalty of perjury and under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Executed in Santa Ana, California on June 9, 2025.

_Cesar Montoya_
CESAR O. MONTOYA

8

JA261

# EXHIBIT A

JA262

# DEPARTMENT OF HOMELAND SECURITY
## NOTICE TO APPEAR

Event No: ▇▇▇▇▇▇▇▇

**In removal proceedings under section 240 of the Immigration and Nationality Act:**

Subject ID : ▇▇▇▇     FIN #: ▇▇▇▇

SIGMA Event: ▇▇▇     DOB: ▇▇▇▇     File No: ▇▇▇▇

In the Matter of: ▇▇▇▇▇▇▇▇

Respondent: ▇▇▇▇▇▇▇▇     currently residing at:

▇▇▇▇▇▇ Santa Ana, CALIFORNIA 92703, UNITED STATES OF AMERICA     ▇▇▇▇▇

(Number, street, city, state and ZIP code)     (Area code and phone number)

[x] You are an arriving alien.

[ ] You are an alien present in the United States who has not been admitted or paroled.

[ ] You have been admitted to the United States, but are removable for the reasons stated below.

The Department of Homeland Security alleges that you:
1. You are not a citizen or national of the United States;
2. You are a native of CUBA and a citizen of CUBA;
3. You applied for admission on 06/28/2024 at CALEXICO, CA, USA;
4. You are an immigrant not in possession of a valid unexpired immigrant visa, reentry permit, border crossing card, or other valid entry document required by the Immigration and Nationality Act;
5.          and/or
6. You are an immigrant not in possession of a valid unexpired passport, or other suitable travel document, or document of identity and nationality.

On the basis of the foregoing, it is charged that you are subject to removal from the United States pursuant to the following provision(s) of law:
See Continuation Page Made a Part Hereof

[ ] This notice is being issued after an asylum officer has found that the respondent has demonstrated a credible fear of persecution or torture.

[ ] Section 235(b)(1) order was vacated pursuant to:     [ ] 8CFR 208.30     [ ] 8CFR 235.3(b)(5)(iv)

YOU ARE ORDERED to appear before an immigration judge of the United States Department of Justice at:
1241 E DYER RD STE 200,
SANTA ANA, CA, US 92705

*(Complete Address of Immigration Court, including Room Number, if any)*

on December 9, 2024 at 08:30 AM     to show why you should not be removed from the United States based on the
    (Date)          (Time)     PEREZ, Jesus D

charge(s) set forth above.     CBP OFFICER

    *(Signature and Title of Issuing Officer)*     *Digitally Acquired Signature*

Date: June 28, 2024     Calexico, CALIFORNIA

    *(City and State)*

EOIR — 1 of 4

Uploaded on: 06/28/2021 at 01:48:28 PM (Pacific Daylight Time) Case 1:25-cv-00872-JMC Document 22-6 Filed 06/11/25 Page 11 of 26

USCA Case #25-5289 Document #2146007 Notice to Respondent Filed: 11/18/2025 Page 267 of 352

**Warning:** Any statement you make may be used against you in removal proceedings.

**Alien Registration:** This copy of the Notice to Appear served upon you is evidence of your alien registration while you are in removal proceedings. You are required to carry it with you at all times.

**Representation:** If you so choose, you may be represented in this proceeding, at no expense to the Government, by an attorney or other individual authorized and qualified to represent persons before the Executive Office for Immigration Review, pursuant to 8 CFR 1003.16. Unless you so request, no hearing will be scheduled earlier than ten days from the date of this notice, to allow you sufficient time to secure counsel. A list of qualified attorneys and organizations who may be available to represent you at no cost will be provided with this notice.

**Conduct of the hearing:** At the time of your hearing, you should bring with you any affidavits or other documents that you desire to have considered in connection with your case. If you wish to have the testimony of any witnesses considered, you should arrange to have such witnesses present at the hearing. At your hearing you will be given the opportunity to admit or deny any or all of the allegations in the Notice to Appear, including that you are inadmissible or removable. You will have an opportunity to present evidence on your own behalf, to examine any evidence presented by the Government, to object, on proper legal grounds, to the receipt of evidence and to cross examine any witnesses presented by the Government. At the conclusion of your hearing, you have a right to appeal an adverse decision by the immigration judge. You will be advised by the immigration judge before whom you appear of any relief from removal for which you may appear eligible including the privilege of voluntary departure. You will be given a reasonable opportunity to make any such application to the immigration judge.

**One-Year Asylum Application Deadline:** If you believe you may be eligible for asylum, you must file a Form 1-589, Application for Asylum and for Withholding of Removal. The Form 1-589, Instructions, and information on where to file the Form can be found at www.uscis.gov/i-589. Failure to file the Form 1-589 within one year of arrival may bar you from eligibility to apply for asylum pursuant to section 208(a)(2)(B) of the Immigration and Nationality Act.

**Failure to appear:** You are required to provide the Department of Homeland Security (DHS), in writing, with your full mailing address and telephone number. You must notify the Immigration Court and the DHS immediately by using Form EOIR-33 whenever you change your address or telephone number during the course of this proceeding. You will be provided with a copy of this form. Notices of hearing will be mailed to this address. If you do not submit Form EOIR-33 and do not otherwise provide an address at which you may be reached during proceedings, then the Government shall not be required to provide you with written notice of your hearing. If you fail to attend the hearing at the time and place designated on this notice, or any date and time later directed by the Immigration Court, a removal order may be made by the immigration judge in your absence, and you may be arrested and detained by the DHS.

**Mandatory Duty to Surrender for Removal:** If you become subject to a final order of removal, you must surrender for removal to your local DHS office, listed on the internet at http://www.ice.gov/contact/ero, as directed by the DHS and required by statute and regulation. Immigration regulations at 8 CFR 1241.1 define when the removal order becomes administratively final. If you are granted voluntary departure and fail to depart the United States as required, fail to post a bond in connection with voluntary departure, or fail to comply with any other condition or term in connection with voluntary departure, you must surrender for removal on the next business day thereafter. If you do not surrender for removal as required, you will be ineligible for all forms of discretionary relief for as long as you remain in the United States and for ten years after your departure or removal. This means you will be ineligible for asylum, cancellation of removal, voluntary departure, adjustment of status, change of nonimmigrant status, registry, and related waivers for this period. If you do not surrender for removal as required, you may also be criminally prosecuted under section 243 of the Immigration and Nationality Act.

**U.S. Citizenship Claims:** If you believe you are a United States citizen, please advise the DHS by calling the ICE Law Enforcement Support Center toll free at (855) 448-6903.

**Sensitive locations:** To the extent that an enforcement action leading to a removal proceeding was taken against Respondent at a location described in 8 U.S.C. § 1229(e)(1), such action complied with 8 U.S.C. § 1367.

Upon information and belief, the language that the alien understands is SPANISH

---

### Request for Prompt Hearing

To expedite a determination in my case, I request this Notice to Appear be filed with the Executive Office for Immigration Review as soon as possible. I waive my right to a 10-day period prior to appearing before an immigration judge and request my hearing be scheduled.
Before:

_____
(Signature of Respondent)

Date: _____

_____
(Signature and Title of Immigration Officer)

---

### Certificate of Service

This Notice To Appear was served on the respondent by me on **June 28, 2024** , in the following manner and in compliance with section 239(a)(1) of the Act.

[x] in person    [ ] by certified mail, returned receipt # _____ requested    [ ] by regular mail

[ ] Attached is a credible fear worksheet.

[x] Attached is a list of organization and attorneys which provide free legal services.

The alien was provided oral notice in the **SPANISH** language of the time and place of his or her hearing and of the consequences of failure to appear as provided in section 240(b)(7) of the Act.

PEREZ, Jesus D

_____    CBP OFFICER
_Digitally Acquired Signature_    _Digitally Acquired Signature_
(Signature of Respondent if Personally Served)    (Signature and Title of officer)

EOIR — 2 of 4

Uploaded on: 06/28/2024: at 01:49:28 PM (Pacific Daylight Time) Base City: SNC
Case 1:25-cv-06872-JMC Document 22-8 Filed 06/11/25 Page 12 of 26
USCA Case #25-5289 Document #2148004 Filed: 11/18/2025 Page 268 of 352

**Privacy Act Statement**

**Authority:**

The Department of Homeland Security through U.S. Immigration and Customs Enforcement (ICE), U.S. Customs and Border Protection (CBP), and U.S. Citizenship and Immigration Services (USCIS) are authorized to collect the information requested on this form pursuant to Sections 103, 237, 239, 240, and 290 of the Immigration and Nationality Act (INA), as amended (8 U.S.C. 1103, 1229, 1229a, and 1360), and the regulations issued pursuant thereto.

**Purpose:**

You are being asked to sign and date this Notice to Appear (NTA) as an acknowledgement of personal receipt of this notice. This notice, when filed with the U.S. Department of Justice's (DOJ) Executive Office for Immigration Review (EOIR), initiates removal proceedings. The NTA contains information regarding the nature of the proceedings against you, the legal authority under which proceedings are conducted, the acts or conduct alleged against you to be in violation of law, the charges against you, and the statutory provisions alleged to have been violated. The NTA also includes information about the conduct of the removal hearing, your right to representation at no expense to the government, the requirement to inform EOIR of any change in address, the consequences for failing to appear, and that generally, if you wish to apply for asylum, you must do so within one year of your arrival in the United States. If you choose to sign and date the NTA, that information will be used to confirm that you received it, and for recordkeeping.

**Routine Uses:**

For United States Citizens, Lawful Permanent Residents, or individuals whose records are covered by the Judicial Redress Act of 2015 (5 U.S.C. § 552a note), your information may be disclosed in accordance with the Privacy Act of 1974, 5 U.S.C. § 552a(b), including pursuant to the routine uses published in the following DHS systems of records notices (SORN): DHS/USCIS/ICE/CBP-001 Alien File, Index, and National File Tracking System of Records, DHS/USCIS-007 Benefit Information System, DHS/ICE-011 Criminal Arrest Records and Immigration Enforcement Records (CARIER), and DHS/ICE-003 General Counsel Electronic Management System (GEMS), and DHS/CBP-023 Border Patrol Enforcement Records (BPER). These SORNs can be viewed at https://www.dhs.gov/system-records-notices-sorns. When disclosed to the DOJ's EOIR for immigration proceedings, this information that is maintained and used by DOJ is covered by the following DOJ SORN: EOIR-001, Records and Management Information System, or any updated or successor SORN, which can be viewed at https://www.justice.gov/opcl/doj-systems-records. Further, your information may be disclosed pursuant to routine uses described in the abovementioned DHS SORNs or DOJ EOIR SORN to federal, state, local, tribal, territorial, and foreign law enforcement agencies for enforcement, investigatory, litigation, or other similar purposes.

For all others, as appropriate under United States law and DHS policy, the information you provide may be shared internally within DHS, as well as with federal, state, local, tribal, territorial, and foreign law enforcement; other government agencies; and other parties for enforcement, investigatory, litigation, or other similar purposes.

**Disclosure:**

Providing your signature and the date of your signature is voluntary. There are no effects on you for not providing your signature and date; however, removal proceedings may continue notwithstanding the failure or refusal to provide this information.

**U.S. Department of Homeland Security**    Continuation Page for Form    I862

| Alien's Name | File Number | Date |
|---|---|---|
| | SIGMA Event: | **June 28, 2024** |
| | Event No: | |

ON THE BASIS OF THE FOREGOING, IT IS CHARGED THAT YOU ARE SUBJECT TO REMOVAL FROM THE
UNITED STATES PURSUANT TO THE FOLLOWING PROVISION(S) OF LAW:
=================================================================================

212(a)(7)(A)(i)(I) of the Immigration and Nationality Act (Act), as amended, as an
immigrant who, at the time of application for admission, is not in possession of a valid
unexpired immigrant visa, reentry permit, border crossing card, or other valid entry
document required by the Act, and a valid unexpired passport, or other suitable travel
document, or document of identity and nationality as required under the regulations issued
by the Attorney General under section 211(a) of the Act.

| Signature | Title |
|---|---|
| **PEREZ, Jesus D** | **CBP OFFICER** |

*Digitally Acquired Signature*

—————  4  of  —————  4  Pages

# EXHIBIT B

For: ███████████████████████



## U.S. Customs and Border Protection
### Securing America's Borders

## Most Recent I-94

**Note to employers, local, state or federal agency granting benefits:**
Please visit the CBP I-94 Public Website and click on the tab for "Get Most Recent I-94" to perform a search for the applicant to confirm that the biographic and travel information displayed on this I-94 printout matches the "Get Most Recent I-94" returned results for this applicant. I-94 FAQs: (https://i94.cbp.dhs.gov/I94/#/faq)

**Admission I-94 Record Number:** ████████████████

**Arrival/Issued Date:** 2024 June 28

**Class of Admission:** DT

**Admit Until Date:** 2025 April 18

**Details provided on the I-94 Information form:**

**Last/Surname:** ████████████████

**First (Given) Name:** ████████

**Birth Date:** ████████████████

**Document Number:** ████████████

**Country of Citizenship:** Cuba

---

▶ Effective April 26, 2013, DHS began automating the admission process. An alien lawfully admitted or paroled into the U.S. is no longer required to be in possession of a preprinted Form I-94. A record of admission printed from the CBP website constitutes a lawful record of admission. See 8 CFR § 1.4(d).

▶ If an employer, local, state or federal agency requests admission information, present your admission (I-94) number along with any additional required documents requested by that employer or agency.

Note: For security reasons, we recommend that you close your browser after you have finished retrieving your I-94 number.

**OMB No. 1651-0111**
**Expiration Date: 06/30/2025**

# EXHIBIT

JA270

For: ███████████████████



## Most Recent I-94

**Note to employers, local, state or federal agency granting benefits:**
Please visit the CBP I-94 Public Website and click on the tab for "Get Most Recent I-94" to perform a search for the applicant to confirm that the biographic and travel information displayed on this I-94 printout matches the "Get Most Recent I-94" returned results for this applicant. I-94 FAQs: (https://i94.cbp.dhs.gov/I94/#/faq)

**Admission I-94 Record Number:** ███████████

**Arrival/Issued Date:** 2024 March 14

**Class of Admission:** DT

**Admit Until Date:** 2025 April 18

**Details provided on the I-94 Information form:**

**Last/Surname:** ███████████

**First (Given) Name:** ████████

**Birth Date:** ████████

**Document Number:** ████████

**Country of Citizenship:** Cuba

▶ Effective April 26, 2013, DHS began automating the admission process. An alien lawfully admitted or paroled into the U.S. is no longer required to be in possession of a preprinted Form I-94. A record of admission printed from the CBP website constitutes a lawful record of admission. See 8 CFR § 1.4(d).

▶ If an employer, local, state or federal agency requests admission information, present your admission (I-94) number along with any additional required documents requested by that employer or agency.

JA271

▶ Note: For security reasons, we recommend that you close your browser after you have finished retrieving your I-94 number.

OMB No. 1651-0111
Expiration Date: 06/30/2025

# EXHIBIT

COPY

Case 1:25-cv-00872-JMC   Document 22-8   Filed 06/11/25   Page 21 of 26
USCA Case #25-5289   Document #2146004   Filed: 11/18/2025   Page 277 of 352

DEPARTMENT OF HOMELAND SECURITY
## NOTICE TO APPEAR

In removal proceedings under section 240 of the Immigration and Nationality Act:

Event No: ▮▮▮▮▮▮▮▮

Subject ID : ▮▮▮▮▮   FIN #: ▮▮▮▮▮

SIGMA Event: ▮▮▮▮   DOB: ▮▮▮▮▮▮▮

In the Matter of: ▮▮▮▮▮▮▮▮

File No: ▮▮▮▮▮▮

Respondent: ▮▮▮▮▮▮▮▮ _____ currently residing at:

▮▮▮▮▮   HIALEAH,FLORIDA 33010,UNITED STATES OF AMERICA   ▮▮▮▮▮

(Number, street, city, state and ZIP code)                (Area code and phone number)

[x]  You are an arriving alien.

[ ]  You are an alien present in the United States who has not been admitted or paroled.

[ ]  You have been admitted to the United States, but are removable for the reasons stated below.

The Department of Homeland Security alleges that you:
1. You are not a citizen or national of the United States;
2. You are a native of Cuba and a citizen of Cuba;
3. On or about March 14, 2024, you applied for admission into the United States from Mexico at the San Ysidro Port of Entry;
4. You are an immigrant not in possession of a valid unexpired immigrant visa, reentry permit, border crossing card, or other valid entry document required by the Immigration and Nationality Act.

On the basis of the foregoing, it is charged that you are subject to removal from the United States pursuant to the following provision(s) of law:
See Continuation Page Made a Part Hereof

[ ]  This notice is being issued after an asylum officer has found that the respondent has demonstrated a credible fear of persecution or torture.

[ ]  Section 235(b)(1) order was vacated pursuant to:      [ ] 8CFR 208.30      [ ] 8CFR 235.3(b)(5)(iv)

YOU ARE ORDERED to appear before an immigration judge of the United States Department of Justice at:
333 S MIAMI AVE STE 700,
MIAMI, FL, US 331301904

*(Complete Address of Immigration Court, including Room Number, if any)*

on March 11, 2025 ____ at 08:30 AM ____ to show why you should not be removed from the United States based on the
    *(Date)*               *(Time)*  REYES, CAR07559

charge(s) set forth above.           CBP OFFICER

*(Signature and Title of Issuing Officer)*          *Digitally Acquired Signature*

Date: March 14, 2024        SAN YSIDRO, CALIFORNIA

*(City and State)*

## Notice to Respondent

**Warning:** Any statement you make may be used against you in removal proceedings.

**Alien Registration:** This copy of the Notice to Appear served upon you is evidence of your alien registration while you are in removal proceedings. You are required to carry it with you at all times.

**Representation:** If you so choose, you may be represented in this proceeding, at no expense to the Government, by an attorney or other individual authorized and qualified to represent persons before the Executive Office for Immigration Review, pursuant to 8 CFR 1003.16. Unless you so request, no hearing will be scheduled earlier than ten days from the date of this notice, to allow you sufficient time to secure counsel. A list of qualified attorneys and organizations who may be available to represent you at no cost will be provided with this notice.

**Conduct of the hearing:** At the time of your hearing, you should bring with you any affidavits or other documents that you desire to have considered in connection with your case. If you wish to have the testimony of any witnesses considered, you should arrange to have such witnesses present at the hearing. At your hearing you will be given the opportunity to admit or deny any or all of the allegations in the Notice to Appear, including that you are inadmissible or removable. You will have an opportunity to present evidence on your own behalf, to examine any evidence presented by the Government, to object, on proper legal grounds, to the receipt of evidence and to cross examine any witnesses presented by the Government. At the conclusion of your hearing, you have a right to appeal an adverse decision by the immigration judge. You will be advised by the immigration judge before whom you appear of any relief from removal for which you may appear eligible including the privilege of voluntary departure. You will be given a reasonable opportunity to make any such application to the immigration judge.

**One-Year Asylum Application Deadline:** If you believe you may be eligible for asylum, you must file a Form I-589, Application for Asylum and Withholding of Removal. The Form I-589, Instructions, and information on where to file the Form can be found at **www.uscis.gov/i-589.** Failure to file the Form I-589 within one year of arrival may bar you from eligibility to apply for asylum pursuant to section 208(a)(2)(B) of the Immigration and Nationality Act.

**Failure to appear:** You are required to provide the Department of Homeland Security (DHS), in writing, with your full mailing address and telephone number. You must notify the Immigration Court and the DHS immediately by using Form EOIR-33 whenever you change your address or telephone number during the course of this proceeding. You will be provided with a copy of this form. Notices of hearing will be mailed to this address. If you do not submit Form EOIR-33 and do not otherwise provide an address at which you may be reached during proceedings, then the Government shall not be required to provide you with written notice of your hearing. If you fail to attend the hearing at the time and place designated on this notice, or any date and time later directed by the Immigration Court, a removal order may be made by the immigration judge in your absence, and you may be arrested and detained by the DHS.

**Mandatory Duty to Surrender for Removal:** If you become subject to a final order of removal, you must surrender for removal to your local DHS office, listed on the internet at **http://www.ice.gov/contact/ero,** as directed by the DHS and required by statute and regulation. Immigration regulations at 8 CFR 1241.1 define when the removal order becomes administratively final. If you are granted voluntary departure and fail to depart the United States as required, fail to post a bond in connection with voluntary departure, or fail to comply with any other condition or term in connection with voluntary departure, you must surrender for removal on the next business day thereafter. If you do not surrender for removal as required, you will be ineligible for all forms of discretionary relief for as long as you remain in the United States and for ten years after your departure or removal. This means you will be ineligible for asylum, cancellation of removal, voluntary departure, adjustment of status, change of nonimmigrant status, registry, and related waivers for this period. If you do not surrender for removal as required, you may also be criminally prosecuted under section 243 of the Immigration and Nationality Act.

**U.S. Citizenship Claims:** If you believe you are a United States citizen, please advise the DHS by calling the ICE Law Enforcement Support Center toll free at (855) 448-6903.

**Sensitive locations:** To the extent that an enforcement action leading to a removal proceeding was taken against Respondent at a location described in 8 U.S.C. § 1229(e)(1), such action complied with 8 U.S.C. § 1367.

---

## Request for Prompt Hearing

To expedite a determination in my case, I request this Notice to Appear be filed with the Executive Office for Immigration Review as soon as possible. I waive my right to a 10-day period prior to appearing before an immigration judge and request my hearing be scheduled.

Before: _____

_____
(Signature of Respondent)

_____
(Signature and Title of Immigration Officer)

Date: _____

---

### Certificate of Service

This Notice To Appear was served on the respondent by me on ___March 14, 2024___ , in the following manner and in compliance with section 239(a)(1) of the Act.

[x] in person  [ ] by certified mail, returned receipt # _____ requested  [ ] by regular mail

[ ] Attached is a credible fear worksheet.

[x] Attached is a list of organization and attorneys which provide free legal services.

The alien was provided oral notice in the _____SPANISH_____ language of the time and place of his or her hearing and of the consequences of failure to appear as provided in section 240(b)(7) of the Act.

_____           REYES, CAR07559
Digitally Acquired Signature                      CBP OFFICER
(Signature of Respondent if Personally Served)     (Signature and Title of officer)     Digitally Acquired Signature

**Privacy Act Statement**

**Authority:**

The Department of Homeland Security through U.S. Immigration and Customs Enforcement (ICE), U.S Customs and Border Protection (CBP), and U.S. Citizenship and Immigration Services (USCIS) are authorized to collect the information requested on this form pursuant to Sections 103, 237, 239, 240, and 290 of the Immigration and Nationality Act (INA), as amended (8 U.S.C. 1103, 1229, 1229a, and 1360), and the regulations issued pursuant thereto.

**Purpose:**

You are being asked to sign and date this Notice to Appear (NTA) as an acknowledgement of personal receipt of this notice. This notice, when filed with the U.S. Department of Justice's (DOJ) Executive Office for Immigration Review (EOIR), initiates removal proceedings. The NTA contains information regarding the nature of the proceedings against you, the legal authority under which proceedings are conducted, the acts or conduct alleged against you to be in violation of law, the charges against you, and the statutory provisions alleged to have been violated. The NTA also includes information about the conduct of the removal hearing, your right to representation at no expense to the government, the requirement to inform EOIR of any change in address, the consequences for failing to appear, and that generally, if you wish to apply for asylum, you must do so within one year of your arrival in the United States. If you choose to sign and date the NTA, that information will be used to confirm that you received it, and for recordkeeping.

**Routine Uses:**

For United States Citizens, Lawful Permanent Residents, or individuals whose records are covered by the Judicial Redress Act of 2015 (5 U.S.C. § 552a note), your information may be disclosed in accordance with the Privacy Act of 1974, 5 U.S.C. § 552a(b), including pursuant to the routine uses published in the following DHS systems of records notices (SORN): DHS/USCIS/ICE/CBP-001 Alien File, Index, and National File Tracking System of Records, DHS/USCIS-007 Benefit Information System, DHS/ICE-011 Criminal Arrest Records and Immigration Enforcement Records (CARIER), and DHS/ICE-003 General Counsel Electronic Management System (GEMS), and DHS/CBP-023 Border Patrol Enforcement Records (BPER). These SORNs can be viewed at https://www.dhs.gov/system-records-notices-sorns. When disclosed to the DOJ's EOIR for immigration proceedings, this information that is maintained and used by DOJ is covered by the following DOJ SORN: EOIR-001, Records and Management Information System, or any updated or successor SORN, which can be viewed at https://www.justice.gov/opcl/doj-systems-records. Further, your information may be disclosed pursuant to routine uses described in the abovementioned DHS SORNs or DOJ EOIR SORN to federal, state, local, tribal, territorial, and foreign law enforcement agencies for enforcement, investigatory, litigation, or other similar purposes.

For all others, as appropriate under United States law and DHS policy, the information you provide may be shared internally within DHS, as well as with federal, state, local, tribal, territorial, and foreign law enforcement; other government agencies; and other parties for enforcement, investigatory, litigation, or other similar purposes.

**Disclosure:**

Providing your signature and the date of your signature is voluntary. There are no effects on you for not providing your signature and date; however, removal proceedings may continue notwithstanding the failure or refusal to provide this information.

DHS Form I-862 (6/22)

**Page 3 of** 4

U.S. Department of Homeland Security                 Continuation Page for Form I862

| Alien's Name | File Number | Date |
|---|---|---|
| ▮▮▮▮▮▮▮▮ | SIGMA Event: ▮▮▮▮▮ | March 14, 2024 |
| | Event No: ▮▮▮▮▮ | |

ON THE BASIS OF THE FOREGOING, IT IS CHARGED THAT YOU ARE SUBJECT TO REMOVAL FROM THE
UNITED STATES PURSUANT TO THE FOLLOWING PROVISION(S) OF LAW:
=================================================================================

212(a)(7)(A)(i)(I) of the Immigration and Nationality Act (Act), as amended, as an
immigrant who, at the time of application for admission, is not in possession of a valid
unexpired immigrant visa, reentry permit, border crossing card, or other valid entry
document required by the Act, and a valid unexpired passport, or other suitable travel
document, or document of identity and nationality as required under the regulations issued
by the Attorney General under section 211(a) of the Act.

| Signature | Title |
|---|---|
| *[signature]* REYES, CAR07559 | CBP OFFICER |

*Digitally Acquired Signature*

Form I-831 Continuation Page (Rev. 08/01/07)
(Page 280 of Total)

JA277

# EXHIBIT E

JA278

Department of Homeland Security
U.S. Citizenship and Immigration Services



## THIS NOTICE DOES NOT GRANT ANY IMMIGRATION STATUS OR BENEFIT.

| ASC Appointment Notice | CASE TYPE I485 - APPLICATION TO REGISTER PERMANENT RESIDENCE OR ADJUST STATUS | | NOTICE DATE 03/27/2025 |
|---|---|---|---|
| APPLICATION/PETITION/REQUEST NUMBER | | USCIS A# | CODE 3 |
| ACCOUNT NUMBER | TCR | SERVICE CENTER NBC | PAGE 1 of 2 |

INDIO CA 92201

PROCESSING STAMP

ASC SITE CODE ___ XLI

BIOMETRICS QA REVIEW BY:
6003 00 ON APR 17 2025

TENPRINTS QA REVIEW BY: APR 17 2025
60 6800 ON

**READ THIS ENTIRE NOTICE CAREFULLY.** To process your application, petition, or request, U.S. Citizenship and Immigration Services (USCIS) must collect your biometrics. Please appear at the Application Support Center (ASC) at the date and time specified. TO REQUEST THAT USCIS RESCHEDULE YOUR APPOINTMENT, SEE THE INSTRUCTIONS AT THE BOTTOM OF THIS NOTICE. IF YOU FAIL TO APPEAR AS SCHEDULED, USCIS WILL CONSIDER YOUR BENEFIT REQUEST ABANDONED AND IT MAY BE DENIED.

| APPLICATION SUPPORT CENTER | DATE AND TIME OF APPOINTMENT |
|---|---|
| USCIS RIVERSIDE | 04/17/2025 |
| 3812 La Sierra Avenue | 11:00AM |
| Riverside CA 92505 | |

WHEN YOU APPEAR AT THE ASC FOR BIOMETRICS SUBMISSION, YOU MUST BRING:

1. **THIS APPOINTMENT NOTICE.** If you received multiple ASC notices, bring **all** notices to your first appointment, and

2. **PHOTO IDENTIFICATION.** You must bring a valid government-issued photo identification. If the name on your identification is different than the name on your ASC notice, bring supporting documents. If you filed an Application for Naturalization (Form N-400) or Application to Replace Permanent Resident Card (Form I-90), you must bring your Permanent Resident Card (also known as a Green Card).

If you are sick, do not visit a USCIS office, follow the instructions on this notice to reschedule your appointment. If you have injuries that may interfere with your biometrics submission, USCIS may reschedule your appointment.

Cell phones or electronic devices must be turned off during biometrics submission. No one may photograph or record at an ASC. For more information regarding your ASC appointment, visit https://www.uscis.gov/forms/filing-guidance/preparing-for-your-biometric-services-appointment.

NOTE: If an ASC closes due to weather or other reasons, USCIS will automatically reschedule your appointment for the next available date and time and you will receive a new ASC appointment notice. For the latest information on the status of an office, visit https:// www.uscis.gov/about-us/uscis-office-closings. Please check this page on the day of your appointment.

You must update your address if you move. For instructions, visit https://www.uscis.gov/addresschange.

USCIS may use your biometrics to check the criminal history records of the FBI, for identity verification, to determine eligibility, to create immigration documents (e.g., Green Card, Employment Authorization Document, etc.), or for any purpose authorized by the Immigration and Nationality Act.

You may obtain a copy of your FBI record using the procedures outlined in 28 C.F.R. 16.32. Visit: https://www.fbi.gov/how-we-can-help-you/more-fbi-services-and-information/identity-history-summary-checks for more information. For Privacy Act information, please visit https://www.fbi.gov/how-we-can-help-you/more-fbi-services-and-information/compact-council/privacy-act-statement.

If you cannot attend your scheduled appointment, you may request to reschedule at https://my.uscis.gov/accounts/biometrics/overview or by calling the USCIS Contact Center at 1-800-375-5283 (TTY 800-767-1833). You must make your request before the date and time of the original appointment, and you must establish good cause for rescheduling. If you fail to make a request before your scheduled appointment or fail to establish good cause, and you do not appear at your appointment, USCIS may consider your application, petition, or request abandoned and, as a result, it may be denied. For more information about rescheduling, see https://www.uscis.gov/forms/filing-guidance/preparing-for-your-biometric-services-appointment.

If you cannot leave your home/hospital due to a serious ongoing medical condition, you may request a mobile biometrics appointment by following the instructions on the back of this notice under "Notice for People with Disabilities," or by visiting uscis.gov/accommodations.

If you have any questions regarding this notice, please contact the USCIS Contact Center at 1-800-375-5283.

... the back of this notice for important information.

JA279

Form I-797C 10/13/21

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COALITION FOR HUMANE IMMIGRANT RIGHTS, *et al.*, <br><br> *Plaintiffs,* <br><br> *v.* <br><br> KRISTI NOEM, in her official capacity as Secretary of Homeland Security, *et al.*, <br><br> *Defendants.* | Case No.: 1:25-cv-0872 |

## DECLARATION OF ENRIQUE ESPINOZA

I, Enrique Espinoza, upon my personal knowledge, hereby declare as follows:

1. I am over the age of 18 and competent to testify to the facts and matters set forth herein.

2. I am a Staff Attorney in the Immigration Clinic at the Chicago-Kent College of Law, and I am an attorney in good standing of the State Bar of Illinois. I have been practicing immigration law, including removal defense, for 2 years. I am the counsel of record for A.A.A., a Venezuelan national who was paroled into the United States on October 26, 2023, at the Laredo, Texas port of entry and who now appears to be targeted for expedited removal by U.S. Immigration and Customs Enforcement (ICE).

### A.A.A.

3. On October 26, 2023, U.S. Customs and Border Protection (CBP) paroled A.A.A. into the United States and simultaneously served him with a Notice to Appear ("NTA"). Attached as Exhibit A to this declaration is a true and correct copy of A.A.A.'s Notice to Appear with all personally identifiable information redacted.

JA280

4. On December 13, 2023, A.A.A.—then unrepresented—timely filed Form I-589 (Application for Asylum) with the Immigration Court in Annandale, Virginia, describing in detail his well-founded fear of persecution if returned to Venezuela.

5. The Immigration Court initially set a master calendar hearing for September 26, 2024, before the Honorable Immigration Judge Sherease R. Pratt. On August 5, 2024, A.A.A. filed a pro se Motion to Change Venue to Chicago, Illinois; Judge Pratt granted the motion the very next day.

6. On May 23, 2025, A.A.A. appeared—still unrepresented—before the Honorable Immigration Judge Ana Mencini in Chicago. Judge Mencini granted A.A.A. a continuance to obtain counsel and rescheduled the master calendar hearing for August 13, 2026. Attached as Exhibit B to this declaration is a true and correct copy of the Notice of In-person Hearing for a master calendar hearing on August 13, 2026 with all personally identifiable information redacted. No other issues were raised, and A.A.A. was excused from the courtroom.

7. Immediately after leaving the courtroom on May 23, 2025, two plain-clothes officers speaking Spanish approached A.A.A. and told him he needed to accompany them because "the government was dismissing the case against him." No such motion had been filed or discussed on the record, and nothing in the EOIR Case Access System (ECAS) suggested pending action by the Department of Homeland Security (DHS) at that time.

8. The officers escorted A.A.A. to a small interview room and presented English-language documents, instructing him—again in Spanish—that signing was "just part of the process." Believing he had no choice, A.A.A. signed.

2

JA281

9. During this interaction, A.A.A. recalled that one officer stated—in Spanish—that "the government was dismissing the case against him and would be seeking expedited removal." Although A.A.A. is not a lawyer and lacks formal legal education, he repeated terms such as "expedited removal" and "motion to dismiss" during my subsequent interview with him. His use of such precise legal language, which he could only have heard during that encounter, strengthens the credibility of his account.

10. The officers then transported A.A.A. to the Broadview, Illinois detention facility. Notably, EOIR system still categorized his case as non-detained.

11. On May 24, 2025, I entered my appearance with ICE via electronic Form G-28 and, on May 25, 2025, filed my notice of appearance with EOIR. At that time, ECAS still contained no DHS motion to dismiss or terminate.

12. That same day—without prior notice—ICE transferred A.A.A. to the Kay County Detention Center in Oklahoma. I learned of the transfer only through an automated ICE notification after my appearance had been accepted.

13. Efforts to contact ICE's Chicago Field Office proved futile; published telephone numbers were either disconnected or went unanswered. Kay County staff confirmed A.A.A.'s physical presence but, because EOIR still listed the case in Chicago, were not able to provide the name of the assigned deportation officer or more information.

14. During my communications with A.A.A. (by phone and videoconference), he described overcrowded conditions: approximately 200 detainees housed in four cells of roughly 50 men each, with limited recreation of forty (40) minutes per day and insufficient beds forcing some detainees to sleep on the floor.

3

JA282

15. On May 29, 2025—six days after A.A.A.'s seizure—DHS finally uploaded several documents to ECAS, including the forms A.A.A. had been compelled to sign. One form purport to waive his right to appear before an Immigration Judge to review his custody determination; A.A.A. emphatically denies understanding this was the effect of his signature. Attached as Exhibit C to this declaration is a true and correct copy of this custody determination form with all personally identifiable information redacted.

16. On May 30, 2025, EOIR transferred venue to the Oklahoma City Immigration Court. A master calendar hearing is now set for June 5, 2025, before the Honorable Immigration Judge Jacinto Palomino.

17. ICE's sudden detention and out-of-state transfer, undertaken without notice to counsel or a pending motion before the Court, have gravely prejudiced A.A.A.'s ability to prepare his asylum case and undermined his faith in the integrity of these proceedings.

18. Relocating him to Oklahoma—hundreds of miles from his pro bono counsel, community ties, and evidence—has effectively deprived him of meaningful access to representation.

19. The misinformation conveyed by ICE officers, coupled with the coercive circumstances under which A.A.A. signed English-language documents he did not comprehend, calls into question the voluntariness and validity of any purported waivers.

20. Prolonged confinement in overcrowded, restrictive conditions has inflicted severe psychological distress on A.A.A. He has expressed hopelessness and a desire to abandon his asylum claim—even though return to Venezuela would expose him to the very harms Congress intended our asylum laws to prevent.

21. I have reviewed the contents of this declaration with A.A.A. during a Videoconference, and he has confirmed that all statements about his immigration history, immigration

4

JA283

status, and immigration case are true and correct to the best of his knowledge. It is not

feasible for A.A.A. to prepare his own signed declaration, because he is in immigration

detention and I have only been able to review the documents in his immigration file and

during our Videoconference. I am not able to visit him in person.

I declare under penalty of perjury and under the laws of the United States that the foregoing

is true and correct to the best of my knowledge.

Executed in Chicago, Illinois on June 4, 2025

_____

Enrique Espinoza

# EXHIBIT A

Uploaded on: 10/26/2023 a 96:25:20 PM (Eastern Daylight Time) Base File WAS
USCA Case #25-5289          Document #2146004          Filed: 11/18/2025          Page 289 of 352
Case 1:25-cv-02096-JMC (Eastern Daylight Time) Base File WAS/11/25          Page 7 of 15

DEPARTMENT OF HOMELAND SECURITY
# NOTICE TO APPEAR

| | |
|---|---|
| **In removal proceedings under section 240 of the Immigration and Nationality Act:** | Event No: ▉ |
| Subject ID : ▉  FIN #: ▉ | |
| SIGMA Event: ▉  DOB: ▉ | File No: ▉ |
| In the Matter of: ▉ | |

Respondent: ▉ _____ currently residing at:

▉ Kinsale,VIRGINIA 22488,UNITED STATES OF AMERICA ▉

| *(Number, street, city, state and ZIP code)* | *(Area code and phone number)* |
|---|---|

[x] You are an arriving alien.

[ ] You are an alien present in the United States who has not been admitted or paroled.

[ ] You have been admitted to the United States, but are removable for the reasons stated below.

The Department of Homeland Security alleges that you:
1. You are not a citizen or national of the United States;
2. You are a native of Venezuela and a citizen of Venezuela;
3. You applied for admission into the United States on October 26, 2023, at the Laredo, Texas Port of Entry;
4. You are an immigrant not in possession of a valid unexpired immigrant visa or other valid entry document required by the Immigrant and National Act.

On the basis of the foregoing, it is charged that you are subject to removal from the United States pursuant to the following provision(s) of law:
See Continuation Page Made a Part Hereof

[ ] This notice is being issued after an asylum officer has found that the respondent has demonstrated a credible fear of persecution or torture.

[ ] Section 235(b)(1) order was vacated pursuant to:  [ ] 8CFR 208.30  [ ] 8CFR 235.3(b)(5)(iv)

YOU ARE ORDERED to appear before an immigration judge of the United States Department of Justice at:
7619 LITTLE RIVER TPKE 4TH FL,
ANNANDALE, VA, US 22003

*(Complete Address of Immigration Court, including Room Number, if any)*

on June 20, 2024 ___ at 01:30 PM ___ to show why you should not be removed from the United States based on the
*(Date)*          *(Time)* BECERRA, Miguel A

charge(s) set forth above.          CBP OFFICER          *(signature)*

*(Signature and Title of Issuing Officer)*          *Digitally Acquired Signature*

Date: October 26, 2023          LAREDO, TEXAS

*(City and State)*

**Warning:** Any statement that you make may be used against you in removal proceedings.

**Alien Registration:** This copy of the Notice to Appear served upon you is evidence of your alien registration while you are in removal proceedings. You are required to carry it with you at all times.

**Representation:** If you so choose, you may be represented in this proceeding, at no expense to the Government, by an attorney or other individual authorized and qualified to represent persons before the Executive Office for Immigration Review, pursuant to 8 CFR 1003.16. Unless you so request, no hearing will be scheduled earlier than ten days from the date of this notice, to allow you sufficient time to secure counsel. A list of qualified attorneys and organizations who may be available to represent you at no cost will be provided with this notice.

**Conduct of the hearing:** At the time of your hearing, you should bring with you any affidavits or other documents that you desire to have considered in connection with your case. If you wish to have the testimony of any witnesses considered, you should arrange to have such witnesses present at the hearing. At your hearing you will be given the opportunity to admit or deny any or all of the allegations in the Notice to Appear, including that you are inadmissible or removable. You will have an opportunity to present evidence on your own behalf, to examine any evidence presented by the Government, to object, on proper legal grounds, to the receipt of evidence and to cross examine any witnesses presented by the Government. At the conclusion of your hearing, you have a right to appeal an adverse decision by the immigration judge. You will be advised by the immigration judge before whom you appear of any relief from removal for which you may appear eligible including the privilege of voluntary departure. You will be given a reasonable opportunity to make any such application to the immigration judge.

**One-Year Asylum Application Deadline:** If you believe you may be eligible for asylum, you must file a Form 1-589, Application for Asylum and for Withholding of Removal. The Form 1-589, Instructions, and information on where to file the Form can be found at www.uscis.gov/I-589. Failure to file the Form 1-589 within one year of arrival may bar you from eligibility to apply for asylum pursuant to section 208(a)(2)(B) of the Immigration and Nationality Act.

**Failure to appear:** You are required to provide the Department of Homeland Security (DHS), in writing, with your full mailing address and telephone number. You must notify the Immigration Court and the DHS immediately by using Form EOIR-33 whenever you change your address or telephone number during the course of this proceeding. You will be provided with a copy of this form. Notices of hearing will be mailed to this address. If you do not submit Form EOIR-33 and do not otherwise provide an address at which you may be reached during proceedings, then the Government shall not be required to provide you with written notice of your hearing. If you fail to attend the hearing at the time and place designated on this notice, or any date and time later directed by the Immigration Court, a removal order may be made by the immigration judge in your absence, and you may be arrested and detained by the DHS.

**Mandatory Duty to Surrender for Removal:** If you become subject to a final order of removal, you must surrender for removal to your local DHS office, listed on the internet at http://www.ice.gov/contact/ero, as directed by the DHS and required by statute and regulation. Immigration regulations at 8 CFR 1241.1 define when the removal order becomes administratively final. If you are granted voluntary departure and fail to depart the United States as required, fail to post a bond in connection with voluntary departure, or fail to comply with any other condition or term in connection with voluntary departure, you must surrender for removal on the next business day thereafter. If you do not surrender for removal as required, you will be ineligible for all forms of discretionary relief for as long as you remain in the United States and for ten years after your departure or removal. This means you will be ineligible for asylum, cancellation of removal, voluntary departure, adjustment of status, change of nonimmigrant status, registry, and related waivers for this period. If you do not surrender for removal as required, you may also be criminally prosecuted under section 243 of the Immigration and Nationality Act.

**U.S. Citizenship Claims:** If you believe you are a United States citizen, please advise the DHS by calling the ICE Law Enforcement Support Center toll free at (855) 448-6903.

**Sensitive locations:** To the extent that an enforcement action leading to a removal proceeding was taken against Respondent at a location described in 8 U.S.C. § 1229(e)(1), such action complied with 8 U.S.C. § 1367.

---

### Request for Prompt Hearing

To expedite a determination in my case, I request this Notice to Appear be filed with the Executive Office for Immigration Review as soon as possible. I waive my right to a 10-day period prior to appearing before an immigration judge and request my hearing be scheduled.

Before: _____    _____
*(Signature of Respondent)*

Date: _____

_____
*(Signature and Title of Immigration Officer)*

---

### Certificate of Service

This Notice To Appear was served on the respondent by me on <u>October 26, 2023</u>, in the following manner and in compliance with section 239(a)(1) of the Act.

[x] in person    [ ] by certified mail, returned receipt # _____ requested    [ ] by regular mail
[ ] Attached is a credible fear worksheet.
[x] Attached is a list of organization and attorneys which provide free legal services.

The alien was provided oral notice in the _____ **SPANISH** _____ language of the time and place of his or her hearing and of the consequences of failure to appear as provided in section 240(b)(7) of the Act.

_____    **BECERRA, Miguel A**
*Digitally Acquired Signature*    **CBP OFFICER**    *Digitally Acquired Signature*
*(Signature of Respondent if Personally Served)*    *(Signature and Title of officer)*

DHS Form I-862 (6/22)    Page 2 of 4

JA287

**Authority:**

The Department of Homeland Security through U.S. Immigration and Customs Enforcement (ICE), U.S. Customs and Border Protection (CBP), and U.S. Citizenship and Immigration Services (USCIS) are authorized to collect the information requested on this form pursuant to Sections 103, 237, 239, 240, and 290 of the Immigration and Nationality Act (INA), as amended (8 U.S.C. 1103, 1229, 1229a, and 1360), and the regulations issued pursuant thereto.

**Purpose:**

You are being asked to sign and date this Notice to Appear (NTA) as an acknowledgement of personal receipt of this notice. This notice, when filed with the U.S. Department of Justice's (DOJ) Executive Office for Immigration Review (EOIR), initiates removal proceedings. The NTA contains information regarding the nature of the proceedings against you, the legal authority under which proceedings are conducted, the acts or conduct alleged against you to be in violation of law, the charges against you, and the statutory provisions alleged to have been violated. The NTA also includes information about the conduct of the removal hearing, your right to representation at no expense to the government, the requirement to inform EOIR of any change in address, the consequences for failing to appear, and that generally, if you wish to apply for asylum, you must do so within one year of your arrival in the United States. If you choose to sign and date the NTA, that information will be used to confirm that you received it, and for recordkeeping.

**Routine Uses:**

For United States Citizens, Lawful Permanent Residents, or individuals whose records are covered by the Judicial Redress Act of 2015 (5 U.S.C. § 552a note), your information may be disclosed in accordance with the Privacy Act of 1974, 5 U.S.C. § 552a(b), including pursuant to the routine uses published in the following DHS systems of records notices (SORN): DHS/USCIS/ICE/CBP-001 Alien File, Index, and National File Tracking System of Records, DHS/USCIS-007 Benefit Information System, DHS/ICE-011 Criminal Arrest Records and Immigration Enforcement Records (CARIER), and DHS/ICE-003 General Counsel Electronic Management System (GEMS), and DHS/CBP-023 Border Patrol Enforcement Records (BPER). These SORNs can be viewed at https://www.dhs.gov/system-records-notices-sorns. When disclosed to the DOJ's EOIR for immigration proceedings, this information that is maintained and used by DOJ is covered by the following DOJ SORN: EOIR-001, Records and Management Information System, or any updated or successor SORN, which can be viewed at https://www.justice.gov/opcl/doj-systems-records. Further, your information may be disclosed pursuant to routine uses described in the abovementioned DHS SORNs or DOJ EOIR SORN to federal, state, local, tribal, territorial, and foreign law enforcement agencies for enforcement, investigatory, litigation, or other similar purposes.

For all others, as appropriate under United States law and DHS policy, the information you provide may be shared internally within DHS, as well as with federal, state, local, tribal, territorial, and foreign law enforcement; other government agencies; and other parties for enforcement, investigatory, litigation, or other similar purposes.

**Disclosure:**

Providing your signature and the date of your signature is voluntary. There are no effects on you for not providing your signature and date; however, removal proceedings may continue notwithstanding the failure or refusal to provide this information.

EOIR – 3 of 4

Uploaded on: 10/26/2023 at 06:25:20 AM (Eastern Daylight Time) Base City: WAS
Case 1:25-cv-00871-JMC   Document 22-9   Filed 06/11/25   Page 10 of 15
USCA Case #25-5289   Document #2146004      Filed: 11/18/2025   Page 292 of 352

**U.S. Department of Homeland Security**                    **Continuation Page for Form** I-862

| Alien's Name | File Number | Date |
|---|---|---|
| | **SIGMA Event:** | October 26, 2023 |
| | **Event No:** | |

ON THE BASIS OF THE FOREGOING, IT IS CHARGED THAT YOU ARE SUBJECT TO REMOVAL FROM THE
UNITED STATES PURSUANT TO THE FOLLOWING PROVISION(S) OF LAW:
=================================================================================

212(a)(7)(A)(i)(I) of the Immigration and Nationality Act (Act), as amended, as an
immigrant who, at the time of application for admission, is not in possession of a valid
unexpired immigrant visa, reentry permit, border crossing card, or other valid entry
document required by the Act, and a valid unexpired passport, or other suitable travel
document, or document of identity and nationality as required under the regulations issued
by the Attorney General under section 211(a) of the Act.

| Signature | Title |
|---|---|
| BECERRA, Miguel A | CBP OFFICER |

*Digitally Acquired Signature*

EOIR | 4-of-4

<u>    4    </u> of <u>    4    </u> Pages

Form I-831 Continuation Page (Rev. 08/01/07)

JA289

# EXHIBIT B

JA290

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
CHICAGO IMMIGRATION COURT

LEAD FILE: ███████████
IN REMOVAL PROCEEDINGS
DATE: May 23, 2025

TO: ████████████████

MADISON, WI  53711

RE: ██████████████████

**Notice of In-Person Hearing**

Your case has been scheduled for a MASTER hearing before the immigration
court on:

Date:          Aug 13, 2026
Time:          1:00 P.M. CT
Court Address: 536 S. CLARK ST., STE. 340
               COURTROOM 4, CHICAGO, IL 60605

**Representation:** You may be represented in these proceedings, at no
expense to the Government, by an attorney or other representative
of your choice who is authorized and qualified to represent persons
before an immigration court. If you are represented, your attorney
or representative must also appear at your hearing and be ready
to proceed with your case.  Enclosed and online at
https://www.justice.gov/eoir/list-pro-bono-legal-service-providers
is a list of free legal service providers who may be able to assist you.

**Failure to Appear:** If you fail to appear at your hearing and the
Department of Homeland Security establishes by clear, unequivocal, and
convincing evidence that written notice of your hearing was provided and
that you are removable, you will be ordered removed from the United
States. Exceptions to these rules are only for exceptional circumstances.

**Change of Address:** The court will send all correspondence, including
hearing notices, to you based on the most recent contact information
you have provided, and your immigration proceedings can go forward in
your absence if you do not appear before the court.  If your contact
information is missing or is incorrect on the Notice to Appear, you must
provide the immigration court with your updated contact information within
five days of receipt of that notice so you do not miss important information.
Each time your address, telephone number, or email address changes,
you must inform the immigration court within five days.  To update your contact
information with the immigration court, you must complete a Form EOIR-33
either online at https://respondentaccess.eoir.justice.gov/en/ or by
completing the enclosed paper form and mailing it to the immigration
court listed above.

JA291

**Internet-Based Hearings:** If you are scheduled to have an internet-based hearing, you will appear by video or telephone. If you prefer to appear in person at the immigration court named above, you must file a motion for an in-person hearing with the immigration court at least fifteen days before the hearing date provided above. Additional information about internet-based hearings for each immigration court is available on EOIR's website at https://www.justice.gov/eoir/eoir-immigration-court-listing.

**In-Person Hearings:** If you are scheduled to have an in-person hearing, you will appear in person at the immigration court named above. If you prefer to appear remotely, you must file a motion for an internet-based hearing with the immigration court at least fifteen days before the hearing date provided above.

For information about your case, please call **1-800-898-7180** (toll-free) or **304-625-2050.**

**The Certificate of Service on this document allows the immigration court to record delivery of this notice to you and to the Department of Homeland Security.**

---

CERTIFICATE OF SERVICE

THIS DOCUMENT WAS SERVED BY:MAIL[M]   PERSONAL SERVICE[P]   ELECTRONIC SERVICE[E]
TO:  [ p ] Noncitizen | [   ] Noncitizen c/o Custodial Officer |
     [   ] Noncitizen ATT/REP | [ e ] DHS
DATE: ___05-23-2025_____ BY:  COURT STAFF _____lg_____
Attachments:[ ] EOIR-33 [ ] Appeal Packet [ x] Legal Services List [ ] Other  NH



Use a smartphone's camera to scan the code on this page to read the notice online.

Usa la cámara de un teléfono inteligente para escanear el código de esta página y leer el aviso en línea.

Use a câmara do smartphone para digitalizar o código nesta página e ler o manual de instruções online.

使用智能手机摄像头扫描本页面的代码，即可在线阅读该通知。

ਨੋਟਿਸ ਨੂੰ ਔਨਲਾਈਨ ਪੜ੍ਹਨ ਲਈ ਇਸ ਪੰਨੇ 'ਤੇ ਕੋਡ ਨੂੰ ਸਕੈਨ ਕਰਨ ਲਈ ਸਮਾਰਟਫੋਨ ਦੇ ਕੈਮਰੇ ਦੀ ਵਰਤੋਂ ਕਰੋ।

অনলাইনে নোটিশ পড়ার জন্য এই পৃষ্ঠের কোডটি স্ক্যান করতে স্মার্টফোনের ক্যামেরা ব্যবহার করুন।

सूचना अनलाइनमा पढ्न यस पृष्ठमा कोड स्क्यान गर्न स्मार्टफोनको क्यामेरा प्रयोग गर्नुहोस्।

Sèvi ak kamera yon telefòn entèlijan pou eskane kòd ki nan paj sa a pou li avi a sou entènèt.

استخدم كاميرا الهاتف الذكي لمسح الرمز الموجود في هذه الصفحة لقراءة الإشعار على الإنترنت.

Чтобы прочитать уведомление онлайн, отсканируйте код на этой странице с помощью камеры вашего смартфона.

Utilisez l'appareil photo d'un téléphone intelligent pour scanner le code sur cette page afin de lire l'avis en ligne.

JA292

# EXHIBIT

Uploaded on: 05/29/2025 at 11:50:37 AM (Central Daylight Time) Case Filed On Page 15 of 15
Case 1:25-cv-00874-JMC   Document 22-9   Filed 06/11/25   Page 15 of 15
USCA Case #25-5289   Document #2146004   Filed: 11/18/2025   Page 297 of 352

DEPARTMENT OF HOMELAND SECURITY
## NOTICE OF CUSTODY DETERMINATION

Alien's Name: ███████████ _____   A-File Number: ██████ _____

Date: 05/23/2025

Event ID: ████████ _____   Subject ID: ████████ _____

Pursuant to the authority contained in section 236 of the Immigration and Nationality Act and part 236 of title 8, Code of Federal Regulations, I have determined that, pending a final administrative determination in your case, you will be:

☒ Detained by the Department of Homeland Security.

☐ Released (check all that apply):

   ☐ Under bond in the amount of  $ _____

   ☐ On your own recognizance.

   ☐ Under other conditions. [Additional document(s) will be provided.]

LEIBAS, D3899   x _____   05/23/2025 11:53 AM
Name and Signature of Authorized Officer   Date and Time of Custody Determination

SDDO   ICE ERO CHICAGO FIELD OFFICE 101 W IDA B WELLS DR, 4TH FLOOR
CHICAGO, IL US 60605
Title   Office Location/Address

---

You may request a review of this custody determination by an immigration judge.

   ☒ I acknowledge receipt of this notification, and

      ☐ I **do** request an immigration judge review of this custody determination.

      ☒ I **do not** request an immigration judge review of this custody determination.

████████████ _____   05/23/2025
Signature of Alien   Date

---

The contents of this notice were read to ALDANA ALCEDO, ANTONIO _____ in the _____ SPANISH _____ language.
(Name of Alien)   (Name of Language)

BUCIO, R 1726 _____   _____
Name and Signature of Officer   Name or Number of Interpreter (if applicable)

DO
Title

ITE    TATE    I T I T        T
THE   I  T  I  T              BIA

| | |
|---|---|
| COALITION FOR HUMANE IMMIGRANT RIGHTS, *et al.*,<br><br>    *Plaintiffs,*<br><br>    *v.*<br><br>KRISTI NOEM, in her official capacity as Secretary of Homeland Security, *et al.*,<br><br>    *Defendants.* | Case No.: 1:25-cv-0872 |

E   A ATI        E  I A    I E

I, Jessica Olive, upon my personal knowledge, hereby declare as follows:

1. I am over the age of 18 and competent to testify to the facts and matters set forth herein.

2. I am a supervising attorney at UnLocal, Inc., a community-based non-profit providing direct legal services to New York's immigrant communities. I am an attorney in good standing with the State Bar of New York, with nearly five years of experience. My practice focuses on representing immigrants seeking humanitarian relief, both through affirmative applications and in defensive proceedings. I now represent E.M.P., who was paroled into the United States at a port of entry in 2023 and is now being processed for expedited removal. E.M.P. is a member of CASA.

3. E.M.P. is a national of Venezuela who presented for inspection at the San Ysidro Port of Entry on December 12, 2023. Well before arriving at the port, E.M.P. had secured an appointment using the CBP One application, and following inspection he was granted parole through December 9, 2025. At the same time, he was issued a Notice to Appear that required him to appear for an initial master calendar hearing in Las Vegas, Nevada on

JA295

February 6, 2025. Attached as Exhibit A to this declaration is a true and correct copy of E.M.P.'s Notice to Appear with all personally identifiable information redacted.

4. After he was paroled into the United States, E.M.P. resided in Mesquite, Nevada for six months before moving to Manhattan and then the Bronx, New York. E.M.P. obtained work authorization based on his parole status and was working to support himself and his family.

5. On November 6, 2024, E.M.P. filed a form I-589 Application for Asylum and Withholding of Removal with the court and without legal representation. On February 6, 2025, E.M.P. appeared pro se for his initial master calendar hearing in Las Vegas, Nevada. Because E.M.P. had relocated to New York by that point, the Immigration Judge changed venue to New York.

6. On May 21, 2025, E.M.P. appeared at the New York Broadway Immigration Court at 290 Broadway pro se for his second master calendar hearing. At the hearing, the attorney representing the Department of Homeland Security (DHS) moved to dismiss E.M.P.'s case. Some of the conversation between the immigration judge and the DHS attorney took place in English and were not translated into Spanish for E.M.P. The immigration judge, Edward Grogan, ordered dismissal and advised E.M.P. to apply for asylum affirmatively with U.S. Citizenship and Immigration Services (USCIS) if he wanted to continue his asylum claim. Attached as Exhibit B to this declaration is a true and correct copy of the immigration judge's dismissal order with all personally identifiable information redacted. It was not made clear to E.M.P. that following dismissal the government would take steps to place him in expedited removal and foreclose his ability to apply for asylum affirmatively with USCIS.

7.  After the case was dismissed, three plainclothes officers followed E.M.P. to the elevator to exit the building. Upon arriving in the lobby, he was approached by other plainclothes officers who identified him and detained him. He was placed in an unmarked car with other individuals and moved around to various locations.

8.  Had the immigration judge understood that DHS only moved to dismiss proceedings so that E.M.P. could be detained and processed for expedited removal, it seems likely that Judge Grogan would not have advised E.M.P. to apply for asylum affirmatively, because that became unavailable to him once he was arrested and placed in expedited removal proceedings.

9.  During his detention, E.M.P. expressed a fear of returning to Venezuela and is now housed at Moshannon Valley Processing Center in Pennsylvania awaiting a credible fear interview (CFI) according to an email sent to me from a Deportation Officer when E.M.P. was in transit between facilities. Attached as Exhibit C to this declaration is a true and correct copy of the email with all personally identifiable information redacted. I do not believe E.M.P. has been told anything about being processed for expedited removal, nor has he been issued any documentation regarding expedited removal, including an I-860, Notice and Order of Expedited Removal.

10. After his last hearing, E.M.P. should have been able to return home and gather evidence in support of his claim with the help of his community. Instead, he is now detained in a location far away, unable to regularly communicate with his attorney and loved ones. E.M.P. was actively pursuing his asylum claim when that process was abruptly taken from him. Forcing him into the CFI process is not an adequate substitute, as it offers substantially fewer legal protections. By placing C.M.P. in expedited removal proceedings, the

JA297

government effectively denied him his due process rights. Additionally, E.M.P., who is HIV+, went days without his life-saving medication because of his detention. In the limited conversations I have had with E.M.P., he has indicated that his mental health is deteriorating rapidly. He has trouble sleeping and is debilitated by intrusive thoughts and fears about being returned to Venezuela at a moment's notice.

11. Even if E.M.P. were to pass his credible fear interview, returning him to removal proceedings does not restore the position he was in before. The damage has already been done. He now faces the asylum process with greater fear and uncertainty, knowing that the system meant to protect him can change course without warning. This disruption has not only undermined his legal rights but has also deepened his trauma, as he lives with the constant threat that the rules may once again shift beneath him.

12. I have reviewed the contents of this declaration with E.M.P. over a phone call, and he has confirmed that all statements about his immigration history, immigration status, and immigration case are true and correct to the best of his knowledge. It is not feasible for E.M.P. to prepare his own signed declaration, because he is in immigration detention and I am only able to speak to him occasionally by phone. I declare under penalty of perjury and under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Executed in New York, New York on June 5, 2025

_____

Jessica Olive, Esq.

JA298

# EXHIBIT A

## DEPARTMENT OF HOMELAND SECURITY
# NOTICE TO APPEAR

Event No: █████████

**In removal proceedings under section 240 of the Immigration and Nationality Act:**

Subject ID : ████████  FIN #: █████████

SIGMA Event: ████  DOB: █████████     File No: █████████

In the Matter of: █████████

Respondent: ████████████████████████████████████████     currently residing at:

████████████ , MESQUITE, NEVADA 89027, UNITED STATES OF AMERICA   █████████

(Number, street, city, state and ZIP code)                                    (Area code and phone number)

[x] You are an arriving alien.

[ ] You are an alien present in the United States who has not been admitted or paroled.

[ ] You have been admitted to the United States, but are removable for the reasons stated below.

The Department of Homeland Security alleges that you:
1. You are not a citizen or national of the United States;
2. You are a native of VENEZUELA and a citizen of VENEZUELA;
3. You applied for admission on 12/12/2023 at SAN YSIDRO, CA, USA;
4. You are an immigrant not in possession of a valid unexpired immigrant visa, reentry permit, border crossing card, or other valid entry document required by the Immigration and Nationality Act.

On the basis of the foregoing, it is charged that you are subject to removal from the United States pursuant to the following provision(s) of law:
See Continuation Page Made a Part Hereof

[ ] This notice is being issued after an asylum officer has found that the respondent has demonstrated a credible fear of persecution or torture.

[ ] Section 235(b)(1) order was vacated pursuant to:     [ ] 8CFR 208.30     [ ] 8CFR 235.3(b)(5)(iv)

YOU ARE ORDERED to appear before an immigration judge of the United States Department of Justice at:
110 N CITY PKWY STE 400,
LAS VEGAS, NV, US 89106

*(Complete Address of Immigration Court, including Room Number, if any)*

on February 6, 2025   at 01:00 PM   to show why you should not be removed from the United States based on the

   (Date)           (Time) FLOURNOY, Markeith A

charge(s) set forth above.     CBP OFFICER

                              *(Signature and Title of Issuing Officer)*     *Digitally Acquired Signature*

Date: December 12, 2023     SAN YSIDRO, CALIFORNIA

                              *(City and State)*

EOIR – 1 of 4

**Warning:** Any statement you make may be used against you in removal proceedings.

**Alien Registration:** This copy of the Notice to Appear served upon you is evidence of your alien registration while you are in removal proceedings. You are required to carry it with you at all times.

**Representation:** If you so choose, you may be represented in this proceeding, at no expense to the Government, by an attorney or other individual authorized and qualified to represent persons before the Executive Office for Immigration Review, pursuant to 8 CFR 1003.16. Unless you so request, no hearing will be scheduled earlier than ten days from the date of this notice, to allow you sufficient time to secure counsel. A list of qualified attorneys and organizations who may be available to represent you at no cost will be provided with this notice.

**Conduct of the hearing:** At the time of your hearing, you should bring with you any affidavits or other documents that you desire to have considered in connection with your case. If you wish to have the testimony of any witnesses considered, you should arrange to have such witnesses present at the hearing. At your hearing you will be given the opportunity to admit or deny any or all of the allegations in the Notice to Appear, including that you are inadmissible or removable. You will have an opportunity to present evidence on your own behalf, to examine any evidence presented by the Government, to object, on proper legal grounds, to the receipt of evidence and to cross examine any witnesses presented by the Government. At the conclusion of your hearing, you have a right to appeal an adverse decision by the immigration judge. You will be advised by the immigration judge before whom you appear of any relief from removal for which you may appear eligible including the privilege of voluntary departure. You will be given a reasonable opportunity to make any such application to the immigration judge.

**One-Year Asylum Application Deadline:** If you believe you may be eligible for asylum, you must file a Form 1-589, Application for Asylum and for Withholding of Removal. The Form 1-589, Instructions, and information on where to file the Form can be found at www.uscis.gov/I-589. Failure to file the Form 1-589 within one year of arrival may bar you from eligibility to apply for asylum pursuant to section 208(a)(2)(B) of the Immigration and Nationality Act.

**Failure to appear:** You are required to provide the Department of Homeland Security (DHS), in writing, with your full mailing address and telephone number. You must notify the Immigration Court and the DHS immediately by using Form EOIR-33 whenever you change your address or telephone number during the course of this proceeding. You will be provided with a copy of this form. Notices of hearing will be mailed to this address. If you do not submit Form EOIR-33 and do not otherwise provide an address at which you may be reached during proceedings, then the Government shall not be required to provide you with written notice of your hearing. If you fail to attend the hearing at the time and place designated on this notice, or any date and time later directed by the Immigration Court, a removal order may be made by the immigration judge in your absence, and you may be arrested and detained by the DHS.

**Mandatory Duty to Surrender for Removal:** If you become subject to a final order of removal, you must surrender for removal to your local DHS office, listed on the internet at http://www.ice.gov/contact/ero, as directed by the DHS and required by statute and regulation. Immigration regulations at 8 CFR 1241.1 define when the removal order becomes administratively final. If you are granted voluntary departure and fail to depart the United States as required, fail to post a bond in connection with voluntary departure, or fail to comply with any other condition or term in connection with voluntary departure, you must surrender for removal on the next business day thereafter. If you do not surrender for removal as required, you will be ineligible for all forms of discretionary relief for as long as you remain in the United States and for ten years after your departure or removal. This means you will be ineligible for asylum, cancellation of removal, voluntary departure, adjustment of status, change of nonimmigrant status, registry, and related waivers for this period. If you do not surrender for removal as required, you may also be criminally prosecuted under section 243 of the Immigration and Nationality Act.

**U.S. Citizenship Claims:** If you believe you are a United States citizen, please advise the DHS by calling the ICE Law Enforcement Support Center toll free at (855) 448-6903.

**Sensitive locations:** To the extent that an enforcement action leading to a removal proceeding was taken against Respondent at a location described in 8 U.S.C. § 1229(e)(1), such action complied with 8 U.S.C. § 1367.

### Request for Prompt Hearing

To expedite a determination in my case, I request this Notice to Appear be filed with the Executive Office for Immigration Review as soon as possible. I waive my right to a 10-day period prior to appearing before an immigration judge and request my hearing be scheduled.

Before: _____

(Signature of Respondent)

Date: _____

_____
(Signature and Title of Immigration Officer)

### Certificate of Service

This Notice To Appear was served on the respondent by me on December 12, 2023, in the following manner and in compliance with section 239(a)(1) of the Act.

[x] in person   [ ] by certified mail, returned receipt # _____ requested   [ ] by regular mail
   [ ] Attached is a credible fear worksheet.
[x] Attached is a list of organization and attorneys which provide free legal services.

The alien was provided oral notice in the SPANISH language of the time and place of his or her hearing and of the consequences of failure to appear as provided in section 240(b)(7) of the Act.

FLOURNOY, Markeith A
Digitally Accepted Signature    CBP OFFICER
(Signature of Respondent if Personally Served)    (Signature and Title of officer)

**Privacy Act Statement**

**Authority:**

The Department of Homeland Security through U.S. Immigration and Customs Enforcement (ICE), U.S. Customs and Border Protection (CBP), and U.S. Citizenship and Immigration Services (USCIS) are authorized to collect the information requested on this form pursuant to Sections 103, 237, 239, 240, and 290 of the Immigration and Nationality Act (INA), as amended (8 U.S.C. 1103, 1229, 1229a, and 1360), and the regulations issued pursuant thereto.

**Purpose:**

You are being asked to sign and date this Notice to Appear (NTA) as an acknowledgement of personal receipt of this notice. This notice, when filed with the U.S. Department of Justice's (DOJ) Executive Office for Immigration Review (EOIR), initiates removal proceedings. The NTA contains information regarding the nature of the proceedings against you, the legal authority under which proceedings are conducted, the acts or conduct alleged against you to be in violation of law, the charges against you, and the statutory provisions alleged to have been violated. The NTA also includes information about the conduct of the removal hearing, your right to representation at no expense to the government, the requirement to inform EOIR of any change in address, the consequences for failing to appear, and that generally, if you wish to apply for asylum, you must do so within one year of your arrival in the United States. If you choose to sign and date the NTA, that information will be used to confirm that you received it, and for recordkeeping.

**Routine Uses:**

For United States Citizens, Lawful Permanent Residents, or individuals whose records are covered by the Judicial Redress Act of 2015 (5 U.S.C. § 552a note), your information may be disclosed in accordance with the Privacy Act of 1974, 5 U.S.C. § 552a(b), including pursuant to the routine uses published in the following DHS systems of records notices (SORN): DHS/USCIS/ICE/CBP-001 Alien File, Index, and National File Tracking System of Records, DHS/USCIS-007 Benefit Information System, DHS/ICE-011 Criminal Arrest Records and Immigration Enforcement Records (CARIER), and DHS/ICE-003 General Counsel Electronic Management System (GEMS), and DHS/CBP-023 Border Patrol Enforcement Records (BPER). These SORNs can be viewed at https://www.dhs.gov/system-records-notices-sorns. When disclosed to the DOJ's EOIR for immigration proceedings, this information that is maintained and used by DOJ is covered by the following DOJ SORN: EOIR-001, Records and Management Information System, or any updated or successor SORN, which can be viewed at https://www.justice.gov/opcl/doj-systems-records. Further, your information may be disclosed pursuant to routine uses described in the abovementioned DHS SORNs or DOJ EOIR SORN to federal, state, local, tribal, territorial, and foreign law enforcement agencies for enforcement, investigatory, litigation, or other similar purposes.

For all others, as appropriate under United States law and DHS policy, the information you provide may be shared internally within DHS, as well as with federal, state, local, tribal, territorial, and foreign law enforcement; other government agencies; and other parties for enforcement, investigatory, litigation, or other similar purposes.

**Disclosure:**

Providing your signature and the date of your signature is voluntary. There are no effects on you for not providing your signature and date; however, removal proceedings may continue notwithstanding the failure or refusal to provide this information.

Page 3 of 4

Uploaded on: 12/12/2023 at 07:07:40 AM (Pacific Standard Time) Page City: Love
USCA Case #25-5289    Document #2146004    Filed: 11/18/2025    Page 306 of 352
Case 1:23-cv-00872-JMC    Document 22-19    Filed 06/11/25    Page 9 of 14

**U.S. Department of Homeland Security**                    **Continuation Page for Form** _I-862_

| Alien's Name | File Number | Date |
|---|---|---|
| | **SIGMA Event:** | December 12, 2023 |
| | **Event No:** | |

ON THE BASIS OF THE FOREGOING, IT IS CHARGED THAT YOU ARE SUBJECT TO REMOVAL FROM THE
UNITED STATES PURSUANT TO THE FOLLOWING PROVISION(S) OF LAW:
========================================================================================

212(a)(7)(A)(i)(I) of the Immigration and Nationality Act (Act), as amended, as an
immigrant who, at the time of application for admission, is not in possession of a valid
unexpired immigrant visa, reentry permit, border crossing card, or other valid entry
document required by the Act, and a valid unexpired passport, or other suitable travel
document, or document of identity and nationality as required under the regulations issued
by the Attorney General under section 211(a) of the Act.

| Signature | Title |
|---|---|
| FLOURNOY, Markeith A | CBP OFFICER |

| *Digitally Acquired Signature*

____4____ of ____4____ Pages

JA303

# EXHIBIT B

JA304



**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**NEW YORK – BROADWAY IMMIGRATION COURT**

Respondent Name:

▮▮▮▮▮▮▮▮▮▮

To:

▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮

▮▮▮

BRONX, NY 10453

A-Number:

▮▮▮▮▮

Riders:
In Removal Proceedings
Initiated by the Department of Homeland Security
Date:
05/21/2025

## ORDER ON MOTION TO DISMISS

☐ The Respondent ☑ the Department of Homeland Security ☐ the parties jointly has/have filed a motion to dismiss these proceedings under 8 CFR 1239.2(c). The moving party has given notice of the motion to the non-moving party and the court has provided the non-moving party with an opportunity to respond. The motion is ☐ opposed ☑ unopposed.

After considering the facts and circumstances, the immigration court orders that the motion to dismiss is:

☑ Granted without prejudice
☐ Denied

Further explanation:

Respondent filed I-589 with Court on 11/6/2024 according to the docket.  Respondent advised to present I-589 to CIS at 26 Federal Plaza in the event that he wished to continue his asylum claim.

IT IS SO ORDERED.

JA305

Immigration Judge: Grogan, Edward 05/21/2025

### Certificate of Service

This document was served:

Via: [ M ] Mail | [ P ] Personal Service | [ E ] Electronic Service | [ U ] Address Unavailable

To: [ P ] Noncitizen | [ ] Noncitizen c/o custodial officer | [ ] Noncitizen's atty/rep. | [ E ] DHS

Respondent Name : ███████████████████  A-Number : ██████████

Riders:

Date: 05/21/2025 By: Correa, Jennifer, Court Staff

JA306

# EXHIBIT

JA307

**UnLocal**

Jessica Olive <jessica@unlocal.org>

---

## *Urgent* A▮▮▮▮▮▮▮▮

**Dawson, Khristopher** <Khristopher.Dawson@ice.dhs.gov>            Thu, May 22, 2025 at 7:58 AM
To: "Pujol, Joseph T" <Joseph.T.Pujol@ice.dhs.gov>, "jessica@unlocal.org" <jessica@unlocal.org>

Good morning,

Your client has filed an M-444 for his fear claim and housing will be assigned soon. Please use the https://locator.ice.gov/odls/#/search to locator your client.

Khristopher Dawson

Supervisory Detention and Deportation Officer, Detained Docket Unit

New York Field Office

Enforcement and Removal Operations

U.S. Immigration and Customs Enforcement

Cell: 646 938-5542  Desk: 212 863-3497

**From:** NYCEROAttorneyInquiries, <NYCEROAttorneyInquiries@ice.dhs.gov>
**Sent:** Thursday, May 22, 2025 7:36 AM
**To:** Pujol, Joseph T <Joseph.T.Pujol@ice.dhs.gov>; Dawson, Khristopher <Khristopher.Dawson@ice.dhs.gov>
**Cc:** NYCEROAttorneyInquiries, <NYCEROAttorneyInquiries@ice.dhs.gov>
**Subject:** FW: *Urgent* A:▮▮▮▮▮▮▮▮

Greetings,

Please see email below and respond to it accordingly copying the NYCEROATTORNEYINQUIRIES Mailbox and also by taking appropriate action (updating EARM/DHS Portal/etc.) If this case does not fall within your docket, kindly forward to the proper Deportation Officer copying also this mailbox.

▮▮▮▮▮▮▮▮▮▮

Thank you,

NYC ERO Attorney Inquiries

Enforcement and Removal Operations

U.S. Immigration and Customs Enforcement

**From:** Jessica Olive <jessica@unlocal.org>
**Sent:** Wednesday, May 21, 2025 6:44 PM
**To:** NYCEROAttorneyInquiries, <NYCEROAttorneyInquiries@ice.dhs.gov>; ERO.INFO <ERO.INFO@ice.dhs.gov>
**Subject:** *Urgent* A▮▮▮▮▮▮▮▮

> **CAUTION:** This email originated from outside of DHS. DO NOT click links or open attachments unless you recognize and/or trust the sender. Please use the Cofense Report Phishing button to report. If the button is not present, click here and follow instructions.

Good evening,
[Quoted text hidden]
[Quoted text hidden]

JA308

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

COALITION FOR HUMANE IMMIGRANT RIGHTS,
*et al.*,

    *Plaintiffs,*

    *v.*                                                                Case No.: 1:25-cv-0872

KRISTI NOEM, in her official capacity as Secretary of
Homeland Security, *et al.*,

    *Defendants.*

## DECLARATION OF LINDSAY TOCZYLOWSKI

I, Lindsay Toczylowski, upon my personal knowledge, hereby declare as follows:

1. I am over the age of 18 and competent to testify to the facts and matters set forth herein.

2. I am the President and CEO at Immigrant Defenders Law Center ("ImmDef"), and I am an attorney in good standing of the State Bar of California (State Bar# 262481). My office represents 2 clients, E.F.S. and R.A.U.P., who were both paroled into the United States at a port of entry following CBP One appointments but were detained last week while unrepresented at their immigration court hearings and are now being processed for expedited removal.

3. On Friday, May 23, 2025, I was at the North Los Angeles Court observing immigration court hearings. During Immigration Judge Peter Kim's morning docket that day, I personally observed E.F.S. appear for his hearing unrepresented alongside his wife and young son.

JA309

4. During the hearing, the Department of Homeland Security ("DHS") attorney, Caroline Tompkins, made an oral motion to the court to sever E.F.S.'s case from that of his wife and son. She specifically stated that the government was moving to dismiss E.F.S.'s case as it was no longer in the government's best interest to pursue the case and the Department intended to place E.F.S. into expedited removal proceedings.

5. E.F.S. verbally opposed the motion to dismiss and told the court that he wanted his case to remain with his wife and child. The Judge said that is not a legal basis to deny the Government's motion to dismiss and ordered E.F.S.'s case dismissed.

6. I followed E.F.S. and his wife and son out of the courtroom after the proceedings were dismissed and witnessed approximately 6 ICE officers arrest E.F.S. in front of his young son and wife. While the male officers handcuffed E.F.S., a female ICE officer ushered his wife and young son away. E.F.S.'s young son, who I later learned was 8 years old, had a shocked look on his face and tears in his eyes. E.F.S.'s wife was shaking and holding on to her son. The ICE officers moved E.F.S. into a non-public hallway with a service elevator and left his wife and young son stunned and confused in the hallway.

7. Another attorney from my office, Andrew Freire, and I spoke to the wife of E.F.S. following his arrest. She informed us that this was their first court hearing and that they had entered the U.S. via CBP One appointments in 2024. I then directed Andrew Freire to go downstairs and attempt to speak to E.F.S. in government custody, which he did.

8. I then returned to Immigration Judge Kim's courtroom to observe the afternoon master calendar docket. The last case that was called that afternoon was a young man, R.A.U.P. In his case, I personally observed the same DHS attorney, Caroline Tompkins, move to

(Page 313 of Total)

JA310

dismiss his case saying that it was no longer in the government's best interest to pursue

the case and the Department intended to pursue expedited removal. Like E.F.S., R.A.U.P.

verbally opposed the dismissal, but when Immigration Judge Kim asked him to articulate

a basis, he was not able to say much more than he wants to remain in the U.S. and wants

to continue with his case. The Immigration Judge told him that he could continue with his

case outside of court but did not explain what expedited removal means. Following this,

the Immigration Judge dismissed the proceedings despite R.A.U.P.'s opposition.

9.  I followed R.A.U.P. out of the courtroom as he exited with his female partner. Moments

after exiting the courtroom, he was stopped by approximately 6 ICE officers who

immediately began restraining him. His partner started screaming and fell to the floor.

She was begging the officers not to take R.A.U.P. and saying "he is a good person. He

didn't do anything wrong." The officers did not speak to her and quickly moved R.A.U.P.

into the service elevator hallway. I remained with his partner who told me that R.A.U.P.

had entered the U.S. approximately 6 months earlier via a CBP One appointment. This

was his first court appearance. I gathered additional information from his partner so that

we could meet with him in custody.

10. No one from ImmDef was able to meet with R.A.U.P. that day because the attorney

access at the 300 North Los Angeles Street building ended shortly after his detention. By

the time we located him the following Tuesday, he and E.F.S. had both been moved 1100

miles away to a detention center in Tacoma, Washington, far from their families and

attorneys. Our team at ImmDef has continued to meet with them and is representing both

E.F.S. and R.A.U.P. in their expedited removal proceedings.

JA311

I declare under penalty of perjury and under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Executed in Los Angeles, California on June 4, 2025.

Lindsay Toczylowski

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COALITION FOR HUMANE IMMIGRANT RIGHTS, *et al.*,<br><br>*Plaintiffs,*<br><br>*v.*<br><br>KRISTI NOEM, in her official capacity as Secretary of Homeland Security, *et al.*,<br><br>*Defendants.* | Case No.: 1:25-cv-0872 |

### DECLARATION OF MEGHAN DUPUIS MAURUS

I, Meghan DuPuis Maurus, upon my personal knowledge, hereby declare as follows:

1. I am over the age of 18 and competent to testify to the facts and matters set forth herein.

2. I am an attorney at Border Butterflies Project, a coalitional project of LGBT organizations including the Transgender Law Center, the Black LGBTQIA+ Migrant Project, and Familia TQLM, and I am an attorney in good standing of the State Bars of New York and New Jersey. I represent J.A.L.M., a citizen of Honduras who arrived in the United States on September 3, 2024, at Eagle Pass, Texas, after appearing at a port of entry pursuant to an appointment that he received using the mobile application formerly known as CBP One. On that date, J.A.L.M. was paroled into the United States and provided a Notice to Appear (NTA) and other documents. Attached as Exhibit A to this declaration is a true and correct copy of J.A.L.M.'s Notice to Appear with all personally identifiable information redacted.

3. J.A.L.M. went to live with family members at the address in Kearns, Utah that he had provided to government personnel at the border. With the help of a community

JA313

organization, J.A.L.M. applied for and received an Employment Authorization Document (EAD) and lawful employment in Kearns.

4. The Department of Homeland Security (DHS) filed the NTA with the Salt Lake City, Utah Immigration Court, and had a court date set for Jan. 20, 2028. In the months before April 2025, I provided legal information and was in contact with the client regarding their efforts to find legal counsel and support, but did not initially enter an appearance to represent him in removal proceedings.

5. In April 2025, J.A.L.M. was arrested at their birthday party by Kearns, Utah police after he went to a nearby police station in person to report an escalating situation at his family's home. J.A.L.M. paid a bail with the police department and was taken immediately into U.S. Immigration and Customs Enforcement (ICE) custody. No charges to date have been filed by the Office of the District Attorney in Salt Lake City, Utah.

6. On April 8, 2025, the ICE attorney representing the Department of Homeland Security in removal proceedings filed in the Salt Lake City Immigration Court a motion to dismiss the case without prejudice. The stated goal was to place J.A.L.M. into expedited removal proceedings. Beginning on April 8, 2025, I attempted three times to file a G-28, Notice of Appearance with United States Citizenship and Immigration Services (USCIS). My goal in entering an appearance with USCIS was to ensure that I could represent J.A.L.M. in any expedited removal proceedings, including in any Credible Fear Interview (CFI) that USCIS might conduct with J.A.L.M. as part of those expedited removal proceedings. Each time the response from USCIS was that they had no jurisdiction over the matter and therefore could not accept the G-28.

JA314

7. On April 10, 2025, I filed an application for Asylum, Withholding of Removal and protection under the Convention against Torture (I-589), which was accepted in ECAS on April 14, 2025. On April 10, I also filed an opposition to the dismissal motion. Attached as Exhibit B to this declaration is a true and correct copy of my opposition to the ICE motion to dismiss with all personally identifiable information redacted.

8. During this time, J.A.L.M. was incarcerated at the Southern Nevada Detention Center, where he remains detained.

9. On April 14, 2025, I received a telephone call without advance notice from a USCIS asylum officer who had my client on the line and said they were going to conduct a CFI. At the outset I explained that my client was not subject to expedited removal because he was still in ongoing removal proceedings in the Salt Lake City Immigration Court. As a result, I objected to USCIS having jurisdiction to conduct a CFI. Nonetheless the CFI proceeded.

10. J.A.L.M. explained during the interview that their fear of return to Honduras was based on their sexual orientation and gender presentation/identity. The USCIS officer asked about J.A.L.M.'s entry into the United States and J.A.L.M. explained that they entered the United States with parole and a Notice to Appear (NTA) after receiving an appointment through the CBP One application to appear at a port of entry. About an hour into the CFI, J.A.L.M. was asked why they had crossed the border without waiting for an appointment to go to a port of entry. J.A.L.M. explained for the second time that they had waited for an appointment and only went to the port of entry at Eagle Pass, Texas, once they had that CBP One appointment. At this point the interviewer paused the interview to

3

JA315

seek clarification. The break was approximately 15-20 minutes. When she returned, the officer terminated the interview without explanation.

11. Shortly after the termination of the CFI, I sent another G-28 to USCIS seeking to be named as J.A.L.M.'s legal representative. That email was also returned stating that USCIS did not have jurisdiction. Attached as Exhibits C and D to this declaration, respectively, are true and correct copies of this next G-28 submission to USCIS and USCIS's responses to the submission, all personally identifiable information redacted. These papers are representative of my prior three attempts to file with USCIS a G-28 to represent J.A.L.M.

12. On April 28, 2025, Immigration Judge (IJ) Douglas Nelson granted DHS's motion to dismiss the removal case against J.A.L.M. Attached as Exhibit E to this declaration is a true and correct copy of the immigration judge's decision with all personally identifiable information redacted.

13. On May 8, 2025, USCIS called me on the telephone without advance notice and with J.A.L.M. on the line to resume my client's CFI. I requested to reschedule because of a scheduling conflict. On May 13, 2025, the CFI proceeded telephonically as scheduled and I was present.

14. On May 19, 2025, J.A.L.M. was informed he had passed his CFI, and was placed back in removal proceedings.

15. J.A.L.M. remains detained pending his new removal case. His first Master Calendar Hearing (MCH) was on June 3, 2025. At the MCH, the new Immigration Judge stated that she could not see any of the prior proceedings, and anything related to the case would need to be re-submitted.

JA316

16. J.A.L.M. arrived in the United States in September 2024 at an official port of entry with an appointment that he secured using the government-issued CBP One process and they was inspected and lawfully paroled into the country at that time. They went to the address that he provided to government officials, lawfully obtained an EAD and employment, and followed all processes and requirements provided to him by ICE and the immigration courts. Beginning with their detention by ICE on or about April 8, 2025, he has experienced significant emotional distress. I have spent numerous hours scrambling to understand what the government was doing at various points in this case, from initiating a credible fear interview process while removal proceedings were ongoing and expedited removal could not legally have been commenced, to moving to dismiss his removal proceedings despite the fact that he was lawfully paroled into the country, to repeatedly rejecting my properly-filed notices of appearance with USCIS. The complete process from being in removal proceedings in front of EOIR through expedited removal and back to removal proceedings took up numerous hours of office time within our office and caused our client incredible amounts of anxiety and took an emotional toll. J.A.L.M. is gay and has a strong asylum case. J.A.L.M.'s asylum claim stems from his effeminate gender presentation and his sexuality. They are afraid and currently experiencing mental distress at being in a detention center where they fear bullying and violence from other detainees. After all the time and emotional distress that J.A.L.M. was subjected to as a result of the government's efforts to dismiss removal proceedings and process them for expedited removal, J.A.L.M. is once more in removal proceedings.

17. This declaration is based on a review of all documents available to myself and J.A.L.M. regarding their immigration history, immigration status, and immigration case and to the

JA317

best of their knowledge all statements are true and correct. It is not feasible for J.A.L.M.

to prepare his own signed declaration, because they are in immigration detention and I

have only been able to review the documents in their immigration file and am only able

to occasionally speak to them by phone.

I declare under penalty of perjury and under the laws of the United States that the foregoing is

true and correct to the best of my knowledge.

Executed in San Diego, California on June 11, 2025.

Meghan Dupuis Maurus

JA318

# EXHIBIT A

JA319

Uploaded on: 05/20/2025 at 09:50:37 AM Pacific Daylight Time Base City: VG
USCA Case #25-5289    Document #2146004    Filed: 11/18/2025    Page 323 of 352
Case 1:25-cv-00872-JMC    Document 22-13    Filed 06/11/25    Page 8 of 37    Page 323 of 37

DEPARTMENT OF HOMELAND SECURITY
## NOTICE TO APPEAR

In removal proceedings under section 240 of the Immigration and Nationality Act:

File No: ▓▓▓▓▓▓▓

In the Matter of:

Respondent: ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ currently residing at:

| NEVADA SOUTHERN DETENTION CENTER, 2190 E. MESQUITE AVE, PAHRUMP NV, 89060 | 385-461-5697 |
| (Number, street, city, state and ZIP code) | (Area code and phone number) |

☐ You are an arriving alien.

☒ You are an alien present in the United States who has not been admitted or paroled.

☐ You have been admitted to the United States, but are removable for the reasons stated below.

The Department of Homeland Security alleges that you:

1. You are not a citizen or national of the United States;
2. You are a native of Honduras and a citizen of HONDURAS;
3. You entered the United States at an unknown location on or about 2024-09-03;
4. You did not then possess or present a valid immigrant visa, reentry permit, border crossing identification card, or other valid entry document.

On the basis of the foregoing, it is charged that you are subject to removal from the United States pursuant to the following provision(s) of law:

Section 212(a)(7)(A)(i)(I) of the Immigration and Nationality Act (Act), as amended, as an immigrant who, at the time of application for admission, is not in possession of a valid unexpired immigrant visa, reentry permit, border crossing card, or other valid entry document required by the Act, and a valid unexpired passport, or other suitable travel document, or document of identity and nationality as required under the regulations issued by the Attorney General under section 211(a) of the Act.

☒ This notice is being issued after an asylum officer has found that the respondent has demonstrated a credible fear of persecution or torture.

☒ Section 235(b)(1) order was vacated pursuant to:    ☒ 8CFR 208.30    ☐ 8CFR 235.3(b)(5)(iv)    ▓▓▓▓

YOU ARE ORDERED to appear before an immigration judge of the United States Department of Justice at:

110 N CITY PKWY, STE 400, LAS VEGAS, NV, 89106
(Complete Address of Immigration Court, including Room Number, if any)

on ___6/3/2025___ at ___8:00 AM___ to show why you should not be removed from the United States based on the
        (Date)                (Time)

charge(s) set forth above.                           _____ Supervisory Asylum Officer
                                                        (Signature and Title of Issuing Officer)

Date: ___5/16/2025___                    PAHRUMP NV
                                          (City and State)

EOIR — 2 of 3

## Notice to Respondent

**Warning:** Any statement you make may be used against you in removal proceedings.
**Alien Registration:** This copy of the Notice to Appear served upon you is evidence of your alien registration while you are in removal proceedings. You are required to carry it with you at all times.

**Representation:** If you so choose, you may be represented in this proceeding, at no expense to the Government, by an attorney or other individual authorized and qualified to represent persons before the Executive Office for Immigration Review, pursuant to 8 CFR 1003.16. Unless you so request, no hearing will be scheduled earlier than ten days from the date of this notice, to allow you sufficient time to secure counsel. A list of qualified attorneys and organizations who may be available to represent you at no cost will be provided with this notice.

**Conduct of the hearing:** At the time of your hearing, you should bring with you any affidavits or other documents that you desire to have considered in connection with your case. If you wish to have the testimony of any witnesses considered, you should arrange to have such witnesses present at the hearing. At your hearing you will be given the opportunity to admit or deny any or all of the allegations in the Notice to Appear, including that you are inadmissible or removable. You will have an opportunity to present evidence on your own behalf, to examine any evidence presented by the Government, to object, on proper legal grounds, to the receipt of evidence and to cross examine any witnesses presented by the Government. At the conclusion of your hearing, you have a right to appeal an adverse decision by the immigration judge. You will be advised by the immigration judge before whom you appear of any relief from removal for which you may appear eligible including the privilege of voluntary departure. You will be given a reasonable opportunity to make any such application to the immigration judge.

**One-Year Asylum Application Deadline:** If you believe you may be eligible for asylum, you must file a Form I-589, Application for Asylum and for Withholding of Removal. The Form I-589, Instructions, and information on where to file the Form can be found at www.uscis.gov/I-589. Failure to file the Form I-589 within one year of arrival may bar you from eligibility to apply for asylum pursuant to section 208(a)(2)(B) of the Immigration and Nationality Act.

**Failure to appear:** You are required to provide the Department of Homeland Security (DHS), in writing, with your full mailing address and telephone number. You must notify the Immigration Court and the DHS immediately by using Form EOIR-33 whenever you change your address or telephone number during the course of this proceeding. You will be provided with a copy of this form. Notices of hearing will be mailed to this address. If you do not submit Form EOIR-33 and do not otherwise provide an address at which you may be reached during proceedings, then the Government shall not be required to provide you with written notice of your hearing. If you fail to attend the hearing at the time and place designated on this notice, or any date and time later directed by the Immigration Court, a removal order may be entered by the immigration judge in your absence, and you may be arrested and detained by the DHS.

**Mandatory Duty to Surrender for Removal:** If you become subject to a final order of removal, you must surrender for removal to your local DHS office, listed on the internet at **http://www.ice.gov/contact/ero**, as directed by the DHS and required by statute and regulation. Immigration regulations at 8 CFR 1241.1 define when the removal order becomes administratively final. If you are granted voluntary departure and fail to depart the United States as required, fail to post a bond in connection with voluntary departure, or fail to comply with any other condition or term in connection with voluntary departure, you must surrender for removal on the next business day thereafter. If you do not surrender for removal as required, you will be ineligible for all forms of discretionary relief for as long as you remain in the United States and for ten years after your departure or removal. This means you will be ineligible for asylum, cancellation of removal, voluntary departure, adjustment of status, change of nonimmigrant status, registry, and related waivers for this period. If you do not surrender for removal as required, you may also be criminally prosecuted under section 243 of the Immigration and Nationality Act.

U.S. Citizenship Claims: If you believe you are a United States citizen, please advise the DHS by calling the ICE Law Enforcement Support Center toll free at (855) 448-6903.

**Sensitive locations:** To the extent that an enforcement action leading to a removal proceeding was taken against Respondent at a location described in 8 U.S.C. § 1229(e)(1), such action complied with 8 U.S.C. § 1367.

Upon information and belief, the language that the alien understands is _____                    SPANISH

---

### Request for Prompt Hearing

To expedite a determination in my case, I request this Notice to Appear be filed with the Executive Office for Immigration Review as soon as possible. I waive my right to a 10-day period prior to appearing before an immigration judge and request my hearing be scheduled.

Before: _____     _____
                                                          *(Signature of Respondent)*

_____                              Date: _____
*(Signature and Title of Immigration Officer)*

---

### Certificate of Service

This Notice To Appear was served on the respondent by me on ~~April~~ 5·19·25 ✔ D·0747, in the following manner and in compliance with section 239(a)(1) of the Act.

☑ in person   ☐ by certified mail, returned receipt # _____ requested   ☐ by regular mail
☐ Attached is a credible fear worksheet.
☑ Attached is a list of organization and attorneys which provide free legal services.

The alien was provided oral notice in the _____SPANISH_____ language of the time and place of his or her hearing and of the consequences of failure to appear as provided in section 240(b)(7) of the Act.

_____                    _____
                        *(Personally Served)*                     *(Signature and Title of officer)*

(Page 324 of Total)

JA321

## Privacy Act Statement

**Authority:**
The Department of Homeland Security through U.S. Immigration and Customs Enforcement (ICE), U.S Customs and Border Protection (CBP), and U.S. Citizenship and Immigration Services (USCIS) are authorized to collect the information requested on this form pursuant to Sections 103, 237, 239, 240, and 290 of the Immigration and Nationality Act (INA), as amended (8 U.S.C. 1103, 1229, 1229a, and 1360), and the regulations issued pursuant thereto.

**Purpose:**
You are being asked to sign and date this Notice to Appear (NTA) as an acknowledgement of personal receipt of this notice. This notice, when filed with the U.S. Department of Justice's (DOJ) Executive Office for Immigration Review (EOIR), initiates removal proceedings. The NTA contains information regarding the nature of the proceedings against you, the legal authority under which proceedings are conducted, the acts or conduct alleged against you to be in violation of law, the charges against you, and the statutory provisions alleged to have been violated. The NTA also includes information about the conduct of the removal hearing, your right to representation at no expense to the government, the requirement to inform EOIR of any change in address, the consequences for failing to appear, and that generally, if you wish to apply for asylum, you must do so within one year of your arrival in the United States. If you choose to sign and date the NTA, that information will be used to confirm that you received it, and for recordkeeping.

**Routine Uses:**
For United States Citizens, Lawful Permanent Residents, or individuals whose records are covered by the Judicial Redress Act of 2015 (5 U.S.C. § 552a note), your information may be disclosed in accordance with the Privacy Act of 1974, 5 U.S.C. § 552a(b), including pursuant to the routine uses published in the following DHS systems of records notices (SORN): DHS/USCIS/ICE/CBP-001 Alien File, Index, and National File Tracking System of Records, DHS/USCIS-007 Benefit Information System, DHS/ICE-011 Criminal Arrest Records and Immigration Enforcement Records (CARIER), and DHS/ICE-003 General Counsel Electronic Management System (GEMS), and DHS/CBP-023 Border Patrol Enforcement Records (BPER). These SORNs can be viewed at https://www.dhs.gov/system-records-notices-sorns. When disclosed to the DOJ's EOIR for immigration proceedings, this information that is maintained and used by DOJ is covered by the following DOJ SORN: EOIR-001, Records and Management Information System, or any updated or successor SORN, which can be viewed at https://www.justice.gov/opcl/doj-systems-records. Further, your information may be disclosed pursuant to routine uses described in the abovementioned DHS SORNs or DOJ EOIR SORN to federal, state, local, tribal, territorial, and foreign law enforcement agencies for enforcement, investigatory, litigation, or other similar purposes.

For all others, as appropriate under United States law and DHS policy, the information you provide may be shared internally within DHS, as well as with federal, state, local, tribal, territorial, and foreign law enforcement; other government agencies; and other parties for enforcement, investigatory, litigation, or other similar purposes.

**Disclosure:**
Providing your signature and the date of your signature is voluntary. There are no effects on you for not providing your signature and date; however, removal proceedings may continue notwithstanding the failure or refusal to provide this information.

EOIR – 3 of 3

# EXHIBIT B

JA323

Meghan DuPuis Maurus                                    **DETAINED**
EOIR CC111789
2364 Paseo de las Americas, 104-301
San Diego, CA 92154
 (619) 649-8898
maurus@transgnderlawcenter.org


### UNITED STATES DEPARTMENT OF JUSTICE
### EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
### SALT LAKE CITY IMMIGRATION COURT
### SALT LAKE CITY, UTAH


**In the matter of:**

███████████████████                    **File No.** ███████████

**In Removal Proceedings**


**Hon. Douglas Donaldson**                    **Next Hearing: Jan. 20, 2028**


### RESPONDENT'S OPPOSITION TO THE DEPARTMENT OF HOMELAND SECURITY'S
### MOTION TO DISMISS

Meghan DuPuis Maurus                                    **DETAINED**
EOIR CC111789
2364 Paseo de las Americas, 104-301
San Diego, CA 92154
 (619) 649-8898
maurus@transgnderlawcenter.org

**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**SALT LAKE CITY IMMIGRATION COURT**
**SALT LAKE CITY, UTAH**

**In the matter of:**

███████████████████████                    **File No.** ████████████

**In Removal Proceedings**

**RESPONDENT'S OPPOSITION TO DHS'S MOTION TO DISMISS**

On April 8, 2025counsel for the Department of Homeland Security (DHS) Office of the Principal Legal Advisor (OPLA) filed a motion to dismiss these proceedings. DHS alleges that, pursuant to 8 C.F.R. § 239.2(a)(7), the circumstances of this case have changed after the issuance of the Notice to Appear to such an extent that continuation is no longer in the best interest of the government because the government has now decided that it would like to pursue expedited removal against the Respondent. OPLA did not seek Respondent's position before filing the motion to dismiss, and Respondent strenuously opposes the motion.[1] For the reasons set forth below, the Court should deny DHS's motion to dismiss.

**I.    FACTS AND PROCEDURAL HISTORY**

---

[1] The Immigration Court Practice Manual (ICPM) states that a party "should make a good faith effort to ascertain the opposing party's position on the motion." EOIR Policy Manual, Pt. II – ICPM, Ch. 5.2(i), https://www.justice.gov/eoir/reference-materials/ic/chapter-5/2. The Court should reject DHS's motion for their failure to comply with the ICPM by not making a good faith effort to contact Respondent's counsel.

DHS issued a Notice to Appear (NTA) to initiate these removal proceedings against Respondent on September 3, 2024, alleging that Respondent was an arriving alien. Respondent was not a citizen or national of the United States. Respondent was a citizen of Honduras. Respondent applied for admission on September 3, 2024, at Eagle Pass, Texas (Bridge 2). DHS further alleged that Respondent was an immigrant not in possession of a valid unexpired immigrant visa, reentry permit, border crossing card, or other valid entry document required by the Immigration and Nationality Act ("INA"); and that they were an immigrant not in possession of a valid unexpired passport, or other suitable travel document, or document of identity or nationality. DHS filed the NTA on September 3, 2024, commencing these removal proceedings.

Respondent entered the United States after applying for, and receiving, a date to present at the border through CBP One. On September 3, 2024, CBP One was the process laid out by the US Government on how to enter and seek asylum. Respondent received their date to present on September 3, 2024, and presented at the assigned date and time, and entered through the Port of Entry at Eagle Pass, Texas. Respondent travelled to the sponsor they had listed in CBP One and at the border. Respondent was placed in removal proceedings and given a date to appear in Salt Lake City Immigration Court on Jan. 20, 2028, at 1pm. Through a local legal organization Respondent applied for, and obtained a work permit, and was on waitlists with at least two organizations to complete the Application for Asylum, Withholding of Removal, and Protection under the Convention against Torture ("CAT"), Form I-589 ("I-589"), within one year of entering the United States. They remained at the address listed when they entered the United States.

Respondent submitted a I-589 on April 9, 2025, asserting asylum based on their membership in a particular social group, and their political opinion. Mr. ███████ is a gay man who has also been a member of a LGBT rights organization in Honduras. On both of these bases he has been physically harmed, sexually assaulted, and endured a lifetime of smaller but daily assault on his person for being gay. Respondent decided to leave Honduras after being kidnapped off the street and violently raped at knifepoint. At the end the perpetrator told Respondent he knew who he was and knew his family. Respondent was threatened with death. He went to the police, but they told him there was nothing they could do, and that likely the perpetrator would know he came. Respondent felt the only way to stay alive was to flee Honduras. See, Exhibit E.

The incident that caused him to flee was merely the last incident in a lifetime of anti-LGBT violence against him. *Id.* He was spit on in the street. Nearly daily he would have people say anti-gay slurs or insults. *Id.* He had to barely subsist as a self-employed person because he could not find employment because of his sexuality. *Id.* He was attacked physically on numerous occasions. *Id.* In short, he suffered a lifetime of violence and abuse for his sexuality.

## I.    ARGUMENT

This Court should deny DHS's motion to dismiss. In adjudicating DHS's motion, this Court must consider Respondent's arguments in opposition to the motion. *Matter of G-N-C-*, 22 I&N Dec. 281, 284-85 (BIA 1998). This Court should deny DHS's motion to dismiss because

Respondent wishes to have this Court adjudicate his pending application for Asylum, Withholding of Removal and protection under CAT, and, since DHS has chosen to

commence INA § 240 proceedings, he has a right to be heard on that claim. Further, Respondent will suffer serious prejudice if this Court grants DHS's motion to dismiss and he is not able to pursue her application for asylum before this Court. Even evaluating DHS's motion solely on its stated basis pursuant to 8 C.F.R. § 239.2(a)(7), the motion must be denied because DHS has failed to establish that circumstances in *this case* have changed since the NTA's issuance, or that it is not in the government's best interest for the case to proceed to a final merits adjudication. In fact, DHS cannot lawfully apply expedited removal to the Respondent, as doing so would violate bedrock anti-retroactivity law. *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988).

### A. This Court Has a Duty to Consider the Respondent's Arguments in Opposition to DHS's Motion to Dismiss.

This Court has the exclusive authority to decide whether or not to dismiss these removal proceedings, and it must consider the Respondent's reasons for opposing DHS's motion. *See* 8 C.F.R. § 1239.2(c); *Matter of G-N-C-*, 22 I&N Dec. 281, 284-85 (BIA 1998). Board of Immigration Appeals (BIA) precedent recognizes that, in adjudicating a DHS motion to dismiss, an Immigration Judge must consider both parties' arguments. *G-N-C-*, 22 I&N Dec. at 284-85 ("To the extent that these proceedings were terminated without considering arguments from both sides, the Immigration Judge erred."). In a 2023 case, the BIA reaffirmed its longstanding precedent that when DHS moves to dismiss removal proceedings, the Immigration Judge "must ... independently adjudicate the motion." *Matter of H.N. Ferreira*, 28 I&N Dec. 765, 768 (BIA 2023). In adjudicating DHS's motion, the Court must consider all "underlying facts and circumstances," including "[t]he respondent's interest." *Id.* at 769. Recent EOIR guidance has affirmed the Immigration Judge's role as an independent and impartial adjudicator. *See* Memorandum from Sirce E. Owen, EOIR Acting

4

Dir., PM 25-02, EOIR's Core Policy Values, at 1 (Jan. 27, 2025).

In interpreting Immigration Judge and BIA regulatory authority to control removal proceedings and adjudicate other types of motions that bear on a case's finality, the BIA has repeatedly confirmed that DHS does not have "absolute veto power over the authority of an Immigration Judge or the Board to act in proceedings." *Matter of Avetisyan*, 25 I&N Dec. 688, 693 (BIA 2012); *accord Matter of W-Y-U-*, 27 I&N Dec. 17, 20 n.5 (BIA 2017); *see also Gonzalez-Caraveo v. Sessions*, 882 F.3d 885, 890 (9th Cir. 2018) ("In the context of . . . motions to reopen and requests for continuances—the BIA and the Ninth Circuit, as well as other circuits, have rejected allowing such veto power to a party."). Instead, Immigration Judges are required to "exercise [their] independent judgment and discretion and may take any action consistent with the Act and regulations that is appropriate and necessary for the disposition of such cases." *Avetisyan*, 25 I&N Dec. at 691 (citing 8 C.F.R. § 1003.10(b)).

In sum, this Court must consider the Respondent's arguments against dismissal.

**B. This Court Should Deny DHS's Motion to Dismiss Because Dismissal for Expedited Removal Would Severely Prejudice the Respondent.**

Dismissal of these proceedings so that DHS can subject the Respondent to expedited removal would result in his swift return to Honduras, where he would face harm. This is further evidenced by the fact that Respondent spent a little over a year in Mexico where he also endured anti-gay violence. Initially, Respondent considered staying in Mexico when they left Honduras. See, I-589. However, they experienced anti-LGBT attacks and violence and realized they had to continue to flee to the United States. Respondent has a strong asylum case as a LGBT man with clear past persecution. Justice is best served by continuing the removal proceedings in Immigration Court where a Judge can adjudicate the claim most expeditiously and efficiently.

JA329

5

Dismissal of these proceedings would also deprive the Respondent of his right to have her meritorious claim for Asylum adjudicated, as described below. BIA case law evaluating unilateral DHS dismissal motions has upheld dismissal where the respondent was not prejudiced. *See, e.g.*, *Matter of Andrade Jaso & Carbajal Ayala*, 27 I&N Dec. 557, 559 (BIA 2019) (upholding Immigration Judge grant of DHS motion to dismiss noting that dismissal was without prejudice, as "[t]he respondents have not been ordered removed,…there is no indication that they are in imminent danger of removal," and they could pursue relief in the future if DHS placed them into new removal proceedings); *G-N-C-*, 22 I&N Dec. at 286 (upholding DHS's motion to dismiss where the respondent did not specify relief he was eligible for or "explain how he was prejudiced" by the Immigration Judge's decision to dismiss). In contrast, here, the dismissal would severely prejudice the Respondent, and thus the Court must deny DHS's motion.

1.  *Respondent Has a Right to Pursue Humanitarian Protection, and This Court Has a Responsibility to Adjudicate Respondent's Application.*

This Court should deny DHS's motion to dismiss because the Respondent has a right to have his claims for humanitarian protection adjudicated on the merits. Noncitizens in removal proceedings have a right to apply for relief from removal and to a hearing on their applications for relief.  *See* INA § 240(b)(4)(B); 8 C.F.R. § 1240.10(a)(4); *see also, e.g.*, *Matter of M-A-M-*, 25 I&N Dec. 474, 479 (BIA 2011) ("Included in the rights that the Due Process Clause requires in removal proceedings is the right to a full and fair hearing."). The regulations state that the Immigration Judge "*shall* inform the [noncitizen] of his or her apparent eligibility to apply for *any of the benefits enumerated in this chapter* and *shall afford the [noncitizen] an opportunity to make application during the hearing*, in accordance with the provisions of § 1240.8(d)." 8 C.F.R.

§ 1240.11(a)(2) (emphases added).

Respondent has a statutory right to seek asylum. INA § 208(a)(1) ("[A noncitizen] who is physically present in the United States or who arrives in the United States . . . irrespective of such [noncitizen's] status, may apply for asylum      "). Granting DHS's motion to dismiss where, as here, Respondent wishes to present his asylum claim would subvert Congress's clearly articulated intent. It would also violate his "right to a hearing on the merits of [their] claim." *W-Y-U-*, 27 I&N Dec. at 19; *see* 8 C.F.R. § 1240.11(c)(3) (directing that applications for asylum and withholding "*will be decided by the immigration judge* . . . after an evidentiary hearing to resolve factual issues in dispute" (emphasis added)).

In adjudicating an opposed DHS motion to dismiss, as here, the Court must consider whether dismissal would prejudice the Respondent, including considering the Respondent's desire to have an application for relief adjudicated on the merits. *Cf. Avetisyan*, 25 I&N Dec. at 691 (recognizing that in considering whether to defer action on a case, an Immigration Judge considers "justice and fairness to the parties"). Once DHS has initiated removal proceedings by filing an NTA, it is the Court's "responsibility to . . . adjudicate the respondent's application for relief from removal, if any." *Id.*; *see also Matter of J-A-B- & I-J-V-A-*, 27 I&N Dec. 168, 170 (BIA 2017) (recognizing IJ's "duty to adjudicate the respondents' case once the removal proceedings were initiated."). The BIA has repeatedly recognized that "[t]he role of the Immigration Courts and the Board is to adjudicate whether [a noncitizen] is removable and eligible for relief from removal in cases brought by the DHS." *J-A-B- & I-J-V-A-*, 27 I&N at 170 (quoting *W-Y-U-*, 27 I&N Dec. at 19); *J-A-B- & I-J-V-A-*, 27 I&N at 170 (noting that terminating proceedings upon unilateral motion may be "inconsistent with [the IJ's] role in our adjudicative process.").

JA331

In *Matter of W-Y-U-*, where the respondent, who had filed an application for asylum with the court, opposed a DHS motion for administrative closure, the BIA recognized that in exercising their administrative closure authority an Immigration Judge must consider the respondent's "interest in having [the] case resolved on the merits." 27 I&N Dec. at 18-19. The BIA further acknowledged that a noncitizen in removal proceedings has a right to seek asylum and related relief and a "right to a hearing on the merits of [their] claim." *Id.* at 19. The BIA concluded that these were persuasive reasons for the case to proceed and be resolved on the merits and reversed the Immigration Judge's grant of DHS's motion for administrative closure. *Id.* at 20.[22]

Similarly, here, the Court should deny DHS's motion given Respondent's interest in having the case resolved on the merits and his right to be heard on his claims for humanitarian protection. *See W-Y-U-*, 27 I&N Dec. at 19; *H.N. Ferreira*, 28 I&N Dec. at 769-70 (reversing dismissal noting the respondent's "significant" interest in having her Form I-751 reviewed). Indeed, the facts of this case are similar to unpublished BIA decisions where the BIA has sustained respondents' appeal of a DHS motion to dismiss in light of respondents' desire to seek relief before the immigration court. *See, e.g.*, Ex. A, G-C-D-, AXXX XXX 178 (BIA May 15, 2017) (unpublished) (sustaining appeal where respondents wished to have their applications for cancellation of removal and asylum adjudicated by the court); Ex. B, R-G-H-M-, AXXX-XXX 972 (Aug. 9, 2017) (unpublished) (sustaining appeal where the respondents wished to seek cancellation of removal, noting that a respondent being a low DHS enforcement priority was no guarantee

---

[22] *Matter of W-Y-U-* was partially superseded on other grounds via the 2024 EOIR Rule, Efficient Case and Docket Management in Immigration Proceedings, 89 Fed. Reg. 46742, 46753 (May 29, 2024).

JA332

8

that she would remain so in the future and was not a sound basis for terminating her case and denying her the opportunity to have her cancellation claim adjudicated); Ex. C, AXXX XXX XXX (BIA Jan. 8, 2024) (unpublished) (sustaining appeal where the respondent wanted an adjudication on their pending asylum application, noting that DHS's reason for dismissal to preserve limited resources "is not a sufficient basis to terminate these proceedings over the objection of the respondent after DHS filed a Notice to Appear, and the respondent filed an application for relief from removal").

2. *Respondent Will Suffer Harm If Not Able to Pursue his Applications for Asylum, Withholding of Removal and protection under the CAT*

Respondent has applied for asylum, withholding of removal, and protection under the CAT and wishes to continue to pursue this relief. Dismissing this case in Immigration Court and then forcing the Respondent to re-start their asylum process via a credible fear under INA § 235 would be an incredible waste of resources and severely harmful to the Respondent. It would prejudice the Respondent to lose the opportunity to have their case heard in an appropriate venue, only to be placed in an extended limbo of starting the process over *via* expedited removal/CFI process. Their detention is unnecessary and undertaken at taxpayer expense. As would be dismissing this case only to place them back into expedited removal proceedings. Additionally, Respondent would have fewer rights in the CFI process than he is currently entitled in removal proceedings, which would prejudice the Respondent. *See Matter of E-R-M- & L-R-M-, 25 I&N Dec. 520, 521 n.1 (BIA 2011) (noting that respondents in removal proceedings have "more rights available to them" than in expedited removal proceedings) compare, e.g., INA § 240(b)(4), 8 C.F.R. §§ 1240.3, 1240.10(a), 1003.1(b)(3) (rights in removal proceedings), with 8 C.F.R. §§ 1003.42(c), 1208.30(g)(2)(iv)(A) (limited rights in credible fear process.*

Granting DHS Motion to Dismiss would upend the principle of fairness and reliance that is guaranteed by our system of law. Respondent followed all instructions and requirements laid out of him by the US Government in pursuing his asylum claim. He waited for six months to obtain a date to present at the border via CBP One, which was then the method laid out by the US Government. See, Exhibit E. He stayed in a shelter for LGBT people in Mexico and suffered anti-LGBT violence during that time, but managed to wait to get a date as was instructed by the US Government. *Id.* Respondent provided a familial sponsor at the border, went to live with that sponsor, and followed all instructions laid out for him by immigration officials. *Id.* They sought, and obtained, a work permit. They were seeking counsel to prepare and file their asylum application and other forms of humanitarian protection. Respondent followed the lawful process in place at the time with the belief that they would be able to pursue asylum, and now they may be removed with virtually no opportunity to present their claim.

As in *Matter of W-Y-U-*, here Respondent seeks a merits adjudication from this Court on his pending application for relief, which if granted would make him "eligible for lawful status in the United States," whereas dismissal provides him no legal status. *Id.* at  19; *see also id.* at 20 ("An unreasonable delay in the resolution of the proceedings may operate to the detriment of [noncitizens] by preventing them from obtaining relief that can provide lawful status…… ").

Unlike in other cases where the BIA has considered DHS unilateral motions to dismiss, here the prejudice to the Respondent would be immediate and extreme. If the Court grants dismissal, DHS will subject himto expedited removal, likely resulting in his swift deportation from the United States with no ability to have his meritorious claim for relief

JA334

heard in any forum. *See, e.g.*, *Matter of Andrade Jaso & Carbajal Ayala*, 27 I&N at 559 (upholding IJ grant of DHS motion to dismiss noting that "[t]he respondents have not been ordered removed, . . . there is no indication that they are in imminent danger of removal," and they could pursue relief in the future if DHS placed them into new removal proceedings).

### C. Even When Evaluated Solely on Its Stated Basis, DHS's Motion Must Be Denied.

Even evaluating DHS's motion solely on its stated basis, if this Court conducts "an informed adjudication . . . based on an evaluation of the factors underlying [DHS's] motion," *G-N-C-*, 22 I&N Dec. at 284, that motions fails on its own terms and must be denied. *See Matter of Andrade Jaso & Carbajal Ayala*, 27 I&N Dec. at 559 (considering whether DHS's motion under 8 C.F.R. § 239.2(a)(7) complied with that provision's requirements). The regulation underlying DHS's motion allows DHS to seek dismissal where "[c]ircumstances of the case have changed after the notice to appear was issued to such an extent that continuation is no longer in the best interest of the government." 8 C.F.R. § 239.2(a)(7). This provision encompasses a case-specific component— "circumstances of the case"— and a government-specific component— "best interest of the government." *Id.* Here, DHS has failed to establish that circumstances in Respondent's case have changed since the NTA's issuance and has separately failed to demonstrate that continuation is no longer in the government's best interest. Further, DHS's sole reason for requesting dismissal is to pursue expedited removal against Respondent, which it cannot lawfully do as explained below.

### 1. DHS Cannot Lawfully Pursue Expedited Removal Against Respondent

DHS's sole reason for requesting dismissal under 8 C.F.R. § 239.2(a)(7) is so that DHS can pursue expedited removal against Respondent. The Court should deny DHS's motion to dismiss because DHS's intended post-dismissal actions are unlawful for at least

JA335

two reasons.

**First**, subjecting Respondent to expedited removal would violate Congress's carefully crafted statutory scheme for processing noncitizen applicants for admission. INA § 235(b) provides DHS with several choices for how to process a noncitizen whom it alleges is an inadmissible applicant for admission, but there is no statutory authority for DHS to later reverse that choice. For certain allegedly inadmissible noncitizens, DHS can *either* place them into expedited removal under 8 U.S.C. § 1225(b)(1) *or* place them into full removal proceedings under 8 U.S.C. § 1225(b)(2). *See Matter of E-R-M- & L-R-M-*, 25 I&N Dec. at 523 (holding that "DHS has discretion to put [noncitizens] in section 240 removal proceedings even though they may also be subject to expedited removal under section 235(b)(1)(A)(i) of the Act"); *Matter of Cabrera-Fernandez*, 28 I&N Dec. 747, 748 (BIA 2023). If DHS at the time of initial processing of the individual makes the choice to use its INA § 235(b)(2) authority by issuing the noncitizen an NTA, as DHS did in Respondent's case, DHS has no authority to later reverse that choice. Nor does DHS point to any such authority in their motion to dismiss.

The Supreme Court's interpretation of INA § 235(b) in *Jennings v. Rodriguez*, 583 U.S. 281 (2018), also supports a reading of the statute that permits DHS to subject any given inadmissible applicant for admission to one process or the other, with no mechanism for later reversing course. In *Jennings*, the Supreme Court differentiated between (b)(1) noncitizens and (b)(2) noncitizens. The Court observed that "applicants for admission fall into one of two categories, those covered by [INA §235](b)(1) and those covered by [INA § 235](b)(2). [INA § 235](b)(2) . . . serves as a catchall provision that applies to all applicants for admission not covered by [INA § 235[(b)(1)." *Id.* at 287–88. Indeed, the statute itself

JA336

states that INA § 235(b)(2) applies to applicants for admission "to whom paragraph [(b)](1) does not apply.[3] Here, because DHS has elected to commence removal proceedings in Respondent's case, paragraph (b)(1) does not apply.

Similarly, a number of provisions in the INA describe INA § 235(b)(2) noncitizens as those "to whom proceedings under [INA § 240] are . . . initiated *at the time of such [noncitizen's] arrival*."[4] This language makes clear that Congress understood that DHS's processing decision for a noncitizen applicant for admission—whether to proceed with (b)(1) or (b)(2)—would occur at the time of the noncitizen's arrival or initial apprehension, not at some other point months or years later.  In a 2003 decision, the U.S. District Court for the Eastern District of Michigan questioned DHS's authority to use expedited removal against noncitizens who had been paroled into the United States at some earlier point, concluding that the government had "not provided any authority to show that expedited removal applies to [noncitizens] who are 'arriving aliens' based solely on the entry fiction doctrine and who have been residing in the interior of the United States for some time." *Am.-Arab Anti-Discrimination Comm. v. Ashcroft*, 272 F. Supp. 2d 650, 667-68 (E.D. Mich. 2003).

**Second**, subjecting Respondent to expedited removal would be unlawful because it would violate the long-held doctrine that new rules may not be applied retroactively in the

---

[3] INA § 235(b)(2)(B)(ii); *accord Innovation L. Lab v. Wolf*, 951 F.3d 1073, 1083 (9th Cir. 2020), *vacated and remanded sub nom. Mayorkas v. Innovation L. Lab*, 141 S. Ct. 2842 (2021), *and vacated as moot sub nom. Innovation L. Lab v. Mayorkas*, 5 F.4th 1099 (9th Cir. 2021).

[4] *See, e.g.*, INA § 240B(a)(4) (referring to a noncitizen "who is arriving . . . and with respect to whom proceedings under section 1229a of this title are . . . initiated *at the time of such alien's arrival*" (emphasis added)); INA § 212(a)(9)(A)(i) (making inadmissible certain noncitizens "ordered removed under [INA § 235(b)(1)] or at the end of proceedings under [INA § 240] initiated upon the [noncitizen's] arrival"); INA § 241(b)(1)(A) ("[a noncitizen] who arrives at the United States and with respect to whom proceedings under [INA § 240] of this title were initiated at the time of such [noncitizen's] arrival"); INA § 241(c)(1) ("[A noncitizen] arriving at a port of entry of the United States who is ordered removed either without a hearing under [INA § 235(b)(1) or § 235(c)] or pursuant to proceedings under [INA § 240] initiated at the time of such [noncitizen's] arrival ..................................................................................................").

JA337

13

absence of a clear congressional grant of retroactive rulemaking authority. *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). In this case, DHS purports to have the authority to subject Respondent to expedited removal pursuant to the January 24, 2025 Federal Register Notice expanding expedited removal to its full legislative scope. DHS, Designating Aliens for Expedited Removal, 90 Fed. Reg. 8139 (Jan. 24, 2025). While Congress granted DHS the authority to determine the scope of expedited removal up to the statutory maximum, *see* INA § 235(b)(1)(A)(iii)(I), it did not grant DHS the authority to apply new expedited removal designations retroactively. The Supreme Court has long recognized that "a statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms." *Bowen*, 488 U.S. at 208. To do so would add "new legal consequences to events completed [prior to the expansion]." *See Landgraf v. USI Film Prods.*, 511 U.S. 244, 269-70 (1994). Because Congress did not grant DHS the power to retroactively expand expedited removal, DHS cannot subject the Respondent, whose removal proceedings were initiated before the January 2025 expansion, to expedited removal; as described above, doing so would cause him significant prejudice.

     2.  *DHS Has Failed to Show How Circumstances of This Case Have Changed Since the NTA's Issuance.*

Further, dismissal is inappropriate because the "[c]ircumstances of the case" have not changed. 8 C.F.R. § 239.2(a)(7). DHS's motion does not even attempt to articulate how circumstances in *this case* have changed since the issuance of Respondent's NTA. In fact, DHS's motion references no facts specific to this case whatsoever. Contrary to DHS's conclusory statement that circumstances have changed, in fact no relevant circumstances have changed with respect to Respondent's case— he remains eligible for asylum and

JA338

14

continues to desire an adjudication on his claim on the merits by this Court. *See supra* Section II.B. Respondent has been waiting for an adjudication of his application for relief that only this Court has jurisdiction to grant.

Though DHS does not articulate the alleged changed circumstance in its motion, presumably DHS would argue that its new desire to pursue expedited removal against Respondent is a change in circumstances. But even if DHS's immigration enforcement policy may have changed since the NTA was issued, a political change underlying the government's enforcement policy is insufficient to show a changed circumstance in "the case," meaning this specific case of Respondent Josue Andres Leiva Molina, considering his individualized circumstances and facts. *See also Andrade Jaso & Carbajal Ayala*, 27 I&N Dec. at 559 (concluding that the respondent's post NTA behavior constituted a change in circumstances for purposes of 8 C.F.R. § 239.2(a)(7)).

Because DHS has not shown that circumstances in this case have changed since the issuance of the NTA, the Court should deny DHS's motion to dismiss.

> 3. *DHS Has Failed to Show Why Continuation Is Not in the "Best Interest of the Government."*

Even if DHS had articulated changed circumstances in this case since the NTA's issuance, which it has not, DHS has failed to show why continuation is not in the "best interest of the government." 8 C.F.R. § 239.2(a)(7). DHS's motion fails to consider key factors necessary to determining the government's best interest in an individual case, including Respondent's individual circumstances, Respondent's position on dismissal, and the efficient use of limited government resources. Consideration of these factors compels the conclusion that this case should proceed to a merits determination, as Respondent desires.

a. *The Respondent's Individual Circumstances and Position on Dismissal*

Determining whether dismissal of given case is in the government's best interest necessarily requires DHS to reach out to the respondent, as required by the ICPM, prior to filing for dismissal in order to understand the respondent's viewpoint and reasons why the respondent opposes dismissal. An individual's in having their claim for permanent immigration relief adjudicated on the merits must inform the government's view of whether dismissal is in the government's best interest. Moreover, what is in the government's best interest necessarily includes knowing the respondent's current case circumstances[5] and how a strategy one way or the other impacts lawful permanent residents and U.S. citizens in the respondent's life. Thus, OPLA's failure to seek Respondent's position before filing this motion itself defeats their assertion that dismissal is in the government's best interest, and therefore the motion must be denied.

b. *Efficient Use of Limited Government Resources*

DHS has not established that dismissal of this case is in the government's best interest because it has failed to address a key factor, the efficient use of limited government resources. In this case, Respondent wishes to pursue relief before the Court, including relief that only the immigration court has authority to grant.

Dismissing these proceedings over Respondent's objection would waste rather than conserve government resources. If this case is dismissed, Respondent will likely appeal the dismissal. DHS will then have to invest considerable resources in defending its decision to dismiss these proceedings. Likewise, the Department of Justice will expend considerable resources if this case is dismissed. The BIA will expend resources to issue a decision on

---

[5] DHS cannot know what the current circumstances of this case are because the of the lack of record in the case.

appeal. The case may then be remanded to this Court, restoring Respondent to his current position before the Court, after the passage of time and expenditure of considerable government resources. If this case is dismissed and Respondent is placed in expedited removal, Respondent will pursue asylum through the Credible Fear process, requiring the use of more government resources to adjudicate the claim in another forum, which will ultimately result in the case returning to this Court for an asylum adjudication. This process would result in a much larger aggregate expenditure of resources than allowing Respondent's claim to proceed now as he desires.

In contrast, this Court's adjudication of Respondent's I-589 application on promotes finality of the removal proceedings and prevents waste of government resources. If this case is allowed to move forward, the Court will schedule Respondent for an individual hearing which will use a limited amount of the Court's time and of OPLA's time.

Because DHS cannot establish either of the necessary requirements for bringing a motion to dismiss under 8 C.F.R. § 239.2(a)(7), this Court must deny the motion and allow Respondent's case to proceed to an adjudication on the merits.

## II.    CONCLUSION

For all of the reasons stated above, this Court should deny DHS's motion to dismiss and allow Respondent to proceed to the merits of the application pending before the Court.

Respectfully Submitted,

Meghan DuPuis Maurus
EOIR CC111789
2364 Paseo de las Americas, 104-301
San Diego, CA 92154
(619) 649-8898
maurus@transgnderlawcenter.org

# EXHIBIT

JA342



EM   ⊕ Emem Maurus <maurus@transgenderlawcenter.org>

To:   AsylumD3Prescreening

Wednesday, April 16, 2025 at 1:32 PM

2 MB

Download All   ✶ Preview All

To Whom It May Concern,

My name is Meghan D. Maurus. I represent the above referenced client. They are currently detained at **Nevada South Detention Center**. Attached you will find a G-28.

My client is in active removal proceedings in Salt Lake City, Utah, and we are opposing any motion to dismiss the case. The case remains pending.

In detention they have been asked several times to sign removal papers, and they have refused. They have refused because they fled their country due to persecution based on their **gender and sexuality**. They have clear past persecution and fear future persecution.

I have spoken with them, and they seek to continue their case and will not abandon or renounce it. Before any removal is effectuated, we seek a CFI with counsel present.

Best Regards,

Meghan D. Maurus

--
Meghan Maurus
Legal Director
Border Butterflies
Transgender Law Center
2364 Paseo de las Americas, 104-301
San Diego, CA 92154
(619) 649-8896
(+52) 664-358-2763
maurus@transgenderlawcenter.org

# EXHIBIT

JA344



RE:

A  ⬡ AsylumD3Prescreening <AsylumD3Prescreening@uscis.dhs.gov>
To: ⬡ Emem Maurus                                              Thursday, April 17, 2025 at 7:59 AM

This message is flagged for follow up.                                         Mark Complete

Hello,

Thank you for reaching out to District 3. Unfortunately, your client's case is no longer in our jurisdiction as it is with ICE.

Please reach out to ICE: https://www.ice.gov/contact

Thank you,
District 3
//mb

**From:** Emem Maurus <maurus@transgenderlawcenter.org>
**Sent:** Wednesday, April 16, 2025 3:33 PM
**To:** AsylumD3Prescreening <AsylumD3Prescreening@uscis.dhs.gov>
**Subject:**

You don't often get email from maurus@transgenderlawcenter.org. Learn why this is important
CAUTION: This email originated from outside of the Federal Government. DO NOT click links or open attachments unless you recognize and/or trust the sender. Contact the USCIS Security Operations Center with questions or click the "Report Phishing" button to report it as a phishing attempt.

To Whom It May Concern,

My name is Meghan D. Maurus. I represent the above referenced client. They are currently detained at **Nevada South Detention Center**. Attached you will find a G-28.

My client is in active removal proceedings in Salt Lake City, Utah, and we are opposing any motion to dismiss the case. The case remains pending.

In detention they have been asked several times to sign removal papers, and they have refused. They have refused because they fled their country due to persecution based on their **gender and sexuality**. They have clear past persecution and fear future persecution.

I have spoken with them, and they seek to continue their case and will not abandon or renounce it. Before any removal is effectuated, we seek a CFI with counsel present.

Best Regards,

Meghan D. Maurus

—

Meghan Maurus
Legal Director
Border Butterflies
Transgender Law Center
2364 Paseo de las Americas, 104-301
San Diego, CA 92154
(619) 649-8898
(+52) 664-358-2763
maurus@transgenderlawcenter.org

# EXHIBIT E



**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**SALT LAKE CITY IMMIGRATION COURT**

| | |
|---|---|
| Respondent Name: | A-Number: |
| ██████████████ | ████████ |
| | Riders: |
| To: | In Removal Proceedings |
| | Initiated by the Department of Homeland Security |
| Maurus, Meghan DuPuis | Date: |
| 2364 paseo de las Americas | 04/28/2025 |
| 104-301 | |
| San Diego, CA 92154 | |

**ORDER ON MOTION TO DISMISS**

☒ The Respondent ☐ the Department of Homeland Security ☐ the parties jointly has/have filed a motion to dismiss these proceedings under 8 CFR 1239.2(c). The moving party has given notice of the motion to the non-moving party and the court has provided the non-moving party with an opportunity to respond. The motion is ☒ opposed ☐ unopposed.

After considering the facts and circumstances, the immigration court orders that the motion to dismiss is:

☒ Granted without prejudice
☐ Denied

Further explanation:

On April 8, 2025, the Department of Homeland Security (DHS) filed its Motion to Dismiss Without Prejudice. It states that the respondent is removable under INA section 235(b)(1). It seeks to remove the respondent as per that authority. Accordingly, it seeks dismissal without prejudice because circumstances have changed since the issuance of the Notice to Appear (NTA), namely that continuation of these removal proceedings is no longer in the interest of the government.

On April 10, 2025, the respondent filed his Opposition to DHS's Motion to Dismiss. He states that DHS failed to make a good faith effort to ascertain the respondent's position on the motion. It objects to dismissal because DHS has failed to establish circumstances in this particular case that have changed since the issuance of the NTA. The respondent fears that the merits of his case will not be heard if placed into expedited removal and that he will face harm upon return to his country. He asserts that he has a right to have his claims for protection adjudicated on their merits. Respondent says he will lose the opportunity to have his case heard in an appropriate venue if dismissal is allowed. He believes that DHS cannot lawfully

pursue expedited removal at this stage. He also argues, among other things, that dismissal is not an efficient use of the government's limited resources.

The Court has considered all arguments presented by both sides. Previously, DHS elected to place this respondent into removal proceedings rather than expedited removal as it probably should have done from the beginning. Its election has caused resources to be spent by multiple agencies and by the respondent in furtherance of these proceedings. Yet there is no authority that states DHS is prohibited from changing its election. Indeed, recent authority (Designating Aliens for Expedited Removal, 90 Fed. Reg. 8139 (Jan. 24, 2025)) reaffirms the application of Congress's explicit authorization of DHS's categorization of aliens to whom expedited removal procedures may be applied. The exercise of that authority is within "the sole and unreviewable discretion" of DHS and may be modified at any time. INA section 235(b)(A)(A) (iii)(I). Accordingly, DHS is allowed to end these removal proceedings and institute expedited removal.

As for any due process concerns the Court finds the respondent is not entitled to commencement or continuation of removal proceedings to regularize his status through adjudication of a discretionary application for relief. See INA section 240A(b)(1); Matters of Jaso & Ayala, 27 I&N Dec. 557 at 559 (BIA 2019). This is a significant factor that weighs in favor of the DHS request. Moreover, the INA does not include "a judicially enforceable duty to proceed within a reasonable time." Kowalczyk v. INS, 245 F.3d 1143, 1150 n.5 (10th Cir. 2001).

Nor is the respondent precluded from seeking asylum and its related protections. In expedited removal, when he expresses his fear of persecution or torture, or a fear of return to his country, the inspecting officer shall not proceed further with his removal until he has been referred to an asylum officer. 8 CFR section 235.3(b)(4).

Accordingly, the government's motion to dismiss these proceedings is hereby GRANTED.


IT IS SO ORDERED.

JA348

Immigration Judge: NELSON, DOUGLAS 04/28/2025

**Certificate of Service**

This document was served:

Via: [ M ] Mail | [ P ] Personal Service | [ E ] Electronic Service | [ U ] Address Unavailable

To: [ ] Noncitizen | [ ] Noncitizen c/o custodial officer | [ E ] Noncitizen's atty/rep. | [ E ] DHS

Respondent Name : ████████████████████ | A-Number : ██████████

Riders:

Date: 05/01/2025 By: Recinos, Nuvia, Court Staff

JA349