JUSTICE ACTION
CENTER

July 2, 2026

VIA CM/ECF

Clifton Cislak
Clerk of Court
U.S. Court of Appeals for the D.C. Circuit
333 Constitution Ave NW
Washington, DC 20001

RE: *CHIRLA v. Noem*, No. 25-5289 (Oral Argument Held March 16, 2026), Rule 28(j) Letter

Dear Mr. Cislak,

Appellees respectfully write to alert the panel to the Supreme Court decision *Mullin v. Al Otro Lado*, 609 U.S. ----, 2026 WL 1825741 (June 25, 2026) *(*"*AOL*"*)*, which supports Appellees in four ways.

First, *AOL* cites dictionary definitions to identify the ordinary meaning of the phrase "arrives in the United States," which, like "arriving in the United States" at issue here, is in 8 U.S.C. §1225, is not statutorily defined, and was enacted in IIRIRA. *AOL,* *6. The Court found that "[t]o 'arrive' is to 'reach a destination'" or "'come to the end of a journey,'" and "[t]he preposition 'in' means '[w]ithin the limits, bounds, or area of.'" *Id.* "[A]n alien 'arrives in the United States' ... when he crosses the border." *Id.* Appellees reference such dictionary definitions to ascertain the ordinary meaning of "arriving in the United States." Appellees' Br. 35-37.

Second, *AOL* refers to other relevant immigration provisions to confirm that the phrase "arrives in the United States" refers to "*actual* entrance" into the United States. *AOL,* *7. Appellees cite multiple other provisions in 8 U.S.C. §1225 to similarly confirm that Congress used variants of the word "arrive" "to refer to physical entry into the country." Appellees' Br. 37.

Third, *AOL* concludes that "[i]n ordinary speech, no one would say that a person 'arrives in' a place—for example ... a country—before the person enters that place." *AOL*, *3 (emphasis omitted). Similarly, in ordinary speech, no one would say a person "is arriving in" a place months or years after they came into that place. Appellees cite numerous authorities referring to parolees as having "arrived" or having a specific "date of arrival." Appellees' Br. 22-23.

Fourth, *AOL* applies the canon that where Congress could have used "'readily available and apparent alternative[]'" language to indicate that "arrives in the United States" carries term-of-art meaning, the choice "not to adopt" such language favors the ordinary meaning. *AOL*, *7. Appellees argue that Congress's choice to subject "arriving" noncitizens to expedited removal—rather than the broader, defined "applicant[s] for admission," 8 U.S.C. §1225(a)(1)—was likewise intentional. Appellees' Br. 30, 40-41.

Sincerely,

Hillary Li
Justice Action Center
P.O. Box 27280
Los Angeles, CA 90027
(323) 841-2781
hillary.li@justiceactioncenter.org

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing letter complies with the type-volume limitations of Fed. R. App. P. 28(j) and D.C. Circuit local rules because the body contains 349 words.

## CERTIFICATE OF SERVICE

I hereby certify that on July 2, 2026, I electronically filed the foregoing with the Clerk for the United States Court of Appeals for the D.C. Circuit by using the appellate CM/ECF system. All participants in this case are registered CM/ECF users and will be served by the appellate CM/ECF system.

Dated: July 2, 2026

/s/Hillary Li
Hillary Li

NOTICE: This opinion is subject to formal revision before publication in the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

# SUPREME COURT OF THE UNITED STATES

No. 25–5

MARKWAYNE MULLIN, SECRETARY OF HOMELAND SECURITY, ET AL., PETITIONERS *v.* AL OTRO LADO, A CALIFORNIA CORPORATION, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 25, 2026]

JUSTICE ALITO delivered the opinion of the Court.

This case presents a straightforward question: whether an alien[1] who seeks to enter the United States[2] from Mexico "arrives *in* the United States" when he or she is still *in* Mexico. In the decision below, the United States Court of Appeals for the Ninth Circuit answered "yes." That is wrong. In ordinary speech, no one would say that a person "arrives *in*" a place—for example, a house, a city, or a country—before the person enters that place. The context in which the phrase "arrives in the United States" is used in the immigration statutes at issue here supports an ordinary-meaning reading. So does the presumption against extraterritoriality. We therefore reverse.

[1] The Immigration and Nationality Act (INA) defines an "alien" as "any person not a citizen or national of the United States." 8 U. S. C. §1101(a)(3).

[2] The term "United States," "when used in a geographical sense," ordinarily means the "continental United States, Alaska, Hawaii, Puerto Rico, Guam, the Virgin Islands of the United States, and the Commonwealth of the Northern Mariana Islands." §1101(a)(38).

# I

## A

Two sections of the Immigration and Nationality Act of 1952 (INA or the Act), 66 Stat. 163, are central to this dispute. Congress adopted both provisions in substantially their current form in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), 110 Stat. 3009–546. And both provisions contain the phrase "arrives in the United States."

The first, 8 U. S. C. §1225(a), governs the inspection of aliens who seek admission to the United States.[3] An alien who wishes to enter the United States lawfully must first be "admitted." As used in the INA, "admission" is a term of art that means the "lawful entry of [an] alien into the United States after inspection and authorization by an immigration officer." §1101(a)(13)(A). So an alien cannot lawfully enter this country without first being inspected by an immigration officer, and immigration officers must inspect all aliens "who are applicants for admission or [are] otherwise seeking admission" to the United States. §1225(a)(3). An alien is deemed an "applicant for admission" if he "arrives in the United States." §1225(a)(1). The Government correspondingly must inspect an alien who "arrives *in* the United States"—say, at the San Ysidro, California, port of entry through which millions of people pass every year. But an alien is not entitled to inspection until he "arrives in the United States." The meaning of the phrase "arrives in the United States" accordingly determines whether and when the Government must inspect an alien seeking to enter the country.

---

[3] The provision states in part: "An alien present in the United States who has not been admitted or who *arrives in the United States* (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters) shall be deemed for purposes of this chapter an applicant for admission." §1225(a)(1) (emphasis added).

The second of the two key statutory provisions, §1158(a)(1),[4] governs a process that may begin during inspection. During inspection, an immigration officer decides whether the alien is inadmissible under §1182, which bars entry on grounds related to, among other things, national security, foreign-policy concerns, and the alien's health or criminal activity. If the officer concludes that the alien is inadmissible, the officer must generally "order the alien removed from the United States without further hearing or review." §1225(b)(1)(A)(i). This procedure is known as expedited removal.

An officer may not proceed with expedited removal, however, if the alien indicates an "intention to apply for asylum under" §1158 or voices a "fear of persecution." §1225(b)(1)(A)(ii). In that event, the immigration officer must refer the alien to an asylum officer for what is known as a "credible fear" interview, at which the alien must establish a "significant possibility" of eligibility for asylum under §1158. *Ibid.*; §1225(b)(1)(B)(v). If the officer determines that the alien does not have a credible fear of persecution, the officer must "order the alien removed from the United States without further hearing or review," although the alien may request "prompt" and limited review by an immigration judge. §§1225(b)(1)(B)(iii)(I), (III). But if the asylum officer decides that the alien does have a credible fear, the officer must detain the alien for further consideration of the alien's application for asylum.

Asylum is a status that entitles an alien who is a "refugee" to remain and work in the United States.

---

[4] That provision states: "Any alien who is physically present in the United States or who *arrives in the United States* (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters), irrespective of such alien's status, may apply for asylum in accordance with this section or, where applicable, section 1225(b) of this title." §1158(a)(1) (emphasis added).

§1158(b)(1)(A). A refugee is an alien who is unable or unwilling to return to the country of his nationality "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." §1101(a)(42)(A). Any alien who "arrives in the United States" may apply for asylum, §1158(a)(1), and the Attorney General or the Secretary of Homeland Security may—but need not—grant such an application, §1158(b)(1)(A).

In sum, an alien that "arrives in the United States" is entitled to inspection, is deemed an applicant for admission, and may apply for asylum. By contrast, until an alien "arrives in the United States," he is not entitled to inspection, is not an applicant for admission, and cannot apply for asylum, except on other grounds not here at issue.

B

In the spring of 2016, U. S. Customs and Border Protection (CBP) began to experience a surge of aliens seeking admission at ports of entry along the U. S.-Mexico border. The number of aliens seeking to enter sometimes far exceeded the number CBP could properly process. Long delays slowed the inspection process, and, in the meantime, CBP sometimes ran short of chairs, meals, and beds. The resulting conditions were often unsafe for aliens, and they rendered border facilities unsecure.

In November 2016, the Department of Homeland Security responded by adopting a policy of "metering" the number of arriving aliens whom CBP would inspect each day and allow to apply for asylum. To enforce the policy, officials stood on the U. S. side of the border and prevented entry into the United States by more aliens than the port could adequately process.

The metering policy continued through the change in Presidential administrations. In April 2018, a CBP official distributed a memorandum that allowed CBP offices to

"meter the flow of travelers at the land border" when "necessary or appropriate to facilitate orderly processing" and to "maintain the security of the port and safe and sanitary conditions." App. 122. The memorandum empowered offices to "establish and operate physical access controls at the borderline, including as close to the U.S.-Mexico border as operationally feasible." *Ibid.* But officers could not "discourage" an alien "from waiting to be processed" if the alien claimed "fear of return" or sought "any other protection." *Id.*, at 122–123. And the memorandum stated that an alien "must be fully processed" once the alien "is in the United States." *Id.*, at 123. The Government reiterated the policy in a second 2018 memorandum, this one issued by the Secretary of Homeland Security. *Id.*, at 124–129.[5]

---

[5] As noted above, two different Presidential administrations found that surges of aliens seeking admission at ports of entry along the southern border had overwhelmed those ports' processing capacities and that allowing all these aliens to enter the country created unacceptable conditions at the port facilities. Both administrations found that metering was an appropriate response to the problem, and in reaching that conclusion they presumably considered alternatives, such as releasing on parole all the aliens who could not be expeditiously processed. See 8 U. S. C. §1182(d)(5)(A). As we note below, a third Presidential administration rescinded the policy after a District Court ruled it unlawful.

The centerpiece of the principal dissent is an impassioned argument against the administrations' policy choice, but we have neither the ability nor the authority to assess and countermand that choice. Assessing the policy would require, among other things, extensive inquiry into the number of aliens seeking admission at various ports of entry, the capacities of those ports and available detention facilities, the effects of attempting to detain all the aliens who could not be expeditiously processed, and the effects of alternative policies, such as granting parole. We lack the resources and expertise needed to make such an assessment on our review of the District Court's summary judgment, and more to the point, we lack the authority to do so. Our authority is limited to interpreting and applying the law.

C

In 2017, asylum seekers and the immigration-advocacy organization Al Otro Lado brought a putative class action against the Government in the United States District Court for the Southern District of California. Respondents argued that CBP's enforcement of the metering policy unlawfully withheld inspection and asylum processing from aliens who arrive at the border and seek to enter the United States. They sought class-wide declaratory and injunctive relief that would end the metering policy.

The District Court certified a class of all noncitizens who "seek or will seek to access" the asylum process "by presenting themselves" at certain ports on the U. S.-Mexico border and "were or will be denied access" to that process by CBP officials. App. to Pet. for Cert. 300a, n. 3. The court then granted summary judgment for the class and declared that the Government's "denial of inspection or asylum processing" to class members "who are in the process of arriving in the United States" is "unlawful regardless of the purported justification for doing so." *Id.*, at 253a. The administration rescinded the metering policy in November 2021, shortly after the District Court ruled the policy unlawful.

A divided panel of the Ninth Circuit affirmed in relevant part. *Al Otro Lado* v. *Executive Office for Immigration Review*, 138 F. 4th 1102 (2025).[6] It held that an alien "arrives in the United States"—and thus must be inspected and may apply for asylum—when the alien, while "standing on" the Mexico side of the border, encounters a United States official at the border. *Id.*, at 1113, 1115. The majority based this conclusion on other language in the provision that allows certain aliens to apply for asylum. Such an application

[6] Before reaching the merits, the panel majority held that the Government's rescission of the metering policy did not moot the claim now before us. The dissent did not disagree with that conclusion.

may be filed by not only an alien who "arrives in the United States" but also any alien who "is physically present in the United States." §1158(a)(1). The majority reasoned that if, as the Government maintained, an alien "arrives in the United States" only when he enters the country, the phrase "arrives in the United States" would be "completely subsumed within the phrase 'physically present in the United States.'" 138 F. 4th, at 1114. The majority stated that its interpretation, by contrast, gave "every clause and word of" §1158(a)(1) an independent meaning. *Id.*, at 1115. And because §1225(a)(1), the provision governing inspection and admission, contains nearly identical language, the majority construed it the same way. *Id.*, at 1118–1119. Judge Ryan Nelson dissented. He argued that an alien "arrives in the United States" only when he "crosses the border" into the United States, and he charged that the majority's reading defied "[t]ext, history, precedent, and common sense." *Id.*, at 1129, 1133.

The Ninth Circuit called for briefing on whether to rehear the case en banc, and 12 judges dissented when the court denied rehearing. Judge Bress, joined by 11 other active judges, argued that the panel's ruling contravened the "clear statutory text" of §§1158(a)(1) and 1225(a)(1) and was "gravely wrong." *Id.*, at 1168, 1177. Judge Bea and two other senior judges noted their agreement with the dissents. *Id.*, at 1177–1178 (Bea, J., respecting denial of reh'g en banc).

We granted certiorari. *Noem* v. *Al Otro Lado*, 607 U. S. 1040 (2025).

## II

We hold that an alien who is standing in Mexico does not "arriv[e] in the United States" by attempting, and failing,

to set foot in this country. An alien "arrives in the United States" only when he crosses the border.[7]

A

1

We begin by considering what the phrase "arrives in the United States" means when used in everyday speech. That meaning is clear. A person arrives in a geographic location only when he enters it. To "arrive" is to "reach a destination." American Heritage Dictionary 102 (def. 1) (3d ed. 1992); see also Webster's Third New International Dictionary 121 (def. 1.a) (1993) ("to reach a destination: come to the end of a journey"); 1 Oxford English Dictionary 651 (def. 5.a.1) (2d ed. 1989) ("[t]o come to the end of a journey" or "to a destination"). The preposition "in" means "[w]ithin the limits, bounds, or area of." American Heritage Dictionary, at 910 (def. 1.a); accord, 7 Oxford English Dictionary, at 759 (def. 1.a). On these definitions, a person arrives in a destination when he enters within its area—not before.

Everyday examples confirm that understanding. A running back does not arrive in the end zone when he reaches the 1-yard line. A guest does not arrive in a house when he knocks on the front door. An army does not arrive in a city by encamping outside its walls. And a letter does not arrive

[7] We agree with the Ninth Circuit that the case is not moot. The District Court's class-wide declaratory relief, which the panel affirmed, continues to bar the Government from using metering to help deal with border surges within the jurisdiction of the Ninth Circuit. Although the Government has rescinded the metering policy, respondents have not carried their burden to establish that it is "'absolutely clear'" that the Government would not "reimpose" metering if it could. *West Virginia* v. *EPA*, 597 U. S. 697, 720 (2022). To the contrary, the Government represents that metering remains an "important tool," Reply Brief 1, of which it "would likely resume the use . . . as soon as changed border conditions warranted," Pet. for Cert. 26. The controversy remains live because a ruling for the Government could reverse the declaratory judgment and so give the Government "'effectual relief.'" *Chafin* v. *Chafin*, 568 U. S. 165, 172 (2013).

in a mailbox while it remains in the mail carrier's hand just inches away.

Respondents suggest that the meaning of the phrase "arrives in" shifts when someone "block[s]" the way of the person seeking to arrive. Brief for Respondents 25. In that circumstance, respondents say, to arrive in a place is merely to "be at its threshold." *Id.*, at 23. So, on respondents' view, a person *does* arrive in a house when, although he "is not in the house" and is merely "ready" to "take the step over" the threshold, the homeowner "stand[s] on the other side" and prevents entry. Tr. of Oral Arg. 70. Put simply, an alien "arrives in" the United States by "attempting to come into the United States." Brief for Respondents 20.

We disagree and return to our earlier examples. The running back does not arrive in the end zone (and six points do not go up on the scoreboard) when he is tackled at the 1-yard line by the defense. The guest does not arrive in the house when the homeowner locks the door right before the guest tries to open it. The army does not arrive in the city when the city's defenders repel the attack outside city limits. And the letter does not arrive in the mailbox when a dog assaults the carrier a step away from the mailbox. A person arrives in a destination only when he enters it, and that conclusion does not change because someone or something blocks entry. A person arrives in the United States, then, only when he enters it.

2

Several features of statutory context suggest that the meaning of the phrase "arrives in the United States" in §§1158(a)(1) and 1225(a)(1) conforms to ordinary usage. The first is the absence from those provisions of reference to attempted entry. Other provisions of the INA refer to both *actual* entrance into the United States and *attempted* entrance. For example, an alien who "enters or attempts to

enter" the country at an improper time or place commits a misdemeanor, §1325(a)(1), and an alien who "enters" or "attempts to enter" the country after being removed commits a felony, §1326(a)(2)(B). Immigration officers may arrest aliens "entering or attempting to enter the United States" unlawfully. §1357(a)(2). We "are required to give effect to Congress' express inclusions and exclusions." *National Assn. of Mfrs.* v. *Department of Defense*, 583 U. S. 109, 126 (2018). So the use of attempt language elsewhere in the INA and the absence of that language in §§1158(a)(1) and 1225(a)(1) signal that Congress enacted the disparate language "'intentionally and purposefully.'" *Keene Corp.* v. *United States*, 508 U. S. 200, 208 (1993) (quoting *Russello* v. *United States*, 464 U. S. 16, 23 (1983)). An alien who unsuccessfully attempts to arrive in the United States does not arrive in the United States.

Second, the INA elsewhere refers to aliens who arrive *near* a land border. It empowers the Attorney General to deputize state or local law enforcement to help enforce the Act in the event of an "actual or imminent mass influx of aliens arriving *off the coast* of the United States, or *near* a land border." §1103(a)(10) (emphasis added). Had Congress meant for aliens who arrive at or near the border to be able to apply for asylum and to be entitled to inspection, it could have said so using similar language in §§1158(a)(1) and 1225(a)(1). Again, we credit that it did not. See *National Assn. of Mfrs.*, 583 U. S., at 126.

Third, Congress easily could have required immigration officers to inspect any alien who "arrives at" or "reaches" the U. S. border. And it could have used similar language in specifying which aliens may apply for asylum. It did something like that in an earlier provision. See §1158(a) (1994 ed.) (allowing an alien "physically present in the United States or *at a land border or port of entry*" to apply for asylum (emphasis added)). As just noted, the INA uses similar phrases in other provisions. See, *e.g.*, §1103(a)(10)

(referring to "aliens arriving . . . near a land border"). That Congress chose not to adopt those "readily available and apparent alternative[s]" supports our conclusion that the ordinary meaning of "arrives in the United States" controls. *Knight* v. *Commissioner*, 552 U. S. 181, 188 (2008).

Fourth, that Congress amended §1158(a) in IIRIRA to replace "at a land border or port of entry" with "arrives in the United States" suggests that we should not read those phrases—which carry different ordinary meanings—to have the same meaning. "When Congress amends legislation," we presume that it "intends the change to have real and substantial effect." *Van Buren* v. *United States*, 593 U. S. 374, 393 (2021) (internal quotation marks omitted). Whatever the proper interpretation of the pre-IIRIRA provisions, §1158(a) now "require[s] that one must be present in the United States to be eligible for asylum." *Sadhvani* v. *Holder*, 596 F. 3d 180, 183 (CA4 2009).

Respondents contend that our interpretation of the phrase "arrives in the United States" puts too much weight on the Act's use of the preposition "in." According to respondents, "in" tells us little about the meaning of §§1158(a)(1) and 1225(a)(1) because "it would make no sense to say someone arrives 'at the United States' or 'upon the United States.'" Brief for Respondents 22. Yet it would be natural to say—and Congress "easily" could have said, had it wanted to adopt respondents' rule, *Knight*, 552 U. S., at 188—that an alien must be inspected and allowed to apply for asylum if he "arrives at the border," or "near" the border, or "upon" a spot adjacent to the border. Congress did not use those terms.

B

1

Respondents rest their principal textual argument on the same ground as the Ninth Circuit panel majority: the canon against surplusage. Recall that §1158(a)(1) allows an alien

to apply for asylum not only when he "arrives in the United States" but also if he "is physically present in the United States." Respondents correctly observe that an alien who "arrives in the United States" is, on the Government's view, "physically present" in the United States. So, they maintain, the phrase "arrives in the United States" is wholly redundant if read to require physical presence in this country. To avoid that result, they argue, the phrase "arrives in" "must apply to at least some noncitizens who are not geographically 'present in' the country." Brief for Respondents 24. Their alternative interpretation of "arrives in the United States" applies that way, and they urge us to adopt it.

2

Although that argument has some force, in the end it does not overcome the arguments that point the opposite way. The anti-surplusage canon is not an iron rule. As Justice Scalia put it, the canon expresses "our general reluctan[ce] to treat statutory terms as surplusage." *Freeman* v. *Quicken Loans, Inc.*, 566 U. S. 624, 635 (2012) (internal quotation marks omitted). The canon is based on an inference about how a careful writer or drafter of statutes ordinarily uses language, namely, that such a person is usually economical in the use of words. But even excellent writers do not always trim every unnecessary word, and the same is true of Congress.

We have acknowledged that Congress sometimes "enacts provisions that are superfluous." *Microsoft Corp.* v. *i4i Ltd. Partnership*, 564 U. S. 91, 107 (2011) (internal quotation marks omitted). For that reason, we have adopted interpretations under which, for example, three distinct verbs in the same clause "all mean the same thing." *Freeman*, 566 U. S., at 635. Nor are other examples of redundancy "uncommon." *Ibid*. Some statutes, for instance, pick out a "general" category alongside a "specific" subcategory that

"might in other circumstances be deemed surplusage." *Lorenzo* v. *SEC*, 587 U. S. 71, 80 (2019) (internal quotation marks omitted). And statutory context can rebut the "idea that each subsection" must have wholly independent meaning. *Id.*, at 81. The anti-surplusage canon is useful, but it is "subordinate to the 'cardinal canon' that 'a legislature says in a statute what it means and means in a statute what it says there.'" *United States Postal Service* v. *Konan*, 607 U. S. 391, 406 (2026). Respondents thus err in suggesting that the "term 'arrives in' *must* apply to at least some noncitizens who are not already geographically 'present in' the country." Brief for Respondents 24 (emphasis added).

To bolster their argument, respondents assert that we should reject the Government's interpretation because it yields "pure" surplusage. *Ibid.* That charge, which the principal dissent repeats, is mistaken.[8] Still, it is true that if "arrives in the United States" means "sets foot on U. S. soil," then this category of aliens is a subset of those who are "physically present in the United States." What explains this redundancy?

The most plausible explanation is the link between the "arrives in the United States" language and expedited removal. Both were added by IIRIRA in 1996. Before then, aliens who were "physically present" in the United States could apply for asylum, see §1158(a) (1994 ed.), but no

---

[8] The reach of the phrase "arrives in the United States" is not the same as that of the phrase "physically present in the United States." The phrase "arrives in the United States" allows the submission of an asylum application by aliens who wish to apply when they arrive in the country. But certain aliens may apply only well after they enter. Some, for example, may have come here on visas but then decided to apply for asylum due to changes in conditions in their home country. Cf. H. R. Rep. No. 104–469, p. 116 (1996) (noting that "visa overstayers account for a substantial portion of those waiting in the 'asylum backlog'"). These aliens are "physically present in the United States," but they are not aliens who apply when they "arriv[e]." Thus, "physically present in the United States" and "arrives in the United States" are not coterminous.

provision of the INA authorized expedited removal of arriving aliens who were inadmissible under §1182. The expedited removal process created by IIRIRA begins when an alien "arrives in the United States" and is inspected, see §§1225(a)(1), (3), and it seems likely that the "arrives in the United States" language was added to §1158(a)(1) to correspond with the event—arrival—that triggered this new process. See Tr. of Oral Arg. 21–22 (Government counsel arguing for this explanation of the partial redundancy); Brief for Respondents 8–9 (explaining that IIRIRA added the phrase "arrives in the United States" to "mirror" that phrase's inclusion "in the new §1225(a)(1)").

This explanation makes sense of the way that §1158(a) is framed. A careful writer or drafter of statutes may sometimes include language that is not strictly necessary in order to make an important point as clear as possible. *Lorenzo*, 587 U. S., at 80. And that may well be the reason for the inclusion of the "arrives in the United States" phrase in the provisions in question. This new language in §§1158(a)(1) and 1225(a)(1) makes it clear that arriving aliens are subject to expedited removal but that even those aliens may apply for asylum and that, when they do so, their applications are governed by a special process that allows only limited and expedited review of adverse credible-fear decisions. The language allowing applications by aliens who are "physically present in the United States," §1158(a)(1), was retained in 1996 so that aliens could continue to apply for asylum well after they arrived.[9]

For these reasons, the redundancy that troubled the Ninth Circuit is understandable. At any rate, if forced to choose between an interpretation that entails some redundancy and one that contradicts what words usually mean, we would choose the former. See *United States* v. *Atlantic Research Corp.*, 551 U. S. 128, 137 (2007) (the anti-

[9] See n. 8, *supra*.

surplusage canon "does not require us to avoid surplusage at all costs"); A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 176 (2012) ("Put to a choice, however, a court may well prefer ordinary meaning to an unusual meaning that will avoid surplusage").

C

Even if statutory text and context were not enough to reject the Ninth Circuit's and respondents' interpretation of "arrives in the United States," the presumption against extraterritoriality would tip the scale against that position. This presumption is a "'longstanding principle of American law'" under which courts will not give a statute effect outside the territory of the United States unless Congress "'clearly expresse[s]'" a contrary intent. *Morrison* v. *National Australia Bank Ltd.*, 561 U. S. 247, 255 (2010); see *RJR Nabisco, Inc.* v. *European Community*, 579 U. S. 325, 335 (2016) (asking whether Congress "affirmatively and unmistakably instructed" that the statute have extraterritorial effect).

We ask two questions when we analyze whether a statutory provision applies outside our borders. We first examine the text of the statute and ask whether the provision "unmistakabl[y]" applies to foreign conduct. *Abitron Austria GmbH* v. *Hetronic Int'l, Inc.*, 600 U. S. 412, 417–418 (2023). If it does, the inquiry ends. If it does not, we move to the second step and ask whether the statute focuses on domestic or foreign conduct. *Id.*, at 419.

We have sometimes used the presumption against extraterritoriality to determine whether statutes with more-or-less settled meanings applied outside the United States. See, *e.g.*, *RJR Nabisco*, 579 U. S., at 329, 338. Here, the presumption serves a somewhat different purpose: to determine whether either of two interpretations of the phrase "arrives in the United States" gives extraterritorial reach to the provisions in which that phrase appears. See *Small* v.

*United States*, 544 U. S. 385, 388 (2005) ("In determining the scope of [a] statutory phrase we find help in the 'commonsense notion that Congress generally legislates with domestic concerns in mind'").

The answer is plain. Nothing in the text of §1158(a)(1) or §§1225(a)(1) and (a)(3) manifests an unmistakable congressional intent to require that aliens be inspected and allowed to apply for asylum while they are still outside the United States. We must therefore consider the conduct relevant to the provisions' focus. And on this score, the difference between the two interpretations favors ours. On our view, the provisions link inspection and the asylum process to what occurs on the U. S. side of the border, while the Ninth Circuit's and respondents' interpretation trains its sight on the other side. Because that interpretation would give the provisions extraterritorial reach, we presume that we should not read the provisions that way.

## III

Respondents' remaining arguments fail. First, respondents are mistaken that the interpretation we adopt allows the Government to violate the obligations under the 1951 Convention Relating to the Status of Refugees, July 28, 1951, 189 U. N. T. S. 150, that the United States assumed through its accession to the 1967 Protocol Relating to the Status of Refugees, Jan. 31, 1967, 19 U. S. T. 6223, T. I. A. S. No. 6577. The Protocol requires nations to comply with Articles 2 through 34 of the Convention. Article 33.1 provides that no nation "shall expel or return ('refouler') a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of" certain grounds. 19 U. S. T., at 6276. The Government's metering policy, respondents press, flouts that obligation.

Our precedent forecloses this argument. We held in *Sale* v. *Haitian Centers Council, Inc.*, 509 U. S. 155, 183 (1993),

that the "text of Article 33 cannot reasonably be read to say anything at all about a nation's actions toward aliens outside its own territory." Because aliens who are standing in Mexico are outside the territory of the United States, the refusal to allow them to enter does not violate Article 33. In *Sale*, we ruled that Article 33 allowed the Government to "gather fleeing refugees" en masse to "preven[t]" them "from reaching our shores" and to "return them to the one country they had desperately sought to escape" "without first determining whether they may qualify as refugees." *Id.*, at 158, 160, 183. If that course of action is consistent with Article 33, the Article surely allows border officials to stop aliens without valid travel documents from entering the United States until they can be processed in a safe and orderly way. The Convention's bar on refoulement imposes a duty on nations not to send refugees that are within their borders to certain places. It does not establish that refugees have a right to enter a nation at the time they prefer.

Second, respondents maintain that we should reject the Government's interpretation because it will create perverse incentives for aliens to enter the country illegally. According to respondents, if border officials may turn away aliens who arrive at ports of entry and thus deny them the chance to apply for asylum, some aliens will respond by attempting to enter the country illegally at other locations.

That concern is overstated and in any event cannot defeat the best reading of the text. Metering does not permanently bar any alien from arriving in the United States and then applying for asylum. It merely delays the date when some may enter. Illegal entry, on the other hand, may be expensive and dangerous, and it carries adverse legal effects. Entry at an improper location is a crime. §1325(a). An alien becomes ineligible for asylum if he unlawfully re-enters the country after having been removed. §1231(a)(5). And an alien unlawfully present in the country is ineligible for various government benefits. §§1621(a), 1641(b). An alien

whose admission and inspection are delayed due to metering would need a powerful reason to apply for asylum immediately for it to be preferable to run all the risks of illegal entry.

Last, respondents argue that acceptance of the interpretation we adopt could cause drastic harm because the Government at some time in the future might prevent all potential arriving asylum applicants from ever reaching the point where an application could be filed. For present purposes, it suffices to say that the rescinded metering policy was never anything like that imagined future policy. The Government's policy merely delayed entry by some aliens as a way of improving a situation that both interfered with the proper conduct of inspection and created unsanitary, inhumane, and sometimes dangerous conditions at ports of entry. If the Government ever adopts the sort of policy that respondents fear, we are confident it would be quickly challenged.

* * *

The wisdom of the policy of metering alien arrivals at the southern border is not before us. We decide only that an alien standing in Mexico does not "arriv[e] in the United States." The INA neither entitles such an alien to apply for asylum nor requires an immigration officer to inspect him.

We reverse the judgment of the Ninth Circuit and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

No. 25–5

MARKWAYNE MULLIN, SECRETARY OF HOMELAND SECURITY, ET AL., PETITIONERS *v.* AL OTRO LADO, A CALIFORNIA CORPORATION, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 25, 2026]

JUSTICE THOMAS, concurring.

The Court's opinion correctly holds that an alien "who seeks to enter the United States from Mexico" does not "'arriv[e] *in* the United States' when he or she is still *in* Mexico." *Ante,* at 1 (footnote omitted). I join it in full. I write separately to address two further problems with the decision below. First, the District Court appeared to effectively grant the classwide injunctive relief that Congress has prohibited in this context. See 8 U. S. C. §1252(f)(1). Second, the relief that the District Court provided may well have unconstitutionally infringed on the President's inherent authority to exclude aliens from the country.

I

A

The Immigration and Nationality Act (INA) imposes various restrictions on judicial review of immigration enforcement. As relevant here, §1252(f)(1) provides: "Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of" certain parts of the INA. It contains an exception only for relief granted on an individual basis. *Ibid.* This provision thus "strips lower courts

of 'jurisdiction or authority' to 'enjoin or restrain the operation of'" these parts of the INA on a classwide basis. *Garland* v. *Aleman Gonzalez*, 596 U. S. 543, 548 (2022) (quoting §1252(f)(1)). In *Aleman Gonzalez*, we interpreted this jurisdictional bar to "prohibi[t] lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." 596 U. S., at 550.

B

Respondents sought relief that §1252(f)(1) prohibits. The District Court certified their proposed class of "'all noncitizens who seek or will seek to access the U.S. asylum process by presenting themselves'" at a port of entry at the U. S.-Mexico border and who "'were or will be denied access to the U.S. asylum process by or at the instruction of'" border officials. *Al Otro Lado* v. *Mayorkas*, 619 F. Supp. 3d 1029, 1033, n. 2 (SD Cal. 2022). They asked the court for an injunction against the Government's "metering" practice, which temporarily prevented class members from entering the country to be inspected under §1225. *Id.*, at 1035–1036; see *ante,* at 4–5. They also asked the court to appoint a magistrate judge as a "special master . . . to monitor and oversee" the Government's "implementation of all classwide injunctive relief." 619 F. Supp. 3d, at 1036.

The District Court acknowledged that our interpretation of §1252(f)(1) in *Aleman Gonzalez* barred this relief. 619 F. Supp. 3d, at 1045.[1] It correctly concluded that *Aleman*

---

[1] The District Court followed *Aleman Gonzalez*'s holding on this point, but it expressed its view that "*Aleman Gonzalez* . . . deflates the historical and traditional role of Article III courts" and "undermines" the "fundamental principal of federalism" that "federal agencies and courts are bound to give effect to the unambiguously expressed intent of Congress." *Al Otro Lado* v. *Mayorkas*, 619 F. Supp. 3d 1029, 1044 (SD Cal. 2022) (internal quotation marks omitted); see also *ibid.* (expressing its

*Gonzalez* "squarely" controls this case, such that the requested injunctive relief "must be construed as enjoining or restraining the operation of §1225 because it would have the effect of interfering with the Government's efforts to operate §1225." 619 F. Supp. 3d, at 1045 (internal quotation marks omitted; alterations adopted). After all, by requiring border officials to carry out §1225's inspection and asylum-interview procedures for the class members, the requested injunction would "order federal officials to take" actions to "implement" or "carry out" a covered provision. *Aleman Gonzalez*, 596 U. S., at 550.

Nonetheless, the District Court effectively gave Respondents all that they asked for in the form of nominally declaratory relief. Even after *Aleman Gonzalez*, the Ninth Circuit maintains that §1252(f)(1) allows "classwide declaratory relief." *Rodriguez* v. *Hayes*, 591 F. 3d 1105, 1120 (2010); see also *Al Otro Lado* v. *Executive Office for Immigration Review*, 138 F. 4th 1102, 1123–1124 (2025) (case below). So, the District Court issued a declaration that the Government's metering policy was unlawful. As a source of authority for this relief, it invoked §706(1) of the Administrative Procedure Act (APA), which allows courts to "*compel* agency action unlawfully withheld or unreasonably delayed," 5 U. S. C. §706(1) (emphasis added). See 619 F. Supp. 3d, at 1032, 1049. Citing §706(1) and the Ninth Circuit's precedents authorizing declaratory relief, the District Court entered a judgment "that, absent any independent, express, and lawful statutory authority, Defendants' refusal to provide inspection or asylum processing to" aliens "who are in the process of arriving in the United States" at

displeasure that "*Aleman Gonzalez* . . . confers to immigration enforcement agencies power to unilaterally ignore or deviate from the Congressional mandates set forth in the removal provisions of the INA"); *id*., at 1043 (describing "competing obligations" between obeying Supreme Court precedent and not "applying §1252(f)(1) in a manner that produces absurd results" (internal quotation marks omitted; alteration adopted)).

ports of entry "is unlawful regardless of the purported justification for doing so." *Id.*, at 1049. The Ninth Circuit affirmed. 138 F. 4th, at 1123–1124, 1128.

II

In a future case, this Court should address this apparent end-run around §1252(f)(1) and *Aleman Gonzalez*.

I am skeptical that the relief that the District Court ordered complies with §1252(f)(1). The statute provides that "no court" may "enjoin or *restrain* the operation of" §1225, subject to limited exceptions. §1252(f)(1) (emphasis added). In *California* v. *Grace Brethren Church*, 457 U. S. 393 (1982), decided before §1252(f)(1) was enacted, the Court interpreted near-identical language in the Tax Injunction Act to bar all declaratory relief. Compare 28 U. S. C. §1341 ("district courts shall not enjoin, suspend or restrain . . . the collection of" state taxes) with 8 U. S. C. §1252(f)(1) ("no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of" specified provisions).[2] In *Grace Brethren Church,* the plaintiffs sought a "declaratory judgment holding state tax laws unconstitutional." 457 U. S., at 408. Even though the plaintiffs did not seek an injunction, the Court held that the Act barred granting the declaration. *Id.*, at 411. It reasoned that "there is little practical difference between injunctive and declaratory relief," *id.*, at 408, so the declaration in question was an order to "enjoin, suspend or restrain" the collection of taxes and thus barred by the Act, 28 U. S. C. §1341.[3]

[2] Section 1252(f) was added to the INA as part of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, 110 Stat. 3009–611 to 3009–612.

[3] As Judge Fuentes of the Third Circuit has explained, the Court has applied this reasoning in other contexts, as well. *Alli* v. *Decker*, 650 F. 3d 1007, 1018 (2011) (dissenting opinion). In *Samuels* v. *Mackell*, 401 U. S. 66 (1971), the Court held that a declaratory judgment would have

The same rationale seems to apply to §1252(f)(1): Declaratory judgments that immigration enforcement actions are unlawful have the practical effect of "restraining" the Government in the same way that an injunction would. See *Alli* v. *Decker*, 650 F. 3d 1007, 1019 (CA3 2011) (Fuentes, J., dissenting). After all, the Government "conform[s] its current conduct to what a court has declared to be the law," just as it would under an injunction. Tr. of Oral Arg. 89. If anything, §1252(f)(1) more clearly forbids such declaratory relief than the Tax Injunction Act because it carried over nearly the exact words that *Grace Brethren Church* had already interpreted to preclude declaratory relief. See *Williams* v. *Taylor*, 529 U. S. 420, 434 (2000); *Learning Resources, Inc.* v. *Trump*, 607 U. S. 229, 344–345 (2026) (KAVANAUGH, J., dissenting).

Even if some declaratory relief were compatible with §1252(f)(1), the relief entered here likely is not. The Government was subject to a declaration that, under §706(1) of the APA, it was illegal for it to withhold inspection from the class members. See *supra*, at 3–4. The court's judgment was therefore a declaration that the Government's metering policy resulted in "agency action unlawfully withheld or unreasonably delayed." A §706(1) order, by its plain terms, "compel[s]" the agency to carry out the relevant duties under §1225. So, like the injunction held unlawful in *Aleman Gonzalez*, this judgment under §706(1) appears to "require officials to take actions that (in the Government's view) are not required by" covered provisions of the INA, contrary to §1252(f)(1). 596 U. S., at 551.

The Court has repeatedly reserved the question whether §1252(f)(1) bars declaratory relief. *Ibid.*, n. 2; *Biden* v. *Texas*, 597 U. S. 785, 801, n. 4 (2022). In this case, the

---

"virtually the same practical impact as a formal injunction," *id.*, at 72, so the holding of *Younger* v. *Harris*, 401 U. S. 37 (1971), barring injunctions against state criminal proceedings, *id.*, at 41, applied to declaratory judgments, too.

Government did not press the issue, and the Court correctly reverses the Ninth Circuit's clearly erroneous merits holding. The Court should soon address the apparent resistance to, and evasion of, §1252(f)(1) in a future case.

III

Separately, even if the statute authorized the District Court's order effectively requiring executive officials to bring certain aliens into the country, it would raise serious constitutional questions.

"[T]he President has *inherent* authority to exclude aliens from the country." *Trump* v. *Hawaii*, 585 U. S. 667, 712 (2018) (THOMAS, J., concurring). There is "founding-era evidence" showing "that 'the executive Power,' Art. II, §1, includes the power to deport aliens." *Sessions* v. *Dimaya*, 584 U. S. 148, 217 (2018) (THOMAS, J., dissenting). For example, William Blackstone explained that the King could send alien friends "home whenever the king sees occasion." 1 Commentaries on the Laws of England 252 (1765). And, at the time of ratification, Framers of the Constitution argued that the President would have the same power. See *Sessions*, 584 U. S., at 218 (collecting sources).

Congress, for its part, has no enumerated power to require the President to bring certain aliens into the country. The Constitution grants Congress the power to "establish an uniform Rule of Naturalization." Art. I, §8, cl. 4. But, the class members in this case are not naturalized or even on the path to naturalization. The Necessary and Proper Clause, Art. I, §8, cl. 18, likewise does not give Congress this power. Congress may pass laws "which shall be necessary and proper for carrying into Execution" its powers and those of the other branches of the Federal Government. *Ibid.* But, a law is not "proper" in this sense if it "purports to direct another branch's exercise of its power," or, at a minimum, "takes one of those actions *and* the branch to which the power is allocated objects to the action."

*Zivotofsky* v. *Kerry*, 576 U. S. 1, 50 (2015) (THOMAS, J., concurring in judgment in part and dissenting in part). So, any statute that forced the President to allow aliens to cross the border against his will would appear to exceed Congress's enumerated powers, and a court could not enforce it against the President.

# SUPREME COURT OF THE UNITED STATES

No. 25–5

MARKWAYNE MULLIN, SECRETARY OF HOMELAND SECURITY, ET AL., PETITIONERS *v.* AL OTRO LADO, A CALIFORNIA CORPORATION, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 25, 2026]

JUSTICE SOTOMAYOR, with whom JUSTICE KAGAN and JUSTICE JACKSON join, dissenting.

Since 1917, Congress has required immigration officers to inspect noncitizens who arrive at ports of entry to determine whether they may enter the United States. Since 1980, Congress has allowed noncitizens who are fleeing persecution in their home country to apply for asylum as part of this inspection process. Congressional statutes lay out a mandatory set of procedures to guide this process. A noncitizen who "arrives in the United States (whether or not at a designated port of arrival . . . )" and seeks admission "shall be inspected by immigration officers," 8 U. S. C. §§1225(a)(1), (3), and "may apply for asylum," §1158(a)(1). If a noncitizen who "is arriving in the United States" lacks valid travel documents, the officer "shall order [her] removed," unless she conveys an intention to apply for asylum or a fear of persecution, which in turn requires the officer to "refer" her for further processing of her asylum application. §1225(b)(1)(A). This system is designed to ensure that the Government processes each person seeking to come into the United States to determine who should be let in, who should be turned away, and who should be allowed to apply for asylum.

The Court today holds that the Executive Branch may circumvent all these mandatory procedures by having U. S. immigration officers stand at the border and physically block noncitizens from setting a foot onto U. S. soil. They may do so even if the asylum seeker is at the threshold of a port of entry designated to receive all noncitizens who seek entrance into the country. Even if the port of entry has ample capacity to inspect that person, including an available asylum officer trained to process asylum applications. Even if the asylum seeker is certain to be persecuted, or killed, if she is turned away.

The Court's illogical interpretation is driven almost entirely by a fixation on a single word: "in." Words, however, must be read in context and with attention to how they fit into the statute as a whole. The majority ignores the statutory context and history, not to mention the longstanding position of the Executive Branch, all of which show that any noncitizen arriving at our doorstep and seeking admission must be inspected and allowed to apply for asylum, regardless of whether her foot has crossed the threshold. Because the Court today blesses the Executive Branch's decision to slam the door shut on all who are fleeing persecution, despite the detailed inspection and asylum system that Congress enacted and commands, I respectfully dissent.

## I

A proper understanding of this case requires appreciating the reality of the challenged "metering" policy, the nature of the respondents' legal challenge, and the Ninth Circuit's decision below.

### A

The United States-Mexico border is dotted with designated ports of entry. Over 20 ports of entry are designated as "Class A," meaning they are designated to "'process all aliens applying for admission into the United States.'" App.

193, 215. These ports abut the border and include vehicle lanes, pedestrian walkways, and an arrival hall, all staffed with Customs and Border Protection (CBP) officials. Where the Rio Grande marks the border between the two countries, arrival halls are generally at the north end of a bridge spanning the river (with the border marked by a plaque on the bridge near the river's midpoint). At land portions of the border, the border is marked by turnstiles on the road leading to the arrival hall.

Before 2016, pedestrians seeking asylum at a port of entry, like any other traveler seeking to enter the United States, would typically pass into U. S. territory (by bridge or through the turnstile), enter an arrival hall, and walk up to one of several desks staffed by CBP officials. A CBP officer would then review their travel documents, a process known as "inspection," and either admit them into the United States or send them to another area for further processing. For example, a pedestrian with a valid visa might be admitted immediately, whereas a pedestrian without valid travel documents might be referred for further inspection under the expedited-removal process. See §1225(b)(1)(A)(i) (stating that the expedited-removal process applies to those who are "inadmissible under section . . . 1182(a)(7)," which renders those without valid documents inadmissible). During this process, pedestrians could also ask to fill out an asylum application and would be forwarded to an inspection area for further processing.

In May 2016, this process began to change. Initially responding to a surge of increased migrant arrivals at a single port of entry in Southern California, CBP officials at that facility for the first time instructed arriving migrants to turn back into Mexico and return to the port at certain times for appointments. Soon, though, this "metering" system spread to other ports of entry along the southern border, with officials turning away all individuals without valid travel documents, but now without identifying any

future time for asylum proceedings. In this early period of metering, asylum seekers often stepped onto U. S. soil (sometimes reaching arrival halls and CBP desks) before being turned back to Mexico. CBP later decided, however, that because of its statutory obligations, it could not send such individuals back to Mexico without processing them for asylum. Instead, CBP began directing officials to block asylum seekers from entering the United States "at 'the actual boundary line,'" which meant sending officials out of arrival halls, to bridges, and past turnstiles, where they could "sto[p] people right before they crossed the border." *Al Otro Lado* v. *Executive Office for Immigration Review*, 138 F. 4th 1102, 1110 (CA9 2025).

Gradually, the Government formalized this system into a "metering policy." First, in November 2016, the Department of Homeland Security (DHS) approved the practice, and CBP authorized ports of entry to "implement metering based on 'what [worked] best operationally and whether it [was] required on any given day or [at] any specific location.'" *Ibid.* (alterations in original). Then, in formal guidance issued in 2018, CBP authorized officials across the entire southern border to "'meter the flow of travelers at the land border,'" meaning that they could "'operate physical access controls at the borderline'" and "'may not provide tickets or appointments or otherwise schedule any person for entry.'" *Ibid.* Once a traveler was "'in the United States,'" the guidance provided that "'he or she must be fully processed.'" *Ibid.*

The stated purpose of the Government's metering policy, consistent with its origin, was to manage CBP "'resources'" and respond to capacity limitations at ports of entry. *Ibid.* Over time, however, it became clear that the metering policy had little to do with capacity issues. According to a report by the Office of the Inspector General of DHS (OIG) issued in 2020, CBP often invoked lack of capacity as a justification for metering "regardless of the port's actual

capacity and capability," including while facilities sat empty. App. 397, 408; see *id.*, at 221 (chart showing significant excess detention capacity even while metering was in effect). For some ports, detention facilities "were completely empty" 80% of the time during which they were turning away asylum seekers under the metering policy. *Id.*, at 192. Still, as a CBP whistleblower would later testify, officers at ports on the southern border were "instructed to lie to people" by telling them "that the port was currently at capacity[,] and turning them back," when in fact the relevant facility retained meaningful capacity to process asylum seekers. *Id.*, at 158–159.[1] The OIG report also found that CBP "redirected" asylum seekers "to other port locations," which "contravene[d] CBP's long-standing practice to process all aliens at a 'Class A' port of entry." *Id.*, at 378. "[T]he ports to which CBP staff redirected" people "range[d] from a few miles to more than 30 miles away," "[o]ften . . . required traversing difficult desert terrain," and "potentially placed undocumented aliens at risk of encountering criminals who may exploit them." *Id.*, at 397. "Moreover, because CBP officers [did] not generally ask migrants where they [we]re from before redirecting them to another port, Mexican nationals seeking asylum" were redirected and forced to "remain in and travel through the very country in which they claim[ed] they [we]re subject to persecution." *Id.*, at 398–399.[2]

Soon, the metering policy created dire humanitarian conditions at the border. As CBP turned back more and more asylum seekers who had traveled treacherous distances to

---

[1] Other times, it seems that CBP officials affirmatively manufactured capacity problems to justify turning back asylum seekers, including by "intentionally remov[ing] seats" in arrival halls in order to reduce the processing capacity at certain ports of entry. App. 176.

[2] Some CBP officials, including the union representative for the Tecate port of entry, "expressed concern about the legality of the redirection practice." *Id.*, at 396.

reach that point, makeshift camps sprung up on the Mexican side of the border, with tens of thousands of those turned away waiting days, then weeks and months, for asylum processing that often never took place. See Brief for Amnesty International USA et al. as *Amici Curiae* 5–6. In addition to "lack[ing] adequate food and shelter," those turned away under the metering policy also found themselves subject to the very "persecution and crime" they were fleeing. 138 F. 4th, at 1110. One woman who had fled Honduras after receiving death threats from gang members was beaten, cut, and knocked unconscious by an unknown man after being turned back from a port of entry. Brief for Amnesty International USA et al. as *Amici Curiae* 11. Another asylum seeker who was turned back at a port three times was later raped in the presence of her child. *Id*., at 9. Those living in migrant camps were subjected to break-ins, robberies, and assaults, "'fac[ing] serious harm at the hands of criminal organizations, including kidnapping, extortion, physical violence, and sexual assault.'" *Id*., at 7–8. Some were "murdered in Mexico while waiting for an opportunity to be processed by U. S. officials." 138 F. 4th, at 1110.

Desperate to flee these conditions and secure the opportunity to apply for asylum, "[s]ome attempted to reach U. S. soil by other means," including by attempting to cross the border between ports of entry by trekking through deserts or swimming across the Rio Grande. *Ibid.* Often, these efforts had tragic ends. One couple that grew discouraged after a month of waiting in a camp near the border decided to cross the river and ask for asylum once they reached U. S. soil, but they were caught in a swift current and drowned. App. 235. Another woman also drowned, along with her 2-year-old son, after she gave up waiting in a tent camp and attempted to swim across the river. *Ibid.*; see 138 F. 4th, at 1110 (describing other "young children" that "tried to swim across the Rio Grande River and drowned"). Hundreds of others have met a similar fate, and many more

died crossing the desert along the southern border, all making 2020 and 2021 some of the "deadliest year[s] for migrant crossings" in various regions of the southern border.[3]

B

In light of these circumstances, respondents brought this lawsuit under §706(1) of the Administrative Procedure Act, which provides that a court shall "compel agency action unlawfully withheld or unreasonably delayed." 5 U. S. C. §706(1). Respondents contended that CBP has a mandatory duty under 8 U. S. C. §§1225(a) and 1158(a)(1) to inspect, and to process asylum applications from, noncitizens who arrive at a port of entry and that CBP's metering policy unlawfully withheld that mandatory duty. The Government raised two counterarguments: first, that these statutes do not impose any duty to inspect or process asylum seekers if they have not stepped foot across the border; and second, that even if this duty exists, the metering policy did not constitute "unlawful withh[olding]" of that duty.

The Ninth Circuit agreed with respondents on both points. 138 F. 4th, at 1113. First, it held that §1225(a) requires the Government to inspect "noncitizen[s] stopped by U. S. officials at the border" and that §1158(a)(1) requires allowing such noncitizens to apply for asylum. *Id.*, at 1118–1119. Second, it held that the metering policy constituted "withholding of agency action," as opposed to delay of agency action, because "border officials turned away noncitizens without taking any steps to keep track of who was being turned away or otherwise allowing them to open asylum

[3] See Human Rights Travesty: Biden Administration Embrace of Trump Asylum Expulsion Policy Endangers Lives, Wreaks Havoc, Human Rights First 21 (Aug. 2021), https://humanrightsfirst.org/wp-content/uploads/2021/10/HumanRightsTravesty_Final-1.pdf (archived at https://perma.cc/UP3Z-LUBS) (citing 107 migrants who drowned crossing a single stretch of the Rio Grande in 2021); see *ibid.* (explaining that the Government's metering policy "pushed desperate people fearing for their lives to cross between ports of entry").

applications." *Id.*, at 1122. In other words, the policy constituted a "wholesale refusal to carry out a mandatory duty," which "le[ft] the responsibility to try again in each noncitizen's hands." *Ibid.* The panel further explained that the difference between withholding and delay of a mandatory duty "is important" because "[i]f an agency withholds a required action, it violates §706(1) regardless of its reason for doing so," but "if an agency delays a required action, it violates §706(1) only if the delay is 'unreasonabl[e].'" *Id.*, at 1121. Thus, the panel emphasized, the Government retains "wide latitude and flexibility to carry out its duties at the border" and "[e]ven minimal steps by the Government, such as implementing and following a waitlist system or initiating the asylum process, would shift the §706(1) analysis of any challenge from the withholding category into the delay category." *Id.*, at 1123. Because "the Government in this case did not take any such steps," however, the metering policy constituted unlawful withholding of a mandatory duty. *Ibid.*

The implication of the Ninth Circuit's decision, importantly, is not that the Government must instantaneously inspect and process asylum seekers at the border. All it stands for is that the Government cannot withhold that duty altogether or unreasonably delay it. All the Government was required to do under the Ninth Circuit's decision was to process asylum seekers in a reasonable time.

## II

The question before this Court is whether §§1225(a) and 1158(a)(1) require the Government to inspect, and to process asylum applications from, noncitizens who arrive at ports of entry but who have not yet stepped across the border. The majority says that they do not, concluding that a noncitizen who walks up to the threshold of a port of entry and is blocked by a CBP officer from stepping foot across

the border is not someone who "arrives in the United States" and has not therefore triggered these obligations.

The majority's conclusion focuses almost exclusively on the word "in" within the phrase "arrives in the United States." If that were all this case were about, the majority might have the better of the argument. Statutory interpretation, however, requires much more. "'It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'" *Sturgeon* v. *Frost*, 577 U. S. 424, 438 (2016). Properly read in context, the phrase "arrives in the United States" encompasses noncitizens who are in the process of arriving, regardless of where their feet are. This construction comports with the plain text of §§1225(a) and 1158(a)(1), the context clues within those provisions, the usage of the terms "arrives" and "arriving" in neighboring statutory provisions, and the consistent interpretation of this phrase in federal regulations. It gives meaning to the "arrives in" clause rather than rendering it wholly superfluous. It avoids the anomalous results of incentivizing illegal border crossings and vesting limitless discretion with immigration officers to ignore their mandated duties. Finally, it accords best with the statutory and legislative histories of both statutes, which show that Congress has long required inspection of all noncitizens seeking entrance at the border and intended such noncitizens to be allowed to apply for asylum.[4]

---

[4] Contrary to the majority's assertion, the "centerpiece" of this dissent is not an "impassioned" argument about the prudence of the metering policy. *Ante*, at 5, n. 5. The truth, based on the summary judgment record, is that the metering policy incentivized illegal border crossings, was used when ports had capacity, and resulted in tragic consequences for migrants. See *supra*, at 2–7. Even so, if this policy were authorized by the statutes Congress enacted, then I would not be in dissent. As described at length in this opinion, however, the proper interpretation of §§1225(a) and 1158(a) reflects that Congress did not authorize such a policy.

A

1

Start with the full language of the statutes at issue. The inspection mandate, §1225(a)(1), first defines an "applicant for admission" as "[a]n alien present in the United States who has not been admitted or who arrives in the United States (whether or not at a designated port of arrival . . . )." Section 1225(a)(3) then states that "[a]ll aliens . . . who are applicants for admission or otherwise seeking admission or readmission to or transit through the United States shall be inspected by immigration officers." The asylum statute, §1158(a)(1), repeating the definition from §1225(a)(1), requires that "[a]ny alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival . . . ), irrespective of such alien's status, may apply for asylum in accordance with this section or, where applicable, section 1225(b)," the expedited-removal provision.

All agree that to "arrive" means "to reach a destination." See, *e.g.*, Merriam-Webster's Collegiate Dictionary 64 (10th ed. 1996); *ante*, at 8 (citing additional dictionaries). Both statutes also use the present tense, "arrives," suggesting that these provisions cover those who are in the process of "arriving," not just those who have already "arrived." See *United States* v. *Wilson*, 503 U. S. 329, 333 (1992) (verb tense "is significant in construing statutes"). As the majority, the Government, and respondents all agree as well, the phrase "arrives in the United States" is coterminous with the phrase "arriving in the United States," which is used in the nearby expedited-removal provision in §1225(b). See *ante*, at 14 (explaining that expedited removal applies to "arriving aliens" and corresponds to the "arrives in the United States" clauses of §§1225(a)(1) and 1158(a)(1)); Brief for Petitioners 23 (discussing §§1225(b) and (c)).

It is natural to say that asylum seekers are arriving, *i.e.*, reaching their destination, when they come to the threshold

of a port of entry because that is where they can present themselves to an immigration official and apply for asylum. In this context, it does not make sense to say an asylum seeker's arrival depends on whether she has taken a step across the border or her foot has not yet landed, or whether her hand is outstretched across the threshold or is still by her side; she is arriving in the United States for purposes of seeking admission.

The analysis, of course, does not stop there because "statutory construction" requires "reviewing text in context." *Pulsifer* v. *United States*, 601 U. S. 124, 133 (2024). Here, context clues within §§1225(a) and 1158(a)(1) reinforce respondents' interpretation. To start, both statutes suggest, in a parenthetical, that one of the ways in which a noncitizen may "arriv[e] in the United States" is by being "at a designated port of arrival." §§1225(a)(1), 1158(a)(1). This shows that noncitizens "arriv[e] in" the country when they are "at" the port, such as when they are standing on the bridge presenting themselves to a border official.

Turn next to the statutory provisions that surround §1225(a)(1). Section 1225(a)(3), for example, requires inspection not only of "applicants for admission" (the term defined in §1225(a)(1)), but also of all noncitizens "otherwise seeking admission or readmission to or transit through the United States." That "otherwise" clause plainly includes those who are walking up to the border "seeking" to enter the country even if they have not yet crossed the threshold. Another neighboring provision, §1225(a)(2), requires inspection of "[a]n arriving alien who is a stowaway" and allows stowaways to "apply for asylum under section 1158," even though stowaways are not eligible to apply for admission and generally are not permitted to "land in the United States," §1231(d)(2)(B). These provisions clearly suggest that §1225(a)'s and §1158(a)(1)'s use of the term "arrives in the United States" is meant to include all noncitizens in the

process of arriving, even if they have not yet stepped foot into U. S. territory.

Notably, respondents' interpretation of §§1225(a) and 1158(a)(1) has been the consistent interpretation adopted by federal regulations since the current language of these provisions was enacted in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA). These Executive Branch interpretations are "especially useful in determining the statute's meaning" because they were "issued contemporaneously" with IIRIRA and "have remained consistent over time." *Loper Bright Enterprises* v. *Raimondo*, 603 U. S. 369, 394 (2024). In 1997, six months after IIRIRA was enacted, the Government promulgated a regulation defining "arriving alien" to include any noncitizen "who seeks admission to or transit through the United States . . . at a port-of-entry." 62 Fed. Reg. 10330. The Government amended that regulation in 1998, defining "arriving alien" as any "applicant for admission coming or attempting to come into the United States at a port-of-entry." 63 Fed. Reg. 19383. This regulation, which remains in place today, see 8 CFR §1.2 (2025), reflects the view that noncitizens are "arriving" if they are "attempting to come into the United States" by applying for asylum "at a port-of-entry," regardless of whether they have stepped foot across the border.

2

The majority's interpretation of "arrives in the United States" makes no sense. To start, the majority ignores that "arrival" and "arriving" in the immigration context have never focused on the precise location of a noncitizen's feet. Instead, the majority concentrates on everyday examples of the phrase "arrives in." *Ante*, at 8–9. The majority is right that its chosen examples are naturally read to require the person or item to be physically inside the relevant space. The terms "arriving in" and "arrives in," however, do not

always work that way. For example, a train conductor's announcement, "We are arriving in Penn Station," might mean that the train is inside the station or merely that it has started slowing down half a mile away. If someone said, "Call me when you arrive in Washington, D. C.," it would be logical to call them once you have landed at DCA Airport, just across the river in Virginia. Nor would it be premature to say someone "arrives in" San Francisco while she is still driving on the Golden Gate Bridge. These examples show that the meanings of the phrases "arrives in" and "arriving in" depend on context.

A more fitting example might be the following. Imagine a movie theater policy that states, "Anyone who arrives in the theater may buy a ticket and all moviegoers must have their tickets scanned before entering." If a person walks up to a ticket booth located just outside the theater, it would be unreasonable to think they could not buy a ticket under the policy because they are not "in" the theater yet. Perhaps the policy could have been clearer by using the preposition "at," but everyone understands, from context, what the policy means.

Context leads to the same conclusion here. Requiring an asylum seeker to plant a foot across the border to become an "applicant for admission," §1225(a)(1), might be plausible looking at the words "arrives in" in a vacuum, but it makes a hash of the statutory scheme overall. Instead, construing text in context, an asylum seeker can be fairly said to "arriv[e] in the United States" for purposes of being an applicant for admission and seeking asylum when she walks up to a port of entry and physically presents herself to an immigration officer who is standing on U. S. soil.

Next, the majority fixates on the preposition "in" and surmises that, had Congress intended to include those who reached the border but have not yet crossed, it would have referred to noncitizens who "'arriv[e] at,'" "'reac[h],'" or are "'at a land border or port of entry.'" *Ante*, at 10 (emphasis

deleted). Other nearby provisions, however, demonstrate that Congress uses the phrase "arrives at" interchangeably with "arrives in" to describe this category of "arriving aliens." For instance, §1231(b)(1)(A), which governs the removal of arriving aliens, uses the terms interchangeably in the same sentence. It specifies that a noncitizen "who arrives at the United States" and is removed upon arrival shall be returned to the country in which the noncitizen "boarded the vessel or aircraft on which the alien arrived in the United States." That provision refers to the same person in both instances, even though one reference uses "at" and the other uses "in." As another example, §1225(b)(1)(A)(i) provides for expedited removal of a noncitizen "who is arriving in the United States." Yet §1231(c)(1), which sets out further expedited-removal procedures, prescribes the process for removing "[a]n alien arriving at a port of entry of the United States who is ordered removed . . . under section 1225(b)(1)." As a result, §1231(c) clearly contemplates that a person who is "arriving at a port of entry of the United States" is also a person who is "arriving in" the United States and removable under §1225(b)(1). These provisions show that Congress's use of "at" versus "in" is not legally significant.[5]

[5] The Court, too, has used the terms "arrives at" and "at [a] port of entry" to describe the inspection mandate in §1225(a), albeit in cases that did not address the question presented in this case. For example, in *Department of Homeland Security* v. *Thuraissigiam*, 591 U. S. 103 (2020), the Court summarized §§1225(a)(1) and (3) as requiring "[a]n alien who arrives at a 'port of entry,' *i.e.*, a place where an alien may lawfully enter, [to] apply for admission." *Id.*, at 108; see *id.*, at 106 (describing expedited removal as applying to noncitizens "at or near the border attempting to enter this country"). Similarly, in *Jennings* v. *Rodriguez*, 583 U. S. 281 (2018), the Court described the inspection process under §§1225(a) and (b) as "begin[ning] at the Nation's borders and ports of entry," *id.*, at 287, and requiring "immigration officials [to] determine whether to admit or remove the many aliens who have arrived at an official 'port of entry' (*e.g.*, an international airport or border crossing)," *id.*, at 285.

The majority also points to several other statutory provisions that, it argues, more clearly refer to noncitizens who are not yet on U. S. soil and contends that Congress would have used that or similar language if it intended to enact respondents' interpretation. *Ante*, at 9–10 (citing, among others, a provision that authorizes immigration officers to arrest those "attempting to enter" the country, §1357(a)(2), and another provision that authorizes the Attorney General to deputize state or local law enforcement to respond to an "influx" of noncitizens "arriving off the coast . . . or near a land border," §1103(a)(10)). True, Congress could have used one of these alternative formulations instead of the "arrives in the United States" clause in §§1225(a)(1) and 1158(a)(1), and the question before the Court might have been easier if it had done so. Congress's choice "to use certain language" in one statute, however, "hardly means it was 'foreclose[d] . . . from using different language to accomplish th[e] same goal'" in another statute. *Department of Agriculture Rural Development Rural Housing Service* v. *Kirtz*, 601 U. S. 42, 52 (2024); see *Kirtsaeng* v. *John Wiley & Sons, Inc.*, 568 U. S. 519, 540 (2013) (explaining that there is no "canon of interpretation that forbids interpreting different words used in different parts of the same statute to mean roughly the same thing").

Here, even if Congress could have been clearer in the words that it chose, the statutory context and history plainly show that Congress used the phrase "arrives in the United States" to capture all those in the process of arriving, even before stepping foot onto U. S. soil.

B

Respondents' interpretation is further supported by the "'cardinal principle of statutory construction' that 'a statute ought . . . to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'" *TRW Inc.* v. *Andrews*, 534 U. S. 19, 31 (2001).

Here, both §§1225(a)(1) and 1158(a)(1) set out two categories of individuals: those "present in the United States" and those who "arriv[e] in the United States." §§1158(a)(1), 1225(a)(1). When, like in §§1225(a)(1) and 1158(a)(1), two clauses are set off by a disjunctive "or," this Court has recognized that "'the words it connects are to be given separate meanings'" and that the latter clause should not be construed as "a mere subset of [the] first." *Loughrin* v. *United States*, 573 U. S. 351, 357 (2014).

Respondents' interpretation adheres well to this basic rule. The first category (those "present") captures those who are already inside the United States and the second (those who "arriv[e]") captures those who are in the process of arriving into the United States. On this reading, while some individuals fit both categories, such as a person who lands at an airport and is thus both physically "present in" and "arriv[ing] in the United States," each category also covers some individuals not included in the other.

The majority's interpretation, on the other hand, renders the "arrives in" category entirely superfluous. On its reading, all individuals who "arriv[e] in the United States" have stepped foot onto U. S. territory and are therefore "a mere subset," *ibid.,* of the category of people who are "present in the United States." This interpretation "thus runs afoul of the 'cardinal principle' of interpretation that courts 'must give effect, if possible, to every clause and word of a statute.'" *Id.*, at 358.

The majority rightly does not dispute that its interpretation renders the "arrives in" clause superfluous. *Ante*, at 13 (conceding that the "arrives in" clause is a "subset of those who are 'physically present in the United States'").[6]

[6] The Government, for its part, resisted this concession and conjured an argument based on the entry-fiction doctrine, which treats certain noncitizens on U. S. territory as not having "entered" as a matter of law. See *Thuraissigiam*, 591 U. S., at 138–139 (describing the doctrine's

Instead, it emphasizes that "[t]he anti-surplusage canon is not an iron rule," and cites several instances in which this Court has declined to apply it. *Ante*, at 12–13. It is true that there are circumstances where the anti-surplusage canon is less salient. For example, unlike here, the canon is less helpful when no alternative interpretation avoids surplusage. See *Microsoft Corp.* v. *i4i L. P.*, 564 U. S. 91, 106 (2011) (declining to apply the canon because "no interpretation" of the statute "avoids excess language"); *Freeman* v. *Quicken Loans, Inc.*, 566 U. S. 624, 635 (2012) (similar). Also, unlike here, the canon may be less relevant in a statutory context, like securities law, where this Court has "long recognized considerable overlap" in statutory

---

relevance in constitutional due process context). The Government posits that courts might have interpreted the clause "present in the United States" to include only noncitizens who are both physically on U. S. soil and had " ' "effected an entry" ' through lawful admission" and that Congress thus added the "arrives in" clause to capture noncitizens who had not yet legally "entered." Brief for Petitioners 22. The majority rightly declines to adopt this argument. First, it is illogical on its own terms as applied to §1225(a). Recall that §1225(a)(1) defines an "applicant for admission" as any noncitizen who is either "present in the United States who has not been admitted or who arrives in the United States." Thus, the Government's reading would mean that a noncitizen "present in the United States who has not been admitted" is somehow one who has already " ' "effected an entry" ' through lawful admission." Second, "present in the United States" cannot reasonably be interpreted as invoking the entry-fiction doctrine. This Court and the Board of Immigration Appeals have long used the term "presence" to describe a noncitizen's physical location and have distinguished that location-based assessment from whether a noncitizen has effected an "entry," which is a distinct legal term of art. See, *e.g.*, *Leng May Ma* v. *Barber*, 357 U. S. 185, 187 (1958); *Matter of K-H-C-*, 5 I. & N. Dec. 312, 317, and n. 8 (BIA 1953). Finally, even assuming Congress was concerned that "present in the United States" would be interpreted to require " ' "entry" ' through lawful admission," Brief for Petitioners 22, that notion is already dispelled by another clause in §1158(a)(1), which clarifies that a noncitizen may apply for asylum "irrespective of such alien's status."

provisions. *Lorenzo* v. *SEC*, 587 U. S. 71, 80 (2019) (collecting cases).

"[T]he canon against surplusage is strongest," however, when, like here, one "interpretation would render superfluous another part of the same statutory scheme." *Marx* v. *General Revenue Corp.*, 568 U. S. 371, 386 (2013); see *United States* v. *Jicarilla Apache Nation*, 564 U. S. 162, 185 (2011) ("'As our cases have noted in the past, we are hesitant to adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law'"); *Mackey* v. *Lanier Collection Agency & Service, Inc.*, 486 U. S. 825, 837, and n. 11 (1988) (collecting cases). It is particularly strange to assume Congress intended the "arrives in" clause to do no work apart from the "present in the United States" clause given that both are not only in the same law but in the very same sentence. See *United States* v. *Taylor*, 596 U. S. 845, 857 (2022) ("[W]e do not lightly assume Congress adopts two separate clauses in the same law to perform the same work"). Nor is it likely that this substantive clause "escaped Congress's notice," as might an "odd word or stray phrase," *Pulsifer*, 601 U. S., at 143, especially given that it is replicated in both §§1225(a)(1) and 1158(a)(1).

The majority proffers a hypothetical reason why Congress adopted the "arrives in" clause even though it is entirely superfluous. It posits that because Congress created expedited removal in IIRIRA, it likely added the "arrives in" clause in §§1225(a)(1) and 1158(a)(1) to "mak[e] it clear that arriving aliens are subject to expedited removal but that even those aliens may apply for asylum." *Ante*, at 14.

It is difficult to credit this account. Setting aside the "arrives in" clause, both §§1225(b) and 1158(a)(1) already make abundantly clear that arriving noncitizens subject to expedited removal may still apply for asylum. Section 1225(b), as the majority acknowledges, *ante*, at 3–4, sets out the detailed expedited-removal process, which specifies

that if a noncitizen "indicates either an intention to apply for asylum under section 1158 of this title or a fear of persecution" during "screening" for expedited removal, the officer must "refer the alien for an interview by an asylum officer." §§1225(b)(1)(B)(i)–(ii). Section 1158(a), in turn, cross-references the expedited-removal provision, stating that any eligible noncitizen "may apply for asylum in accordance with this section or, where applicable, section 1225(b) of this title." Even absent the "arrives in" clause, these statutes could hardly be clearer that those subject to expedited removal may still apply for asylum, thus negating the majority's explanation for Congress's inclusion of the "arrives in" clause.

In the end, the majority does get one thing right: "Arriving" noncitizens do belong to a distinct legal subcategory. This subcategory is best understood to include noncitizens who walk up to ports of entry but have not yet stepped foot on U. S. territory. See *supra*, at 8–15. The better interpretation is thus that Congress used the term "arrives in the United States" in §§1225(a)(1) and 1158(a)(1) to capture this group of people because the "present in the United States" clause does not already capture them. Only this construction "give[s] effect . . . to every clause" of these statutes, *Loughrin*, 573 U. S., at 358, and keeps them both logically and historically consistent.[7]

C

The complete superfluity of the majority's construction might be understandable if there were reason to believe that doing so avoided anomalous results or otherwise conformed with the purpose of these statutes. The majority's interpretation, however, does neither.

[7] The legislative history of the relevant provisions will be discussed further below. See *infra*, at 24–33.

1

This Court has previously recognized that immigration statutes and procedures should not be construed to "create a perverse incentive to enter at an unlawful rather than a lawful location." *Department of Homeland Security* v. *Thuraissigiam*, 591 U. S. 103, 140 (2020). Yet, the majority's construction does exactly that: It tells asylum seekers that they may apply for asylum if they can make it across the border illegally but that they cannot apply if they patiently wait at the edge of a port of entry.

The majority contends that this concern is "overstated" because illegal entry carries other adverse legal consequences that should discourage asylum seekers. See *ante*, at 17–18 (noting criminal liability and ineligibility for certain state and local public benefits). The point, however, is not that illegal entry always produces a net windfall for asylum seekers; it is that Congress was unlikely to devise a system in which asylum is available to those who unlawfully set foot over the border, but not to those who attempt to comply with the law and are physically blocked from entering at the threshold of a port of entry by an immigration officer.

It is also the unfortunate reality that, despite the adverse consequences the majority cites, many asylum seekers are desperate enough to flee the persecution they face in their home countries that they are willing to run significant risks to apply for asylum. Far from "overstated," this counterproductive incentive structure in fact bore out under the metering policy. In 2018, OIG reported that the policy's "unintended consequences" included that it "le[d] some aliens who would otherwise seek legal entry into the United States to cross the border illegally." DHS, Special Review—Initial Observations Regarding Family Separation Issues Under the Zero Tolerance Policy 7 (Sept. 2018), https://www.org.dhs.gov/sites/default/files/assets/2018-10/OIG-18-8-Sep18.pdf (archived at https://perma.cc/LZG3-

5FSE); *ibid.* (reporting that a Border Patrol supervisor saw "an increase in illegal entries when aliens [we]re metered at ports of entry"). For example, OIG described that one woman "had been turned away three times by an officer on [a] bridge before deciding to take her chances on illegal entry." *Ibid.* The metering policy also incentivized some asylum seekers to "ru[n] down the vehicle lanes at ports of entry" in an effort to get across the boundary. App. 214–215; see *id.*, at 215 (describing such incidents at several ports of entry).

There is no need to construe §§1225(a) and 1158(a) to produce such anomalous results. See *American Tobacco Co.* v. *Patterson*, 456 U. S. 63, 71 (1982) ("Statutes should be interpreted to avoid . . . unreasonable results whenever possible"). The simple answer is that these statutes mandate inspection of, and allow asylum applications from, all noncitizens who come to a port of entry, even if they have not yet stepped across the border.

2

The majority's interpretation of §§1225(a) and 1158(a)(1), moreover, vests limitless discretion in the Executive Branch to abandon its inspection and processing duties. If, as the majority holds, these mandatory statutory duties are not triggered until a noncitizen physically crosses the border, then the Government can easily ignore all these duties by preventing people from stepping across, as it did under the metering policy.

This result is incompatible with the mandatory processes created by these statutes, which only selectively vest discretion in the Executive Branch. See *Galvan* v. *Press*, 347 U. S. 522, 531 (1954) (explaining that "the formulation" of "[p]olicies pertaining to the entry of aliens and their right to remain here" is "entrusted exclusively to Congress"). In describing the Executive Branch's duties at the border, the inspection and expedited-removal provisions repeatedly

use the word "'shall,'" thus creating "'discretionless obligations.'" *National Assn. of Home Builders* v. *Defenders of Wildlife*, 551 U. S. 644, 661 (2007). All noncitizens "who are applicants for admission or otherwise seeking admission or readmission to or transit through the United States *shall* be inspected by immigration officers." §1225(a)(3) (emphasis added). If a noncitizen who is being inspected through the expedited-removal process "indicates either an intention to apply for asylum under section 1158 . . . or a fear of persecution," the "officer *shall* refer the alien for an interview by an asylum officer," §1225(b)(1)(A)(ii) (emphasis added); the "asylum officer *shall* conduct interviews . . . either at a port of entry or at such other place designated by the Attorney General," §1225(b)(1)(B)(i) (emphasis added); and, if the asylum officer determines that the noncitizen "has a credible fear of persecution," the noncitizen "*shall* be detained for further consideration of the application for asylum," §1225(b)(1)(B)(ii) (emphasis added).

These provisions vest discretion in the Executive Branch at certain points in the process. For instance, although the Government is required to accept asylum applications from arriving noncitizens, the ultimate decision whether to grant asylum resides with the Government. See §1158(b)(1)(A) (explaining when the Government "may grant asylum"). Similarly, although the Government must inspect arriving noncitizens, "the Attorney General may return" a noncitizen "who is arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States" while their removal proceedings are "pending." §1225(b)(2)(C). Taken together, these provisions spell out a detailed set of mandatory procedures that selectively vests some discretion in the Government but only when they specifically say so.

Yet the majority's construction allows immigration officers to circumvent this detailed statutory scheme by simply preventing noncitizens from stepping across the border. So

long as officers turn noncitizens back, they need not inspect them, nor assess their eligibility for expedited removal, nor consider whether they indicate an intention to apply for asylum or a fear of persecution, nor refer them to an asylum officer. Sections 1225(a) and 1158(a)(1) should not be construed to "open a loophole [that] allow[s] easy evasion of the statutory provision[s'] basic purpose." *County of Maui* v. *Hawaii Wildlife Fund*, 590 U. S. 165, 180 (2020); see *Whitman* v. *American Trucking Assns., Inc.*, 531 U. S. 457, 485 (2001) (explaining that statutes should not be construed "in a way that completely nullifies textually applicable provisions meant to limit [the Government's] discretion").

The majority responds by claiming that the metering policy "merely delayed entry . . . as a way of improving a situation that both interfered with the proper conduct of inspection and created unsanitary, inhumane, and sometimes dangerous conditions at ports of entry." *Ante*, at 18. As a factual matter, that is untrue. See *supra*, at 4–5. Under the metering policy, noncitizens were often turned away "regardless of the port's actual capacity and capability," App. 397, 408, without being given future appointments. Border officials also failed to take "any steps to keep track of who was being turned away or otherwise allo[w] them to open asylum applications." 138 F. 4th, at 1122. That is why the Ninth Circuit held that the metering policy constituted withholding of its mandatory duties, not mere "dela[y]," which is permissible so long as the delay is not "unreasonabl[e]." 5 U. S. C. §706(1).

More to the point, the majority's recharacterization of the metering policy as a "mere delay" is immaterial to its holding. Neither the majority's holding nor its analysis turns on whether immigration officials block noncitizens from stepping foot onto U. S. soil because of legitimate capacity issues at ports of entry, for other policy reasons, or for no reason at all. Nor does it matter whether a noncitizen's entry was blocked for a few hours, a few months, or forever.

As long as the Government successfully prevents noncitizens from crossing the threshold at the border, no matter how long they wait, the majority holds that the Government has no duty to inspect them and no duty to accept their asylum applications.

It is for this same reason that the majority's purported "confiden[ce]" that a future policy that "prevent[s] all potential arriving asylum applicants from ever reaching the point where an application could be filed . . . would be quickly challenged" is meaningless. *Ante*, at 18. Perhaps such a policy would be challenged, but the rule adopted by the majority today forecloses any chance of success for such a challenge: So long as the noncitizens are kept one inch away from U. S. soil, the majority holds that the Government has no duty to inspect them or accept their asylum applications. Sections 1225(a) and 1158(a)(1) should not be construed to allow the Executive Branch so easily to circumvent the detailed and mandatory set of procedures that Congress has enacted.

III

Respondents' construction also comports best with the history of both statutes. As the majority explains, before IIRIRA's enactment, §1158(a)(1) covered noncitizens at the border who had not crossed over because it allowed noncitizens who were "physically present in the United States or at a land border or port of entry" to apply for asylum. *Ante*, at 10 (quoting §1158(a) (1994 ed.); emphasis deleted). In the majority's view, Congress's decision in IIRIRA to replace this "at a land border or port of entry" clause with the current "arrives in the United States" clause suggests that Congress intended to change the scope of the provision substantively, eliminating protections for those at the border. *Ante*, at 11 (internal quotation marks omitted).

There is no doubt that "'[w]hen Congress amends legislation,'" this Court ordinarily "'presume[s] it intends the

change to have real and substantial effect.'" *Van Buren* v. *United States*, 593 U. S. 374, 393 (2021). This presumption may be overcome, however, if there is evidence to the contrary. See, *e.g.*, *United States* v. *Hansen*, 599 U. S. 762, 777–778 (2023) (declining to attribute broad change in meaning to statutory amendment because statutory history suggested amendment was an effort to "'streamlin[e]'" the statute); *BNSF R. Co.* v. *Loos*, 586 U. S. 310, 320–321 (2019) (rejecting presumption because legislative history and federal regulations interpreting an amendment showed Congress had no intent to change the statute's substantive meaning); *Wilson*, 503 U. S., at 336–337 (rejecting presumption because statute could not otherwise function sensibly). On the other side of the ledger, "'[i]t is not lightly to be assumed that Congress intended to depart from a long established policy.'" *Id.*, at 336.

Here, a complete understanding of the statutes' history shows both that the immigration laws have long afforded protection to those arriving at the border and that IIRIRA's amendments did not narrow the scope of these provisions to exclude those who are arriving but have not yet crossed.

A

Start with §1225(a). Since 1917, the inspection mandate has covered all noncitizens who are arriving at ports of the United States. Further, by amending §1225(a)(1) to apply to those who "arriv[e] in the United States," Congress did not eliminate the inspection requirement for arriving noncitizens who have not yet stepped across the border.

To begin, the inspection mandate has covered those who arrive at ports, regardless of where their feet are, since well before IIRIRA. Starting in 1917, the Immigration Act mandated that "[a]ll aliens arriving at ports of the United States shall be examined by at least two immigrant inspectors." Immigration Act, §16, 39 Stat. 886; see §15, *id.*, at 885 ("[U]pon the arrival at a port of the United States of any

vessel bringing aliens[,] it shall be the duty of the proper immigration officials to go or to send competent assistants to the vessel and there inspect all such aliens"). This iteration of the inspection mandate did not depend on whether the noncitizen had touched U. S. soil; what mattered was that they were "at" a port. This statute was later amended in 1952, through the passage of the Immigration and Nationality Act (INA). The INA's inspection mandate stated that the "inspection . . . of aliens . . . seeking admission or readmission to, or the privilege of passing through the United States shall be conducted by immigration officers" and that "[a]ll aliens arriving at ports of the United States shall be examined by one or more immigration officers." §235(a), 66 Stat. 198–199. Again, the inspection duty was triggered when noncitizens "arriv[ed] at ports," not when they stepped foot onto U. S. territory. *Ibid.*

IIRIRA amended the inspection mandate to apply to those who "arriv[e] in the United States," 8 U. S. C. §1225(a)(1), but Congress did not eliminate the inspection requirement for arriving noncitizens who have not yet stepped across the border. IIRIRA instead enacted two different substantive changes. First, it specified in §§1225(a)(1) and (3) that any noncitizen "present in the United States" qualifies as an "applicant for admission" and that such a noncitizen must also be inspected to have lawful status. Second, it created the expedited-removal process in §1225(b) to funnel a subset of arriving noncitizens into an accelerated process.

Before IIRIRA, the immigration system was split into "two types of proceedings in which" noncitizens could "be denied the hospitality of the United States: deportation hearings and exclusion hearings." *Landon* v. *Plasencia*, 459 U. S. 21, 25 (1982). Noncitizens seeking to enter the United States, including those at the border who had not stepped foot onto U. S. soil, were placed into exclusion proceedings, while those "already physically in the United States" were

subject to deportation hearings. *Ibid.*[8] One incongruity in that system was that deportation proceedings conferred greater procedural protections than exclusion proceedings, which benefited noncitizens who entered illegally without inspection compared to those who showed up legally at ports of entry. See *id.*, at 25–27.

IIRIRA addressed this issue by "abolish[ing] the distinction between exclusion and deportation procedures and creat[ing] a uniform proceeding known as 'removal,'" which would apply to all noncitizens regardless of whether they were arriving or already inside the country. *Vartelas* v. *Holder*, 566 U. S. 257, 262 (2012). To facilitate this transition, "Congress made 'admission' the key word, and defined admission to mean 'the lawful entry of the alien into the United States after inspection and authorization by an immigration officer.'" *Ibid.* It correspondingly modified §1225(a) by defining an "applicant for admission" as any noncitizen who was either "present in the United States who has not been admitted or who arrives in the United States," §1225(a)(1), and then adding that inspection is required of all noncitizens "who are applicants for admission or otherwise seeking admission," §1225(a)(3).

This change, properly contextualized, did not exclude those at the border from being "applicants for admission," but rather "redefine[d] applicants for admission to include

---

[8] Before IIRIRA, noncitizens at the border were placed into exclusion proceedings whether or not they had physically stepped foot onto U. S. soil. *Landon*, 459 U. S., at 23, 28 (noncitizen properly placed in exclusion proceedings when "attempt[ing] to cross the international border . . . at the port of entry"); *Kwong Hai Chew* v. *Colding*, 344 U. S. 590, 595 (1953) (noncitizen placed in exclusion proceedings when aboard a vessel arriving in New York and "not permitted to land"); *id.*, at 596, n. 4 (explaining that exclusion generally meant "preventing someone from entering the United States who is actually outside of the United States"); see also *Hernandez* v. *Casillas*, 520 F. Supp. 389, 394, n. 2 (SD Tex. 1981) ("presenting oneself at the international bridge" "[o]bviously . . . constitute[s] . . . an application for admission" warranting "an exclusion hearing").

aliens who entered the United States without inspection." 62 Fed. Reg. 10312 (describing IIRIRA's changes). As the Committee Report explained, IIRIRA was designed to ensure that noncitizens "who have entered the United States without inspection" do not "gain equities and privileges in immigration proceedings that are not available to aliens who present themselves for inspection at a port of entry." H. R. Rep. No. 104–469, p. 225 (1996); see *id.*, at 157 (explaining that IIRIRA subjected noncitizens who entered unlawfully to "the same burden" as someone "seeking to be admitted at a port of entry"); *id.*, at 228 (similar).[9]

In tandem with abolishing the distinction between exclusion and deportation proceedings, IIRIRA enacted a second substantive change to §1225: the creation of expedited removal in §1225(b). Section 1225(b) requires that certain arriving noncitizens (such as those without valid travel documents) be inspected and removed through the expedited-removal process. §1225(b)(1)(A)(i). By enacting §1225(b), Congress evinced no intent to allow immigration officers to turn away arriving noncitizens who have not stepped onto U. S. soil, *i.e.*, those who would have been subject to exclusion proceedings in the pre-IIRIRA system. Instead, as the Conference Report on IIRIRA explained, Congress funneled a subset of those arriving noncitizens through expedited removal in order to promote faster inspection and removal "while [still] providing an opportunity for such an alien who claims asylum to have the merits of his or her claim promptly assessed." H. R. Conf. Rep. No. 104–828, p. 209 (1996).

Finally, there is no other evidence that Congress amended §1225(a) to create the "one foot across the border" rule that the majority today imposes. Indeed, the

---

[9] The amended language in §§1225(a) and 1158(a) was originally proposed in H. R. 2202, 104th Cong., 1st Sess., §1 (1995), and later adopted in IIRIRA.

Committee Report described IIRIRA's amended §1225(a) as applying to any noncitizen who "arrives at the United States, whether or not at a designated port of arrival," H. R. Rep. No. 104–469, at 228, reinforcing again that the majority's fixation on the preposition "in" is misplaced.[10] The federal regulations implementing IIRIRA understood §1225 the same way as soon as IIRIRA was passed. See *supra*, at 12. The history of §1225(a) thus reinforces that it applies to all who are arriving, including those who have not yet crossed the border.

B

The history of the asylum statute, §1158(a)(1), similarly shows that IIRIRA did not narrow its scope.

Section 1158(a) and the rest of the current asylum system developed in response to the international moral reckoning that followed the Holocaust and World War II. One infamous incident, the voyage of the M. S. *St. Louis*, is emblematic. In 1939, over 900 Jewish refugees attempted to flee persecution in Nazi Germany by setting sail aboard the M. S. *St. Louis*, which was headed to Cuba and the United

[10] One of IIRIRA's chief architects, Representative Lamar Smith, corroborated respondents' interpretation in a letter to the Immigration and Naturalization Service when it was adopting regulations to implement IIRIRA in 1997. Smith explained that "[t]he term 'arriving alien' was selected specifically by Congress in order to provide a flexible concept that would include all aliens who are in the process of physical entry past our borders" and that any "alien apprehended at any stage of this process, whether attempting to enter, at the point of entry, or just having made entry, should be considered an 'arriving alien.'" Hearing before the Subcommittee on Immigration and Claims of the House Committee on the Judiciary, 105th Cong., 1st Sess., 17–18 (1997) (correspondence from Chairman Smith to Immigration and Naturalization Service (Feb. 3, 1997)). Smith also noted that "'[a]rrival' in this context should not be considered . . . instantaneous but, consistent with common usage, as a process." *Id*., at 18.

States.[11] The ship docked in the Havana harbor for days, but the Cuban Government refused to allow the fleeing passengers offboard. The ship then sailed near the Miami coastline, but the U. S. Government also turned them away in part because the immigration laws at the time had strict country quotas and the relevant quota was already filled for that year. The ship sailed to Canada and was again turned away. It eventually returned to Europe. Tragically, over 500 of the refugees that had attempted to flee were trapped in Western Europe under German control, and over 250 of them died during the Holocaust. Most of them were "murdered in the killing centers of Auschwitz and Sobibór" and "the rest died in internment camps, in hiding, or attempting to evade the Nazis." S. Ogilvie & S. Miller, Refuge Denied: The *St. Louis* Passengers and the Holocaust 174–175 (2006).

In the wake of World War II, the United States negotiated international treaties with other nations to prevent future incidents like the voyage of the M. S. *St. Louis*. This culminated in the Protocol Relating to the Status of Refugees, Jan. 31, 1967, 19 U. S. T. 6223, T. I. A. S. No. 6577 (1967 Protocol), to which the United States acceded in 1968.[12] The 1967 Protocol, among other things, prohibits "refoulement," meaning that contracting states may not "expel or return ('refouler') a refugee in any manner whatsoever to the frontiers of territories where" she would face persecution based on her protected characteristics. *Id.*, at 6276; see *Sale* v. *Haitian Centers Council, Inc.*, 509 U. S. 155, 181–182 (1993) (explaining that the terms of this

[11] See United States Holocaust Memorial Museum, Voyage of the St. Louis, https://encyclopedia.ushmm.org/content/en/article/voyage-of-the-st-louis (archived at: https://perma.cc/KEC4-VQDC).

[12] The United Nations first established a convention protecting European refugees in the aftermath of World War II. See Convention relating to the Status of Refugees, July 28, 1951, 189 U. N. T. S. 150. These protections were extended to all refugees in the 1967 Protocol.

nonrefoulement obligation "imply that 'return' means a defensive act of resistance or exclusion at a border").

"[T]o bring United States refugee law into conformance with" the 1967 Protocol, Congress passed the Refugee Act of 1980. *INS* v. *Cardoza-Fonseca*, 480 U. S. 421, 436 (1987). To comply with the nonrefoulement obligation, the Act prohibited the "deport[ation] or return [of] any alien . . . to a country" if that person would be persecuted on account of protected characteristics, a mandatory form of relief called withholding of removal. *Id.*, at 429–430, n. 9 (citing 8 U. S. C. §1253(h)(1)). It also standardized the asylum-eligibility criteria by enacting §1158(a)(1), which at the time permitted noncitizens to apply for asylum if they were "physically present in the United States or at a land border or port of entry, irrespective of [their] status." Refugee Act of 1980, §201(b), 94 Stat. 105. Although these two forms of relief are distinct, they were (and still are) accessible through the same form. See Brief for Petitioners 32; 8 CFR 208.3(b). Thus, as the plain text stated, the Refugee Act permitted anyone who was "at a land border or port of entry," even if they had not stepped foot onto U. S. soil, to apply for asylum and withholding of removal. See *ante*, at 10 (agreeing on the Refugee Act's reach); see also *INS* v. *Stevic*, 467 U. S. 407, 423, n. 18 (1984) (explaining that §208 of the Refugee Act applied to noncitizens "either in the United States or at our borders"); *Sale*, 509 U. S., at 177 (agreeing that the Refugee Act "authorize[d] relief for [noncitizens] at the border seeking protection as refugees").[13]

---

[13] In *Sale*, the Court held that neither the withholding of removal statute nor the 1967 Protocol restricted the Government's ability to interdict noncitizens "on the high seas," *i.e.*, "beyond the territorial waters of the United States." 509 U. S., at 159, 177. *Sale*, however, did not address whether, as here, such obligations apply to U. S. immigration officers who are standing in U. S. territory and physically blocking noncitizens from crossing the border.

The central question, then, is whether Congress intended to narrow the scope of §1158(a)(1) to only noncitizens who stepped foot across the border when, in enacting IIRIRA, it amended the Refugee Act's language to the current "arrives in the United States (whether or not at a designated port of arrival . . . )" language. Given that §1158(a)(1) was originally enacted to comply with the United States' treaty obligations under the 1967 Protocol, it would be strange to construe Congress as abdicating those obligations with this amendment without any affirmative indication that it sought to do so. Congress, after all, "'does not alter the fundamental details' of an existing scheme with 'vague terms' and 'subtle device[s].'" *Hall* v. *Hall*, 584 U. S. 59, 74 (2018). Nor does this Court normally presume that Congress intends to depart from its international obligations. Cf. *Murray* v. *Schooner Charming Betsy*, 2 Cranch 64, 118 (1804) ("[A]n act of Congress ought never to be construed to violate the law of nations if any other possible construction remains").

Instead, the most plausible explanation for this change is that Congress adopted the "arrives in" language in §1158(a)(1) to conform it to the newly reworked inspection mandate and expedited-removal procedures, both of which now refer to "arriving" noncitizens. See *supra*, at 27–29. The legislative history confirms this understanding. The Committee Report on IIRIRA stated that §1158(a)(1) continues to allow "any alien who is physically present in the United States or at the border of the United States, regardless of status, . . . to apply for asylum." H. R. Rep. No. 104–469, at 259. The Report evinced no intent by Congress to narrow the scope of §1158(a)(1) solely to those who cross the border, nor has any party pointed to any other evidence of such an intent. See *id.*, at 173–176 (describing other changes to the asylum system with no mention of narrowing scope of §1158(a)(1)); *id.*, at 175 (describing intention to

"streamlin[e] the asylum process, while ensuring that no alien will be returned to persecution").

* * *

In the end, the histories of §§1225(a) and 1158(a)(1) reinforce rather than undermine the understanding that these statutes permit noncitizens in the process of arriving, regardless of where their feet are, to apply for asylum.

IV

Finally, the majority's invocation of the presumption against extraterritoriality to "tip the scale" in its favor is misplaced. *Ante*, at 15. Under this canon of statutory construction, the Court generally construes federal statutes "to have only domestic application" unless Congress clearly says otherwise. *RJR Nabisco, Inc.* v. *European Community*, 579 U. S. 325, 335 (2016). The "basic premise" of the doctrine is that "'United States law governs domestically but does not rule the world.'" *Ibid.* It thus reflects the "'commonsense notion that Congress generally legislates with domestic concerns in mind'" and "serves to avoid the international discord that can result when U. S. law is applied to conduct in foreign countries." *Id.*, at 335–336.

Accepting that Congress did not clearly give either §1225(a) or §1158(a)(1) an extraterritorial scope, the presumption against extraterritoriality does not advance the majority's case. This Court has held that "[t]he ultimate question regarding permissible domestic application turns on the location of the conduct relevant to the focus" of a statute. *Abitron Austria GmbH* v. *Hetronic Int'l, Inc.*, 600 U. S. 412, 422 (2023). Here, all the relevant conduct is domestic, with CBP officials stationed inside the United States allegedly violating both their statutory duties and asylum seekers' rights by physically blocking individuals at the border from entering and refusing to allow them to apply for asylum. Far from seeking to have U. S. law "'rule the world,'"

*RJR Nabisco*, 579 U. S., at 335, respondents' position would simply hold U. S. officials stationed on the U. S. side of the border to their domestic legal obligations.[14] Doing so is fully consistent with the assumption that Congress generally has "'domestic,'" not foreign, "'concerns in mind.'" *Id.*, at 336. Sections 1225(a) and 1158(a)(1) are part of a detailed regulatory scheme specifically concerned with, among other things, the processing of noncitizens at the U. S. border.

*  *  *

Congress passed the Refugee Act in 1980 because it did not want this country to repeat the mistakes of its past. Yet if the refugees on the M. S. *St. Louis* were to walk up to a port of entry on our southern border today, the majority's interpretation would allow immigration officers to refuse even to consider their asylum applications by physically blocking them from stepping foot onto U. S. soil. The majority's interpretation permits the Government to do that even if the refugees complied with all applicable laws and regulations, even if the port had ample capacity to inspect them, and even if turning them back would result in the very persecution from which they narrowly escaped. The consequences of today's decision are predictable. More people will die. More people will attempt to cross the border illegally, and some will make it while others will not. More

---

[14] This case is thus far afield from other cases in which the presumption against extraterritoriality did significant work. See, *e.g.*, *RJR Nabisco*, 579 U. S., at 332 (addressing alleged scheme involving black-market smuggling between Colombian and Russian traffickers in Europe and South America); *Kiobel* v. *Royal Dutch Petroleum Co.*, 569 U. S. 108, 113 (2013) (addressing attempted use of Alien Tort Statute to challenge alleged atrocities committed by foreign corporations in Nigeria); *Morrison* v. *National Australia Bank Ltd.*, 561 U. S. 247, 251, 262–265 (2010) (addressing attempted use of U. S. securities law to regulate the purchase or sale of securities traded only on foreign exchanges). In all these cases, the Court relied on the presumption to resist the application of domestic law to regulate conduct taking place outside the United States.

people will be forced to walk along the U. S.-Mexico border in dangerous conditions, trying to find a port that will inspect them. More people will turn back and be subjected to violence because of something they cannot or should not have to change about themselves, such as their race, religion, nationality, or political opinion. Because this is neither what Congress said nor what its words permit, I respectfully dissent.

# SUPREME COURT OF THE UNITED STATES

No. 25–5

MARKWAYNE MULLIN, SECRETARY OF HOMELAND SECURITY, ET AL., PETITIONERS *v.* AL OTRO LADO, A CALIFORNIA CORPORATION, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 25, 2026]

JUSTICE JACKSON, dissenting.

Today, the Court issues an advisory opinion on the lawfulness of metering—a policy that has not been in place for almost five years and that the Government has no concrete plans to reinstate. In its rush to greenlight this retired practice, the majority elides serious justiciability concerns and decides legal issues entirely in the abstract. With potential mootness problems and without a factual record establishing how metering works in practice, the writ of certiorari in this case should never have been granted. I respectfully dissent from the Court's unwise decision to plow ahead nevertheless. I also join JUSTICE SOTOMAYOR's dissenting opinion because, in my view, her understanding of the Government's asylum-processing obligations under 8 U. S. C. §§1158(a)(1) and 1225(a)(1) is correct.

## I

The majority barely mentions the most important factual development that occurred below: While respondents' suit was pending in the District Court, the Department of Homeland Security (DHS) rescinded its metering policy. See App. 135–139. The metering policy—which DHS first began implementing in 2016 and eventually formalized through written guidance in 2018—was the basis for

respondents' claim for declaratory relief in the District Court. See *id*., at 120–123. Respondents asserted that, by implementing the metering policy, DHS had unlawfully withheld access to the asylum and inspection process that §§1158(a)(1) and 1225(a)(1) provide to all noncitizens who "arriv[e] in the United States." It was to prevent future violations of these statutory provisions that respondents requested a judgment declaring the metering policy unlawful.

Agreeing with respondents' interpretation of §§1158(a)(1) and 1225(a)(1), the District Court entered summary judgment in their favor on September 2, 2021. App. to Pet. for Cert. 406a–407a, 422a. But on November 1, 2021—before the District Court had ordered any relief—DHS rescinded its metering guidance. App. 135–139. Despite this significant turn of events, the District Court entered the requested declaration on August 23, 2022. App. to Pet. for Cert. 253a. The District Court agreed with both parties that declaratory relief would still "serve a useful purpose in clarifying" the Government's obligations under §§1158(a)(1) and 1225(a)(1). *Al Otro Lado, Inc.* v. *Mayorkas*, 619 F. Supp. 3d 1029, 1049 (SD Cal. 2022). The District Court did not address whether it remained appropriate to provide the Government with such clarification—*i.e.*, it did not address whether a live case or controversy remained.

## II

Article III of the Constitution empowers federal courts to resolve "Cases" or "Controversies" and nothing more. The case-or-controversy requirement "limits our power as judges: It means that we can only resolve concrete legal disputes—those with real stakes for real people." *Diamond Alternative Energy, LLC* v. *EPA*, 606 U. S. 100, 133 (2025) (JACKSON, J., dissenting). In this way, Article III "tends to assure that the legal questions presented to the court will be resolved, not in the rarified atmosphere of a debating

society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *Valley Forge Christian College* v. *Americans United for Separation of Church and State, Inc.*, 454 U. S. 464, 472 (1982).

Article III's limits apply throughout the entirety of a dispute, not just at its outset. Thus, a case or controversy "must be extant at all stages of review, not merely at the time the complaint is filed." *Alvarez* v. *Smith*, 558 U. S. 87, 92 (2009) (internal quotation marks omitted). Federal courts lack jurisdiction over cases that become "moot" during the course of litigation because "the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *Chafin* v. *Chafin*, 568 U. S. 165, 172 (2013) (internal quotation marks omitted). By insisting on the continued existence of a "live controversy," our mootness rules ensure that we do not issue "advisory opinions on abstract propositions of law." *Hall* v. *Beals*, 396 U. S. 45, 48 (1969) (*per curiam*).

The Court is surprisingly cavalier with respect to these requirements today. Now that the metering policy is no longer in place, it is doubtful that a pronouncement about its lawfulness can "affect the rights of [the] litigants in the case before [us]." *North Carolina* v. *Rice*, 404 U. S. 244, 246 (1971) (*per curiam*). And in the absence of a live dispute "touching the legal relations of [the] parties," *ibid.* (internal quotation marks omitted), we are left with only a hypothetical one requiring rank speculation over how §§1158(a)(1) and 1225(a)(1) might apply to a future policy. But "a dispute solely about the meaning of a law, abstracted from any concrete actual or threatened harm, falls outside the scope of the constitutional words 'Cases' and 'Controversies.'" *Alvarez*, 558 U. S., at 93.

To avoid this jurisdictional problem, the majority points to the voluntary-cessation exception to mootness. It maintains that the Court has jurisdiction because "respondents have not carried their burden to establish that it is

'absolutely clear' that the Government would not 'reimpose' metering if it could." *Ante,* at 8, n. 7 (quoting *West Virginia* v. *EPA*, 597 U. S. 697, 720 (2022)). But we have "given mixed signals concerning how likely recurrence needs to be for this exception to mootness doctrine to apply." W. Baude, J. Goldsmith, J. Manning, J. Pfander, & A. Tyler, Hart and Wechsler's The Federal Courts and the Federal System 250–251 (8th ed. 2025). And, here, the Government has not expressed an intent to reinstate metering; it states only that "it seeks to retain *the option* of reviving the practice." Brief for Petitioners 7 (emphasis added).

What is more, we generally apply the voluntary-cessation exception in cases where the plaintiff argues that application of the mootness doctrine will "'leave [t]he defendant . . . free to return to his old ways.'" *Friends of the Earth, Inc.* v. *Laidlaw Environmental Services (TOC), Inc.*, 528 U. S. 167, 189 (2000) (quoting *City of Mesquite* v. *Aladdin's Castle, Inc.*, 455 U. S. 283, 289, n. 10 (1982); alterations in original). The exception thus allows a plaintiff to obtain a court's review where there is reason to believe that the defendant's allegedly harmful conduct will resume if the case is declared moot. See *United States* v. *W. T. Grant Co.*, 345 U. S. 629, 632, n. 5 (1953). But, in the case before us now, it is only *the defendant* (*i.e.*, the Government) that seeks this Court's review of its allegedly harmful conduct. See Brief for Petitioners 3. And the Government does not need an opinion from this Court as to whether its rescinded guidance violated §§1158(a)(1) and 1225(a)(1) to resume metering in the future; it can simply issue new guidance. So on these facts the voluntary-cessation exception is an odd fit.*

---

*If there was concern that denying certiorari would have allowed the Ninth Circuit's decision to remain on the books and continue to bind the Government, see *ante,* at 8, n. 7, this Court could have vacated the judgment below. There are grounds for doing so: The District Court likely abused its equitable discretion by declaring unlawful a policy that was no longer in place, and the Ninth Circuit erred by not considering this

Odder still is the fact that, before the Ninth Circuit, the Government suggested that its rescission of the guidance created jurisdictional problems. See Supp. Brief for Appellants in Response to Court Order in No. 22–55988 etc., p. 42, n. 5. Before us, it asserted the opposite. See Tr. of Oral Arg. 26. This shift in positions calls for consideration of whether the Government's arguments are sincere and reasonable, rather than a ploy to obtain this Court's review of a now-defunct policy.

Ultimately, the Government's rescission of the metering policy raises jurisdictional questions that this Court needs to resolve before reaching the merits. See *Steel Co.* v. *Citizens for Better Environment*, 523 U. S. 83, 94–95 (1998). But the parties did not address mootness in their merits-stage briefing, and the majority fails to give this crucial matter the attention it warrants. To me, all this suggests that the better course was to refrain from exercising certiorari jurisdiction in this case.

III

Even assuming Article III presents no obstacle to our review, there was no need to decide the issues presented in this case today. As is often true, "[t]he Court had plenty of other options." *Diamond Alternative Energy*, 606 U. S., at 134 (JACKSON, J., dissenting). Our docket is "discretionary," and "no one is now subject to" metering, so "there was no reason to reach out to decide this case." *West Virginia*, 597 U. S., at 755 (KAGAN, J., dissenting). We should have waited for the Government to reinstate a metering policy before reaching the merits. Had we done so, we would have a record establishing how metering works on the ground and how it interacts with the Government's obligations under §§1158(a)(1) and 1225(a)(1).

———————

issue. Taking this course of action would not have required this Court to opine on the merits of the legal issues.

Our lack of any factual basis for understanding these critical points was apparent at oral argument. There were multiple questions, for instance, about the rate at which immigration officials can process noncitizens at ports of entry. That rate might indicate how far into Mexican territory a noncitizen subject to metering must wait in line before he can present an asylum claim to an immigration officer. See Tr. of Oral Arg. 70–72. The answer, in turn, might affect our conclusions about when the noncitizen is deemed to have "arrive[d] in" the United States under §§1158(a)(1) and 1225(a)(1). Without such an answer, the Court interprets those provisions in a vacuum—an unreliable endeavor at best.

The absence of a current metering policy has plainly infected the Court's ultimate analysis, too. The majority grounds its reasoning in metaphors about a linebacker and a houseguest and a piece of mail. *Ante*, at 8–9. (It must do this, of course, because it has no actual facts to grapple with.) No one knows how, if at all, the reasoning drawn from these metaphors will map on to the realities of a future metering policy. All we can do now is guess.

But the Court is not a law student puzzling through a difficult cold call. When we issue opinions, we create legal rules with real-world impact. It is for this very reason that our precedents require "a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *Valley Forge*, 454 U. S., at 472. Because we so obviously lack that context here, we should not have decided this case.